UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, ) | |
| As Guardian of the Person and Property of ) | |
| KARYN A. KERRIS, ) | |
|  ) | |
| Plaintiffs, ) | |
|  ) | |
| v.  ) | Civil Action No. 1:05CV02086 |
|  ) | |
| Georgetown University Hospital, ) | Judge Paul L. Friedman |
| GEORGETOWN UNIVERSITY, t/a ) | |
| Georgetown University, and ) | |
| VANCE E. WATSON, M.D., ) | |
|  ) | |
| Defendants. ) | |

DEFENDANTS' MOTION TO DISMISS
COUNTS III, IV, VI, VII, IX, X, XI, and XII,
PURSUANT TO F.R.C.P. 12(b)(6)

AND

MOTION FOR SUMMARY JUDGMENT ON COUNTS II, VI, AND IX
(IN THE ALTERNATIVE FOR COUNTS VI AND IX),
PURSUANT TO F.R.C.P. 56(b)

AND

MOTION TO STRIKE CERTAIN ALLEGATIONS FROM THE
AMENDED COMPLAINT,
PURSUANT TO F.R.C.P. 12(f)

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated: March 6, 2006          By:    //s// Megan E. Hills_____
                                    Megan E. Hills ((D.C. Bar #437340)
                                    Nicolas Muzin (*Bar Membership in New York &
                                    the District of Columbia pending*)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)
mhills@wc.com
nmuzin@wc.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, ) | |
| As Guardian of the Person and Property of ) | |
| KARYN A. KERRIS, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:05CV02086 |
| ) | |
| Georgetown University Hospital, ) | Judge Paul L. Friedman |
| GEORGETOWN UNIVERSITY, t/a ) | |
| Georgetown University, and ) | |
| VANCE E. WATSON, M.D., ) | |
| ) | |
| Defendants. ) | |

## TABLE OF CONTENTS

FACTUAL BACKGROUND……………………………………………………..2

ARGUMENT…………………………………………………………………….8

I.  NO CLAIM FOR STRICT PRODUCTS LIABILITY (COUNT III) OR
    BREACH OF WARRANTY, EITHER EXPRESS OR IMPLIED (COUNTS IV
    AND V), LIES AGAINST DEFENDANTS……………………………………..9

II. PLAINTIFFS' LOSS OF CONSORTIUM CLAIM (COUNT VII) IS BARRED
    BY THE STATUTE OF LIMITATIONS……………………………………12

III.PLAINTIFFS' CLAIM FOR FRAUD (COUNT VI) MUST BE DISMISSED AS
    PLAINTIFFS FAIL TO PLEAD ITS ELEMENTS………………… ..……..13

IV.PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES (COUNT IX) SHOULD
    BE DISMISSED…………………………………………………………….15

V.  AS A MEDICAL PRACTITIONER USING HIS SKILL AND JUDGMENT TO
    TREAT MS. KERRIS, 21 U.S.C. § 360(A)(2), 21 C.F.R. § 812.20(A)(2), AND 21
    U.S.C. § 331(a), (b), (c), (g), and (k) ARE INAPPLICABLE TO THIS CASE
    AND COUNTS X, XI, AND XII SHOULD BE DISMISSED………………….17

PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(b)
THE COURT SHOULD DISMISS COUNTS III, VI, and IX……………………….20

I.  PLAINTIFFS HAVE NO EVIDENCE AND CAN OBTAIN NO EVIDENCE
    THAT DR. WATSON FAILED TO APPRISE MS. KERRIS FULLY OF ALL
    MATERIAL INFORMATION REGARDING HER MEDICAL TREATMENT,
    PLAINTIFFS' LACK OF INFORMED CONSENT CLAIM (COUNT II) MUST
    BE DISMISSED...............................................................................21

II. AS THERE IS NO EVIDENCE SUPPORTING PLAINTIFFS' CLAIM FOR
    LACK OF INFORMED CONSENT, IF NOT DISMISSED PURSUANT TO
    F.R.C.P. 12(b)(6), PLAINTIFFS' CLAIM FOR FRAUD (COUNT VI) MUST BE
    DISMISSED PURSUANT TO F.R.C.P. 56(b)........................................26

III. AS PLAINTIFFS' ONLY INTENTIONAL TORT, FRAUD, MUST BE
    DISMISSED, THE BASIS FOR A CLAIM FOR PUNITIVE DAMAGES
    (COUNT IX) DOES NOT EXIST.....................................................27

PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(f)
THE COURT SHOULD STRIKE ENUMERATED PARAGRAPHS OF
PLAINTIFFS' AMENDED COMPLAINT................................................28

CONCLUSION..............................................................................31

.

## TABLE OF AUTHORITIES

### FEDERAL STATUTES

21 U.S.C. § 331.................................................................................................18, 19, 20

21 U.S.C. § 360.................................................................................................17, 19, 20

### FEDERAL REGULATIONS

21 C.F.R. § 812............................................................................................17, 18, 19, 20

### STATE STATUTES

D.C. Code Ann. § 12-301 ..............................................................................................13

### FEDERAL CASES

*Blincoe v. Luessenhop*, 669 F. Supp. 513 (D.D.C. 1987) ...........................21, 24, 25, 29

*Brooks v. Vitek, Inc.*, 875 F.2d 499 (5th Cir. 1989) ......................................................12

*Calvetti v. Antcliff*, 346 F. Supp. 92 (D.D.C. 2004)(citing *Jemison v. Nat'l Baptist Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972)......................................23

In re *Temporomandibular Joint (TMJ) Implants Products Liability Litigation*, 852 F. Supp. 1019 (D. Minn. 1995), *aff'd*, In re *Temporomandibular Joint (TMJ) Products Liability Litigation*, 97 F.3d 1050 (8th Cir. 1996) ..........................................................................11, 12

*Kozup v. Georgetown University*, 663 F. Supp. 1048 (D.D.C. 1987), *aff'd in part, vacated in part on other grounds*, 851 F.2d 437 (D.C. Cir. 1987) ...................................................................11

*Marsteller v. McClean*, 1 Cranch C.C. 579 (D.C. Cir. 1809), aff'd 7 Cranch (11 U.S.) 156 (1812).............................................................................13

*Vergott v. Deseret Pharmaceutical Co., Inc.*, 463 F.2d 12 (5th Cir. 1972)....................10

*Washington Legal Foundation v. Kessler*, 880 F. Supp. 26 (D.D.C. 1995) ..................20

**STATE CASES**

*Allen v. Yates*, 870 A.2d 39 (D.C. 2005)(*quoting Sere v. Group Hospitalization, Inc.*, 443 A.2d 33 (D.C. 1982)) ...................................................15

*Bennett v. Kiggins*, 377 A.2d 57 (D.C. 1977) ...........................................................14

*Brandt v. Sarah Bush Lincoln Health Center*, 329 Ill. App. 3d 348 (2002) .....................10, 11, 12

*Cafazzo v. Central Medical Health Servs., Inc.*, 635 A.2d 151 (Pa. Super. 1993) ........................12

*Cottom v. McGuire Funeral Service, Inc.*, 262 A.2d 807 (D.C. 1970)...........................................9

*Crain v. Allison*, 443 A.2d 558 (D.C. 1982) .........................................................................23

*Fisher v. Sibley Memorial Hospital*, 403 A.2d 1130 (D.C. 1979).........................................9, 11

*Foley Corp. v. Dove*, 101 A.2d 841 (D.C. 1954) .................................................................12

*Goldfarb v. Teitelbaum*, 540 N.Y.S. 2d 263 (N.Y. App. Div. 1989).........................................12

*Gordon v. Neviaser*, 478 A.2d 292 (D.C. 1984)(*citing Canterbury v. Spence*, 464 F.2d 772 (D.C. Cir. 1972))..........................................................................23

*Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916 (D.C. 1992) ............................................14

*Hoven v. Kelble*, 256 N.W.2d 379 (Wis. 1977) ..................................................................10

In re *Breast Implant Product Liability Litigation*, 503 S.E. 2d 445 (S.C. 1998) .........................................................................11, 12

*Jemison v. Nat'l Baptist Convention*, U.S.A., Inc., 720 A.2d 275 (D.C. 1998)) ......................................................................15, 16

*LaPrade v. Rosinsky*, 882 A.2d 192 (D.C. 2005) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................20 quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)) ......................................................................20 quoting *Musa v. Cont'l Ins. Co.*, 644 A.2d 999 (D.C. 1994)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317 (1986))........................................20

*McCracken v. Walls-Kaufman*, 717 A.2d 346 (D.C. 1998) (*citing Emerson v. S.Ry. Co.*, 404 So.2d 576 (Ala. 1981)) ..................................13

