UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, As Guardian of the Person and Property of KARYN A. KERRIS, | ( ( ( ( ( ( |
| Plaintiffs, | ( ( |
| v. | ( ( |
| Georgetown University Hospital, GEORGETOWN UNIVERSITY, t/a Georgetown University, and VANCE E. WATSON, M.D., | ( ( ( ( ( ( |
| Defendants. | ( ( ( ( |

Civil Action No. 1:05CV02086

Judge Paul L. Friedman

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH DEFENDANTS CONTEND THERE IS NO GENUINE DISPUTE IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants, Georgetown University and Vance E. Watson, M.D., (hereinafter, collectively referred to as "defendants"), by and through undersigned attorneys, hereby submit this Statement of Material Facts as to which Defendants Contend There is No Genuine Dispute, relating to defendants' Motion for Summary Judgment on Claim II: Lack of Informed Consent, and in the alternative to dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6), Count VI: Fraud and Count IX: Punitive Damages.

**MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE**

1.     In the summer of 1998, plaintiff Karyn Kerris ("Ms. Kerris"), a woman with Turner's Syndrome, was referred to Georgetown University Hospital ("GUH"), suffering from bithalmic arteriovenous malformations ("AVMs"), measuring 6 to 7 centimeters in diameter, a neurologic disease that she was told was terminal as it manifested in her, after discovering that

she had an AVM while voluntarily participating as part of a control group in a National Institute of Health ("NIH") study where she worked. *See* 8/31/98 GUH Ambulatory and Less Than 48 Hours Record; 3/5/99 GUH Psychiatry Consult; 11/4/98 GUH Radiology Report (Exs. 1, 2, & 3, respectively).

2.    Turner's Syndrome is a chromosomal abnormality involving the absence of all or part of one X chromosome in females. While abnormalities vary, all females who present with the syndrome exhibit a short stature, sexual infantilism due to rudimentary ovaries, and a variety of somatic abnormalities including congenital heart disease, hypothyroidism, kidney malformation, and skeletal abnormalities. *See* http://tumers.nichd.nih.gov.

3.    AVM is a congenital, non-hereditary defect of the vascular system, where a normal capillary system does not exist between an artery and a vein, and arterial blood passes directly into the venous system. Brain AVMs are very rare and occur in less than 1% of the general population. *See* The Toronto Brain Vascular Malformation Group, http://brainavm.uhnres.utoronto.ca.

4.    The risk of bleeding from AVMs is 4% per year, which means that 4 out of every 100 people with an AVM will have a bleed (hemorrhage) during any one year. Treatment is offered to try to prevent bleeding from an AVM. Bleeding may injure the surrounding brain resulting in a stroke with possible permanent disability or even death. The most common symptoms of AVM include hemorrhaging (bleeding), seizures, headaches, and neurological problems such as paralysis or loss of speech, memory, or vision. Treatment may alleviate these symptoms. The cumulative risk of bleeding from an AVM for a 30 year old (Ms. Kerris was 28 years old at the time of the procedures) over one's lifetime is 70.6%. *Id.*

3

5.    AVMs typically cause problems before the age of 40.  AVM rupture accounts for 2% of all strokes.  http://www.answers.com/topic/arteriovenous-malformation.

6.    There are three general forms of treatment for AVM:  1) Surgery, which involves identifying the margins of the malformation, ligating (tying off) or clipping the feeder arterial vessels, obliterating the draining veins, and removing or obliterating the nidus (the nest) of the AVM; 2) Endovascular occlusion, which involves closing off the vessels of the AVM by one of various nonsurgical means.  Catheters can deliver agents to block the blood vessels that include permanent balloons, thrombosing (clogging) coils, sclerosing (hardening) drugs, and *fast-acting embolization glue*; and 3) Radiosurgery, generally reserved for relatively small AVMs (less than 3 cm in diameter), which involves focusing multiple radiation beams on the AVM so as to injure and thrombose (clog) the AVM.  *Id.*

