# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FELICE I. IACANGELO, et al.** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Case No.: 1:05CV02086** |
| | : | **Judge Paul L. Friedman** |
| **GEORGETOWN UNIVERSITY, et al.** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COUNTS III, IV, VI, VII, X, XI AND XII PURSUANT TO F.R.C.P. 12(B)(6); MOTION FOR SUMMARY JUDGMENT ON COUNTS II, VI, AND IX (IN THE ALTERNATIVE FOR COUNTS VI AND IX) PURSUANT TO F.R.C.P. 56(B); AND MOTION TO STRIKE CERTAIN ALLEGATIONS FROM THE AMENDED COMPLAINT PURSUANT TO F.R.C.P. 12(F)**

Plaintiffs, Felice Iacangelo, Cicily Iacangelo and Paul Kerris, by and through their counsel, Newman & McIntosh,  Anthony G. Newman, Esquire, and Joseph, Greenwald and Laake, Andrew Greenwald, Esquire, hereby oppose the Motion on multiple bases below and ask the Court to allow the Plaintiffs to proceed with the litigation as to all counts in the Amended Complaint.

## FACTUAL BACKGROUND

Mrs. Kerris received an angiogram at GUH on August 31, 1998 to investigate the cause of her headaches and other symptoms.  Radiological evaluations uncovered the fact that she had an arterial venous malformation (AVM).  (Radiology Report 11/4/98, Exh. 1 ).   She was referred to defendant Vance E. Watson, M.D., an interventional neuroradiologist [1] to ascertain if she

---

[1]Beginning in the early 70's a new speciality emerged called, " interventional neuroradiology." These physicians originally were "neuroradiologists", the physicians who, *inter alia,* placed catheters and injected contrast dye into the blood vessels of the brain to obtain images.   They became "interventionalists" and crossed-over from being mere diagnosticians to clinicians by injecting chemicals, solids and other agents/devices into vessels they were examining to see if they could bring about a positive physiologic response.

would benefit from type of non-surgical treatment called an embolization.[2]   Apparently, it was immediately recognized by her attending physician Dr. Watson that any attempt to embolize her AVM would carry with it "significant, great risks." including "death, stroke, [or at least] neurological worsening."(Declaration ¶14, Exh. 2).  Further, in Dr. Watson's opinion, these risks far outweighed any potential benefit, for it was "only a theory," that the procedure would reduce her neurologic symptoms and it would not even "address her risk of hemorrhage," (the primary concern of a patient with an AVM). (Declaration ¶¶13-14, Exh.2).

Nonetheless, Dr. Watson, planned multiple embolizations for Mrs. Kerris,  the three he "completed" became the subject of this litigation (Radiology Report 11/4/98, Exh. 1).   Shortly after Mrs. Kerris' last embolization she "became very lethargic and then stopped eating, communicating or showing signs of being awake," (Result Document 3/3/99, Exh.3)  while her condition waxed and waned for a period of time, she ultimately became and remains catatonic.

### Histoacryl® and Lipiodol® were Class III Devices Unapproved by the FDA

The embolic devices chosen by defendants Vance E. Watson, M.D., and Georgetown University, were Histoacryl® (a n-butyl cyanoacrylate, basically a sterile form of SuperGlue®) and Lipiodol® (a poppy seed oil base) (Declaration ¶¶ 15-16, Exh. 2).  These devices were neither approved by the FDA for embolizations, nor approved for *any* medical treatment in the United States at all. [3]*Id*., see also (Damaska Affidavit ¶5, Exh.4)[4].   Histoacryl® and Lipiodol®

---

[2]Embolization is defined as the, *"therapeutic introduction of various substances into the circulation to occlude vessels, either to arrest or prevent hemorrhaging, to devitalize a structure, tumor, or organ by occluding its blood supply, or to reduce blood flow to an arteriovenous malformation." (Stedman, 2000).

[3]When Mrs. Kerris was embolized there were devices that had been specifically approved by the FDA and available for embolizations, and there were devices that had not been specifically approved for embolizations, but were nonetheless available because they had been approved for other legitimate medical purpose.  These devices included, Polyvinyl Alcohol (PVA), ethanol (ethyl alcohol), Gelfoam (surgical foam), etc.  Histoacryl® and

were categorized by the FDA as "Class III" unapproved devices, because their safety and efficacy had not been demonstrated for any medical usage. (See 21 U.S.C. §360e(a), Damaska Affidavit¶ 6, Exh.4).

On multiple occasions Vance E. Watson, M.D., and Georgetown University procured Histoacryl® from an entity called "Yocan Pharmaceuticals," in Canada.[5] *Declaration*, ¶15.[6] Upon the device's entry into the United States, pursuant to Dr. Watson's order, Histoacryl® became adulterated and misbranded. Class III devices that do not have an "application for pre-market approval," are adulterated (21 U.S.C. §(f)(1)(B)(I)); and the devices "used in violation of regulations," are misbranded. 21 U.S.C. §352(q).

### Histoacryl® Was Being Seized and or Detained on the United States Border Pursuant to Import Trade Alert #89-08

At the times when Histoacryl® was being injected into Mrs. Kerris, on November 4, 1998, January 13, 1999, and March 3, 1999 (Exh. 5a-c), it was not only adulterated and misbranded it was the subject of an FDA Import Trade Alert, IA #89-08, dated 8/11/92[7] (Damaska Affidavit ¶ 8, Exh 4, and Import Trade Alert, #89-08, Exh. 6). The Import Trade

---

Lipiodol® being Class III, fell under neither legitimate category.

[4]William Damaska was the Director of the Division of Compliance Operations in the Food and Drug Administration Center for Devices and Radiological Health (CDRH).

[5]"Yocan Pharmaceuticals" is not a pharmaceutical company it is a residential home in Thornill, Canada acting as a mere conduit for the shipment of Histoacryl® from Germany.

