# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Felice I. Iacangelo and Cicily Iacangelo,<br>As Guardian of the Person and Property of<br>KARYN A. KERRIS,<br><br>  Plaintiffs,<br><br>v.<br><br>Georgetown University Hospital,<br>GEORGETOWN UNIVERSITY, t/a<br>Georgetown University, and<br>VANCE E. WATSON, M.D.,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:05CV02086<br><br>Judge Paul L. Friedman |

## DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS CERTAIN CLAIMS PURSUANT TO F.R.C.P. 12(b)(6), MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56(b), AND, PURSUANT TO F.R.C.P. 12(F), MOTION TO STRIKE CERTAIN ALLEGATIONS IN THE AMENDED COMPLAINT

At best, plaintiffs' Opposition to defendants' Motion to Dismiss Certain Claims and Motion for Partial Summary Judgment represents shoddy legal research. At worst, it is an egregious and conscious attempt to mislead the Court. As if written for another case involving a different situation, plaintiffs submit pages and pages of irrelevant material regarding federal statutes and requirements under those statutes, but fail to inform the Court the central fact that **requires** dismissal of Counts X through XII: **Plaintiffs may not bring claims based upon alleged violations of 21 U.S.C. §§ 331, 360 or 21 C.F.R. § 812.20(a)(2) – the federal statutes and regulation they cite. Title 21 U.S.C. § 337 specifically states:** "All such proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United

States."[1] This Court has adopted the rule that private party claims based on alleged violations of the FDCA are impermissible. *International Union of Bricklayers and Allied Craftworkers v. Insurance Co. of The West*, 366 F.Supp.2d 33, 39 fn. 4 (D.D.C. 2005). The FDCA does not create or imply a private right of action for individuals injured as a result of violations of the Act. *Pediamed Pharmaceuticals, Inc. v. Breckenridge Pharmaceutical, Inc.*, --- F.Supp.2d ---, 2006 WL 544525 at *8, 2006 U.S. Dist. LEXIS 8565 (D.Md. 2006).[2] Not surprisingly, all of the cases plaintiffs cite in support of their legally invalid claims are those that are brought by the government. *See* Plaintiff's Opposition to Defendants' Motion ("Plts. Opp.") at 19-25.

In the remaining eight pages of plaintiffs' twenty-five page brief addressing claims other than those based on the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et. seq.* ("FDCA"), plaintiffs simply ignore applicable law and the facts of this case – reaching for cases in other contexts from other jurisdictions, while ignoring applicable on-point precedent – even resorting to an overt request to the Court to reject District of Columbia law because it goes against them. *See id.* at 18. As plaintiffs' Opposition fails to demonstrate that their claims state a cause of action for which relief can be granted and does not demonstrate a genuine dispute of material fact, defendants respectfully submit that their Motion to Dismiss Certain Counts of the Amended and Motion for Partial Summary Judgment should be granted.

---

[1] The only qualification to the general rule that only the United States government may bring a suit is that a state government may bring enforcement actions. 21 U.S.C. § 337(b)(1): "A State may bring in its own name and within its jurisdiction proceedings for the civil enforcement, or to restrain violations, of section 341, 343(b), 343(c), 343(d), 343(e), 343(f), 343(g), 343(h), 343(i), 343(k), 343(q), or 343(r) of this title if the food that is the subject of the proceedings is located in the State."

[2] *See also PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997) (same); *Bailey v. Johnson*, 48 F.3d 965 (6th Cir. 1997) (same); *Gile v. Optical Radiation Corp.*, 22. F.3d 540 (3rd Cir. 1994) (same); *Solvay Pharmaceuticals, Inc. v. Global Pharmaceuticals*, 298 F.Supp.2d 880 (D. Minn. 2004 (same); *Holland v. Smith & Nephew Richards, Inc.*, 100 F.Supp. 2d 53 (D. Mass. 1999) (same).

## ARGUMENT

**I.     PLAINTIFFS' CLAIM FOR LACK OF INFORMED CONSENT MUST BE DISMISSED AS PLAINTIFFS' ONLY EVIDENCE IS IMPERMISSIBLE SPECULATION.**

In an effort to hide the indisputable fact that plaintiffs have no evidence as to what Vance Watson, M.D. ("Dr. Watson"), told Ms. Kerris other than what her executed consent forms in the record state, *inter alia*:

> 2.     I acknowledge that Dr. Vance Watson has described the nature of this procedure to me in terms which I understand and has answered all questions I have asked about it to my satisfaction. **He has also explained significant complications and risks which may be associated with this procedure** . . . .
>                     . . . .
> 5.     I am aware that the practice of medicine and surgery is not an exact science and **I acknowledge that no guarantees have been made to me as the result of treatments** or examination in the hospital.

Exhibits 4, 6, 10, and 15 to Defendants' Motion for Partial Summary Judgment ("SJ Motion"; emphasis added) and Dr. Watson's Affidavit detailing his conversations alone with her (Ex. 8 to SJ Motion) that dooms their lack of informed consent claim,  plaintiffs provide identical affidavits from Mrs. Kerris's parents and husband as to what Dr. Watson allegedly told them. Not only are these affidavits irrelevant and legally invalid, they clearly fail to raise a genuine dispute of fact.

