# Exhibit 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **Felice I. Iacangelo and Cicily Iacangelo,**<br>**As Guardian of the Person and Property of**<br>**KARYN A. KERRIS,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Civil Action No. 1:05CV02086**<br>**Judge Paul L. Friedman** |
| **Georgetown University Hospital,**<br>**GEORGETOWN UNIVERSITY, t/a**<br>**Georgetown University, and**<br>**VANCE E. WATSON, M.D.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

CITY OF WASHINGTON    )
                                       )
DISTRICT OF COLUMBIA )

## DECLARATION OF VANCE E. WATSON, M.D.

I, Vance E. Watson, M.D., hereby declare and state as follows:

1.      My name is Vance E. Watson, M.D.  I am over the age of 18, and am otherwise competent and authorized to make and give this Declaration in connection with the above numbered and entitled case.  I have personal knowledge of the facts set forth below.  The statements set forth in this Declaration are true and correct based upon my personal knowledge to the best of my knowledge and recollection.

2.      Plaintiff Karyn Kerris ("Ms. Kerris") was referred to Georgetown University Hospital ("GUH") in the summer of 1998 after she discovered that she had a bithalmic arteriovenous malformation ("AVM"), measuring 6 to 7 centimeters, from a magnetic resonance imaging ("MRI") performed in December 1997 at the National Institute of Health ("NIH"), while

participating as a control in a voluntary study where Ms. Kerris was employed. Ms. Kerris was

told that her condition was terminal. *See* 11/4/98 GUH Consultation Report (Ex. 3); 11/4/98

GUH Radiology Report (Ex. 7); 3/5/99 GUH Psychiatry Consult (Ex. 2).[1]

3.      Ms. Kerris was asymptomatic until March 1998 when she began experiencing

increasing difficulty with balance and progressive slurring of her speech, increasing in frequency

so that by November 1998, Ms. Kerris was experiencing them every 2 to 3 days and she reported

having blacked out on July 4, 1998 while driving. *See* 11/4/98 GUH Consultation Report (Ex.

3). Ms. Kerris also carried the diagnosis of having Turner's Syndrome. *Id.*[2]

4.      On August 31, 1998, Ms. Kerris presented at GUH for a cerebral arteriogram to

delineate further the abnormalities of the blood vessels – AVM – within Ms. Kerris's brain.

8/31/98 GUH Ambulatory and Less Than 48 Hours Record (Ex. 1).

5.      On August 31, 1998, Ms. Kerris signed a Consent for Surgery, Anesthetics, and

Other Medical Services ("Consent Form"). *See* 8/31/98 Consent Form (Ex. 4). As is the case

with all of the other Consent Forms Ms. Kerris signed, in the August 31, 1998 Consent Form,

Ms. Kerris acknowledged that I had

> described the nature of this procedure to me in terms I
> understand and has answered all questions I have asked about it to
> my satisfaction. He has also explained significant complications
> and risks which may be associated with this procedure, including
> the complications and risks of anesthesia, and has advised me of
> possible alternatives to this treatment, including the possible
> consequences of no treatment at all, and the significant
> complications and risks associated with such alternatives. *Id.*

---

[1] Unless specifically noted, all citations to Exhibits are to Exhibits attached to Defendants'
Statement of Facts Defendants Contend Are Undisputed ("SOF"). By reference to these
exhibits, Vance C. Watson, M.D., affirms that these Exhibits, as well as all Exhibits attached to
the aforementioned Statement, are true and accurate copies of documents contained in Karyn
Kerris's medical record.

[2] *See* definition of Turner's Syndrome at SOF ¶ 2.

6.    Ms. Kerris also acknowledged that "I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as the result of treatments or examination in the hospital." *Id.*

7.    The August 31, 1998 arteriogram showed that "[t]here is a high flow arteriovenous malformation involving the thalamic structures bilaterally, and primary drainage is the vein of Galen." *See* 8/31/98 Bilateral Carotid Arteriogram (Ex. 5). The conclusion was "bithalamic arteriovenous malformation, Spetzler-Martin, grade 5." *Id.*[3]

8.    I had multiple conversations with Ms. Kerris about her condition, the seriousness of it, her prognosis, the alternative treatments available, the risks, benefits, and complications associated with each of the alternative procedures, including those associated with embolization with an acrylate (the "glue") and oil-based contrast – the mixture plaintiffs have labeled, Lipiodol/Histoacryl[4] – including the risks and complications of doing nothing, prior to doing each of the three embolization procedures using the Lipiodol/Histoacryl mixture. Surgery and radiosurgical treatments were also discussed as options.

9.    While I had discussions with Ms. Kerris about some of the issues described in paragraph 8, when her parents and husband were singly or together present, I had several conversations regarding all of the issues described in paragraph 8 with Ms. Kerris alone.

---

[3] The Spetzler-Martin is a 5 point scale. "The rate of neurological complications increased by Spetzler-Martin grade. Female gender, AVM size, and deep venous drainage were significantly associated with neurological deficits at in-hospital and long-term evaluation." *See* "Determinants of Neurological Outcome After Surgery for Brain Arteriovenous Malformation," Hartmann, A., et al., *Stroke.* 2000; 31:2361.

[4] For the sole purpose of this motion, defendants accept, *arguendo*, plaintiffs' factual allegations, but do not agree that plaintiffs have accurately represented the facts of the case.

10.     Of particular concern to Ms. Kerris was treatment for the fact that she felt she was experiencing progressive cognitive decline and increasing motion disorders. *See* 11/4/98 GUH Radiology Report ("28 yo woman with Turner's Syndrom [sic] had decreasing cognitive function and increasing gait ataxia [uncoordinated movement of the arms, hands, legs, or trunk] worsened with exertion . . . . She also reports slurring of speach [sic] and right sided headache's [sic] which occur at night") (Ex. 7).

11.     I told Ms. Kerris that her symptoms were unusual and there was a real concern that her cognitive issues, Parkinson's-like symptoms, focal deficits, and sleepiness would progress.

12.     I also explained that her AVMs carried a risk of hemorrhage, which could lead to stroke and/or death.

13.     I described the embolization procedure with a Lipiodol and Histoacryl mixture and that – while it would not be a cure or address her risk of hemorrhage – I had a previous patient whose cognitive decline had improved after undergoing a series of such embolizations, but another patient who had died after experiencing complications associated with the procedure.

14.     I clearly explained to Ms. Kerris that improvement of her cognitive symptoms with a series of embolization procedures using the Lipiodol and Histoacryl mixture was only a theory with significant, great risks – including a high rate of failure, death, stroke, neurological worsening – and that there was no way to predict whether Ms. Kerris would improve, stay the same, decline, or even die from the treatment. I also expressed to Ms. Kerris that it was unlikely that we could completely cure her AVM, and she would, therefore, remain at risk for hemorrhage.

4

15.    I also told Ms. Kerris that while using a Lipiodol and Histoacryl mixture in embolization had been used before,[5] neither the procedure, *nor* the substances were approved by the Food and Drug Administration ("FDA") and would need to be obtained from a foreign source such as Canada.

16.    I particularly remember discussing the fact that the substances to be used – Lipiodol and Histoacryl, individually, nor the mixture of them together, as was going to be used in her medical procedure – had not been approved by the FDA with Ms. Kerris as I discussed with her that she might need to write a letter of need to facilitate bringing the items into the country.

17.    I also remember Ms. Kerris remarking that – as an employee of NIH – she was very familiar with the use of substances that the FDA had not approved and that she was more than willing to write such a letter if one were needed.

18.    Further, as per Ms. Kerris's medical record, members of my staff were asked to speak with an employee of Blue Cross/Blue Shield to obtain insurance approval for the procedure. These notes establish that "proc.[ess] needs glue" was approved. *See* 11/4/98 Insurance Notes (Ex. 9).

---

[5] *See* Chul Suh, D., et al., "Change of Spontaneous Reaction of Glue and Lipiodol Mixture during Embolization after the Addition of Tungsten Powder: In Vitro Study," Am J Neuroradiol 21:1277-1279 (August 2000); Casaco A., et al., "Major Complications of Percutaneous Embolization of Skull-Base Tumors," Am J Neuroradiol 20:179-181 (Jan. 1999); Stoesslein F., et al., "Experimental Studies on New Liquid Embolization Mixtures (histoacryl-lipiodol, histoacryl-panthopaque)," Cardiovasc Intervent Radiol, 1982; 5(5):264-76; Lieber, B. et al., "Acute and Chronic Swine Rete Arteriovenous Malformation Models: Effect of Ethiodol and Glacial Acetic Acid on Penetration, Dispersion, and Injection Force of N-Butyl 2-Canoacrylate," Am J Neuroradiol 26(7):1707-1414 (Aug 2005); Hong, J., et al. "Successful Management with Glue Injection of Arterial Rupture Seen during Embolization of an Arteriovenous Malformation Using a Flow-Directed Catheter: A Case Report," Korean J Radiol 2000; 1:208-211.

5

Because of the rare nature of Ms. Kerris's medical presentation, "[t]he case was discussed at [the] multidisciplinary neurovascular conference and endovascular treatment was encouraged." 11/4/98 GUH Radiology Report (Ex. 7). The multidisciplinary neurovascular conference is a group consisting of neurosurgeons, neurologists, and radiologists from Georgetown University, other hospitals, and private practice, which meets regularly, at which different doctors present cases that they have, the diagnosis, and treatment of the condition is discussed in the open forum. From the description of Ms. Kerris' case to the conference, I would have presented her images and clinical findings and a discussion of them would have followed.

19.    On November 4, 1998, prior to undergoing the first of the series of embolization procedures using the Lipiodol/Histoacryl mixture, Ms. Kerris acknowledged that I had explained all material facts regarding the embolization procedure to her in a manner that she could fully understand and that I had satisfactorily answered any questions she had by signing the November 4, 1998 Consent Form. *See* 11/4/98 Consent Form (Ex. 6).

20.    The November 4, 1998 Consent Form contained the same acknowledgement as the August 31, 1998 Consent Form that all risks, complications, and alternative treatments had been satisfactorily explained to Ms. Kerris and that no guarantees were given to her as to the result of the treatment. *Id.*

21.    Ms. Kerris underwent the first of her embolization procedures on November 4, 1998 in an attempt "to maintain optimal cerebral tissue perfusion." 11/4/98 GUH Patient Care Summary (Ex. 11). Ms. Kerris experienced no clinical complications during the procedure. *See* 11/4/98 GUH Radiology Report (Ex. 7).

22.    Ms. Kerris returned to GUH for the second in the series of embolization procedures using the Lipiodol/Histoacryl mixture on January 13, 1999 in an attempt to maintain

6

optimal cerebral tissue perfusion. 1/13/99 GUH Consultation Report; 1/13/99 GUH Patient Care Summary (Exs. 26[6] & 10, respectively).

23.    Again, prior to undergoing this second of the series of embolization procedures using the Lipiodol/Histoacryl mixture, Ms. Kerris acknowledged that I had satisfactorily explained the procedure, all material aspects (possible risks, benefits, complications, alternative treatments, etc.) of the procedure in terms that she could understand and answered any questions that she might have. 1/13/99 Consent Form (Ex. 10).

24.    Ms. Kerris underwent the second embolization using the Lipiodol/Histoacryl mixture without complications. 1/13/99 GUH Consultation Report (Ex. 26).

25.    Ms. Kerris returned to GUH for the third in the series of embolization procedures using the Lipiodol/Histoacryl mixture on March 3, 1999 in an attempt to address a declining level of consciousness, worsening lethargy, difficulty walking, and declining fine motor skills, "barely able to work." *See* 3/17/99 GUH Discharge Summary; 3/5/99 GUH Psychiatry Consult (Exs. 14 & 2, respectively). There were no evident technical complications during the procedure. 3/17/99 GUH Discharge Summary (Ex. 14).

26.    Again, prior to undergoing the third of the series of embolization procedures using the Lipiodol/Histoacryl mixture, Ms. Kerris acknowledged that I had satisfactorily explained the procedure, all material aspects (possible risks, benefits, complications, alternative treatments, etc.) of the procedure in terms that she could understand and answered any questions that she might have. 3/3/99 Consent Form (Ex. 15).

---

[6] Exhibit 26 is attached only to Dr. Watson's affidavit, but is incorporated by reference into defendants' motion in its entirety as support for the motion as a whole.

27.     I am in the practice of medicine with a specialty in interventional neuroradiology. I am not a manufacturer of any product, nor do I sell any product.

28.     The purpose of my interaction with Ms. Kerris was to provide medical treatment for her serious condition of bithalamic AVMs with progressive symptoms.


I declare under penalty of perjury that the foregoing is true and correct.

Vance C. Watson, M.D.


Executed on: March 3, 2006

8

# Exhibit 2

# Institutional Review Board
# Policies & Procedures Manual



# Georgetown University
# Office of Regulatory Affairs

# July 2003

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

# Table of Contents

## A. INTRODUCTION

**1. The Ethical Mandate to Protect Human Subjects**
   a.  The Nuremberg Code  ................................................1-1
   b.  The Declaration of Helsinki  ......................................1-1
   c.  The Belmont Report  .................................................1-1

**2. The Regulatory Mandate to Protect Human Subjects**
   a.  Department of Health and Human Services (DHHS)  ...........................2-1
   b.  Food and Drug Administration (FDA) Regulations....................................2-1
   c.  The Assurance and IRB Registration Process  ......................................2-1

**3. Defining Human Subject Research**
   a.  Definition of Human Subject and Research  ...........................................3-1
   b.  Types of Human Subject Research ......................................................3-1

**4. Shared Responsibilities To Protect Human Subjects**
   a.  The Institution  .........................................................4-1
   b.  The Institutional Review Board (IRB)  ...........................................4-1
   c.  The Principal Investigator  ........................................................4-2
   d.  Other Members of the Research Team  ...........................................4-2
   e.  Research Subjects  .................................................................4-1

**5. The Future of Human Subject Protections**
   a.  Certification of Investigators ......................................................5-1
   b.  Certification of IRB Members  ......................................................5-1
   c.  Certification of IRB Administrators and Staff  ......................................5-1
   d.  Accreditation of IRBs and Institutional Protection Systems  ...................5-1

## B. INSTITUTIONAL REVIEW BOARD (IRB) ADMINISTRATION

**6. IRB Roles and Authorities**
   a.  Human Subject Protections under Federal Regulations  ...........................6-1
   b.  Institutional Authority of the IRB  ...........................................6-1
   c.  Purpose of the IRB .................................................................6-2
   d.  Scope of the IRB's Authority  ......................................................6-2
   e.  Disagreements Among Designated IRBs  ...........................................6-2
   f.  Additional Institutional Review of IRB-Approved Research ......................6-2
   g.  Appeal of IRB Determinations  ......................................................6-3
   h.  Relationships and Responsibilities within the Institution  ...........................6-3
   i.  Responsibilities to Regulatory Agencies  ...........................................6-4
   j.  Relationship of Georgetown University (GU) IRBs to Other Institutions  .....6-4
   k.  Human Subject Protection Education Program ......................................6-4
   l.  Relationship of Georgetown University (GU) IRBs to IND/IDE Sponsors ......6-4

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

m. Administrative Review of Human Protection Activities  .............................6-4

**7. IRB Membership**
   a. Appointment of IRB Members, Length of Service and Duties  .................7-1
   b. Appointment of IRB Chairperson, Length of Service and Duties  ...............7-1
   c. Alternate IRB Members  .................................................................7-1
   d. Non-Voting IRB Members  .............................................................7-2
   e. Consultants  .............................................................................7-2
   f. IRB Membership Requirements  .......................................................7-2
   g. Conflict of Interest  ....................................................................7-2
   h. Initial Training, Continuing Education, and Professional Development
      of IRB Members  .......................................................................7-3
   i. Compensation of IRB Members  ......................................................7-3
   j. Liability Coverage  .....................................................................7-3

**8. IRB Adminsitrative Support**
   a. Resource Allocation  ..................................................................8-1
   b. Reporting Lines and Supervision  ...................................................8-1
   c. Initial Training, Continuing Education, and Professional Development
      of IRB Staff  ...........................................................................8-1
   d. IRB Executive Officer Duties  ........................................................8-1
   e. IRB Staff Duties  .......................................................................8-2

**9. IRB Recordkeeping & Required Documentation**
   a. Record Retention  .....................................................................9-1
   b. Access to IRB Records  ...............................................................9-1
   c. IRB Records  ...........................................................................9-1
   d. IRB Membership Rosters  .............................................................9-1
   e. Education and Training Records  .....................................................9-2
   f. IRB Correspondence  ..................................................................9-2
   g. IRB Research Application (Protocol) Files  .........................................9-2
   h. IRB Database  ..........................................................................9-3
   i. Documentation of Exemptions  ......................................................9-3
   j. Documentation of Exceptions from Informed Consent Requirements for
      Emergency Use of a Test Article  ...................................................9-5
   k. Documentation of Exemptions from IRB Review Requirements for Emergency
      Use of a Test Article  ................................................................9-5
   l. Documentation of Expedited reviews  ..............................................9-5
   m. Documentation of Convened IRB Meetings—Minutes  ...........................9-5
   n. Attendance at IRB Meetings  ........................................................9-6
   o. Quorum Requirements and Voting at IRB Meetings ..............................9-6
   p. Actions Taken by the Convened IRB ...............................................9-7
   q. The Basis for Requiring Changes in or Disapproving Research  ...............9-7
   r. Summary of Controverted Issues at Convened Meetings  .......................9-7
   s. Required IRB Findings and Determines .............................................9-7

## C. **THE SUBSTANCE OF IRB REVIEW**

**10. Types of IRB Review**
    a.  Review by the Convened IRB ...............................................10-1
    b.  Initial Review by the Convened IRB ....................................10-1
    c.  Continuing Review by the Convened IRB ............................10-1
    d.  Use of Primary Reviewers with Convened IRB Reviews .........10-2
    e.  Expedited Review of Research .........................................10-2
    f.   Expedited Review of Minor Changes in Previously Reviewed Research ....10-3
    g.  Expedited Initial and Continuing Review: Permitted Categories ...............10-3
    h.  Use of Subcommittees to Support IRB Activities ................10-5
    i.   Review of Reports of Unanticipated Problems or Adverse Events ...........10-6
    j.   Review of Sponsor or cooperative Group Adverse Event or Safety Reports.10-7
    k.  Review of Data and Safety Monitoring Board (DSMB) Reports ...............10-7
    l.   Outcomes of IRB Review ................................................10-7
    m. Expiration of Approval Period ...........................................10-8
    n.  Suspension or Termination of IRB Approval .......................10-8

**11. IRB Review: Regulatory Criteria for Approval of Research**
    a.  Levels of Risk ............................................................11-1
    b.  Risks Minimized .........................................................11-1
    c.  Risks Reasonable Relative to Anticipated Benefits ...............11-2
    d.  Equitable Selection of Subjects ......................................11-2
    e.  Informed Consent Procedures .......................................11-2
    f.   Documentation of Informed Consent ..............................11-3
    g.  Data Safety Monitoring .................................................11-4
    h.  Privacy of Subjects and Confidentiality of Data ..................11-4
    i.   Additional Safeguards for Vulnerable Subjects ...................11-4
    j.   Review More Often Than Annually ..................................11-5
    k.  Independent Verification From Sources Other than the Investigator
        of Any Information Regarding the Study Including That No Material
        Changes Have Occurred Since Last Reviewed by the IRB ..................11-5
    l.   Consent Monitoring .....................................................11-6
    m. Advertisements and Recruitment Incentives .....................11-6
    n.  Obtaining Consent from Non-English Speakers ..................11-7
    o.  Payment to Research Subjects ......................................11-8
    p.  Compensation for Injury ...............................................11-8
    q.  Certificates of Confidentiality ........................................11-9
    r.   Compliance with All Applicable Laws ..............................11-9
    s.  Waiver or Alteration of Informed Consent Requirements: State or
        Local Public Benefit Programs ........................................11-9
    t.   Waiver or Alteration of Informed Consent Requirements: Minimal
        Risk Research ...........................................................11-10
    u.  Waiver of Documentation of Consent .............................11-10

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

**12. Required Elements of Informed Consent**
   a.  Research Statement ...............................................................12-1
   b.  Reasonably Foreseeable Risks or Discomforts ....................................12-2
   c.  Reasonably Expected Benefits to Subjects or Others ............................12-2
   d.  Appropriate Alternatives .......................................................12-2
   e.  Extent of confidentiality .....................................................12-2
   f.  Compensation or Treatment for Injury ..........................................12-3
   g.  Contact Information ............................................................12-3
   h.  Voluntary Participation Statement .............................................12-3
   i.  Additional Elements Where Appropriate .........................................12-4
   j.  Intellectual Property Statement ...............................................12-5

**D.  FDA REGULATED RESEARCH**

**13. Investigational Drugs, Devices, and Biologics**
   a. FDA vs Common Rule and DHHS Requirements ......................................13-1
   b. INDs and IDEs .................................................................13-1
   c. Investigator and Sponsor Responsibilities .....................................13-2
   d. IRB Review of Medical Devices .................................................13-2
   e. Radiology Devices and Radioactive Materials ...................................13-3
   f. Adverse Events and Reporting Requirements – INDs ..............................13-3
   g. Adverse Events and Reporting Requirements – IDEs ..............................13-4
   h. Off-Label (Unapproved) Use of FDA-Regulated Products in Medical
      Practice Versus Research ......................................................13-4
   i. Treatment INDs and IDEs .......................................................13-5
   j. Parallel Track Studies ........................................................13-6
   k. Gene Transfer Research ........................................................13-6
   l. Emergency Use of a Test Article without IRB Review ............................13-6
   m. Emergency Use of a Test Article without Informed Consent ......................13-8
   n. Compassionate Use of a Test Article. .........................................13-8
   o. Humanitarian Use Devices (HUDs) ...............................................13-9
   p. Planned Emergency Research ....................................................13-9

**E.  SPECIAL CONSIDERATIONS IN IRB REVIEW**

**14. Social and Behavioral Research**
   a.  Social and Psychological Harms ...............................................14-1
   b.  Privacy and Confidentiality Concerns .........................................14-1
   c.  Safeguarding Confidentiality .................................................14-2
   d.  Exempt Research ..............................................................14-3
   e.  Exempt Research in Educational Settings ......................................14-3
   f.  Exempt Research Using Educational Tests, Survey Procedures,
       Interview Procedures, or the Observation of Public Behavior .................14-3
   g.  Exempt Research Using Existing Data and Documents ............................14-4
   h.  Expedited Review of Social and Behavioral Research ...........................14-4
   i.  Expedited Review of Research Involving Existing Materials ....................14-4

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

    j.  Expedited Review of Research Involving Data from Voice, Video, Digital, or Image Recordings Made from Research Purposes ...................14-5
    k.  Expedited Review of Research Involving Individual or Group Characteristics of Behavior or Research Employing Survey, Interview, Oral History, Focus Group, Program Evaluation, Human Factors Evaluation, or Quality Assurance Methodologies .......................14-5
    l.  Research Involving Deception ...................................................................14-5

**15. Bio-Social and Bio-Behavioral Research**
    a.  Prospective Use of "Existing" Materials.............................................15-1
    b.  Retrospective Use of Existing Materials ...........................................15-1
    c.  Research Utilizing Large Existing Data Sets .....................................15-1
    d.  Research Utilizing Data or Tissue Repositories ...............................15-2
    e.  Epidemiology Research ....................................................................15-3
    f.  Issues in Genetic Research..............................................................15-4
    g.  Family History Research ...................................................................15-4
    h.  Research Involving Potentially Addictive Substances ......................15-4

**16. Potentially Vulnerable Subject Groups**
    a.  Elements to Consider ......................................................................16-1
    b.  Pregnant Women, Human Fetuses and Neonates ..........................16-2
    c.  Research Involving Prisoners ...........................................................16-4
    d.  Research Involving Children .............................................................16-6
    e.  Research Involving Decisionally Impaired Subjects .........................16-7
    f.  Research Involving Other Potentially Vulnerable Adult Subjects ...............16-8
    g.  Fetal Tissue Transplantation Research.............................................16-8
    h.  Research Involving Deceased Persons.............................................16-8

**17. Managing Conflicts of Interest**
    a.  Research Personnel .........................................................................17-1
    b.  IRB Chairpersons and Members .....................................................17-1
    c.  Office of Regulatory Affairs and IRB Staff ......................................17-1
    d.  Institutional Officials ........................................................................17-1
    e.  Federal Regulations and the Common Rule.....................................17-2
    f.  FDA Requirements ..........................................................................17-2
    g.  PHS Requirements for Grantee Institutions .....................................17-2
    h.  The Disclosure Process ...................................................................17-3

**18. HIPAA Information for Researchers**...................................................18-4

**APPENDICES**

**I.  Glossary of Frequently Used Terms**

**II.  GU IRB Forms**

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

**III. Informed Consent Templates**
    A. Biomedical and Clinical Research Informed Consent Template
    B. Social and Behavioral Research Informed Consent Templates

**IV. Ethics References**
    C. The Nuremberg Code
    D. The Declaration of Helsinki (1996)
    E. The Declaration of Helsinki (2000)
    F. The Belmont Report

**V. Regulations and Standards**
    A. FDA Informed Consent Regulations (21 CFR Part 50)
    B. FDA Financial Disclosure by Clinical Investigators (21 CFR Part 54)
    C. FDA IRB Regulations (21 CFR Part 56)
    D. FDA Investigational New Drug Regulations (21 CFR Part 312)
    E. FDA Biological Products Regulations (21 CFR Part 600)
    F. FDA Investigational Device Regulations (21 CFR Part 812)
    G. FDA Non-Significant and Significant Risk Device Examples
    H. PHS Responsibility of Applicants for Promoting Objectivity in Research for Which PHS Funding is Sought (42 CFR Part 50, Subpart F)
    I. DHHS Human Subject Regulations (45 CFR Part 46)
    J. DHHS/FDA Expedited Review List (November 1998)
    K. DHHS Draft Interim Guidance on Financial Relationships in Clinical Research (January 2001)
    L. Public Law 103-43
    M. OHRP Guidance and Sample "Short Form" Informed Consent Document
    N. International Conference on Harmonisation-Guideline for Good Clinical Practice (ICH-GCP)

**VI. GU Requirements**
    A. Assurance Documents (MPA and FWA)
    B. IRB Membership Rosters
    C. IRB Meeting Schedule and Submission Deadlines
    D. Memorandum to Principal Investigators
    E. Georgetown University Conflict of Interest Disclosure Form and Policy
    F. Ethical and Religious Directives for Catholic Healthcare Institutions
    G. Radiation Safety Committee Information
    H. Institutional Biosafety Committee Information
    I. University Code of Procedure for Alleged Misconduct in Research

**INDEX**

## A. Introduction

Human subject research at Georgetown University (GU) must be carried out in conformity with the basic ethical principles governing research involving human subjects. Since GU is ethically and religiously bound by the conventions of Catholic moral theology, the Ethical and Religious Directives for Catholic Healthcare Institutions have the force of policy at Georgetown. Specifically applicable to research are Directives 4, 32, 52, and 67. Directive 4 directs Catholic health care institutions to promote medical research in a manner consistent with its mission of providing health care with concern for the responsible stewardship of resources and in accordance with Catholic moral principles. Directive 32 concerns informed consent procedures. Directives 52 and 67, respectively, pertain to research on living embryos or fetuses and the use of fetal tissue for research purposes. The full text of the Ethical and Religious Directives is provided in Appendix VI.

