# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FELICE I. IACANGELO and CICILY IACANGELO, Guardians of the Person and Property of KARYN A. KERRIS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGETOWN UNIVERSITY, *et al.*,<br><br>Defendants. | Civil Action No. 05-2086 (PLF) (AK) |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned pursuant to Rule 72.3(a) of the Local Rules

of the United States District Court for the District of Columbia for a Report and

Recommendation regarding the disposition of Defendants' Motion to Dismiss Counts III, IV,

[V], VI, VII, IX, X, XI, and XII, pursuant to F.R.C.P. 12(b)(6), and Motion for Summary

Judgment on Counts II, VI, and IX (in the Alternative for Counts VI and IX), pursuant to

F.R.C.P. 56(b), and Motion to Strike Certain Allegations from the Amended Complaint, pursuant

to F.R.C.P. 12(f) ("Mot."), which includes a Memorandum of Points and Authorities in support

of the Motion [11-1]. Defendants' Motion also includes a Statement of Material Facts as to

Which Defendants Contend there is No Genuine Dispute ("SOMF") [11-3].[1] Upon consideration

of the Defendants' Motion and SOMF; Plaintiffs' [consolidated] opposition thereto ("Opp'n.")

---

[1]The title of the Defendants' Motion fails to reference Count V but the discussion contained therein requests that Count V, together with Counts III and IV, be dismissed. Defendants do not move for summary judgment or dismissal of Counts I and VIII. Count I is a claim for medical negligence-personal injury, and Count VIII is a claim for breach of fiduciary obligations.

[13-1], including their Statement of Material Facts at Issue regarding Informed Consent

("Statement") [13-2]; Defendants' [consolidated] reply to the Opposition ("Reply") [14];

Defendants' Response to Plaintiffs' Statement ("Resp.") [15]; and Plaintiffs' Surreply

("Surreply") [16], and for the reasons set forth below, the undersigned recommends that

Defendants' Motion to Dismiss be granted regarding Counts III, IV, V, VI, and VII, and denied

without prejudice regarding Counts IX, X, XI, and XII of the Plaintiffs' Amended Complaint;

Defendants' Motion for Summary Judgment be denied regarding Count II of the Amended

Complaint; and the Motion to Strike be granted regarding Paragraphs 11(o) and 60, and denied

without prejudice regarding Paragraphs 11(c), 11(d), 11(f), 11(h), 11(i), 11(j), 11(k), 11(l), 11(o),

59(b)-(c), 59(h), 60, and 61.[2]

## I. BACKGROUND

In December 1997, Karyn Kerris, daughter of Plaintiffs Felice I. Iacangelo and Cicily

Iacangelo, and wife of Plaintiff Paul Kerris, participated as a member of a control group in a

study at the National Institutes of Health ("NIH"), where she was employed. (Mot. at 3.) As part

of this study, she underwent magnetic resonance imaging ("MRI") and it was consequently

discovered that she had a bithalamic Arteriovenous Malformation ("AVM") in her brain,

measuring between six and seven centimeters in diameter. (Mot. at 3.)

An AVM is a congenital, non-hereditary defect in the vascular system, in which a normal

capillary system does not exist between an artery and a vein, causing arterial blood to pass

---

[2]The undersigned recommends that the fraud claim in Count VI be dismissed without
prejudice.

-2-

directly into the venous system. (Mot. at 2; SOMF ¶3.)[3] Common symptoms of AVM include

hemorrhaging, seizures, headaches, and neurological problems such as paralysis or loss of

speech, memory, or vision, and progressive dementia. (SOMF ¶¶4-5, 8-9.)

Ms. Kerris was told that AVM was a terminal condition and she was referred to

Defendant Georgetown University Hospital ("GUH") for an angiogram. (Mot. at 3; SOMF ¶1.)

Prior to undergoing the angiogram procedure on August 31, 1998, Ms. Kerris executed a Consent

Form. (SOMF ¶¶14-16.) The angiogram confirmed that Ms. Kerris had an AVM of the highest

grade of severity located deep within her brain. (SOMF ¶17.) Ms. Kerris returned to GUH on

November 4, 1998, complaining of slurred speech, headache, decreasing cognitive function, and

other symptoms. (Mot. at 4; SOMF ¶18.) At that time, she underwent another angiogram and

Dr. Vance Watson performed an embolization procedure using a mixture of acrylate and oil-

based contrast.[4] Plaintiffs claim that the substances used were Histoacryl® and Lipiodol®

(Opp'n. at 2-3.)[5] Prior to the embolization procedure, Ms. Kerris signed another Consent Form

_____

[3]When citing to the Statement of Material Facts, the undersigned will not repeat the underlying supporting citations noted in that document.

[4]There are three generally accepted treatment procedures for AVM. First is traditional surgery, in which a surgeon identifies the AVM and ties off or clips the feeder arterial vessels, obliterating the feeder arterial veins and removing the AVM. Second is radiosurgery, in which a surgeon focuses radiation beams at the AVM to injure and clog the AVM. This procedure is usually reserved for small AVMs, less than 3 cm in diameter. Finally, there is endovascular occlusion (also known as embolization), in which vessels to the AVM are blocked using non-surgical means – including balloons, thrombosing (clogging) coils, sclerosing (hardening) drugs, and embolization glue. (SOMF ¶6.)

[5]Defendants do not necessarily concede that this was the particular mixture used (Mot. at 4) but they are willing to accept, for purposes of argument, that this mixture was used, and they present no alternative theory. Histoacryl is the product name of the chemical N-butyl-cyanoacrylate, a polymer glue that is chemically identical to "Super Glue"™; Lipiodol is a

on November 4, 1998. (Mot. at 4; SOMF ¶19.) Ms. Kerris experienced no clinical

complications during this procedure. (SOMF ¶26.)

The Plaintiffs contend that at the time of the embolization procedure, both Histoacryl®

and Lipiodol® were classified as Class III devices by the FDA, and as such were not approved

for medical use in the United States. (Opp'n. at 2-3.) Because of these restrictions, the Plaintiffs

state, Dr. Watson ordered the Histoacryl® from a pharmaceutical distributor in Canada. (Opp'n.

at 3; Am. Compl. ¶16. )[6] Plaintiffs also note that the sole contraindication on the Histoacryl®

packaging states that it should not be used on the surface of the brain, in the nervous system, or

in the blood vessels. (Opp'n. at 4; Am. Compl. ¶18.)

Ms. Kerris underwent a second embolization procedure on January 13, 1999, again

executing a Consent Form prior to the procedure. (SOMF ¶27.) No complications were noted

from the procedure, (SOMF ¶28), but Ms. Kerris's symptoms continued to increase in severity

thereafter. (SOMF ¶29.) Ms. Kerris underwent a third embolization procedure on March 3,

1999, again signing a Consent Form prior to the procedure, and without any complications noted

during the procedure. (SOMF ¶¶29-31.) Ms. Kerris was discharged home on March 17, 1999.

