00001
1
1        UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF COLUMBIA
3
4    -------------------------x
4                          :
5    FELICE I. IACANGELO,    :
5    et al.              :
6                          :
6            Plaintiffs   :
7                          : Case No.
7      vs.              : 1:05CV02086
8                          : Judge Friedman
8    GEORGETOWN UNIVERSITY,   :
9    t/a Georgetown University :
9    Hospital, et al.      :
10                          :
10            Defendants   :
11                          :
11    -------------------------x
12
12                Washington, D.C.
13                March 27, 2007
14    Videotaped Deposition of:
15        VANCE E. WATSON, M.D.,
16    called for oral examination by counsel for
17    Plaintiffs, pursuant to notice, at the offices
18    of Williams & Connolly, 725 12th Street, N.W.,
19    Washington, D.C., beginning at 10:22 a.m.,
20    before Zev V. Feder, CSR, a Notary Public in
21    and for the State of Maryland, when were
22    present on behalf of the respective parties:

00002
 1
 2    On behalf of the Plaintiffs:
 3    Newman, McIntosh & Hennessey
 3    By:  ANTHONY G. NEWMAN, ESQ.
 4    By:  WENDY WYETH, ESQ.
 4      7315 Wisconsin Avenue, Suite 700E
 5      Bethesda, Maryland  20814
 5      (301) 654-3400
 6
 6       - and -
 7
 7    Joseph, Greenwald & Laake
 8    By:  ANDREW E. GREENWALD, ESQ.
 8      6404 Ivy Lane, Suite 400
 9      Greenbelt, Maryland  20770
 9      (301) 220-2200
10
10
11    On behalf of the Defendants:
11
12    Williams & Connolly
12    By:  MEGAN E. HILLS, ESQ.
13    By:  NICOLAS MUZIN, Esq.
13      725 12th Street
14      Washington, D.C. 20005
14      (202) 434-5393
15
15
16    Also Present:
17      Scott Preston, Videographer
18           + + +
19
20
21
22

00003

1
2                   C O N T E N T S
3    WITNESS:  VANCE E. WATSON, M.D.
4    EXAMINATION BY:                    PAGE
5    MR. NEWMAN                     5
6    MS. HILLS                      -
7
8                   EXHIBITS
9    DEPOSITION NO.      MARKED FOR IDENTIFICATION
10    1.  Declaration of Vance E. Watson, M.D.   16
11    2.  Histoacryl package insert          44
12
13
14
15
16
17
18
19
20
21
22

00004

1
2          P R O C E E D I N G S
3          VIDEOTAPE OPERATOR:  Good morning.
4    This is the video deposition of Dr. Vance E.
5    Watson, M.D., taken by counsel for the
6    plaintiff in the matter of Felice I.
7    Iacangelo, et al. versus Georgetown University
8    Hospital, et al., in the United States
9    District Court for the District of Columbia,
10   Case Number 105CV02086.  The deposition is
11   held today in the offices of Williams &
12   Connolly at 725 12th Street, Northwest,
13   Washington, D.C., 20005 on March 27, 2007 and
14   at approximately 9:18 -- I'm sorry, 10:18 in
15   the morning.
16          We will go by the time code on
17   this because we have changed time.
18          My name is Scott Preston.  I am
19   the video specialist.  The court reporter
20   today is Zev Feder from the firm of Feder
21   Reporting.  Counsel will now introduce
22   themselves.

00005
1          MR. NEWMAN:  Anthony Newman on
2     behalf of the plaintiff.  Joining with me is
3     Andrew Greenwald and Wendy Wyeth.
4          MS. HILLS:  Megan Hills on behalf
5     of all defendants, including Dr. Watson.  And
6     with me is Nicolas Muzin, also with the firm
7     of Williams & Connolly.
8          VIDEOTAPE OPERATOR:  You may now
9     swear in the witness.
10     Whereupon,
11          VANCE E. WATSON, M.D.
12     was called for examination by counsel and,
13     having been duly sworn by the Notary, was
14     examined and testified as follows:
15     EXAMINATION BY COUNSEL FOR PLAINTIFFS
16          BY MR. NEWMAN:
17     Q.   Would you state your full name for
18     the record?
19     A.   Vance Emory Watson.
20     Q.   You are a medical doctor?
21     A.   Correct.
22     Q.   If I understand, you are board

00006
1   certified in a specialty.  What specialties
2   are you board certified in?
3        A.   Radiology.
4        Q.   Is there any particular training
5   for interventional neuroradiology at the
6   present time that results in any kind of
7   certificate or certification?
8        A.   Rephrase the question.
9        Q.   Isn't there presently a process by
10  which people can become certified in
11  interventional neuroradiology?
12       A.   There is no special added
13  qualification at the current time.
14       Q.   There is actually, though,
15  criteria and a process by which one takes
16  courses and becomes certified in
17  interventional radiology, isn't there, at the
18  present time?
19       A.   No, there is not.
20            MS. HILLS:  I think the problem,
21  counsel, is your word certified.
22            THE WITNESS:  Yes.

