# EXHIBIT 2

# COPY

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
--------------------------x
                          :
FELICE I. IACANGELO,      :
et al.                    :
                          :
          Plaintiffs      :
                          : Case No.
     vs.                  : 1:05CV02086
                          : Judge Friedman
GEORGETOWN UNIVERSITY,    :
t/a Georgetown University :
Hospital, et al.          :
                          :
          Defendants      :
                          :
--------------------------x
```

Washington, D.C.
March 27, 2007

Videotaped Deposition of:

VANCE E. WATSON, M.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the offices

of Williams & Connolly, 725 12th Street, N.W.,

Washington, D.C., beginning at 10:22 a.m.,

before Zev V. Feder, CSR, a Notary Public in

and for the State of Maryland, when were

present on behalf of the respective parties:

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

2

1

2      On behalf of the Plaintiffs:

3      Newman, McIntosh & Hennessey
       By:   ANTHONY G. NEWMAN, ESQ.
4      By:   WENDY WYETH, ESQ.
             7315 Wisconsin Avenue, Suite 700E
5            Bethesda, Maryland  20814
             (301) 654-3400
6
             - and -
7
       Joseph, Greenwald & Laake
8      By:   ANDREW E. GREENWALD, ESQ.
             6404 Ivy Lane, Suite 400
9            Greenbelt, Maryland  20770
             (301) 220-2200
10

11     On behalf of the Defendants:

12     Williams & Connolly
       By:   MEGAN E. HILLS, ESQ.
13     By:   NICOLAS MUZIN, Esq.
             725 12th Street
14           Washington, D.C. 20005
             (202) 434-5393
15

16     Also Present:

17          Scott Preston, Videographer

18                    + + +

19

20

21

22

                    FEDER REPORTING COMPANY
            (202) 863-0000     (800) 956-8996

3

1

2                        C O N T E N T S

3    WITNESS:  VANCE E. WATSON, M.D.

4    EXAMINATION BY:                              PAGE

5    MR. NEWMAN                                     5

6    MS. HILLS                                      -

7

8                        EXHIBITS

9    DEPOSITION NO.        MARKED FOR IDENTIFICATION

10     1.   Declaration of Vance E. Watson, M.D.   16

11     2.   Histoacryl package insert              44

12

13

14

15

16

17

18

19

20

21

22

4

1

2              P R O C E E D I N G S

3              VIDEOTAPE OPERATOR:  Good morning.

4     This is the video deposition of Dr. Vance E.

5     Watson, M.D., taken by counsel for the

6     plaintiff in the matter of Felice I.

7     Iacangelo, et al. versus Georgetown University

8     Hospital, et al., in the United States

9     District Court for the District of Columbia,

10    Case Number 105CV02086.  The deposition is

11    held today in the offices of Williams &

12    Connolly at 725 12th Street, Northwest,

13    Washington, D.C., 20005 on March 27, 2007 and

14    at approximately 9:18 -- I'm sorry, 10:18 in

15    the morning.

16              We will go by the time code on

17    this because we have changed time.

18              My name is Scott Preston.  I am

19    the video specialist.  The court reporter

20    today is Zev Feder from the firm of Feder

21    Reporting.  Counsel will now introduce

22    themselves.

5

1          MR. NEWMAN:  Anthony Newman on

2     behalf of the plaintiff.  Joining with me is

3     Andrew Greenwald and Wendy Wyeth.

4          MS. HILLS:  Megan Hills on behalf

5     of all defendants, including Dr. Watson.  And

6     with me is Nicolas Muzin, also with the firm

7     of Williams & Connolly.

8          VIDEOTAPE OPERATOR:  You may now

9     swear in the witness.

10    Whereupon,

11          VANCE E. WATSON, M.D.

12    was called for examination by counsel and,

13    having been duly sworn by the Notary, was

14    examined and testified as follows:

15    EXAMINATION BY COUNSEL FOR PLAINTIFFS

16          BY MR. NEWMAN:

17    Q.    Would you state your full name for

18    the record?

19    A.    Vance Emory Watson.

20    Q.    You are a medical doctor?

21    A.    Correct.

22    Q.    If I understand, you are board

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

6

1    certified in a specialty.  What specialties

2    are you board certified in?

3         A.    Radiology.

4         Q.    Is there any particular training

5    for interventional neuroradiology at the

6    present time that results in any kind of

7    certificate or certification?

8         A.    Rephrase the question.

9         Q.    Isn't there presently a process by

10   which people can become certified in

11   interventional neuroradiology?

12        A.    There is no special added

13   qualification at the current time.

14        Q.    There is actually, though,

15   criteria and a process by which one takes

16   courses and becomes certified in

17   interventional radiology, isn't there, at the

18   present time?

19        A.    No, there is not.

20             MS. HILLS:  I think the problem,

21   counsel, is your word certified.

