# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEPOSITION EXHIBIT
WATSON 1
3-27-07 [initials]

| | |
|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, As Guardian of the Person and Property of KARYN A. KERRIS, <br><br> Plaintiffs, <br><br> v. <br><br> Georgetown University Hospital, GEORGETOWN UNIVERSITY, t/a Georgetown University, and VANCE E. WATSON, M.D., <br><br> Defendants. | Civil Action No. 1:05CV02086 <br> Judge Paul L. Friedman |

*you wrote*

*Nothing same as now*

CITY OF WASHINGTON   )
                                         )
DISTRICT OF COLUMBIA )

## DECLARATION OF VANCE E. WATSON, M.D.

I, Vance E. Watson, M.D., hereby declare and state as follows:

1. My name is Vance E. Watson, M.D. I am over the age of 18, and am otherwise competent and authorized to make and give this Declaration in connection with the above numbered and entitled case. I have personal knowledge of the facts set forth below. The statements set forth in this Declaration are true and correct based upon my personal knowledge to the best of my knowledge and recollection.

2. Plaintiff Karyn Kerris ("Ms. Kerris") was referred to Georgetown University Hospital ("GUH") in the summer of 1998 after she discovered that she had a bithalmic arteriovenous malformation ("AVM"), measuring 6 to 7 centimeters, from a magnetic resonance imaging ("MRI") performed in December 1997 at the National Institute of Health ("NIH"), while

participating as a control in a voluntary study where Ms. Kerris was employed. Ms. Kerris was told that her condition was terminal. *See* 11/4/98 GUH Consultation Report (Ex. 3); 11/4/98 GUH Radiology Report (Ex. 7); 3/5/99 GUH Psychiatry Consult (Ex. 2).[1]

3.   Ms. Kerris was asymptomatic until March 1998 when she began experiencing increasing difficulty with balance and progressive slurring of her speech, increasing in frequency so that by November 1998, Ms. Kerris was experiencing them every 2 to 3 days and she reported having blacked out on July 4, 1998 while driving. *See* 11/4/98 GUH Consultation Report (Ex. 3). Ms. Kerris also carried the diagnosis of having Turner's Syndrome. *Id.*[2]

4.   On August 31, 1998, Ms. Kerris presented at GUH for a cerebral arteriogram to delineate further the abnormalities of the blood vessels – AVM – within Ms. Kerris's brain. 8/31/98 GUH Ambulatory and Less Than 48 Hours Record (Ex. 1).

5.   On August 31, 1998, Ms. Kerris signed a Consent for Surgery, Anesthetics, and Other Medical Services ("Consent Form"). *See* 8/31/98 Consent Form (Ex. 4). As is the case with all of the other Consent Forms Ms. Kerris signed, in the August 31, 1998 Consent Form, Ms. Kerris acknowledged that I had

> described the nature of this procedure to me in terms I understand and has answered all questions I have asked about it to my satisfaction. He has also explained significant complications and risks which may be associated with this procedure, including the complications and risks of anesthesia, and has advised me of possible alternatives to this treatment, including the possible consequences of no treatment at all, and the significant complications and risks associated with such alternatives. *Id.*

---

[1] Unless specifically noted, all citations to Exhibits are to Exhibits attached to Defendants' Statement of Facts Defendants Contend Are Undisputed ("SOF"). By reference to these exhibits, Vance C. Watson, M.D., affirms that these Exhibits, as well as all Exhibits attached to the aforementioned Statement, are true and accurate copies of documents contained in Karyn Kerris's medical record.

[2] *See* definition of Turner's Syndrome at SOF ¶ 2.

6.  Ms. Kerris also acknowledged that "I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me as the result of treatments or examination in the hospital." *Id.*

7.  The August 31, 1998 arteriogram showed that "[t]here is a high flow arteriovenous malformation involving the thalamic structures bilaterally, and primary drainage is the vein of Galen." *See* 8/31/98 Bilateral Carotid Arteriogram (Ex. 5). The conclusion was "bithalamic arteriovenous malformation, Spetzler-Martin, grade 5." *Id.*[3]

8.  I had multiple conversations with Ms. Kerris about her condition, the seriousness of it, her prognosis, the alternative treatments available, the risks, benefits, and complications associated with each of the alternative procedures, including those associated with embolization with an acrylate (the "glue") and oil-based contrast – the mixture plaintiffs have labeled, Lipiodol/Histoacryl[4] – including the risks and complications of doing nothing, prior to doing each of the three embolization procedures using the Lipiodol/Histoacryl mixture. Surgery and radiosurgical treatments were also discussed as options.