*Nevauex v. Park Place Hosp., Inc.*, 656 S.W.2d 923 (Tex. Ct. App. 1983) ...................................10

*North Miami General Hosp., Inc. v. Goldberg*, 520 So. 2d 650
    (Fla. Dist. Ct. App. 1988) ........................................................................................10

*Robinson v. Sarisky*, 535 A.2d 901 (D.C. 1988)...................................................................16

*Silverhart v. Mt. Zion Hospital*, 20 Cal. App. 3d 1022 (1971) ...........................................10

*Va. Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs.*,
    878 A.2d 1226 (D.C. 2005) ...........................................................................13, 26
    *quoting Bennet v. Kiggins*, 377 A.2d 57 (D.C. 1977) ...........................................26
    *quoting Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279 (D.C. 2002) ..............27
    *quoting Teru Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318
        (D.C. 2004) ...............................................................................................26

*Wagman v. Lee*, 457 A.2d 401 (D.C. 1983)..........................................................................16

*Wold v. Jeep Corp.*, 141 Mich. App. 476 (1985) .................................................................13

*Word v. Potomac Elec. Power Co.*, 742 A.2d 452 (D.C. 1999) .............................................9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, <br> As Guardian of the Person and Property of <br> KARYN A. KERRIS, <br><br> Plaintiffs, <br><br> v. <br><br> Georgetown University Hospital, <br> GEORGETOWN UNIVERSITY, t/a <br> Georgetown University, and <br> VANCE E. WATSON, M.D., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action No. 1:05CV02086 <br><br> Judge Paul L. Friedman |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION TO DISMISS CERTAIN CLAIMS
PURSUANT TO F.R.C.P. 12(b)(6) AND 56(b),
AND PURSUANT TO F.R.C.P. 12(F),
<u>MOTION TO STRIKE CERTAIN ALLEGATIONS IN THE AMENDED COMPLAINT</u>[1]**

Defendants, Georgetown University and Vance E. Watson, M.D. (hereinafter,

collectively referred to as "defendants"), by and through undersigned attorneys, hereby submit

this Memorandum of Points and Authorities in support of their Motion to Dismiss with prejudice

Count III: Strict Products Liability, Count IV: Breach of Implied Warranty of Fitness for a

Particular Purpose, Count V: Breach of Express Warranties, Count VI: Fraud, Count VII:

Consortium Claim of Paul Kerris, Count IX: Punitive Damages, Counts X and XI: Violations of

21 U.S.C. § 360(a)(II) and 21 C.F.R. § 812.20(a)(2), and Count XI: Violation of 21 U.S.C. §

331(a), (b), (c), (g), and (k), pursuant to Federal Rule of Civil Procedure 12(b)(6) ("F.R.C.P.").

---

[1] Defendants are simultaneously filing an Answer to the remaining two claims of plaintiffs'
Amended Complaint: Count I: Medical Negligence and certain paragraphs of Count VIII:
Breach of Fiduciary Duty.

Defendants also submit this Memorandum of Points and Authorities in support of their Motion for Partial Summary Judgment on Count II: Lack of Informed Consent and, in the alternative to dismissal with prejudice pursuant to F.R.C.P. 12(b)(6) for Count VI: Fraud and Count IX: Punitive Damages, for summary judgment to be entered in their favor on Count VI: Fraud and Count IX: Punitive Damages, pursuant to F.R.C.P. 56(b).

This Memorandum of Points and Authorities is also submitted in support of Defendants' Motion to Strike Certain Allegations in the Amended Complaint as set out in this memorandum, pursuant to F.R.C.P. 12(f).

## FACTUAL BACKGROUND

After withdrawing the original non-diverse Complaint, plaintiffs filed the current Amended Complaint on February 14, 2006, continuing this litigation – essentially a medical malpractice action – against defendants for injuries allegedly suffered by Karyn A. Kerris ("Ms. Kerris") stemming from embolization procedures performed by Vance E. Watson, M.D. ("Dr. Watson") at Georgetown University Hospital ("GUH") on November 4, 1998, January 13, 1999, and March 3, 1999.

Ms. Kerris suffers from Turner's Syndrome and Bithalamic Arteriovenous Malformations ("AVMs"), which are associated with a high rate of death and progressive decline in mental functioning. AVM is a congenital, non-hereditary defect of the vascular system, where a normal capillary system does not exist between an artery and a vein, and arterial blood passes directly into the venous system. Brain AVMs are very rare and occur in less than 1% of the general population.[2]

---

2 *See*, The Toronto Brain Vascular Malformation Group, http://brainavm.uhnres.utoronto.ca. The risk of bleeding is 4% per year, which means that 4 out of every 100 people with an AVM will have a bleed (hemorrhage) during any one year. Treatment is offered is to try to prevent

Turner's Syndrome is a chromosomal abnormality involving the absence of all or part of one X chromosome in females. While abnormalities vary, all females who present with the Syndrome exhibit a short stature, sexual infantilism due to rudimentary ovaries, and a variety of somatic abnormalities, including congenital heart disease, hypothyroidism, kidney malformation, and skeletal abnormalities.[3]

Ms. Kerris first came to GUH on August 31, 1998 for an angiogram[4] to determine the size and location of her AVM, which she first discovered in December 1997 when she underwent magnetic resonance imaging ("MRI") performed on her in the course of her participation as a member of a control group in a study at the National Institute of Health ("NIH") where she worked. SOF ¶¶ 1, 13. Ms. Kerris was told that her AVM measured 6 to 7 centimeters in diameter, that her condition was terminal, and was referred to GUH. *Id.*

---

bleeding from the AVM. Bleeding may injure the surrounding brain resulting in a stroke with possible permanent disability or even death. The most common symptoms of AVM include hemorrhaging (bleeding), seizures, headaches, and neurological problems such as paralysis or loss of speech, memory, or vision, and in rare instances, dementia. SOF ¶¶ 4-5, 8-11. Treatment may alleviate these symptoms. AVMs typically cause problems before the age of 40. *See* http://www.answers.com/topic/arteriovenous-malformation. AVM rupture accounts for 2% of all strokes. *Id.* There are three general forms of treatment for AVM: 1) Surgery, which involves identifying the margins of the malformation, ligating (tying off) or clipping the feeder arterial vessels, obliterating the draining veins, and removing or obliterating the nidus (the nest) of the AVM; 2) Endovascular occlusion, which involves closing off the vessels of the AVM by one of various nonsurgical means. Catheters can deliver agents to block the blood vessels that include permanent balloons, thrombosing (clogging) coils, sclerosing (hardening) drugs, and *fast-acting embolization glue* (embolization is often used before surgery); 3) Radiosurgery, which involves focusing multiple radiation beams on the AVM so as to injure and thrombose (clog) the AVM. Radiosurgery is usually reserved for AVMs that are relatively small (less than 3 cm in diameter), situated so deep within important brain tissue that surgery is hazardous, or have so many feeder arteries that embolization is not feasible. *Id.*

[3] *See* http://turners.nichd.nih.gov.

[4] An angiogram and arteriogram are different words for the same procedure.

3

Prior to undergoing the angiogram, Ms. Kerris signed a Consent for Surgery, Anesthesia, and Other Medical Services ("Consent Form") for the angiogram, in which she acknowledged that Dr. Watson had explained the material facts of the procedure – its risks, complications, benefits, alternative treatments, *etc.* – in terms that she could understand and satisfactorily answered any of her questions. SOF ¶¶ 14-16. The August 31, 1998 angiogram showed a "bithalamic arteriovenous malformation" of the highest grade of severity located deep within her brain. SOF ¶ 17.

Ms. Kerris next returned to GUH on November 4, 1998 for a cerebral angiogram and possible embolization with complaints of slurring, right-sided headache, decreasing cognitive function, and increasing gait ataxia (uncoordinated movement of the arms, hands, legs, or trunk), which symptoms had increased to occurring every two to three days. SOF ¶ 18. A mixture of some type of polymer and oil substance is often used for such embolization procedures. SOF ¶ 7. Ms. Norris signed the Consent Form in connection with the angiogram and possible embolization procedure using an polymer-acrylate/oil mixture – the Lipiodol/Histoacryl mixture plaintiffs' allege[5] – in which she acknowledged that Dr. Watson

> has described the nature of this procedure to me in terms I understand and has answered all questions I have asked about it to my satisfaction. He has also explained significant complications and risks which may be associated with this procedure, including the complications and risks of anesthesia, and has advised me of possible alternatives to this treatment, including the possible consequences of no treatment at all, and the significant complications and risks associated with such alternatives.