7.    A mixture of an acrylate ("glue") and an oil-based contrast material, such as Lipiodol and Histoacryl, is often used for such embolization procedures.  *See* J.S. DeMeritt, et al., "Outcome Analysis of Preoperative Embolization with N-Butyl Cyanoacrylate in Cerebral Arteriovenous Malformations," AJNR 16:1801-1807 (Oct 1995) at 1802, 1804 ("We routinely mixed N-butyl cyanoacrylate with the oil-based contrast material ethiodized oil to slow polymerization times; tantalum was added to opacify the solution. . . . We have shown that preoperative N-butyl cyanoacrylate embolization improves surgical outcome."); Chul Suh, D., et al., "Change of Spontaneous Reaction of Glue and Lipiodol Mixture during Embolization after the Addition of Tungsten Powder," Am J Neuroradiol 21:1277-1279 (August 2000); Casaco A., et al., "Major Complications of Percutaneous Embolization of Skull-Base Tumors," Am J Neuroradiol 20:179-181 (Jan. 1999); Stoesslein F., et al., "Experimental Studies on New Liquid Embolization Mixtures (histoacryl-lipiodol, histoacryl-panthopaque),"

Cardiovasc Intervent Radiol, 1982; 5(5):264-76; Lieber, B. et al., "Acute and Chronic Swine Rete Arteriovenous Malformation Models: Effect of Ethiodol and Glacial Acetic Acid on Penetration, Dispersion, and Injection Force of N-Butyl 2-Canoacrylate," Am J Neuroradiol 26(7):1707-1414 (Aug 2005); Hong, J., et al., "Successful Management with Glue Injection of Arterial Rupture Seen during Embolization of an Arteriovenous Malformation Using a Flow-Directed Catheter: A Case Report," Korean J Radiol 2000; 1:208-211.

8.     While intracranial hemorrhage is the most dramatic and acutely life-threatening manifestation of AVMs, progressive dementia is another manifestation. Hurst, RW, et al., "Dementia Resulting from Dural Arteriovenous Fistulas: The Pathologic Findings of Venous Hypertensive Encephalopathy," Am J Neuroradiol 19: 1267-1273 (Aug. 1998).

9.     AVMs cause dementia by increasing venous hypertension and congestion which impairs parenchymal venous drainage, causing ischemia. This leads to progressive global cognitive dysfunction with dementia. Without treatment, the dementia will most likely progress. *Id.*

10.     Angiography with arterial embolization is the preferred technique for ameliorating symptoms of progressive dementia that are due to AVMs. *Id.*

11.     Arterial embolization can result in subtotal eradication of the AVM, but it is a seriously risk laden procedure to address a dire situation. Even if subtotal eradication cannot be achieved, in many cases this procedure leads to decrease in blood flow through the AVM and is associated with improved cognitive function. Should cognitive decline recur, additional arterial embolization may be performed to further decrease flow and venous hypertension. *Id.*

12.     Ms. Kerris was asymptomatic until March 1998 when she began experiencing increasing difficulty with balance and progressive slurring of her speech, increasing in frequency

and she reported having blacked out while driving on July 4, 1998. *See* 11/4/98 GUH Consultation Report (Ex. 3).

13.     On August 31, 1998, Ms. Kerris presented at GUH for a cerebral arteriogram to delineate further the abnormalities of the blood vessels – AVM – within her brain. 8/31/98 GUH Ambulatory and Less Than 48 Hours Record (Ex. 1).

14.     On August 31, 1998, Ms. Kerris signed a Consent for Surgery, Anesthetics, and Other Medical Services ("Consent Form") in connection with the angiogram. *See* 8/31/98 Consent Form (Ex. 4).