[6]By defendant Dr. Watson's own admission these shipments occurred on several occasions. He makes reference to this fact by stating, "one patient improved after undergoing a *series* of such embolizations" and "another patient ... died experiencing complications" (Declaration, ¶13,Exh 2) . Discovery will likely uncover the fact that numerous other embolizations with Histoacryl® and Lipiodol had been performed.

[7]Import Trade Alert IA #89-08 was in full force and effect at all relevant times herein as evidenced by its 10/29/99 and 2/24/04 revisions repeating the prohibition involving Histoacryl® (Exh. 6).

Alert called for shipments of Hisotacryl® from Yocan Pharmaceuticals to be seized by U.S. Customs on the Canadian border prior to reaching the United States.  (Import Trade Alert, IA #89-08, Exh.6)  Undaunted by Hisotacryl®'s illegality and unavailability, defendant Vance E. Watson, M.D., and Georgetown University procured the adulterated and misbranded device, from Canada.  (Declaration ¶¶ 15-16, Exh.2).

**Histoacryl® Is Contraindicated for Use as an Embolic Device by its Manufacturer**

Not only was Hisotacryl®, a Class III unapproved, adulterated, misbranded device subject to an Import Trade Alert,  its use as an embolic agent was entirely antithetical to the German manufacturer's specific contraindications.  The sole contraindication in the package insert reads as follows:

> **Contraindications**
> Histoacryl® must not be used for clotting wounds to internal organs or on the surface of the brain and to the central and peripheral nervous system, *since tissue damage with scar formation and subsequent disturbance of function* can result.  *Administration to the intima and media of blood vessels should be avoided on account of the risk of thrombosis and damage to the vascular wall.* (Emphasis added).

(Histoacryl® Package Insert, Exh. 7)

**Dr. Watson's "Theory" Was Not Reviewed by an Institution Review Board**

Any "theory" to be studied implanting a device in a human being at Georgetown University (let alone a study involving devices that was unapproved, adulterated, misbranded, subjected Trade Alert, and being injected in a manner forbidden by its manufacturer) at Georgetown University that has "significant, great risk[]," requires review by the Georgetown University's  Institutional Review Board (IRB).  (VanWoert[8] Affidavit ¶¶11, 12, Exh. 8;

---

[8]Dr. VanWoert is a Professor of Neurology and Pharmacology at Mt. Sinai School of Medicine.  He has been a principle investigator for industry and the private sector, as well as a consultant for Neuropharmacological

Kaufman[9] Affidavit ¶¶11, 12, 13, Exh.9; and Kamm Affidavit ¶19, Exh.10).  The Georgetown University Institutional Review Board Policies and Procedures Manual states, in relevant portion, states that the "FDA considers studies of all SR [Significant Risk] devices to present more than a minimal risk; therefore, full IRB review for all studies involving SR devices is necessary." (Institutional Review Board (IRB) Manual § D Ch 13 (d), Exh.11).[10]

The Georgetown University  (IRB) is a review board made up of members serving three year terms, selected from diverse backgrounds, they are physicians, administrators, lay persons, attorneys, etc. (IRB Manual Ch. 7 (a-b), Exh. 11).  In exercising their responsibility, the IRB members must determine whether all human research is, "conducted ethically, and in compliance with GU and Federal regulations, the requirements of applicable law, [GU]'s Assurance, and [GU]'s institutional policies and procedures." (Manual B Ch.6 (c), Exh. 11).  One of the primary functions of the IRB is to approve a specialized written informed consent for each study, such consents must contain, at a minimum, the following basic elements:

a.     Research Statement:
     (i)      A statement that the use of the device involves research.
     (ii)      An explanation of the purpose of the research including its long-term goal.
     (iii)      An explanation of the expected duration of subject's participation.
     (iv)      A description of what procedures will be followed.
     (v)      Identification of any procedures that are experimental.

b.     Reasonable Forseeable Risks or Discomforts associated with the use of the device.
c.     Reasonably Expected Benefits to Subjects or Others.
d.     Appropriate Alternatives.

---

Drug Products for the Food and Drug Administration.  He has sat on therapeutics committees at both Sinai and Yale.

[9]Dr. Kaufman was the Vice President of Prince George's General Hospital for eleven years and is presently the Medical Director of the External Peer Review Program for the Veteran's Administration.

[10]Given the fact that there has been no discovery to date, plaintiffs only have in their possession the 2003 IRB manual, however, considering the fact that the relevant portions mirror the federal guidelines, it is unlikely that the prior versions vary greatly from the 2003 edition.

e.     Extent of Confidentiality.
f.     Compensation or Treatment for Injury.
g.     Contact Information.
h.     Voluntary Participation Statement.

(IRB Manual B Ch.12(a-h), Exh. 11).  No specialized informed consent was drafted by

defendants and/or executed by Mrs. Kerris. (VanWoert Affidavit ¶¶9,11, Exh. 8;  Kaufman

Affidavit ¶¶10,11, Exh. 9; and Kamm[11] Affidavit ¶¶19, 23, Exh. 9).

**The Consent Form Did Not Identify the Devices or Explain the Theory Being Tested.**

The consent forms provided to Mrs. Kerris from Georgetown University were

standardized, boilerplate "Consent for Surgery, Anesthetics and Other Medical Services."  These

forms did not contain the (a-h) requirements aforesaid, nor did they mention: (i) the types of

devices being implanted (acrylic glue and poppy seed oil), (ii) the names of the devices,

(Histoacryl® and Lipiodol®), (iii) the fact that the devices were unapproved for any purpose in

the United States, (iv) the fact that the devices were being illegally procured from Canada, (v) the

fact that there was a Trade Alert seizing the shipments of the devices, (vi) and the fact that the

treatment itself was "only a theory."  (Consents for Surgery, Anesthetics, and Other Medical

Services dated 11/4/98, 1/13/99, 3/3/99, Exh. 5a-c and Declaration ¶ 14, Exh. 2).