First, plaintiffs cannot prove a negative – particularly a statement that "Vance E. Watson, M.D. did not have any meetings with my daughter where a member of the family was not present, prior to the embolizations." ¶ 3 of all plaintiffs' Affidavits.  At the time of the embolizations, Ms. Kerris was fully competent and working at NIH.  Defendants' Statement of Material  Facts Not in Dispute ("Defs. SOF") ¶ 1.  While it might be credible to believe that the caretakers of a person in a wheelchair and adjudged incompetent would be present at every

3

conversation that the individual had with her doctor, it is not where the patient is fully functioning, working, and competent. Defs. SOF ¶ 1. Plaintiffs' claim that they are unaware of conversations where Ms. Kerris and Dr. Watson were alone is much less believable when one considers that at the time of the embolizations, Ms. Kerris was working at the National Institutes of Health and for several years thereafter going to the Mall. Defs. SOF ¶¶ 1, 36. It strains credulity to claim that a doctor was never alone with his patient when examinations of her body were conducted or in the operating room prior to the procedure taking place. Regardless of whether plaintiffs are using a hypertechnical definition of "meeting," at best, all plaintiffs can swear to is that *they are unaware of any discussions that Dr. Watson had with Ms. Kerris when they were not present.* Ms. Kerris's family may be unaware of such discussions, but they cannot offer competent evidence that the discussions did not occur.

A claim for lack of consent "initially requires proof of nondisclosure of material risks." *Gordon v. Neiviaser*, 478 A.2d 292, 294 (D.C. 1984). Dr. Watson swears that he had discussions where only he and Ms. Kerris were present. Ex. 8 to SJ Motion. Only Ms. Kerris could provide evidence to dispute the fact that such discussions without a member of her family present and in a location where they could not overhear.

Secondly, the seven years after-the-fact affidavits submitted by Ms. Kerris's family contradict Ms. Kerris's contemporary testimony. While more than seven years after the event, her family swears that Dr. Watson told them that "the embolizations had a 95% chance of success," all Plaintiffs' Affidavits ¶ 4, at the time of the embolizations, Ms. Kerris acknowledged that *she understood and acknowledged* "that the practice of medicine and surgery is not an exact science and **I acknowledge that no guarantees have been made to me as the result of treatments or examination in the hospital.**" Exs. 4, 6, 10, and 15 to SJ Motion (emphasis

4

added).  Thus, if taken as true and her husband and parents recall conversations with Dr. Watson

where he promised a 95% chance of success with the embolizations, clearly, Karyn Kerris had

separate conversations alone with Dr. Watson where he told her that there were no guarantees

and she acknowledged that he had told her that fact in the four, separate Consent Forms that she

signed.  *Id.*

Federal Rule of Civil Procedure 56(e) requires that affidavits "be made on

personal knowledge, shall set forth such facts as would be admissible in evidence, and shall

show affirmatively that the affiant is competent to testify to the matters stated therein."

Plaintiffs' affidavits do not meet this standard.  To the extent they make claims that can only be

substantiated by Dr. Watson or Karyn Kerris (*e.g.*, as to whether they had discussions alone),

Ms. Kerris's family do not have personal knowledge and are not competent to testify as to these

matters.  To the extent that these after-the-fact affidavits contradict documents Karyn Kerris

signed at the time of the event, they demonstrate their invalidity.  Obviously, there had to be

conversations between Dr. Watson and Karyn Kerris that Mr. Kerris and the Iacangelos did not

hear when Dr. Watson explained to Karyn Kerris that there were no guarantees, such that she

was comfortable signing the Consent Forms, attesting to her understanding of that fact.

*Goldberg v. U.S. Dept. of State*, 818 F.2d 71, 78 (C.A.D.C. 1987) ("In order to obtain summary

judgment under the decisions of this court [and necessarily, to defeat summary judgment] the

agency's **affidavit must not be controverted by either contrary evidence in the record** nor by

evidence of agency bad faith.") (quotation omitted; emphasis added)).

Additionally, all of plaintiffs' affidavits state "that the following is true, to the

best of my knowledge."  *See* Exs. 12-14 to Plts. Opp.  "A statement made on belief or on

information and belief does not meet this requirement."  *Emerson v. American Exp. Co.*

78 A.2d 862, 863 (D.C. App. 1951) (citing *Jameson v. Jameson*, 176 F.2d 58 (D.C. Cir. 1949) and *Dewey v. Clark*, 180 F.2d 766 (D.D.C. 1950)). "The affidavit must not only be made on personal knowledge but must also show that the affiant possesses the knowledge asserted, *i.e.,* that the affiant is competent to testify to the matter stated." *Id.* (citing *Schwartz v. Sandidge*, 63 A.2d 869 (D.C. App. 1949) and *Walling v. Fairmont Creamery Co.*, 139 F.2d 318 (8th Cir. 1943)). "The closing paragraph of the affidavit states: 'The foregoing statements are true and accurate to the best of your affiant's knowledge and belief.' How much of the affidavit is made on knowledge and how much on belief is not disclosed. The affidavit is insufficient to support [or necessarily, to preclude]a summary judgment." *Emerson*, 78 A.2d at 863.

When a patient has signed a written consent form expressly covering a particular procedure, the terms of the consent form will ordinarily control the question of whether the patient consented to the procedure. *Church v. Perales*, 39 S.W. 3d 149, 161 (Tenn. Ct. App. 2000). Karyn Kerris signed not one, but four consent forms in connection with the procedures of which her family now complain. "To prevail on an informed-consent theory, the plaintiff must establish that if she had been alerted to the material risk, she would not have consented to the surgery, and that the surgery caused her injury." *Dorn v. McTigue*, 157 F.Supp.2d 37, 45 (D.D.C. 2001). Even if plaintiffs could show what Dr. Watson told Ms. Kerris, they have no evidence as to whether she would have withheld her consent for the embolization procedures. Ms. Kerris came to Georgetown University Hospital ("GUH") and Dr. Watson, suffering from a serious condition that was spiraling her into dementia and physical incapacity (not to mention the ongoing risk of death). If she chose to do nothing, her outcome was certain. Grabbing a chance – albeit a small chance with great risks – that she could do something to stop her decline might not be something that a healthy person would choose, but that was not the situation in which Ms.