## Chapter 1.
## The Ethical Mandate to Protect Human Subjects

The following summarize important events in the development of protections for human subjects in research. (These documents are provided in Appendix IV.)

    a.  **The Nuremberg Code**. The modern history of human subject protections begins with the discovery after World War II of numerous atrocities committed by Nazi doctors in war-related research experiments. The Nuremberg Military Tribunal developed ten principles, known as *The Nuremberg Code,* to judge the Nazi doctors. The significance of the Code is that it addressed the necessity to require the voluntary consent of the human subject and that any individual "who initiates, directs, or engages in the experiment" must bear personal responsibility for the quality of consent.

    b.  **The Declaration of Helsinki.** Similar principles have been articulated and expanded in later codes, such as the World Medical Association *Declaration of Helsinki: Recommendations Guiding Medical Doctors in Biomedical Research Involving Human Subjects (1964, revised 1975, 1983, 1989, 1996, 2000,* which calls for prior approval and ongoing monitoring of research by independent ethical review committees).

    c.  **The Belmont Report.** Revelations about the 40-year United States Public Health Service Syphilis Study at Tuskegee and other ethically questionable research resulted in legislation in 1974 calling for regulations to protect human subjects and for a National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research to examine ethical issues related to human subject research.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

The Commission's final and most influential report, *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research*, defines the ethical principles and guidelines for the protection of human subjects. Perhaps the most important contribution of *The Belmont Report* is its elucidation of three basic ethical principles:

(i)     respect for persons (operationalized by obtaining informed consent);

(ii)    beneficence (operationalized by weighing risks and benefits); and

(iii)   justice (operationalized by the fair selection of subjects).

*The Belmont Report* also provides important guidance regarding the boundaries between biomedical research and the practice of medicine.

## Chapter 2.
## The Regulatory Mandate to Protect Human Subjects

Georgetown University (GU) and Federal regulations require specific protections for human subjects. These, and other, regulatory documents are provided in Appendix V.

    **a.** **Department of Health and Human Services (DHHS).** DHHS regulations at 45 CFR Part 46, Subpart A constitute the Federal Policy (Common Rule) for the protection of human subjects. The DHHS regulations also include additional protections for pregnant women, human fetuses and neonates (Subpart B), prisoners (Subpart C), and children (Subpart D). All human subject research at GU must comply with all four Subparts of the DHHS regulations. These regulations are enforced by the DHHS, Office for Human Research Protections (OHRP).

    **b.** **Food and Drug Administration (FDA) Regulations.** FDA has codified informed consent (21 CFR Part 50), IRB (21 CFR Part 56), and child protection (61 FR 20589 and 21 CFR Part 50, Subpart D) regulations that are almost identical to the DHHS regulations. Additional FDA regulations relevant to the protection of human subjects address Investigational New Drug Applications (21 CFR Part 312), Biological Products (21 CFR Part 600), and Investigational Device Exemptions (21 CFR Part 812).

    In general, FDA human subject regulations apply to clinical investigations and other research involving products regulated by FDA, including food and color additives, drugs for human use, medical devices for human use, biological products for human use, and electronic products. IRB review and approval is required for clinical investigations and other research involving products regulated by FDA for human use, even where an Investigational New Drug Application (IND) or Investigational Device Exemption (IDE) is not required.

    **c.** **The Assurance and IRB Registration Process.** Every institution that receives funds from DHHS for human subject research must have an "Assurance" of protection for human subjects (45 CFR 46.103).

    GU currently conducts human subject research under a DHHS, OHRP-approved Multiple Project Assurance (MPA) with Federalwide application. The transition to an FWA will have no effect on the conduct of human subject research at GU. The GU Office of Regulatory Affairs coordinates IRB registration and Assurance filing for all GU IRBs.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

## Chapter 3.
## Types of Human Subject Research

All research involving human subjects conducted at GU or its affiliates must
be reviewed by one of Georgetown's Institutional Review Boards (IRBs).

   **a. Definition of Human Subject and Research.** Federal regulations (45
   CFR 46.102(d)) define **research** as "a systematic investigation,
   including research development, testing, and evaluation, designed to
   develop or contribute to generalizable knowledge."

   Federal regulations (45 CFR 46.102(f)) define **human subject** as "a
   living individual about whom an investigator (whether professional or
   student) conducting research obtains (1) data through intervention or
   interaction with the individual or (2) identifiable private information."
   **Private information** includes information that an individual can
   reasonably expect will not be made public, and information about
   behavior that an individual can reasonably expect will not be observed
   or recorded. **Identifiable** means that the identity of the individual is or
   may readily be ascertained by the investigator or associated with the
   information.

   **b. Types of Human Subject Research.** The following examples illustrate
   common types of human subject research. These are examples only,
   and are not exhaustive of all human subject research.

   1. *Biomedical Research.* Biomedical research involves research (i)
      to increase scientific understanding about normal or abnormal
      physiology, disease states, or development; and (ii) to evaluate
      the safety, effectiveness or usefulness of a medical product,
      procedure, or intervention. Vaccine trials, medical device
      research, and cancer research are all types of biomedical
      research. GU IRBs A and B both review biomedical research.

   2. *Social and Behavioral Research.* The goal of social and
      behavioral research is similar to that of biomedical research -- to
      establish a body of knowledge and to evaluate interventions -- but
      the content and procedures often differ. Social and behavioral
      research involving human subjects focuses on individual and
      group behavior, mental processes, or social constructs and
      usually generates data by means of surveys, interviews,
      observations, studies of existing records, and experimental
      designs involving exposure to some type of stimulus or
      environmental intervention. GU IRB C reviews social and
      behavioral research.

3-1

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

3.  *Clinical Research*. Clinical research involves the evaluation of biomedical or behavioral interventions related to disease processes or normal physiological functioning.

4.  *Epidemiology Research*. Epidemiology research targets specific health outcomes, interventions, or disease states and attempts to reach conclusions about cost-effectiveness, efficacy, interventions, or delivery of services to affected populations. Some epidemiology research is conducted through surveillance, monitoring, and reporting programs— such as those employed by the Centers for Disease Control and Prevention (CDC)—whereas other epidemiology research may employ retrospective review of medical, public health, and/or other records. Because epidemiology research often involves aggregate examination of data, it may not always be necessary to obtain individually identifiable information. When this is the case, the research may quality for exemption or expedited review.  In all cases, the IRB not the individual investigator, will determine when IRB review of the activity is required.

5.  *Repository Research*. Research utilizing stored data or materials (cells, tissues, fluids, and body parts) from individually identifiable living persons qualifies as human subject research, and requires IRB review. When data or materials are stored in a bank or repository for use in future research, the IRB should review a protocol detailing the repository's policies and procedures for obtaining, storing, and sharing its resources, for verifying informed consent provisions, and for protecting subjects' privacy and maintaining the confidentiality of data. The IRB may then determine the parameters under which the repository may share its data or materials with, or without, IRB review of individual research protocols.

6.  *Quality Assurance Activities*. Quality assurance activities attempt to measure the effectiveness of programs or services. Such activities may constitute human subject research, and require IRB review, if they are designed or intended to contribute to generalizable knowledge. Quality assurance activities that are designed solely for internal program evaluation purposes with no external application or generalization may not require IRB review. Where any disagreement arises about whether a quality assurance activity constitutes human subject research, the IRB, not the individual investigator, will determine when IRB review of such activities is required.

7.  *Pilot Studies*. Pilot studies involving human subjects are considered human subject research and require IRB review.

## Chapter 4.
## Shared Responsibilities for Protecting Human Subjects

The ethical conduct of research is a shared responsibility. It requires cooperation, collaboration, and trust among the institution, investigators and their research staff, the subjects who enroll in research, and the IRBs. A clear delineation of the responsibilities of each of these parties can help protect the participants who volunteer for research.

a. **The Institution.** The responsibilities of GU flow from its research mission as a Catholic and Jesuit institution committed to compassionate care for the whole person. Thus, in all of its activities, GU will promote the physical, psychological, spiritual, and social well-being of those we serve. In addition, inspired by the healing ministry of the Church, GU is dedicated to defending and promoting human dignity, health, and well being. All elements of this mission apply to the subjects who volunteer to participate in research and to Medical Center personnel, who must perform their duties in a manner consistent with the Ethical and Religious Directives for Catholic Health Care Services, which is attached in Appendix VI.

It is the responsibility of the institution to assure Federal Agencies in writing that it will comply with regulations governing the protection of human subjects. As part of this Assurance, the institution must develop policies and procedures for conducting human subject research in a responsible and ethical fashion, including how research will be reviewed by the IRB, the reporting of unanticipated problems to the IRB and appropriate regulatory bodies, and other issues. The OHRP general terms for a domestic FWA is provided in Appendix VI.

The Director of the Office of Regulatory Affairs serves as the Institutional Signatory Official for GU's Assurance and is ultimately responsible for overseeing the protection of human subjects within the institution. The Institutional Signatory Official must also maintain open channels of communication between the IRB, research investigators and staff, and administration, and provide the IRB with sufficient meeting space and staff to support its substantial review and record keeping responsibilities.

b. **The Institutional Review Board (IRB).** An IRB is an appropriately constituted group that has been formally designated to review and monitor research involving human subjects. In accordance with the Common Rule and FDA regulations, the IRB has responsibility for approving, requiring modification in (to secure approval), or disapproving research. IRBs at GU also have the authority to suspend or terminate research for continued noncompliance with the Common

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

Rule, FDA regulations, or its own findings, determinations, and initial and continuing review procedures.

c. **The Principal Investigator.** As the individual responsible for the implementation of research, the principal investigator bears direct responsibility for protecting every research subject. This responsibility starts with protocol design, which must minimize risks to subjects while maximizing research benefits. In addition, the principal investigator and all members of the research team must comply with the findings, determinations, and requirements of the IRB. The principal investigator must also be responsible for the adequacy of both the informed consent document and the informed consent process, regardless of which members of the research team actually obtain and document consent.

Principal investigators have the following responsibilities: (i) that all human subject research which they conduct in this institution or as employees or agents of this institution has received prospective review and approval by an IRB designated by this institution; (ii) that continuing review and approval of the research has been secured in a timely fashion; and (iii) that the research is conducted at all times in compliance with all applicable regulatory requirements and the determinations of the designated IRB. No changes in approved research may be initiated without prior IRB approval, except where necessary to eliminate apparent immediate hazards to subjects; and no research may be continued beyond the IRB-designated approval period. Investigators must notify the IRB promptly of (i) any unanticipated problems or serious adverse events involving risks to subjects or others, and (ii) any serious or continuing noncompliance with applicable regulatory requirements or determinations of the designated IRB of which they become aware.

d. **Other Members of the Research Team.** Every member of the research team is responsible for protecting human subjects. Co-investigators, study coordinators, nurses, research assistants, and all other research staff have a strict obligation to comply with all IRB determinations and procedures, adhere rigorously to all protocol requirements, inform investigators of all adverse subject reactions or unanticipated problems, oversee the adequacy of the informed consent process, and take whatever measures are necessary to protect the safety and welfare of subjects. Researchers at every level are responsible for notifying the IRB promptly of any serious or continuing noncompliance with applicable regulatory requirements or determinations of the designated IRB of which they become aware, whether or not they themselves are involved in the research.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

e. **Research Subjects.** Subjects have responsibilities as well. They can be expected to make every effort to comprehend the information researchers present to them so that they can make an informed decision about their participation in good faith. They should also be willing to comply with protocol requirements (unless they decide to discontinue participation) and inform the investigators of unanticipated problems.

## Chapter 5.
## The Future of Human Subject Protections

A number of initiatives have been advanced to strengthen protections for human subjects in the United States. Several of the most frequently discussed are summarized below.

   a. **Certification of Investigators.** The Office for Human Research Protections (OHRP) Assurances requires that research investigators receive appropriate initial and continuing education in the protection of human subjects. In addition, the National Institutes of Health (NIH) requires that all "key personnel" involved in NIH-supported human subject research receive training in protecting subjects. In both cases, however, the curriculum for this training is unspecified, and institutions have been given great latitude in determining what is appropriate for their investigators.

   Nevertheless, there is speculation that formal certification programs may be developed by relevant professional organizations in order to verify investigator knowledge of human protection requirements. It is presently unclear, however, whether such programs will actually be developed, and whether government agencies will recognize and/or require certification of investigators for the research that they support.

   b. **Certification of IRB Members.** The need for training of IRB members is universally recognized, and is required under the OHRP Assurance. Again, however, the curriculum for such training is unspecified, and institutions have been given wide latitude in determining what is appropriate for their IRB members.

   c. **Certification of IRB Administrators and Staff.** Within the past several years, there has been increasing recognition that adequate IRB support goes far beyond the need for clerical assistance. Professional staff are needed to advise IRB members and investigators, maintain current knowledge of regulatory requirements, properly document IRB actions and determinations, and manage IRB records in a satisfactory manner. At least two organizations currently offer certification of IRB professionals:  the Applied Research Ethics National Association (ARENA) Council for Certification of IRB Professionals (CCIP), and the National Association of IRB Managers (NAIM).

   d. **Accreditation of IRBs and Institutional Protection Systems.** The concept of accrediting IRBs and/or institutional programs for the protection of human subjects has recently received widespread attention from both government officials and professional organizations.  Regulatory and legislative activity on this front is anticipated in the future.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

## B. Institutional Review Board (IRB) Administration

## Chapter 6.
## IRB Roles and Authorities

a. **Human Subject Protections under Federal Regulations.** Federal regulations at 45 CFR Part 46 require that institutions engaging in human subject research funded by the Department of Health and Human Services (DHHS) devise mechanisms for the protection of human subjects. The regulations require that each institution conducting human subject research file a written "Assurance" of protection for human subjects and designate one or more Institutional Review Boards (IRBs) to review its human subject research. These and other applicable regulations are provided in Appendix V.

The filing of Assurances and the registration of IRBs are coordinated for all GU IRBs by the Office of Regulatory Affairs, which has developed policies and procedures for its IRBs to operate under a "Federalwide Multiple Project Assurance " (MPA) or the Federalwide Assurance (FWA) from the Office for Human Research Protections (OHRP) in the Department of Health and Human Services (DHHS).

These policies and procedures apply to all research involving human subjects, regardless of the source of funding, if any.

b. **Institutional Authority of the IRB.** The Office of Regulatory Affairs, which reports to the institution's Executive Vice President, is responsible for all research activities conducted under the auspices of this institution.

The Office of Regulatory Affairs may designate one or more Institutional Review Boards (IRBs) to review this institution's human subject research. Designated IRBs may be operated by this institution or by any entity deemed appropriate by the Office of Regulatory Affairs, and must be listed in this institution's Assurance. This institution's designated IRBs are listed in Appendix VI.

Any designated IRB that is operated by another entity functions under the authority of this institution's Office of Regulatory Affairs when overseeing this institution's human subject research. Any such designation must comply with GU requirements and must be accompanied by a written agreement specifying the responsibilities of the designated IRB and this institution under this institution's Assurance.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

c. **Purpose of the IRB.** A designated IRB's primary responsibility is to protect the rights and welfare of participants involved in human subject research. In doing so, the designated IRB monitors human subject research to determine that it is conducted ethically, and in compliance with GU and Federal regulations, the requirements of applicable law, this institution's Assurance, and this institution's policies and procedures. The designated IRB fulfills these responsibilities by conducting prospective and continuing review of human subject research, including review of the protocol and grant applications or proposals (for Federally-funded research), the informed consent process, procedures used to enroll subjects, as well as any adverse events or unanticipated problems reported to the IRB.

d. **Scope of the IRB's Authority.** All human subject research conducted at GU or by GU's employees or agents must be prospectively reviewed and approved by an IRB designated by GU's Office of Regulatory Affairs. No human subject research may be initiated or continued at GU or by GU's employees or agents without prospective approval of a designated IRB.

Any IRB designated by GU's Office of Regulatory Affairs is empowered to take any action necessary to protect the rights and welfare of human subjects in GU's research conducted at GU or by GU's employees or agents. The IRB has the authority to approve, require modifications in, or disapprove any human subject research conducted at GU or by Gu's employees or agents.

A designated IRB may suspend or terminate the enrollment and/or ongoing involvement of human subjects in this institution's research as it determines necessary for the protection of those subjects. The IRB has the authority to observe and/or monitor this institution's human subject research to whatever extent it considers necessary to protect human subjects.

e. **Disagreements Among Designated IRBs.** Should two of GU's designated IRBs, or a GU-designated IRB and a collaborating institution's IRB, disagree about the conditions necessary to approve a specific protocol, that disagreement must be resolved to the satisfaction of both IRBs before the protocol can be initiated or continued.

f. **Additional Institutional Review of IRB-Approved Research.** Although research approved by a designated IRB may be disapproved by other GU committees or officials, no human subject research may be conducted at GU or by GU's employees or agents without the initial and continuing approval of a designated IRB. No GU committee or official may approve or authorize to proceed any human subject

research that has not been reviewed and approved by a designated IRB.

g. **Appeal of IRB Determinations.** No GU committee or official may set aside or overrule a determination by a designated IRB to disapprove or require modifications in this institution's human subject research. The IRB will provide the investigator with a written statement of its reasons for disapproving or requiring modifications in proposed research and will give the investigator an opportunity to respond in person or in writing. The IRB will carefully and fairly evaluate the investigator's response in reaching its final determination. There is no limit to the number of times a research project can be revised and re-submitted to the IRB for consideration.

h. **Relationships and Responsibilities within the Institution.**
   (i)   The Director of the Office of Regulatory Affairs serves as the Institutional Signatory Official on GU's Assurance and is ultimately responsible for overseeing the protection of human subjects in research conducted at GU or by GU's employees or agents.
   (ii)  Although IRBs ordinarily report to the Director of Regulatory Affairs, a designated IRB and/or its Chairperson may bring any matter directly to the attention of the relevant Dean or the University President whenever a majority of the members and/or the Chairperson deems it to be warranted.
   (iii) The Director of Regulatory Affairs may establish additional reporting relationships between designated IRBs and other officials or other committees as deemed appropriate.
   (iv)  A designated IRB may require that proposed research be reviewed and approved by GU's Radiation Safety Committee or Institutional Biosafety Committee, other GU committees, or relevant committees of collaborating institutions.
   (v)   A designated IRB must report any serious adverse effects and any unanticipated problems involving risks to subjects or others to GU's Office of Regulatory Affairs and to any other relevant GU official or committee.
   (vi)  All persons conducting research within this institution, and all persons acting as GU employees or agents regardless of location, must comply with all GU requirements of GU's designated IRBs in the conduct of human subject research. Such persons must promptly provide the IRB with copies of any reports or correspondence to or from any regulatory agency (such as OHRP or FDA) that bear upon the protection of human subjects in research in which they are involved.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

i.  **Responsibilities to Regulatory Agencies.** Designated IRBs must comply with the requirements of all relevant regulatory, agencies including the DHHS Office for Human Research Protections (OHRP), and the Food and Drug Administration (FDA). Copies of any reports or correspondence to or from such agencies must be provided by the IRB to this institution's Office of Regulatory Affairs, which will determine whether any additional notifications are necessary.

j.  **Relationship of GU IRBs to Other Institutions.** IRBs operated by this institution may be designated for review of research under another institution's Assurance only with the written agreement of the Director of Regulatory Affairs and in accordance with applicable requirements. Any such designation must be accompanied by a written agreement specifying the responsibilities of GU and its IRB under the other institution's Assurance. IRBs operated by GU have no authority over, or responsibility for, research conducted at other institutions in the absence of such a written agreement.

k.  **Human Subject Protection Education Program.** GU is required to have a plan to provide education about human subject protections for research investigators and IRB members and staff. The Office of Regulatory Affairs is responsible for developing and implementing this education plan.

l.  **Relationship of GU IRBs to IND/IDE Sponsors.** Unless specifically required by an Investigational New Drug Application (IND) or Investigational Device Exemption (IDE) sponsor or by the IRB, no written notifications of IRB decisions will be provided to IND/IDE sponsors by the IRB or the Office of Regulatory Affairs. The principal Investigator usually serves as the communications link between the IRB and the sponsor. For FDA regulated test articles such linkage is agreed to by the sponsor and principal Investigators when they sign the FDA Form 1572, Statement of Investigator.

m.  **Administrative Review of Human Protection Activities.** The office of Regulatory Affairs is responsible for administrative oversight and review of the institution's systemic protections for human subjects.

## Chapter 7.
## IRB Membership

GU currently has three IRBs to review research from its faculty, students, employees, and other agents.  IRB A and IRB B both review biomedical research, and IRB C reviews social and behavioral research. Each IRB is comprised of faculty from various academic disciplines and departments at GU, and community representatives not affiliated with the University or Medical Center.

GU's designated IRBs will have sufficient expertise to review the broad variety of research in which GU commonly becomes involved, will be knowledgeable about all relevant regulatory requirements, and will remain impartial and objective in its reviews.

    **a.  Appointment of IRB Members, Length of Service, and Duties.** Members of IRBs operated by this institution are formally appointed by the Director of Regulatory Affairs or the University Provost. Members serve three year terms, and are eligible for reappointment. Members vote to approve, require modifications in, disapprove, or defer research submitted to the IRB. Members are expected to attend IRB meetings on a regular basis, serve as primary reviewers for research within their areas of expertise, and serve as general reviewers on all research discussed at convened meetings. Members are also expected to conduct expedited reviews on behalf of the IRB when so designated by the IRB Chairperson.

    **b.  Appointment of IRB Chairperson, Length of Service, and Duties.** Chairpersons of IRBs operated by this institution formally appointed by the Director of Regulatory Affairs or the University Provost. Chairpersons serve three year terms and may serve no more than three consecutive terms as Chairperson. In addition to the responsibilities of IRB membership, Chairpersons have primary responsibility for conducting IRB meetings and directing IRB staff so that the IRB operates within all applicable regulatory requirements. The IRB Chairperson works with IRB members, institutional officials, and investigators to protect the rights and welfare of research subjects. As a fair and impartial committee head, the Chairperson functions as a role model for how IRB business should be conducted. The Chairperson also signs all official IRB correspondence.

    **c.  Alternate IRB Members.** The Director of Regulatory Affairs or the University Provost also may appoint, one or more alternate members to replace regular IRB members who are, on occasion, unable to attend convened meetings of the IRB. Alternate members must be listed on the IRB's official membership roster, which must specify which member (or members) the alternate is qualified to replace. (Note: Although an

alternate may be qualified to replace more than one regular member, only one such member may be represented by the alternate at any convened meeting.) Terms of appointment, length of service, and duties are exactly as for regular IRB members.

d. **Non-Voting IRB Members.** The Director of Regulatory Affairs or the University Provost may appoint certain "non-voting" members to the IRB. Examples include IRB staff and staff of the Office of Regulatory Affairs, who may be present at IRB meetings to answer questions or pose issues for discussion, but who may not vote and whose presence does not count towards quorum.

e. **Consultants.** An IRB may, at its discretion, invite individuals with competence in special areas to assist in the review of issues that require expertise beyond or in addition to that available on the IRB. These individuals may not vote with the IRB. Consultants may assist the IRB on either a regular or an as-needed basis.

f. **IRB Membership Requirements.** In compliance with Federal regulations at 45 CFR 46.107, GU's designated IRBs must satisfy the following requirements:
   (i)    Each IRB will have at least five members.
   (ii)   IRB members will possess varying backgrounds to promote complete and adequate review of research activities commonly conducted at GU.
   (iii)  IRB members will be sufficiently diverse relative to race, gender, cultural background, and sensitivity to community attitudes so as to promote respect for the IRB's advice and counsel in safeguarding the rights and welfare of human subjects.
   (iv)   IRB members will include persons able to ascertain the acceptability of proposed research in terms of institutional commitments, regulations, applicable law, and standards of professional conduct and practice.
   (v)    IRBs will consist of qualified persons of both sexes.
   (vi)   No IRB will consist entirely of members of one profession.
   (vii)  Each IRB will include at least one member whose primary expertise is in a scientific area.
   (viii) Each IRB will have at least one member whose primary concerns are in non-scientific areas.
   (ix)   Each IRB will include at least one member who is not otherwise affiliated with GU and who is not part of the immediate family of a person who is affiliated with GU.

g. **Conflict of Interest.** No IRB member may participate in the IRB's initial or continuing review of any project in which the member has a conflicting interest, except to provide information requested by the IRB. IRB members, including the Chairperson, who have conflicting

interests are required to disclose such interests and to absent themselves from deliberations, quorum counts, and votes on the relevant protocol. Such absences are recorded in the meeting's minutes. Since many IRB members also conduct research, it is their responsibility to adequately disclose any conflicting interests they may have. For this reason, Conflict of Interest Forms (provided in Appendix VI) must be filed and updated with the Office of Regulatory Affairs if IRB members may also conduct research.

h. **Initial Training, Continuing Education, and Professional Development of IRB Members.** Upon receiving an appointment to the IRB, a member receives comprehensive reference materials (including these operating procedures) necessary to review research from an ethical and regulatory perspective. At a minimum, all members must complete the initial educational module available on the OHRP website, or comparable training. Members will periodically be provided with continuing education opportunities at GU or at neighboring institutions, and resources will be made available each fiscal year for one or more IRB members to attend national or regional human subject protection meetings.

i. **Compensation of IRB Members.** GU does not currently provide monetary compensation to employees or others for their service on the IRB. However, it is acknowledged that service on the IRB requires a significant investment of time for all IRB members and especially for IRB Chairpersons.

j. **Liability Coverage.** GU provides liability protection to individuals for actions taken in their capacities as a GU employee or in representing GU as a Chairperson or Member of its IRBs.