(SOMF ¶32.)

Despite her surgical procedures, Ms. Kerris's health continued to decline and she was

admitted to GUH on several occasions between April 1999 and March 2004, for a variety of

medical problems including aspiration pneumonia, worsening headaches and functional decline,

and abdominal pain. (Mot. at 7.) On August 11, 2005, Plaintiffs Felice and Cicily Iacangelo

---

mixture of poppy seed oil and a radio-opaque material. (Am.Compl.¶3.)

[6]Plaintiffs filed their Amended Complaint on February 14, 2006.

were appointed as Ms. Kerris's guardians by the Circuit Court of Montgomery County. (Am.

Comp. ¶2.)

In October 2005, Plaintiffs filed suit against Defendants for medical malpractice, alleging

that as a direct and proximate result of the Defendants' negligence, Ms. Kerris has suffered

permanent damage to her body, including seizures, ischemia and neurological impairments,

leaving her brain damaged and dysfunctional for the rest of her life.[7] (Am. Compl. ¶12.)

Defendants claim that Ms. Kerris was aware of the risks involved in embolization, but

was sufficiently concerned about the decline in her cognitive functioning to undergo the

embolization procedures. (Mot. at 5.) Plaintiffs, however, contend that the risks of the

procedure were not made clear to Ms. Kerris. What was stated in the discussions between Ms.

Kerris and Dr. Watson is unknown as many of the conversations between the doctor and patient

occurred when only those two persons were present and Ms. Kerris can no longer communicate.

(Mot. at 5.)

Plaintiffs allege that the embolization procedure should have been reviewed and approved

by the Georgetown University Institutional Review Board (IRB). (Opp'n. at 4-6.) Plaintiffs

further allege that the standard consent form used by GUH and Dr. Watson, which did not

mention the types of devices being used in the embolization or their names, the fact that the

devices were procured from Canada, or the fact that the treatment was not approved in the United

States, is insufficient to denote true informed consent. (Opp'n. at 6.)

Plaintiffs also allege that Dr. Watson concealed the illegality of the substances to be used

in the embolization procedures. (Opp'n. at 6.) They state that Dr. Watson misrepresented the

---

[7] Ischemia denotes a shortage of blood supply to an area of the brain.

-5-

effectiveness of the embolization procedure in their presence, saying it had a 95% chance of

success (*Id.*), and that Dr. Watson violated United States law by bringing the substances across

the border.

## II. LEGAL STANDARD

### A. Motion to Dismiss

A court may grant a defendant's motion to dismiss if a plaintiff fails to state a claim upon

which relief could be granted. Fed. R. Civ. 12(b)(6).  "The complaint should not be dismissed

unless plaintiffs can prove no set of facts in support of their claim which would entitled them to

relief." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  In

evaluating a motion to dismiss, a court must construe  the complaint in the light most favorable

to the Plaintiff and give the Plaintiff the "benefit of all inferences that can be derived from the

facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979).  *See Doe v. United

States Department of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985) (The court accepts as true all

of the complaint's factual allegations.)  "However, legal conclusions, deductions or opinions

couched as factual allegations are not given a presumption of truthfulness." *Wiggins v. Hitchens*,

853 F. Supp. 505, 508 n.1 (D.D.C. 1994)(quoting 2A Moore's Federal Practice, §12.07, at 63 (2d

ed. 1986)).

The purpose of a Rule12(b)(6) motion is to test the legal sufficiency of the complaint.

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (U.S. 1974); *Browning v. Clinton*, 292 F.3d 235, 242

(D.C. Cir. 2002).  On a motion to dismiss for failure to state a claim, if the allegations contained

in the complaint, when taken as true, fail to state a claim for which relief may be granted, or

otherwise establish that the complaint faces "some insuperable bar to relief," the motion should

be granted. *Franklin Asaph Limited Partnership v. FDIC*, 794 F. Supp. 402, 404 (D.D.C. 1992).

In resolving a motion to dismiss for failure to state a claim, the Court may be presented with

matters outside the pleadings, and if such matters are not excluded, the motion is then treated as

a motion for summary judgment pursuant to Rule 56. Fed. R. Civ. P. 12(b).

## B. Motion for Summary Judgment

A court should grant summary judgment if the pleadings, depositions, answers to

interrogatories, and affidavits demonstrate that there is no genuine issue of material fact in

dispute and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Tao v. Freeh*, 27 F. 3d 635, 638 (D.C.

Cir. 1994); *Robinson v. Nussbaum*, 11 F. Supp. 2d 8, 9 (D.D.C. 1997). Although a court should

draw all reasonable inferences from the records submitted by the nonmoving party, the mere

existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The adverse party's pleading must demonstrate

the existence of a genuine issue of material fact. *Id*; *Hayes v. Principi*, 284 F. Supp. 2d 40, 45

(D.D.C. 2005). To be genuine, the issue must be supported by sufficiently admissible evidence

such that a reasonable trier of fact could find for the nonmoving party. In determining

materiality, the factual assertion must be capable of affecting the substantive outcome of the

litigation. *See Anderson, supra.*; *see also Laningham v. U. S. Navy*, 813 F. 2d 1236, 1242-43

(D.C. Cir. 1987).

Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an

otherwise proper motion for summary judgment. *Matsushita Electric Industries Co. v. Zenith*

-7-

*Radio Corp.*, 475 U.S. 574, 586 (1986); *Hayes,* 248 F. Supp. 2d at 45.  The nonmoving party

bears the affirmative duty to present, by affidavits or other means, specific facts showing that

there is a genuine issue for trial.  *Anderson*, 477 U.S. at 248-49; *Hudert v. Alion Sci. & Tech.

Corp.*, 49 F. Supp. 2d 99, 109 (D.D.C. 2006).  The adverse party must do more that simply

"show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at

586.

### C. Motion to Strike

Pursuant to Federal Rule of Civil Procedure 12(f), a court may strike any matter that is

"redundant, immaterial, impertinent or scandalous."  Fed. R. Civ. P. 12(f).  A matter is

immaterial or impertinent when it is not relevant to the resolution of the issue at hand.

*Judicial Watch, Inc. v. Dep't of Commerce*, 224 F.R.D. 261, 263 (D.D.C. 2004) (citing *LaRouche

v. Dep't of the Treasury*, Civil Action No. 91-1655, 2000 WL 805214 at *15 (D.D.C. Mar. 31,

2000)).   For purposes of Rule 12, a pleading or portion thereof qualifies as "scandalous" when it

"generally refers to any allegation that unnecessarily reflects on the moral character of an

individual or states anything in repulsive language that detracts from the dignity of the court."  2

Moore's Federal Practice §12.37 [3] at 12-97

### III. ANALYSIS OF CLAIMS

### A. Motion to Dismiss

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss with

prejudice the following Counts of Plaintiffs' Amended Complaint: 1) Count III - Strict Products

Liability; 2) Count IV - Breach of Implied Warranty of Fitness for a Particular Purpose; 3) Count

V - Breach of Express Warranties; 4) Count VI- Fraud; 5) Count VII - Consortium Claim of Paul

Kerris; 6) Count IX - Punitive Damages; 7) Count X - Negligence *Per Se* - Violation of 21

U.S.C. §360c (a)(II) and 21 C.F.R. §812.20(a)(2); 8) Count XI - Negligence *Per Se* - Violation of

21 U.S.C. §331(a), (b), (g), and (k); and 9) Count XII - Negligence *Per Se* - Violation of 21

C.F.R.§812.20(a)(2), for  failure to state a claim upon which relief can be granted.