00007
1         MS. HILLS:  I think the doctor is
2    trying to answer your question but I think you
3    are misusing the term, certified or
4    certification.  Perhaps that's why the doctor
5    asked you to rephrase.
6         MR. NEWMAN:  Thank you, counsel.
7    But I would ask that there be no speaking
8    objections on the record.  You may object to
9    it and I will clarify.
10        BY MR. NEWMAN:
11        Q.   Doctor, let me ask you this.  Is
12   there any course right now in interventional
13   radiology beyond that which is taken in
14   straight radiology?  Any curriculum?
15        A.   The words you are using are not
16   correct in any way I understand.  Fellowships.
17   There is additional training available.
18        Q.   And the fellowship results in the
19   certification, is your testimony?
20        MS. HILLS:  Objection.  Vague.
21        BY MR. NEWMAN:
22        Q.   What happens at the end of the

00008
1   fellowship?
2        A.   At the end of the fellowship you
3   have completed a fellowship.  There are many
4   subspecializations in medicine that do not
5   have additional boards.  That's not the
6   policy.
7        Q.   In any event, you were board
8   certified in radiology when?
9        A.   At the time I finished my
10  residencies, 1991.
11       Q.   Was there both a written and oral
12  portion of the exam at that time?
13       A.   Correct.
14       Q.   Did you pass both the first time?
15       A.   Yes.
16       Q.   And when did you first begin
17  working for Georgetown University, or its
18  hospital?
19       A.   I believe it was 1994.
20       Q.   Since that time have you been at
21  that facility?  Is that your primary place of
22  business?

00009
1      A.    It is my primary place of
2   business.
3      Q.    Are you and were you at the times
4   involved in this case in 1998 and 1999 an
5   employee of Georgetown University Hospital, or
6   Georgetown University?
7      A.    Well, as you are aware, the names
8   have changed because sometime between then and
9   now the university sold the hospital to
10   MedStar, which is the largest hospital company
11   in our area.
12      Q.    Fair enough.  Let's do it this
13   way.  Between '98 and '99 who were you
14   employed by?
15      A.    I don't recall when the sale
16   happened.  I think in -- my recollection in
17   1998 is that I was employed by the university.
18      Q.    And then at some time thereafter
19   you became employed by MedStar?
20      A.    Correct.
21      Q.    And that happened whenever the
22   takeover occurred, the buyout, by MedStar of

00010
1   Georgetown University?
2        A.   I don't think it was a takeover.
3   It was a mutually agreed strategy and...
4        Q.   Let me ask you this.
5          MS. HILLS:  May I ask that you,
6   counsel, not speak over the witness.  Let him
7   finish his answer and then you may ask your
8   follow-up questions.
9          MR. NEWMAN:  Sure.  How courteous.
10         BY MR. NEWMAN:
11       Q.   Let me ask you this.  Whatever
12   happened, when Georgetown University Hospital
13   became involved with MedStar, then you became
14   an employee of MedStar?  Is that correct?
15       A.   Well, again, you are not using the
16   correct names and that's my hesitance.  I
17   think we used to be called Georgetown
18   University Medical Center when the university
19   ran the hospital.  And when the administration
20   of the hospital switched to MedStar, I think
21   they changed the name to Georgetown University
22   Hospital.  Which is a difference.

00011
1      Q.    So Georgetown University Medical
2   Center was who you were employed by first and
3   then Georgetown University Hospital?
4      A.    No, I was employed by the
5   university.  The hospital had a different
6   name.
7      Q.    I will try it again, then, so I
8   understand.  Maybe I am not clear on anything.
9          At one time there was Georgetown
10   University Medical Center.  At that time you
11   were employed by the university?  Or were you
12   employed by Georgetown University Medical
13   Center?
14          MS. HILLS:  Objection.  Form.
15          BY MR. NEWMAN:
16      Q.    Just do this, doctor.  I don't
17   need to fence with this issue.  I just want to
18   know, when there was a change that involved
19   MedStar in any capacity by any name, who were
20   you employed by before that change occurred,
21   and who were you employed by after that change
22   occurred?