22             THE WITNESS:  Yes.

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

7

1          MS. HILLS:  I think the doctor is

2    trying to answer your question but I think you

3    are misusing the term, certified or

4    certification.  Perhaps that's why the doctor

5    asked you to rephrase.

6          MR. NEWMAN:  Thank you, counsel.

7    But I would ask that there be no speaking

8    objections on the record.  You may object to

9    it and I will clarify.

10         BY MR. NEWMAN:

11    Q.    Doctor, let me ask you this.  Is

12    there any course right now in interventional

13    radiology beyond that which is taken in

14    straight radiology?  Any curriculum?

15    A.    The words you are using are not

16    correct in any way I understand.  Fellowships.

17    There is additional training available.

18    Q.    And the fellowship results in the

19    certification, is your testimony?

20         MS. HILLS:  Objection.  Vague.

21         BY MR. NEWMAN:

22    Q.    What happens at the end of the

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

8

1    fellowship?

2          A.     At the end of the fellowship you

3    have completed a fellowship.   There are many

4    subspecializations in medicine that do not

5    have additional boards.   That's not the

6    policy.

7          Q.     In any event, you were board

8    certified in radiology when?

9          A.     At the time I finished my

10   residencies, 1991.

11         Q.     Was there both a written and oral

12   portion of the exam at that time?

13         A.     Correct.

14         Q.     Did you pass both the first time?

15         A.     Yes.

16         Q.     And when did you first begin

17   working for Georgetown University, or its

18   hospital?

19         A.     I believe it was 1994.

20         Q.     Since that time have you been at

21   that facility?   Is that your primary place of

22   business?

9

1      A.      It is my primary place of

2    business.

3      Q.      Are you and were you at the times

4    involved in this case in 1998 and 1999 an

5    employee of Georgetown University Hospital, or

6    Georgetown University?

7      A.      Well, as you are aware, the names

8    have changed because sometime between then and

9    now the university sold the hospital to

10   MedStar, which is the largest hospital company

11   in our area.

12     Q.      Fair enough.  Let's do it this

13   way.  Between '98 and '99 who were you

14   employed by?

15     A.      I don't recall when the sale

16   happened.  I think in -- my recollection in

17   1998 is that I was employed by the university.

18     Q.      And then at some time thereafter

19   you became employed by MedStar?

20     A.      Correct.

21     Q.      And that happened whenever the

22   takeover occurred, the buyout, by MedStar of

10

1     Georgetown University?

2          A.    I don't think it was a takeover.

3     It was a mutually agreed strategy and...

4          Q.    Let me ask you this.

5               MS. HILLS:  May I ask that you,

6     counsel, not speak over the witness.  Let him

7     finish his answer and then you may ask your

8     follow-up questions.

9               MR. NEWMAN:  Sure.  How courteous.

10              BY MR. NEWMAN:

11         Q.    Let me ask you this.  Whatever

12    happened, when Georgetown University Hospital

13    became involved with MedStar, then you became

14    an employee of MedStar?  Is that correct?

15         A.    Well, again, you are not using the

16    correct names and that's my hesitance.  I

17    think we used to be called Georgetown

18    University Medical Center when the university

19    ran the hospital.  And when the administration

20    of the hospital switched to MedStar, I think

21    they changed the name to Georgetown University

22    Hospital.  Which is a difference.

11

1        Q.    So Georgetown University Medical

2   Center was who you were employed by first and

3   then Georgetown University Hospital?

4        A.    No, I was employed by the

5   university.  The hospital had a different

6   name.

7        Q.    I will try it again, then, so I

8   understand.  Maybe I am not clear on anything.

9             At one time there was Georgetown

10  University Medical Center.  At that time you

11  were employed by the university?  Or were you

12  employed by Georgetown University Medical

13  Center?

14             MS. HILLS:  Objection.  Form.

15             BY MR. NEWMAN:

16        Q.    Just do this, doctor.  I don't

17  need to fence with this issue.  I just want to

18  know, when there was a change that involved

19  MedStar in any capacity by any name, who were

20  you employed by before that change occurred,

21  and who were you employed by after that change

22  occurred?

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

12

1      A.      I think it was a little bit

2    complicated.  You probably have to talk to

3    somebody else.  Basically, there was a

4    transition from the name Georgetown University

5    Medical Center which was managed by the

6    university, and I was a university employee,

7    to Georgetown University Hospital, where the

8    hospital management switched to MedStar.

9    Exactly the order of that business, I don't

10   know.  I am not a corporate officer.

11     Q.      Doctor, let me switch now to an

12   issue involving a document which is eight

13   pages long and entitled the declaration of

14   Vance Watson.  While there is other writing on

15   that document, I am going to ask you if you

16   recognize that document.

17           MS. HILLS:  Do you have a copy for

18   counsel?

19           MR. NEWMAN:  Of the declaration

20   that you drafted?  I don't think so.