9.  While I had discussions with Ms. Kerris about some of the issues described in paragraph 8, when her parents and husband were singly or together present, I had several conversations regarding all of the issues described in paragraph 8 with Ms. Kerris alone.

---

[3] The Spetzler-Martin is a 5 point scale. "The rate of neurological complications increased by Spetzler-Martin grade. Female gender, AVM size, and deep venous drainage were significantly associated with neurological deficits at in-hospital and long-term evaluation." *See* "Determinants of Neurological Outcome After Surgery for Brain Arteriovenous Malformation," Hartmann, A., et al., *Stroke.* 2000; 31:2361.

[4] For the sole purpose of this motion, defendants accept, *arguendo*, plaintiffs' factual allegations, but do not agree that plaintiffs have accurately represented the facts of the case.

10. Of particular concern to Ms. Kerris was treatment for the fact that she felt she was experiencing progressive cognitive decline and increasing motion disorders. *See* 11/4/98 GUH Radiology Report ("28 yo woman with Turner's Syndrom [sic] had decreasing cognitive function and increasing gait ataxia [uncoordinated movement of the arms, hands, legs, or trunk] worsened with exertion . . . . She also reports slurring of speach [sic] and right sided headache's [sic] which occur at night") (Ex. 7).

11. I told Ms. Kerris that her symptoms were unusual and there was a real concern that her cognitive issues, Parkinson's-like symptoms, focal deficits, and sleepiness would progress.

12. I also explained that her AVMs carried a risk of hemorrhage, which could lead to stroke and/or death.

13. I described the embolization procedure with a Lipiodol and Histoacryl mixture and that – while it would not be a cure or address her risk of hemorrhage – I had a previous patient whose cognitive decline had improved after undergoing a series of such embolizations, but another patient who had died after experiencing complications associated with the procedure.

14. I clearly explained to Ms. Kerris that improvement of her cognitive symptoms with a series of embolization procedures using the Lipiodol and Histoacryl mixture was only a theory with significant, great risks – including a high rate of failure, death, stroke, neurological worsening – and that there was no way to predict whether Ms. Kerris would improve, stay the same, decline, or even die from the treatment. I also expressed to Ms. Kerris that it was unlikely that we could completely cure her AVM, and she would, therefore, remain at risk for hemorrhage.

4

*[handwritten annotations]*

15. I also told Ms. Kerris that while using a Lipiodol and Histoacryl mixture in embolization had been used before,[5] neither the procedure, *nor* the substances were approved by the Food and Drug Administration ("FDA") and would need to be obtained from a foreign source such as Canada.

16. I particularly remember discussing the fact that the substances to be used – Lipiodol and Histoacryl, individually, nor the mixture of them together, as was going to be used in her medical procedure – had not been approved by the FDA with Ms. Kerris as I discussed with her that she might need to write a letter of need to facilitate bringing the items into the country.

17. I also remember Ms. Kerris remarking that – as an employee of NIH – she was very familiar with the use of substances that the FDA had not approved and that she was more than willing to write such a letter if one were needed.

18. Further, as per Ms. Kerris's medical record, members of my staff were asked to speak with an employee of Blue Cross/Blue Shield to obtain insurance approval for the procedure. These notes establish that "proc.[ess] needs glue" was approved. *See* 11/4/98 Insurance Notes (Ex. 9).

---

[5] *See* Chul Suh, D., et al., "Change of Spontaneous Reaction of Glue and Lipiodol Mixture during Embolization after the Addition of Tungsten Powder: In Vitro Study," Am J Neuroradiol 21:1277-1279 (August 2000); Casaco A., et al., "Major Complications of Percutaneous Embolization of Skull-Base Tumors," Am J Neuroradiol 20:179-181 (Jan. 1999); Stoesslein F., et al., "Experimental Studies on New Liquid Embolization Mixtures (histoacryl-lipiodol, histoacryl-panthopaque)," Cardiovasc Intervent Radiol, 1982; 5(5):264-76; Lieber, B. et al., "Acute and Chronic Swine Rete Arteriovenous Malformation Models: Effect of Ethiodol and Glacial Acetic Acid on Penetration, Dispersion, and Injection Force of N-Butyl 2-Canoacrylate," Am J Neuroradiol 26(7):1707-1414 (Aug 2005); Hong, J., et al. "Successful Management with Glue Injection of Arterial Rupture Seen during Embolization of an Arteriovenous Malformation Using a Flow-Directed Catheter: A Case Report," Korean J Radiol 2000; 1:208-211.