---

[5] For the sole purpose of these motions, defendants accept, *arguendo*, plaintiffs' factual allegations, including their representation as to the mixture of Lipiodol and Histoacryl allegedly used in Ms. Kerris's embolization procedures, but do not concede or necessarily agree that the facts of this case are accurately represented by plaintiffs, but for the sole purposes of these motions, defendants will accept plaintiffs' allegations as true.

4

SOF ¶ 19.  Further, Ms. Kerris acknowledged that "I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as the result of treatments or examination in the hospital." *Id.*

Dr. Watson had many conversations with Ms. Kerris when both or either her parents or husband were present, but Dr. Watson also had several conversations regarding the material facts of the embolization procedures using the Lipiodol/Histoacryl mixture when only he and Ms. Kerris were present.  SOF ¶¶ 22, 33.  In these discussions, Dr. Watson explained that the connection between embolization with the Lipiodol/Histoacryl mixture and possible improvement or cessation of Ms. Kerris's cognitive decline was only theoretical, and that the procedure involved tremendous risks – including the worsening of cognitive function, stroke, and death.  Surgery and radiosurgical treatments were also discussed.  SOF ¶¶ 22-23.

Because Ms. Kerris was particularly concerned about the decline of her cognitive functioning, Dr. Watson was explicit in his discussions with her regarding the rarity of the these symptoms with her already rare condition, the nature of the embolization procedure with the Lipiodol/Histoacryl mixture, the only theoretical possibility of that the procedure would help her condition, including her declining cognition, and the substantial attendant risks of the procedure – that her condition could worsen or that she could suffer a stroke or  death.  SOF ¶¶ 22-23.  Dr. Watson specifically discussed with Ms. Kerris the fact that neither Lipiodol (the oil-based contrast) or Histoacryl (the "glue"), nor the mixture of them together had been approved by the Food and Drug Administration ("FDA") and explained that there was the possibility that Ms. Kerris would need to write a letter of need to facilitate bringing the substances into the country.  SOF ¶ 24.  As an NIH employee, Ms. Kerris expressed familiarity with the use of unapproved medical treatments and letters of need.  *Id.*  Further, Ms. Kerris's medical insurance approved the

5

embolization procedure using the "glue" mixture, implicitly showing that this procedure is used as a treatment for AVMs.  SOF ¶ 25.

Because of the rarity of Ms. Kerris's symptomatology, Ms. Kerris's case was discussed at the multidisciplinary neurovascular conference.  SOF ¶ 20.  The multidisciplinary neurovascular conference includes radiologists, neurologists, and neurosurgeons from GUH, other area hospitals, and private practice physicians from outside GUH that regularly meets. Cases are presented by the treating physician and diagnosis and management are discussed in the open forum.  Dr. Watson presented the images and clinical findings from Ms. Kerris's case and then discussion followed.  *Id.*

Endovascular treatment was encouraged by the participants in the multidisciplinary neurovascular conference – the other physicians who specialized in neurovascular conditions.  *Id.*  Ms. Kerris underwent the first embolization procedure using the Lipiodol/Histoacryl mixture on November 4, 1998, and experienced no clinical complications during the procedure.  SOF ¶ 26.

Ms. Kerris returned to GUH on January 13, 1999 for a second embolization procedure and again signed the Consent Form, which contained the same acknowledgments that the procedure, alternative treatments, and risks and complications, *etc.*, had been satisfactorily explained to her and that no guarantees had been made to her in connection with the procedure. SOF ¶ 27.  She again had discussions alone with Dr. Watson regarding all material facts of the procedure.  SOF ¶¶ 15-16, 19, 22-24, 27, 33.  Ms. Kerris was attempting to maintain optimal cerebral tissue profusion, as she was suffering from decreasing cognitive function, gait disturbance, and slurred speech.  Because of the large size of her AVM and its deep location within her brain, the hope was that embolization might prevent the AVM from growing and

thereby prevent her progressive decline; it was, however, made clear to Ms. Kerris that preventing further cognitive and physical decline with embolization was only theoretical and that even with the embolization procedures, she could get worse or even die. SOF ¶¶ 15-16, 19, 22-24, 27, 33. Ms. Kerris was discharged and went home on January 15, 1999 without any complications arising from the procedure. SOF ¶ 28.

Ms. Kerris returned to GUH on March 3, 1999, for a cerebral AVM embolization because of new numbness, slight worsening of lethargy, and difficulty walking. SOF ¶ 29. Again, Ms. Kerris signed the Consent Form, in which she acknowledged that all risks, complications, and alternative treatments had been satisfactorily explained to her and that no guarantees were given to her as to the result of the treatment, *etc*. SOF ¶ 30. Once again, she had discussions with Dr. Watson about the material facts of the procedure. SOF ¶¶ 15-16, 19, 22-24, 27, 30, 33. There were no complications from this procedure and Ms. Kerris showed mild improvement. SOF ¶ 31. Ms. Kerris was discharged and went home on March 17, 1999. SOF ¶ 32.

Despite the embolizations, Ms. Kerris's health continued to decline and she came to GUH for medical treatment on April 13, 1999 with aspiration pneumonia, on October 11, 1999 with right lower extremity weakness, pallor, and increased drooling, on July 31, 2000 for abdominal pain, on February 18, 2001 for worsening headaches, functional decline, and personality changes, at which time she underwent the insertion of a ventriculoperitoneal shunt, on October 12, 2003 with aspiration pneumonia, after having received methadone for headaches at Montgomery General Hospital, and on March 26, 2004 for abdominal pain. SOF ¶ 37.[6]

---

[6] Georgetown University sold Georgetown University Hospital and its clinical operations to MedStar Health, Inc. on July 1, 2000. MedStar, not Georgetown University, has operated GUH since that time. Dr. Watson has been employed by MedStar since July 1, 2000.

As of September 2005, approximately one month before plaintiffs filed the original complaint initiating this suit against defendants for medical malpractice, Ms. Kerris was still obtaining her medical treatment from the same Neurology offices from which she received medical treatment from 1998 on and at GUH (now owned and operated by MedStar Health, Inc.).  SOF ¶ 38.  Although plaintiffs claim that the embolization procedure that defendants performed amounted to medical malpractice, this procedure was precisely the medical treatment subsequently planned by another doctor Ms. Kerris consulted at Stanford University Hospital in November, 2000.  SOF ¶ 39.

Both GUH and Dr. Watson provide medical services to patients.  Amended Complaint, ¶¶ 5-6, SOF ¶¶ 40-41.  They do not manufacture, nor sell, any product.  *Id.*  Dr. Watson used the Lipiodol/Histoacryl mixture to treat Ms. Kerris, not to investigate it for future approval by the federal Food and Drug Administration ("FDA").  SOF ¶ 40.

## **ARGUMENT**

### **PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6) DEFENDANTS MOVE TO DISMISS COUNTS III, IV, V, VI, VII, IX, X, XI, AND XII**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants move to dismiss with prejudice Count III:  Strict Products Liability, Count IV:  Breach of Implied Warranty of Fitness for a Particular Purpose, Count V:  Breach of Express Warranties, Count VI:  Fraud, Count VII:  Consortium Claim of Paul Kerris, Count IX:  Punitive Damages, Counts X and XII:  Violation of U.S.C. § 360(A)(2) and 21 C.F.R. § 812.20(A)(2), and Count XI:  Violation of 21 U.S.C. § 331(a), (b), (c), (g), and (k) for failure to state a claim upon which relief can be granted.

I.   **NO CLAIM FOR STRICT PRODUCTS LIABILITY (COUNT III) OR BREACH OF WARRANTY, EITHER EXPRESS OR IMPLIED (COUNTS IV AND V), LIES AGAINST DEFENDANTS.**

In bringing causes of actions against a hospital and a medical doctor for strict liability and breach of either express or implied warranty, plaintiffs show their fundamental misunderstanding of the relationship between a patient seeking medical treatment for a serious illness at a hospital from a doctor rendering whatever aid is possible in discouraging circumstances. None of these claims have any applicability to the provision of medical services to a patient – as applicable case law recognizes. (A discussion of the inapplicability of the federal statutes and regulations cited by plaintiffs is set forth in Section V, *infra*, which defendants incorporate by reference here.)

The District of Columbia Court of Appeals views "actions for breach of warranty and strict liability in tort as being expressions of a single basic public policy as to liability for defective products." *Fisher v. Sibley Memorial Hospital*, 403 A.2d 1130, 1133 (D.C. 1979). "[T]he current doctrines of implied warranty and strict liability in tort are but two labels for the same legal right and remedy, as the governing principles are identical." *Cottom v. McGuire Funeral Service, Inc.*, 262 A.2d 807, 808 (D.C. 1970).