15.     As was the case with all of the other Consent Forms Ms. Kerris signed, in the August 31, 1998 Consent Form, Ms. Kerris acknowledged that her treating physician, Vance C. Watson, M.D. ("Dr. Watson"), had "described the nature of this procedure to me in terms I understand and has answered all questions I have asked about it to my satisfaction. He has also explained significant complications and risks which may be associated with this procedure, including the complications and risks of anesthesia, and has advised me of possible alternatives to this treatment, including the possible consequences of no treatment at all, and the significant complications and risks associated with such alternatives." *Id.*

16.     Ms. Kerris also acknowledged that "I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as the result of treatments or examination in the hospital." *Id.*

17.     The August 31, 1998 arteriogram showed that "[t]here is a high flow arteriovenous malformation involving the thalamic structures bilaterally, and primary drainage is

the vein of Galen." *See* 8/31/98 GUH Bilateral Carotid Arteriogram Report (Ex. 5). The conclusion was "bithalamic arteriovenous malformation, Spetzler-Martin, grade 5."[1] *Id.*

18.    On November 4, 1998, Ms. Kerris came to GUH for an angiogram and possible embolization using a mixture of an acrylate and oil-based contrast which plaintiffs label a combination of Lipiodol and Histoacryl.[2] *See* 11/4/98 Consent Form (Ex. 6). Ms. Kerris was experiencing decreasing cognitive function, increasing gait ataxia (uncontrolled movement of the arms, hands, legs or trunk). *See* 11/4/98 GUH Radiology Report (Ex. 3). By November 4, 1998, Ms. Kerris reported that her balance problems and the slurring of her speech had increased where she now experienced them every two to three days. *Id.*

19.    Again, prior to the embolization procedure Ms. Kerris signed the GUH Consent for Surgery, Anesthetics, and Other Medical Services in connection with her treatment in which she acknowledged that Dr. Watson

has described the nature of this procedure to me in terms I understand and has answered all questions I have asked about it to my satisfaction. He has also explained significant complications and risks which may be associated with this procedure, including the complications and risks of anesthesia, and has advised me of possible alternatives to this treatment, including the possible consequences of no treatment at all, and the significant complications and risks associated with such alternatives.

---

[1] The Spetzler-Martin is a 5 point scale. "The rate of neurological complications increased by Spetzler-Martin grade. Female gender, AVM size, and deep venous drainage were significantly associated with neurological deficits at in-hospital and long-term evaluation." *See* "Determinants of Neurological Outcome After Surgery for Brain Arteriovenous Malformation," Hartmann, A., et al., Stroke. 2000; 31:2361. "[T]he correlation between worse neurologic outcome and higher Spetzler-Martin grade had been previously determined." DeMerrit, J.S., et al., "Outcome Analysis of Preoperative Embolization with N-Butyl Cyanoacrylate in Cerebral Arteriovenous Malformations," AJNR 16:1801-1807 (Oct 1995) at 1802.

[2] For the sole purpose of this motion, defendants accept plaintiffs' representation of facts as true, but do not concede the truth of plaintiffs' allegations for purposes of the litigation as a whole. So, for the sole purpose of this motion, defendants will accept plaintiffs' label of Lipiodol and Histoacryl.

November 4, 1998 Consent Form (Ex. 6). Ms. Kerris again acknowledged that "I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as the result of treatments or examination in the hospital." *Id.*

20.    Because of the rare nature of Ms. Kerris's medical presentation and even rarer symptoms, Dr. Watson presented her situation to the multidisciplinary neurovascular conference: "The case was discussed at [the] multidisciplinary neurovascular conference and endovascular treatment was encouraged." 11/4/98 GUH Radiology Report (Ex. 3). The multidisciplinary neurovascular conference includes radiologists, neurologists, and neurosurgeons from GUH, other area hospitals, and private practice physicians from outside GUH that regularly meets. Cases are presented by the treating physician and diagnosis and management are discussed in the open forum. Dr. Watson presented the images and clinical findings from Ms. Kerris's case and then discussion followed. Affidavit of Vance C. Watson, M.D. ("Watson Affidavit") at ¶ 18 (Ex. 8).

21.    Embolization is such a widely accepted treatment for Ms. Kerris' medical condition that in November 2000 when her parents took her to Stanford University Hospital in California for a consult with Gary K. Steinberg, M.D., PhD, Professor and Chair of Neurology at Stanford University Medical Center, he planned to treat her condition with a subsequent embolization, the very same procedure that plaintiffs now claim Dr. Watson was negligent in performing. 11/30/00 Gary K. Steinberg, M.D., Letter to GUH Carlos Tornatore, M.D. (Ex. 7).