**Defendant Vance E. Watson, M.D. Expressly Warrantied the Embolizations and**
**Fraudulently Concealed their Illegality**

Mrs. Kerris' father, Felice I. Iacangelo, mother, Cicily Iacangelo, and husband, Paul

Kerris were present during the meetings Dr. Watson had with Mrs. Kerris and  he did not

mention the devices or their legality, instead, he made an express guarantee to Mrs. Kerris, in

their presence, that the embolizations had a 95% chance of success. (Felice Iacangelo Affidavit

_____

[11]Robert Kamm, B.S., Pharm., J.D., is an attorney and pharmacist, presently a regulatory consultant on food
and drug law and general counsel for the American Foundation for Pharmaceutical Education.

¶4, Exh.12; Cicily Iacangelo Affidavit ¶4, Exh.13; and Paul Kerris Affidavit ¶4, Exh.14).

### Violations of 21 USC §331's Prohibited Acts

For years Vance E. Watson, M.D., Georgetown University's employee, manufactured his own device from the combination of Histoacryl® and Lipiodol® creating "Histadol,"(a name invented by plaintiffs for simplicity); the Histadol was then implanted into residents of the Washington metropolitan area, if not residents of other areas. (Declaration ¶15, Exh. 2).   The only method Dr. Watson could produce Histadol was to acquire its raw components illegally from Canada and then introduced them into interstate commerce. (Declaration ¶¶ 15-16, Exh.2).

When Hisotacryl® and Lipiodol®, entered the United States' and traveled state to state arriving in the District of Columbia, Defendants had engaged in an act prohibited by 21 U.S.C. §331(a), "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated and misbranded." *Id.*  When Vance E. Watson, M.D., combined the Hisotacryl® with Lipiodol® manufacturing Histadol,[12]   Defendants had engaged in an act prohibited by 21 U.S.C. §331(b), "[t]he adulteration or misbranding of any food, drug, device, or cosmetic in interstate commerce."*Id.*  Finally, when Vance E. Watson, M.D. received the two adulterated and misbranded devices, Hisotacryl® and Lipiodol®, from Yocan Pharmaceuticals and then sold them, along with his embolization procedure to Mrs. Kerris, Defendants had engaged in an act prohibited by 21 U.S.C. §331(c), "[t]he receipt in interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the

---

[12]Vance E. Watson, M.D.'s, use of the Histoacryl® and/or Lipiodol® did not fall under the so called "practice of medicine" exclusion of the FDCA, 21 U.S.C. §360(g)(2) for Dr. Watson was not a "practitioner[] licensed by law to prescribe or administer ...[these]...device[s]" for no practitioner in the United States is "licenced by law to prescribe or administer" misbranded and adulterated Class III devices, much less a combination of the two. Damaska Affidavit ¶19, Exh..4 and Kamm Affidavit ¶14, Exh. 14.

delivery or proffered delivery thereof for pay or otherwise." (Id.).

On the basis of the above, Plaintiffs filed an Amended Complaint sounding in medical negligence, Count I; lack of informed consent, Count II; strict liability, Count III; breach of implied warranty, Count IV; breach of express warranty, Count V; fraud, Count VI; consortium, Count VII; breach of fiduciary, Count VIII; punitive damages, Count IX; and negligence per se, Counts X, XI, XII.   Defendants have filed motions as to all counts except Count I, negligence and Count VII, breach of fiduciary.  The Counts at issue are argued below.

## ARGUMENT

In order for the Amended Complaint to survive a Rule 12(b)(6) motion to dismiss, it need only provide a short and plain statement of the claim and the grounds on which it rests, it clearly does so.   FRCP 8(a)(2); *See also Conley v. Gibson*, 355 U.S. 41, 47,(1957).  A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. FRCP 12(b)(6); *See also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Thus, a court may dismiss a complaint for failure to state a claim *only* if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Woodruff v. DiMario,* 197 F.R.D. 191, (D.D.C. 2000)(quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

Furthermore, where there are genuine issues of material fact, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.*.  The Amended

8

Complaint, taken in conjunction with the Statement of Material Facts at Issue (and those

Defendants placed at issue), as well as the arguments contained herein, establish that Plaintiffs

have more than met their burden.

**COUNT II:  INFORMED CONSENT**

> **a. Defendants reliance on the Case Law is Misplaced - In *Kerris* there are witnesses to the discussions between Defendant Dr. Watson and Mrs. Kerris.**

Defendants application of the case law involving informed consent is flawed.  Defendants

focuses on the case of *Blincoe v. Luessenhop*, arguing that *Blincoe* is "a case directly on

point,"*Memo*. 24.  The facts, however, are clearly distinguishable from *Kerris*.  (699 F.Supp. 513

(D.C. Cir. 1987) .  While it is true that *Blincoe* involved an embolization at Georgetown

University Hospital that rendered yet another patient neurologically compromised, the

similarities end there.  First, *Blincoe* did not involve the injection of unapproved Class III devices

illegally procured from Canada that were being injected into a patient simply to test a theory.

(Declaration ¶¶ 8-16, Exh.2).