Kerris found herself. At best, plaintiffs can only speculate both as to what Dr. Watson told Ms. Kerris and then speculate once again as to what she would have chosen to do.

Recognizing that the views of the patient and the views of the patient's family are not synonymous, the United States Supreme Court rejected the notion that evidence of a patient's family could serve as a substitute for evidence of the wishes of the patient.

> Petitioners alternatively contend that Missouri must accept the "substituted judgment" of close family members even in the absence of substantial proof that their views reflect the views of the patient. . . . No doubt is engendered by anything in this record but that Nancy Cruzan's mother and father are loving and caring parents. . . . Close family members may have a strong feeling-a feeling not at all ignoble or unworthy, but not entirely disinterested . . . . But **there is no automatic assurance that the view of close family members will necessarily be the same as the patient's would have been had she been confronted with the prospect of her situation while competent.**

*Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 286 (1990) (emphasis added).

Plaintiffs' remaining argument – that the four consent forms Ms. Kerris signed did not constitute a proper IRB Approved Consent – is irrelevant. First, plaintiffs are ignoring the facts of this case. There was no study. There was no research. There was no clinical investigation. Dr. Watson was doing his best to provide medical treatment to one patient, Karyn Kerris, a woman in dire medical circumstances. By their own quotations, "IRB review and approval is required for **clinical investigations**." Plts. Opp. at 11 (emphasis added). In setting out the "eight basic informed consent elements" for IRB Consent forms, plaintiffs acknowledge that IRB Consent Forms should contain a "Research Statement," containing:

> (i) A statement that the use of the device **involves research**;
> (ii) An explanation of the **purpose of the research** including its long-term goal.
> (iii) An explanation of the expected duration of **subject's participation**.

Plts. Opp. at 12 (emphasis added). Plaintiffs then go on to cite FDA requirements, which are irrelevant to their private action as the FDCA does not create a private right of action. 21 U.S.C. § 337. Moreover, *nothing in Plaintiffs' Amended Complaint contains any allegations to support a research study or investigation being involved in their lawsuit.* All of their claims describe complaints with how Dr. Watson treated his patient, Karyn Kerris. In fact, none of plaintiffs' affidavits mention Ms. Kerris participating in a study or clinical investigation. The characterization of Dr. Watson's treatment of Ms. Kerris – a patient who was admittedly referred to GUH for treatment for her condition, Defs. SOF ¶ 1, not to participate in any research, clinical investigation, or study – is an after-the-fact formulation to fit the actual facts into invalid theories.

Plaintiffs' Opposition creates no dispute of material facts germane to this case – whether Ms. Kerris's husband or parents feel that they were adequately informed when **the patient gave informed consent** – has no legal bearing on the determination of a claim of lack of **consent by the patient. It is irrelevant what they believe they were told,** as it is what the patient was told, understood, and relied upon that matters (Plts. Statement of Material Facts in Dispute ("Plts. SOF") ¶¶ 1-5). "If the affidavit is introduced in opposition to a motion for summary judgment, **it must also create some genuine dispute regarding one or more facts that are legally material** to the outcome of the case." *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 103-04 (Tenn. Ct. App. 1998) (emphasis added).

As plaintiffs fail to demonstrate a genuine dispute of a material fact, defendants respectfully submit that their motion for summary judgment on plaintiffs' Lack of Informed Consent claim (Count II) should be granted in their favor.

## II.    FAILING TO EVEN DISCUSS, MUCH LESS DISTINGUISH, CASES HOLDING THAT DOCTORS AND HOSPITALS ARE NOT SELLERS OF MEDICAL

**SUPPLIES USED IN TREATMENT, DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIMS FOR STRICT LIABILITY AND BREACHES OF EXPRESS OR IMPLIED WARRANTY MUST BE GRANTED.**

Showing the weakness of their position, plaintiffs' Opposition to defendants' Motion to Dismiss their claims for Strict Liability, Breach of Express Warranty, and Breach of Implied Warranty (Counts III, IV, and V, respectively) does not even mention the many cases defendants cited in their memorandum in support of their Motion to Dismiss, cases holding that doctors and hospitals are not sellers of medical supplies subject to liability under these claims. *See, e.g., Fisher v. Sibley Memorial Hospital* is instructive.  403 A.2d 1130 (D.C. 1979); *Hoven v. Kelble,* 79 Wis.2d 444, 256 N.W.2d 379 (1977); *Vergott v. Deseret Pharmaceutical Co., Inc.,* 463 F.2d 12 (5th Cir.1972) (hospital cannot be held strictly liable for injuries caused by defective intercath needle because hospital is not a seller engaged in business of selling the product); *North Miami General Hosp., Inc. v. Goldberg,* 520 So.2d 650 (Fla.Dist.Ct.App.1988) (overturning jury's verdict of strict liability against hospital for injuries suffered as a result of malfunction of electro-surgical grounding pad; holding that hospital is not a business within product's distributive chain but more like a consumer that employs a product in the course of providing medical services); *Nevauex v. Park Place Hosp., Inc.,* 656 S.W.2d 923 (Tex.Ct.App.1983) (hospital not liable for misapplication of cobalt radiation, because it is not a "merchant" dispensing radiation treatment); *Silverhart v. Mt. Zion Hospital,* 20 Cal.App.3d 1022, 98 Cal.Rptr. 187 (1971) (court denied patient's strict liability claim against the hospital for damages allegedly sustained when a surgical needle broke during an operation and became permanently lodged in the patient's body, holding that the hospital had merely furnished the product in connection with its business of treating a patient); *Brandt v. Sarah Bush Lincoln Health Center,* 329 Ill.App.3d 348, 352 (Ill.App. 4 Dist., 2002); *In re Temporomandibular Joint (TMJ) Implants*

*Products Liability Litigation*, 97 F.3d 1050 (8th Cir. 1996); *In re Breast Implant Product Liability Litigation*, 503 S.E.2d 445, 552-53 (S.C. 1998). *See* Plts. Opp. at 13-15.