## Chapter 8.
## IRB Administrative Support

DHHS regulations at 45 CFR 46.103(b)(2) require that GU provide its IRBs with sufficient meeting space and staff to support the IRBs' review and recordkeeping responsibilities.

   a.  **Resource Allocation.** The Director of Regulatory Affairs has ultimate responsible for protecting human subjects in research conducted at GU. To this end, the Director of Regulatory Affairs will allocate on an annual basis sufficient resources to support the IRBs' review and recordkeeping responsibilities.

   b.  **Reporting Lines and Supervision.** All IRB administrative staff are appointed by the Director of Regulatory Affairs. For the biomedical IRB, the Executive Officer and Project Assistant(s) report to and are supervised by the Director of Regulatory Affairs, but take daily direction from the institution's IRB Chairperson(s). For the social and behavioral IRB, the IRB Administrator reports to and is supervised by both the Director of Regulatory Affairs and the Associate Dean of Georgetown College, but takes daily direction from the institution's IRB Chairperson.

   c.  **Initial Training, Continuing Education, and Professional Development of IRB Staff.** GU is required under NIH policy to have a plan to provide education about human subject protections for IRB staff. At a minimum, all IRB staff must complete the initial educational module available on the OHRP website, or comparable training. IRB staff will periodically be provided with continuing education opportunities.

   d.  **IRB Executive Officer Duties.** The IRB Executive Officer is responsible for the following IRB support functions:
      (i)    maintaining the official roster of IRB members;
      (ii)   scheduling IRB meetings;
      (iii)  distributing pre-meeting materials;
      (iv)   compiling the minutes of IRB meetings in compliance with regulatory requirements;
      (v)    promptly reporting changes in IRB membership to OHRP;
      (vi)   maintaining all IRB documentation and records in accordance with regulatory requirements;
      (vii)  assisting new IRB members in completing orientation procedures and meeting required education standards;
      (viii) securely and properly archiving all IRB records;
      (ix)   facilitating communication between investigators and the IRB;
      (x)    tracking the progress of each research protocol submitted to the IRB;
      (xi)   maintaining a computerized database for tracking purposes;

(xii)   serving as a resource for investigators on general regulatory information, and providing guidance about forms and submission procedures;

(xiii)  maintaining training and reference materials related to human subject protection requirements;

(xiv)   maintaining and updating the IRB policies and procedures manual and IRB forms (See Appendix II);

(xv)    drafting reports and correspondence to research investigators on behalf of the IRB (s) or IRB Chairperson(s) regarding the status of the research, including conditions for initial or continuing approval of research and responses to reports of adverse events or unanticipated problems;

(xvi)   drafting reports and correspondence directed to research officials, federal officials, and others on behalf of the IRB (s) or IRB Chairperson(s);

(xvii)  maintaining quality control of IRB support functions;

(xviii) assisting in evaluation, audit, and monitoring of human subject research as directed by the IRB and the Office of Regulatory Affairs; and

(xix)   filing assurance documents.

Ultimately, the IRB Executive Officer is responsible for documenting that IRB activities and decisions fully satisfy all regulatory requirements. The IRB Executive Officer must have a detailed, working knowledge of relevant regulatory requirements.  The IRB Executive Officer is a professional staff person responsible for the day-to-day operation of the IRB and the management and supervision of the other IRB professional and support staff.

e.  **IRB Staff Duties**. IRB staff support the function and operation of the IRBs at the direction and under the supervision of the IRB Executive Officer.

## Chapter 9.
## IRB Recordkeeping & Required Documentation

Federal regulations require that GU implement written policies and procedures to govern the operations and direct the activities of its IRB (s). This IRB Policies and Procedures document satisfies that requirement.

Staff in the Office of Regulatory Affairs are responsible for developing and implementing procedures for efficient document flow and maintenance of all IRB records.

    **a. Record Retention**. In accordance with Federal regulations at 45 CFR 46.115(b), IRB records will be retained by GU for no less than three years after the completion of the research with which they are associated.

    **b. Access to IRB Records.** All IRB records will be kept secure in locked filing cabinets or locked storage rooms. Ordinarily, access to IRB records is limited to staff in the Office of Regulatory Affairs, the IRB Chairperson, IRB members, IRB staff, and officials of Federal and State regulatory agencies, including OHRP and FDA. Research investigators will be provided reasonable access to files related to their research. All other access to IRB records is limited to those who have legitimate need for them, as determined by the Director of Regulatory Affairs.

    **c. IRB Records.** IRB records include files organized into the following categories:
        (i)    Written Operating Procedures
        (ii)   IRB Membership Rosters
        (iii)  Training Records
        (iv)  IRB Correspondence (other than protocol-related)
        (v)   IRB Research Application (Protocol) Files
        (vi)  Research (Protocol) Tracking System
        (vii) Documentation of Exemptions and Exceptions
        (viii) Documentation of Expedited Reviews
        (ix)  Documentation of Convened IRB Meetings – Minutes
        (x)   Documentation of Review by Another Institution's IRB
        (xi)  Adverse Event Reports

    **d. IRB Membership Rosters.** Any changes in IRB membership will be reported promptly to OHRP. All IRB membership rosters will include the following information:
        (i)    Names of IRB members.
        (ii)   Names of alternate members and the corresponding regular member(s) for whom each alternate may serve.

(iii)   Earned degrees and specialties of each member and alternate, if applicable, sufficient to describe each member's chief anticipated contribution to IRB deliberations.

(iv)   The representative capacity of each member or alternate.

(vi)   Any employment or other relationship at GU or this GU's collaborating affiliates (e.g., full or part time employee, stockholder, member of governing board, paid or unpaid consultant).

**e.   Education and Training Records.** GU is required to have a plan to provide education about human subject protections for research investigators and IRB members and staff.

At a minimum, all research investigators must complete the education program provided by GU, the module available on the National Institutes of Health Office for Human Subject Research (NIH-OHSR) website, the education module available on the National Cancer Institute (NCI) website, or comparable training approved by the Office of Regulatory Affairs. IRB members and staff must complete the initial educational program provided by the University, the module available on the OHRP website, or comparable training approved by the Office of Regulatory Affairs.

GU will maintain accurate records listing research investigators, IRB members, and IRB staff who have fulfilled GU's human subject protection training requirements.

**f.   IRB Correspondence.** The IRB Executive Officer will maintain accurate records of all correspondence to and from the IRB.

**g.   IRB Research Application (Protocol) Files.** The IRB will maintain a separate file for each research application (protocol) that it receives for review. Protocols will be numbered sequentially by calendar year, in the order in which they are initially received (i.e., the first application received in calendar year 2002 = 02-001; the second = 02-002; etc.).

Each IRB research application (protocol) file will contain the following materials:

(i)     The IRB Research Application (Protocol) Form (included in Appendix II).

(ii)    Documentation of type of IRB review.

(iii)   The IRB-approved informed consent document, with the beginning and ending dates of the current approval period clearly displayed on at least the first page.

(iv)   Scientific evaluations of the proposed research, if any.

(v)    Applications for Federal support, if any.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

(vi)   Sponsor or cooperative group protocols and sample informed consent documents, if any.
(vii)  Advertising or recruiting materials, if any.
(viii) Applications for protocol amendments or modifications.
(ix)   Continuing review progress reports and related information.
(x)    Reports of unanticipated problems involving risks to subjects or others.
(xi)   Reports of adverse events occurring within GU (or involving GU's employees or agents of GU) and reported to any regulatory agency.
(xii)  Reports of external adverse events received from sponsors or cooperative groups.
(xiii) Data and Safety Monitoring Board (DSMB) reports, if any.
(xiv)  Results of any internal quality control and monitoring activities, if any.
(xv)   All IRB correspondence to and from research investigators.
(xvi)  All other IRB correspondence related to the research.
(xvii) Documentation of all IRB review and approval actions, including initial and continuing convened (full) IRB review.
(xviii) Documentation of type of IRB review.
(xix)  Documentation of Project Closeout.

**h.  IRB Database.** The University will maintain a research (protocol) tracking database.

At a minimum, the database will include the following information:
(i)    Title of the Research (Protocol)
(ii)   Name of Principal Investigator
(iii)  Funding Source (if any)
(iv)   Date of Initial Approval
(v)    Date of Most Recent Continuing Approval
(vi)   End of Current Approval Period
(vii)  Type of Review (Expedited or Convened Review)
(viii) Current Status (Under Review, Approved, Suspended, Closed)

**i.  Documentation of Exemptions.** The Director of Regulatory Affairs or his or her designee is responsible for reviewing and verifying, on behalf of GU, whether activities are exempt from the human subject regulations.

Documentation of verified exemptions consists of the reviewer's written concurrence in the IRB Research Application File that the activity described in the investigator's Application for Exempt Research (included in Appendix II) satisfies the conditions of the cited exemption category.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

Categories of exempt research are stipulated in Federal regulations at 45 CFR 46.101(b)(1-6) as follows:

(i)   Research conducted in established or commonly accepted educational settings, involving normal educational practices, such as (i) research on regular and special education instructional strategies, or (ii) research on the effectiveness of or the comparison among instructional techniques, curricula, or classroom management methods.

(ii)  Research involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview procedures or observation of public behavior, unless: (i) Information obtained is recorded in such a manner that human subjects can be identified, directly or through identifiers linked to the subjects; and (ii) any disclosure of the human subjects' responses outside the research could reasonably place the subjects at risk of criminal or civil liability or be damaging to the subjects' financial standing, employability, or reputation.

(iii) Research involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview procedures, or observation of public behavior that is not exempt under paragraph (b)(2) of this section, if: (i) The human subjects are elected or appointed public officials or candidates for public office; or (ii) federal statute(s) require(s) without exception that the confidentiality of the personally identifiable information will be maintained throughout the research and thereafter.

(iv)  Research, involving the collection or study of existing data, documents, records, pathological specimens, or diagnostic specimens, if these sources are publicly available or if the information is recorded by the investigator in such a manner that subjects cannot be identified, directly or through identifiers linked to the subjects.

(v)   Research and demonstration projects which are conducted by or subject to the approval of department or agency heads, and which are designed to study, evaluate, or otherwise examine: (i) Public benefit or service programs; (ii) procedures for obtaining benefits or services under those programs; (iii) possible changes in or alternatives to those programs or procedures; or (iv) possible changes in methods or levels of payment for benefits or services under those programs.

(vi)  Taste and food quality evaluation and consumer acceptance studies, (i) if wholesome foods without additives are consumed or (ii) if a food is consumed that contains a food ingredient at or below the level and for a use found to be safe, or agricultural chemical or environmental contaminant at or below the level found to be safe, by the Food and Drug Administration or approved by the Environmental Protection Agency or the Food

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

Safety and Inspection Service of the U.S. Department of Agriculture.

**j.  Documentation of Exceptions from Informed Consent Requirements for Emergency Use of a Test Article.** FDA regulations at 21 CFR 50.23 permit the use of a test article without the informed consenht of the subject (or the subject's legally authorized representative) where the clinical investigator and a physician not otherwise involved in the research certify in writing that (i) the subject is confronted with a life threatening emergency; (ii) informed consent cannot be obtained because of an inability to communicate; (iii) time is not sufficient to obtain consent from the subject's legally authorized representative; and (iv) there is no alternative approved or generally recognized therapy that provides equal or greater likelihood of saving the life of the subject.

This written certification must be submitted to the IRB within 5 working days of the use of the test article. IRB staff are responsible for maintaining this documentation in IRB records.

**k.  Documentation of Exemptions from IRB Review Requirements for Emergency Use of a Test Article.** FDA regulations at 21 CFR 56.104(c) permit the emergency use of a test article without IRB review. Written documentation of the emergency use must be submitted to the IRB within 5 working days. Any subsequent use of the test article at GU requires IRB review. IRB staff are responsible for maintaining this documentation in IRB records.

**l.  Documentation of Expedited Reviews.** Expedited IRB review procedures may be employed for (i) minor changes in previously approved research during the specified approval period, or (ii) initial or continuing review of research falling with specific categories published in the Federal Register. Expedited reviews are conducted by the IRB Chairperson or a qualified IRB member designated by the Chairperson.

Documentation for expedited review and approval consists of the reviewer's written concurrence in the IRB Research Application File that the activity described in the Investigator's Application for Expedited Review (included in Appendix II) satisfies the conditions (i) for a minor change, or (ii) of the cited expedited review category.

**m. Documentation of Convened IRB Meetings—Minutes.** IRB staff will compile the minutes of IRB meetings. The following specific information will be recorded in the meeting minutes:
    (i)   Attendance.
    (ii)  Quorum requirements.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

    (iii)  Actions taken by the IRB on the initial or continuing review of research; review of protocol or informed consent modifications or amendments; unanticipated problems involving risks to subjects or others; adverse event reports; reports from sponsors, cooperative groups, or DSMBs; reports of continuing noncompliance with the human subject regulations or IRB determinations; suspensions or terminations of research; and other actions.

    (iv)  Votes on these actions.

    (v)  The basis for requiring changes in or disapproving research.

    (vi)  Summary of controverted issues.

    (viii)  Required IRB findings and determinations.

    (iv)  A list of research approved since the last meeting utilizing expedited review procedures.

**n.  Attendance at IRB Meetings.** IRB minutes will list attendance as follows:

    (i)  Names of members present.

    (ii)  Names of absent members.

    (iii)  Names of alternates attending in lieu of specified (named) absent members. Alternates may substitute for specific absent members only as designated on the official IRB membership roster.

    (iv)  Names of consultants present.

    (v)  Name of investigators present.

    (vi)  Names of guests present.

**o.  Quorum Requirements and Voting at IRB Meetings.** IRB minutes will include a statement of Quorum Requirements based on the following standards:

    (i)  A majority of the IRB members (or their designated alternate), including at least one member whose primary concerns are in nonscientific areas, must be present in order to conduct a convened meeting. In order for research to be approved, it must receive the approval of a majority of those members present at the meeting.

    (ii)  Members may be present in person or audio (telephone) or audio-visual teleconference. Members present via teleconference will be noted as such in the meeting minutes, which will also indicate that the members received all pertinent information prior to the meeting and were able to actively and equally participate in all discussions.

    (iii)  IRB minutes will include documentation of quorum and votes for each IRB action and determination by recording votes as follows: Total Number Voting ( ); Number voting for ( ); Number voting against ( ); Number abstaining ( ).

*Office of Regulatory Affairs Institutional Review Board of Georgetown University
Policies & Procedures Manual*

    (iv)  Members absenting themselves due to conflicting interests may not be counted toward quorum requirements (i.e., may not be counted among those voting or abstaining).

    (v)  No individual who is not listed on the official IRB membership roster may vote with the IRB.

**p.  Actions Taken by the Convened IRB.** IRB minutes will include all actions taken by the convened IRB and the votes underlying those actions. IRB actions for initial or continuing review of research include the following. These actions will also be provided in writing to investigators:

    (i)  Approved with no changes (or no additional changes). The research may proceed.

    (ii)  Approvable with minor changes to be reviewed by a designated IRB member. Such minor changes must be clearly delineated by the IRB so the investigator may simply concur with the IRB's stipulations. The research may proceed after the required changes are verified and the protocol is approved by the designated reviewer.

    (iii)  Approvable with substantive changes to be reviewed by the convened IRB. The research may proceed only after the convened IRB has reviewed and approved the required changes to the research.

    (iv)  Deferred pending receipt of additional substantive information. The IRB determines that it lacks sufficient information about the research to proceed with its review. The research may not proceed until the convened IRB has approved a revised application incorporating all necessary information.

    (v)  Disapproved. The IRB has determined that the research cannot be conducted at GU or by GU's employees or agents.

**q.  The Basis for Requiring Changes in or Disapproving Research.** The minutes of IRB meetings will include the basis for requiring changes in or disapproving research. This information will also be provided in writing to the investigator, who will be given an opportunity to respond in person or in writing.

**r.  Summary of Controverted Issues at Convened Meetings.** The minutes of IRB meetings will include a summary of the discussion of all controverted issues and their resolution.

**s.  Required IRB Findings and Determinations.** The following specific IRB findings and determinations will be documented in IRB meeting minutes:

    (i)  The level of risk of the research.

    (ii)  The approval period for the research, including identification of research that warrants review more often than annually.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

(iii)   Identification of any research for which there is need for verification from sources other than the investigator that no material changes are made in the research.

(iv)   Justification for waiver or alteration of informed consent, addressing each of the 4 criteria at 45 CFR 46.116(d). Briefly, the criteria that the IRB must find and document are: (1) the research involves no more than minimal risk to subjects; (2) the waiver or alteration will not adversely affect the rights and welfare of subjects; (3) the research could not practicably be carried out without the waiver or alteration; and (4) whenever appropriate, the subjects will be provided with additional pertinent information after participation.

(v)   Justification for waiver of the requirement for written documentation of consent in accordance with the criteria at 45 CFR 46.117(c).

(vi)   For DHHS-supported research, justification for approval of research involving pregnant women, human fetuses, and human in vitro fertilization, addressing each of the criteria specified under Subpart B of the DHHS human subject regulations.

(vii)   For DHHS-supported research, justification for approval of research involving prisoners, addressing each of the categories and criteria specified under Subpart C of the DHHS human subject regulations. The Director of Regulatory Affairs is responsible for providing certification of the IRB's findings to OHRP.

(viii)   For DHHS-supported research, justification for approval of research involving children, addressing each of the categories and criteria specified under Subpart D of the DHHS human subject regulations. The IRB Director of Regulatory Affairs is responsible for providing notification to OHRP of the IRB's findings concerning research requiring review by a panel of experts.

(ix)   Special protections warranted in specific research projects for groups of subjects who are likely to be vulnerable to coercion or undue influence, such as children, prisoners, pregnant women, mentally disabled persons, or economically or educationally disadvantaged persons, regardless of source of support for the research.

(x)   Justification for approval of research planned for an emergency setting, with specific reference to the criteria specified under the special 45 CFR 46.101(i) DHHS waiver (see Appendix V) or the FDA exception at 21 CFR 50.24 (see Appendix V).

## C. The Substance of IRB Review

## Chapter 10.
## Types of IRB Review

All human subject research conducted at GU or by GU's employees or agents must be prospectively reviewed and approved by an IRB designated by this institution's Office of Regulatory Affairs. No human subject research may be initiated or continued at GU or by GU's employees or agents without prospective approval of a designated IRB.

   a. **Review by the Convened IRB.** Federal regulations, the Federal Policy (Common Rule) for the Protection of Human Subjects, and FDA regulations require that the IRB conduct initial and continuing reviews of all non-exempt research at convened meetings at which a majority of the members are present, unless the research falls into one or more of the categories appropriate for expedited review (see item "e" of this Chapter).

   A majority of the IRB members (or their designated alternates), including at least one member whose primary concerns are in nonscientific areas, must be present in order to conduct a convened meeting. In order for research to be approved, it must receive the approval of a majority of those members present at the meeting.

   b. **Initial Review by the Convened IRB.** Prior to the convened meeting, IRB members will be provided detailed initial review materials describing the research in order to discuss the protocol adequately and determine the appropriate action during the convened review. These materials will include the proposed informed consent document and the IRB Research (Protocol) Application Form, which includes information about subject recruitment and selection, the research plan, risks and benefits, privacy and confidentiality protections, safety monitoring, informed consent procedures, protections for vulnerable subjects, as well as grant applications or proposals for Federally funded research, and any other information relevant to the approval criteria described in the regulations.

   c. **Continuing Review by the Convened IRB.** GU's designated IRB(s) are required to conduct substantive and meaningful continuing review of research at intervals appropriate to the degree of risk, but not less than once per year. Continuing reviews will be conducted by the convened IRB unless the research falls into one or more of the categories appropriate for expedited review (see item "e" of this Chapter).

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

Prior to the convened meeting, IRB members will be provided with detailed continuing review materials sufficient to conduct substantive and meaningful reviews. These materials will include the currently approved informed consent document and the IRB Continuing Review Application Form, which includes a summary of the research, a status report on the progress of the research, number of subjects enrolled and withdrawn, problems and adverse events, relevant recent literature, and other relevant information.

d. **Use of Primary Reviewers with Convened IRB Reviews.** IRBs operated by GU utilize a primary reviewer system to assist in the initial review of research by the convened IRB. A primary reviewer system is also utilized to assist in the continuing review of research by the convened IRB.

The primary reviewer for initial review, and the primary reviewer for continuing review, are considered the lead reviewers for research proposals assigned to them. They are responsible for (i) being thoroughly versed in all details of the research; (ii) conducting an in-depth review of the research using the IRB Reviewer Forms contained in Appendix II; and (iii) leading the discussion of the research at the convened meeting. Prior to the convened meeting, the primary reviewer must be provided with the applicable documents from the IRB file, including the industry protocol or investigator's project description, clinical investigator's brochure (if applicable), and application for Federal support, where applicable.

The entire IRB file will be available to all IRB members, and all IRB members will be afforded full opportunity to discuss each research proposal during the convened meeting.

e. **Expedited Review of Research.** Federal regulations, the Federal Policy (Common Rule), and FDA regulations permit the IRB to review research through an expedited procedure if:
   (i)   the research constitutes a minor change in previously approved research during the period for which approval is authorized; or
   (ii)  the research is not greater than minimal risk and falls within the categories on the November 9, 1998 DHHS-FDA list of research eligible for expedited IRB review (see Appendix V).

Under an expedited review procedure, the IRB Chairperson or an experienced reviewer designated by the Chairperson may review and approve the research on behalf of the IRB.

IRBs operated by GU will keep all IRB members advised of research that has been approved under expedited procedures by listing the research in the minutes of the next IRB meeting.

Documentation for expedited reviews maintained in IRB records will include the category and circumstances that justify using expedited procedures.

f. **Expedited Review of Minor Changes in Previously Reviewed Research.** Investigators must report to the IRB any proposed changes in IRB-approved research, including proposed changes in informed consent documents. No changes may be initiated without prior approval of the IRB, except where necessary to eliminate apparent immediate hazards to subjects.

This institution's designated IRBs may utilize expedited procedures to review a proposed change to previously approved research if it represents a minor change to be implemented during the previously authorized approval period.

A minor change is one which, in the judgment of the IRB reviewer, makes no substantial alteration in (i) the level of risks to subjects; (ii) the research design or methodology; (iii) the number of subjects enrolled in the research; (iv) the qualifications of the research team; (v) the facilities available to support safe conduct of the research; or (vi) any other factor which would warrant review of the proposed by changes by the convened IRB.

g. **Expedited Initial and Continuing Review:  Permitted Categories.** This institution's designated IRBs may utilize expedited procedures for the initial or continuing review of research that is no greater than minimal risk and falls within the categories on the November 9, 1998 DHHS-FDA list of research eligible for expedited IRB review (see Appendix V) as follows:

    (i)   Clinical studies of drugs and medical devices only when condition (a) or (b) is met:

        (a) Research on drugs for which an investigational new drug application (21 CFR Part 312) is not required. (Note: Research on marketed drugs that significantly increases the risks or decreases the acceptability of the risks associated with the use of the product is not eligible for expedited review.)

        (b) Research on medical devices for which (i) an investigational device exemption application (21 CFR Part 812) is not required; or (ii) the medical device is cleared/approved for marketing and the medical device is being used in accordance with its cleared/approved labeling.

    (ii)  Collection of blood samples by finger stick, heel stick, ear stick, or venipuncture as follows:

  (a) from healthy, nonpregnant adults who weigh at least 110 pounds. For these subjects, the amounts drawn may not exceed 550 ml in an 8 week period and collection may not occur more frequently than 2 times per week; or

  (b) from other adults and children, considering the age, weight, and health of the subjects, the collection procedure, the amount of blood to be collected, and the frequency with which it will be collected. For these subjects, the amount drawn may not exceed the lesser of 50 ml or 3 ml per kg in an 8 week period and collection may not occur more frequently than 2 times per week.

(iii) Prospective collection of biological specimens for research purposes by noninvasive means.  Examples: (a) hair and nail clippings in a nondisfiguring manner; (b) deciduous teeth at time of exfoliation or if routine patient care indicates a need for extraction; (c) permanent teeth if routine patient care indicates a need for extraction; (d) excreta and external secretions (including sweat); (e) uncannulated saliva collected either in an unstimulated fashion or stimulated by chewing gumbase or wax or by applying a dilute citric solution to the tongue; (f) placenta removed at delivery; (g) amniotic fluid obtained at the time of rupture of the membrane prior to or during labor; (h) supra- and subgingival dental plaque and calculus, provided the collection procedure is not more invasive than routine prophylactic scaling of the teeth and the process is accomplished in accordance with accepted prophylactic techniques; (i) mucosal and skin cells collected by buccal scraping or swab, skin swab, or mouth washings; (j) sputum collected after saline mist nebulization.

(iv) Collection of data through noninvasive procedures (not involving general anesthesia or sedation) routinely employed in clinical practice, excluding procedures involving x-rays or microwaves. Where medical devices are employed, they must be cleared/approved for marketing. (Studies intended to evaluate the safety and effectiveness of the medical device are not generally eligible for expedited review, including studies of cleared medical devices for new indications.)  Examples: (a) physical sensors that are applied either to the surface of the body or at a distance and do not involve input of significant amounts of energy into the subject or an invasion of the subject's privacy; (b) weighing or testing sensory acuity; (c) magnetic resonance imaging; (d) electrocardiography, electroencephalography, thermography, detection of naturally occurring radioactivity, electroretinography, ultrasound, diagnostic infrared imaging, Doppler blood flow, and echocardiography; (e) moderate exercise, muscular strength testing, body composition assessment, and flexibility testing

where appropriate given the age, weight, and health of the individual.

(v)    Research involving materials (data, documents, records, or specimens) that have been collected, or will be collected solely for nonresearch purposes (such as medical treatment or diagnosis). (NOTE: Some research in this category may be exempt from the HHS regulations for the protection of human subjects at 45 CFR 46.101(b)(4). This listing refers only to research that is not exempt.)

(vi)   Collection of data from voice, video, digital, or image recordings made for research purposes.

(vii)  Research on individual or group characteristics or behavior (including, but not limited to, research on perception, cognition, motivation, identity, language, communication, cultural beliefs or practices, and social behavior) or research employing survey, interview, oral history, focus group, program evaluation, human factors evaluation, or quality assurance methodologies. (NOTE: Some research in this category may be exempt from the HHS regulations for the protection of human subjects. 45 CFR 46.102(b)(2) and (b)(3). This listing refers only to research that is not exempt.)