### 1. Strict Products Liability and Breach of Warranty Claims (Counts III, IV, and V)

The District of Columbia recognizes a cause of action for strict liability in tort based on

the principles of the Restatement (Second) of Torts §402A.  *Hull v. Eaton Corporation*, 825 F.2d

448, 454 (D.C. Cir. 1987).  Defendants acknowledge that strict products liability claims apply to

manufacturers or sellers of a product but contend that such claims are inapplicable to service

providers who incidentally use a product.  *See Word v. Potomac Elec. Power Co.*, 742 A.2d 452,

459 (D.C. 1999) ("[T]o prevail on a claim for strict liability in tort under [Restatement of Torts]

§402A, the plaintiff must prove [*inter alia*] that . . . the seller was engaged in the business of

selling the product that caused the harm. . . .") (quotation omitted).  *See also Brandt v. Sarah

Bush Lincoln Health Center,* 329 Ill. App. 3d 348, 352 (Ill. App. 4 Dist., 2002) (finding that a

person seeking medical care from a hospital purchases services rather than medical supplies or

devices.)

Section 402A provides guidance concerning the three ways in which a product might be

found defective: "(1) by defective design, (2) by defective manufacture, or (3) by failure of the

producer or assembler to warn adequately of a risk related to the way the product was designed."

*Webster v. Pacesetter,* 259 F. Supp. 2d 27, 30 (D.D.C. 2003) (quoting *MacPherson v. Searle and

Co.*, 775 F.Supp. 417, 422 (D.D.C. 1991)(citations omitted)).  Plaintiffs assert that Defendants

have placed at issue their status as manufacturers, by "initiat[ing] the introduction into interstate

commerce of two unapproved devices" [Statement, Fact 21]; "manufactur[ing] Histadol"

[Statement, Fact 22]; and "[being] part of the distribution process" [Statement, Fact 23] with all

such actions contributing to their strict liability and responsibility for warranty claims.[8]

(Statement, Fact 24.)[9]  Plaintiffs further allege that Dr. Watson may be classified as a designer

and/or manufacturer of "Histadol" by way of his procurement of Histoacryl® from Canada, and

the fact that he compounded Histoacryl® with Lipiodol®. (Opp'n. at 15.)  Plaintiffs surmise that

strict liability claims broadly apply to "items in the flow of commerce" and extrapolating from

that statement, they note that "[d]octors holding drugs for use in their practice are clearly one part

of the distribution process, and doctors may therefore hold drugs for sale within the meaning of

[the section]."  (Opp'n. at 13, citing *U.S. v. Evers*, 643 F.2d 1043, 1050 (5th Cir. 1981)).

Defendants distinguish the cases cited by Plaintiffs on grounds that they involve claims

by the Government rather than claims by a private party alleging violations of the Federal Food,

Drug and Cosmetic Act.  The instant case involves claims brought on behalf of a patient against

her physician where the primary purpose of such relationship was not the purchase of medical

supplies or devices, but rather the receipt of medical services.  Dr. Watson, an interventional

neuroradiologist, provided medical services to Ms. Kerris, the patient, relating to treatment of her

AVM, in the form of embolization.  (Amended Complaint ¶¶6, 9.)  Ms. Kerris's relationship with

Defendant GUH was similarly developed for the purpose of her receipt of treatment and health

care services.  (Amended Complaint ¶¶5, 6.)  The provision of the drugs used by Dr.

---

[8]Plaintiffs refer to the combination of Histoacryl® and Lipidodol® as "Histadol," a name
conceived by them.

[9]Plaintiffs' Statement of Material Facts at Issue regarding Informed Consent contains no
citations to the record in this case.

Watson/GUH was incidental to the provision of medical services.[10]

The undersigned recommends that Plaintiffs' claim for strict liability be dismissed for failure to state a claim because the weight of uncontradicted legal authority suggests that courts do not apply this doctrine to a hospital or medical practitioner for injuries caused by medical instruments, drugs or other substances used in treatment. (*See* Mot.at 9-10; Reply at 9-10.)[11] See *e.g., Fisher v. Sibley Memorial Hospital*, 403 A.2d 1130 (D.C. 1979) (wherein plaintiff sought recovery of damages for injuries sustained when she contracted hepatitis after a blood transfusion, the D.C. Court of Appeals affirmed the trial court's directed verdict for the hospital on the theories of strict liability and breach of implied warranty relating to the furnishing of blood, which was considered to be a service rather than a good); *Kozup v. Georgetown University*, 663 F. Supp. 1048, 1059 (D.D.C. 1987), *aff'd in part, vacated in part on other grounds*, 851 F.2d 437 (D.C. Cir. 1987) (extending holding in *Fisher* to blood banks); *North Miami General Hosp., Inc. v. Goldberg*, 520 So.2d 650 (Fla. Dist. Ct. App. 1988) (overturning jury's verdict of strict liability against hospital for injuries suffered as a result of malfunctioning electro-surgical grounding pad and finding that a hospital is not a business within the product's distributive chain but analogous to a consumer employing a product in the course of provision of medical services). See also *In re TMJ Products Liab.Litig.*, 852 F. Supp.1019 (D. Minn. 1995), *aff'd, In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation*, 97 F.3d

---

[10]The undersigned notes that even if Plaintiffs' claim for strict liability is dismissed, Plaintiffs may contest the appropriateness of the combination of drugs used by Dr. Watson in the context of their claim for medical negligence-personal injury [Count I].

[11]Defendants string cite cases holding that doctors and hospitals are not sellers of medical supplies subject to strict liability in relation to such sales.

1050 (8th Cir. 1996)(the incidental sale of a product or device necessary for rendering a medical service does not transform the transaction into one primarily for the sale of goods.)

Defendants contend that claims for breach of warranty and strict liability should be considered together because they are "expressions of a single basic public policy as to liability for defective products." (Mot.at 9, citing *Fisher v. Sibley Hospital*, 403 A.2d 1130, 1133 (D.C. 1979)). *See also MacPherson v. Searle & Co.*, 775 F. Supp. 417, 422 (D.D.C. 1991) (supporting merging implied warranty of merchantability with strict liability for product defect); *Cottom v. McGuire Funeral Service, Inc.*, 262 A.2d 807, 808 (D.C. 1970) ("[T]he current doctrines of implied warranty and strict liability in tort are but two labels for the same legal right and remedy, as the governing principles are identical.") "[H]ealth care providers offer services, not products [and this] determines our holding [dismissing breach of warranty claims] as to issues of warranty under Article II of the U.C.C." *In re Breast Implant Product Liability Litigation*, 503 S.E.2d 445, 553 (S.C. 1998).