00012
1        A.   I think it was a little bit
2    complicated.  You probably have to talk to
3    somebody else.  Basically, there was a
4    transition from the name Georgetown University
5    Medical Center which was managed by the
6    university, and I was a university employee,
7    to Georgetown University Hospital, where the
8    hospital management switched to MedStar.
9    Exactly the order of that business, I don't
10   know.  I am not a corporate officer.
11       Q.   Doctor, let me switch now to an
12   issue involving a document which is eight
13   pages long and entitled the declaration of
14   Vance Watson.  While there is other writing on
15   that document, I am going to ask you if you
16   recognize that document.
17       MS. HILLS:  Do you have a copy for
18   counsel?
19       MR. NEWMAN:  Of the declaration
20   that you drafted?  I don't think so.
21       MS. HILLS:  Let's go off the
22   record.  I would like to have a copy at the

00013
1   same time my witness has a copy.
2            MR. NEWMAN:  That's fine.
3            MR. GREENWALD:  A clean copy.
4            MR. NEWMAN:  All right.  Go off
5   the record.
6            VIDEOTAPE OPERATOR:  We are going
7   off the record at 9:27.
8            (A recess was taken.)
9            VIDEOTAPE OPERATOR:  We are on the
10   record.
11           BY MR. NEWMAN:
12      Q.   Dr. Watson, since counsel demanded
13   a copy that I have my own not clean version,
14   that has some writings on it, I am going to
15   ask you to disregard what is there in
16   penmanship.  We are referring to, of course,
17   the printed section of this document.
18           MS. HILLS:  Objection to sidebar.
19           BY MR. NEWMAN:
20      Q.   Have you seen this document
21   before, without my handwriting on it?
22      A.   It is an eight page document.

00014
1    Skimming through it, it looks like the
2    declaration I am familiar with.  I can't tell
3    whether there is a page substituted or not.
4        Q.    Doctor, take a look through that
5    document and you tell me -- I will tell you,
6    that document, itself, is the one submitted by
7    defense counsel to the court.  But you show --
8    if there is anything in there that you believe
9    looks different than what you signed, I would
10   like to know.  If you have no idea, tell me
11   that, also.
12       MS. HILLS:  Other than the
13   marginalia by counsel.
14       THE WITNESS:  I am going to have
15   to take time to look through this.  You can't
16   throw eight pages at me and say has anything
17   been changed.  I would have to go and look at
18   it.
19       MS. HILLS:  I think that's fair.
20       BY MR. NEWMAN:
21       Q.    That's fair.  Let me withdraw the
22   question and ask you this.

00015
1          Doctor, I am going to tell you
2    that nothing has been changed in that document
3    at all from the day that we received a
4    signator on it.  My question to you is this,
5    first of all.  Do you recall reviewing a
6    document that was eight pages long, that you
7    signed under penalty of perjury, that was a
8    declaration by you?  Do you remember doing
9    that?
10      A.   Yes, I do.  And this looks like
11    the correct front page and that is my
12    signature.
13      Q.   Let me ask you specific questions
14    rather than have you look through the whole
15    document as to the areas I am questioning you
16    about.
17          MS. HILLS:  Are we going to mark
18    this as an exhibit for this deposition?
19          MR. NEWMAN:  Counsel, you have
20    asked me to provide him a copy that is dirty.
21    I will do that.  We will mark it as Exhibit 1.
22    I don't ask to attach it because it does have

00016

1   notes that may or may not be relevant.

2   Certainly, we can identify it as Exhibit 1.

3          MS. HILLS:  Let's get it marked as

4   Exhibit 1.  If you didn't bring a clean copy

5   for your exhibit, I don't think you can

6   withhold it as an exhibit at this deposition.

7          MR. NEWMAN:  Counsel, you are

8   kidding.  You drafted the declaration, had

9   your client sign it.  Now you are telling me

10   that I can't use because I didn't bring a

11   copy?  You didn't bring a copy.

12          MS. HILLS:  No, sir, it is not my

13   deposition.

14          MR. NEWMAN:  That's fine.

15          Exhibit 1, can you please mark --

16   Doctor, if I may, since you have the copy.

17   That is Exhibit 1.  And I have no objection to

18   attaching it if counsel wishes to do so.

19          (Document referred to marked

20   Deposition Exhibit No. 1 for identification

21   and subsequently attached to the deposition.)

22          BY MR. NEWMAN:

00017
1    Q.   Fair enough.  Now, doctor, what
2  has been marked as Exhibit 1, I am going to
3  ask you, there is a paragraph two, number two.
4  Within it, the last sentence of that document,
5  that paragraph, says, "Ms. Kerris was told
6  that her condition was terminal."
7      Do you see that line?  That's the
8  last sentence before the C section.
9    A.   Yes.
10    Q.  Let me, first of all, ask you if
11  you had an opinion at the time you treated
12  Ms. Kerris that her condition was terminal.
13      MS. HILLS:  If you remember.
14      Objection.  Vague.
15      THE WITNESS:  So in reading this
16  paragraph, it is my understanding that
17  physicians and staff at NIH told her that her
18  condition was terminal.  A very large
19  arteriovenous malformation like this with
20  symptoms has a good chance of eventually
21  killing her.  I don't know and it is unlikely
22  I would have used the word terminal, since it