21           MS. HILLS:  Let's go off the

22   record.  I would like to have a copy at the

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

13

1    same time my witness has a copy.

2             MR. NEWMAN:  That's fine.

3             MR. GREENWALD:  A clean copy.

4             MR. NEWMAN:  All right.  Go off

5    the record.

6             VIDEOTAPE OPERATOR:  We are going

7    off the record at 9:27.

8             (A recess was taken.)

9             VIDEOTAPE OPERATOR:  We are on the

10   record.

11            BY MR. NEWMAN:

12       Q.   Dr. Watson, since counsel demanded

13   a copy that I have my own not clean version,

14   that has some writings on it, I am going to

15   ask you to disregard what is there in

16   penmanship.  We are referring to, of course,

17   the printed section of this document.

18            MS. HILLS:  Objection to sidebar.

19            BY MR. NEWMAN:

20       Q.   Have you seen this document

21   before, without my handwriting on it?

22       A.   It is an eight page document.

14

1    Skimming through it, it looks like the

2    declaration I am familiar with.  I can't tell

3    whether there is a page substituted or not.

4         Q.    Doctor, take a look through that

5    document and you tell me -- I will tell you,

6    that document, itself, is the one submitted by

7    defense counsel to the court.  But you show --

8    if there is anything in there that you believe

9    looks different than what you signed, I would

10   like to know.  If you have no idea, tell me

11   that, also.

12         MS. HILLS:  Other than the

13   marginalia by counsel.

14         THE WITNESS:  I am going to have

15   to take time to look through this.  You can't

16   throw eight pages at me and say has anything

17   been changed.  I would have to go and look at

18   it.

19         MS. HILLS:  I think that's fair.

20         BY MR. NEWMAN:

21         Q.    That's fair.  Let me withdraw the

22   question and ask you this.

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

15

1          Doctor, I am going to tell you

2      that nothing has been changed in that document

3      at all from the day that we received a

4      signator on it.  My question to you is this,

5      first of all.  Do you recall reviewing a

6      document that was eight pages long, that you

7      signed under penalty of perjury, that was a

8      declaration by you?  Do you remember doing

9      that?

10          A.    Yes, I do.  And this looks like

11     the correct front page and that is my

12     signature.

13          Q.    Let me ask you specific questions

14     rather than have you look through the whole

15     document as to the areas I am questioning you

16     about.

17              MS. HILLS:  Are we going to mark

18     this as an exhibit for this deposition?

19              MR. NEWMAN:  Counsel, you have

20     asked me to provide him a copy that is dirty.

21     I will do that.  We will mark it as Exhibit 1.

22     I don't ask to attach it because it does have

16

1    notes that may or may not be relevant.

2    Certainly, we can identify it as Exhibit 1.

3                MS. HILLS:  Let's get it marked as

4    Exhibit 1.  If you didn't bring a clean copy

5    for your exhibit, I don't think you can

6    withhold it as an exhibit at this deposition.

7                MR. NEWMAN:  Counsel, you are

8    kidding.  You drafted the declaration, had

9    your client sign it.  Now you are telling me

10   that I can't use because I didn't bring a

11   copy?  You didn't bring a copy.

12               MS. HILLS:  No, sir, it is not my

13   deposition.

14               MR. NEWMAN:  That's fine.

15               Exhibit 1, can you please mark --

16   Doctor, if I may, since you have the copy.

17   That is Exhibit 1.  And I have no objection to

18   attaching it if counsel wishes to do so.

19               (Document referred to marked

20   Deposition Exhibit No. 1 for identification

21   and subsequently attached to the deposition.)

22               BY MR. NEWMAN:

17

1        Q.    Fair enough.  Now, doctor, what

2     has been marked as Exhibit 1, I am going to

3     ask you, there is a paragraph two, number two.

4     Within it, the last sentence of that document,

5     that paragraph, says, "Ms. Kerris was told

6     that her condition was terminal."

7             Do you see that line?  That's the

8     last sentence before the C section.

9        A.    Yes.

10       Q.    Let me, first of all, ask you if

11    you had an opinion at the time you treated

12    Ms. Kerris that her condition was terminal.

13            MS. HILLS:  If you remember.

14            Objection.  Vague.

15            THE WITNESS:  So in reading this

16    paragraph, it is my understanding that

17    physicians and staff at NIH told her that her

18    condition was terminal.  A very large

19    arteriovenous malformation like this with

20    symptoms has a good chance of eventually

21    killing her.  I don't know and it is unlikely

22    I would have used the word terminal, since it

18

1      is not a thing that I bring to these patients.

2                    BY MR. NEWMAN:

3            Q.    Do you know, first of all, was

4      your opinion then in 1998 and 1999 that Karyn

5      Kerris was not terminal?

6                    MS. HILLS:  Objection.  Vague.

7                    THE WITNESS:  As I said, I don't

8      use the word terminal for this kind of patient

9      because it carries too much emotional baggage

10     and it is not compassionate.