Because of the rare nature of Ms. Kerris's medical presentation, "[t]he case was discussed at [the] multidisciplinary neurovascular conference and endovascular treatment was encouraged." 11/4/98 GUH Radiology Report (Ex. 7). The multidiscliplinary neurovascular conference is a group consisting of neurosurgeons, neurologists, and radiologists from Georgetown University, other hospitals, and private practice, which meets regularly, at which different doctors present cases that they have, the diagnosis, and treatment of the condition is discussed in the open forum. From the description of Ms. Kerris' case to the conference, I would have presented her images and clinical findings and a discussion of them would have followed.

19. On November 4, 1998, prior to undergoing the first of the series of embolization procedures using the Lipiodol/Histoacryl mixture, Ms. Kerris acknowledged that I had explained all material facts regarding the embolization procedure to her in a manner that she could fully understand and that I had satisfactorily answered any questions she had by signing the November 4, 1998 Consent Form. See 11/4/98 Consent Form (Ex. 6).

20. The November 4, 1998 Consent Form contained the same acknowledgement as the August 31, 1998 Consent Form that all risks, complications, and alternative treatments had been satisfactorily explained to Ms. Kerris and that no guarantees were given to her as to the result of the treatment. Id.

21. Ms. Kerris underwent the first of her embolization procedures on November 4, 1998 in an attempt "to maintain optimal cerebral tissue perfusion." 11/4/98 GUH Patient Care Summary (Ex. 11). Ms. Kerris experienced no clinical complications during the procedure. See 11/4/98 GUH Radiology Report (Ex. 7).

22. Ms. Kerris returned to GUH for the second in the series of embolization procedures using the Lipiodol/Histoacryl mixture on January 13, 1999 in an attempt to maintain

6

optimal cerebral tissue perfusion. 1/13/99 GUH Consultation Report; 1/13/99 GUH Patient Care Summary (Exs. 26[6] & 10, respectively).

23.     Again, prior to undergoing this second of the series of embolization procedures using the Lipiodol/Histoacryl mixture, Ms. Kerris acknowledged that I had satisfactorily explained the procedure, all material aspects (possible risks, benefits, complications, alternative treatments, etc.) of the procedure in terms that she could understand and answered any questions that she might have. 1/13/99 Consent Form (Ex. 10).

24.     Ms. Kerris underwent the second embolization using the Lipiodol/Histoacryl mixture without complications. 1/13/99 GUH Consultation Report (Ex. 26).

25.     Ms. Kerris returned to GUH for the third in the series of embolization procedures using the Lipiodol/Histoacryl mixture on March 3, 1999 in an attempt to address a declining level of consciousness, worsening lethargy, difficulty walking, and declining fine motor skills, "barely able to work." See 3/17/99 GUH Discharge Summary; 3/5/99 GUH Psychiatry Consult (Exs. 14 & 2, respectively). There were no evident technical complications during the procedure. 3/17/99 GUH Discharge Summary (Ex. 14).

26.     Again, prior to undergoing the third of the series of embolization procedures using the Lipiodol/Histoacryl mixture, Ms. Kerris acknowledged that I had satisfactorily explained the procedure, all material aspects (possible risks, benefits, complications, alternative treatments, etc.) of the procedure in terms that she could understand and answered any questions that she might have. 3/3/99 Consent Form (Ex. 15).

---

[6] Exhibit 26 is attached only to Dr. Watson's affidavit, but is incorporated by reference into defendants' motion in its entirety as support for the motion as a whole.

7

27.  I am in the practice of medicine with a specialty in interventional neuroradiology. I am not a manufacturer of any product, nor do I sell any product.

28.  The purpose of my interaction with Ms. Kerris was to provide medical treatment for her serious condition of bithalamic AVMs with progressive symptoms.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Vance C. Watson*
Vance C. Watson, M.D.

Executed on: March 3, 2006