Strict liability in tort applies to manufacturers or sellers of a product, not to service providers who only incidentally use a product. "To prevail on a claim for strict liability in tort under § 402A, the plaintiff must prove that . . . the seller was engaged in the business of selling the product that caused the harm." *Word v. Potomac Elec. Power Co.*, 742 A.2d 452, 459 (D.C. 1999).

Courts will not apply the doctrine of strict liability to a hospital or medical practitioner for injuries caused by medical instruments, drugs or other substances used in

treatment. *See, e.g., Hoven v. Kelble,* 79 Wis.2d 444, 256 N.W.2d 379 (1977); *Vergott v. Deseret Pharmaceutical Co., Inc.,* 463 F.2d 12 (5th Cir.1972) (hospital cannot be held strictly liable for injuries caused by defective intercath needle because hospital is not a seller engaged in business of selling the product); *North Miami General Hosp., Inc. v. Goldberg,* 520 So.2d 650 (Fla.Dist.Ct.App.1988) (overturning jury's verdict of strict liability against hospital for injuries suffered as a result of malfunction of electro-surgical grounding pad; holding that hospital is not a business within product's distributive chain but more like a consumer that employs a product in the course of providing medical services); *Nevauex v. Park Place Hosp., Inc.,* 656 S.W.2d 923 (Tex.Ct.App.1983) (hospital not liable for misapplication of cobalt radiation, because it is not a "merchant" dispensing radiation treatment); *Silverhart v. Mt. Zion Hospital,* 20 Cal.App.3d 1022, 98 Cal.Rptr. 187 (1971) (court denied patient's strict liability claim against the hospital for damages allegedly sustained when a surgical needle broke during an operation and became permanently lodged in the patient's body, holding that the hospital had merely furnished the product in connection with its business of treating a patient).

"In general, when a person seeks medical care from a hospital, the primary purpose of the transaction is to obtain the hospital's services, not to buy medical supplies or devices." *Brandt v. Sarah Bush Lincoln Health Center*, 329 Ill.App.3d 348, 352 (Ill.App. 4 Dist., 2002). Dr. Watson is an interventional neuroradiologist. His business consists of providing medical services. Amended Complaint ¶ 6; SOF ¶ 40. The dominant purpose of the interaction between Dr. Watson and Karyn Kerris was the provision of medical services – treatment of her AVMs in the form of embolization – and not the sale of goods. Amended Complaint ¶ 9; SOF ¶ 40. The Histoacryl/Lipiodol mixture of which plaintiffs complain, like plasma, was merely a substance utilized in the course of Ms. Kerris' medical treatment – like

anesthesia – to perform the medical procedure. *Id.* Similarly, Georgetown is neither a manufacturer, nor seller of goods. SOF ¶ 41; Amended Complaint, ¶ 5.

"The incidental sale of the product or device that is necessary to render the medical service does not transform the transaction into one primarily for the sale of goods. In this case, plaintiff sought the hospital's services for treatment of a medical condition. The rendition of services was the primary purpose of the transaction. The sale of the sling, though an important part of the services, was incidental to those services." *Brandt*, 329 Ill.App.3d at 352-53. This principle has been upheld in nationwide litigations involving medical devices. *See In re: TMJ Implants Products Liability Litigation*, 852 F.Supp. 1019 (D. Minn. 1995), *aff'd, In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation*, 97 F.3d 1050 (8th Cir. 1996); *In re Breast Implant Product Liability Litigation*, 503 S.E.2d 445, 552-53 (S.C. 1998).

*Fisher v. Sibley Memorial Hospital* is instructive. 403 A.2d 1130 (D.C. 1979). In *Fisher*, the plaintiff sought to recover damages for personal injuries sustained when she incurred hepatitis after a transfusion of blood supplied by Sibley Memorial Hospital. *Id.* In affirming the trial court's directed verdict for the hospital on the theories of breach of implied warranty and strict liability, the District of Columbia Court of Appeals ruled that neither theory applied to the administering of blood transfusions by a hospital, reasoning that the furnishing of blood is more in the nature of a service than a sale of goods. *Id.* at 1133. The D.C. Circuit reaffirmed this principle – that the provision of blood could not be characterized as a product sold to patients – rather it was a "service" that was part of the overall medical treatment that a patient received in *Kozup v. Georgetown University*, 663 F. Supp. 1048, 1059 (D.D.C. 1987), *aff'd in part, vacated in part on other grounds*, 851 F.2d 437 (D.C. Cir. 1987).

Breach of warranty claims cannot lie where the provision of services is the dominant purpose of the transaction. *Foley Corp. v. Dove*, 101 A.2d 841, 842 (D.C. 1954). Courts view the provision of medical treatment as the provision of medical "services," not the sale of a good. *Brandt, supra*; *In re TMJ Products Liab. Litig., supra.*; *Brooks v. Vitek, Inc.*, 875 F.2d 499, 500-01 (5th Cir.1989) (fact that dentist fitted squares of Proplast® to fit plaintiff's TMJ did not make dentist a manufacturer; plaintiff's claims were really medical malpractice claims, not products liability claims); *Cafazzo v. Central Medical Health Servs., Inc.*, 635 A.2d 151, 154-55 (1993) (claims of strict liability will not lie against doctors and hospitals because they are not "sellers"); *Goldfarb v. Teitelbaum*, 149 A.D.2d 566, 540 N.Y.S.2d 263, 264 (N.Y.App.Div.1989) (implantation of mandibular prosthesis not a "sale" of the device).

Plaintiffs' Amended Complaint clearly establishes that Dr. Watson was primarily engaged in the provision of medical services as an interventional neuroradiologist, and that Georgetown was the hospital where "treatments" and "health care services" were provided to patients. Amended Complaint ¶¶ 5-6. Ms. Kerris went to Dr. Watson for medical treatment of her AVM – any transfer of "goods" was purely incidental to the performance of this service. "[H]ealth care providers offer services, not products [and] determines our holding as to the issues of warranty under Article II of the U.C.C.," *In re Breast Implant Product Liability Litigation*, 503 S.E.2d at 553 (which dismissed the claims); therefore, defendants respectfully submit that plaintiffs' claims for strict liability (Count III) and breach of implied and express warranty (Counts IV and V) should be dismissed with prejudice.

## II.    PLAINTIFFS' LOSS OF CONSORTIUM CLAIM (COUNT VII) IS BARRED BY THE STATUTE OF LIMITATIONS.

In Count VII of plaintiffs' Amended Complaint, plaintiff Paul Kerris attempts to make a claim for loss of consortium, stemming from events occurring no later than March 3,

1999. *See*, *generally*, Amended Complaint. District of Columbia statute of limitations for all of

Ms. Kerris's claims is three (3) years from the date of injury. D.C. Code Ann. § 12-301. While

Mrs. Kerris's incompetency may have tolled the statute of limitations as to claims personal to

her, it does not toll the statute on Mr. Kerris's loss of consortium claim. *McCracken v. Walls-*

*Kaufman*, 717 A.2d 346, 355 n.8 (D.C. 1998) (citing *Emerson v. S. Ry. Co.,* 404 So. 2d 576, 580

(Ala. 1981) ("[T]he derivative claim for loss of consortium of a spouse or parent is not subject to

the tolling statute of the infant or incompetent.") (quotations omitted); *Wold v. Jeep Corp.,* 141

Mich. App. 476, 367 N.W.2d 421, 421 (1985) (holding that the disability that tolled the statute of

limitations on appellant's wife's claim could not be used to toll appellant's own loss of

consortium claim)); *Marsteller v. McClean*, 1 Cranch C.C. 579 (D.C. Cir. 1809), aff'd, 7 Cranch

(11 U.S.) 156 (1812).

   Being barred by the statute of limitations by more than four years, pursuant to

*McCracken, supra*, plaintiffs' claim for Loss of Consortium (Count VII) should be dismissed

with prejudice.

## III.  PLAINTIFFS' CLAIM FOR FRAUD (COUNT VI) MUST BE DISMISSED AS PLAINTIFFS FAIL TO PLEAD ITS ELEMENTS.

   In Count VI of plaintiffs' Amended Complaint, plaintiffs purport to bring a cause

of action for fraud. Amended Complaint ¶¶ 47-53. Plaintiffs, however, fail to set forth a valid

claim for fraud. "Fraud is never presumed and must be particularly pleaded. It must be

established by clear and convincing evidence, which is not equally consistent with either honesty

or deceit. The essential elements of common law fraud are: (1) a false representation (2) in

reference to material fact, (3) made with knowledge of its falsity, (4) *with the intent to deceive,*

and (5) action is taken in reliance upon the representation." *Va. Acad. of Clinical Psychologists*

*v. Group Hospitalization & Med. Servs.*, 878 A.2d 1226, 1233 (D.C. 2005) (emphasis added).