22.    Dr. Watson had multiple conversations with Ms. Kerris alone about all material facts regarding her medical presentation and proposed embolization procedures using the Lipiodol and Histoacryl mixture, including her condition, the seriousness of it, her prognosis, the alternative treatments available, the risks, benefits, and complications associated with each of the

alternative procedures, including the risks and complications of doing nothing, *etc.*, prior to doing each of the three embolization procedures using the Lipiodol/Histoacryl mixture. Surgery and radiosurgery treatments were also discussed as options. Watson Affidavit at ¶¶ 8-9 (Ex. 8).

23.     Dr. Watson also explained to Ms. Kerris the material facts regarding the embolization procedure using the Lipiodol/Histoacryl mixture and also clearly explained to Ms. Kerris that improvement of her cognitive symptoms with a series of embolization procedures using the Lipiodol and Histoacryl mixture was only a theory with significant, great risks – including a high rate of failure, death, stroke, neurological worsening – and that there was no way to predict whether Ms. Kerris would improve, stay the same, decline, or that she could even die from the treatment. Dr. Watson did not tell Ms. Kerris that the embolizations would cure her. *Id.* at ¶¶ 13-15.

24.     Dr. Watson also told Ms. Kerris that while using a Lipiodol and Histoacryl mixture in embolization had been used before, neither the procedure, *nor* the substances or mixture of substances to be used were approved by the Federal Drug Administration ("FDA"). Dr. Watson clearly recalls this conversation with Ms. Kerris as there was a possibility that a letter from her would be necessary to obtain the substances for the procedure from outside of the United States and Ms. Kerris, as an employee of NIH, was familiar with both the use of unapproved medical treatments and the use of letters of need. Watson Affidavit ¶¶ 15-17 (Ex. 8).

25.     Ms. Kerris's insurance, Blue Cross/Blue Shield, approved the use of "glue" in the procedure. *See* 11/4/98 Insurance Notes (Ex. 9).

26.     Ms. Kerris experienced no clinical complications during her first embolization procedure on November 4, 1998.  11/4/98 GUH Radiology Report (Ex. 3).

27.    Ms. Kerris returned to GUH on January 13, 1999 for a second embolization procedure and again signed the Consent for Surgery, Anesthetics, and Other Medical Services, which contained the same acknowledgments that the procedure, alternative treatments, and risks and complications, *etc.*, had been satisfactorily explained to her and that no guarantees had been made to her in connection with the procedure. *See* 1/13/99 Consent for Surgery, Anesthetics, and Other Medical Services (Ex. 10). Ms. Kerris was attempting to maintain optimal cerebral tissue profusion, as she was suffering from decreasing cognitive function, gait disturbance, and slurred speech. *See* 1/13/99 GUH Patient Care Summary (Ex. 11).

28.    Ms. Kerris was discharged home on January 15, 1999 without complications noted from the procedure. *See* 1/13/99 GUH Daily Patient Assessment Flowsheet; 1/15/99 GUH Attestation Report (Exs. 12 & 13, respectively).

29.    Ms. Kerris returned to GUH on March 3, 1999 for a cerebral AVM embolization because of new numbness, slight worsening of lethargy, and difficulty walking. *See* 3/17/99 GUH Discharge Summary (Ex. 14).

30.    Again, Ms. Kerris signed the Consent for Surgery, Anesthetics, and Other Medical Services, in which she acknowledged that all risks, complications, and alternative treatments, *etc.*, had been satisfactorily explained to her and that no guarantees were given to her as to the result of the treatment. *See* 3/3/99 Consent for Surgery, Anesthetics, and Other Medical Services (Ex. 15).

31.    No complications were noted in the procedure. *See* 3/17/99 GUH Discharge Summary (Ex. 14). Ms. Kerris denied any change in her concentration or memory or denied feeling depressed or hopeless. 3/5/99 GUH Psychiatry Consult (Ex. 2).

32.     Ms. Kerris was discharged home on March 17, 1999. *See* 3/17/99 GUH Discharge Summary (Ex. 14).

33.     Dr. Watson had several discussions with Karyn Kerris alone as to all material facts, risks, complications, prognosis, alternative treatments, the nature of the procedure, *etc.*, on which basis Ms. Kerris gave her informed consent. Watson Affidavit ¶¶ 8-9, 11-17, 19-20, 23, 26 (Ex. 8).