 Second,  there were no witnesses at any of the meetings between Mrs. Blincoe and her

health care providers, "Mrs. Blincoe's deposition testimony indicate[d] that she had no

independent recollection of any events" and "Mr. Blincoe was not present at the hospital during

the critical discussions." *Blinco*e 699 F. Supp. at 517-518.  These facts are in sharp contrast to

*Kerris*, for Mr. Felice Iacangelo, Mrs. Kerris' father, Mrs. Cicily Iacangelo, Mrs. Kerris' mother,

and Mr. Paul Kerris, Mrs. Kerris' husband, were present at all the critical conversations. Their

Affidavits attest to the fact that Dr. Watson did not tell Mrs. Kerris: the nature of the devices to

be used; their unapproved Class III status; their illegal procurement from Canada; the

embolizations 50% failure rate; and the fact that the embolization had a theoretical chance for improving her symptoms.  (Felice Iacangelo Affidavit, ¶¶ 5-14, Exh.2;  Cicily Iacangelo Affidavit, ¶¶ 5-14, Exh. 3;  and Paul Kerris Affidavit, ¶¶ 5-14, Exh.4).   To the contrary, the Affidavits demonstrate that Dr. Watson made an express guarantee to Mrs. Kerris that the likelihood of success was 95%.  (Felice Iacangelo Affidavit, ¶ 4, Exh 2  Cicily Iacangelo Affidavit, ¶ 4, Exh. 3, and Paul Kerris Affidavit, ¶ 4, Exh. 4). While defendant attempts to force the facts of *Kerris* into the mold of *Blincoe,* the testimonies of Mrs. Kerris' husband and parents make the holding of *Blincoe* inapplicable.

Reliance on *Canterbury v. Spence*, 464 F.2d 772(D.C. Cir. 1972) would lead to no different conclusion.  In *Canterbury,* appellant's mother had been told by Dr. Spence that the surgery was "not anymore [serious] than any other operation." *Id* at 777.  Her discussions with Dr. Spence were not discarded, as defendant would have the Court discard the testimonies of Felice Iacangelo, Cicily Iacangelo, and Paul Kerris, instead they formed the basis of that Court's holding that a prima facia case of lack of informed consent had been presented. *Id* at 779. Clearly the testimony of the discussions Mrs. Kerris' relatives had with Dr. Watson and the discussions those individuals overheard between Dr. Watson and Mrs. Kerris are relevant evidence for the trier of fact. *Id*. [13]

---

[13]It should be noted that Dr. Watson's veracity, even in the absence of testimony to the contrary, presents an issue of fact for the jury.  According to his declaration, Dr. Watson told Mrs. Kerris: that he intended to use unapproved devices that were not available in the U.S. and would have to be imported from Canada and, he would have to mixed them together to create a third unapproved, untested device. (Declaration ¶s 10-15, Exh. 2).  He further asserts that he told Mrs. Kerris that she only had a theoretical chance of improving her symptoms;  her chances of surviving the procedure was only 50%; and even if she did survive, she would have a significant risk of stroke or neurologic worsening.  *Id*.   A jury may not find this testimony credible believing that no rational patient would ever have consented to such a speculative and risky procedure. *Canterbury*.

The jury may also call into question Dr. Watson's credibility when and if he testifies that he only discussed the legally relevant issues of informed consent when he was alone with Mrs. Kerris.  Declaration ¶ 9, Exh.2).

It should be added that if defendants' argument was adopted, the only testimony that could possibly rebut a physician's testimony regarding informed consent, would be that of the patient, even if there were third-party witnesses to the discussions. Thus, a physician who negligently, but fortuitously, injured a patient's memory, could never be sued for failing to provide informed consent, unless he admitted to doing so.

>    **b. Defendants Failed to Provide A Proper IRB Approved Consent to Mrs. Kerris.**

Notwithstanding the above, it is plaintiffs' experts' opinion that the boilerplate consents signed by Mrs. Kerris, titled, "Consents for Surgery, Anesthesia, and Other Medical Services" are wholly insufficient to obtain informed consent for an unapproved procedure employing an unapproved Class III device. (Kaufman Affidavit ¶¶ 11-12, Exh. 9; Kamm Affidavit, ¶¶ 20-21, Exh. 10). It is Plaintiffs' assertion that the use of such devices was, at best, an experiment requiring a specialized consent form approved by Georgetown University's IRB. *Id.* This is consistent with the Georgetown University's own IRB procedure:

> IRB Review and approval is required for clinical investigations...involving products regulated by the FDA for human use, even where an Investigational New Drug Application (IND) or Investigational Device Exemption (IDE) is not required.

(Manual Ch 2b, Exh. 11). The proper IRB approved consent form must contain at least the following eight basic informed consent elements:

> For an effective informed consent process, Federal regulations at 45 CFR 46.116(a), the Common Rule and FDA regulations at 21 CFR 50.25(a)...mandate the inclusion of eight basic informed consent elements unless the IRB has specifically approved an alteration or waiver of theses elements. The IRB may routinely, or on a case-by-case basis, require that additional information, beyond these eight basis elements, be included in the informed consent.

***

      a.      Research Statement:
            (i)      A statement that the use of the device involves research.
            (ii)     An explanation of the purpose of the research including its long-term goal.
            (iii)    An explanation of the expected duration of subject's participation.
            (iv)    A description of what procedures will be followed.
            (v)     Identification of any procedures that are experimental.

      b.      Reasonable Forseeable Risks or Discomforts associated with the use of the device.
      c.      Reasonably Expected Benefits to Subjects or Others.
      d.      Appropriate Alternatives.
      e.      Extent of Confidentiality.
      f.      Compensation or Treatment for Injury.
      g.      Contact Information.
      h.      Voluntary Participation Statement.

(IRB Manual Ch. 12, Exh.11, see also Kaufman Affidavit. ¶ 11, Exh. 9).  Assuming *arguendo*,

that a jury credits Dr. Watson's statements in his declaration, and finds that they fulfill the eight

required elements[14] the consent would still be deficient because the form must be in writing.