       Instead of addressing the context in which this case is brought – the provision of medical services – and defendants' arguments, plaintiffs spend pages of their brief regurgitating horn book law on the general tenets of strict liability or cite cases that – being brought by the government, and therefore, not barred by 21 U.S.C. § 337 – are inapplicable to their claims. (Noticeably, all of the cases plaintiffs cite in support of their claims involved the government: *U.S. v. Evers*, 643 F.2d 1043 (5th Cir. 1981) and *U.S. v. Sullivan*, 332 U.S. 689 (1948)). Plts. Opp. at 14-15. As is clear from applicable precedent, *Fisher, supra*, neither GUH nor Dr. Watson are "sellers," "distributors" or "manufacturers" of anything and theories of strict liability and breach of warranty do not apply to them. *Brooks v. Vitek, Inc.,* 875 F.2d 499, 500-01 (5th Cir.1989) (fact that dentist fitted squares of Proplast® to fit plaintiff's TMJ did not make dentist a manufacturer; plaintiff's claims were really medical malpractice claims, not products liability claims).

       Plaintiffs' breaches of warranty claims also fail. Though plaintiffs criticize defendants for "lumping" plaintiffs' claims for breach of warranty and strict liability under one section, they are – again – ignoring District of Columbia law. Plts. Opp. at 14-15. Per applicable precedent, claims of breaches of warranty and strict liability are but two different labels for the same legal right. *MacPherson v. Searle & Co.*, 775 F. Supp. 417, 422 (D.D.C. 1991) (supporting merging implied warranty of merchantability with strict liability for product defect); *Fisher, supra*, 403 A.2d at 1133 (breach of implied warranty and strict liability are expressions of a single basis public policy as to liability for defective products); *Cottom v. McGuire Funeral Service, Inc.*, 262 A.2d 807, 808 (D.C. 1970) ("[t]he differences between strict

liability in tort and implied warranty, if any, are conceptual."); *Berman v. Watergate West, Inc.*, 391 A.2d 1351 (D.C. 1978).

As set out in defendants' Memorandum of Points and Authorities in Support of their Motion to Dismiss, "health care providers offer services, not products [and] determines our holding [dismissing breach of warranty claim] as to the issues of warranty under Article II of the U.C.C." *In re Breast Implant Product Liability Litigation*, 503 S.E.2d 445, 553 (S.C. 1998); *see also, Kozup v. Georgetown University*, 663 F. Supp. 1048, 1059 (D.D.C. 1987), *aff'd in part, vacated in part on other grounds*, 851 F.2d 437 (D.C. Cir. 1987).

Moreover, plaintiffs' Amended Complaint based allege breaches of warranty claims on allegations that that "Defendants . . . impliedly and/or by operation of law **warranted that the medical device**, "Histadol," was reasonably fit and suitable for the particular purpose for which Karyn A. Kerris was receiving it" and that "Defendants . . . **expressly warranted . . . that the "medical device" at issue** was reasonably fit and safe for the intended, ordinary, foreseeable, and particular purposed of being injected and embolizing Karyn A. Kerris's arteriovenous malformation (AVM)." Amended Compl. ¶¶ 40, 43, respectively (emphasis added). Nowhere in plaintiffs' Amended Complaint do plaintiffs allege a breach of any type of warranty having to do with the procedure, but only regarding the device used in the procedure.[3]

---

[3] Again, whether by conscious design or careless drafting, plaintiffs' statement to the Court that "defendants expressly warranted to Mrs. Kerris and Mr. Kerris that her **embolization procedures** would be safe and effective," citing paragraphs 43 and 44 of the Amended Complaint, is demonstrably false. Pl. Opp. at 16. As set forth above, paragraph 43 makes no mention of the **procedure**, only the device. Similarly, paragraph 44 refers only to the device, not the procedure ("Defendants' express representation to Karyn A. Kerris was the basis of the bargain between the Defendants, and Karyn Kerris, in that, *inter alia*, Karyn A. Kerris would not have agreed, that **the medical device** be injected into her body, but for Defendant's representation that **it** was safe and effective.") (Emphasis added throughout).

11

Apparently in an apparent eleventh hour attempt to create a viable warranty claim, through attached affidavits plaintiffs now appear to say that the "warranty" was Dr. Watson's alleged statement of a 95% chance of success to Ms. Kerris's parents and husband – **directly contradicting the Consent Forms that Ms. Kerris signed at the time in which she stated that no guarantees had been given to her** (Exs. 4, 6, 10, and 15 to Defendants' SJ Motion) – as the basis of their breach of warranty claims.  Notwithstanding that plaintiffs may not change the basis for their causes of action against defendants in an Opposition, *Pierce v. Montgomery Cty. Opportunity Bd.*, 884 F. Supp. 965 (D.C. Pa. 1995) (even construed most liberally, the rules do not permit a plaintiff to supply by affidavit allegations that are missing from the complaint) (citations omitted), statements made to Ms. Kerris's parents and husband – **affidavits directly contradicted by the Consent Forms Ms. Kerris signed** – cannot form the basis of a breach of warranty claims as the warranty would run only to Ms. Kerris and require the same proof that is missing from plaintiffs' lack of informed consent claim.  Plaintiffs have no evidence with which to contradict Ms. Kerris's signed Consent Forms, stating that she understood that their were no guarantees, and Dr. Watson's affidavit stating that he told her there was "high rate of failure, death, stroke, neurological worsening – and that there was no way to predict whether Ms. Kerris would improve, stay the same, or even die from the treatment."  Watson Aff. (Ex. 8 to SJ Motion).  The only evidence is that Dr. Watson provided no guarantees to Ms. Kerris – as her signed Consent Forms show.[4]  When a patient has signed a written consent form expressly