(viii) Continuing review of research previously approved by the convened IRB as follows:

(a) where (i) the research is permanently closed to the enrollment of new subjects; (ii) all subjects have completed all research-related interventions; and (iii) the research remains active only for long-term follow-up of subjects;

(b) where no subjects have been enrolled and no additional risks have been identified; or

(c) where the remaining research activities are limited to data analysis.

(ix)   Continuing review of research, not conducted under an investigational new drug application or investigational device exemption where categories two (2) through eight (8) do not apply but the IRB has determined and documented at a convened meeting that the research involves no greater than minimal risk and no additional risks have been identified.

**h. Use of Subcommittees to Support IRB Activities.** IRBs operated by GU may utilize subcommittees to support IRB review activities. At the discretion of the IRB Chairperson, subcommittees may be appointed to perform expedited reviews or fulfill the duties of primary reviewers. The IRB Chairperson may also appoint subcommittees on an ad hoc basis to perform additional functions as needed.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

**i.  Review of Reports of Unanticipated Problems or Adverse Events.**
Investigators are required to notify the IRB promptly of any
unanticipated problems involving risks to subjects or others that occur
in research conducted at GU or by GU's employees or agents.
Investigators are also required to report promptly to the IRB any
adverse event that is reported to the FDA or the sponsor in accordance
with FDA requirements.

IRBs operated by GU should receive the completed IRB Adverse
Event/Unanticipated Problem Reporting Form (contained in Appendix
II) from the investigator within 5 working days of the event.

All such reports are reviewed by the IRB Chairperson or a qualified
member of the IRB designated by the Chairperson. If the event is
determined not to be related to the research or not serious, and if the
event does not require a change in the informed consent document,
the reviewer documents this determination in writing. The report with
documentation of the reviewer's determination is placed in the IRB
Research Application (Protocol) file.

If, in the judgment of the IRB Chairperson, the event may warrant more
than a minor change in the protocol or informed consent process, the
Chairperson will refer the event to the convened IRB for review. In the
interim, the Chairperson may require modification or suspension of
research activities deemed necessary to eliminate apparent immediate
hazards to subjects.

During the convened review, the IRB determines whether the research
will be permitted to continue as proposed or whether changes are
required. If the research will continue, the IRB also determines whether
a consent form revision is required and to what extent re-consenting
and/or subject notification about new information is warranted. The
Committee has the authority to suspend the research if it has
significant safety or other concerns.

Regardless of the type of review (expedited or convened), the
investigator is notified in writing of the IRB's determinations.

It is the responsibility of the IRB Chairperson to provide prompt written
notification to GU's Office of Regulatory Affairs and to relevant Federal
Agencies, including OHRP and FDA (for FDA-regulated research) of
any unanticipated problems involving risks to subjects or others, and of
the resolution of those problems.

**j.  Review of Sponsor or Cooperative Group Adverse Event or Safety
Reports.** Investigators are required to forward adverse event or safety

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

reports issued by sponsors or cooperative groups to the IRB within 5 working days of receipt. Each report should be accompanied by the completed IRB Adverse Event/Unanticipated Problem Reporting Form (contained in Appendix II).

The IRB review of such reports is handled in the same manner as internal reports of unanticipated problems or adverse events.

**k. Review of Data and Safety Monitoring Board (DSMB) Reports.** Investigators are required to forward DSMB reports to the IRB within 5 working days of receipt. The review of DSMB reports is handled in the same manner as internal reports of unanticipated problems or adverse events.

When DSMBs are employed, IRBs conducting continuing review of research may rely on a current statement from the DSMB indicating that it has reviewed study-wide adverse events, interim findings, and any recent literature that may be relevant to the research, in lieu of requiring that this information be submitted directly to the IRB. Of course, the IRB must still receive and review reports of local, on-site unanticipated problems involving risks to subjects or others and any other information needed to make its continuing review substantive and meaningful.

**l. Outcomes of IRB Review.** GU's designated IRBs will notify investigators in writing of its determinations.

Although research approved by a designated IRB may be disapproved by other GU committees or officials, no human subject research may be conducted at GU or by GU's employees or agents without the initial and continuing approval of a designated IRB. No GU committee or official may approve or authorize to proceed any human subject research that has not been reviewed and approved by a designated IRB.

IRB actions for review of research include the following:

1. *Approved with no changes (or no additional changes).* The research may proceed.

2. *Approvable with minor changes* to be reviewed by a designated IRB member. Such minor changes must be clearly delineated by the IRB so the investigator may simply concur with the IRB's stipulations. The research may proceed after the required changes are verified and the protocol is approved by the designated reviewer.

3. *Approvable with substantive changes* to be reviewed by the convened IRB. The research may proceed only after the convened IRB has reviewed and approved the required changes to the research.

4. *Deferred pending receipt of additional substantive information*. The IRB determines that it lacks sufficient information about the research to proceed with its review. The research may not proceed until the convened IRB has approved a revised application incorporating all necessary information.

5. Disapproved. The IRB has determined that the research cannot be conducted at GU or by GU's employees or agents.

m. **Expiration of Approval Period.** The IRB is required to conduct substantive and meaningful continuing review of research not less than once per year. Thus, for research requiring review by convened IRB, the IRB approval period may extend no more than 365 days after the convened meeting at which the research was last approved.  For research within categories appropriate for expedited review, the IRB approval period may extend no more than 365 days after the expedited review at which the research was last approved.

The regulations permit no grace period and no exceptions to this one year requirement. Research that continues after the approval period expires is research conducted without IRB approval.

Consequently, GU's designated IRBs will automatically suspend the enrollment of new subjects in any ongoing research that does not receive continuing review and approval prior to the end of the stipulated approval period. Previously enrolled subjects may continue their involvement in suspended research only where the IRB determines that continued involvement is in the best interest of the subjects.

n. **Suspension or Termination of IRB Approval.**  All investigators conducting research at GU or as GU's employees or agents are required to notify the designated IRB promptly of any serious adverse events or unanticipated problems involving risks to subjects or others.

In addition, all GU's employees and agents are required to notify the designated IRB promptly of any serious or continuing noncompliance with applicable regulatory requirements or with the determinations of the IRB.

The IRB may vote to suspend or terminate approval of research not being conducted in accordance with IRB or regulatory requirements or

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

that has been associated with unexpected problems or serious harm to subjects.

The IRB will notify the principal investigator in writing of such suspensions or terminations and will include a statement of the reasons for the IRB's actions. The investigator will be provided with an opportunity to respond in person or in writing.

Where the IRB Chairperson determines that such action is necessary to protect the rights and welfare of subjects, the Chairperson may require an immediate, temporary suspension of enrollment of new subjects or of continued participation of previously enrolled subjects, pending review of the situation by the convened IRB.

It is the responsibility of the IRB Chairperson to provide prompt written notification to GU's Office of Regulatory Affairs and to relevant Federal Agencies, including OHRP and FDA (for FDA-regulated research) of the suspension or termination or IRB approval as described in this section.

## Chapter 11.
## IRB Review and Approval Considerations

Federal regulations at 45 CFR 46.111, FDA regulations, and the Federal Policy (Common Rule) delineate specific criteria for the approval of research. IRBs designated by GU will determine that all of the following requirements are satisfied before approving proposed research.

a. **Levels of Risk.** IRBs must consider the overall level of risk to subjects in evaluating proposed research, and investigators are required to minimize risks to subjects while maximizing research benefits. In general, the regulations require that the IRB distinguish research that is "greater than minimal risk " from research that is "no greater than minimal risk." Under specific circumstances, research that is no greater than minimal risk may be eligible for expedited review, waiver or alteration of informed consent requirements, or waiver of the requirement to obtain written documentation of consent.

Under Federal regulations at 45 CFR 46.102(i), "minimal risk means that the probability and magnitude of harm or discomfort in the research are not greater in and of themselves than those encountered in daily life or during the performance of routine physical or psychological examinations or tests."

b. **Risks Minimized.** In order to approve research, the IRB must determine that risks are minimized by using procedures that are consistent with sound research design and do not expose subjects to unnecessary risks. Whenever appropriate, the research should utilize procedures that are already being performed on the subjects for diagnostic or treatment purposes.

The IRB is expected to consider the research plan, including the research design and methodology, to determine that there are no flaws that would place subjects at unnecessary risk. When the research design presents unnecessary or unacceptable risks to subjects without commensurate benefits to the subjects or to others, the research cannot ethically proceed.

In order to ascertain whether the research project is adequately designed and thus subjects protected, the IRB reserves the authority to seek opinions from consultants on proposed research and its design. The IRB may determine that proposed research must be re-designed to enhance subject autonomy, maximize benefits, reduce risks, select subjects equitably, minimize undue influence or coercion, etc.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

The IRB will also consider the qualifications of the research team. Clinicians are expected to maintain appropriate professional credentials and licensing privileges. Overall, the research team must possess the professional and educational qualifications, as well as the resources, to conduct the research project and to protect the rights and welfare of subjects.

c. **Risks Reasonable Relative to Anticipated Benefits.** In order to approve research, the IRB must determine that the risks of the research are reasonable in relation to the anticipated benefits (if any) to subjects, and/or the importance of the knowledge that may reasonably be expected to result.

The IRB develops its risk/benefit analysis by evaluating the most current information about the risks and benefits of the interventions involved in the research, in addition to information about the reliability of this information. The IRB should consider only those risks that result from the research, and should not consider long range effects (e.g., public policy implications) of applying the knowledge gained in the research.

d. **Equitable Selection of Subjects.** In order to approve research, the IRB must determine that the selection of subjects is equitable. In making this determination, the IRB should evaluate the purposes of the research and the research setting, and should be especially cognizant of the problems of research involving vulnerable subject populations.

The IRB should carefully examine inclusion-exclusion criteria and recruitment procedures in order to determine that the burdens and benefits of the research are being distributed equitably. The IRB should be mindful of the importance of including members of minority groups in research, particularly when the research holds out the prospect of benefit to individual subjects or the groups to which they belong.

The IRB should be mindful of the desirability of including both women and men as research subjects and should not arbitrarily exclude the participation of persons of reproductive age. Exclusion of such persons must be fully justified and based on sound scientific rationale.

e. **Informed Consent Procedures.** In order to approve research, the IRB must determine that legally effective informed consent will be sought from each prospective subject or the subject's legally authorized representative (see 45 CFR 46.116), unless informed consent requirements can be waived or altered under Federal regulations. Any such waiver must be consistent with applicable laws. The specific elements required for legally effective informed consent are discussed

11-2

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

in detail in Chapter 12. The following informed consent procedures apply to all research conducted at GU or by GU's employees or agents:

(i)   Informed consent may only be sought under circumstances that provide the subject (or the legally authorized representative) with sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence.

(ii)  Informed consent information must be presented in language that is understandable to the subject (or the legally authorized representative).

(iii) No informed consent process may include any exculpatory language (a) through which the subject is made to waive, or appear to waive, any legal rights as research subjects; or (b) through which the investigator, the sponsor, GU, or GU's employees or agents are released from liability for negligence, or appear to be so released.

(vi)  Informed consent must be obtained prior to initiation of any clinical screening procedures that are performed solely for the purposes of determining eligibility for research.

**f.  Documentation of Informed Consent.** In order to approve research, the IRB must determine that informed consent will be appropriately documented, unless documentation can be waived under Federal regulations.

Federal regulations at 45 CFR 46.117 provide two methods for documenting informed consent.

1.   *Written Consent Document*. Consent may be documented through use of a written consent document that embodies all of the required elements of informed consent (these elements will be discussed in detail in Chapter 12). The consent document must be signed by the subject (or the subject's legally authorized representative), and a copy must be given to the person signing the form. FDA regulations require that the signature be dated.

2.   *Short Form Consent Document*. Consent may also be documented through use of a short form consent document which states that the elements of informed consent have been presented orally to the subject (or the legally authorized representative). When this method is used, (1) there must be a witness to the oral presentation; (2) the IRB must approve a written summary of what is to be presented orally; (3) only the short form must be signed by the subject or the representative; (4) the witness must sign both the short form and the summary; (5) the person actually obtaining consent must sign the summary; and (6) a copy of the summary

and the short form will be given to the subject or the
representative.

g.  **Data Safety Monitoring.** In order to approve research, the IRB must
determine that, where appropriate, the research plan makes adequate
provision for monitoring the data to protect the safety of subjects. For
research in which risks are substantial, a general description of the
data and safety monitoring plan should be submitted to the IRB as part
of the proposal. This plan should contain procedures for reporting
adverse events.

In general, it is desirable for a Data and Safety Monitoring Board
(DSMB) to be established for research that is blinded, involves multiple
sites, targets vulnerable subjects, or employs high-risk interventions.  It
is the policy of the National Institutes of Health (NIH) to require a
DSMB and/or a data safety monitoring plan for certain types of studies
conducted with its support.  The IRB has the authority to require a
DSMB as a condition for approval of research where it determines that
such monitoring is needed.

When DSMBs are utilized, IRBs conducting continuing review of
research may rely on a current statement from the DSMB indicating
that it has reviewed study-wide adverse events, interim findings, and
any recent literature that may be relevant to the research, in lieu of
requiring that this information be submitted directly to the IRB.

h.  **Privacy of Subjects and Confidentiality of Data.** In order to approve
research, the IRB must determine that, where appropriate, there are
adequate provisions to protect the privacy of subjects and the
confidentiality of data.

In reviewing confidentiality protections, the IRB will consider the nature,
probability, and magnitude of harms that would be likely to result from a
disclosure of collected information outside the research. It will evaluate
the effectiveness of proposed anonymizing techniques, coding
systems, encryption methods, storage facilities, access limitations, and
other relevant factors in determining the adequacy of confidentiality
protections.

i.  **Additional Safeguards for Vulnerable Subjects.** In order to approve
research, the IRB must determine that, where appropriate, additional
safeguards have been included to protect the rights and welfare of
subjects who are likely to be vulnerable to coercion or undue influence,
such as children, prisoners, pregnant women, persons with mental
disabilities, or economically or educationally disadvantaged persons.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

Should this institution's designated IRB (s) find that they regularly review research involving such vulnerable subjects, the IRB will include among its reviewers persons who are knowledgeable about and experienced in working with these vulnerable subjects.

j. **Review More Often Than Annually.** The following factors will determine which studies require review more frequently than on an annual basis:

    (i)   The probability and magnitude of anticipated risks to subjects.

    (ii)  The likely medical condition of the proposed subjects.

    (iii) The overall qualifications of the principal investigator and other members of the research team.

    (iv) The specific experience of the principal investigator and other members of the research team in conducting similar research.

    (v)  The nature and frequency of adverse events observed in similar research at this and other institutions.

    (vi) Any other factors that the IRB deems relevant.

In specifying an approval period of less than one year, the IRB may define the period with either a time interval or a maximum number of subjects studied or enrolled as specified by the IRB. If a maximum number of subjects studied or enrolled is used to define the approval period, it is understood that the approval period in no case can exceed 365 days and that the number of subjects studied or enrolled determines the approval period only when that number of subjects is studied or enrolled in less than 365 days.

k. **Independent Verification From Sources Other than the Investigator of Any Information Regarding the Study Including That No Material Changes Have Occurred Since the Previous IRB Review.** Protecting the rights and welfare of subjects sometimes requires that the IRB verify independently, utilizing sources other than the investigator, information about various aspects of the study including but not limited to adverse event reporting, information in the scientific literature, reports of drug toxicity, and that no material changes occurred during the IRB-designated approval period.

GU's designated IRBs will consider the following factors in determining which studies require such independent verification:

    (i)   The probability and magnitude of anticipated risks to subjects.

    (ii)  The likely medical condition of the proposed subjects.

    (iii) The probable nature and frequency of changes that may ordinarily be expected in the type of research proposed.

    (iv) Prior experienced with the principal investigator and research team.

    (vi) Any other factors that the IRB deems relevant.

In making determinations about independent verification, the IRB may prospectively require that such verification take place at predetermined intervals during the approval period, or may retrospectively require such verification at the time of continuing review.

l.  **Consent Monitoring.** In reviewing the adequacy of informed consent procedures for proposed research, GU's designated IRBs may on occasion determine that special monitoring of the consent process by an impartial observer (consent monitor) is required in order to reduce the possibility of coercion and undue influence.

Such monitoring may be particularly warranted where the research presents significant risks to subjects, or if subjects are likely to have difficulty understanding the information to be provided. Monitoring may also be appropriate as a corrective action where the IRB has identified problems associated with a particular investigator or a research project.

The IRB may also require that investigators include a "waiting period" within the consent process, or employ devices such as audiovisual aids or tests of comprehension.

m. **Advertisements and Recruitment Incentives.** This institution's designated IRBs are required to review and approve all advertisements and recruitment incentives associated with the research that they oversee. Approval of the GU-designated IRB must be obtained prior to the use of the proposed advertisement or recruitment incentive. Advertisements and incentives are directly related to the informed consent process and must be consistent with prohibitions on coercion and undue influence.

Any advertisement to recruit subjects should be limited to the information the prospective subjects need to determine their eligibility and interest. When appropriately worded, the following items may be included:

  (i)    The name and address of the clinical investigator and/or research institution.
  (ii)   The condition under study and/or the purpose of the research.
  (iii)  In summary form, the criteria that will be used to determine eligibility for the study.
  (iv)   A brief list of participation benefits, if any.  The possible benefits should be presented in a conservative manner without any exaggeration or excessive enthusiasm.
  (v)    The time or other commitment required of the subjects.
  (vi)   The location of the research and the person or office to contact for further information.

Recruitment procedures should be designed so that informed consent is given freely and coercion or undue influence is avoided. In order to evaluate this aspect of the research, the IRB should know who the subjects will be, what incentives are being offered, and the conditions under which the offer will be made.

GU IRBs may require that advertisements and recruitment incentives for proposed research be modified to minimize the possibility of coercion or undue influence in recruitment.

**n. Obtaining Consent from Non-English Speakers.** Federal regulations at 45 CFR 46.116 require that informed consent be obtained in language that is understandable to the subject (or the subject's legally authorized representative).

In accordance with these regulations, GU's designated IRBs require that informed consent conferences include a reliable translator when the prospective subject does not understand the language of the person who is obtaining consent.

Investigators can document informed consent in either of two ways:
   (i)    A full–length informed consent document written in language understandable to the subject; or
   (ii)   A "short-form" consent document in the language of the subject that states the general elements of informed consent.

GU will provide generic "short form" consent documents to investigators in languages typically encountered in GU subject populations. Investigators will be responsible for providing documents in languages not typically encountered.

If investigators use the "short form" to document informed consent, they must also provide subjects with (i) the full-length informed consent document in English, and (ii) a translator who can take part in the oral informed consent conversation to ensure subject understanding and who may serve as the witness. The "short form" consent document written in the subject's language must be signed by the subject (or the subject's legally authorized representative) and the witness. The full-length English consent document must be signed by the witness and the person obtaining consent. The subject must be given copies of both the "short form" consent document and the English consent document.

Whether a full-length or a "short form" consent document is utilized, GU's designated IRBs will require that appropriately translated documents be submitted to the IRB for review and approval prior to their use in enrolling subjects.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

o. **Payment to Research Subjects.**  GU's designated IRBs will review any proposed payments to research subjects associated with the research that they oversee. Payments to research subjects may not be of such an amount as to result in coercion or undue influence on the subject's decision to participate. Payments may not be provided to subjects on a schedule that results in coercion or undue influence on the subject's decision to continue participation.

Federal policy prohibits paying subjects to participate in research when the research is an integral part of a patient's medical care and when it makes no special demands on the patient beyond those of medical care.

Payment may be permitted, with prior approval of the IRB, in the following circumstances:

   (i)    No direct subject benefit. When the study to be performed is not directly intended to enhance the diagnosis or treatment of the medical condition for which the volunteer subject is being treated, and when the standard of practice in affiliated, non-Georgetown institutions is to pay subjects in this situation.

   (ii)   Others being paid. In multi-institution studies, where subjects at a collaborating non-GU are to be paid for the same participation in the same study at the same rate proposed.

   (iii)  Comparable situations. In other comparable situations in which, in the opinion of the IRB, payment of subject volunteers is appropriate.

The IRB will review all proposals involving the payment of subjects (in excess of reimbursement for travel) in the light of these guidelines.

p. **Compensation for Injury.** GU's IRBs will provide subjects with accurate information about the availability or absence of compensation and/or treatment for injury occurring in the research that it reviews.

"Injury" may include physical injury, psychological harm, social harm, or harm to one's dignity, depending upon the nature of the research.

Principal investigators at GU have an obligation to make every effort to prevent study-related injuries and illnesses. If a subject is injured or becomes ill while participating in research and the illness or injury is due to this participation, emergency care will be provided at the usual charge. The costs of emergency care will be charged to the subject or the subject's health insurer. No funds are available from GU, Georgetown University Hospital or their affiliates, the District of Columbia, or the Federal government to compensate subjects for a study-related injury or illness. Where a research sponsor agrees to pay

the costs of care for injury or illness, the terms will be clearly spelled out in the informed consent document.

**q. Certificates of Confidentiality.** Where research involves the collection of highly sensitive information about individually identifiable subjects, the IRB may determine that special protections are needed to protect subjects from the risks of investigative or judicial processes.

In such situations, GU's designated IRBs may require that an investigator obtain a DHHS Certificate of Confidentiality (CoC). The CoC protects against the involuntary release of sensitive information about individual subjects for use in Federal, State, or local civil, criminal, administrative, legislative, or other legal proceedings.

The CoC does not prohibit voluntary disclosure of information by an investigator, such as voluntary reporting to local authorities of child abuse or of a communicable disease. In addition, the CoC does not protect against the release of information to DHHS or FDA for audit purposes. Consequently, it is important for investigators to identify beforehand all conditions under which they will voluntarily release information to third parties. GU's designated IRBs will require that these conditions for release be stated clearly and explicitly in the informed consent document.

Information concerning Certificates of Confidentiality can be obtained from any of the following websites:

http://www.nimh.nih.gov/research/confident.cfm
http://www.niaaa.nih.gov/extramural/confidential.htm
http://www.nida.nih.gov/funding/confidentialityfaq.html
http://www.hrsa.gov/quality/certconf.htm
http://cancertrials.nci.nih.gov/researchers/safeguards/certificates/index.html
http://www.nhlbi.nih.gov/funding/policies/certsinfo.htm

**r. Compliance with All Applicable Laws.** All human subject research conducted at GU or by GU's employees or agents must comply with applicable laws.

**s. Waiver or Alteration of Informed Consent Requirements: State or Local Public Benefit Programs.** Federal regulations at 45 CFR 46.116(c) permit an IRB to approve a consent procedure that eliminates or alters the required elements of informed consent, or to waive the requirement to obtain informed consent altogether. In order to approve such a waiver or alteration, the IRB must find and document that:

(i)    The activity constitutes a research or demonstration project that is to be conducted by, or subject to the approval of, state or local

government officials, and is designed to study, evaluate, or otherwise examine: (1) public benefit or service programs; (2) procedures for obtaining benefits or services under those programs; (3) possible changes in or alternatives to those programs or procedures; or (4) possible changes in methods or levels of payment for benefits or services under those programs; and

(ii) The research could not practicably be carried out without the waiver or alteration.

These findings and their justifications will be clearly documented in IRB minutes when GU's designated IRBs exercise this waiver provision. This waiver provision is not applicable to research governed by FDA regulations, and GU's designated IRBs will not approve such alterations or waivers for FDA-regulated research.

t. **Waiver or Alteration of Informed Consent Requirements: Minimal Risk Research.** Federal regulations at 45 CFR 46.116(d) permit an IRB to approve a consent procedure that eliminates or alters the required elements of informed consent, or to waive the requirement to obtain informed consent altogether. In order to approve such a waiver or alteration, the IRB must find and documents that:

(i) The research involves no more than minimal risk to the subjects.

(ii) The waiver or alteration will not adversely affect the rights and welfare of the subjects.

(iii) The research could not practically be carried out without the waiver or alteration.

(iv) Whenever appropriate, the subjects will be provided with additional pertinent information after participation.

These findings and their justifications will be clearly documented in IRB minutes when GU's designated IRBs exercise this waiver provision. This waiver provision is not applicable to research governed by FDA regulations, and GU's designated IRBs will not approve such alterations or waivers for FDA-regulated research.

u. **Waiver of Documentation of Consent.** Federal regulations at 45 CFR 46.117(c) permit an IRB to waive the requirement to obtain written documentation of informed consent. In order to approve such a waiver, the IRB must find and document **either** of the following conditions:

(i) The only record linking the subject and the research would be the consent document and the principal risk would be potential harm resulting from a breach of confidentiality. In this case, each subject will be asked whether the subject wants documentation linking the subject with the research, and the subject's wishes will govern; or

(ii)    The research presents no more than minimal risk of harm to subjects and involves procedures or activities for which written consent is not normally required outside of the research context. In cases in which the documentation requirement is waived, the IRB may require the Principal Investigator to provide subjects with a written statement regarding the research.

These findings and their justifications will be clearly documented in IRB minutes when GU's designated IRBs exercise this waiver provision. This waiver provision is not applicable to research governed by FDA regulations, and GU's designated IRBs will not approve such alterations or waivers for FDA-regulated research.

## Chapter 12.
## Required Elements of Informed Consent

Investigators must obtain the legally effective informed consent of the prospective subject, or the subject's legally authorized representative, before the subject can be included in research.

Informed consent presumes two simultaneous concepts: informed decision making and voluntary participation. Prospective subjects must be given sufficient information about the research and its risks and benefits in order to reach an **informed decision** as to whether they will **voluntarily participate**.

For an effective informed consent process, Federal regulations at 45 CFR 46.116(a), the Common Rule, and FDA regulations at 21 CFR 50.25(a) (see Appendix V) mandate the inclusion of eight basic informed consent elements unless the IRB has specifically approved an alteration or waiver of these elements. The IRB may routinely, or on a case-by-case basis, require that additional information, beyond these eight basic elements, be included in the informed consent.

No informed consent process may include any exculpatory language through which the subject is made to waive, or appear to waive, any of their legal rights or through which the investigator, the sponsor, the institution, or the institution's employees or agents are released from liability for negligence, or appear to be so released.

The Informed Consent Templates included in Appendix III provide specific guidance on how the following elements should be worded and ordered.

   a. **Research Statement (required element #1).** Informed consent information must include the following:
      (i)   A statement that the study involves research.
      (ii)  An explanation of the purposes of the research including its long term goals.
      (iii) An explanation of the expected duration of subjects' participation.
      (iv)  A description of what procedures will be followed.
      (v)   Identification of any procedures that are experimental.