In the instant case, Plaintiffs claim that Defendants made warranties, either express or implied, regarding "the medical device 'Histadol'" and its fitness and suitability for the purpose of "being injected and embolizing Karyn A. Kerris' arteriovenous malformation (AVM)." (Amended Complaint ¶¶40, 43.) While the Amended Complaint does allege a breach of warranty regarding the "medical device 'Histadol'" (Amended Complaint ¶¶41, 43), it does not allege a breach of any warranty regarding the procedure utilized, although Plaintiffs now appear to allege that Defendants warranted that the "embolization procedures would be safe and effective" and further, that Dr. Watson warranted that the procedure itself had a "'95%' chance

of success." (Opp'n. at 16, citing Amended Complaint at ¶¶43,44, and Plaintiffs' Affidavits.)[12]

The undersigned finds that both Counts IV and V relate to warranties about the "medical device"

used; i.e., the "Histadol," as opposed to warranties about the procedure selected by Defendants.)[13]

Plaintiffs cite one case in support of their argument that breach of warranty claims

against physicians are recognized under District of Columbia law, *Scarzella v. Saxon*, 436 A.2d

358 (D.C. 1981). Defendants distinguish *Scarzella* on grounds that the physician in that case did

not recall what he told the plaintiff/patient and the patient there was able to testify about

assurances she received that there would be no complications, with neither circumstance existing

---

[12]Paragraphs 43 and 44 of the Amended Complaint contain no references to warranties regarding the procedure selected or representations about the percentage chance of success. Both Count IV and Count V allege warranties relating to the combination of drugs used. Defendants assert that "regardless of whether plaintiffs' breach of warranty claims are deemed to stem from the embolization materials used . . . or under the new allegations of a verbal warranty to Ms. Kerris's parents and husband, Dr. Watson and GUH are deemed not to be sellers under the law . . . ." (Reply at 13.)  *See Foley, supra.*; *Brandt, supra.*; *In re TMJ Products Liab. Litig., supra*; *Brooks v. Vitek, Inc.*, 875 F.2d 499, 500-01 (5th Cir. 1989) (dentist's manipulation of fitted squares of proplast to fit plaintiff's TMJ did not make him a manufacturer; plaintiff's claims were really medical malpractice claims, not products liability claims); *Cafazzo v. Central Medical Healther Servs., Inc.*, 635 A.2d 151, 154-55 ( Pa. Super. 1993) (claims of strict liability will not lie against doctors and hospitals because they are not "sellers").

[13]Defendants argue that even if the trial court were to consider Plaintiffs' assertion that Dr. Watson warranted the procedure, any "verbal warranty" would "need to be proved by statements made to **Ms. Kerris**, and not statements allegedly made to [her] family." (Reply at 13.)  Moreover, Defendants assert that such assertions of warranty are contradicted by the language of the Consent Forms signed by Ms. Kerris, indicating that she had received no guarantees, as well as Dr. Watson's affidavit indicating that he informed Ms. Kerris about risks. Defendants also suggest that it "strains credulity" to imagine that any doctor performing an embolization procedure on a patient who had a large ATV embedded in her brain, and was experiencing symptoms such as dementia, would state that there was a 95% success rate. (Reply at 12, n.4.) If the trial court were to consider such matters outside the pleadings, the motion to dismiss Counts IV and V would, in effect, be converted to a motion for summary judgment. Fed. R. Civ. P. 12(b).

-13-

in the instant case.  *See id.* at 359-360.  To prove a breach of warranty claim, a plaintiff must

demonstrate that the physician "clearly and unmistakably [gave] a positive assurance [that he

would] produce or . . . avoid a particular result or results in treating the patient."  *Scarzella* at 362

(quoting trial court's instruction).  Because Ms. Kerris is incapacitated and incompetent to testify

on her own behalf (Amended Complaint ¶¶12-13), Plaintiffs are unable to prove that Dr. Watson

made any positive assurance to Ms. Kerris or that she relied upon such assurance in deciding to

go forward with medical treatment.[14]  Furthermore, the weight of authority suggests that because

doctors and hospitals primarily provide medical services as opposed to medical supplies or

devices, the theories of strict liability and breach of warranty are inapplicable.  The undersigned

accordingly recommends that Plaintiffs' strict products liability and breach of  warranty claims

[Counts III, IV, and V] be dismissed for failure to state a claim.

## 2. Fraud (Count VI)

Count VI of Plaintiffs' Amended Complaint alleges a claim for fraud, asserting that Dr.

Watson "made and/or fraudulently withheld material representations of material facts which were

false and or the falsity of what was known or should have been known . . . ." (Am. Comp. ¶¶47-

53.)  Defendants move to dismiss the fraud claim on grounds that Plaintiffs do not plead with

particularity the following essential elements: "(1) a false representation (2) in reference to a

material fact, (3) made with knowledge of falsity, (4) with the intent to deceive, and (5) action

[which] is taken in reliance upon the representation."  *Va. Acad. of Clinical Psychologists v.*

---

[14]Defendants again point to the Consent Forms signed by Ms. Kerris as "[t]he only
evidence from the patient that is present or can even be present in the record, [showing] that
plaintiff-patient Ms. Kerris was given no guarantees." Reply at 14.  Consideration of these
portions of the record would convert this motion to dismiss the warranty claims into a motion for
summary judgment.

*Group Hospitalization & Med. Servs.*, 878 A.2d 1226, 1233 (D.C. 2005). "Allegations in the

form of conclusions on the part of the pleader as to the existence of fraud are insufficient." (Mot.

at 14, citing *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992) (quotations

omitted)).

Defendants concede that either active misrepresentation, nondisclosure or silence may

constitute fraud (Mot. at 14), but they assert that because Ms. Kerris is incapacitated and

incompetent, Plaintiffs may only speculate that Dr. Watson did not advise Ms. Kerris about

material facts in light of the fact that there were many discussions between Ms. Kerris and her

doctor, not all of them when Ms. Kerris's parents or husband were present. (*Id.*) Because Ms.

Kerris is brain damaged and cannot communicate, there is no way to ask her what occurred in

those meetings. (*Id.*) The Defendants further state that there is only "one conclusory allegation,"

in the Amended Complaint [at ¶49], that Dr. Watson's statements were made for the purpose of

defrauding Ms. Kerris (Mot. at 15) and Plaintiffs proffer no reason as to why Dr. Watson would

want to defraud Ms. Kerris by convincing her to submit to a particular procedure. (Reply at 15.)