00018
1   is not a thing that I bring to these patients.
2           BY MR. NEWMAN:
3       Q.   Do you know, first of all, was
4   your opinion then in 1998 and 1999 that Karyn
5   Kerris was not terminal?
6           MS. HILLS:  Objection.  Vague.
7           THE WITNESS:  As I said, I don't
8   use the word terminal for this kind of patient
9   because it carries too much emotional baggage
10   and it is not compassionate.
11          BY MR. NEWMAN:
12      Q.   Therefore, you would not have used
13   the term.  Is that what you are saying?
14          MS. HILLS:  Objection.  Vague.
15          BY MR. NEWMAN:
16      Q.   Doctor, would you have used the
17   term terminal in any medical document or to
18   the patient Karyn Kerris in your treatment of
19   her in 1998 and 1999?
20          MS. HILLS:  Objection, compound.
21   Objection, vague.
22          THE WITNESS:  In a medical

00019
1   document, I may or may not have used the word
2   terminal.  Talking to a patient, I tend to
3   avoid it.  I can't say -- this is 1998.  It
4   is, what, nine, ten years ago.  When we first
5   started discussing this, I can't recall
6   whether I would have used the word terminal
7   once, or not, or twice.  It is unlikely.  I
8   don't use that word when I am talking to
9   patients.
10          BY MR. NEWMAN:
11      Q.   Doctor, you did state that there
12   is a potential for these types of lesions to
13   cause some type of mortality to the patient.
14   Let me ask you if you know what your opinion
15   was in 1998 as to her chances of this AVM
16   bleeding.
17          MS. HILLS:  Objection.  Calls for
18   speculation.
19          THE WITNESS:  Well, she is a
20   fairly young patient.  Deep arteriovenous
21   malformations and large malformations are more
22   prone to bleed.  There is probably a two to

00020
1   four percent per year risk for the average AVM
2   to bleed.  So her risk would be greater than
3   that.  And she is a young person so the odds
4   are that she would have a hemorrhage sometime
5   over her life.
6            BY MR. NEWMAN:
7        Q.   Just so I understand, did you have
8   an opinion to a reasonable degree of medical
9   certainty or probability that her chances of
10   this AVM bleeding are somewhere greater than
11   four percent?
12           MS. HILLS:  Objection, compound.
13   Objection, calls for speculation.
14           BY MR. NEWMAN:
15       Q.   Let's do it in each little piece.
16           Doctor, do you have an opinion to
17   a reasonable degree of medical certainty as to
18   the percentage chance of bleed of this AVM?
19           MS. HILLS:  Objection.  Calls for
20   speculation.
21           THE WITNESS:  AVMs are a very rare
22   disease.  Actually, I did lecture on the

00021
1   natural history of AVMs.  I reviewed the
2   literature.  The best evidence is that average
3   risk is two to four percent.  And, again,
4   large deep AVMs are at higher risk of
5   bleeding.  So her yearly risk was likely at
6   least that.  And probably greater.
7          BY MR. NEWMAN:
8      Q.   Probably greater.  Do you know, do
9   you have a percentage opinion as opposed to
10   just probably greater?
11          MS. HILLS:  Objection.  Calls for
12   speculation.  Asked and answered.
13          BY MR. NEWMAN:
14      Q.   Doctor, let me tell you that every
15   question I ask you to a reasonable degree of
16   medical certainty does not ask you to
17   speculate but give me your opinion as a
18   clinician, if you had one, now or at the time.
19          MS. HILLS:  Objection.  Overbroad.
20   Dr. Watson's opinion in 2007 has no relevance
21   as to his questions here today as a fact
22   witness regarding what happened in 1998.  I

00022
1   stand by my objections.
2        BY MR. NEWMAN:
3      Q.    Doctor, then let's, for counsel's
4   sake and for this deposition, refer to your
5   opinions in 1998 to a reasonable degree of
6   medical certainty.
7        Now, did you have an opinion in
8   1998 to a reasonable degree of medical
9   certainty as to the percentage chance of Karyn
10  Kerris' AVM bleeding beyond the fact that it
11  was somewhere greater than four percent?
12       MS. HILLS:  Objection.  Calls for
13  speculation.
14       BY MR. NEWMAN:
15     Q.    Doctor, first of all, are you
16  speculating or can you answer that to a
17  reasonable degree of medical certainty?
18       MS. HILLS:  Objection to counsel's
19  sidebar.  Objection, calls for speculation.
20  We are in 2007.  You are speculating on 1998.
21       MR. NEWMAN:  Counsel, if you
22  continue with your speaking objections as to

00023
1   telling this witness what to say about '98
2   versus today, I am going to ask for a ruling
3   by the court that you not do so.
4          But let's try one last time,
5   doctor.
6          BY MR. NEWMAN:
7     Q.   Do you recall what your opinion
8   was in 1998 as to the chance of Karyn Kerris'
9   AVM bleeding?
10         MS. HILLS:  Object to counsel's
11  sidebar.  Objection based on asked and
12  answered.  Objection, calls for speculation.
13         BY MR. NEWMAN:
14    Q.   Do you recall, doctor?
15    A.   Okay.  This is, again, 2007.  I
16  have given a number of invited lectures on the
17  natural history of this disease.  I,
18  therefore, have read a lot of papers and put a
19  lot of things together, which makes it very
20  hard to go back to 1998, because much of my
21  knowledge comes from more recent research.
22         Now, there were teachings,