11                   BY MR. NEWMAN:

12           Q.    Therefore, you would not have used

13     the term.  Is that what you are saying?

14                   MS. HILLS:  Objection.  Vague.

15                   BY MR. NEWMAN:

16           Q.    Doctor, would you have used the

17     term terminal in any medical document or to

18     the patient Karyn Kerris in your treatment of

19     her in 1998 and 1999?

20                   MS. HILLS:  Objection, compound.

21     Objection, vague.

22                   THE WITNESS:  In a medical

19

1    document, I may or may not have used the word

2    terminal.  Talking to a patient, I tend to

3    avoid it.  I can't say -- this is 1998.  It

4    is, what, nine, ten years ago.  When we first

5    started discussing this, I can't recall

6    whether I would have used the word terminal

7    once, or not, or twice.  It is unlikely.  I

8    don't use that word when I am talking to

9    patients.

10                   BY MR. NEWMAN:

11         Q.      Doctor, you did state that there

12    is a potential for these types of lesions to

13    cause some type of mortality to the patient.

14    Let me ask you if you know what your opinion

15    was in 1998 as to her chances of this AVM

16    bleeding.

17                   MS. HILLS:  Objection.  Calls for

18    speculation.

19                   THE WITNESS:  Well, she is a

20    fairly young patient.  Deep arteriovenous

21    malformations and large malformations are more

22    prone to bleed.  There is probably a two to

20

1    four percent per year risk for the average AVM

2    to bleed.  So her risk would be greater than

3    that.  And she is a young person so the odds

4    are that she would have a hemorrhage sometime

5    over her life.

6                   BY MR. NEWMAN:

7         Q.    Just so I understand, did you have

8    an opinion to a reasonable degree of medical

9    certainty or probability that her chances of

10   this AVM bleeding are somewhere greater than

11   four percent?

12                   MS. HILLS:  Objection, compound.

13   Objection, calls for speculation.

14                   BY MR. NEWMAN:

15        Q.    Let's do it in each little piece.

16                   Doctor, do you have an opinion to

17   a reasonable degree of medical certainty as to

18   the percentage chance of bleed of this AVM?

19                   MS. HILLS:  Objection.  Calls for

20   speculation.

21                   THE WITNESS:  AVMs are a very rare

22   disease.  Actually, I did lecture on the

21

1    natural history of AVMs.  I reviewed the

2    literature.  The best evidence is that average

3    risk is two to four percent.  And, again,

4    large deep AVMs are at higher risk of

5    bleeding.  So her yearly risk was likely at

6    least that.  And probably greater.

7                BY MR. NEWMAN:

8        Q.      Probably greater.  Do you know, do

9    you have a percentage opinion as opposed to

10   just probably greater?

11               MS. HILLS:  Objection.  Calls for

12   speculation.  Asked and answered.

13               BY MR. NEWMAN:

14       Q.      Doctor, let me tell you that every

15   question I ask you to a reasonable degree of

16   medical certainty does not ask you to

17   speculate but give me your opinion as a

18   clinician, if you had one, now or at the time.

19               MS. HILLS:  Objection.  Overbroad.

20   Dr. Watson's opinion in 2007 has no relevance

21   as to his questions here today as a fact

22   witness regarding what happened in 1998.  I

22

1    stand by my objections.

2                 BY MR. NEWMAN:

3        Q.    Doctor, then let's, for counsel's

4    sake and for this deposition, refer to your

5    opinions in 1998 to a reasonable degree of

6    medical certainty.

7                 Now, did you have an opinion in

8    1998 to a reasonable degree of medical

9    certainty as to the percentage chance of Karyn

10   Kerris' AVM bleeding beyond the fact that it

11   was somewhere greater than four percent?

12               MS. HILLS:   Objection.   Calls for

13   speculation.

14               BY MR. NEWMAN:

15       Q.    Doctor, first of all, are you

16   speculating or can you answer that to a

17   reasonable degree of medical certainty?

18               MS. HILLS:   Objection to counsel's

19   sidebar.   Objection, calls for speculation.

20   We are in 2007.   You are speculating on 1998.

21               MR. NEWMAN:   Counsel, if you

22   continue with your speaking objections as to

23

1    telling this witness what to say about '98

2    versus today, I am going to ask for a ruling

3    by the court that you not do so.

4              But let's try one last time,

5    doctor.

6              BY MR. NEWMAN:

7         Q.    Do you recall what your opinion

8    was in 1998 as to the chance of Karyn Kerris'

9    AVM bleeding?

10             MS. HILLS:  Object to counsel's

11    sidebar.  Objection based on asked and

12    answered.  Objection, calls for speculation.

13             BY MR. NEWMAN:

14        Q.    Do you recall, doctor?

15        A.    Okay.  This is, again, 2007.  I

16    have given a number of invited lectures on the

17    natural history of this disease.  I,

18    therefore, have read a lot of papers and put a

19    lot of things together, which makes it very

20    hard to go back to 1998, because much of my

21    knowledge comes from more recent research.