"*Allegations in the form of conclusions* on the part of the pleader as to the existence of fraud are *insufficient.*" *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992) (quotations omitted; emphasis added).

Although nondisclosure or silence, as well as active misrepresentation, may constitute fraud, based on the allegations in plaintiffs' Amended Complaint a claim for fraud can only be made out, if at all, by means of impermissible speculation. *Bennett v. Kiggins*, 377 A.2d 57, 59-60 (D.C. 1977). At best, all plaintiffs do is speculate[7] that Dr. Watson failed to advise Ms. Kerris of material facts, Amended Complaint ¶¶ 48-49, and that she relied on such hypothetical nondisclosure to her detriment. *Id.* ¶ 21. As set forth in plaintiffs' Amended Complaint, Ms. Kerris is currently incompetent and has had guardianship appointed over her. *Id.* ¶ 2. Moreover, by plaintiffs' pleading, Ms. Kerris is "brain damaged and dysfunctional for the remainder of her life," *id.* ¶ 12; "brain damaged, and will forevermore remain so, unable to comprehend or otherwise be cognizant of what had occurred. . ." *Id.* ¶ 13. Plaintiffs can have no idea what Dr. Watson said to Ms. Kerris because there were discussions where they were not present. SOF ¶¶ 22-24, 33.

Therefore, Ms. Kerris can shed no light as to what Dr. Watson did or did not tell her, nor can she provide any substantiation for the claim that information was withheld with the intent to deceive her. There are no allegations in the Amended Complaint sufficient to find that any of the defendants had a motivation, much less an intent to deceive Ms. Kerris, nor why it would even be in their interest to do so. In fact, the Amended Complaint contains only one conclusory allegation as to defendants' incentive for the theoretical nondisclosure: the

---

[7] In Section Two of the Brief, subsection I, defendants demonstrate why any assertion as to what Dr. Watson said to Ms. Kerris is nothing more than speculation and there is no further discovery that can provide support for plaintiffs' claim.

"omissions were made by Defendants for the purpose of defrauding Karyn A. Kerris and Paul Kerris." *Id.* ¶ 49. Even accepting, *arguendo*, that defendants defrauded plaintiffs with nondisclosure, plaintiffs fail to substantiate this claim with allegations as to the motivation for *why* defendants would want to "defraud" plaintiffs sufficient to demonstrate that the hypothetical nondisclosure was done with the intent to deceive Ms. Kerris.

As set out in Section Two of this brief, *infra*, because of plaintiffs' inability to substantiate their claim for lack of informed consent, defendants move to dismiss that claim, as well as plaintiffs' fraud claim as the lack of informed consent serves as the basis for plaintiffs' fraud claim. *See* Section Two, *infra*.

As plaintiffs failed to plead the requisite elements of fraud, defendants respectfully submit that Count VI (Fraud) should be dismissed with prejudice, pursuant to F.R.C.P. 12(b)(6).

## IV.    PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES (COUNT IX) SHOULD BE DISMISSED.

> 'It is well-recognized that punitive damages are not favored in the law.... The most appropriate field for their application is the realm of tort actions generally...; but even there, they are available only in cases which present circumstances of extreme aggravation.... *The defendant's tortious conduct must have been outrageous, characterized by malice, wantonness, gross fraud, recklessness, or willful disregard of the plaintiffs rights....*'

*Allen v. Yates*, 870 A.2d 39, 49 n.10 (D.C. 2005) (quoting *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C. 1982); emphasis added). Under District of Columbia law, punitive damages are normally available only in actions arising from intentional torts, not torts of negligence. *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 108 (D.D.C.2004) (citing *Jemison v. Nat'l Baptist Convention, U.S.A., Inc.,* 720 A.2d 275, 285 n. 9 (D.C.1998) ("In the District of Columbia, with rare exceptions, punitive damages are available only for intentional torts");

15

*Robinson v. Sarisky,* 535 A.2d 901, 906 (D.C. 1988) ("[p]unitive damages are available in actions for intentional torts...") (internal quotations omitted).

Moreover, "[t]o succeed on a claim for punitive damages arising from an intentional tort, the plaintiff must establish that the tortious act was committed with an "'evil motive, actual malice, deliberate violence or oppression' or for 'outrageous conduct in willful disregard for another's rights.'" *Calvetti,* 346 F. Supp. 2d at 108 (quoting *Robinson, supra,* 535 A.2d at 906).

Here, the only intentional tort allegation that plaintiffs bring to serve as the basis for punitive damages is Fraud (Count VI), which defendants demonstrate should be dismissed pursuant to F.R.C.P. 12(b)(6) and/or F.R.C.P 56(b); therefore, there is no basis for plaintiffs' claim for punitive damages (Count IX). Punitive damages may not be awarded for negligence, even gross negligence. "[P]unitive damages may not be awarded where an act though willful in itself is committed in the honest assertion of a supposed right or discharge of duty, or without any evil or bad intention." *Wagman v. Lee,* 457 A.2d 401, 404 n.4 (D.C. 1983).

Additionally, the allegations contained in plaintiffs' Amended Complaint – rising from the provision of medical services to a seriously ill woman - do not evidence evil motive, actual malice or outrageous conduct, nor any motive to commit fraud – an accusation which is belied by the fact that Ms. Kerris and her family continue to seek treatment for her medical conditions from the very group of doctors and GUH (now owned and operated by MedStar Health, Inc.) against whom they bring this suit, seeking punitive damages for evil motive as well as claims of medical malpractice. SOF ¶¶ 37-38. One wonders – if the allegations forming the basis for plaintiffs' punitive damages claim are true – why that would be.

16

Because of the fact that the predicate intentional tort, fraud, should be dismissed with prejudice and because plaintiffs make no showing of evil motive or actual malice or even facts from which an inference of such motive could be drawn – a claim that is greatly undercut by the fact that plaintiffs continue to seek medical treatment for Ms. Kerris at from the same group of neurologists at GUH (now owned and operated by MedStar Health, Inc.), SOF ¶ 38, defendants respectfully submit that plaintiffs' claim for punitive damages (Count IX) should be dismissed with prejudice.

## V.    AS A MEDICAL PRACTITIONER USING HIS SKILL AND JUDGMENT TO TREAT MS. KERRIS, 21 U.S.C. § 360(A)(2), 21 C.F.R. § 812.20(A)(2), AND 21 U.S.C. § 331(a), (b), (c), (g), and (k) ARE INAPPLICABLE TO THIS CASE AND COUNTS X, XI, AND XII SHOULD BE DISMISSED.

Plaintiffs' addition of three new causes of action in their Amended Complaint based on federal statutes exhibits a fundamental misunderstanding of the FDA's role in the regulation of medications and medical devices. While the FDA does regulate the sale and manufacture of medications and medical devices, it does not regulate the practice of medicine. In fact, the very statutes upon which plaintiffs base their new claims contain exemptions for individuals who are "practitioners licensed by law to prescribe or administer drugs or devices and who manufacture, prepare, propagate, compound, or process drugs or devices solely for use in the course of their professional practice," such as Dr. Watson. 21 U.S.C. 360(g)(3).

Similarly, 21 C.F.R. § 812.20(a)(2) is inapplicable and irrelevant to this case. As clearly defined in 21 C.F.R. §812(b)(7), the section setting out the applicability of 21 C.F.R. § 812.20(a)(2), "[t]his part, with the exception of § 812.119 [dealing with the disqualification of clinical investigators], does not apply to investigations of the following categories of devices: . . . (7) A custom device as defined in § 812.3(b), unless the device is being used to determine safety

or effectiveness for commercial distribution.  A custom device is defined in 21 C.F.R. §812.3(b),

a custom device is one that:

> (1) Necessarily deviates from devices generally available or from an applicable performance standard or premarket approval requirement in order to comply with the order of an individual physician or dentist;
>
> (2) Is not generally available to, or generally used by, other physicians or dentists;
>
> (3) Is not generally available in finished form for purchase or for dispensing upon prescription;
>
> (4) Is not offered for commercial distribution through labeling or advertising; and
>
> (5) *Is intended for use by an individual patient named in the order of a physician or dentist, and is to be made in a specific form for that patient, or is intended to meet the special needs of the physician or dentist in the course of professional practice.*

(Emphasis added).