34.     Ms. Kerris has been adjudged incompetent, having had Felice and Cicily Iacangelo (her parents) appointed as her guardians on August 11, 2005. In their complaint, plaintiffs characterize Ms. Kerris as "brain damaged and dysfunctional for the remainder of her life" and "unable to comprehend or otherwise be cognizant of what had occurred . . ." Amended Complaint ¶¶ 2, 12-13.

35.     Ms. Kerris is and, per the Amended Complaint, will always be unable to provide any additional facts as to the information with which she was provided by defendants prior to signing the Consent Forms, nor can anyone other than Dr. Watson as he and Ms. Kerris were the only people present during some of the discussions. Watson Affidavit ¶¶ 8-9, 11-17, 19-20, 23, 26 (Ex. 8).

36.     The decline in Ms. Kerris's functional abilities appear to be associated with personality changes for as of October 2004, Ms. Kerris was dressing herself, going to the Mall and to the theater, answering questions, and talking on the phone. *See* 6/9/04-10/04 GUH Dr. Tornatore Office Notes (Ex. 16).

37.     Despite the interventions of the embolizations, Ms. Kerris's health continued to deteriorate and she sought treatment at GUH (owned and operated as of July 1, 2000, by MedStar Health, Inc.) for four years after her last embolization procedure. In addition to the

embolization procedures at GUH during the November 1998-March 1999 time period, Ms. Kerris was admitted to GUH on April 13, 1999 (aspiration pneumonia), on October 11, 1999 (neurologic symptoms), on July 31, 2000 (abdominal pain), on February 18, 2001 (headaches), on October 12, 2003 (pneumonia), and on March 26, 2004 (abdominal pain). *See* 5/7/99 GUH Discharge Summary; 10/14/99 GUH Discharge Summary; 7/31/00 GUH Attestation Report; 3/7/01 GUH Discharge Summary; 10/15/03 GUH Discharge Summary; 3/26/04 Discharge Summary (Exs. 17, 18, 19, 20, 21, & 22, respectively).

38.    As of September 2005 – approximately one month before plaintiffs filed the current suit for punitive damages for "willfully, maliciously, and fraudulently" providing medical treatment to Ms. Kerris against defendants – Ms. Kerris was obtaining her medical treatment from the same group of neurologists that have been providing her with medical treatment since 1998 at GUH (owned and operated since July 1, 2000 by MedStar Health, Inc.). *See* 9/12/05 GUH Dr. Tomatore Office Notes (Ex. 23); Amended Complaint, ¶ 63.

39.    As of November 30, 2000, Gary K. Steinberg, M.D., PhD, Professor and Chair of Neurology at Stanford University Medical Center, planned to perform endovascular embolizations of Ms. Kerris's AVM, the same procedure for which plaintiffs fault Dr. Watson for using. *See* 11/30/00 Gary K. Steinberg, M.D., Letter to GUH Carlos Tomatore, M.D. (Ex. 7).

40.    Dr. Watson is in the practice of medicine with a specialty of interventional neuroradiology. He is not manufacturer of any product, nor does he sell any product. His interaction with Ms. Kerris was to provide medical treatment for her AVM. Amended Complaint ¶ 6; Watson Affidavit ¶¶ 27-28 (Ex. 8).

41.     GUH is a "duly licensed and accredited health care facility . . ." Amended Complaint ¶ 5. It is not a manufacturer of any product, nor does it sell Lipiodol or Histoacryl or a mixture thereof. *Id.*

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated:  March 6, 2006          By:  /s// Megan E. Hills
                                    Megan E. Hills (D.C. Bar #437340)
                                    Nicolas Muzin (*Bar Membership in New York &
                                    the District of Columbia pending*)
                                    725 Twelfth Street, N.W.
                                    Washington, D.C. 20005
                                    (202) 434-5000
                                    (202) 434-5029 (fax)
                                    mhills@wc.com
                                    nmuzin@wc.com

Attorneys for Defendants