Again, Georgetown's IRB Policies and Procedures Manual provides guidance :

> Federal regulations at 45 CFR 46.117 provide two methods for documenting
> informed consent.
>
> 1. *Written Consent Document.*  Consent may be documented through use of a
> written consent document that embodies all of the required elements of informed
> consent (these elements will be discussed in detail in Chapter 12).  The consent
> document must be signed by the subject (or the subject's legally authorized
> representative), and a copy must be given tot he person signing the form.  FDA
> regulations require that the signature be dated.
>
> 2. *Short Form Consent Document.*  Consent may also be documented through use
> of a short form consent document which states that the elements of informed
> consent have been presented orally to the subject (or the legally authorized
> representative). When this method is used, (1) there must be a witness to the oral
> presentation; (2) the IRB must approve a written summary of what is to be
> presented orally; (3) only the short form must be signed by the subject or the
> representative; (4) the witness must sign both the short form and the summary; (5)

---

    [14] A comparison between Dr. Watson's declaration and the requirements a-h establish that
subsections a(i-v), and subsections e-h were never addressed.

the person actually obtaining consent must sign the summary; and (6) a copy of
the summary and the short form will be given to the subject or the representative.

(IRB Manual, Ch. 11(f)(1-2), Exh. 11).

Needless to say no such documents were created and thus, no such documents were
executed by Mrs. Kerris, violating  the standard of care and violating Georgetown's own IRB
policies and procedures.   (VanWoert Affidavit ¶¶ 9-11, Exh. 8;  Kaufman Affidavit ¶¶ 9-11,
Exh. 9).  At a minimum the informed consent issue and the need for a IRB approved form, are
issues for the jury.

### COUNT III: STRICT PRODUCTS LIABILITY

**Dr. Watson Is a Manufacturer of a Defective Product Who Did Not Adequately
Warn of the Risks Associated with the Device He Produced.**

Defendants' broad-based claim that a medical doctor and a hospital may not be held
strictly liable for products that they import illegally, alter and use ignoring the warned
contraindications, is in error.

Strict products liability applies to items in the flow of commerce.  As discussed in more
detail under the section addressing statutory liability, Counts X, XI, and XII, *supra,* the flow of
commerce begins with the manufacturer of the drug and ends with the consumer, that is, the
patient."  *U.S. v. Evers*, 643 F.2d 1043, 1049 (5th Cir. 1981); *See also U.S. v. Sullivan*, 332 U.S.
689, 696-97 (1948).  Applying this principle, the Court held that the distribution process takes on
many different forms and "[d]octors holding drugs for use in their practice are *clearly one part of
the distribution process, and doctors may therefore hold drugs for sale within the meaning of
[the section]*."  *Id.* at 1050(emphasis added).  Further, a "serious gap would be left in the statute
if doctors who had received drugs in an intrastate transaction from a party who in turn had

received them from interstate commerce were allowed to misbrand the drugs and then distribute them to their patients." *Id.*

Simply put, the Restatement (Third) of Torts: Products Liability § 1 (1998) establishes that one who is engaged in the business of selling *or otherwise distributing products* is subject to liability. Non-manufacturing sellers in the distribution chain are strictly liable. *Id. at cmt. a.* "A . . . manufacturer may be held liable in damages for defective component parts manufactured by another . . . if the . . . manufacturer incorporated the defective component into its finished product." *Weakley v. Burnham*, 871 A.2d 1167, 1177(D.D.C. 2005) (quoting Ford Motor Co. v. Wood, 703 A.2d 1315, 1331 (Md. Ct. Spec. App), cert. denied, 709 A.2d 139 (Md. 1998)) (emphasis added). Specifically, in the District of Columbia, there is liability for injury caused by *placing a defective product into the stream of commerce. Berman v. Watergate,* 391 A.2d 1351, 1357 (D.C. App. 1978) (quoting *Cottom v. McGuire Funeral Service, Inc.*, 262 A.2d 807, 808-09 (D.C. App.1970)) (emphasis added). The District of Columbia recognizes three ways in which a product may be found defective under The Restatement of Torts section 402A: (1) by defective design, (2) by defective manufacture, or (3) by failure of the producer or assembler to warn adequately of a risk related to the way the product was designed. *Webster v. Pacesetter,* 259 F. Supp. 2d 27, 30 (D.D.C. 2003) (quoting *MacPherson v. Searle and Co.*, 775 F. Supp. 417, 422 (D.D.C. 1991) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts Sect. 99, at 695 (5th ed. 1984)); Restatement (Second) of Torts § 402A cmt. k (1965)).

The facts of *Kerris* distinguish Defendants' actions from the cases cited in Defendants' Motion to Dismiss. In *Kerris*, Dr. Watson crossed the line from providing a mere service to a patient and became a manufacturer, creating a device, which was otherwise unavailable in the

14

United States, and move it into interstate commerce. The facts show that even though approved

devices were available for use in the United States, Dr. Watson procured Histoacryl® from

Canada, and had it transported interstate to the District of Columbia. Dr. Watson then

compounded Histoacryl® with Lipiodol® and created and manufactured a new medical device,

"Histadol." (See Plaintiffs' Amended Complaint, ¶ 33).

Further, at least two of the three criteria recognized by the District of Columbia in which

a product may be found defective and render the manufacturer liable apply to this case. First, Dr.

Watson defectively designed Histadol by illegally procuring Histoacryl® and compounding it for

use contrary to the indications of the product's package insert (Package Insert Exh. 7). Second,

as discussed in the section addressing informed consent, Dr. Watson failed to adequately warn, in

fact he provided no warning whatsoever, of a risk related to the way the product was designed.

(See Felice Iacangelo Affidavit ¶¶ 4-14, Exh. 12; Cicily Iacangelo Affidavit ¶¶ 4-14, Exh. 13;

Paul Kerris Affidavit ¶¶ 4-14, Exh. 14).

As Dr. Watson falls within the definition of a manufacturer, Defendants are liable under

the theory of Strict Products Liability as interpreted by the District of Columbia and, therefore,

Defendants Motion to Dismiss Count III should be denied.