---

[4] It strains credulity to imagine that a doctor in the November 1998- March 1999 time period would state that an embolization procedure would have a 95% success rate, particularly when performed on a patient like Karyn Kerris who was suffering from the rare symptom of dementia, had Turner's Syndrome, and had the largest type of AVM embedded deep in her brain, which she had been told was terminal. Defs. SOF ¶¶ 1, 17.  In 1997, the published rate of "success" with just an embolization was three (3) patients out of fifty-four (54) (a .05% "success" rate). Debrun, Gerard M. MD, *et al.*, "Embolization of the Nidus of Brain Arteriovenous

covering a particular procedure, the terms of the consent form will ordinarily control the question

of whether the patient consented to the procedure.  *Church v. Perales*, 39 S.W. 3d 149, 161

(Tenn. Ct. App. 2000).

      The medical procedure was provided to and for Ms. Kerris.  Therefore, regardless

of whether plaintiffs' breach of warranty claims are deemed to stem from the embolization

materials used (as alleged in the Amended Complaint) or under the new allegations of a verbal

warranty to Ms. Kerris's parents and husband, Dr. Watson and GUH are deemed not to be sellers

under the law and, regardless, any "verbal warranty" about either the embolizations or the

substances used for the embolizations would need to be proved by statements made to **Ms.**

**Kerris**, and not statements allegedly made to Ms. Kerris's family.

      Plaintiffs cite only one case, *Scarzella v. Saxon*, 436 A.2d 358 (D.C. 1981), as

support for their allegation that breach of warranty claims against physicians are recognized

under District of Columbia.  Plaintiffs' reliance on *Scarzella* is flawed for several reasons.  First,

although *Scarzella* does state that a plaintiff may bring a breach of warranty claim where the

doctor does not recall what he told the plaintiff ("[a]t trial, Dr. Scarzella had no clear recollection

of the precise details of the conversations with the [plaintiffs]."  *Id.* at 260), and where the

patient/plaintiff testifies that she was given the assurance that there would be no complications in

---

Malformations with n-Butyl Cyanoacrylate," Neurosurgery. 40(1):112-121, 112 January 1997
("RESULTS: Twenty-six of 54 patients are still waiting for more radical treatment. Two deaths
and two minor and one severe permanent neurological deficit occurred. Three patients were
cured with embolization alone; 11 patients were cured after surgical resection. Three patients
underwent radiosurgery, with one cure after 1 year.").  Even eight years later in 2004, the study-
observed "success rate" of embolizations with AVMs in general was, as an endovascular cure for
patients, nowhere near 95% - hovering around 22%.  Yu, C.H., et al., "Complete Obliteration of
Intracranial Arteriovenous Malformation with Endovascular Cyanoacrylate Embolization: Initial
Success and Rate of Permanent Cure," *American Journal of Neuroradiology* 25:1139-1143,
August 2004 ("*CONCLUSION:* The overall initial cure rate of intracranial AVM with
cyanoacrylate embolization was 22%.").

the surgery ("**According to her testimony**, Dr. Scarzella also stated that 'the operation was a simple operation without complications'..." **Ms. Saxon testified** that she and her husband initially met with Dr. Scarzella on January 9, 1976, and that at that time he recommended that she undergo surgery." *Id.* at 359-60; emphasis added).  Unlike *Scarzella*, in this case the plaintiff patient cannot provide such evidence as to what she was told or what she relied upon in making her decision to consent to the surgery.  (Though facing certain progressive decline, one understands why a patient in Ms. Kerris's situation would grasp at any chance to hold off the deterioration her disease was causing.)  The only evidence from the patient that is present or can ever be present in the record, is that plaintiff-patient Ms. Kerris was given no guarantees.  Exs. 4, 6, 10, and 15 to SJ Motion.  In the present case, Ms. Kerris is unavailable to testify; therefore, plaintiffs have **no** evidence regarding whether the alleged statement was even made, much less made without qualification to Ms. Kerris and that relied upon it.

At trial to prove a breach of warranty claim, a plaintiff is required to prove that the physician "**clearly and unmistakeably** [sic] (gave) a positive assurance (that he would) produce or ... avoid a particular result or results in treating the patient,'" *Id.* at 362 (quoting trial court's instruction) (emphasis added).  Just to make a *prima facie* claim, plaintiffs need to come forward with evidence 1) that Dr. Watson made such a statement to Ms. Kerris without qualification; 2) that **she** relied upon Dr. Watson's alleged statement in deciding to have the embolizations; and 3) that her reliance upon Dr. Watson's alleged statement caused her injury, *Scarzella*, *supra*.  None of which plaintiffs can do.[5]

---

[5] Given that Ms. Kerris suffered from rare conditions – having both AVM and Turner's Syndrome – of intense severity (a large AVM located deep within her brain, SOF ¶¶ 1, 17) and the even rarer symptomatology of progressive dementia, having been referred to GUH after being told that her condition was terminal (Exs. 1-3 to SJ Motion), it is likely that the *Scarzella* Court's admonition that "an appropriate instruction might point out that in determining whether a

For all these reasons, as well as those stated in defendants' Memorandum of Points and Authorities in Support of their Motion to Dismiss and Partial Summary Judgment, defendants respectfully submit that plaintiffs' claims for breach of expresses and implied warranty and strict liability should be dismissed with prejudice.[6]

## III.    PLAINTIFFS' REPRESENTATION TO THE COURT THAT COUNT VI (FRAUD) HAS ITS OWN INDEPENDENT ALLEGATIONS IS DEMONSTRABLY FALSE AS WELL AS FAILING TO PLEAD THE ADDED REQUIREMENT OF MOTIVE.