   If the treating physician is also the research investigator, subjects may mistake their participation in research for therapeutic treatment. By specifying the purpose of the research and describing experimental procedures, subjects should be able to recognize the difference between research and treatment.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

b. **Reasonably Foreseeable Risks or Discomforts (required element #2)**. Informed consent information must describe any reasonably foreseeable risks or discomforts associated with the research.

c. **Reasonably Expected Benefits to Subjects or Others (required element #3)**. Informed consent information must describe any benefits to subjects or to others which may reasonably be expected from the research. However, benefits must not be overstated so as to create an undue influence on subjects.

d. **Appropriate Alternatives (required element #4)**. Informed consent information must include a disclosure of any appropriate alternative procedures or courses of treatment that may be advantageous to the subject. Enough detail must be presented so that the subject can understand and appreciate the nature of any alternatives. It is not sufficient simply to state that "the doctor will discuss alternatives to participating."

e. **Extent of Confidentiality (required element #5)**. Informed consent information must describe the extent to which confidentiality of records identifying the subject will be maintained (or not maintained). Research often poses the risk of loss of confidentiality to subjects who participate. Many persons who would not otherwise be privy to identifiable, private information about the subject may be involved in the research process. Consent information should describe any procedures that the research team will use to protect subjects' private records. However, the informed consent information must emphasize the loss of confidentiality that is expected (e.g., study sponsor, FDA, OHRP, IRB) and indicate the other, unanticipated loss of confidentiality might occur despite the best efforts of the investigator.

GU requires the following statement be used in informed consent documents:

> "Individuals from the Georgetown University IRB, Georgetown University Hospital and Medical Center, other Georgetown offices, the U.S. Food and Drug Administration, other Federal regulatory agencies, and _____ may look at medical and research records related to this study, both to assure quality control and to analyze data. Your name and any material that could identify you will remain confidential except as may be required by law."

Investigators should list any additional individuals or agencies in the blank space who will have access to the data and records.

12-2

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

**f.  Compensation or Treatment for Injury (required element #6)**. Informed consent information for research involving more than minimal risk must include explanations regarding:

(i)     Whether any compensation is available if injury occurs.

(ii)    Whether any medical treatments are available if injury occurs and whether there is a charge for such medical treatment.

(iii)   A description of any such compensation or treatments or where more information about them is available.

Here is a standard GU statement, which is recommended boilerplate language:

> "We will make every effort to prevent study-related injuries and illnesses. If you are injured or become ill while you are in the study and the illness or injury is due to your participation in this study, you will receive emergency medical care. The costs of this care will be charged to you or to your health insurer. No funds are available from Georgetown University, Georgetown University Hospital or their affiliates, the District of Columbia government or the federal government to compensate you for a study-related injury or illness."

**g.  Contact Information (required element #7).** Informed consent information must include details, including telephone numbers, about whom to contact for three specific situations:

(i)     For answers to questions about the research. The principal investigator and other members of the research team are appropriate contacts for this information.

(ii)    For answers to questions about subjects' rights. Contact the appropriate IRB Office for this information. For biomedical research, include the following phone number: 202-687-1506. For social and behavioral research, including the following phone number: 202-687-5594.

(iii)   In the event of a research-related injury. Depending upon the nature of the research, the research team, the emergency services department, may serve as appropriate contacts for this information. Any billing inquiries for research-related questions should go to the Clinical Trials Officer at 202-687-0381.

**h.  Voluntary Participation Statement (required element #8).** Informed consent information must contain clear statements of the following:

(i)     Participation in the research is voluntary.

(ii)    Refusal to participate will involve no penalty or loss of benefits to which the subject is otherwise entitled.

(iii)   The subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled.

12-3

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

It is particularly important for subjects and prospective subjects to understand and have complete confidence that declining to participate in research will not jeopardize their care.

i.  **Additional Elements Where Appropriate.** Where appropriate, the regulations require that one or more of the following six additional elements be included in the informed consent information.

1.  *Unforeseeable Risks to Subjects, Embryos, or Fetuses.* Some research involves particular procedures or interventions that may result in unforeseeable risks to subjects, to the embryo, or the fetus (if the subject is or may become pregnant). For research of such a nature, the informed consent information must warn subjects that there may be risks that are not known or not foreseeable.

2.  *Investigator-Initiated Termination of Participation.* There may be instances that would require investigators to terminate the participation of particular subjects (e.g., subject noncompliance with research, subject not benefiting from direct-benefit research). The informed consent information should specify these circumstances.

3.  *Additional Costs.* If subjects must bear any additional costs (transportation, time away from work, health costs, etc.), these must be disclosed in the informed consent information.

4.  *Early Withdrawal/Procedures for Termination.* Subjects have the right to withdraw from the research. However, some studies involve medications or procedures that would be dangerous for subjects to discontinue abruptly. For studies of this nature, the informed consent information must provide subjects with knowledge of the consequences affecting a decision to withdraw. In addition, if there are procedures regarding how to withdraw safely from the research, these must also be described. It is not appropriate for research staff to administer any additional research-oriented questionnaires or interventions that do not affect the safety of subjects who have decided to withdraw.

5.  *Significant New Findings.* Subjects will be informed of any new knowledge or findings about the medication or test article and/or the condition under study that may affect the risks or benefits to subjects or subjects' willingness to continue in the research.

6.  *Approximate Number of Subjects.* For certain types of research, the informed consent information should disclose the approximate number of subjects to be enrolled.

j.  **Intellectual Property Statement.** In addition to these elements, GU requires that informed consent information contain information about the rights of subjects should the research yield commercial products.

For biomedical research, include the following statement:

> "Materials obtained from you in this research may be used for commercial purposes. It is the policy of Georgetown University, MedStar Health, and their affiliates not to provide financial compensation to you should this occur."

For social and behavioral research, include the following statement:

> "Materials obtained from you in this research may be used for commercial purposes. It is the policy of GU and its affiliates not to provide financial compensation to you should this occur."

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

## D. FDA-Regulated Research

## Chapter 13.
## Investigational Drugs, Devices, and Biologics

The Food and Drug Administration (FDA) is a component of the U.S. Department of Health and Human Services (DHHS) that is responsible for implementing and enforcing the Federal Food, Drug, and Cosmetic Act to regulate the safety and efficacy of these products for human use.

The FDA regulates clinical investigations that involve drugs, devices, and biologics. All such investigations must be conducted in accordance with FDA requirements for informed consent and IRB review.

Clinical trials involving an investigational drug, device, or biologic that are supported by DHHS (e.g., the National Institutes of Health) fall under the jurisdiction of both the FDA and the DHHS Office for Human Research Protections (OHRP). Such trials must comply with both the FDA and the DHHS human subject regulations.

   a. **FDA vs Common Rule and DHHS requirements.** The human subject protection requirements found in FDA regulations and DHHS regulations are substantially the same as the Common Rule requirements. However, there are important differences:
       (i)    FDA regulations contain no Assurance requirement.
       (ii)   Conditions for exemption, exception, and waiver of IRB review and Informed Consent requirements differ.
       (iii)  FDA regulations require specific determinations for the IRB review of device studies (see below).
       (iv)   FDA regulations include specific requirements for reporting adverse events that are not found in the Common Rule or DHHS regulations.
       (v)    DHHS regulations include specific additional protections for pregnant women, human fetuses and neonates (Subpart B); and prisoners (Subpart C); that are not contained in the FDA.

   b. **INDs and IDEs.** Applications are submitted to FDA for approval of research involving an investigational drug, device, or biologic as follows.

       1.  *An Investigational New Drug (IND)* application is submitted so that an investigation can be conducted in support of a potential New Drug Application.

       2.  *An Investigational Device Exemption (IDE)* supports research to be conducted for a Pre-Market Approval application. Devices that are substantially equivalent to other devices that are legally on the

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

market without a Pre-Market Approval are called 510(k) devices (see below).

3. *A Biologics License Application* is submitted to the FDA to receive approval for research on products that would support a Biologics License. Biologics include any virus, therapeutic serum, toxin, antitoxin, or analogous product applicable to the prevention, treatment or cure of human diseases or injuries.

c. **Investigator and Sponsor Responsibilities.** Under FDA regulations, the **investigator** in a clinical trial is responsible for the conduct of the study and for leading the team of individuals coordinating the study. These responsibilities include:
    (i)   Obtaining IRB approval.
    (ii)  Complying fully with the regulations.
    (iii) Supervising the use and disposition of the test article.
    (iv) Disclosing relevant financial information.

The **sponsor** of a clinical investigation initiates and holds the IND or IDE for a clinical investigation, but often does not actually conduct the investigation. Although the sponsor is usually a pharmaceutical, biotech, or medical device company, an individual or group of individuals can also be considered a sponsor for an investigation. An investigator is referred to as the sponsor-investigator when the individual investigator is also the initiator of the clinical investigation.

d. **IRB Review of Medical Devices.** IRBs must determine whether a device study involves significant risk (SR) or non-significant risk (NSR). A SR device is defined (21 CFR 812.3(m)) as a study of a device that presents a potential for serious risk to the health, safety, or welfare of a subject and (i) is intended as an implant; or (ii) is used in supporting or sustaining human life; or (iii) is of substantial importance in diagnosing, curing, mitigating or treating disease, or otherwise prevents impairment of human health; or (iv) otherwise presents a potential for serious risk to the health, safety, or welfare of a subject.  The FDA considers studies of all SR devices to present more than minimal risk; therefore, full IRB review for all studies involving SR devices is necessary.  All devices with an IDE number require full Board approval.  An NSR device investigation is one that does not meet the definition for a significant risk study.
    (i)    If the IRB determines, or concurs with the assessment of the sponsor, that a device study involves a SR, then it would be governed by the IDE regulations at 21 CFR Part 812. The determination of the risk status of the device will be based on the proposed use of the device in the investigation. The IRB may review any of the following materials:
        • A description of the device

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

- Reports of prior investigations conducted with the device
- The proposed investigational plan
- A description of subject selection criteria
- Monitoring procedures
- The sponsor risk assessment and the rationale used to make the sponsor's risk determination

The IRB may also request additional information if necessary from the sponsor or investigator or ask the FDA to provide a risk assessment.

(ii) A device study that is deemed to involve a NSR may begin with IRB approval since it would not require the submission of an application to the FDA.

(iii) It is very important to note that the terms "non-significant risk" and "minimal risk" are defined separately, and are not synonymous. Minimal risk is defined as the probability and magnitude of harm or discomfort anticipated in the research are not greater in and of themselves than those ordinarily encountered in daily life or during the performance of routine physical or psychological examinations or tests.

(iv) The review requirements for 510(k) devices are somewhat different. If FDA agrees that a new device is substantially equivalent to a device already on the market, it can be marketed without clinical testing. However, if clinical data are necessary to demonstrate equivalence, any clinical studies must be conducted in compliance with the requirements of the IDE regulations, IRB review, and informed consent.

**e. Radiology Devices and Radioactive Materials.** FDA is responsible for regulating radiology devices and radioactive materials used in healthcare and research. The institutional Radiation Safety Committee and Institutional Biosafety Committee handle local oversight in this area. Information on these institutional regulatory bodies is provided in Appendix VI. At GU, the Office of Regulatory Affairs oversees the committees.

**f. Adverse Events and Reporting Requirements – INDs.** FDA IND regulations require that the investigator report promptly to the sponsor any "adverse effect that may reasonably be regarded as caused by, or probably caused by, the drug. If the adverse effect is alarming, the investigator shall report the adverse effect immediately" (21 CFR 312.64(b)).

(i) FDA and DHHS regulations require prompt reporting to the IRB, FDA, and OHRP of any unanticipated problems involving risks to subjects or others.

(ii) FDA IND regulations require the clinical investigator to notify the sponsor of any adverse effect that may reasonably be regarded as caused by, or probably caused by, the drug.

13-3

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

    (iii)   GU requires that any adverse event information submitted to the sponsor also be submitted to the IRB. Appropriate notification will be made to relevant Federal regulatory bodies, including FDA and OHRP, of any adverse events or unanticipated problems involving risks to subjects or others, and of the resolution of those events or problems.

    (iv)   FDA IND regulations require that the sponsor notify the FDA and all participating investigators of any adverse experience associated with the use of the drug or biologic that is both serious and unexpected as soon as possible but in no event later than 15 calendar days after the sponsor determines it to be reportable. "Serious adverse drug experience" is defined as "any adverse drug experience occurring at any dose that results in any of the following outcomes: death, a life-threatening adverse drug experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, or a congenital anomaly/birth defect" (21 CFR 312.32(a)). The FDA should be notified by telephone, facsimile, or in writing as soon as possible but in no event later than seven calendar days of the sponsor's receipt of the information of any unexpected fatal or life-threatening experience.

g.  **Adverse Events and Reporting Requirements – IDEs.** FDA IDE regulations require that the investigator notify the sponsor and the IRB of any unanticipated adverse device effect within 10 days.

    (i)   Appropriate notification will be made to relevant Federal regulatory bodies, including FDA and OHRP, of any adverse events or unanticipated problems involving risks to subjects or others, and of the resolution of those events or problems.

    (ii)   The sponsor is required to evaluate the event and report it to the FDA, to all participating investigators, and to all reviewing IRBs within 10 working days of the sponsor's receipt of the information.

    (iii)   Since 510(k) devices under clinical investigation fall under the IDE regulations, reporting of adverse or unanticipated 510(k) device effects must follow these same requirements.

h.  **Off-Label (Unapproved) Use of FDA-Regulated Products in Medical Practice Versus Research.** Good medical practice and the best interests of the patient require that physicians use legally available, marketed drugs, biologics and devices according to their best knowledge and judgment. If physicians use a product for an indication not included in the approved labeling (i.e., off-label), they have the responsibility to be well informed about the product, to base its use on firm scientific rationale and on sound medical evidence, and to maintain records of the product's use and effects.

13-4

(i) Off-label use of a marketed product in this manner when the intent is solely the **practice of medicine** does not require IRB review or the submission of an IND or IDE.

(ii) Off-label use of a marketed product in **research** (i.e., as part of a systematic investigation designed to develop or contribute to generalizable knowledge) does require IRB review.

(iii) Off-label use of a marketed product intended to support **a change in labeling** requires both IRB review and submission of an IND or IDE.

i. **Treatment INDs and IDEs.** The treatment IND is a mechanism for providing eligible subjects with investigational drugs for the treatment of serious and life-threatening illnesses for which there are no satisfactory alternative treatments. Where necessary, this mechanism can be used even for providing such drugs to a single patient-subject. The Treatment IDE is a comparable mechanism for providing investigational devices to such patient-subjects.

The FDA regulations at 21 CFR 312.34 and 312.35 specify the requirements that must be satisfied before a Treatment IND can be issued. The FDA regulations at 21 CFR 812.36 specify the requirements that must be satisfied before a Treatment IDE can be issued.

Treatment IND and IDE studies require prospective IRB review and informed consent. Although the sponsor may apply for a waiver of local IRB review under a Treatment IND or IDE, such a waiver does not apply to the informed consent requirement. It is the policy of GU that all Treatment IND or IDE studies must reviewed and prospectively approved by one of its designated IRBs.

1. *Treatment IND.* During the clinical investigation of a drug, it may be appropriate to use the drug in treatment of patients not in the clinical trials. Such use requires FDA approval under a treatment protocol (21 CFR 312.35) or a treatment IND (21 CFR 312.34), as well as IRB review and approval and informed consent.

2. *Single Patient Treatment IND.* The Single-Patient Treatment IND is not described in regulations yet, but was added to the law under the FDA Modernization Act (FDAMA) in 1997. From an operational standpoint, the Single-Patient IND must meet the same requirements as a standard IND, and requires IRB review and approval and informed consent.

3. *Treatment IDE.* Treatment use of an investigational device facilitates the availability of promising new devices to desperately ill patients as early as possible before general marketing begins. Such use may occur when: (i) the patient has a serious or

immediately life-threatening condition; (ii) there is no comparable or satisfactory alternative available; (iii) the device is under investigation in a controlled trial for the same use (or such trials have been complete); (iv) the Sponsor is pursuing marketing approval/clearance; (v) the Sponsor has submitted and the FDA has approved an IDE under 21 CFR 812.36. Such use permits wide access to the device dependent upon patient need.  IRB review and approval and informed consent are required.

**j.  Parallel Track Studies.** FDA HIV/AIDS related "parallel track" studies require prospective IRB review and informed consent.

**k.  Gene Transfer Research.** Gene transfer research involves the administration of genetic material to alter the biological properties of living cells for therapeutic purposes. Gene transfer activities in humans are investigational and are regulated by the both the FDA and the NIH, Office of Biotechnology Activities (OBA).

1.   FDA regulations require the submission of an IND for human gene transfer research.

2.   DHHS regulations specify that no individual may be enrolled in human gene transfer research until review has been completed by the Recombinant DNA Advisory Committee (RAC) at NIH, local Institutional Biosafety Committee (IBC) approval has been obtained, local IRB approval has been obtained, and the investigator has obtained all other regulatory authorizations (such as any consents required by regulations) from the subject (65 FR 196, October 10, 2000).

3.   While the RAC is advisory to the Director of the National Institutes of Health (NIH), compliance with its guidelines is mandatory for all investigators at institutions that receive NIH funds for research involving recombinant DNA.

**l.  Emergency Use of a Test Article without IRB Review.** An exemption under FDA regulations at 21 CFR 56.104(c) permits the emergency use of an investigational drug, device, or biologic on a one-time basis per institution without IRB review and approval. All of the following conditions must be met for this type of emergency use:
(i)   A human subject is in a life-threatening situation.
(ii)   No standard acceptable treatment is available.
(iii)   There is insufficient time to obtain IRB approval.
(iv)   The emergency use must be reported to the IRB within five working days. This reporting must not be construed as an approval for the emergency use by the IRB.  Any subsequent

use of the investigational new drug at the institution requires IRB review and approval.

(v)    Ordinarily, the investigator must obtain the informed consent of the subject for such an emergency use, except as described below.

(a) <u>Emergency Use of Drugs</u>.  Emergency use of an investigational new drug occurs when the emergency situation does not allow time for submission of an IND. Use of the drug <u>requires a request to FDA</u> to authorize shipment of the drug for the emergency use.  Such authorization is conditioned on the sponsor making an appropriate IND submission as soon as practicable (21 CFR 312.36).  The emergency use of an investigational new drug may take place without IRB review and approval, provided that the use is reported to the IRB within 5 working days.  Informed consent is required unless the situation is life-threatening, the criteria at 21 CFR 50.23(a) or 50.23(b) have been met, and the IRB is notified within 5 working days. (See item "m" below.)

(b) <u>Emergency Use of Devices</u>.  Emergency use of an unapproved device may occur in an emergency situation when (i) an IDE for the device does not exist, (ii) a physician wants to use a device in a way not approved under an existing IDE, or (iii) when a physician is not an investigator under the existing IDE.  The device may be used if (i) the patient has a life-threatening condition that needs immediate treatment, (ii) there is no generally acceptable alternative treatment, and (iii) there is no time to obtain FDA approval.  Such uses require as many of the following patient protections as possible (FDA Center for Devices and Radiological Health Guidance on IDE Policies and Procedures, January 20, 1998): (i) informed consent; (ii) clearance from the institution; (iii) concurrence of the IRB chairperson (this concurrence does not constitute IRB approval); (iv) an independent assessment of an uninvolved physician; and (v) authorization from the IDE sponsor (if an IDE exists).  Follow-up reports should be provided to the Sponsor if an IDE exists, or to FDA if no IDE exists.  Such use is limited to a few patients.

**NOTE**: Despite the above guidance, GU operates under the assumption that FDA regulatory requirements for informed consent (21 CFR Part 50) and IRB review (21 CFR Part 56) remain in effect.  Please consult the IRB Chairperson for guidance in the emergency use of drugs and medical devices. Informed consent is required unless the situation is life-threatening, the criteria at 21 CFR 50.23(a) or 50.23(b) have been met, and the IRB is notified within 5 working days.

**m. Emergency Use of a Test Article without Informed Consent.** An exception under FDA regulations at 21 CFR 50.23 permits the emergency use of an investigational drug, device, or biologic without informed consent where the investigator and an independent physician who is not otherwise participating in the clinical investigation certify in writing all four of the following specific conditions:

(i) The subject is confronted by a life-threatening situation necessitating the use of the test article.

(ii) Informed consent cannot be obtained because of an inability to communicate with, or obtain legally effective consent from, the subject.

(iii) Time is not sufficient to obtain consent from the subject's legally authorized representative.

(iv) No alternative method of approved or generally recognized therapy is available that provides an equal or greater likelihood of saving the subject's life.

If time is not sufficient to obtain the independent physician determination before use of the test article, the actions of the investigator must be reviewed and evaluated in writing by an independent physician within five working days. The emergency use must be reported to the IRB within five working days. This reporting must not be construed as an approval for the emergency use by the IRB.

**n. Compassionate Use of Investigational Drugs and Devices.** "Compassionate use" is not a term that appears in the FDA or DHHS regulations or the Common Rule. For studies involving investigational drugs, "compassionate use" is often meant to refer to the emergency use situations discussed above. For studies involving investigational devices, compassionate use may occur when a device that is being tested in a clinical trial is the only option available for a patient with a serious condition. Such uses require prior FDA approval of a protocol deviation under 21 CFR 812.35(a). Prior FDA approval for compassionate use should be obtained before the device is used.

On occasion, compassionate use may occur even if there is no IDE for the device. Under this situation, the physician would submit the compassionate use request directly to FDA.

Compassionate use of an unapproved device also requires as many of the following patient protections as possible: (i) informed consent; (ii) clearance from the institution; (iii) concurrence of the IRB chairperson (this concurrence does not constitute IRB approval); (iv) an independent assessment of an uninvolved physician; and (v) authorization from the IDE sponsor. Follow-up reports should be

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

provided to the Sponsor.  Such use may involve an individual patient or a small group of patients.

**NOTE:**  Despite the above guidance, GU operates under the assumption that FDA regulatory requirements for informed consent (21 CFR Part 50) and IRB review (21 CFR Part 56) remain in effect.  Please consult the IRB Chairperson for guidance.  Informed consent is required unless the situation is life-threatening, the criteria at 21 CFR 50.23(a) or 50.23(b) have been met, and the IRB is notified within 5 working days.

**NOTE:**  The above Compassionate Use situations should <u>not</u> be confused with the Humanitarian Use Device (HUD) Exemption (see item "o" below).

o. **Humanitarian Use Devices (HUDs).**  An HUD is a device that is intended to benefit patients by treating or diagnosing a disease or condition that affects fewer than 4,000 individuals in the United States per year.  FDA developed this regulation to provide an incentive for the development of devices for use in the treatment or diagnosis of diseases affecting these populations. The regulation provides for the submission of an humanitarian device exemption (HDE) application. An HDE application is not required to contain the results of scientifically valid clinical investigations demonstrating that the device is effective for its intended purpose. The application, however, must contain sufficient information for FDA to determine that the device does not pose an unreasonable or significant risk of illness or injury, and that the probable benefit to health outweighs the risk of injury or illness from its use. The labeling for an HUD must state that the device is an humanitarian use device and that, although the device is authorized by Federal Law, the effectiveness of the device for the specific indication has not been demonstrated.

An approved HDE authorizes marketing of the HUD.  However, an HUD may only be used after approval of the convened (full) IRB has been obtained for use of the device at the institution for the FDA approved indication (21 CFR 814.124(a)).  After granting initial approval, the IRB may use expedited procedures for conducting continuing review.  Informed consent of patients is not required because an HDE provides for marketing approval, so use of the HUD does not constitute research.

p. **Planned Emergency Research.** An exception under FDA regulations at 21 CFR 50.24 permits planned research in an emergency setting without the informed consent of the subjects.  Planned emergency research that is not FDA-regulated is also permitted by DHHS regulations and the Common Rule when specific Department or

Agency action is taken to exercise the waiver provision at 38 CFR 16.101(i). However, planned emergency research is usually subject to FDA regulations because it usually involves use of an FDA-regulated test article. When this is the case, the FDA requirements govern, and no notification of OHRP is required.

It is the responsibility of the IRB Chairperson to provide prompt written notification to this institution's Office of Regulatory Affairs should a GU-designated IRB approve planned emergency research.  Planned emergency use of a test article may be approved as follows:

(i)    The IRB responsible for the review, approval, and continuing review of the clinical investigation may approve that investigation without requiring that informed consent of all research subjects be obtained if the IRB (with the concurrence of a licensed physician who is a member of or consultant to the IRB and who is not otherwise participating in the clinical investigation) finds and documents each of the following:

(a) The human subjects are in a life-threatening situation, available treatments are unproven or unsatisfactory, and the collection of valid scientific evidence, which may include evidence obtained through randomized placebo-controlled investigations, is necessary to determine the safety and effectiveness of particular interventions.

(b) Obtaining informed consent is not feasible because: (i) The subjects will not be able to give their informed consent as a result of their medical condition; (ii) The intervention under investigation must be administered before consent from the subjects' legally authorized representatives is feasible; and (iii) There is no reasonable way to identify prospectively the individuals likely to become eligible for participation in the clinical investigation.

(c) Participation in the research holds out the prospect of direct benefit to the subjects because: (i) Subjects are facing a life-threatening situation that necessitates intervention; (ii) Appropriate animal and other preclinical studies have been conducted, and the information derived from those studies and related evidence support the potential for the intervention to provide a direct benefit to the individual subjects; and (iii) Risks associated with the investigation are reasonable in relation to what is known about the medical condition of the potential class of subjects, the risks and benefits of standard therapy, if any, and what is known about the risks and benefits of the proposed intervention or activity.

(d) The clinical investigation could not practicably be carried out without the waiver.

(e) The proposed investigational plan defines the length of the potential therapeutic window based on scientific evidence,

and the investigator has committed to attempting to contact a legally authorized representative for each subject within that window of time and, if feasible, to asking the legally authorized representative contacted for consent within that window rather than proceeding without consent. The investigator will summarize efforts made to contact legally authorized representatives and make this information available to the IRB at the time of continuing review.

(f)  The IRB has reviewed and approved informed consent procedures and an informed consent document consistent with 21 CFR 50.25. These procedures and the informed consent document are to be used with subjects or their legally authorized representatives in situations where use of such procedures and documents is feasible. The IRB has reviewed and approved procedures and information to be used when providing an opportunity for a family member to object to a subject's participation in the clinical investigation consistent with paragraph (a)(7)(v) below.