Plaintiffs fail to proffer any opposition to Defendants' assertions that they have not pled

the elements of a fraud claim with the requisite specificity. (*See* Opp'n. at 17-18 (merely stating

that "Count VI contains . . . adequate allegations to stand on its own")). To the contrary, the

undersigned finds that Defendants' claim of fraud fails to state a claim because Plaintiffs cannot

meet their burden of proof to show that Dr. Watson made false representations of material fact

upon which Ms. Kerris relied. Nor have Plaintiffs proffered any substantiation for their claim

that Dr. Watson's actions were taken with the purpose of defrauding Ms. Kerris. For these

reasons, the undersigned recommends that Plaintiffs' claim of fraud [Count VI] should be

dismissed for failure to state a claim, but that such dismissal be without prejudice.[15]

### 3. Loss of Consortium (Count VII)

Count VII of the Plaintiffs' Amended Complaint [¶¶54-55] is a claim for loss of consortium by Ms. Kerris's husband, Plaintiff Paul Kerris.  Defendants argue that the statute of limitations expired regarding this particular claim (Mot. at 12; Reply at 17) and that it should therefore be dismissed under Fed. R. Civ. P. 12(b)(6).  Plaintiffs, in their Opposition, argue that a consortium claim may be tolled during the spouse's infirmity, because "strong equitable considerations might mitigate against application of [a strict rule]."  (Opp'n. at 18, citing *McKracken v. Walls-Kaufman*, 717 A.2d 346, 355, n.9 (D.C. App. 1998) (quoting *Taylor v. Houston*, 93 U.S. App. D.C. 391, 392, 211 F.2d 427 (1954)).  The *Taylor* court found that such considerations should only be taken into account "where the disability arises a very short time after the injury and persists throughout the entire limitation period." 211 F.2d at 428.

In *Taylor*, the plaintiff [appellant] alleged that defendants' assault upon him caused him to become mentally incompetent, beginning shortly after the assault and continuing for seven months thereafter, leaving five months remaining before the statute of limitations expired. The defendants moved to dismiss the claim for failure to state a claim and the trial court granted the motion.  The appellate court upheld the decision, determining that a five month period of time was too long to wait before filing suit. *Taylor v. Houston*, *id.*  In contrast, the disability that Ms. Kerris attributes to the actions of the Defendants accrued gradually (as opposed to shortly after

---

[15]Plaintiffs state that Count VI [Fraud] is independent of any issues of Count II [Informed Consent], although Defendants have asked the court to dismiss the fraud claim if the informed consent claim is dismissed, reasoning that  the allegations in these claims are "virtually identical." (Reply at 16.)   The undersigned will address these two claims separately.

her injury) and her decline continued after treatment; however, her parents [guardians] did not

file this lawsuit until several years after Ms. Kerris underwent her third embolization. Equitable

considerations therefore would not apply.

Furthermore, the *McKracken* court noted that a derivative claim for loss of consortium by

a spouse or parents is not subject to the tolling of a statute of limitations. 717 A.2d at 355. Even

if Ms. Kerris's infirmity may have tolled the statute of limitations in terms of the claims brought

by her parents on her behalf, the statute was not tolled on Mr. Kerris's cause of action, as a

derivative claim. Accordingly, any tolling of the statute of limitation for Ms. Kerris does not

affect Mr. Kerris's claim, and the undersigned recommends that Count VII [Loss of Consortium]

should be dismissed.

### 4. Punitive Damages (Count IX)

_____Defendants move to dismiss Plaintiffs' punitive damage claim, arguing that because

punitive damages are generally only available "in actions arising from intentional torts, not torts

of negligence" (Mot. at 15 (citations omitted)) and the only intentional tort claim brought by

Plaintiffs' is their punitive damages claim; accordingly, if the fraud claim fails, the punitive

damages claim should also fail.[16] Defendants further assert that "plaintiffs make no showing of

evil motive or actual malice or even facts from which an inference of such motive could be

drawn . . . ." (Mot. at 17.) Plaintiffs proffer a one-line opposition to the dismissal of their

punitive damages claim, incorporating by reference their argument regarding their breach of

expressed warranty claim, including the fact that Dr. Watson allegedly made representations that

---

[16]The undersigned has recommended that the Plaintiffs' claim for fraud be dismissed
without prejudice.

the embolization had a "'95%' chance of success." (Opp'n. at 16.) The undersigned notes that a

request for dismissal of punitive damages is premature because Plaintiffs' ability to pursue

punitive damages is directly dependent on the evidence that is put before the jury at trial.

Accordingly, the Defendants' request for dismissal of Plaintiffs' punitive damages claim [Count

IX] should be denied without prejudice for Defendants to raise this request in the form of a

motion *in limine*.

### 5. Statutory and Regulatory Violations (Counts X, XI, and XII)

Plaintiffs' Amended Complaint alleges that Defendants violated sections of the United

States Code and the Code of Federal Regulations as follows: Count X - Negligence *Per Se* -

Violation of 21 U.S.C. § 360c (a)(II) and 21 C.F.R. Ch. 1 § 812.20 (a)(2); Count XI - Negligence

*Per Se* - Violation of 21 U.S.C. § 331 (a), (b), (c), (g), and (k); and Count XII - Negligence *Per*

*Se* - Violation of 21 C.F.R. § Ch. 1 812.20(a)(2)[17] Plaintiffs argue that Defendants violated these

federal statutes by using substances classified as Class III devices under the Food, Drug, and

---

[17] Histoacryl® and Lipiodol® were Class III devices. (Amended Complaint ¶67.) A
Class III device is one which cannot be classified as Class I or Class II because "insufficient
information exists ... to provide reasonable assurance of the safety and effectiveness of the
device," among other concerns. 21 U.S.C. § 360c (a)(1)(C)(I). According to Plaintiffs, "[t]he
only acceptable process by which Class III devices can be marketed in the United States is by an
approved application to the FDA, known as an application to obtain premarket approval (PMA)."
(Amended Complaint ¶69; *see* 21 U.S.C. §360c(a)(II).) Furthermore, "[t]he only exemption
which allows a physician and/or hospital to treat a patient with a Class III device is an
investigational device exemption (IDE)." (Amended Complaint ¶71; *see* 21 C.F.R. Ch.
1§360j(g)(1).) Pursuant to 21 C.F.R. Ch. 1§812.20(a)(2), a physician or institution must become
a "sponsor" and "submit an application to FDA" to obtain an IDE. (Amended Complaint ¶72.)
21 U.S.C. §331 entitled "Prohibited Acts" discusses violations of the statute revolving around
adulteration or misbranding of drugs or devices. (Amended Complaint Count XI.)
21 C.F.R. §Ch. 1 812.20(a)(2), discussing investigational device exemptions, states that "[a]
sponsor shall not begin an investigation for which FDA's approval of an application is required
until FDA has approved the application." (Amended Complaint ¶91.)