00024
1   research, papers that I knew of, obviously, in
2   1998 and before, to help me base my decisions.
3   Or 1998.  Exactly what percentage I would have
4   in mind in 1998, there is no way for me to
5   recall that far back, with the fact that AVMs
6   are a daily part of my work.
7            BY MR. NEWMAN:
8      Q.   Doctor, I am going to ask you now
9   to look at the third paragraph.  I will direct
10  you to the section in that that I am referring
11  to.
12           First with a recollection
13  question.  Do you have any recollection that
14  Ms. Kerris was having difficulty with balance
15  and progressive slurring of speech, increasing
16  in frequency, so that by November, 1998
17  Ms. Kerris was experiencing them every two to
18  three days?
19           MS. HILLS:  Objection, misstates
20  the document.  Objection, misstates facts in
21  the record.  Objection, does not give this
22  witness the underlying medical records to

00025
1  which this paragraph directs and relies.
2      BY MR. NEWMAN:
3      Q.   First of all, doctor, did I read
4  that line correctly, and that is -- I will do
5  it again.  I will do the entire paragraph
6  again, since counsel is not allowing the
7  questions.
8          Ms. Kerris was asymptomatic until
9  1998 when she began experiencing increasing
10  difficulty with balance and progressive
11  slurring of speech, comma, increasing in
12  frequency, so that by November, 1998
13  Ms. Kerris was experiencing them every two to
14  three days and she reported having blacked out
15  on July 4, 1998 while driving.
16          First of all, did I read that --
17          MS. HILLS:  Objection, fails to
18  read the entire paragraph.  Objection, fails
19  to provide the records which the reader is
20  directed to in the paragraph.  And fails to
21  provide the witness the basis on which he
22  signed this affidavit which are the records to

00026
1  which both the reader is directed to and is
2  cited in the paragraph.
3       BY MR. NEWMAN:
4       Q.   I will just ask you a question.
5  Doctor, do you recall any of those symptoms as
6  they are written in that paragraph?
7       A.   This is where physicians have a
8  difficult time with lawyers' questions.
9            I can interpret that question many
10  ways.
11       Q.   Dr. --
12       A.   I just need you to be more
13  specific, please.
14       Q.   Sure.  Can you testify under oath
15  that, in fact, as you swore under the penalty
16  of perjury, that those were Ms. Kerris'
17  symptoms at the time you evaluated her, as it
18  states in paragraph three?  Can you swear
19  under oath that that is true?
20            MS. HILLS:  Same objections,
21  particularly of not providing the doctor with
22  the records to which the paragraph directs.

00027
1        THE WITNESS:  May I see my
2  records?
3        BY MR. NEWMAN:
4   Q.   Sure.  Let me ask you this.
5        Doctor, did you tell counsel not
6  to give you any of your office records, or any
7  medical records in this case?
8        MS. HILLS:  Objection.
9        Do not answer that.  It intrudes
10  upon the attorney-client privilege.
11        BY MR. NEWMAN:
12   Q.   Doctor, can you answer any
13  questions in this deposition without your full
14  medical record?
15        MS. HILLS:  Objection.  Calls for
16  speculation.
17        THE WITNESS:  I have a
18  recollection that Karyn came to us with
19  abnormal gait, slurring, decreased mental
20  function.  If we want to go into further
21  details, it does reference this record, and I
22  should match paragraph three with the record.

00028
1          BY MR. NEWMAN:
2     Q.   Did you do that before you signed
3    the affidavit initially?
4          MS. HILLS:  Objection.
5          BY MR. NEWMAN:
6     Q.   Match this comment with the
7    record?
8          MS. HILLS:  Objection.  Intrudes
9    upon attorney-client communications.
10          BY MR. NEWMAN:
11     Q.   Doctor, let me ask you a broader
12    question.  Did you write the declaration?
13          MS. HILLS:  Objection.  Overbroad.
14    Intrudes upon attorney-client privilege.
15          MR. NEWMAN:  Does that mean you
16    are not -- counsel is directing him not to
17    answer the question?  That's my question.
18          MS. HILLS:  You may answer that
19    question.
20          BY MR. NEWMAN:
21     Q.   Did you write this?
22          Same objection that counsel made.