22             Now, there were teachings,

24

1   research, papers that I knew of, obviously, in

2   1998 and before, to help me base my decisions.

3   Or 1998.  Exactly what percentage I would have

4   in mind in 1998, there is no way for me to

5   recall that far back, with the fact that AVMs

6   are a daily part of my work.

7           BY MR. NEWMAN:

8       Q.    Doctor, I am going to ask you now

9   to look at the third paragraph.  I will direct

10  you to the section in that that I am referring

11  to.

12          First with a recollection

13  question.  Do you have any recollection that

14  Ms. Kerris was having difficulty with balance

15  and progressive slurring of speech, increasing

16  in frequency, so that by November, 1998

17  Ms. Kerris was experiencing them every two to

18  three days?

19          MS. HILLS:  Objection, misstates

20  the document.  Objection, misstates facts in

21  the record.  Objection, does not give this

22  witness the underlying medical records to

25

1    which this paragraph directs and relies.

2                    BY MR. NEWMAN:

3         Q.    First of all, doctor, did I read

4    that line correctly, and that is -- I will do

5    it again.  I will do the entire paragraph

6    again, since counsel is not allowing the

7    questions.

8                    Ms. Kerris was asymptomatic until

9    1998 when she began experiencing increasing

10   difficulty with balance and progressive

11   slurring of speech, comma, increasing in

12   frequency, so that by November, 1998

13   Ms. Kerris was experiencing them every two to

14   three days and she reported having blacked out

15   on July 4, 1998 while driving.

16                    First of all, did I read that --

17                    MS. HILLS:  Objection, fails to

18   read the entire paragraph.  Objection, fails

19   to provide the records which the reader is

20   directed to in the paragraph.  And fails to

21   provide the witness the basis on which he

22   signed this affidavit which are the records to

26

1    which both the reader is directed to and is

2    cited in the paragraph.

3                    BY MR. NEWMAN:

4        Q.    I will just ask you a question.

5    Doctor, do you recall any of those symptoms as

6    they are written in that paragraph?

7        A.    This is where physicians have a

8    difficult time with lawyers' questions.

9                    I can interpret that question many

10   ways.

11       Q.    Dr. --

12       A.    I just need you to be more

13   specific, please.

14       Q.    Sure.  Can you testify under oath

15   that, in fact, as you swore under the penalty

16   of perjury, that those were Ms. Kerris'

17   symptoms at the time you evaluated her, as it

18   states in paragraph three?  Can you swear

19   under oath that that is true?

20                    MS. HILLS:  Same objections,

21   particularly of not providing the doctor with

22   the records to which the paragraph directs.

27

1          THE WITNESS:  May I see my

2     records?

3          BY MR. NEWMAN:

4     Q.    Sure.  Let me ask you this.

5          Doctor, did you tell counsel not

6     to give you any of your office records, or any

7     medical records in this case?

8          MS. HILLS:  Objection.

9          Do not answer that.  It intrudes

10     upon the attorney-client privilege.

11          BY MR. NEWMAN:

12     Q.    Doctor, can you answer any

13     questions in this deposition without your full

14     medical record?

15          MS. HILLS:  Objection.  Calls for

16     speculation.

17          THE WITNESS:  I have a

18     recollection that Karyn came to us with

19     abnormal gait, slurring, decreased mental

20     function.  If we want to go into further

21     details, it does reference this record, and I

22     should match paragraph three with the record.

28

1        BY MR. NEWMAN:

2        Q.    Did you do that before you signed

3    the affidavit initially?

4             MS. HILLS:  Objection.

5             BY MR. NEWMAN:

6        Q.    Match this comment with the

7    record?

8             MS. HILLS:  Objection.  Intrudes

9    upon attorney-client communications.

10             BY MR. NEWMAN:

11        Q.    Doctor, let me ask you a broader

12    question.  Did you write the declaration?

13             MS. HILLS:  Objection.  Overbroad.

14    Intrudes upon attorney-client privilege.

15             MR. NEWMAN:  Does that mean you

16    are not -- counsel is directing him not to

17    answer the question?  That's my question.

18             MS. HILLS:  You may answer that

19    question.

20             BY MR. NEWMAN:

21        Q.    Did you write this?

22             Same objection that counsel made.

29

1        A.    This is a legal document.  To me

2    it is just like a will.  I state my desires

3    and an attorney drafts it.  I wouldn't write

4    my own will.

5        Q.    Does that also mean, as to every

6    word in this document, you cannot attest to

7    its veracity because you didn't write it and

8    you may not have even spoken those words?

9              MS. HILLS:  Objection, counsel.

10   Misstates records -- misstates what the doctor

11   testified to.

12             THE WITNESS:  That is absolutely

13   not what I said.