Lastly, 21 U.S.C. § 331 by its very terms applies <u>only</u> to manufacturers of

prescription devices who introduce them into interstate commerce.  ((a):  "[t]he introduction or

delivery for introduction into interstate commerce"; (b):  "in interstate commerce"; (c):  "the

receipt in interstate commerce"; (g):  "[t]he manufacture"; (k):  "while such article is held for

sale (whether or not the first sale) after shipment in interstate commerce"), not to medical doctors

rendering medical treatment to their patients.  Again, plaintiffs label Georgetown and Dr. Watson

as having performed a "sale" of the substances used in performing the consented-to embolization

procedures on Ms. Kerris.  As set out in plaintiffs' Amended Complaint and shown in Section I,

*supra*, Dr. Watson performed the embolization procedures with the substances for Karyn Kerris.

He made no attempt to market or sell the substances – unavailable as plaintiffs allege – beyond

the use of it in the "course of professional practice" to treat Ms. Kerris' rare condition with poor prognosis. Both case law and the statutes themselves show that 21 U.S.C. § 331 is inapplicable to defendants.

In addition to ignoring the text of the very statutes they cite, not to mention applicable case law, plaintiffs set up a fallacy in an attempt to make these statutes applicable. As set out in Section I, neither Georgetown, nor Dr. Watson were sellers or manufacturers of any medical device or medication. They did not market anything. Therefore, they were under no obligation to seek premarket approval of anything. Amended Complaint ¶¶ 69-70. Plaintiffs' statement that "[t]he only exemption which allows a physician and/or physician to treat a patient with a Class III device is an investigational device exemption" is demonstrably wrong. *Id.* at ¶ 71. As cited above, 21 U.S.C. § 360(g)(3) clearly allows "practitioners licensed by law to prescribe or administer drugs or devices and who manufacture, prepare, propagate, compound, or process drugs or devices solely for use in the course of their professional practice." As set out in the Amended Complaint, plaintiffs fault Dr. Watson's choice of substances *to treat* Ms. Kerris, not the investigation of a device. Amended Complaint, ¶¶ 9-11. Clearly, there is no obligation to apply for an exemption for an investigational device if that device is not being investigated for purposes of marketing it. Dr. Watson used substances commonly used in embolization procedures for treatment of AVMs, see SOF ¶ 7, a "custom device," "intended for use by an individual patient . . . made in a specific form for that patient, or is intended to meet the special needs of the physician . . . in the course of professional practice" and is exempt from the federal statutes and regulations plaintiffs cite. 21 C.F.R. §812.3(b)(5).

The FDA does not regulate medical treatment. Many things are used in the practice of medicine that are not approved by the FDA for the specific use. As this Court has

recognized: "While manufacturers may not themselves *promote* such uses, it is not unlawful for

doctors to employ or prescribe medical products for "unapproved" uses. Indeed, the FDA claims

that it has long recognized the important role that some unapproved uses may play in the practice

of medicine." *Washington Legal Foundation v. Kessler*, 880 F.Supp. 26, 28 (D.D.C. 1995)

(internal quotations omitted; emphasis in original). The FDA statutes and regulation plaintiffs

cite have no application to medical practitioners and hospitals; therefore, defendants do not fall

within their purview.

      Defendants respectfully submit that Counts X and XII for Violations of 21 U.S.C.

§ 360(a)(II) and 21 C.F.R. § 812.20(a)(2), and Count XI for Violation of 21 U.S.C. § 331(a), (b),

(c), (g), and (k) should be dismissed with prejudice, pursuant to F.R.C.P. 12(b)(6).

## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(b) <br> THE COURT SHOULD DISMISS COUNTS III, VI, and IX

      "'The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact, after which *the burden shifts to the non-moving party to designate*

*specific facts showing that there is a genuine issue for trial.*'" *LaPrade v. Rosinsky*, 882 A.2d

192, 194 (D.C. 2005) (quoting *Musa v. Cont'l Ins. Co.,* 644 A.2d 999, 1002 (D.C. 1994) (citing

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)); (emphasis added). "To carry this

burden, *the non-moving party 'must do more than simply show that there is some metaphysical*

*doubt as to the material facts.'"* *LaPrade*, 882 A.2d at 196 (quoting *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) (emphasis added). "'The mere existence of a

scintilla of evidence ... will be insufficient; there must be evidence on which the jury could

reasonably find for the [non-moving party].'" *LaPrade*, 882 A.2d at 196 (quoting *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)).

As pled in plaintiffs' Amended Complaint, Ms. Kerris will never be able to provide further evidence as to whether she was provided with sufficient information to make an informed decision to undergo the embolization procedures in an attempt to stop the frightening progression of her illness, other than the Consent Forms she signed that are in the record. SOF ¶¶ 14-16, 19, 27, 29, 30, 34-35; Amended Complaint, ¶¶ 2, 12-13. Moreover, plaintiffs' unfounded, speculative assertions as to what information was conveyed to Ms. Kerris does not carry their burden, given defendants' evidence of Dr. Watson's specific memories of his discussions with Ms. Kerris regarding the procedures. SOF ¶¶ 22-24, 33.

Plaintiffs have no evidence to offer and there are no avenues by which they can discover evidence through discovery. Dr. Watson had several conversations about all material facts regarding the procedures when they were the only people present. *Id.* Ms. Kerris cannot provide any more evidence as to the information she received, other than her signed Consent Forms already in her medical records. The law does not permit them to recover from defendants in the absence of evidence showing the alleged nondisclosure; therefore, defendants respectfully submit that summary judgment must be entered in their favor on plaintiffs' claims for Lack of Consent (Count II), Fraud (Count VI), and Punitive Damages (Count IX). *Blincoe v. Luessenhop*, 669 F. Supp. 513, 518 (D.D.C. 1987).

I.    **PLAINTIFFS HAVE NO EVIDENCE AND CAN OBTAIN NO EVIDENCE THAT DR. WATSON FAILED TO APPRISE MS. KERRIS FULLY OF ALL MATERIAL INFORMATION REGARDING HER MEDICAL TREATMENT, PLAINTIFFS' LACK OF INFORMED CONSENT CLAIM (COUNT II) MUST BE DISMISSED.**

Despite the numerous signed consent forms in Ms. Kerris's medical record, *see* Exs. 4, 6, 10, & 15, plaintiffs claim that defendants failed to disclose certain material facts to her

21

regarding the embolization procedures.  *See* Amended Complaint ¶¶ 15-20.[8]  These factual

allegations are mere speculation – the only evidence that there will ever be in the record is that

Dr. Watson fully disclosed all material facts about the procedures.  *See* Consent Forms (Exs. 4,

6, 10, & 15) and Watson Affidavit at ¶¶ 5-6, 8-9, 11-17, 20-21, 24, 27 (Ex. 8); SOF ¶¶ 15-16, 19-

20, 23, 26 (Ex. 8); SOF ¶¶ 14-16, 19, 22-24, 27, 30, 33-35.

   As is apparent from the face of plaintiffs' Complaint, Ms. Kerris is incompetent,

having had Felice and Cicily Iacangelo (her parents) appointed as her guardians on August 11,

2005.  Amended Complaint ¶ 2.  Moreover, plaintiffs characterize Ms. Kerris as "brain damaged

and dysfunctional for the remainder of her life" and "unable to comprehend or otherwise be

cognizant of what had occurred . . ." Amended Complaint ¶¶ 12-13.   Thus, Ms. Kerris is unable

to provide any additional facts as to the information with which she was provided by defendants

prior to signing the Consent Forms.  SOF ¶¶ 34-35.  Dr. Watson's affidavit conclusively

establishes that he had several discussions with her without any other person present as to all

material facts, complications, prognosis, alternative treatments, the nature of the procedure, *etc.*,

so further discovery into the issue would be fruitless.  SOF ¶¶ 14-16, 19, 22-24, 27, 30, 33-35

and Watson Affidavit ¶¶ 5-6, 8-9, 11-17, 19-20, 23, 26 (Ex. 8).  There is no discovery that

plaintiffs could seek to further elucidate this claim, as only Ms. Kerris was present during these

discussions.  SOF ¶ 33.

   In fact, the only support for plaintiffs' contention that defendants failed to obtain

informed consent – despite the signed Consent Forms and Dr. Watson's affidavit – is the

---

[8] As set out in Section V, *infra*, IRB procedures have no applicability to a treatment situation
where a clinical trial investigation is not being conducted to provide the FDA with information to
support a New Drug Application.  Amended Complaint, ¶ 21.

supposition that "[h]ad Karyn A. Kerris been informed of . . . [numerous factors] she would not have consented to the embolizations." Amended Complaint ¶ 22.