## COUNT V: BREACH OF EXPRESSED WARRANTY

### Breach of Express Warranty Against a Physician is a
### Viable Action in the District of Columbia

Defendants' arguments regarding Count V of the Amended Complaint, the express

warranty claim, is lumped together with defendants' arguments relating to plaintiffs' product

liability claims, arguing that, "none of these claims have any application to the provision of

medical services to a patient," Memo. p. 9.    This oversimplification ignores the law in the
District of Columbia, for plaintiffs *can* pursue an express warranty claim against a physician for
medical services.    *Scarzella v. Saxon*, 436 A.2d 358, 360 (D.C. App. 1981).    It is well
established that, "[t]he District of Columbia has joined those jurisdictions which recognize and
enforce warranties made by physicians."*Id*. at 361.

      Count V of the Amended Complaint, alleges, *inter alia*, that defendants expressly
warranted to Mrs. Kerris and Mr. Kerris that her embolization procedures would be safe and
effective. (Amended Complaint ¶¶ 43, 44).    It is plaintiffs' allegation that Dr. Watson induced
Mrs. Kerris into consenting to a very risky procedure by exaggerating the likelihood of its
success and concealing its very high failure rate as well as the devices' illegality.[15]  (Felice
Iacangelo Affidavit ¶¶ 4-14, Exh.12, and Cicily Iacangelo Affidavit ¶¶ 4-14, Exh.13; Paul Kerris
Affidavit ¶¶ 4-14, Exh. 14).    Plaintiffs' allege that Dr. Watson affirmatively stated that the
embolization had a "95%" chance of success and deliberately omitted the facts that the device
was being seized on the U.S. borders because its safety and efficacy were unproven; and, the
device was going to be used in a manner expressly forbidden by the manufacturer. *Id.,* (see, also
Import Alert, Exh. 6).  The jury instruction in *Scarzella* sets forth the elements of the claim of
warranty against a physician,

> [i]n order to create a claim of warranty...the language or statements used or
> alleged to have been used by the surgeon must be clearly and unmistakably a
> positive assurance by the surgeon or physician to produce or to avoid a particular
> result or results in treating the patient.

---

[15]While defendants may not appreciate the word "illegal,"(Memo. 29 ¶¶ 5,8,11),  the truth is the truth and
attempts to strike the word would not strike the fact that Histoacryl® and Lipiodol® and their combination, Histadol
had no legal status in the United States.

*Id.* 360.

Dr. Watson's statements and omissions, "clearly and unmistakably [gave] a positive assurance [that he would] produce . . . a particular result," and thus constituted a warranty. *Id.* at 362. *Scarzella* also shares facts with *Kerris* in that the jury was allowed to consider a warranty claim even though Dr. Scarzella testified that he made no such warranty and Mrs. Saxon had signed a boilerplate informed consent. *Id.*

Given the aforesaid, the Motion to dismiss Count V [sic], must be denied.[16]

## COUNT VI: FRAUD

### Count VI (Fraud) has its own Independent Allegations With Its Own Elements Separate and Apart from Count II (Informed Consent).

Defendants have chosen the issue of informed consent as their lynchpin argument, arguing that if Count II fails, summary judgment must also be entered in their favor on Fraud (Count VI) and Punitive Damages (Count IX). (Memo. 21). To the contrary, only the Court's *denial* of the Motion regarding Count II would be dispositive, since Defendants chose to intertwine their Count II arguments inextricably with Counts VI and IX. However, even if the Court granted the Motion as to Count V, it would not preclude Plaintiffs from going forward with the issues contained in Counts VI and IX.

Count VI contains within its paragraphs (47-53) adequate allegations to stand on its own. Moreover, Dr. Watson's statements contained in his declaration did not extinguish the specific allegations found in the Amended Complaint ¶48 subparagraphs (a-e). (Declaration, Exh. 2). In

---

[16]Interestingly, the Motion's title, Motion to Dismiss Counts III, IV, VI, VII, X, XI and XII Pursuant to F.R.C.P. 12(b)(6); Motion for Summary Judgment on Counts II, VI, and IX (In the Alternative for Counts VI and IX) Pursuant to F.R.C.P. 56(b); and Motion to Strike Certain Allegations from the Amended Complaint Pursuant to F.R.C.P. 12(f)" fails to reference Count V.

fact, Dr. Watson's declaration does not address these issues, furthermore, it is unlikely that Dr. Watson will ever testify he told Mrs. Kerris that: (a) he intentionally did not seek the required FDA approval or provide the FDA with required notice; (b) he intentionally did not seek or obtain an IDE;  (c)  he intended to use illegal devices; (d) he intended to inject the illegal devices into her brain; and/or (e) he would manufacture a third illegal device in the operating room that had never been tested.

**COUNT VII: CONSORTIUM**

Defendants' argument regarding Count VII, the consortium claim, can simply be addressed by the fact that "strong equitable considerations might mitigate against application of [a strict] rule," that the consortium claim is not tolled during the spouse's infirmity. *McCracken v. Walls-Kaufman*, 717 A.2d 346, 355 n. 9 (D.C. App. 1998).   After all, application of this harsh rule leads to a "catch-22".   Mr. Kerris would have had to file his claim for consortium before claim was filed on behalf of his wife; but that would have been impossible because his claim is derivative and could only be brought with his spouse's action.[17]

---

[17] Regardless of the issue involving consortium, Mr. Kerris has other viable claims (Count VI).

COUNTS X:  VIOLATION OF 21 U.S.C. § 360(c)
COUNT XI:  VIOLATIONS OF 21 U.S.C. § 331 (a,b,c,g,k)
COUNT XII: VOILATION OF  21 C.F.R. § 812.20(a)(2).


**Defendants Violated the Statutes 21 U.S.C. § 360 (c); §331(a,b,c,g,k) and 21 C.F.R. §812.20(a)(2); They were not exempt under the "practice of medicine" exemption, 21 U.S.C. §360(g)(2); or under the "research" exemption, 21 U.S.C. §360(g)(3);[18]**

Defendants Motion to Dismiss should be denied because Defendants do not qualify for an exemption from FDA regulation under either 21 U.S.C. §360(g)(2), "practicing medicine," or 21 U.S.C. §360(g)(3), "research" when the device in question is not lawfully available in the United States and is not FDA-approved.