In their Memorandum in Support of Defendants' Motion to Dismiss and Partial Summary Judgment, defendants pointed out the fatal flaws plaintiffs' Fraud claim (Count VI). *See* Memorandum in Support of Motion to Dismiss and Partial Summary Judgment at 14-15. Instead of responding to defendants' arguments that plaintiffs failed "to substantiate this claim with allegations as to the motivation for *why* defendants would want to "defraud" plaintiffs sufficient to demonstrate that the hypothetical nondisclosure was done with the intent to deceive Ms. Kerris," *id.* at 15, plaintiffs merely state: "Count VI contains within its paragraphs (47-53) adequate allegations to stand on its own." Plts. Opp. at 17. As defendants stated in their pleadings, Count VI does not contain any factual allegations as to **why** a hospital and doctor would want to defraud a patient by convincing her to have a particular procedure (as opposed to

---

warranty was made by a physician 'special attention be given to the circumstances of the making of the alleged agreement, particularly the nature, complexity, and urgency of the treatment, the probability of its resulting in the desired end, the 'atmosphere' in which it was made, and the result allegedly contracted for." *Id.* at 362.

[6] Reflective of the care taken in drafting both the Complaint and Amended Complaint, plaintiffs' Prayers for Relief for Counts IV-V (Amended Complaint at 11-13) for Breaches of Express and Implied Warranty run contrary to law: "In the contract action [plaintiffs] are restricted to the payments made and to the expenditures for nurses and medicines or other damages that flow from the breach thereof." *Dingle v. Belin*. 749 A.2d 157, (M.D. App. 2000) (citing, *inter alia*, *Scarzella, supra*). Thus, the prayer for $30 million contained in plaintiffs' Amended Complaint for these counts is wrong.

15

any other).  Therefore, even assuming, *arguendo*, that plaintiffs' allegations for both counts are sufficient, plaintiffs' fraud claim fails as it does not provide the particular factual allegations as to defendants' alleged motivation.

Moreover, if one compares the allegations that serve the basis for plaintiffs' Informed Consent claim (¶¶ 15-22), which defendants maintain plaintiffs cannot substantiate, to the paragraphs that plaintiffs claim support their Fraud claim (¶¶ 47-53),[7] the assertions are virtually identical.  Both sets of allegations complain that Dr. Watson failed to disclose the same material to **Ms. Kerris, the patient**.  Defendants, however, again point out that plaintiffs have no evidence to support these claims.  There is and can never be any competent evidence in the record that establishes – much less establishes by clear and convincing evidence as required for fraud – that any nondisclosure even took place, much less nondisclosure motivated by an intent to deceive.  *Va. Acad. of Clinical Psychologists v. Group Hospitalization & Med. Servs.*, 878 A.2d 1226, 1235 (D.C. 2005).

As plaintiffs simply cannot provide sufficient evidence in the record to meet, under the requisite standard of proof, their burden of "'produc[ing] at least enough evidence to make out a prima facie case in support of [their] position,'" defendants respectfully submit that if not dismissed with prejudice pursuant to F.R.C.P. 12(b)(6), plaintiffs' claim for fraud (Count VI), as well as their claim for punitive damages (Count IX) must be dismissed with prejudice, pursuant to F.R.C.P. 56(b).  *Id.* at 1236 (quoting *Joeckel v. Disabled Am. Veterans,* 793 A.2d 1279, 1281-82 (D.C.2002)).[8]

---

[7] As set out in Section II of this brief and in the Supporting Memorandum for Defendants' Motion to Dismiss at 21-28, plaintiffs cannot substantiate their claims of nondisclosure or disclosure against Dr. Watson.

[8] As plaintiffs' only intentional tort, fraud, must be dismissed, the basis for their claim for punitive damages (Count IX) does not exist and must also be dismissed with prejudice.

IV.    **HAVING SAT ON THEIR CLAIMS FOR SIX YEARS PRIOR TO HAVING MS. KERRIS DECLARED INCOMPETENT, STRONG EQUITABLE CONSIDERATIONS DO NOT EXIST TO DISREGARD APPLICABLE PRECEDENT THAT BARS PLAINTIFFS' LOSS OF CONSORTIUM CLAIM.**

Plaintiffs concede that their Loss of Consortium claim is barred by the statute of limitations. Plts. Opp. at 18. Recognizing that District of Columbia law states that "the derivative claim for loss of consortium of a spouse or parent is not subject to the tolling statute of the infant or incompetent," *McCracken v. Walls-Kaufman*, 717 A.2d 346, 355 n.8 (D.C. 1998), plaintiffs fall back on the plea that "equitable considerations" should bar the application of District of Columbia black letter law. Plts. Opp at 18.

Plaintiffs' brief, however, fails to tell the Court the context in which the quote arises, making it inapplicable to Mr. Kerris's claim. Indeed, the *McCracken* court recognized that the "United States Court of Appeals for the D.C. Circuit has refused to toll the running of the statute of limitations **where 'the disability occurred or arose subsequent to the origin of the cause of action.'** *Taylor v. Houston*, 211 F.2d 427, 428 (D.C. Cir. 1954) (emphasis added). In rejecting the argument to toll the statute of limitations, the *Taylor* court distinguished the facts of that case, in which the disability arose twelve days after the cause of action arose, and was removed "almost five months" before the statute of limitations had run, from cases in which **"the disability arises a very short period of time after the injury and persists throughout the entire limitation period."** *Id.* **In the latter cases, the court opined, strong equitable considerations might militate against application of this rule."** *McCracken*, 717 A.2d at 355 n.8 (quotation omitted; emphasis added); *see also Taylor*, 211 F.2d at 427 ("[o]f course, where the disability arises a very short time after the injury and persists throughout the entire limitation period, strong equitable considerations might militate against application of this rule. But such is

not the case here. Appellant admits his disability was removed about December 20, 1951. He had almost five months after that to bring suit."); *Speiser v. U.S. Dept. of Health and Human Services*, 670 F.Supp. 380, 384-85 (D.D.C. 1986) (court refused to use "equitable considerations" to refresh plaintiff's claim where she missed the deadline by five and a half months while suffering "impaired judgment" allegedly from defendant's conduct).