(g)  Additional protections of the rights and welfare of the subjects will be provided, including, at least: (i) Consultation (including, where appropriate, consultation carried out by the IRB) with representatives of the communities in which the clinical investigation will be conducted and from which the subjects will be drawn; (ii) Public disclosure to the communities in which the clinical investigation will be conducted and from which the subjects will be drawn, prior to initiation of the clinical investigation, of plans for the investigation and its risks and expected benefits; (iii) Public disclosure of sufficient information following completion of the clinical investigation to apprise the community and researchers of the study, including the demographic characteristics of the research population, and its results; (iv) Establishment of an independent data monitoring committee to exercise oversight of the clinical investigation; and (v) If obtaining informed consent is not feasible and a legally authorized representative is not reasonably available, the investigator has committed, if feasible, to attempting to contact within the therapeutic window the subject's family member who is not a legally authorized representative, and asking whether he or she objects to the subject's participation in the clinical investigation. The investigator will summarize efforts made to contact family members and make this information available to the IRB at the time of continuing review.

(ii)  The IRB is responsible for implementing procedures to inform, at the earliest feasible opportunity, each subject, or if the subject remains incapacitated, a legally authorized representative of the

subject, or if such a representative is not reasonably available, a family member, of the subject's inclusion in the clinical investigation, the details of the investigation and other information contained in the informed consent document. The IRB shall also maintain procedures to inform the subject, or if the subject remains incapacitated, a legally authorized representative of the subject, or if such a representative is not reasonably available, a family member, that he or she may discontinue the subject's participation at any time without penalty or loss of benefits to which the subject is otherwise entitled. If a legally authorized representative or family member is told about the clinical investigation and the subject's condition improves, the subject is also to be informed as soon as feasible. If a subject is entered into a clinical investigation with waived consent and the subject dies before a legally authorized representative or family member can be contacted, information about the clinical investigation is to be provided to the subject's legally authorized representative or family member, if feasible.

(iii)   The IRB determinations required by paragraph (a) above and the documentation required by paragraph (e) of this section are to be retained by the IRB for at least 3 years after completion of the clinical investigation, and the records shall be accessible for inspection and copying by FDA in accordance with 21 CFR 56.115(b).

(iv)   Protocols involving an exception to the informed consent requirement under this section must be performed under a separate investigational new drug application (IND) or investigational device exemption (IDE) that clearly identifies such protocols as protocols that may include subjects who are unable to consent. The submission of those protocols in a separate IND/IDE is required even if an IND for the same drug product or an IDE for the same device already exists. Applications for investigations under this section may not be submitted as amendments under 21 CFR 312.30 or 812.35.

(v)   If an IRB determines that it cannot approve a clinical investigation because the investigation does not meet the criteria in the exception provided under paragraph (a) above or because of other relevant ethical concerns, the IRB must document its findings and provide these findings promptly in writing to the clinical investigator and to the sponsor of the clinical investigation. The sponsor of the clinical investigation must promptly disclose this information to FDA and to the sponsor's clinical investigators who are participating or are asked to participate in this or a substantially equivalent clinical investigation of the sponsor, and to other IRB's that have been, or are, asked to review this or a substantially equivalent investigation by that sponsor.

13-12

## E. Special Considerations in IRB Review

## Chapter 14.
## Social and Behavioral Research

Social and behavioral research often involves surveys, observational studies, personal interviews, or experimental designs involving exposure to some type of stimulus or intervention.

a. **Social and Psychological Harms.** When evaluating social and behavioral science research, IRBs should carefully examine the research to determine the probability of risk of harm to subjects.
   (i)  The IRB will consider the potential for participants to experience stress, anxiety, guilt, or trauma that can result in genuine psychological harm.
   (ii)  The IRB will also consider the risks of criminal or civil liability or other risks that can result in serious social harms, such as damage to financial standing, employability, insurability, or reputation; stigmatization; and damage to social relationships.
   (iii)  Collecting any identifiable, private information about any living individual constitutes human subject research. If information is being collected on living individuals in addition to the primary "target" subjects, the IRB will consider the risk of harm to those "non-target" individuals, as well. The IRB may require additional protections, study redesign, or the informed consent of "non-target" individuals (unless the requirement for informed consent can be waived).

In order to mitigate such harms, IRBs will review the proposal for appropriate preventive protections and debriefings, adequate disclosure of risks in the informed consent information, and mechanisms to protect the confidentiality and privacy of persons participating in the research.

b. **Privacy and Confidentiality Concerns.** The use of confidential information is an essential element of much social and behavioral research.
   (i)  It is important that the methods used to identify potential research subjects or to gather information about subjects not invade the privacy of the individual. In general, identifiable information may not be obtained from private (non-public) records without the approval of the IRB and the informed consent of the subject. Such is the case even for activities intended to identify potential subjects who will later be approached to participate in research. However, there are circumstances that will allow an exemption from the regulations

to be granted, and circumstances in which the IRB may approve a waiver of the usual informed consent requirements.

(ii)   It is also important to protect individually identifiable private information once it has been collected in order to prevent a breach of confidentiality that potentially could harm subjects.

**c. Safeguarding Confidentiality.** When information linked to individuals will be recorded as part of the research design, IRBs should require that adequate precautions will be taken to safeguard the confidentiality of the information.  The more sensitive the data being collected, the more important are the confidentiality procedures.

(i)   When reviewing survey and interview research, the IRB should be aware of the regulatory provision at 45 CFR 46.117(c)(1) for waiving documentation of consent when a signed consent form would itself constitute a risk to the subjects.

(ii)   Among the available methods for safeguarding confidentiality are coding of records, statistical techniques, and physical or computerized methods for maintaining the security of stored data.

(iii)   Regulations at 45 CFR 46.116(a)(5) require that subjects be informed of the extent to which confidentiality of research records will be maintained (or not maintained).

(iv)   Federal officials have the right to inspect research records, including consent forms and relevant clinical records of individual subjects, to ascertain compliance with the rules and standards of their programs.  FDA requires that information regarding this authority be included in the consent information for all research that it regulates.  Identifiable information obtained by Federal officials during such inspections is protected by the provisions of the Privacy Act of 1974.

(v)   IRBs may require that an investigator obtain a DHHS Certificate of Confidentiality (CoC). The CoC protects against the involuntary release of sensitive information about individual subjects for use in Federal, State, or local civil, criminal, administrative, legislative, or other legal proceedings.

Information concerning Certificates of Confidentiality can be obtained from any of the following websites:

http://www.nimh.nih.gov/research/confident.cfm
http://www.niaaa.nih.gov/extramural/confidential.htm
http://www.nida.nih.gov/funding/confidentialityfaq.html
http://www.hrsa.gov/quality/certconf.htm
http://cancertrials.nci.nih.gov/researchers/safeguards/certificates/index.html
http://www.nhlbi.nih.gov/funding/policies/certsinfo.htm

**d. Exempt Research.** Much social and behavioral research is exempt from the requirements of the Federal regulations (45 CFR 46.101(b)). However, appropriate application of these exemptions requires a relatively sophisticated level of expertise, and is not left to individual investigators. In reviewing exemption requrest, the IRB must elicit enough information from the investigator to ascertain whether the claimed exemption really applies.

All exemptions claimed for research conducted at GU or by employees or agents of GU must be verified by the IRB. The following exemptions are particularly applicable to social and behavioral research.

**e. Exempt Research in Educational Settings.** Research conducted in established or commonly accepted educational settings that involves normal educational practices is exempt from Federal regulations in accordance with 45 CFR 46.101(b)(1).
  (i)    This exemption does not apply if the setting is not commonly recognized as an educational one, or if other than normal educational practices are employed.
  (ii)   Even if the research is exempt, the investigator has an ethical obligation to respect and safeguard students' rights and welfare.

**f. Exempt Research Using Educational Tests (Cognitive, Diagnostic, Aptitude, and Achievement Tests), Survey Procedures, Interview Procedures, or The Observation of Public Behavior.** Research involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview pr ocedures, or the observation of public behavior is ordinarily exempt under Federal regulations at 45 CFR 46.101(b)(2).
  (i)    When the subjects are **adults**, this exemption applies **UNLESS**: (a) information is recorded in an identifiable manner (either directly or indirectly using codes or other identifying links); **AND** (b) disclosure of the information would place the subject at risk of criminal or civil liability or be damaging to the subject's financial standing, employability, or reputation. **NOTE:** The research is exempt unless both (a) and (b) apply; i.e., the research is exempt unless the information collected is both identifiable and sensitive, except in the case of children as follows.
  (ii)   This exemption applies to research involving **children, EXCEPT** that: (a) research involving survey or interview procedures with children is **NOT EXEMPT**; and (b) research involving observation of the public behavior of children is **NOT EXEMPT** if the investigator participates in the actions being observed.
  (iii)  If not exempt under the conditions described above, research involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview

procedures, or the observation of public behavior is exempt where: (a) the subjects are elected or appointed public officials or candidates for public office; or (b) federal statutes require confidentiality without exception. **NOTE**: Condition (b) regarding federal statutes rarely applies. The IRB should consult with OHRP if it receives an exemption request based on absolute confidentiality under a federal statue.

   (iv)  If not exempt under the conditions described above, the IRB may often utilize expedited procedures for review and approval of research involving the use of educational tests (cognitive, diagnostic, aptitude, achievement), survey procedures, interview procedures, or the observation of public behavior.

**g.** **Exempt Research using Existing Data and Documents.** Social and behavioral research often relies on analysis of existing data or documents. Such research, which is may be exempt, will be discussed further in Chapter 15.

**h.** **Expedited IRB Review of Social and Behavioral Research.** Social and behavioral research that presents no greater than minimal risk to subjects and fits one (or more) of the nine categories specified in the November 9, 1998 Federal Register notice on expedited review (see Appendix V) may be reviewed by the IRB utilizing expedited procedures.

The categories discussed below are particularly applicable to social and behavioral research, and include research involving children as well as adult subjects. However, these categories do **NOT** apply to research involving prisoners, or to research specifically directed toward pregnant women.

**i.** **Expedited Review of Research Involving Existing Data and Documents**. Research involving materials (including data, documents, records, or specimens) that have been collected, or will be collected solely for non-research purposes, may be reviewed using expedited procedures. **NOTE:** The intent of the drafters was to define two categories here, each appropriate for expedited review.

   (i)  Non-exempt research involving materials that have already been collected (for any previous research or non-research purpose) at the time when the research is proposed.

   (ii)  Non-exempt research involving materials that will be collected in the future for a non-research purpose.

**j.  Expedited Review of Research Involving Data from Voice, Video, Digital, or Image Recordings Made for Research Purposes.** The IRB may utilize expedited procedures to review research that involves the collection of data from voice, video, digital, or image recordings made for research purposes.

**k.  Expedited Review of Research Involving Individual or Group Characteristics or Behavior or Research Employing Survey, Interview, Oral History, Focus Group, Program Evaluation, Human Factors Evaluation, or Quality Assurance Methodologies.** The IRB may utilize expedited procedures to review of the following:
  (i)   research on individual or group characteristics or behavior; or
  (ii)  research employing survey, interview, oral history, focus group, program evaluation, human factors evaluation, or quality assurance methodologies.

This category covers a wide range of non-exempt social and behavioral research activities when they present no greater than minimal risk to subjects. Examples include, but are not limited to, research on perception, cognition, motivation, identify, language, communication, cultural beliefs or practices.

**l.  Research Involving Deception.** IRBs reviewing research involving incomplete disclosure or outright deception must apply both common sense and sensitivity to the review.

Where deception is involved, the IRB needs to be satisfied that the deception is necessary and that, when appropriate, the subjects will be debriefed. (Debriefing may be inappropriate, for example, when the debriefing itself would present an unreasonable risk of harm without a countervailing benefit.)

Deception can only be permitted where the IRB documents that waiver of the usual informed consent requirements is justified under the criteria present in Federal regulations at 45 CFR 46.116(d). Specifically, the IRB must find and document that all four of the following criteria have been satisfied:
  (i)   The research presents no more than minimal risk to subjects.
  (ii)  The waiver or alteration will not adversely affect the rights and welfare of the subjects.
  (iii) The research could not practicably be carried out without the waiver or alteration.
  (iv)  Where appropriate, the subjects will be provided with additional pertinent information after participation.

Note that the regulations make no provision for the use of deception in research that poses greater than minimal risks to subjects.

## Chapter 15.
## Bio-Social and Bio-Behavioral Research

Many studies combine characteristics of behavioral and social research with characteristics of biomedical research. Such studies may be referred to as bio-social and bio-behavioral research.

a. **Prospective Use of "Existing" Materials.** Prospective studies are designed to observe outcomes or events (e.g., diseases, behavioral outcomes, or physiological responses) that occur subsequent to identifying the targeted group of subjects, proposing the study, and initiating the research. Prospective studies using materials (data, documents, records or specimens) that will "exist" in the future because they will be collected for some purpose unrelated to the research (e.g., routine clinical care) do **not** qualify for **exemption** under DHHS regulations at 45 CFR 46.101(b)(4) and the Common Rule because the materials in these studies are not in existence at the time the study is proposed and initiated. Under some circumstances, the IRB may use **expedited procedures** to review such research. Under some circumstances, the IRB may use expedited procedures to review such research.

b. **Retrospective Use of Existing Materials.** Retrospective studies are research studies that involve the review of materials (including data, documents, records, or specimens) collected in the past (e.g., medical records, school records, or employment records) and existing at the time the research is proposed and initiated. However, retrospective studies using existing materials occasionally entail significant, greater than minimal risks and require review by the convened IRB (e.g., where the research reveals previously undisclosed illegal drug use and the expedited reviewer indicated concerns about invasion of subjects' privacy and/or the adequacy of confidentiality protections proposed by the investigators).

Such research may be exempt under DHHS regulations at 45 CFR 46.101(b)(4) if the information is publicly available or if the information is recorded in such a manner that **subjects cannot be identified, either directly or through identifiers linked to the subjects**. If not exempt, the IRB may review such research utilizing expedited procedures, provided that the research involves no more than minimal risk to subjects.

c. **Research Utilizing Large Existing Data Sets.** Bio-social and Bio-behavioral research often involves the use of large, existing data sets.

When the data sets are publicly available (i.e., available to the general public, with or without charge), their use is exempt, even if they contain sensitive, identifiable information (see item "b" above). Of course, use of data from publicly available data sets would still be exempt if the information is not sensitive or not identifiable.

The use of large, existing data sets requires IRB review when they contain identifiable private information about living individuals. In such cases, the IRB must determine whether the information can be used without additional informed consent from the subjects.

(i)    In making this determination, the IRB should first examine the conditions of informed consent under which the data were originally obtained. It may be that the proposed research is permissible under the original terms of consent.

(ii)   If this is not the case, then the IRB should consider whether it is permissible to waive the usual informed consent requirements in accordance with 45 CFR 46.116(d). Many times, a waiver of consent will be appropriate.

(iii)  In other cases, the IRB may determine that the research can proceed only if the investigator obtains and uses "anonymized" data. Under this scenario, codes and other identifiers are permanently removed from the data set before the data are sent to the investigator, and the removal is accomplished in such a manner that neither the investigator nor the source maintaining the data set can re-establish subjects' identities.

(iv)   An alternative to anonymizing data is to maintain the data set as a data repository under the guidelines established by OHRP (see below and refer to Guidance on this topic on the OHRP Website).

d. **Research Utilizing Data or Tissue Repositories**. Human data repositories collect, store, and distribute identifiable information about individual persons for research purposes. Human tissue repositories collect, store, and distribute identifiable human tissue materials for research purposes.

Repository activities involve three components: (i) the **collectors** of data or tissue samples; (ii) the **repository** storage and data management center; and (iii) the **recipient** investigators. Under a repository arrangement, an IRB formally oversees all elements of repository activity, setting the conditions for collection, storage, secure maintenance, and sharing of the data and/or tissues with external investigators. Specifically, the IRB determines the parameters for sharing data and/or tissues (which are identifiable within the repository) in a manner such that additional informed consent of subjects is not required. (Refer to Guidance on this topic on the OHRP Website.)

Typically, these parameters involve formal, written agreements stipulating these conditions:

    (i)    The repository will not release any identifiers to the investigator.

    (ii)    The investigator will not attempt to recreate identifiers, identify subjects, or contact subjects.

    (iii)    The investigator will use the data only for the purposes and research specified.

    (iv)    The investigator will comply with any conditions determined by the repository IRB to be appropriate for the protection of subjects. Additional information about the operation of data repositories can

**e. Epidemiology Research.** Epidemiology research often makes use of sensitive, individually identifiable, private information (usually obtained from medical or other private records), and links this information with additional information obtained from other public or private records, such as employment, insurance, or police records. Epidemiology research may also combine historical research with survey and interview research.

Epidemiology studies often present significant problems regarding both **privacy** and **confidentiality**.

    (i)    The IRB must first consider privacy issues, and must satisfy itself that the research does not constitute an unwarranted invasion of the subjects' privacy. The IRB will seek to establish that the investigator has legitimate access to any identifiable information that is to be utilized. For example, if State disease registry information is to be utilized, the IRB will need to examine State law relative to the legitimate release of such information for research.

    (ii)    Once the IRB's privacy concerns have been resolved, the IRB will examine mechanisms for maintaining the confidentiality of data collected. The IRB will seek to establish that confidentiality protections are appropriate to the nature and sensitivity of the information that has been obtained.

    (iii)    Because epidemiology research typically requires very large numbers of subjects, epidemiology investigators almost always request that the IRB waive the usual requirements for informed consent. In order to approve such a waiver in epidemiology research, the IRB must find and document that the criteria at 45 CFR 46.116(d) for a waiver of informed consent have been met; specifically that (a) the research presents no more than minimal risk to subjects; (b) the waiver will not adversely affect the rights and welfare of the subjects; and (c) the research could not practicably be carried out without the waiver. The fourth requirement ("whenever appropriate, the subjects will be

provided with additional pertinent information after participation")
usually does not apply.

**f.  Issues in Genetic Research.** Information obtained through genetic
research may have serious repercussions for the subject or the
subject's family members. Genetic information can adversely affect an
individual's insurability and employability.

IRBs need to be particularly careful about approving research that
appears to involve only a simple, minimal risk blood draw, but then
goes on to include or add a component involving genetic analysis. The
addition of the genetic analysis can radically alter the level of risk.

The protection of private information gathered for and resulting from
genetic research is a major concern. The IRB will expect the
investigator to describe in detail how individual privacy will be protected
and how the confidentiality of obtained information will be maintained.

**g.  Family History Research.** Family history research is a common
technique used in bio-social and bio-behavioral research. Family
history research typically involves obtaining information from one family
member (called a proband) about other family members.  The Federal
regulations and the Common Rule include in the definition of human
subject a living individual about whom an investigator obtains
"identifiable private information." Thus, the family members identified
and described by the proband may be human subjects under the
regulations if the investigators obtain identifiable private information
about them.  IRBs must determine whether family members are human
subjects in such research, and if so, consider the possible risks
involved, and determine whether their informed consent is required or
can be waived under the conditions specified at 45 CFR 46.116(d).

**h.  Research Involving Potentially Addictive Substances.** Research
involving potentially addictive substances often involves the use of
what may be termed "abuse-liable" substances. Abuse-liable
substances are pharmacological substances that have the potential for
creating abusive dependency. Abuse-liable substances can include
both legal and illicit drugs.

The following are among the issues that the IRB should consider when
reviewing research involving potentially addictive substances:

(i)   The IRB must consider the subject's capacity to provide
continuous informed consent, and determine that subjects are
competent and are not coerced.

(ii)  If such research involves subjects who are institutionalized, the
IRB will consider whether the subject's ability to exercise
autonomy could be impaired.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

(iii)   The IRB must also consider the requirements for equitable selection of subjects and protections for maintaining confidentiality, as such a population may be at risk for being discriminated against, or overselected.

(iv)   The IRB must be sensitive to the ethical context of the research, in that there may be moral dilemmas associated with the use of placebos, or in cases where addicts are presented with alcohol and/or drugs.

(v)   The IRB will focus on the considerations of risk and benefit of such research.

## Chapter 16.
## Potentially Vulnerable Subject Groups

DHHS regulations at 45 CFR 46.111(b), FDA regulations at 21 CFR 56.111(b), and the Common Rule require IRBs to give special consideration to protecting the welfare of particularly vulnerable subjects, such as children, prisoners, pregnant women, mentally disabled persons, or economically or educationally disadvantaged persons.

The IRB is required to include adequate representation on the Board to consider specific kinds of research involving these vulnerable populations in a satisfactory manner.

a. **Elements to Consider.** IRBs must pay special attention to specific elements of the research plan when reviewing research involving vulnerable subjects.

  (i)    Strategic issues include inclusion and exclusion criteria for selecting and recruiting participants; informed consent and voluntarism; coercion and undue influence; and confidentiality of data.

  (ii)   The IRB should carefully consider group characteristics, such as economic, social, physical, and environmental conditions, so that the research incorporates additional safeguards for vulnerable subjects.

  (iii)  Investigators should not over-select or exclude certain groups based on perceived limitations or complexities associated with those groups. For example, it is not appropriate to target prisoners as research subjects merely because they are a readily available "captive" population.

  (iv)   Investigators must be knowledgeable about applicable laws that bear on the decision-making abilities of potentially vulnerable populations.

  (v)    Research studies that plan to involve any potentially vulnerable populations must have adequate procedures in place for assessing subjects' capacity, understanding, and informed consent or assent. When weighing the decision whether to approve or disapprove research involving vulnerable subjects, the IRB will look to see that such procedures are a part of the research plan.

  (vi)   In certain instances, it may be possible for researchers to enhance understanding for potentially vulnerable subjects. Examples include the inclusion of a consent monitor, a subject advocate, interpreter for hearing-impaired subjects, translation of informed consent forms into languages the subjects understand, and reading the consent form to subjects slowly to gauge their understanding paragraph by paragraph.

(vii) The IRB may require additional safeguards to protect potentially vulnerable populations. For instance, the IRB may require that the investigator submit each signed informed consent form to the IRB, that someone from the IRB oversee the consent process, or that a waiting period be established between initial contact and enrollment to allow time for family discussion and questions.

b. **Pregnant Women, Human Fetuses and Neonates.** DHHS regulations at 45 CFR Part 46, Subpart B detail special protections for research involving pregnant women, human fetuses and neonates. Under these regulations, the IRB is are required to document specific findings to minimize the potential for risk or harm to the fetus, and additional attention must be given to the conditions for obtaining informed consent.

Unilateral exclusion of non-pregnant women of reproductive potential from research, in order to avoid a risk, will not be permitted by the IRB. Exclusion requires compelling scientific justification. Where such justification exists, it may also be appropriate to exclude men of reproductive potential.

Four separate categories, each with their own requirements and IRB determinations, apply to research with pregnant women, human fetuses and neonates, as outlined below.   IRB determinations regarding the applicable category and protocol-specific findings relative to the specific requirements of the relevant category should be clearly documented in IRB records.  DHHS Regulations at 45 CFR 46 provide the following in pertinent part:

**§ 46.204 Research involving pregnant women or fetuses prior to delivery.**

Pregnant women or fetuses prior to delivery may be involved in research if all of the following conditions are met:

(a) Where scientifically appropriate, preclinical studies, including studies on pregnant animals, and clinical studies, including studies on nonpregnant women, have been conducted and provide data for assessing potential risks to pregnant women and fetuses;

(b) The risk to the fetus is not greater than minimal, or any risk to the fetus which is greater than minimal is caused solely by interventions or procedures that hold out the prospect of direct benefit for the woman or the fetus;

(c) Any risk is the least possible for achieving the objectives fo the research;

(d) The woman's consent or the consent of her legally authorized representative is obtained in accord with the informed consent provisions of subpart A of this part, unless altered or waived in accord with §46.101(i) or §46.116(c) or (d);

(e) The woman or her legally authorized representative, as appropriate, is fully informed regarding the reasonably foreseeable impact of the research on the fetus or resultant child;

16-2

(f) For children as defined in 45 CFR 46.402(a) who are pregnant, assent and permission are obtained in accord, with the provisions of subpart D of this part;

(g) No inducements, monetary or otherwise, will be offered to terminate a pregnancy;

(h) Individuals engaged in the research will have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy; and

(i) Individuals engaged in the research will have no part in determining the viability of a fetus.

### § 46.205 Research involving fetuses after delivery.

(a) After delivery, fetuses may be involved in research if all of the following conditions are met:

(1) Where scientifically appropriate, preclinical and clinical studies have been conducted and provide data for assessing potential risks to fetuses.

(2) The individual(s) providing consent under paragraph (b)(2) or (c)(5) of this section is fully informed regarding the reasonably foreseeable impact of the research on the fetus or resultant child.

(3) No inducements, monetary or otherwise, will be offered to terminate a pregnancy.

(4) Individuals engaged in the research will have no part in any decisions as to the timing, method, or procedures used to terminate a pregnancy.

(5) Individuals engaged in the research will have no part in determining the viability of a fetus.

(6) The requirements of paragraph (b) or (c) of this section have been met as applicable.

(b) Fetuses of uncertain viability.  After delivery, and until it has been ascertained whether or not a fetus is viable, a fetus may not be involved in research covered by this subpart unless the following additional conditions are met:

(1) The IRB determines that:

(i) The research holds out the prospect of enhancing the probability of survival of the particular fetus to the point of viability, and any risk is the least possible for achieving the objectives or the research, or

(ii) The purpose of the research is the development of important biomedical knowledge which cannot be obtained by other means and there will be no risk to the fetus resulting from the research; and

(2) The legally effective informed consent of either parent of the fetus or, if neither parent is able to consent because of unavailability, incompetence, or temporary incapacity, the legally effective informed consent of either parent's legally authorized representative is obtained in accord with subpart A of this part, unless altered or waived in accord with §46.101(i) or §46.116(c) or (d).

(c) Nonviable fetuses.  After delivery, a nonviable fetus may not be involved in research covered by this subpart unless all of the following additional conditions are met:

(1) Vital functions of the fetus will not be artificially maintained;

(2) The research will not terminate the heartbeat or the respiration of the fetus;

(3) There will be no risk to the fetus resulting from the research;

(4) The purpose of the research is the development of important biomedical knowledge that cannot be obtained by other means; and

(5) The legally effective informed consent of both parents of the fetus is obtained in accord with subpart A of this part, except that the waiver and alteration provisions of §46.116(c) and (d) do not apply.  However, if either parent is unable to consent because of unavailability, incompetence, or temporary incapacity, the informed consent of one parent of a nonviable fetus will suffice to meet the requirements of this paragraph.  The consent of a legally authorized representative of either or both of the parents of a nonviable fetus will not suffice to meet the requirements of this paragraph.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

(d) Viable fetuses. A fetus, after delivery, that has been determined to be viable is a child as defined by §46.402(a) and may be included in research only to the extent permitted by and in accord with the requirements of subparts A and D of this part.