Cosmetic Act ("FDCA"), by "adulterating" these substances, "misbranding" them, introducing

them into interstate commerce, and ignoring the medical contraindications on the packaging.

(Am. Compl. ¶¶ 20-24.) Plaintiffs also argue that Defendants violated the statutes by failing to

apply for an Investigational Device Exemption ("IDE") with the Food and Drug Administration

("FDA"). (Opp'n. at 21.)  Plaintiffs claim that Defendants do not qualify for an exemption from

FDA regulation under either 21 U.S.C. §360(g)(2) or (g)(3) "when the device in question is not

lawfully available in the United States and is not FDA-approved." (Opp'n. at 19.)[18]

Defendants assert that "Plaintiffs may not bring claims based upon alleged violations of

21 U.S.C. §§ 331, 360 or 21 C.F.R. §812.20(a)(2) - the federal statutes and regulation they cite"

because there is no private right of action.  (Reply at 1.)  *See* 21 U.S.C. §337 (stating that "[a]ll

such proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the

name of the United States.")  *See also International Union of Bricklayers and Allied*

*Craftworkers v. Insurance Co. of the West*, 366 F. Supp.2d 33, 39 n.4 (D.D.C. 2005)

(finding that private party claims based on alleged violations of the FDCA are impermissible);

*Pediamed Pharmaceuticals, Inc. v. Breckenridge Pharmaceutical, Inc.*, 419 F. Supp. 2d 715,

---

[18]This argument responds to Defendants' assertion that the "statutes upon which plaintiffs base their [statutory] claims contain exemptions for individuals who are 'practitioners licensed by law to prescribe or administer drugs or devices and who manufacture, prepare, propagate, compound, or process drugs or devices solely for use in the course of their professional practice,' such as Dr. Watson." (Mot. at 24; *see* 21 U.S.C. §360 (g)(3).)  Defendants contend that Dr. Watson and his method of treating Ms. Kerris fall under several exceptions to the FDCA because he was a medical practitioner using his skill and judgment in treating a patient, and because the FDCA does not apply to custom devices intended for use by an individual patient, nor does it apply to devices not introduced into interstate commerce, and Defendants argue that they had no intention of marketing or selling this device.  Defendants further argue that the FDA does not regulate medical treatment and that practitioners may employ or prescribe products for unapproved uses. (Mot. at 17-20.)

723-24 (D. Md. 2006) (holding that the FDCA does not create or imply a private right of action

for individuals injured as a result of violations of the Act).[19]

The text of the FDCA states that all proceedings brought under the law "shall be by and

in the name of the United States," the only exception being that a state may bring a suit under this

title with the permission of the federal government.  21 U.S.C.A. § 337(a)-(b).  The District of

Columbia has affirmed this rule, stating that "Congress considered but rejected the propriety of

setting up a nationally uniform law for such  private damage causes of action." *Consumer*

*Federation of America v. Upjohn Company*, 346 A.2d 725, 731 (D.C. App. 1975).  Plaintiffs,

being private citizens, accordingly have no private right of action based on violations of these

regulations.

Plaintiffs regard "[t]he issue of a private right of action in the FDCA [as] irrelevant."

(Surreply at 2.)  Plaintiffs explain that they are employing the statutes and violations thereof not

to imply a private cause of action, but instead to demonstrate negligence *per se* on the part of the

Defendants.  (*Id.*)  The accepted rule in the District of Columbia is that "where a particular

statute or regulatory standard is enacted to protect the persons in that plaintiff's position... an

unexplained violation of that standard renders the Defendant negligent as a matter of law."

*See Chadbourne v. Kappaz*, 779 A.2d 293, 295 (D.C. App. 2001) (citing *Ceco Corp. v. Coleman*,

441 A.2d 940, 945 (D.C. 1982) (quotation omitted)).  *See also Zhou v. Jennifer Mall Restaurant*,

534 A.2d 1268, 1273 (D.C. App. 1987) (A negligence *per se* jury instruction is applicable where

there is a statute or regulation designed to protect persons in plaintiff's position; plaintiff can

---

[19]Defendants note that the cases cited by Plaintiffs in support of these claims involved
suits brought by the government.  (Reply at 2.)

-20-

establish that the statute or regulation applies to him; and defendant has not put forth evidence

excusing violation of the statute or regulation.)  In such cases, a plaintiff may rely on a statute as

proof that the Defendant breached the applicable standard of care.  *McNeil Pharmaceuticals v.*

*Hawkins*, 686 A.2d 567, 578 (D.C. App. 1996).  Even with negligence *per se*, plaintiff, however,

still bears the burden of proof of causation [and damages].  *Twyman v. Johnson*, 655 A.2d 850,

852-53 (D.C. 1995); *accord, Otis Elevator Co. v. Tuerr*, 616 A.2d 1254, 1259 (D.C.1992).

In cases of technical statutory violations, if the Defendant puts forth evidence excusing

[or "explaining"] the violation, then the violation may be considered as evidence of negligence,

rather than negligence *per se.  McNeil*, 686 A.2d at 578; *Chadbourne*; 779 A.2d at 295.  *See also*

*Hecht Co. v. McLaughlin*, 214 F.2d 212, 213-14 (D.C. App. 1954) (excusing violation of safety

regulations regarding a store door because the installation had been approved by public and

architectural authorities).  The District of Columbia considers such violations excused if the

Defendant can demonstrate that he or she has done "everything a reasonable person would do" to

avoid the violation.  *McNeil, supra.*

The District of Columbia has permitted individual plaintiffs to use statutes to prove a

violation of the standard of care in cases where there is no private right of action. In the instant

case, Defendants did not argue that Plaintiff's statutory claims were barred because of lack of

private cause of action until they filed their Reply and accordingly, Plaintiffs did not indicate

their intention to use the statutory violations under a negligence *per se* theory until they filed

their Sur-Reply.  Defendants therefore did not have an opportunity to respond to the negligence

*per se* argument.  "Before admitting statutes and regulations offered for negligence *per se*

purposes, a trial judge must examine each law to determine first, whether it in fact established a

standard of care, and if so, whether it could be reasonably understood by the jury without expert

testimony or guidance by the court." *McNeil Pharmaceutical v. Hawkins*, 686 A.2d 567, 581

(footnote and citation omitted.) *See also District of Columbia v. Brown*, 589 A.2d 384, 386-87

(D.C. 1991) (A trial court errs if it allows a jury to determine the purpose of a statue in the

negligence *per se* context.)  During the September 8, 2006 hearing, counsel for Defendants here

suggested that the statutory violation claims may be more appropriate for resolution through

motions *in limine*.[20]  The undersigned thus recommends that dismissal of Plaintiffs' statutory

claims [Counts X, XI, and XII] should be denied without prejudice as premature.