00029
1          A.   This is a legal document.  To me
2    it is just like a will.  I state my desires
3    and an attorney drafts it.  I wouldn't write
4    my own will.
5          Q.   Does that also mean, as to every
6    word in this document, you cannot attest to
7    its veracity because you didn't write it and
8    you may not have even spoken those words?
9               MS. HILLS:  Objection, counsel.
10   Misstates records -- misstates what the doctor
11   testified to.
12              THE WITNESS:  That is absolutely
13   not what I said.
14              BY MR. NEWMAN:
15         Q.   Let's do it then, doctor.  Let's
16   go to paragraph eight.
17              Without reading paragraph eight in
18   its entirety into the record, you may look at
19   paragraph eight and read it yourself.  My
20   questions to you are the same as before.
21              Is paragraph eight correct, to the
22   best of your understanding and recollection?

00030
1          MS. HILLS:  Objection.  The
2    document speaks for itself.
3          THE WITNESS:  So the -- I took the
4    time to read eight, which is kind of long.
5    Now I forgot the question.
6          BY MR. NEWMAN:
7      Q.   The question was, is there
8    anything in that statement that is incorrect
9    or does not state your recollection?
10     A.   It is an abbreviated form of my
11   recollection.  There is also discussion of
12   alternative embolic agents or tools that I
13   would use to doing endovascular treatment.
14   (Pause).  And there is, of course, a much
15   longer discussion on the agent we ultimately
16   treated her with, which is n-butyl
17   cyanoacrylate, n-BCA, and oil.
18     Q.   Just for clarity, was the oil
19   Lipiodol?
20     A.   I would have to see my records but
21   that would be likely.
22     Q.   First of all, you mentioned in

00031
1    regard to paragraph eight, that there were
2    other agents and embolic devices that may have
3    been discussed.  What other ones would be
4    discussed or were discussed?
5         A.   Back to your question, Lipiodol,
6    there is a similar agent, Ethiodol, that we
7    may have used.  It is in the current kit that
8    we purchased with n-BCA and Ethiodol for
9    embolization.  What was available to us in
10   1998, I don't recall which one, Ethiodol or
11   Lipiodol.  And Histocryl, again, which is a
12   brand name for the n-BCA.  That's what we
13   would have used.
14        Q.   There is a mention there of the
15   risks, benefits, complications, et cetera.  My
16   question to you is, in 1998, what risks were
17   there of this procedure, the embolization?
18        A.   Well, the risks in 1998 are the
19   same as they are in 2007.  And these risks
20   involve everything from beginning the
21   procedure, where we enter the femoral artery
22   in the region of the hip.  You damage the

00032
1   artery to the leg.  Potentially lose the leg.
2   Then we take the catheter and we pass it up
3   through the body up to the neck, and then take
4   another one, pass it up through the brain to
5   the malformation.
6           If we damage any of those blood
7   vessels the result could be stroke.  Then,
8   when we use any embolic agent -- by embolic
9   agent what we mean is something that blocks a
10  blood vessel off on purpose, in order to treat
11  something.  There are complications related to
12  that.
13          With liquid embolic agents, the
14  type of thing that we are discussing,
15  treatment of this AVM, the risks include the
16  material getting around the catheter, the
17  small catheters in the brain, and trapping it
18  so that you can't remove it and you have to
19  leave it in place.  Again, you can damage
20  these fragile blood vessels, cause a bleed, or
21  cause them to block off, both of which result
22  in stroke.

00033
1           And the embolic material can go
2    where you don't want it to.  That can block
3    off the normal blood vessels and cause stroke.
4       Q.   Do you use the term nontarget
5    embolization for that?
6       A.   No, I don't.
7       Q.   Doctor, all in all, as far as the
8    risks of mortality from the embolic procedure
9    with the Histoacryl, what were the chances of
10   the risks of that occurring?
11          MS. HILLS:  Objection, calls for
12   speculation.  Objection, vague.
13          BY MR. NEWMAN:
14      Q.   Doctor, just for the record, let
15   me reask the question.
16          What was the mortality rate for
17   using Histoacryl as you did in 1998 for an
18   embolization of an AVM such as Karyn Kerris'?
19      A.   I believe it has a fair amount to
20   do with the skill of the operator and how much
21   risk the operator is willing to take.  I have
22   done hundreds, probably over a thousand

00034
1   injections with n-BCA and, to my knowledge, we
2   have had one patient with a hemorrhage, and it
3   is unclear whether that was the cause of the
4   death.  So it would be one patient.  So we are
5   talking less than one percent.
6            In other hands -- there are
7   series, as you know -- it can be higher.
8       Q.   As far as morbidity is concerned,
9   what was the percentage chance of any
10   morbidity of a significant neurologic
11   compromise from the embolization?
12            MS. HILLS:  Objection.  Vague.
13            BY MR. NEWMAN:
14       Q.   Make it real easy, doctor.  What
15   are the chances of Karyn Kerris winding up the
16   way she is presently following an
17   embolization?
18       A.   Objection.  Assumes facts not in
19   evidence.  Vague.
20            BY MR. NEWMAN:
21       Q.   What are the chances of her
22   winding up the way she is right now?