14             BY MR. NEWMAN:

15       Q.    Let's do it then, doctor.  Let's

16   go to paragraph eight.

17             Without reading paragraph eight in

18   its entirety into the record, you may look at

19   paragraph eight and read it yourself.  My

20   questions to you are the same as before.

21             Is paragraph eight correct, to the

22   best of your understanding and recollection?

30

1          MS. HILLS: Objection. The

2    document speaks for itself.

3          THE WITNESS: So the -- I took the

4    time to read eight, which is kind of long.

5    Now I forgot the question.

6          BY MR. NEWMAN:

7          Q.    The question was, is there

8    anything in that statement that is incorrect

9    or does not state your recollection?

10         A.    It is an abbreviated form of my

11   recollection. There is also discussion of

12   alternative embolic agents or tools that I

13   would use to doing endovascular treatment.

14   (Pause). And there is, of course, a much

15   longer discussion on the agent we ultimately

16   treated her with, which is n-butyl

17   cyanoacrylate, n-BCA, and oil.

18         Q.    Just for clarity, was the oil

19   Lipiodol?

20         A.    I would have to see my records but

21   that would be likely.

22         Q.    First of all, you mentioned in

FEDER REPORTING COMPANY
(202) 863-0000     (800) 956-8996

1    regard to paragraph eight, that there were

2    other agents and embolic devices that may have

3    been discussed.  What other ones would be

4    discussed or were discussed?

5         A.    Back to your question, Lipiodol,

6    there is a similar agent, Ethiodol, that we

7    may have used.  It is in the current kit that

8    we purchased with n-BCA and Ethiodol for

9    embolization.  What was available to us in

10   1998, I don't recall which one, Ethiodol or

11   Lipiodol.  And Histocryl, again, which is a

12   brand name for the n-BCA.  That's what we

13   would have used.

14        Q.    There is a mention there of the

15   risks, benefits, complications, et cetera.  My

16   question to you is, in 1998, what risks were

17   there of this procedure, the embolization?

18        A.    Well, the risks in 1998 are the

19   same as they are in 2007.  And these risks

20   involve everything from beginning the

21   procedure, where we enter the femoral artery

22   in the region of the hip.  You damage the

32

1   artery to the leg.  Potentially lose the leg.

2   Then we take the catheter and we pass it up

3   through the body up to the neck, and then take

4   another one, pass it up through the brain to

5   the malformation.

6            If we damage any of those blood

7   vessels the result could be stroke.  Then,

8   when we use any embolic agent -- by embolic

9   agent what we mean is something that blocks a

10  blood vessel off on purpose, in order to treat

11  something.  There are complications related to

12  that.

13           With liquid embolic agents, the

14  type of thing that we are discussing,

15  treatment of this AVM, the risks include the

16  material getting around the catheter, the

17  small catheters in the brain, and trapping it

18  so that you can't remove it and you have to

19  leave it in place.  Again, you can damage

20  these fragile blood vessels, cause a bleed, or

21  cause them to block off, both of which result

22  in stroke.

33

1          And the embolic material can go

2     where you don't want it to.  That can block

3     off the normal blood vessels and cause stroke.

4          Q.    Do you use the term nontarget

5     embolization for that?

6          A.    No, I don't.

7          Q.    Doctor, all in all, as far as the

8     risks of mortality from the embolic procedure

9     with the Histoacryl, what were the chances of

10    the risks of that occurring?

11          MS. HILLS:  Objection, calls for

12    speculation.  Objection, vague.

13          BY MR. NEWMAN:

14          Q.    Doctor, just for the record, let

15    me reask the question.

16          What was the mortality rate for

17    using Histoacryl as you did in 1998 for an

18    embolization of an AVM such as Karyn Kerris'?

19          A.    I believe it has a fair amount to

20    do with the skill of the operator and how much

21    risk the operator is willing to take.  I have

22    done hundreds, probably over a thousand

34

1    injections with n-BCA and, to my knowledge, we

2    have had one patient with a hemorrhage, and it

3    is unclear whether that was the cause of the

4    death.  So it would be one patient.  So we are

5    talking less than one percent.

6                   In other hands -- there are

7    series, as you know -- it can be higher.

8         Q.    As far as morbidity is concerned,

9    what was the percentage chance of any

10   morbidity of a significant neurologic

11   compromise from the embolization?

12                MS. HILLS:  Objection.  Vague.

13                BY MR. NEWMAN:

14        Q.    Make it real easy, doctor.  What

15   are the chances of Karyn Kerris winding up the

16   way she is presently following an

17   embolization?

18        A.    Objection.  Assumes facts not in

19   evidence.  Vague.

20                BY MR. NEWMAN:

21        Q.    What are the chances of her

22   winding up the way she is right now?

35

1          MS. HILLS:  Objection.  Calls for

2   speculation.  Vague.  It assumes facts not in

3   evidence.