Under District of Columbia law, this speculative, hindsight allegation is insufficient to maintain a claim for lack of informed consent and to overcome the evidence that Ms. Kerris was informed of all material facts regarding the embolization procedures. "[T]he question is not what this particular patient would have done if there had been adequate disclosure, but what a reasonably prudent person in the patient's position would have done if adequately informed." *Gordon v. Neviaser*, 478 A.2d 292, 294 (D.C. 1984) (citing *Canterbury v. Spence*, 464 F.2d 772, 791 (D.C. Cir. 1972)). *Canterbury v. Spence, supra*, the seminal District of Columbia case on informed consent, held:

> [W]hen causality is explored at a postinjury trial with a professedly uninformed patient, *the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical*: "Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?" *And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.*
>
> In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. *It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited.* It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.

464 F.2d at 790-91 (citations omitted; emphasis added); adopted by the D.C. Court of Appeals in *Crain v. Allison*, 443 A.2d 558 (D.C. 1982). Here, the situation presented by plaintiffs is even more speculative and attenuated, as it is not based on what Ms. Kerris says she would have done,

but what her family, with the help of their attorneys, <u>say</u> she would have done. Amended

Complaint ¶ 21.

      *Blincoe v. Luessenhop*, *supra*, a case directly on point, instructs that summary

judgment should be entered for defendants on plaintiffs' lack of informed consent claim.

*Blincoe*, 669 F. Supp. at 518. *Blincoe* presented a situation virtually identical to the

circumstances presented here. Plaintiff Blincoe, who suffered from AVM and was experiencing

a slight hesitancy of speech and an unsteady walk, entered Georgetown University Hospital for a

series of embolizations. *Id.* at 514. In granting defendants' motion for summary judgment,

defendants submitted the signed consent forms and an affidavit from the treating physician, as

defendants do here, as to the discussions the treating physician normally had with patients as to

embolization procedures. *Id.* at 517. Here, defendants present an affidavit from Dr. Watson

based on his specific recollections of his discussions with the patient, Ms. Kerris, because of the

rarity of her medical presentation, not just an affidavit from the treating physician about his

general practice of disclosure. "These documents satisfy defendant's burden of pointing to

portions of the record either negating an element of plaintiffs' affirmative case or indicating an

absence of evidence supporting plaintiffs' affirmative case." *Id.*

> The burden of production shifts to plaintiff: plaintiff must adduce
> some evidence to show that Mrs. Blincoe did not give her informed
> consent to Dr. Camponovo on either February 15 or February 17.
> *Plaintiffs, however, have no evidence to offer. . . .* Mr. Blincoe was
> not present at the hospital during critical discussions. Mrs.
> Blincoe's deposition testimony indicates that she has no
> independent recollection of any events between her admission to
> Georgetown and the evening after her first embolization. *Plaintiffs*
> *are left with only an inference, drawn from Mrs. Blincoe's inability*
> *to recall that her discussions with Dr. Camponovo did not occur.*

*Id.* at 517-18 (emphasis added).

Here, defendants have come forward with evidence that Ms. Kerris was informed of the complications and risks of the procedure, as evidenced by a consent forms she signed, Exs. 4, 6, 10, 15, as well as Dr. Watson's affidavit (Ex. 8) as to the discussions they had about the procedure. SOF ¶¶ 14-16, 19, 22-24, 27, 30, 33. The burden of production, therefore, shifts to plaintiffs to adduce some evidence to show that Mrs. Kerris did not give her informed consent for the procedure, something plaintiffs admit in their Amended Complaint that they cannot do. SOF ¶¶ 34-35.

Under *Blincoe* and its predecessors, "[a] jury verdict for the plaintiff, based on the evidence adduced here, could only be the result of sheer speculation, with no grounding in the record. . . . [T]he law does not permit [plaintiffs] to recover from Dr. Luessenhop in the absence of evidence showing that Dr. Luessenhop's alleged non-disclosure resulted in Mrs. Blincoe's undergoing a procedure she would not reasonably have undergone otherwise. . . . *Without such proof, summary judgment for the defendant Dr. Luessenhop must be granted*." *Id.* at 518 (emphasis added).

As in *Blincoe*, here plaintiffs have no evidence, nor can they create or discover any evidence as to what Ms. Kerris was told about her procedures or what Ms. Kerris would have done on November 4, 1998, January 13, 1999, and March 3, 1999, as she was facing a dire medical situation – one that she had been told was terminal, to counter defendants' evidence that Ms. Kerris was fully informed. SOF ¶¶ 14-16, 19, 22-24, 27, 30, 33-35.

Therefore, defendants respectfully submit that summary judgment should be entered in their favor on plaintiffs' claim for lack of informed consent (Count II) under F.R.C.P. 56(b) and applicable case law.

25

II.     **AS THERE IS NO EVIDENCE SUPPORTING PLAINTIFFS' CLAIM FOR LACK OF INFORMED CONSENT, IF NOT DISMISSED PURSUANT TO F.R.C.P. 12(b)(6), PLAINTIFFS' CLAIM FOR FRAUD (COUNT VI) MUST BE DISMISSED PURSUANT TO F.R.C.P. 56(b).**

If not dismissed pursuant to F.R.C.P. 12(b)(6) for failing to meet the pleading standards for fraud, plaintiffs' fraud claim (Count VI) must be dismissed under F.R.C.P. 56(b) as the claim is completely dependent on plaintiffs' hypothetical allegation that defendants "fraudulently withheld representations of material facts which were false and/or the falsity of what was known or should have been known to Defendants at the time the representations were made." Amended Complaint ¶ 47; *see also id.* ¶¶ 48-52. As demonstrated in the prior section, plaintiffs have no and can develop no evidence to counter defendants' evidence that Ms. Kerris was given full disclosure of all material facts regarding the embolization procedures. SOF ¶¶ 14-16, 19, 22-24, 27, 30, 33-35.

"'In order to survive a motion for summary judgment, the non-moving party must present more than mere conclusory allegations.'" *Va. Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs., supra,* 878 A.2d 1226, 1233 (D.C. 2005) (quoting *Teru Chang v. Inst. for Public-Private P'ships, Inc.,* 846 A.2d 318, 323 (D.C.2004)). As demonstrated above, "'[n]othing in the record establishes or suggests that the [ ] representation[s] w[ere] made without the intention to perform or with the intention to mislead or deceive ... [and a] mere allegation in an unverified complaint is not enough.'" *Va. Acad. of Clinical Psychologists.,* 878 A.2d at 1236 (quoting *Bennett v. Kiggins,* 377 A.2d 57, 61 (D.C. 1977)). Moreover, there is and will be nothing in the record that establishes – much less establishes by clear and convincing evidence as required for fraud – that any nondisclosure even took place, much less nondisclosure motivated by an intent to deceive. *Va. Acad. of Clinical Psychologists,* 878 A.2d at 1235.

26

As plaintiffs simply cannot provide sufficient evidence in the record to meet,
under the requisite standard of proof, their burden of "'produc[ing] at least enough evidence to
make out a prima facie case in support of [their] position,'" defendants respectfully submit that if
not dismissed with prejudice pursuant to F.R.C.P. 12(b)(6), plaintiffs' claim for fraud (Count VI)
must be dismissed with prejudice, pursuant to F.R.C.P. 56(b). *Id.* at 1236 (quoting *Joeckel v.
Disabled Am. Veterans,* 793 A.2d 1279, 1281-82 (D.C.2002)).

## III.    AS PLAINTIFFS' ONLY INTENTIONAL TORT, FRAUD, MUST BE DISMISSED, THE BASIS FOR A CLAIM FOR PUNITIVE DAMAGES (COUNT IX) DOES NOT EXIST.

Although defendants believe that they have demonstrated that plaintiffs' claim for
fraud (Count VI) must be dismissed either or both under F.R.C.P. 12(b)(6) and 56(b), and that
plaintiffs' claim for punitive damages (Count IX) should be dismissed pursuant to F.R.C.P.
12(b)(6), given the evidence defendants present to the Court and that plaintiffs cannot counter
now or in the future, there is no basis for plaintiffs' claim for punitive damages (Count IX);
therefore, in the alternative to dismissal pursuant to F.R.C.P. 12(b)(6), defendants respectfully
submit that summary judgment should be entered in their favor on plaintiffs' claim for punitive
damages (Count IX) under F.R.C.P. 56(b), if it is not dismissed with prejudice pursuant to
F.R.C.P. 12(b)(6).