_____While the Defendants point out that the FDA does not regulate the practice of medicine, the FDA also does not cloak physicians with absolute immunity allowing them to use and/or compound illegal unapproved devices at will, ignoring the statutes and injecting those untested devices into patients.  21 U.S.C. §360(g)(2) only provides an exemption for "practitioners *licensed by law to prescribe or administer* drugs or devices and who...compound, or process drugs or devices solely for use in the course of their professional practice," (emphasis added) it does not provide an exemption for drugs and/or devices practitioners are *not* licensed by law to prescribe or administer.

 The medical practitioner exemption affords no more than the right to be free from regulation when the medicine is compounded with *legally* acquired components and "*not the right to acquire unapproved drug substances.*"  *US v. Algon Chemical Inc.*, 879 F. 2d 1154, 1160

---

[18]Defendants cite 21 U.S.C. §360(g)(3) as the basis of their exemption.  However, the quoted language is taken from 21 U.S.C. §360(g)(2).  For the purposes of this opposition, Plaintiffs will address each exemption and explain how neither applies to Defendants.

(3rd Cir. 1989)(emphasis added).  This exemption applies *only* to drugs and/or devices made from components that *lawfully* may be obtained and compounded.  *US v. 9/1 KG Containers*, 854 F. 2d. 173, 177(7th Cir. 1988)(emphasis added).

The Court of Appeals for the D.C. Circuit examined the practice of medicine exemption and held that the purpose of the exemption was to allow physicians the discretion to discover new uses for approved drugs and/or devices beyond the package insert.  *Chaney v. Heckler,* 71 F.2d 1174, 1180 (US App. DC 1983)(rev'd on other grounds, 470 U.S. 821 (1985)).  The Court in *Algon* looked to *Chaney*, which described the congressional intent of the exception as supporting "no more than the... medical practitioners' right to compound medicines *legally* obtained in the course of their professional practice." 879 F.2d at 1163 (emphasis in original). This authority is well within the purview of the FDA.  *U.S. v Rutherford*, 442 U.S. 544, 546 (1979).

The Fifth Circuit also had the opportunity to look into the congressional intent behind the practice of medicine exemption.  In *U.S. v. Evars,* the court held that the very purpose of the statute is to regulate the availability of drugs.  643 F.2d 1043, 1049 (5th Cir. 1981) (quoting a letter dated March 7, 1974 signed by the acting director of the Office of Scientific Evaluation of the Bureau of Drugs, "[o]f course, while the Act was not intended to regulate the practice of medicine, *it was obviously intended to control the availability of drugs for prescribing by physicians*.")(emphasis added).  Congressional intent behind the statute and applied by the courts is echoed in the Institutional Review Board of Georgetown University Policies & Procedures Manual, Chapter 13, Sub-h, which states, "Good medical practice and the best interests of the patient require that physicians use *legally* available, marketed drugs, biologics and devices

20

according to their best knowledge and judgment." (Exh.11).

Defendants' actions of smuggling Histoacryl® and Lipiodol® into the United States without first obtaining FDA approval clearly puts them outside of the scope of the practice of medicine exemption afforded by 21 U.S.C. §360(g)(2).  Defendant Watson admits that "neither the procedure, *nor* the substances were approved by the Food and Drug Administration and would need to be obtained from a foreign source such as Canada." (Watson Declaration ¶ 15, Exh. 2).  Thus, the only logical conclusion to reach is that neither of these substances was legally available in the United States.  The Defendants' actions place them squarely within the confounds of the very aim of the FDA's regulation, to control the availability of drugs and/or devices to be used  by prescribing physicians, and not within the exemption of the practice of medicine.

The only acceptable way that Defendants could have legally used the unknown compound, Histadol, was to apply for premarket approval (PMA) from the FDA.  21 U.S.C. §360c(a)(C); 21 C.F.R Ch. 1 §882.5940.  Moreover, the *only* acceptable exemption for a physician to treat a patient with a Class III device is an investigational device exemption (IDE). 21 C.F.R. Ch. 1 §812.1(a).  The reasoning behind such a scrupulous approval process is that Class III devices, by their very definition, have not been studied to determine a reasonable assurance of safety and efficacy and, as such, they "present a potential unreasonable risk of illness or injury."  21 C.F.R. Ch. 1 §360c(a)(C)(ii)(II).  As neither of the Defendants ever acquired an IDE or PMA before injecting Histadol, at best a Class III device, into Mrs. Kerris's brain, they are outside of the scope of the Code of Federal Regulations exemptions in addition falling outside of the practice of medicine exemption codified in 21 U.S.C. §360(g)(2).

Defendants cite 21 U.S.C. §360(g)(3) as an applicable exemption. Plaintiffs' assume this was in error as their quoted statutory language references (g)(2) of the same section. However, if Defendants contend that they were conducting research on customized devices and, therefore, fall within an exemption provided for under 21 C.F.R. Ch. 1 §812.3(b)(5), they were not performing a procedure within the practice of medicine. Moreover, if they were in fact performing research and not practicing medicine, then Defendants failed to follow their own Institutional Review Board Policies & Procedures Manual which requires that:

> IRB review and approval is required for clinical investigations and other research involving products regulated by FDA for human use, *even where an Investigational New Drug Application (IND) or Investigational Device Exemption (IDE) is not required.*

(IRB Manual Ch. 2b, Exh.11).

Defendants are liable on either front. For the purposes of falling within the exemption afforded by 21 U.S.C. §331(g)(2), Defendants contend that they were not conducting research, they were practicing medicine. Then for the purposes of falling within the exemption afforded by 21 C.F.R. Ch. 1 §812.3(b)(5), Defendants contend that they were conducting research and not practicing medicine, while Defendants can not have it both ways, they are liable either way.