Here, Ms. Kerris's family did not seek to have her adjudged incompetent until August 2005 – more than six years after the events giving rise to their claims. If plaintiffs' claims are true and the embolizations are the cause of plaintiff's infirmities (which is doubtful as Ms. Kerris was going to the mall in 2004 and her family planned another embolization in 2000, Defs. SOF ¶¶ 21, 36, and 39 – as opposed to her preexisting condition, which results in the same or worse condition that Ms. Kerris exhibits today – Mr. Kerris (as well as the entire Kerris family) knew of their claims in 1999, yet waited until 2005 to file a lawsuit. Contrary to plaintiffs' representation in their Opposition, Plts. Opp. at 18, Mr. Kerris and the Iacangelos could easily have filed within the three year statute of limitations, D.C. Code Ann. § 12-301, by March 2001 for all of their claims.

Therefore, defendants respectfully submit that there is no justification sufficient under the law to toll the applicable statute of limitations – missed by more than three years – and that plaintiffs' Count VII: Loss of Consortium should be dismissed with prejudice.

## V. AS THE FDCA DOES NOT CREATE A PRIVATE RIGHT OF ACTION, COUNTS X, XI, AND XII BASED ON 21 U.S.C. §§ 331, 360, AND 21 C.F.R. § 812.20(a)(2) MUST BE DISMISSED.

As defendants first addressed in their Memorandum of Supporting Points and Authorities for their Motion to Dismiss, 21 U.S.C. §§ 331, 360, and 21 C.F.R. § 812.20(a)(2) are inapplicable to doctors and hospitals – like Dr. Watson and GUH – who were trying to treat one

patient facing death. *See* Defendants' Memo in Support of their Motion to Dismiss at 17-19.

Defendants did not realize and did not expect that plaintiffs would try to use statutes that

contained an explicit prohibition against private claims and suits such as theirs.

21 U.S.C. § 337 states, in pertinent part:

> **Except as provided in subsection (b) of this section, all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.** Subpoenas for witnesses who are required to attend a court of the United States, in any district, may run into any other district in any proceeding under this section.

> **(b)(1)** A State may bring in its own name and within its jurisdiction proceedings for the civil enforcement, or to restrain violations, of section 341, 343(b), 343(c), 343(d), 343(d), 343(e), 343(f), 343(g), 343(h), 343(i), 343(j), 343(k), 343(q), or 343(r), of this title if the food that is the subject of the proceedings is located in the State.

(Emphasis added).

This Court affirms this principle. As this Court recently held in *International*

*Union of Bricklayers and Allied Craftworkers*, 366 F.Supp.2d at 39 fn. 4:

> In *Merrell Dow*, the plaintiffs filed multi-count complaints in state court alleging a variety of common-law claims including, for example, negligence, fraud and breach of warranty. *Id.* at 805. However, **in one count, the plaintiffs alleged that the drug on which their claims were predicated on was "misbranded" in violation of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301** *et. seq.* **. . . . The Court concluded that 'a complaint alleging a violation of a federal statute as an element of a state cause of action, when Congress has determined that there should be no private federal cause of action for the violation, does not state a claim 'arising under the Constitution, laws, or treatise of the United States.'**

(quoting *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 817 (1986) (emphasis added)).

In *Pediamed Pharmaceuticals, Inc.*, 2006 WL 544525 at *8, *supra.*, the court rejected precisely

the type of arguments plaintiffs seek to make here:

> These arguments (adulteration, mislabeling, and new drug
> applications) implicate various provisions of the FDCA. Because
> Defendants' argument requires direct application of the FDCA, which
> only the FDA is entitled to enforce, these arguments are precluded. . . .
> It is for the FDA to exercise its discretion to determine whether these four
> ointments are on the market lawfully, whether it be because they are
> grandfathered or otherwise qualify for any exception to the FDA pre-
> clearance process. Resolution of these questions in court would require
> the "direct interpretation and application of the FDCA . . . [which] . . . are
> more appropriately addressed by the FDA, especially in light of
> Congress's intention to repose in that body the task of enforcing the
> FDCA.

(quoting, *inter alia*, *Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (emphasis added)).  Attempts

by private plaintiffs to recover for alleged violations of FDCA, including claims of misbranding

and failure to get premarket approval, are habitually dismissed by courts around the country .

*PDK Labs, Ink, supra, Bailey, supra,* (same); *Gile, supra,* (same); *Solvay Pharmaceuticals, Inc.,*

*supra,* (same); *Holland, supra,* (same), *Coleman v. Danek Medical, Inc.,* 43 F.Supp.2d 629 (S.D.

Miss. 1998) (same).

      As stated in defendants' Memorandum in Support of Motion to Dismiss and

Partial Summary Judgment, the FDCA is inapplicable to this case as they do not apply to GUH

and Dr. Watson.  Defs. Supporting Memo. at 17-20.  Moreover, plaintiffs are prohibited from

bringing claims based on the FDCA.  21 U.S.C. § 337.  Notably, all of the cases plaintiffs cite as

authority for their FDCA claims involved the government.  *See* Plts. Opp at 13-14.