**§ 46.206   Research involving, after delivery, the placenta, the dead fetus, or fetal material.**

(a) Research involving, after delivery, the placenta; the dead fetus; macerated fetal material; or cells, tissue, or organs excised from a dead fetus, shall be conducted only in accord with any applicable Federal, State, or local laws and regulations regarding such activities.

(b) If information associated with material described in paragraph (a) of this section is recorded for research purposes in a manner that living individuals can be identified, directly or through identifiers linked to those individuals, those individuals are research subjects and all pertinent subparts of this part are applicable.

**§ 46.207  Research not otherwise approvable which presents an opportunity to understand, prevent, or alleviate a serious problem affecting the health or welfare of pregnant women or fetuses.**

The Secretary will conduct or fund research that the IRB does not believe meets the requirements of §46.204 only if:

(a) The IRB finds that the research presents a reasonable opportunity to further the understanding, prevention, or alleviation of a serous problem affecting the health or welfare of pregnant women or fetuses; and

(b) The Secretary, after consultation with a panel of experts in pertinent disciplines (for example: science, medicine, ethics, law) and following opportunity for public review and comment, including a public meeting announced in the Federal Register, has determined either:

(1) That the research in fact satisfies the conditions of §46.204, as applicable, or

(2) The following:

(i) The research presents a reasonable opportunity to further the understanding, prevention, or alleviation of a serious problem affecting the health or welfare of pregnant women or fetuses;

(ii) The research will be conducted in accord with sound ethical principles; and

(iii) Informed consent will be obtained in accord with the informed consent provisions of subpart A and other applicable subparts of this part, unless altered or waived in accord with §46.101(i) or §46.116(c) or (d).

**c.  Research Involving Prisoners.** DHHS regulations at 45 CFR Part 46, Subpart C detail special protections for research involving prisoners, who, due to their incarceration, may have a limited ability to make truly voluntary and uncoerced decisions about whether or not to participate as subjects in research. A prisoner is defined as any individual involuntarily confined or detained in a penal institution. In order to consider research involving prisoners, IRBs must:

    (i)    Have a majority of its members not otherwise associated with the prison.

    (ii)   Include a prisoner or a prisoner advocate, who can adequately represent the interests of the prisoners, unless the research has already been reviewed by an IRB that included a prisoner advocate.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

IRBs that approve research involving prisoners must
  (i)    Make the seven additional findings set forth in 45 CFR 46.305 that are listed below.
  (ii)   Determine which category in 45 CFR 46.306 permits the research to go forward.
  (iii)  If the research is DHHS-supported, certify these findings to OHRP. Certification to OHRP is not required for research not supported by DHHS. However, OHRP recommends that the IRB apply the standards of Subpart C to all prisoner research. Should non-DHHS research fall outside the category stipulations under 45 CFR 46.306, OHRP recommends that the IRB consult with appropriate experts before approving the research.

Under DHHS regulations, prisoners may participate in the following categories of research:
  (i)    Studies (involving no more than minimal risk or inconvenience) of the possible causes, effects, and processes of incarceration and criminal behavior.
  (ii)   Studies (involving no more than minimal risk or inconvenience) of prisons as institutional structures or of prisoners as incarcerated persons.
  (iii)  Research on particular conditions affecting prisoners as a class (providing the Secretary of HHS has consulted with appropriate experts and published the intent to support such research in the Federal Register).
  (iv)   Research involving practices that have the intent and reasonable probability of benefiting the prisoner subject. If the research involves possible assignment to a control group that may not benefit from the research, the Secretary of HHS must also consult with appropriate experts and publish the intent to support the research in the Federal Register (45 CFR 46.306).

The following additional determinations must be made by the IRB before research involving prisoners goes forward (45 CFR 46.305):
  (i)    The research under review is limited to one of the categories of research listed above.
  (ii)   Any possible advantages accruing to the prisoner through his or her participation in the research, when compared with the general living conditions, medical care, quality of food, amenities and opportunity for earnings in the prison, are not of such a magnitude that his or her ability to weigh the risks of the research against the value of such advantages in the limited choice environment of the prison is impaired.
  (iii)  The risks involved in the research are commensurate with risks that would be accepted by nonprisoner volunteers.

(iv) Procedures for selecting subjects within the prison are fair to all prisoners, and immune from arbitrary intervention by prison authorities or prisoners. Unless the principal investigator provides to the IRB justification in writing for following some other procedures, control subjects must be selected randomly from the group of available prisoners who meet the characteristics needed for that particular research project.

(v) The information is presented in language that is understandable to the subject population.

(vi) Adequate assurance exists that parole boards will not take into account a prisoner's participation in the research in making decisions regarding parole, and each prisoner is clearly informed in advance that participation in the research will have no effect on his or her parole.

(vii) Where the board finds there may be a need for follow-up examination or care of participants after the end of their participation, adequate provision has been made for such examination or care, taking into account the varying lengths of individual prisoner's sentences, and for informing participants of this fact.

**c. Research Involving Children.** DHHS regulations at 45 CFR Part 46, Subpart D and FDA Regulations at 21 CFR 50 Subpart D require special protections for research involving children. Under the regulations, children are persons who have not attained the legal age for consent to treatments or procedures involved in the research under the applicable jurisdiction in which the research will be conducted. GU has determined that this is 18 years of age in the District of Columbia.

The IRB will consider three main issues when reviewing research involving children: (1) risk-benefit analysis; (2) parental permission; and (3) assent of the child.

(i) IRBs must make certain findings and determinations when reviewing research involving children. IRB records must reflect the IRB's understanding and justification for the risks and benefits posed by approved research involving children. Proposed research must fall within one of the following four categories:

(a) Research not involving greater than minimal risk.

(b) Research involving greater than minimal risk, but presenting the prospect of direct benefit to the individual subjects.

(c) Research involving greater than minimal risk and no prospect of direct benefit to individual subjects, but likely to yield generalizable knowledge about the subject's disorder or condition.

(d) Research not otherwise approvable, which presents an opportunity to understand, prevent, or alleviate a serious problem affecting the health or welfare of children.
Each category stipulates specific conditions that must be met before the proposed research can be approved. These conditions are summarized in the Table at the end of this Chapter.

(ii) The IRB shall determine that adequate provisions are made for soliciting the assent of the children, when in the judgment of the IRB the children are capable of providing assent. In determining when children are capable of assenting, the IRB shall take into account the ages, maturity, and psychological state of the children involved. This judgment may be made for all children to be involved in research under a particular protocol, or for each child, as the IRB deems appropriate. If the IRB determines that the capability of some or all of the children is so limited that they cannot reasonably be consulted or that the intervention or procedure involved in the research holds out a prospect of direct benefit that is important to the health or well-being of the children and is available only in the context of the research, the assent of the children is not a necessary condition for proceeding with the research. Even where the IRB determines that the subjects are capable of assenting, the IRB may still waive the assent requirement where (a) the research involves no more than minimal risk; (b) the waiver will not adversely affect subjects' rights and welfare; (c) the research could not practicably be carried out without the waiver; and (d) when appropriate, the subjects will be provided with pertinent information after participation.

(iii) IRBs should take great care in approving research where the child is suffering from a life-threatening illness with little real chance of therapeutic benefit from the research. IRBs should also take great care in allowing the parents to overrule the child's dissent where experimental therapy has little or no reasonable expectation of benefit.

(iv) If it is deemed appropriate that the child's assent should be solicited, the assent form should be tailored for the child, with respect to his or her level of understanding. For young children, the assent form should be a relatively brief document, with simple, age-appropriate language, presented in a manner understandable to the child.

e. **Research Involving Decisionally Impaired Subjects.** Decisionally impaired persons are individuals who have or may develop a diminished capacity for judgment and reasoning due to a psychiatric, organic, developmental, or other disorder that affects cognitive or emotional functions. Other individuals who may be considered

decisionally impaired, with limited decision-making ability, are individuals under the influence of or dependent on drugs or alcohol, those suffering from degenerative diseases affecting the brain, terminally ill patients, and persons with severely disabling physical handicaps.

In cases where research involving cognitively impaired individuals is approved, IRBs may require additional safeguards (e.g., involvement of subject advocates, independent monitoring, formal capacity assessment, waiting periods) as part of the research plan to protect participants.

f. **Research Involving Other Potentially Vulnerable Adult Subjects.** Employees, students, and trainees at GU should also be considered vulnerable subjects. Thus, the IRB should uphold the same standards in approving research involving these groups as other research with vulnerable subjects.

The context of the research is an important consideration for the IRB to consider when reviewing research that involves other potentially vulnerable subjects. Research involving homeless persons, members of particular minority groups, or the economically or educationally disadvantaged pose significant challenges. Research involving significant follow-up procedures or offering significant monetary compensation may unduly influence certain types of subjects, and the IRB must take such considerations into account.

g. **Fetal Tissue Transplantation Research.** Human fetal transplantation research supported by DHHS is governed by Public Law 103-43. (See Appendix V.)

GU follows the Ethical and Religious Directives for Catholic Health Care Services, which specifically addresses the topic of fetal tissue for research purposes. For guidance on this issue, please contact the IRB Office.

h. **Research Involving Deceased Persons.** Research involving deceased persons is not covered by the FDA or DHHS human subject regulations.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

| Research Involving Children | Requirements |
|---|---|
| No greater than minimal risk | Assent of child and permission of at least one parent |
| Greater than minimal risk and prospect of direct benefit | Assent of child and permission of at least one parent |
| | Anticipated benefit justifies the risk |
| | Anticipated benefit is at least as favorable as that of alternative approaches |
| Greater than minimal risk and no prospect of direct benefit | Assent of child and permission of both parents |
| | Only a minor increase over minimal risk |
| | Likely to yield generalizable knowledge about the child's disorder or condition that is of vital importance for the understanding or amelioration of the disorder or condition |
| | The intervention or procedure presents experiences to the child that are reasonably commensurate with those in the child's actual or expected medical, dental, or expected medical, dental, psychological, social, or educational situations |
| Any other research | Assent of child and permission of both parents |
| | IRB finds that the research presents a reasonable opportunity to further the understanding, prevention, or alleviation of a serious problem affecting the health or welfare of children |
| | The HHS Secretary or the FDA Commissioner approves, after consultation with a panel of experts in pertinent disciplines (e.g., science, medicine, education, ethics, law) and following publication in the Federal Register and public comment |

16-9

## Chapter 17.
## Managing Conflicts of Interest

Conflict of interest can be defined as any situation in which financial or personal obligations may compromise or present the appearance of compromising an individual's or group's professional judgment in conducting, reviewing, or reporting research.

GU's policy and the conflict of interest forms are included in Appendix VI.

Research personnel, IRB members, IRB Chairs, research administration officials, the Institutional Official, and research sponsors may all have certain conflicts of interest. Such conflicts of interest may arise because of the intellectual property involved in many research discoveries or industry-academic partnerships, or from financial incentives many pharmaceutical or biotech companies offer researchers or physicians for conducting trials or enrolling subjects, or due to particular role relationships within particular institutions.

    a. **Research Personnel**. For researchers, financial or other incentives may negatively impact the collection, analysis and interpretation of data, scientific objectivity and integrity, and ultimately the public trust in the research enterprise. In addition, if also the treating physician, a researcher may unwittingly exert coercion or undue influence on patients to participate in research.

    b. **IRB Chairpersons and Members**. IRB chairpersons and IRB members may find themselves in situations that present conflicts of interest, such as:
        (i)   Where the IRB Chairperson or member is listed as an investigator on the research.
        (ii)  Where any investigator must report to or is under the supervision of an IRB chairperson or member or vice versa.
        (iii) Where the IRB Chairperson or member competes for research grants or contracts in the same or similar field as an investigator whose research is scheduled for review.

    c. **Office of Regulatory Affairs and IRB Staff.** To eliminate possible conflict of interest among Office of Regulatory Affairs and IRB staff, staff in either office will not serve as voting members of this institution's designated IRBs.

    d. **Institutional Officials**. To eliminate possible conflict of interest among institutional officials, the Director of Regulatory Affairs and other designated Institutional Officials will not serve as voting members of this institution's designated IRBs.

17-1

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

e. **Federal Regulations and the Common Rule**. The Federal human subject regulations and the Federal Policy (Common Rule) prohibit IRB members, chairs, or staff who have a conflicting interest from participating in the IRB's initial or continuing review of research.

  (i)   Such conflicts must be disclosed, and the IRB member, chairperson, or staff member must not take part in the discussion or voting of such research, except to answer questions from the IRB.

  (ii)  IRBs may consider any matter that raises the possibility of coercion or undue influence in the consent process. The existence of an investigator conflict of interest would fall within this category.

  (iii) As a matter of policy, this institution requires disclosure of any potential conflicts of interest to appropriate institutional officials or committees established for this purpose. Adherence to this disclosure requirements is a routine condition for IRB approval of research.

f. **FDA Requirements**. FDA regulations at 21 CFR Part 54 requires a sponsor of any drug, device, or biologic to submit information on financial interests and arrangements of clinical investigators conducting studies. The following financial arrangements must be disclosed:

  (i)   Any relationship between the study outcome and the value of the compensation made to the investigator.

  (ii)  The investigator's proprietary interest in the studied product, including but not limited to a patent, trademark, copyright or licensing agreement.

  (iii) Any equity interest in the study sponsor, ownership interest, stock options, or other financial interest.

  (iv)  Any equity interest in a publicly held company that exceeds $50,000 in value.

  (v)   Significant payment of another type, which has a cumulative monetary value of $25,000 or more, made by the sponsors to the investigator(s).

g. **PHS Requirements for Grantee Institutions**. DHHS requires that Public Health Service (PHS) grantee institutions have a written policy and guidelines on conflicts of interest.

A designated institutional official is responsible for reviewing all financial disclosures, and determining if a conflict of interest exists. If one exists, the institutional official must determine what actions should be taken to manage, reduce, or eliminate the conflicting interest. At GU , the designated institutional conflict of interest official is the Director of Regulatory Affairs or his or her designee in the Office of Regulatory Affairs.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

The PHS requirements call for grantee institutions to:
- (i)   Maintain a written, enforced policy on conflicts of interest.
- (ii)  Review all financial disclosure statements (listings of significant financial interests for investigators and immediate family members) for all investigators participating in PHS-funded research.
- (iii) Report to PHS the existence of a conflicting interest found by the institution and manage it effectively.

GU requires that all investigators submit conflict of interest disclosure forms to the designated institutional conflict of interest official.

**h.  The Disclosure Process.**  As one method of preventing, monitoring, managing, and/or resolving conflicts of interest, this institution requires full disclosure of conflicts of interest by investigators.

Full disclosure of conflicting information demonstrates good faith and protects the integrity of the research and the reputation of the institution. Disclosure is made to this institution's conflict of interest official, and where deemed appropriate by that official, to the IRB.

Where appropriate, and as determined by the IRB or the conflict of interest official, disclosure to the human subjects involved in the research may be warranted via the informed consent document.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

## Chapter 18.
## HIPAA Information for Researchers

MedStar HIPAA Training Site:
http://www.medstarresearch.org/departments/orp/HIPAA/hipaatraining.htm

As of April 14, 2003, Georgetown University Researchers accessing protected health information maintained by MedStar must be trained in MedStar's responsibilities under HIPAA. MedStar is certifying all researchers, regardless of the researcher's affiliation.

All members of the research team are required to complete the HIPAA education module found on the MedStar Research Institute website set forth below in order to access PHI (Protected Health Information) in a MedStar facility, including Georgetown University Hospital.

All PIs must submit copies of the certificate of completion of HIPAA training to the IRB in order to obtain IRB approval of new studies, enroll in open studies, or access PHI for research on or after April 14, 2003. Access to PHI for subjects enrolled before April 14, 2003 does not require compliance with HIPAA regulations.

The HIPAA authorizations and requests for waiver/alteration of authorization require IRB approval, and should be sent to the IRB office. Sponsors should be directed to the template authorization on the website and encouraged to rely on the template form. If changes or additions are requested by the sponsor, they should be incorporated into the template and the competed form should be sent to the IRB for approval.

Requests for Review Preparatory to Research, Limited Date Sets, and Access to Decedent Information do not require IRB review and, at Georgetown University Hospital, should be submitted to the Vice President for Medical Affairs, Dr. Richard Goldberg.

HIPAA Authorizations and requests for waiver/alteration of HIPAA authorizations for open studies should be sent as soon as possible to the IRB in order to continue research on or after April 14, 2003. The legal criteria for waiver/alteration are set forth on the form.

Please note that researchers may only access, and the IRB and Covered Entity (MedStar) may only approve access, to the minimum PHI necessary to complete the research. Please tailor your requests accordingly. Also note the Statement of Assurance to accompany the authorization forms that are filed with the IRB in which the PI verifies the accuracy of the request.

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

MedStar HIPPA Training Site:

http://www.medstarresearch.org/departments/orp/HIPAA/
hipaatraining.htm

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

## INDEX

**A**

Addictive Substances, 15-4
Adverse Event (AE), 6-2, 8-2, 9-1, 9-3, 9-6, 10-2, 10-6, 10-7, 11-4, 11-5, 13-1, 13-3, 13-4
Advertising, 9-3, 11-6
Alteration, 9-8, 10-3, 11-1, 11-9, 11-10, 12-1, 14-5, 16-3
Alternatives, 9-4, 9-5, 11-10, 12-2, 13-5, 13-6, 13-7, 13-8, 15-2, 16-9
Assent, 16-1, 16-3, 16-6, 16-7, 16-9
Assurance, 2-3, 4-1, 5-1, 6-1, 6-2, 6-3, 6-4, 13-1
Autonomy, 11-1, 15-4

**B**

Belmont Report, 1-1, 1-2
Beneficence, 1-2
Bio-Behavioral Research, 15-1, 15-4
Biomedical Research, 1-1, 1-2, 3-4, 7-1, 12-3, 12-5, 15-1
Bio-Social Research, 15-1, 15-4

**C**

Catholic Moral Theology, 1-1, 4-1, 16-8
Centers for Disease Control and Prevention (CDC), 3-5
Certificates of Confidentiality, 11-9, 14-2
Children, 2-2, 9-8, 10-4, 11-4, 14-3, 14-4, 16-1, 16-3, 16-6, 16-7, 16-9
Clinical Research, 3-5
Co-Investigators, 4-2
Common Rule, 2-2, 4-1, 10-1, 10-2, 11-1, 12-1, 13-1, 13-8, 13-9, 15-1, 15-4, 16-1, 17-2
Compassionate Use, 13-8, 13-9
Confidentiality, 3-5, 9-4, 10-1, 11-4, 11-9, 11-10, 12-2, 14-1, 14-2, 14-4, 15-1, 15-3, 15-4, 15-5, 16-1

Conflict of Interest, 7-2, 17-1, 17-2, 17-3
Consent, 1-1, 4-2, 9-5, 9-8, 10-1, 10-6, 11-1, 11-2, 11-3, 11-6, 11-7, 11-9, 11-10, 11-11, 12-1, 12-2, 13-5, 13-7, 13-8, 13-9, 13-10, 13-11, 13-12, 14-1, 14-2, 15-2, 15-3, 16-1, 16-2, 16-3, 16-4, 16-6, 17-2
Consent Monitoring, 11-6
Continuing Review, 4-2, 6-2, 7-2, 9-3, 9-5, 9-6, 9-7, 10-1, 10-2, 10-3, 10-5, 10-7, 10-8, 11-4, 11-6, 13-9, 13-10, 13-11, 17-2
Control, 16-5, 16-6
Cooperative Groups, 9-3, 9-6, 10-7

**D**

Data and Safety Monitoring, 9-3, 10-7, 11-4
Deceased Persons, 16-8
Deception, 14-5
Decetpion, 14-5
Decisionally Impaired, 16-7
Declaration of Helsinki, 1-1
Department of Health and Human Services (DHHS), 2-2, 2-3, 6-1, 6-4, 8-1, 9-8, 10-2, 10-3, 11-9, 13-1, 13-3, 13-6, 13-8, 13-9, 14-2, 15-1, 16-1, 16-2, 16-4, 16-5, 16-6, 16-8, 17-2
Device, 6-4, 10-3, 10-4, 10-5, 11-6, 13-1, 13-2, 13-3, 13-4, 13-5, 13-6, 13-7, 13-8, 13-9, 13-12, 17-2
Discomforts, 11-1, 12-2, 13-3
District of Columbia, 3-5, 11-8, 12-3, 16-6

**E**

Education, 6-4, 7-3, 8-1, 9-2
Emergency, 9-5, 9-8, 11-8, 12-3, 13-6, 13-7, 13-8, 13-9, 13-10
Epidemiology Research, 3-5, 15-3

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

Exemption, 3-5, 6-4, 9-3, 10-3, 10-5, 13-1, 13-6, 13-9, 13-12, 14-1, 14-3, 14-4, 15-1
Expedited Review, 3-5, 7-1, 9-1, 9-5, 9-6, 10-1, 10-2, 10-3, 10-4, 10-5, 10-8, 11-1, 14-4, 14-5, 15-1
Experiment, 1-1

**F**

Family History Research, 15-4
Federalwide Assurance Program (FWA), 2-3, 4-1, 6-1
Fetal Tissue, 1-1, 16-8
Fetus, 1-1, 2-2, 9-8, 12-4, 13-1, 16-2, 16-3, 16-4
Food and Drug Administration (FDA), 2-2, 4-1, 6-3, 6-4, 9-1, 9-4, 9-5, 9-8, 10-1, 10-2, 10-3, 10-6, 10-9, 11-1, 11-3, 11-9, 11-10, 11-11, 12-1, 12-2, 12-1, 13-1, 13-2, 13-3, 13-4, 13-5, 13-6, 13-7, 13-8, 13-9, 13-12, 14-2, 16-1, 16-6, 16-8, 16-9, 17-2

**G**

Gene Transfer Research, 13-6
Genetic Research, 15-4
Georgetown University, 1-1, 2-2, 2-3, 3-4, 4-1, 6-1, 6-2, 6-3, 6-4, 7-1, 7-2, 7-3, 8-1, 9-1, 9-2, 9-3, 9-5, 9-7, 10-1, 10-2, 10-5, 10-6, 10-7, 10-8, 10-9, 11-1, 11-3, 11-5, 11-6, 11-7, 11-8, 11-9, 11-10, 11-11, 12-2, 12-3, 12-5, 13-3, 13-4, 13-5, 13-7, 13-9, 13-10, 14-3, 16-6, 16-8, 17-1, 17-2, 17-3
Grant, 6-2, 10-1

**H**

Human Subject, 1-1, 1-2, 2-2, 2-3, 3-4, 3-5, 4-1, 4-2, 4-3, 5-1, 6-1, 6-2, 6-3, 6-4, 7-1, 7-2, 7-3, 8-1, 8-2, 9-2, 9-3, 9-4, 9-5, 9-6, 9-8, 10-1, 10-2, 10-3, 10-4, 10-5, 10-6, 10-7, 10-8, 10-9, 11-1, 11-2, 11-3, 11-4, 11-5, 11-6, 11-7, 11-8, 11-9, 11-10, 11-11, 12-1, 12-2, 12-3, 12-4, 12-5, 13-1, 13-2, 13-3, 13-4, 13-5, 13-6, 13-7, 13-8, 13-9, 13-10, 13-11, 13-12, 14-1, 14-2, 14-3, 14-4, 14-5, 15-1, 15-2, 15-3, 15-4, 15-5, 16-1, 16-4, 16-5, 16-6, 16-7, 16-8, 17-1, 17-2, 17-3
equitable selection, 11-2

**I**

Identifiable, 3-4, 3-5, 9-4, 11-9, 12-2, 14-1, 14-2, 14-3, 15-2, 15-3, 15-4
Identifiers, 9-4, 15-1, 15-2, 15-3, 16-4
Immediate Hazards, 4-2, 10-3, 10-6
Incapacity, 13-4, 16-3
Incentives, 11-6, 11-7, 13-9, 17-1
Informed Assent, 16-1, 16-3, 16-6, 16-7, 16-9
Informed Consent, 1-1, 1-2, 2-2, 3-5, 4-2, 6-2, 9-2, 9-3, 9-5, 9-6, 9-8, 10-1, 10-2, 10-3, 10-6, 11-1, 11-2, 11-3, 11-6, 11-7, 11-9, 11-10, 11-11, 12-1, 12-2, 12-3, 12-4, 12-5, 13-1, 13-3, 13-5, 13-6, 13-7, 13-8, 13-9, 13-10, 13-11, 13-12, 14-1, 14-2, 14-5, 15-2, 15-3, 15-4, 16-1, 16-2, 16-3, 16-4, 16-6, 17-2, 17-3
informed decision, 4-3, 12-1
required elements, 11-3, 11-9, 11-10, 12-1, 12-2, 12-3
voluntary participation, 12-1
Injury, 11-8, 12-3, 13-9

Institution, 2-3, 4-1, 4-2, 6-1, 6-2, 6-3, 6-4, 7-1, 8-1, 9-1, 10-1, 10-3, 11-5, 11-6, 11-8, 12-1, 13-6, 13-7, 13-8, 13-9, 13-10, 16-4, 17-1, 17-2, 17-3

Institutional Official, 7-1, 17-1, 17-2

Institutional Review Board (IRB), 2-2, 2-3, 3-4, 3-5, 4-1, 4-2, 5-1, 6-1, 6-2, 6-3, 6-4, 7-1, 7-2, 7-3, 8-1, 8-2, 9-1, 9-2, 9-3, 9-5, 9-6, 9-7, 9-8, 9-1, 10-1, 10-2, 10-3, 10-5, 10-6, 10-7, 10-8, 10-9, 11-1, 11-2, 11-3, 11-4, 11-5, 11-6, 11-7, 11-8, 11-9, 11-10, 11-11, 12-1, 12-2, 12-3, 13-1, 13-2, 13-3, 13-4, 13-5, 13-6, 13-7, 13-8, 13-9, 13-10, 13-11, 13-12, 13-1, 14-1, 14-2, 14-3, 14-4, 14-5, 15-1, 15-2, 15-3, 15-4, 15-5, 16-1, 16-2, 16-3, 16-4, 16-5, 16-6, 16-7, 16-8, 16-9, 17-1, 17-2, 17-3
  appeal, 6-3
  membership, 7-1, 7-2, 9-1
  review, 9-5, 9-1, 10-1, 10-2, 10-7, 11-1, 11-5, 13-2, 13-6, 13-1, 14-4