### B. Motion for Summary Judgment

### 1. Lack of Informed Consent (Count II)

Plaintiffs allege that Ms. Kerris would not have consented to the embolization procedures

had she been informed of various factors such as "a full description of the risks and benefits of

the proposed treatment" and "the availability of alternative devices and/or treatments."  (Am.

Compl. ¶22.)  "To prevail on an informed-consent theory, the plaintiff must establish that if she

had been alerted to the material risk, she would not have consented to the surgery, and that the

surgery caused her injury." *Dorn v. McTigue*, 157 F. Supp. 2d 37, 45 (D.D.C. 2001).  Defendants

assert that even if Plaintiffs could show what Dr. Watson told Ms. Kerris, they have no evidence

whether she would have withheld her consent for the procedures.  (Reply at 6.)[21]  "The test for

---

[20]Assuming the trial court finds that one or more of the statutes was enacted to protect persons such as Plaintiffs, there would still be a question of whether a jury instruction on negligence *per se* or evidence of negligence is appropriate.

[21]The views of a patient and their family do not necessarily coincide and therefore, evidence of the family may not be substituted for evidence of the wishes of a patient. *Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 286 (1990).

assessing the materiality of any given information is whether '[a] reasonable person in what the

physician knows or should know to be the plaintiff's position would be likely to attach

significance to the risks in deciding to accept or forego the proposed treatment." *Gordon v.*

*Neiviaser*, 478 A.2d 292, 294 (D.C. 1984) (citing *Crain v. Allison*, 443 A.2d at 562) (citation

omitted)). *See also Canterbury v. Spence*, 464 F.2d 772, 786 (D.C. Cir. 1972) ("Once the

circumstances give rise to a duty on the physician's part to inform his patient, the next inquiry is

the scope of the disclosure . . . [and while] [t]he courts have frequently confronted this problem

[,] no uniform standard defining the adequacy of the divulgence emerges from the decisions.")

Plaintiffs' assertion that Ms. Kerris did not give her informed consent is directly

contradicted by the record evidence submitted by Defendants, in the form of an Affidavit by Dr.

Watson (Mot., Exh. 8) and four Consent Forms (Mot., Exhs. 4, 6, 10, 15) executed by Ms.

Kerris. Dr. Watson's Affidavit establishes that he had "several discussions with [Ms. Kerris]

without any other person present as to all material facts, complications, prognosis, alternative

treatments, the nature of the procedure, . . . ." (Mot. at 29; *See* Exh. 8 [Dr. Watson Affidavit]

¶¶ 5-6, 8-9, 11-17, 19-20, 23, 26.) At the time of the embolizations, Ms. Kerris was fully

competent and working at NIH. (SOMF ¶1.)

Plaintiffs proffer three virtually identical affidavits to attempt to contradict Dr. Watson's

sworn assertions that he informed Ms. Kerris about the risks of the surgery and alternative

treatments. Plaintiffs do not however testify as to what information Ms. Kerris received but

instead, they attempt to prove a negative by asserting that "Vance E. Watson, M.D. did not have

any meetings with [Ms. Kerris] where a member of the family was not present, prior to the

embolizations." (Opp'n., Exhs. 2 [Felice Iacangelo Affidavit], 3 [Cicily Iacangelo Affidavit], 4

-23-

[Paul Kerris Affidavit] at ¶3.)[22]   These Affidavits also "attest" to the fact that Dr. Watson did not

tell Ms. Kerris about "the nature of the devices to be used; their unapproved Class III status, . . ."

(Opp'n. at 9.)

Defendants' argument on informed consent relies on *Blincoe v. Luessenhop*, 669 F. Supp.

513 (D.D.C. 1987), a case factually on point with the instant proceeding, where the court entered

summary judgment on plaintiffs' lack of informed consent claim.  In *Blincoe*, the patient suffered

from AVM and was experiencing problems with speech and gait before she entered Georgetown

University Hospital for a series of embolizations.  *Id.* at 514.  Defendants in that case submitted

signed consent forms and an affidavit from the treating physician as evidence of routine

discussions the treating physician had with patients regarding embolization procedures.  *Id.* at

517. The *Blincoe* court noted that plaintiff failed to meet her burden of producing some evidence

to show that she did not give her informed consent.  In that case, plaintiff's husband was not

present during critical discussions and plaintiff had no independent recollection of the events

between her admission to the hospital and completion of her first procedure.  *Id.* at 517-18.

Plaintiffs attempt to distinguish this case from *Blincoe* based on the allegations in their

affidavits but, as already noted, such affidavits are deficient to affirmatively prove that Ms.

Kerris did not give her informed consent, particularly in light of the four Consent Forms she

signed.[23]   The Consent Forms state that the patient acknowledges that "Dr. Vance Watson has

---

[22]While Defendants may be unaware that any such meetings took place, only Dr. Watson and Ms. Kerris know whether there were meetings that did not involve any other person.

[23]Defendants assert that, because Ms. Kerris is incompetent, "the only evidence that there will ever be in the record is that Dr. Watson fully disclosed all material facts about the procedures [,]" based on his affidavit and the Consent Forms executed by Ms. Kerris.  (Mot. at 22.) During the September 8, 2006 hearing, Plaintiffs directed the undersigned's attention to the

-24-

described the nature of this procedure to me in terms which I understand and has answered all questions I have asked about it to my satisfaction.  He has also explained significant complications and risks which may be associated with this procedure. . . ." (Mot., Exhs. 4, 6, 10, 15.)  The Consent Forms further state that the patient "acknowledge[s] that no guarantees have been made [to her] as the result of treatments or examination in the hospital." (*Id.*)

Plaintiffs also argue that the Consent Forms used by Defendants were insufficient for purposes of obtaining informed consent relative to "an unapproved procedure employing an unapproved Class III device." (Opp'n. at 11.)  Plaintiffs contend that the Defendants should have employed a specialized consent form approved by Georgetown University's Institutional Review Board ("IRB") requiring eight elements of  informed consent. (*See id.*)  Defendants contend that use of this specialized consent form is applicable in cases involving research studies and clinical investigations, whereas in this case, Ms. Kerris received medical treatment at Georgetown University Hospital and there was no research study or clinical investigation being performed.  Plaintiffs allege however that the use of the combination of drugs selected was "experimental" and not "approved by Georgetown University Hospital's IRB, . . . . " (Amended Complaint ¶20.)  Plaintiffs also proffer that "hospitals and practitioners may not use any Class III (unapproved) device without a valid Investigational Device Exemption (IDE) or Premarket Approval (PMA) issued by the FDA . . . ." and that using the combination of two unapproved Class III devices . . .