00035
1          MS. HILLS:  Objection.  Calls for
2     speculation.  Vague.  It assumes facts not in
3     evidence.
4          THE WITNESS:  The question is hard
5     to follow.  I just don't follow the question.
6          BY MR. NEWMAN:
7       Q.   Doctor, presently, at least the
8     last time -- when was the last time you saw
9     Karyn Kerris?  Do you know when that was,
10    roughly?
11      A.   A long time ago.
12      Q.   At that time when you last saw her
13    was she suffering from any kind of neurologic
14    compromise?
15      A.   The last time I saw her was
16    actually not even professionally.  She was
17    just traveling through our hallway.  She
18    appeared to have progressed.
19      Q.   All right, doctor.
20          Prior to the embolizations of
21    Karyn Kerris -- first of all, were there three
22    embolizations done by you?

00036
1        A.    That's my recollection.
2        Q.    Prior to any of those procedures
3    were any flow studies done as to the AVM?
4        A.    What kind of flow studies?
5        Q.    Did you do any type of study to
6    determine the kind of pressures involved or
7    the blood flow through the AVM as far as
8    velocity, amount, pressure?
9        A.    That's not standard care.  We did
10    MRIs, which do have a lot of flow information.
11        Q.    I will ask you this, doctor.  On
12    what basis do you select the percentage of
13    n-BCA versus oil when you embolize?
14            MS. HILLS:  Objection.  Vague.
15            THE WITNESS:  You put the
16    microcatheters, the very, very small
17    catheter -- smaller than angel hair pasta, is
18    what I tell the patients.  It is a very small,
19    delicate catheter.  In the position that you
20    want to block off.  You inject dye under x-ray
21    and you see how rapidly it travels, and you
22    see what is in front of you, how many vessels,

00037
1    one direct connection, many small ones, and
2    with experience you can determine how rapidly
3    you need n-BCA mixed with the radiopaque oil,
4    or one of the new agents we have.  You can
5    determine which concentration you want and
6    which speed you want it to harden, or come up
7    with strategies if you think it is too fast or
8    too slow.
9          BY MR. NEWMAN:
10       Q.   First of all, doctor, do you
11   believe that in 1998 and 1999 you were using
12   Histoacryl as opposed to any other
13   cyanoacrylate?
14       A.   I think in 1998 n-BCA was
15   available as the brand name Histocryl.  I
16   don't think the brand name TruFill was yet
17   being sold.  It wasn't available yet.  That's
18   the current agent that we use in 2007.
19          As a cyanoacrylate, I believe
20   those are the only two brands I have used,
21   n-butyl cyanoacrylate sold as Histocryl and
22   sold as TruFill.

00038
1       Q.    Am I correct that, since TruFill
2    was not available to 2000, that prior to that
3    you were using Histoacryl?
4       A.    I don't have the records in front
5    of me about exactly when TruFill came on the
6    market.  But it would be reasonable to assume
7    that we were using Histocryl in 1998.  Because
8    my recollection in your question is that it
9    wasn't available until later.
10      Q.    Doctor, prior to using Histoacryl
11   or Histocryl, had you read the package insert?
12   This is any time prior to using it in Karyn
13   Kerris.
14      A.    I can remember reading the package
15   insert in training.  I think I probably read
16   it a couple of times after that.
17      Q.    Let me ask you if you recall the
18   contraindication written by the manufacturer
19   of Histoacryl.  First of all, do you recall
20   the contraindication?
21      A.    I believe there are likely more
22   than one contraindication.  If you want me to

00039
1   quote a long sheet of paper, you are asking
2   someone to memorize the Gettysburg address.  I
3   don't have it committed to memory.
4       Q.    Fair enough.  My question, doctor,
5   is do you remember, if you say there was more
6   than one, any of the contraindications of
7   Histoacryl, as we sit here today?  I am just
8   asking a recollection question.
9       A.    Some of the contraindications
10  would involve trying to suture together pieces
11  of the surface of the brain, I believe.
12  Trying to suture together nerves or something.
13  Things that are unrelated to what we were
14  doing.
15      Q.    Do you recall there being a
16  contraindication that said the administration
17  to blood vessels should be avoided on account
18  of risk of thrombosis and damage to the
19  vascular wall?  Do you recall that
20  contraindication?
21      A.    I don't remember the exact
22  wording.  Our goal is to block off the blood

00040
1   vessels.  And I do remember that wording but
2   the sole purpose of the embolization is to
3   block off the blood vessel.
4        Q.   I understand, doctor.  That was
5   your purpose.  But then you did recognize,
6   when you were using Histoacryl, it was
7   contrary to the manufacturer's
8   contraindication that says do not put it in
9   blood vessels?
10          MS. HILLS:  Objection.  Misstates
11   the document.  You have the document before
12   you so the document speaks for itself.  But I
13   believe what you read, sir, is that it should
14   be avoided, not that the manufacturer said it
15   was contrary to its use.
16          THE WITNESS:  It very clearly did
17   not say it is contraindicated for this
18   purpose.
19          MR. NEWMAN:  Doctor -- first of
20   all, let me put on the record that, counsel,
21   that is the last speaking objection.  We will
22   have to reconvene this in front of Magistrate