4          THE WITNESS:  The question is hard

5   to follow.  I just don't follow the question.

6          BY MR. NEWMAN:

7      Q.    Doctor, presently, at least the

8   last time -- when was the last time you saw

9   Karyn Kerris?  Do you know when that was,

10   roughly?

11      A.    A long time ago.

12      Q.    At that time when you last saw her

13   was she suffering from any kind of neurologic

14   compromise?

15      A.    The last time I saw her was

16   actually not even professionally.  She was

17   just traveling through our hallway.  She

18   appeared to have progressed.

19      Q.    All right, doctor.

20          Prior to the embolizations of

21   Karyn Kerris -- first of all, were there three

22   embolizations done by you?

36

1          A.    That's my recollection.

2          Q.    Prior to any of those procedures

3     were any flow studies done as to the AVM?

4          A.    What kind of flow studies?

5          Q.    Did you do any type of study to

6     determine the kind of pressures involved or

7     the blood flow through the AVM as far as

8     velocity, amount, pressure?

9          A.    That's not standard care.  We did

10    MRIs, which do have a lot of flow information.

11         Q.    I will ask you this, doctor.  On

12    what basis do you select the percentage of

13    n-BCA versus oil when you embolize?

14              MS. HILLS:  Objection.  Vague.

15              THE WITNESS:  You put the

16    microcatheters, the very, very small

17    catheter -- smaller than angel hair pasta, is

18    what I tell the patients.  It is a very small,

19    delicate catheter.  In the position that you

20    want to block off.  You inject dye under x-ray

21    and you see how rapidly it travels, and you

22    see what is in front of you, how many vessels,

37

1    one direct connection, many small ones, and

2    with experience you can determine how rapidly

3    you need n-BCA mixed with the radiopaque oil,

4    or one of the new agents we have.  You can

5    determine which concentration you want and

6    which speed you want it to harden, or come up

7    with strategies if you think it is too fast or

8    too slow.

9              BY MR. NEWMAN:

10        Q.    First of all, doctor, do you

11   believe that in 1998 and 1999 you were using

12   Histoacryl as opposed to any other

13   cyanoacrylate?

14        A.    I think in 1998 n-BCA was

15   available as the brand name Histocryl.  I

16   don't think the brand name TruFill was yet

17   being sold.  It wasn't available yet.  That's

18   the current agent that we use in 2007.

19              As a cyanoacrylate, I believe

20   those are the only two brands I have used,

21   n-butyl cyanoacrylate sold as Histocryl and

22   sold as TruFill.

38

1          Q.    Am I correct that, since TruFill

2    was not available to 2000, that prior to that

3    you were using Histoacryl?

4          A.    I don't have the records in front

5    of me about exactly when TruFill came on the

6    market.  But it would be reasonable to assume

7    that we were using Histocryl in 1998.  Because

8    my recollection in your question is that it

9    wasn't available until later.

10          Q.    Doctor, prior to using Histoacryl

11    or Histocryl, had you read the package insert?

12    This is any time prior to using it in Karyn

13    Kerris.

14          A.    I can remember reading the package

15    insert in training.  I think I probably read

16    it a couple of times after that.

17          Q.    Let me ask you if you recall the

18    contraindication written by the manufacturer

19    of Histoacryl.  First of all, do you recall

20    the contraindication?

21          A.    I believe there are likely more

22    than one contraindication.  If you want me to

39

1    quote a long sheet of paper, you are asking

2    someone to memorize the Gettysburg address.  I

3    don't have it committed to memory.

4         Q.    Fair enough.  My question, doctor,

5    is do you remember, if you say there was more

6    than one, any of the contraindications of

7    Histoacryl, as we sit here today?  I am just

8    asking a recollection question.

9         A.    Some of the contraindications

10   would involve trying to suture together pieces

11   of the surface of the brain, I believe.

12   Trying to suture together nerves or something.

13   Things that are unrelated to what we were

14   doing.

15        Q.    Do you recall there being a

16   contraindication that said the administration

17   to blood vessels should be avoided on account

18   of risk of thrombosis and damage to the

19   vascular wall?  Do you recall that

20   contraindication?

21        A.    I don't remember the exact

22   wording.  Our goal is to block off the blood

40

1    vessels.  And I do remember that wording but

2    the sole purpose of the embolization is to

3    block off the blood vessel.

4         Q.    I understand, doctor.  That was

5    your purpose.  But then you did recognize,

6    when you were using Histoacryl, it was

7    contrary to the manufacturer's

8    contraindication that says do not put it in

9    blood vessels?

10            MS. HILLS:  Objection.  Misstates

11    the document.  You have the document before

12    you so the document speaks for itself.  But I

13    believe what you read, sir, is that it should

14    be avoided, not that the manufacturer said it

15    was contrary to its use.

16            THE WITNESS:  It very clearly did

17    not say it is contraindicated for this

18    purpose.