Taking the facts in the light most favorable to plaintiffs, Ms. Kerris came to GUH
for medical treatment of a very serious, rare, medical condition – a Grade 5, bithalamic AVM
that she had been told was terminal – compounded by her experiencing the even rarer symptom
of cognitive decline. SOF ¶¶ 1, 8-11, 20, 23. With no evidence to the contrary, the record
establishes that Ms. Kerris was fully informed regarding the embolization procedures. SOF ¶¶

14-16, 19, 22-24, 27, 30, 33-35.  Plaintiffs have no evidence, nor can they create evidence as Ms. Kerris has been adjudged incompetent, that nondisclosure took place.  SOF ¶¶ 34-35.

The basis, therefore, for plaintiffs' claim for punitive damages – the intentional tort of fraud based on alleged nondisclosure – is nonexistent.  Not only do plaintiffs lack and will always lack evidence supporting this allegation of nondisclosure, but plaintiffs do not explain, nor demonstrate, why defendants would have any motivation to deceive Ms. Kerris through nondisclosure.

Whether pursuant to F.R.C.P. 12(b)(6) or 56(b), plaintiffs' claim for lack of informed consent fails and with it, their claim for fraud, and therefore, plaintiffs' claim for punitive damages (Count IX) likewise fails.  The predicate intentional tort for punitive damages to be imposed being absent, defendants respectfully submit that summary judgment should be entered in their favor on plaintiffs' claim for punitive damages (Count IX).

### PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(f) THE COURT SHOULD STRIKE ENUMERATED PARAGRAPHS OF PLAINTIFFS' AMENDED COMPLAINT

Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  To the extent that plaintiffs' Amended Complaint contains allegations that are immaterial to Ms. Kerris's claims – such as Dr. Watson's fiduciary duties to GUH and allegations concerning inapplicable federal statutes and regulations – which allegations are set forth below and are immaterial, impertinent, and/or scandalous, defendants respectfully move to have these allegations struck from the Amended Complaint, thereby creating a pleading that contains only allegations that are relevant to this case, making the adjudication of Ms. Kerris's claims easier.

28

## Allegations That Defendants Move to Strike From The Amended Complaint

1.  **Paragraph 11(c)**: As set out in Section V, *supra*, FDA regulations regarding investigational device exemptions have no applicability to this case.

2.  **Paragraph 11(d)**: As set out in Section V, *supra*, FDA regulations regarding investigational device exemptions have no applicability to this case.

3.  **Paragraph 11(f)**: Plaintiffs have provided no reasonable basis for their allegation that the substances used in the embolization procedures requested by Ms. Kerris were illegal. Without such good faith basis, such allegation of illegality is both impertinent and scandalous and, as set out in Section V, *supra*, FDA regulations regarding whether the substances were approved or unapproved for the use in embolization procedures, the allegation is immaterial to this case.

4.  **Paragrah 11(h)**: As set out in Section V, *supra*, and in the entirety of plaintiffs' Amended Complaint, the substances used to perform the embolization procedures were not being investigated; rather, they were being used to treat Ms. Kerris's rare and serious condition; therefore, FDA regulations regarding investigational devices have no applicability to this case.

5.  **Paragraph 11(i)**: Plaintiffs have provided no reasonable basis for their allegation that the substances used in the embolization procedures requested by Ms. Kerris were illegal. Without such good faith basis, such allegation of illegality is both impertinent and scandalous and, as set out in Section V, *supra*, FDA regulations regarding whether the substances were approved or unapproved for the use in Ms. Kerris's embolization procedures, the allegation is immaterial to this case.

6.  **Paragraph 11(j)**: As set out in Section V, *supra*, and in the entirety of plaintiffs' Amended Complaint, the substances used to perform the embolization procedures were not being investigated; rather, they were being used to treat Ms. Kerris's rare and serious condition; therefore, FDA regulations regarding investigational devices, IRBs and/or human experimentation have no applicability to this case.

7.  **Paragraph 11(k)**: As set out in Section V, *supra*, the FDA does not regulate the practice of medicine, nor the choices an individual medical practitioner makes as to the appropriate treatment for his or her patient. A "trade alert" is generally enacted against a manufacturer and has no bearing on an individual doctor's use of a substance and is, therefore, immaterial to this case.

8.  **Paragraph 11(l)**: Plaintiffs have provided no reasonable basis for their allegation that the substances used in the embolization procedures requested by Ms. Kerris were illegal. Without such good faith basis, such allegation of illegality is both impertinent and scandalous and, as set out in Section V, *supra*, FDA regulations regarding whether the substances were approved or unapproved for the use in embolization procedures, the allegation is immaterial to this case.

9.  **Paragraph 11(o)**:  District of Columbia law states that the doctrine of *res ipsa loquitur* is inapplicable to a complex medical malpractice case.  *Blincoe*, 669 F. Supp. at 516.

10. **Paragraph 59(b)-(c)**:  As set out in Section V, *supra*, and in the entirety of plaintiffs' Amended Complaint, the substances used to perform the embolization procedures were not being investigated; rather, they were being used to treat Ms. Kerris's rare and serious condition; therefore, FDA regulations regarding seeking approval, notice or investigational devices have no applicability to this case.

11. **Paragraph 59(h)**:  Plaintiffs have provided no reasonable basis for their allegation that the substances used in the embolization procedures requested by Ms. Kerris were illegal.  Without such good faith basis, such allegation of illegality is both impertinent and scandalous and, as set out in Section V, *supra*, FDA regulations regarding whether the substances were approved or unapproved for the use in embolization procedures, the allegation is immaterial to this case.

12. **Paragraph 60**:  Should be struck in its entirety as whatever fiduciary duty Dr. Watson may or may not have to Georgetown University Hospital is immaterial to plaintiffs' claims and in addition to being immaterial, paragraph 60 contains impertinent and scandalous matter as to what plaintiffs assume are duties Dr. Watson owed to another defendant and have no bearing on this case.

13. **Paragraph 61**:  As set out in Section V, *supra*, FDA statutes and regulations cited by plaintiffs have no applicability to this case and defendants had no obligation to conform to them; therefore, this allegation is immaterial to this case and should be stricken from the Amended Complaint.

30

## CONCLUSION

For all of the reasons stated above, the facts set out in defendants'
Statement of Material Facts as to which Defendants Contend There is No Genuine
Dispute, and the evidence contained in the attached exhibits, defendants respectfully
submit that Count III: Strict Products Liability, Count IV: Breach of Implied Warranty
of Fitness for a Particular Purpose, Count V: Breach of Express Warranties, Count VI:
Fraud, Count VII: Consortium Claim of Paul Kerris, Count IX:  Punitive Damages,
Counts X and XII: Violations of 21 U.S.C. § 360(a)(2) and 21 C.F.R. §812.20(a)(2), and
Count XI: Violation of 21 U.S.C. § 331(a), (b), (c), (g), and (k) should be dismissed with
prejudice pursuant to Federal Rule of Evidence 12(b)(6); that summary judgment be
entered in defendants' favor on Count II:  Lack of Informed Consent, and/or in the
alternative to dismissal for failure to state a claim under Federal Rule of Evidence
12(b)(6), summary judgment entered in defendants' favor as to Count VI:  Fraud and
Count IX: Punitive Damages; and that the enumerated paragraphs identified in this
memorandum be struck from the Amended Complaint as containing allegations that are
immaterial, impertinent, and/or scandalous.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated:  March 6, 2006          By:   /s/ Megan E. Hills
                                    Megan E. Hills ((D.C. Bar #437340)
                                    Nicolas Muzin (*Bar Membership in New York &
                                    the District of Columbia pending*)

                                    725 Twelfth Street, N.W.

31

Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)
mhills@wc.com
nmuzin@wc.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendants' Motion to Dismiss, for Summary Judgment, and to Strike Certain Allegations in plaintiffs' Amended Complaint with the Memorandum of Supporting Points and Authorities, Defendants' Statement of Material Facts as to which Defendants Contend There is No Genuine Dispute, Proposed Order, and Exhibits were mailed, first-class mail, and postage prepaid this 6th day of March, 2006 to:

> Anthony Newman, Esquire
> Newman & McIntosh
> 7315 Wisconsin Avenue
> Suite 700E
> Bethesda, Maryland 20814
>
> and
>
> Andrew Greenwald, Esquire
> Greenwald and Laake
> 6404 Ivy Lane
> Suite 440
> Greenbelt, Maryland 20770
>
> Plaintiffs' Attorneys

and a courtesy-copy hand-delivered to:

> The Honorable Paul L. Friedman
> Chambers
> 3 rd  & Constitution Avenue, N.W.
> Washington, D.C. 20001

_____
Nicolas Muzin

33