Therefore, Defendants' Motion to Dismiss as to Count XII should be denied.

Defendants' final assertion that 21 U.S.C. §331 does not apply to them. As admitted by the Defendants in their Motion, Dr. Watson performed the embolization procedures with the device on Mrs. Kerris. (Defense Motion, p. 18). Dr. Watson also admits that he had to procure the devices from Canada because they had not been approved for use in the United States and had not been approved for use by the FDA. (Declaration, ¶¶ 15-16, Exh.2). This places the

Defendants' actions squarely within the scope of 21 U.S.C. §331. The intention of the Act was to "keep misbranded drugs out of the channels of interstate commerce. The flow of commerce begins with the manufacturer of the drug and ends with the consumer, that is, the patient." *U.S. v. Evers*, 643 F.2d 1043, 1049 (5th Cir. 1981); *See also U.S. v. Sullivan*, 332 U.S. 689, 696-97 (1948). Applying this principle, the Court held that the distribution process takes on many different forms and "[d]octors holding drugs for use in their practice are *clearly one part of the distribution process, and doctors may therefore hold drugs for sale within the meaning of [the section]*." *Id.* at 1050(emphasis added). Further, a "serious gap would be left in the statute if doctors who had received drugs in an intrastate transaction from a party who in turn had received them from interstate commerce were allowed to misbrand the drugs and then distribute them to their patients." *Id.*

If any further clarification of the breadth of the statute is required, this Court only need look to *U.S. v. Ballistrea*, which held that the statute "makes no distinction as to whether the person who has personally introduced or caused the introduction of an unapproved or unregistered product into commerce is a 'responsible party.'" 101 F.3d 827, 836 (2nd Cir. 1996). The Second Circuit noted that the criminal penalty section of the statute specifically states that "any" person who violates the statute is liable and "it is unnecessary to go beyond the plain language of the statute. 'Any' means any." *Id.* (citing *US v. General Nutrition, Inc.*, 638 F. Supp. 556, 563 (W.D.N.Y. 1986); *U.S. v. Acosta*, 17 F.3d 538 (2nd Cir. 1994); *U.S. v. Tuente Livestock,* 888 F. Supp. 1416, 1427 (S.D. Ohio 1995)).

Clearly, 21 U.S.C. §331 was intended to include Defendants' actions. Dr. Watson obtained illegal devices from international commerce, misbranded and adulterated the devices by

23

importing for use and then compounding them without FDA approval, and ignoring the contraindications for at least one of the devices. (Factual Background, *supra*).  Because Defendants were directly involved in the flow of commerce of the substances used in the embolization procedures on Mrs. Kerris and doctors are clearly one part of the distribution process, they not exempted from the statute.

Therefore, Defendants' Motion to Dismiss as to Count XII should be denied.

**Count IX: Punitive Damages**

Without any further reference, it is clear that Defendant's argument regarding Count IX, fails for identical reasons set forth in aforesaid section relating to Count V.

**Motion to Strike Amended Complaint ¶11(c,d,f,h-l,o,); ¶ 59(b,c,h); ¶60; and ¶61.**

Defendants asks the Court to strike ¶11(c,d,f,h-l,o,); ¶ 59(b,c,h); ¶60; and ¶61 of the Amended Complaint for various reasons.   The vast majority of the paragraphs at issue relate to FDA rules or regulations.   Defendant asserts that the FDA regulations are "immaterial to this case," and/or that the term "illegal" is "impertinent and scandalous." Specifically, requests 1-8, 10,11 and 13 relating to ¶s11(c,d,f,h-l), ¶59(b,c,h) and ¶61 of the Amended Complaint.  For the reasons aforesaid the FDA regulations are quite relevant to the present litigation and the term "illegal" is fair characterization for non-legal unapproved and untested devices that had to be smuggled into the United States to avoid seizure by U.S. Customs.

As for request 9, relating to ¶ 11(o) of the Amended Complaint, plaintiffs, *res ipsa loquitur* claim, defendants site to *Blincoe*, 669 F. Supp. at 516, as authority for the assertion that plaintiffs may not even plead the doctrine.  Defendants again misapply *Blincoe*.  *Blincoe* did not hold that a plaintiff is precluded from pleading an action for *res ipsa loquitur,* in an embolization

24

case, it simply held that Mrs. Blincoe had no expert to causal connect her embolization to her injuries, *Id*. at 517.  Plaintiffs in the case at bar have the required experts, and are free to plead *res ipsa loquitur*. (Van Woert Affidavit ¶6, Exh. 8; and Kaufman Affidavit ¶6, Exh.8).

Finally, as for request 12, relating to ¶60, plaintiffs' argument that Dr. Watson breached his fiduciary duty to Georgetown University by failing to submit his studies to the IRB, defendants again argue that this reference is "immaterial..impertinent and scandalous."  Any evidence involving the process by which Mrs.  Kerris was treated with an unapproved device without proper safegaurds, i.e., failure to seek IRB review, failure to seek a petition for an IDE, or the illegal procurement of the devices, etc., is relevant to this litigation.  If Dr. Watson breached his fiduciary obligation to Georgetown University by failing to inform the University of any of the issues above, and if such was a cause of Mrs. Kerris' injuries, it is relevant evidence and must be pled in the complaint.

WHEREFORE, Plaintiffs pray that Defendants' Motion be denied in total.

Respectfully submitted,


_____
Anthony G. Newman, Esq.
NEWMAN & McINTOSH
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814
(301) 654-3400


_____
Andrew Greenwald, Esq.
JOSEPH, GREENWALD AND LAAKE, P.A.
6404 Ivy Lane, Suite 440
Greenbelt, Maryland 20770
(301) 220-2200
***Attorneys for Plaintiffs***

25