      Therefore, defendants respectfully submit that Counts X, XI, and XII of plaintiffs'

Amended Complaint must be dismissed with prejudice as barred by the law.

**VI.  ALLEGATIONS REGARDING FEDERAL STATUTES HAVING NO
APPLICABILITY TO PRIVATE RIGHTS OF ACTION, AS WELL AS
ALLEGATIONS REGARDING INAPPLICABLE IRB PROCEDURES ARE
IMMATERIAL AND SHOULD BE STRUCK.**

Plaintiffs admit that the "vast majority of paragraphs relate to FDA rules and regulations." Plts. Opp. at 24. Since plaintiffs may not base private actions on alleged violations of FDA rules and regulations, such allegations (Amended Complaint, ¶¶ 11(c)-11(d), 11(f), 11(h)-11(l), 59(b)-(c), 59(h), 60, 61) are immaterial to plaintiffs' causes of action and should be stricken pursuant to Federal Rule of Civil Procedure 12(f). *See* 21 U.S.C. § 377. Similarly, plaintiffs' allegations (Amended Complaint, ¶ 60), concerning an alleged fiduciary duty Dr. Watson had to GUH, being based on plaintiffs' claims that Dr. Watson should have followed an IRB procedure or should have submitted an IDE, procedures applicable only to research and FDA claims, these allegations are immaterial as well and should be struck. Section V at 17-19, *supra*. Similarly, the characterization of "illegality" regarding the substances or the use of these substances is based upon plaintiffs' reading of the FDCA. Such judgment can only be made by the FDA if it so chooses. Under 21 U.S.C. § 337 and F.R.C.P. 12(f), these statements should be struck.

Lastly, the doctrine of *res ipsa loquitur* is an evidentiary fallacy that allows a claimant to proceed when they cannot prove that an event caused their injury, but that the injury normally does not occur in the absence of negligence. District of Columbia courts consistently hold that in "a medically complicated case such as this [an AVM embolization], contemporaneity between a medical procedure and an injury is too weak a foundation upon which to infer causation. Correlation and causation are hardly synonymous." *Lasley v. Georgetown University*, 688 A.2d 1381, 1387 (D.C. 1997) (listing cases).

> If we were to conclude otherwise-that contemporaneity proved causation-we might inappropriately shift the plaintiff's burden of proof onto the defendant. Instead of requiring the plaintiff to indicate why the injury occurred, we would in effect be forcing defendants to disprove causality. For example, a jury could easily be tempted to conclude that any injuries sustained during brain surgery necessarily result from the operation itself

because brain surgery is inherently risky. **Such a conclusion here would constitute an unreasonable application of the doctrine of res ipsa loquitur because both parties agree that there was always an appreciable risk that the AVM might rupture on its own even if the embolization procedure were never performed.**

(Emphasis added) (citing *Blincoe v. Luessenhop*, 669 F. Supp. 513, 518 (D.D.C. 1987) ("res ipsa loquitur is inapplicable"). And, since plaintiffs state that they have experts, Plts. Opp. at 25, there is absolutely no reason that they should be allowed to invoke the doctrine of *res ipsa loquitur* in this case.

## CONCLUSION

For all of the reasons stated above, defendants' Memorandum in Support of their Motion to Dismiss and Partial Summary Judgment, the facts set out in defendants' Statement of Material Facts as to which Defendants Contend There is No Genuine Dispute, the evidence contained in the attached exhibits, and defendants' response to plaintiffs' Statement of Material Facts in Dispute, defendants respectfully submit that Count III: Strict Products Liability, Count IV: Breach of Implied Warranty of Fitness for a Particular Purpose, Count V: Breach of Express Warranties, Count VI: Fraud, Count VII: Consortium Claim of Paul Kerris, Count IX: Punitive Damages, Counts X and XII: Violations of 21 U.S.C. § 360(a)(2) and 21 C.F.R. §812.20(a)(2), and Count XI: Violation of 21 U.S.C. § 331(a), (b), (c), (g), and (k) should be dismissed with prejudice pursuant to Federal Rule of Evidence 12(b)(6); that summary judgment be entered in defendants' favor on Count II: Lack of Informed Consent, and/or in the alternative to dismissal for failure to state a claim under Federal Rule of Evidence 12(b)(6), summary judgment entered in defendants' favor as to Count VI: Fraud and Count IX: Punitive Damages; and that the enumerated paragraphs identified in this

memorandum be struck from the Amended Complaint as containing allegations that are immaterial, impertinent, and/or scandalous.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated:  March 27, 2006        By:    /s/ Megan E. Hills
Megan E. Hills ((D.C. Bar #437340)
Nicolas Muzin (N.Y. Bar Registration # 4378626
*D.C. Bar pending*)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)
mhills@wc.com
nmuzin@wc.com

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendants' Reply in Support of Defendants' Motion to

Dismiss and for Partial Summary Judgment, and to Strike Certain Allegations in plaintiffs' Amended

Complaint was mailed, first-class mail, and postage prepaid this 27th day of March, 2006 to:

> Anthony Newman, Esquire
> Newman & McIntosh
> 7315 Wisconsin Avenue
> Suite 700E
> Bethesda, Maryland 20814
>
> and
>
> Andrew Greenwald, Esquire
> Greenwald and Laake
> 6404 Ivy Lane
> Suite 440
> Greenbelt, Maryland 20770
>
> Plaintiffs' Attorneys

and a courtesy-copy hand-delivered to:

> The Honorable Paul L. Friedman
> Chambers
> 3 rd & Constitution Avenue, N.W.
> Washington, D.C. 20001

_____
Nicolas Muzin