Intellectual Property, 12-5, 17-1

Investigational Device Exemption (IDE), 2-2, 2-3, 6-4, 13-1, 13-2, 13-3, 13-4, 13-5, 13-7, 13-8, 13-12

Investigational New Drug Application (IND), 2-2, 2-3, 6-4, 13-1, 13-2, 13-3, 13-4, 13-5, 13-6, 13-7, 13-12

IRB Chairperson, 6-3, 7-1, 7-2, 7-3, 8-1, 8-2, 9-1, 9-5, 10-2, 10-5, 10-6, 10-9, 13-7, 13-9, 13-10, 17-1

IRB Director, 9-8

**L**

Law, 6-2, 7-2, 11-2, 11-9, 12-2, 13-5, 13-9, 15-3, 16-1, 16-4, 16-8, 16-9

Liability, 7-3, 9-4, 11-3, 12-1, 14-1, 14-3

**M**

Medical Devices, 2-2, 3-4, 10-3, 10-4, 13-2, 13-7

Member, 4-2, 7-1, 7-2, 7-3, 9-1, 9-2, 9-5, 9-6, 9-7, 10-1, 10-6, 10-7, 13-10, 13-11, 13-12, 15-4, 17-1, 17-2

Minimal Risk, 9-8, 10-2, 10-3, 10-5, 11-1, 11-10, 11-11, 12-3, 13-2, 13-3, 14-4, 14-5, 15-1, 15-3, 15-4, 16-5, 16-6, 16-7, 16-9

Monitoring, 1-1, 3-5, 8-2, 9-3, 10-1, 11-4, 11-6, 13-3, 13-11, 16-8, 17-3

Multiple Project Assurance (MPA), 2-3, 6-1

**N**

Neonate, 2-2, 13-1, 16-2

Non-English Speakers, 11-7

Nuremberg Code, 1-1

Nurse, 4-2

**O**

Office for Human Research Protections (OHRP), 2-2, 2-3, 4-1, 5-1, 6-1, 6-3, 6-4, 7-3, 8-1, 9-1, 9-2, 9-8, 10-6, 10-9, 12-2, 13-1, 13-3, 13-4, 13-10, 14-4, 15-2, 16-5

Office of Regulatory Affairs, 2-3, 4-1, 6-1, 6-2, 6-3, 6-4, 7-2, 7-3, 8-2, 9-1, 9-2, 10-1, 10-6, 10-9, 13-3, 13-10, 17-1, 17-2

Off-Label Use, 13-4, 13-5

**P**

Parallel Track Study, 13-6

Payment, 9-4, 11-8, 11-10, 17-2

Pilot Studies, 3-5

Pregnancy, 16-3

Principal Investigator (PI), 4-2, 9-3, 10-9, 11-5, 11-8, 11-11, 12-3, 16-6

Prisoners, 2-2, 9-8, 11-4, 13-1, 14-4, 16-1, 16-4, 16-5, 16-6

*Office of Regulatory Affairs Institutional Review Board of Georgetown University*
*Policies & Procedures Manual*

Privacy, 3-5, 10-1, 10-4, 11-4, 14-1, 14-2, 15-1, 15-3, 15-4
Private Information, 3-4, 12-2, 14-1, 14-2, 15-2, 15-3, 15-4
Public Health Service (PHS), 1-1, 17-2, 17-3

**Q**

Quality Assurance, 3-5, 10-5, 14-5
Quality Control, 8-2, 9-3, 12-2

**R**

Radioactive Material, 13-3
Radiology Device, 13-3
Recruitment, 9-3, 10-1, 11-2, 11-6, 11-7, 16-1
   advertising, 9-3
Representatives, 7-1, 13-10, 13-11
Research
   investigator-initiated, 12-4
Research Assistants, 4-2
Research Statement, 12-1
Research, defined, 3-4
Respect for Persons, 1-2
Risk, 1-2, 4-2, 6-3, 9-3, 9-4, 9-6, 9-7, 10-1, 10-3, 10-5, 10-6, 10-7, 10-8, 11-1, 11-2, 11-4, 11-5, 11-6, 11-9, 11-10, 12-1, 12-2, 12-4, 13-2, 13-3, 13-4, 13-9, 13-10, 13-11, 14-1, 14-2, 14-3, 14-5, 15-4, 15-5, 16-2, 16-3, 16-5, 16-6, 16-9

**S**

Safety Reports, 10-7
Serious Adverse Events (SAEs), 4-2, 10-8
Significant New Findings, 12-4
Social and Behavioral Research, 3-4, 7-1, 12-3, 12-5, 14-1, 14-3, 14-4, 14-5

Sponsor, 6-4, 9-3, 9-6, 10-6, 10-7, 11-3, 11-8, 12-1, 12-2, 13-2, 13-3, 13-4, 13-5, 13-6, 13-7, 13-8, 13-12, 17-1, 17-2
Study Coordinators, 4-2
Survey, 9-4, 10-5, 14-2, 14-3, 14-4, 14-5, 15-3
Suspension, 10-6, 10-8, 10-9

**T**

Termination, 10-8, 10-9, 12-4
Test Article, 6-4, 9-5, 12-4, 13-2, 13-6, 13-8, 13-10

**U**

Unanticipated Problems, 4-1, 4-2, 4-3, 6-2, 6-3, 8-2, 9-3, 9-6, 10-6, 10-7, 10-8, 13-3, 13-4

**V**

Verification
   independent, 11-5
Voluntary, 1-1, 11-9, 12-1, 12-3, 16-4
Vulnerable Subject Groups, 10-1, 11-2, 11-4, 11-5, 16-1, 16-8

**W**

Waiver, 9-8, 11-1, 11-2, 11-9, 11-10, 11-11, 12-1, 13-1, 13-5, 13-10, 14-2, 14-5, 15-2, 15-3, 16-3, 16-7
Withdrawal, 12-4

**X**

X-Ray, 10-4

# Appendix I.
# Glossary of Frequently Used Terms

**Adverse event** – An undesirable and unintended, although not necessarily unexpected, result arising during the course of a research protocol.

**Adverse Event Report** – Report to appropriate institutional officials about adverse events.

**Advertising** – One mechanism or method used by researchers to recruit subjects for research studies.

**Alternatives** – Options that exist for a subject who is thinking about participating in research.

**ARENA** – Applied Research Ethics National Association: a membership organization for individuals interested in ethical issues relating to medicine and research.

**Assent** – Agreement by an individual not competent to give legally valid informed consent to participate in research (e.g., a child).

**Assurance** – A formal written, binding commitment that is submitted to a federal agency in which an institution promises to comply with regulations governing the protection of human subjects in research. Assurance is the word used in the Federal Policy (Common Rule).

**Authorized Institutional Official** – See "Institutional Official."

**Autonomy** – See "Respect for Persons."

**Belmont Report** – A statement of basic ethical principles governing research involving human subjects issued in 1978 by the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research.

**Beneficence** – An ethical principle discussed in the Belmont Report that entails an obligation to protect persons from harm. The principle of beneficence can be expressed in two general rules: (1) do not harm; and (2) protect from harm by maximizing possible benefits and minimizing possible risks of harm.

**Benefit** – A valued or desired outcome; an advantage.

**Certificate of Confidentiality** – A Certificate of Confidentiality protects the compelled release of identifiable information about research subjects in any legal proceeding. These documents are issued by the DHHS and can be requested for all research, regardless of funding source [42 USC 241(d)].

**Certification** – The human subject regulations, in certain parts require the Institutional Review Board (IRB) to provide a "certification" to the government. For example, see the prisoner regulations at 45 CFR Part 46, Subpart C.

**Chair** – The person who leads the activities of the IRB.

**Children** – Persons who are minors as defined by law.

**Clinical Investigation** – Any experiment that involves a test article and one or more human subjects that is subject to Food and Drug Administration (FDA) requirements for research or marketing permits [21 CFR Part 50.3(c) and 56.102(c)].

**Clinical Trial** – A controlled study involving human subjects designed to contribute to generalizable knowledge about the safety and/or effectiveness of an intervention or treatment.

**Coercion** – The act of inducing or pressuring an individual to consent to participate in research or to stay in research.

**Cognitive Impairment** – Some disorder that affects cognitive or emotional functions to the extent that capacity for judgment and reasoning is significantly diminished.

**Common Rule** – The short description of the Federal Policy for the Protection of Human Subjects in Research [56 FR 29003].

**Compensation** – Refers to payment or other benefits that will be given to subjects who volunteer to participate in research protocols.

**Competence** – The capacity to act on one's own behalf; the ability to understand information presented; to appreciate the consequences of acting or not acting on that information, and to make a choice.

**Confidentiality** – Pertains to the treatment of information that an individual has disclosed in a relationship of trust and with the expectation that it will not be divulged to others without permission in ways that are inconsistent with the understanding of the original disclosure.

**Consent** – Agreement to do something. Informed consent is agreement to do something based upon a complete understanding of that task.

**Control** – Subject(s) used for comparison who are not given a treatment under study or who do not have a given condition, background, or risk factor that is the object of the study.

**Continuing Review** – The regulatory requirement that the Institutional Review Board (IRB) review research at intervals not greater than one year. The IRB may review research at more frequent intervals [45 CFR 46.109(e); 21 CFR 56.109(f)].

**Data and Safety Monitoring Board (DSMB)** – A group of people who monitor a clinical trial for adverse events and other trends. The Data and Safety Monitoring Board looks for any information that might warrant modification or termination of the trial or notification of subjects about new information that might affect their willingness to continue in the trial.

**Deception** – Intentionally misleading with respect to a research protocol.

**Declaration of Helsinki** – A code of ethics for clinical research approved by the World Medical Association. It has been widely adopted by medical associations worldwide and has been revised numerous times.

**DHHS** – Acronym for U.S. Department of Health and Human Services.

**DSMB** – Acronym for Data and Safety Monitoring Board.

**Emancipated Minor** – Defined by law, this refers to the legal status of a person who has not yet attained the age of legal competency but who is entitled to adult status for certain matters.

**Embryo** – Early stages of a developing organism, broadly used to refer to stages immediately following fertilization of an egg through implantation and very early pregnancy.

**Exemptions** – The Federal Policy for the Protection of Human Subjects contains six exemptions. Research falling under one of these exemptions is not required to undergo IRB review and the investigator is not required to abide by the requirements for obtaining information consent [See 45 CFR 46.101(b)]. FDA regulations contain an exemption from IRB review requirements for the emergency use of a test article [21 CFR 56.104(c)] and for certain taste and food quality evaluations and consumer acceptance studies [21 CFR 56.104(d)].

**Expedited Review** – Review of proposed research by the IRB chair or a designated voting member or group of voting members rather than by the entire convened IRB. Federal regulations permit expedited review for: (1) certain kinds of research involving no more than minimal risk and that fall within a category listed on the November 9, 1998 Federal Register [63 FR 60364]; and, (2) for minor changes in previously approved research [45 CFR 46.110; 21 CFR 56.110].

**Experiment** – Generally, this refers to an intervention or interaction that is unproven and not yet scientifically validated.

**FDA** – Acronym for the Food and Drug Administration, a component of DHHS.

**Federal Policy** – Another short reference, along with the phrase "Common Rule," for the Federal Policy for the Protection of Human Subjects in Research [56 FR 28003].

**Federal Register** – The government's publication in which final and proposed rules or notices are published.

**Fetus** – The product of conception from the time of implantation until delivery. Refer to Subpart B of 45 CFR Part 46 for specific findings that are required for research involving fetuses.

**FR** – Acronym for Federal Register.

**Full Board Review** – Review of proposed research at a convened meeting of the IRB, at which a majority of the membership of the IRB are present, including at least one member whose primary concerns are in a nonscientific area [45 CFR 46.109; 21 CFR 56.108].

**Grant** – Financial support provided for a research study designed and proposed by the principal investigator.

**Guardian** – An individual who is authorized under applicable state or local law to give permission on behalf of another person to participate in research.

**Helsinki Declaration** – See "Declaration of Helsinki."

**Human in Vitro Fertilization** – Any fertilization involving human sperm and ova that occurs outside the human body.

**Human Protections Administrator** – An individual who has responsibility for day-to-day operation and implementation of the institution's program for protecting human subjects. The institutional title and duties of the Human Protections Administrator may vary widely from institution to institution. For example, an institutional compliance officer, head IRB administrator, or some other individual might fill this role, depending upon the nature of the institution. In any case, the Human Protections Administrator should have detailed knowledge of institutional protection mechanisms and be readily available for consultation with federal officials and institutional personnel. The IRB Chairperson should not serve as the Human Protections Administrator.

**Human Subject** – An individual who is the object of study in a research project. Under the Federal Policy (Common Rule), human subject means a living individual about whom an investigator conducting research obtains: (1) data through intervention or interaction with the individual; or (2) identifiable private information [45 CFR 46.102(f)]. Under FDA regulations, "human subject" means an individual who is or becomes a participant in research, either as a recipient of the test article or as a control. A subject may be either a healthy individual or a patient [21 CFR 50.3(g) and 56.102(e)].

**IDE** – Acronym for Investigational Device Exemption.

**IEC** – Acronym for Independent Ethics Committee.

**Incapacity** – Refers to a person's mental status and means inability to understand information presented, to appreciate the consequences of acting (or not acting) on that information, and to make a choice.

**Inclusion Criteria** – The criteria that establish whether a person is eligible to participate in a clinical trial.

**Incompetence** – A legal term meaning inability to manage one's own affairs.

**IND** – Acronym for Investigational New Drug Application.

**Independent Ethics Committee (IEC)** – The equivalent of an IRB under the International Conference on Harmonisation Guidelines for Good Clinical Practice.

**Informed Consent** – A person's voluntary agreement, based upon adequate knowledge and understanding of relevant information, to participate in research or to undergo a diagnostic, therapeutic, or preventive procedure.

**Institution** – Any public or private entity or agency (including federal, state, and other agencies) [45 CFR 46.102(b); and, 21 CFR 50.3(h) and 56.102(f)].

**Institutional Review Board (IRB)** – A review body established by regulation to protect the welfare of human subjects recruited to participate in research.

**Institutional Official** – The individual at an institution who is responsible for ensuring the effective administration and implementation of the institution's system for the protection of human subjects.

**Investigational Device Exemption (IDE)** – Exemptions from certain regulations found in the FDA, Medical Device Amendments that allow shipment of unapproved devices for use in clinical investigations [21 CFR 812.20].

**Investigational New Drug Application (IND)** – An application to conduct a clinical investigation involving a drug not yet determined by the Food and Drug Administration to be safe and effective for a particular use in the general population and not yet licensed for marketing [21 CFR 312.1].

**Investigator** – The individual who actually conducts a research investigation [21 CFR 50.3(d) and 56.102(h)].

**IRB** – Acronym for Institutional Review Board.

**IRB Forum (formerly know as "McWIRB"** – An IRB Listserve that is widely used and can be found at http://www.irbforum.org.

**Justice** – An ethical principle discussed in the Belmont Report requiring fairness in distribution of burdens and benefits; often expressed in terms of treating persons of similar circumstances or characteristics similarly.

**Legally Authorized Representative (LAR)** – The person authorized by law to consent to something on behalf of another person. For research purposes, only select states permit a LAR to consent for research participation [45 CFR 46.102(c); 21 CFR 50.3(e)].

**Member** – A person who is listed on the roster of an IRB as a voting participant in IRB deliberations and actions.

**Minimal Risk (Federal Policy, DHHS Subpart A, and FDA)** – The probability and magnitude of harm or discomfort anticipated in the research are not greater in and of themselves than those ordinarily encountered in daily life or during the performance of routine physical or psychological examinations or tests [45 CFR 46.102(i); and, 21 CFR 50.3(k) and 56.102(j)].

**Minimal Risk (DHHS Subpart C - prisoners)** – The probability and magnitude of physical or psychological harm that is normally encountered in the daily lives, or in the routine medical, dental, or psychological examination of healthy persons [45 CFR 46. 303(d)].

**Monitoring** – A mechanism for keeping track of any part of the research process: data analysis, recruitment of subjects, informed consent process, to ensure its compliance with Institutional Review Board dictates and the federal regulations.

**National Bioethics Advisory Commission (NBAC)** – A Presidentially appointed commission that issues reports and makes recommendations relating to the protection of human subjects in research.

**NIH** – Acronym for National Institutes of Health.

**Non-Affiliated Member** – Member of an IRB who has no ties (and whose immediate family members have no ties) to the parent institution, its staff, or faculty. This individual is usually from the local community [45 CFR 46.107(d); and 21 CFR 56.107(d)].

**Non-Scientist** – Member of an IRB who does not have a scientific background, but may be affiliated with the institution [45 CFR 46.107(c); and, 21 CFR 56.107(c)]. At least one non-scientist member must be present at convened meetings to approve research [45 CFR 46.108(b); and, 21 CFR 46.108(c)].

**Normal Volunteers** – Volunteer subjects in a research study who do not have the condition under study. The 1993 Office for Protection from Research Risks (OPRR) Guidebook defines normal volunteers as follows: "Normal" may not mean normal in all respects. For example, patients with broken legs (if not on medication that will affect the results) may serve as normal volunteers in studies of metabolism, cognitive development, and the like. Similarly, patients with heart disease but without diabetes may be the "normals" in a study of diabetes complicated by heart disease [OPRR IRB Guidebook, 1993, G-9].

**Notice of Proposed Rule-Making (NPRM)** – Pursuant to the Administrative Procedure Act, the government must typically issue a notice of a proposed rule before it issues the final rule. This affords the public the opportunity to comment on contemplated government action.

**Nuremberg Code** – A code of research ethics developed during the trials of Nazi war criminals following World War II and widely recognized as a standard during the 1950s and 1960s for protecting human subjects.

**Oral Consent** – Typically refers to informed consent that is obtained from a subject without use of a written informed consent document.

**Office for Human Research Protections (OHRP)** – An office within the DHHS that was created in June of 2000. OHRP is responsible for the implementation of the DHHS regulations [45 CFR Part 46] governing the protection of human subjects in research.

**Office for Protection from Research Risks (OPRR)** – Until June 2000, this office was within the DHHS as part of the National Institutes of Health (NIH). OPRR was responsible for the implementation of the DHHS regulations [45 CFR Part 46] governing research involving human subjects. The Office for Human Research Protections supercedes OPRR.

**Parental Permission** – The agreement of one or both parents or a guardian to research involving a minor [45 CFR 46.402(c)].

**Phase 1,2,3,4, Clinical Trials** – Different stages of testing drugs in humans, from first application in humans (Phase 1) through limited and broad clinical tests (Phase 3), to postmarketing studies (Phase 4).

**Phase 1 Clinical Trials** – Phase 1 trials include the initial introduction of an investigational new drug into humans. These studies are typically conducted with healthy volunteers; however, where the drug is intended for use in patients with a particular disease, such patients may participate as subjects. Phase 1 trials are designed to determine the metabolic and pharmacological actions of the drug in humans, the side effects associated with increasing doses (to establish a safe dose range), and, if possible, to gain early evidence of effectiveness. They are typically closely monitored. The ultimate goal of Phase 1 trials is to obtain sufficient information about the drug's pharmacokinetics and pharmacological effects to permit the design of well-controlled, sufficiently valid Phase 2 studies. Other examples of Phase 1 studies include studies of drug metabolism, structure-activity relationships, and mechanisms of actions in humans, as well as studies in which investigational drugs are used as research tools to explore biological phenomena or disease processes. Typically, Phase 1 investigations involve anywhere from 20-80 subjects [21 CFR 312.21(a)].

**Phase 2 Clinical Trials** – Phase 2 trials include controlled clinical studies conducted to evaluate the drug's effectiveness for a particular indication in patients with the disease or condition under study, and to determine the common short-term side effects and risks associated with the drug. These studies are typically well-controlled, closely monitored, and conducted with a relatively small number of patients, usually involving no more than several hundred subjects [21 CFR 312.21(d)].

**Phase 3 Clinical Trials** – Phase 3 trials involve the administration of a new drug to a larger number of patients in different clinical settings to determine its safety, efficacy, and appropriate dosage. They are performed after preliminary evidence of effectiveness has been obtained, and are intended to gather necessary additional information about effectiveness and safety for evaluating the overall benefit-risk relationship of the drug, and to provide an adequate basis for physician labeling. In Phase 3 studies, the drug is used the way it would be administered when marketed. When these studies are completed and the sponsor believes that the drug is safe and effective under specific conditions, the sponsor applies to the FDA for approval to market the drug. Phase 3 trials usually involve several hundred to several thousand subjects [21 CFR 312.21(c)].

**Phase 4 Clinical Trials** – The FDA, when it gives market approval, may seek an agreement from the sponsor to conduct certain postmarketing studies to ascertain additional information about the drug's risks, benefits, and optimal use. These studies could include, but would not be limited to, studying different doses or schedules of administration than were used in Phase 2 studies, use of the drug in other patient populations or other stages of the disease, or use of the drug over a longer period of time [21 CFR 312.85].

**Public Health Service (PHS)** – A division within the DHHS. PHS agencies include the National Institutes of Health, Centers for Disease Control, the Indian Health Service, and the Substance Abuse and Mental Health Services Administration.

**Placebo** – In biomedical research, a chemically inert substance given in the guise of medicine for its psychologically suggestive effect; used in controlled clinical trials to determine whether improvement and side effects may reflect imagination or anticipation rather than the actual power of a drug. In social and behavioral research, a condition that mimics the experimental context but does not include the experimental manipulation under study. As in biomedical research, the control condition is used to confirm that observed effects are the result of the experimental manipulation rather than the research context itself.

**Pregnancy** – The period of time from confirmation of implantation of a fertilized egg within the uterus until the fetus has entirely left the uterus (i.e., has been delivered). Implantation is confirmed through a presumptive sign of pregnancy such as missed menses or a positive pregnancy test [45 CFR 46.203(b)]. This confirmation may be in error, but, for research purposes, investigators must presume that a living fetus is present until evidence to the contrary is clear. Although fertilization occurs a week or more before implantation, the current inability to detect the fertilization event or the presence of a newly fertilized egg makes a definition of pregnancy based on implantation necessary.

**Principal Investigator (PI)** – The person with primary responsibility for design and conduct of a research project.

**Public Responsibility in Medicine and Research (PRIM&R)** – A non-profit organization that organizes conferences, workshops, and other activities to further the protection of human subjects in research.

**Prisoner** – An individual involuntarily confined or detained in a penal institution, including persons: (1) sentenced under a criminal or civil statute; (2) detained pending arraignment, trial, or sentencing; and (3) detained in other facilities (e.g., for drug detoxification or treatment of alcoholism) under statutes or commitment procedures providing such alternatives to criminal prosecution; or (4) incarcerated in a penal institution [45 CFR 46.303(c)].

**Prisoner Representative** – A member of an IRB who has appropriate background and experience to represent the interests and concerns of an individual who is involuntarily confined to an institution [45 CFR 46.304(b)].

**Privacy** – Concealment from others of information about oneself.

**Protocol** – The formal design or plan of an experiment or research activity. The protocol includes a description of the research design or methodology to be employed, the eligibility requirements for prospective subjects and controls, the treatment regimen(s), and the proposed methods of analysis that will be performed on the collected data.

**Random Assignment** – Assignment of subjects to different treatments, interventions, or conditions according to chance.

**Recruitment** – The process of enrolling human subjects in research protocols.

**Research** – Under the Federal Policy and the DHHS Subpart A, research is a systematic investigation designed to develop or contribute to generalizable knowledge [45 CFR 46.102(d)]. Under FDA regulations, "research" is synonymous with "clinical investigation" [21 CFR 56.102(c)].

**Respect for Persons** – A principle enunciated in the Belmont Report stating that (1) individuals should be treated as autonomous agents, and, (2) persons with diminished autonomy are entitled to protection.

**Risk** – The probability of harm or injury occurring as a result of participation in a research study.

**Secretary** – In the context of the federal regulations pertaining to the protection of human subjects in research, refers to the head of a federal agency [45 CFR 46.102(a)].

**Site Visit** – Typically refers to a visit from a federal office to ensure the entity is complying with federal regulations.

**Sponsor** – Typically refers to the entity that initiates a clinical investigation but does not actually conduct the investigation [21 CFR 50.3(e) and 56.102(j)].

**Sponsor-Investigator** – An individual who both initiates and actually conducts a clinical investigation [21 CFR 50.3(f) and 56.102(k)].

**Subjects** – See "Human Subject."

**Subpart A** – The DHHS codification of the Federal Policy for the Protection of Human Subjects in Research is found in Subpart A of 45 CFR Part 46.

**Subpart B** – Subpart B of the DHHS regulations [45 CFR Part 46] contains additional protections for pregnant women and fetuses that are involved in research, and references human in vitro fertilization research.

**Subpart C** – Subpart C of the DHHS regulations [45 CFR Part 46] contains additional protections for prisoners who are involved in research.

**Subpart D** – Subpart D of the DHHS regulations [45 CFR Part 46] contains additional protections for children who are involved in research.

**Surveys** – Studies designed to obtain information from human subjects through written questionnaires, telephone interviews, door-to-door canvassing, or similar procedures.

**Suspension** – Typically used in the context of a federal agency taking action against an institution. For example, the Office for Human Research Protections can suspend an Assurance, preventing the institution from continuing to conduct studies supported with federal funds.

**Test Article** – Any drug, biological product for human use, medical device for human use, human food additive, color additive, electronic product subject to FDA regulations under 42 USC 262, 263b-263N [21 CFR 50.3(j) and 56.102(e)].

**Tuskegee** – Often used erroneously to refer to the U.S. Public Health Service Syphilis Study in Tuskegee, Alabama.

**Undue Influence** – This refers to a prohibition in the Common Rule that investigators not use unfair measures or influence to enroll persons in research [45 CFR 46.116].

**Unaffiliated Member** – See "Non-affiliated member."

**Unanticipated Problems Involving Risks to Subjects or Others** – This is a regulatory phrase which requires reporting of this event to the IRB and to the government [45 CFR 46.103(d)(5); 21 CFR 56.108(b)].

**Voluntary** – Free of coercion, duress, or undue influence.

**Vulnerable population** – This is a regulatory phrase which refers to a group of people who have some condition or situation that makes them more susceptible to coercion or undue influence [45 CFR 46.107(a)].

**Waiver of Informed Consent** – An action taken by the IRB permitting the investigator to pursue research involving human subjects without obtaining informed consent [45 CFR 46.116(d)].