_____

March 3, 1999 Consent Form mentioned in Paragraph 26 of the Dr. Watson Affidavit, wherein Dr. Watson states that "Ms. Kerris acknowledged that I had satisfactorily explained the procedure, all material aspects, . . . ." (Mot., Exh. 8.)  That Consent Form states that the procedure and its risks were explained to Ms. Kerris by Dr. Paul Goldberg, as opposed to Dr. Vance Watson.  This does not preclude the fact that Dr. Watson may have spoken to Ms. Kerris prior to the third embolization procedure.  Plaintiffs do not raise this contention as a material fact in dispute.

without FDA approval "violat[ed] . . . the FDCA and [ ] Georgetown University's own

Institutional Review Board Policies & Procedures. . . ." (Opp'n., Exhs. 8,9 [Affidavits of Dr. Van

Woert and Dr. Kaufman] at ¶¶5-6.)   Drs. Van Woert and Kaufman opine that the Defendants'

"general 'consent' forms . . . failed to provide [Ms.] Kerris with proper informed consent . . . "

and the affiants elaborate on the ways in which the forms are "deficient."  (Opp'n., Exhs. 8, 9 at

¶11.)[24]  The undersigned finds that while there is no dispute that Ms. Kerris executed Consent

Forms prior to each medical procedure and further, that Dr. Watson is the only witness who is in

a position to affirm the substance of all conversations between himself and Ms. Kerris, Plaintiffs

have however raised a genuine issue of material fact regarding the adequacy of the Consent

Forms that were used.   The undersigned therefore recommends that summary judgment be

denied on the issue of informed consent [Count II].

### C. Motion to Strike

Under Fed. R. Civ. P. 12(f), which permits the court to strike "from any pleading any

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter, Defendants

move to strike fourteen paragraphs from the amended complaint: Paragraphs 11(c), 11(d), 11(f),

11(h), 11(i), 11(j), 11(k), 11(l), 11(o), 59(b)-(c), 59(h), 60, and 61.  Twelve of the contested

paragraphs involve FDA statutes and regulations, and Defendants argue that such regulations are

inapplicable to this case.  Defendants also contest the use of the word "illegal" with reference to

the substances used in the embolization procedure.  (Mot. at 29-30.)  Plaintiffs contend that these

regulations are, in fact, relevant and that there is nothing "impertinent" or "scandalous" about

---

[24]Defendants note that the Affidavits discuss FDA requirements that are irrelevant
because the FDCA does not create a private cause of action.  This may however relate to
Plaintiffs' claims that violations of certain statutes and regulations indicate negligence *per se*.

calling the devices "illegal," a term to which Defendants object. (Opp'n at 24.) The undersigned

has recommended that a determination of the applicability of statutes and regulations and

whether the Plaintiffs can use any violations thereof as evidence of negligence or negligence *per*

*se* is a matter that is left to the trial court. Accordingly, it is also recommended that the motion to

strike any paragraphs relating to enforcement of statutes and regulations be denied without

prejudice as premature.[25]

Defendants also move to strike paragraph 11(o), arguing that the doctrine of *res ipsa*

*loquitur* does not apply to complex medical malpractice cases.[26] *See Blincoe*, 669 F. Supp. at

516 ("*Res ipsa loquitur*, however, only applies to the consequences of professional treatment if

such consequences would not ordinarily occur in the absence of the allegedly culpable conduct.")

(citation omitted). The undersigned recommends that Defendants' motion to strike be granted

regarding Plaintiffs' allegation of *res ipsa loquitur*, on grounds that Plaintiffs must adduce

medical proof of causation in this complex medical malpractice case.

Defendants move to strike paragraph 60 on grounds that it contains "impertinent and

scandalous matter" as to what the Plaintiffs believe Dr. Watson's duties to his co-Defendant were

in this case. (Mot at 30.)[27] Plaintiffs argue that the question of whether Dr. Watson breached his

fiduciary duty to his co-Defendant, GUH, is material to this case and is therefore relevant

---

[25]This includes the motion to strike paragraphs: 11(c), 11(d), 11(f), 11(h), 11(I), 11(j), 11(k), 11(l), 59 (b)-(c), 59(h), and 61.

[26]Paragraph 11(o) states: "Plaintiffs may also rely on *res ipsa loquitur*."

[27]Paragraph 60 states that: "Defendant Vance E. Watson, M.D., breached his fiduciary duties with Co-Defendant Georgetown University Hospital, by *inter alia*: a) Failing to notify the hospital that the United States Government had issued a trade alert regarding cyanoacrylate to stop its importation into the United States of America . . . ." (containing subparts (a) through (g).)

evidence. (Opp'n at 25.) Plaintiffs proffer no support for this assertion and on its face, the

undersigned finds the while the breach of any fiduciary duty owed *to Plaintiffs* is at issue in this

case, the breach of any fiduciary duty *between co-Defendants* is impertinent and immaterial, as

well as being repetitive with allegations made in connection with the medical malpractice claim.

The undersigned therefore recommends that paragraph 60 be stricken in its entirety.

## IV. RECOMMENDATION

The undersigned recommends that the Defendants' Motion to Dismiss be granted

regarding the following Counts of Plaintiffs' Amended Complaint: Count III - Strict Products

Liability; Count IV - Breach of Implied Warranty of Fitness for a Particular Purpose; Count V -

Breach of Express Warranty; Count VI - Fraud; and Count VII - Consortium Claim of Paul

Kerris; and that the dismissal of Count VI should be without prejudice. The undersigned

recommends that the Defendants' Motion to Dismiss be denied without prejudice regarding

Count IX - Punitive Damages, and Counts X, XI, and XII of the Plaintiffs' Amended Complaint,

alleging violations of certain statutes and regulations. The undersigned recommends that

Defendants' Motion for Summary Judgment be denied regarding Count II - Informed Consent.

The undersigned further recommends that the Defendants' Motion to Strike be granted

with regard to Paragraphs 11(o) and 60, and denied without prejudice regarding Paragraphs

11(c), 11(d), 11(f), 11(h), 11(i), 11(j), 11(k), 11(l), 11(o), 59(b)-(c), 59(h), 60, and 61.

## V. REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the

United States District Court for the District of Columbia, any party who objects to the Report and

Recommendation must file a written objection thereto with the Clerk of this Court within 10 days

-28-

of the party's receipt of this Report and Recommendation.  The written objections must

specifically identify the portion of the report and/or recommendation to which objection is made,

and the basis for such objections.  The parties are further advised that failure to file timely

objections to the findings and recommendations set forth in this report may waive their right of

appeal from an order of the District Court that adopts such findings and recommendation.  *See*

*Thomas v. Arn*, 474 U.S. 140 (1985).  If this Report and Recommendation is served on the parties

by mail, calculation of the time period for filing written objections is as follows: 10 business days

(excluding weekends and holidays) plus three calendar days (including weekends and holidays).

*See CNPq-Conselho Nacional De Desenvolvimento Cientifico e Technologico v. Inter-Trade,*

*Inc.*, 50 F.3d 56, 58 (D.C. Cir. 1995) (*per curiam*).


DATED: October 11, 2006                          _____ /s/_____
                                                                            ALAN KAY
                                                                            UNITED STATES MAGISTRATE JUDGE

-29-