00041
1   Kay because you do not know how to allow me to
2   conduct a deposition and I don't wish to spend
3   many, many days with this deponent.  With that
4   being on the record, let me try to finish this
5   one point and we can reconvene at counsel's
6   expense.
7           MS. HILLS:  Objection to sidebar.
8           BY MR. NEWMAN:
9     Q.    Doctor, are you surprised that
10  within Histoacryl's contraindication what you
11  said would not be a contraindication
12  specifically says administration to the intima
13  and media of blood vessels should be avoided
14  on account of risk of thrombosis and damage to
15  the vascular wall?
16          MS. HILLS:  Objection.  The
17  document speaks for itself.
18          BY MR. NEWMAN:
19    Q.    My question is are you surprised
20  by that being a contraindication when you said
21  it wasn't?
22    A.    It is not a contraindication.  It

00042
1   is telling you, if you apply it to the blood
2   vessel wall, you will block the blood vessel
3   off.  Since our entire goal is to block the
4   blood vessel off, I don't follow your
5   question.
6          BY MR. NEWMAN:
7      Q.   Doctor, why did the manufacturer
8   of Histoacryl say it is contraindicated to
9   block the blood vessel wall and you say that
10   that is incorrect?
11          MS. HILLS:  Objection, the
12   document speaks for itself.  Objection,
13   misstates the document.  Objection, asked and
14   answered.
15          MR. NEWMAN:  We are going to stop
16   the deposition at this point, reconvene,
17   request, if we can, with the magistrate.
18   Counsel's behavior has been outrageous.
19          MS. HILLS:  I would like to put on
20   the record my objection.  Counsel has not
21   brought documents for the witness.  He has
22   misread them and misstated them.  He objects

00043
1   to objections that are directly from the D.C.
2   Civil Rules and is now leaving.  To object to
3   misstating the document is not a speaking of
4   document.  Moreover, his demeanor and his
5   questions have been misleading of these
6   documents, nor has he allowed the witness to
7   look at these documents to show that they are
8   misstated.  If he chooses to leave now, we
9   will ask the magistrate judge to ask that the
10  expense be borne by the plaintiffs.  We are
11  prepared to stay here for the two and-a-half
12  hours that he represented that he would be
13  here.  However, if they choose to leave after
14  this expense, that is their choice.
15          MR. NEWMAN:  Let me put on the
16  record the Histoacryl package insert which is
17  going to be Exhibit 2.
18          MS. HILLS:  Do you have a copy for
19  counsel?
20          MR. NEWMAN:  It will be attached
21  to the exhibit -- depo.
22          MS. HILLS:  I need to see it at

00044
1   the same time the witness is questioned.
2          MR. NEWMAN:  I am not questioning
3   the witness anymore.  Your behavior, counsel,
4   in 25 years I have never seen anything like
5   it.
6          I will tell you, Dr. Watson, you
7   will be redeposed until these questions are
8   answered, so help me.
9          With that being in mind, I cannot
10  imagine counsel was not giving the witness his
11  own medical records in an effort to stop and
12  impede my deposition.  I have never seen that
13  before.
14         With that we are leaving.  Please
15  take it up with the magistrate.  We will, of
16  course, mark this as Exhibit 2.
17         (Document referred to marked
18  Deposition Exhibit No. 2 for identification
19  and subsequently attached to the deposition.)
20         MS. HILLS:  Please note my
21  objection.
22         VIDEOTAPE OPERATOR:  Going off the

00045
1    record.
2         (Whereupon, at 11:12 p.m., the
3    deposition was adjourned, to reconvene as
4    determined.)
5              + + +
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

00046

1      CERTIFICATE OF NOTARY PUBLIC
2           I, Zev V. Feder, the officer
3   before whom the foregoing deposition was
4   taken, do hereby certify that the witness,
5   whose testimony appears in the foregoing
6   deposition, was duly sworn by me; that the
7   testimony of said witness was taken by me in
8   shorthand and thereafter reduced to computer
9   type under my direction; that said deposition
10  is a true record of the testimony given by
11  said witness; that I am neither counsel for,
12  related to, nor employed by any of the parties
13  to which this deposition was taken; and
14  further, that I am not a relative or employee
15  of any attorney or counsel employed by the
16  parties hereto, nor financially or otherwise
17  interested in the outcome of the action.
18
19  _____
19           Notary Public in and for
20           The District of Columbia
21  My Commission Expires:
21  April 14, 2007
22