19            MR. NEWMAN:  Doctor -- first of

20    all, let me put on the record that, counsel,

21    that is the last speaking objection.  We will

22    have to reconvene this in front of Magistrate

FEDER REPORTING COMPANY
(202) 863-0000      (800) 956-8996

41

1    Kay because you do not know how to allow me to

2    conduct a deposition and I don't wish to spend

3    many, many days with this deponent.  With that

4    being on the record, let me try to finish this

5    one point and we can reconvene at counsel's

6    expense.

7                MS. HILLS:  Objection to sidebar.

8                BY MR. NEWMAN:

9        Q.    Doctor, are you surprised that

10   within Histoacryl's contraindication what you

11   said would not be a contraindication

12   specifically says administration to the intima

13   and media of blood vessels should be avoided

14   on account of risk of thrombosis and damage to

15   the vascular wall?

16               MS. HILLS:  Objection.  The

17   document speaks for itself.

18               BY MR. NEWMAN:

19       Q.    My question is are you surprised

20   by that being a contraindication when you said

21   it wasn't?

22       A.    It is not a contraindication.  It

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

42

1    is telling you, if you apply it to the blood

2    vessel wall, you will block the blood vessel

3    off.  Since our entire goal is to block the

4    blood vessel off, I don't follow your

5    question.

6                    BY MR. NEWMAN:

7          Q.    Doctor, why did the manufacturer

8    of Histoacryl say it is contraindicated to

9    block the blood vessel wall and you say that

10   that is incorrect?

11                   MS. HILLS:  Objection, the

12   document speaks for itself.  Objection,

13   misstates the document.  Objection, asked and

14   answered.

15                   MR. NEWMAN:  We are going to stop

16   the deposition at this point, reconvene,

17   request, if we can, with the magistrate.

18   Counsel's behavior has been outrageous.

19                   MS. HILLS:  I would like to put on

20   the record my objection.  Counsel has not

21   brought documents for the witness.  He has

22   misread them and misstated them.  He objects

43

1    to objections that are directly from the D.C.

2    Civil Rules and is now leaving.  To object to

3    misstating the document is not a speaking of

4    document.  Moreover, his demeanor and his

5    questions have been misleading of these

6    documents, nor has he allowed the witness to

7    look at these documents to show that they are

8    misstated.  If he chooses to leave now, we

9    will ask the magistrate judge to ask that the

10   expense be borne by the plaintiffs.  We are

11   prepared to stay here for the two and-a-half

12   hours that he represented that he would be

13   here.  However, if they choose to leave after

14   this expense, that is their choice.

15           MR. NEWMAN:  Let me put on the

16   record the Histoacryl package insert which is

17   going to be Exhibit 2.

18           MS. HILLS:  Do you have a copy for

19   counsel?

20           MR. NEWMAN:  It will be attached

21   to the exhibit -- depo.

22           MS. HILLS:  I need to see it at

FEDER REPORTING COMPANY
(202) 863-0000     (800) 956-8996

44

1    the same time the witness is questioned.

2             MR. NEWMAN:  I am not questioning

3    the witness anymore.  Your behavior, counsel,

4    in 25 years I have never seen anything like

5    it.

6             I will tell you, Dr. Watson, you

7    will be redeposed until these questions are

8    answered, so help me.

9             With that being in mind, I cannot

10   imagine counsel was not giving the witness his

11   own medical records in an effort to stop and

12   impede my deposition.  I have never seen that

13   before.

14            With that we are leaving.  Please

15   take it up with the magistrate.  We will, of

16   course, mark this as Exhibit 2.

17            (Document referred to marked

18   Deposition Exhibit No. 2 for identification

19   and subsequently attached to the deposition.)

20            MS. HILLS:  Please note my

21   objection.

22            VIDEOTAPE OPERATOR:  Going off the

45

1    record.

2              (Whereupon, at 11:12 p.m., the

3    deposition was adjourned, to reconvene as

4    determined.)

5                        + + +

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

46

1              CERTIFICATE OF NOTARY PUBLIC

2                    I, Zev V. Feder, the officer

3      before whom the foregoing deposition was

4      taken, do hereby certify that the witness,

5      whose testimony appears in the foregoing

6      deposition, was duly sworn by me; that the

7      testimony of said witness was taken by me in

8      shorthand and thereafter reduced to computer

9      type under my direction; that said deposition

10     is a true record of the testimony given by

11     said witness; that I am neither counsel for,

12     related to, nor employed by any of the parties

13     to which this deposition was taken; and

14     further, that I am not a relative or employee

15     of any attorney or counsel employed by the

16     parties hereto, nor financially or otherwise

17     interested in the outcome of the action.

18

19                          _____

                            Notary Public in and for
20                          The District of Columbia

21     My Commission Expires:
       April 14, 2007
22

                    FEDER REPORTING COMPANY
                 (202) 863-0000    (800) 956-8996