IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
*Civil Division*

| | |
|---|---|
| **FELICE I. IACANGELO,** *et al.* : | |
| : | **Civil No. 1:05CV02086** |
| Plaintiffs, : | |
| : | **Judge Paul L. Friedman** |
| vs. : | |
| : | **Magistrate Judge Alan Kay** |
| **GEORGETOWN UNIVERSITY**, *et al.* : | |
| : | |
| Defendants. : | |
| _____ : | |

### PLAINTIFFS' BRIEF STATEMENT AS TO RELEVANT WITNESSES' TESTIMONY

On June 26, 2007, this Court Ordered Plaintiffs to file a brief statement proffering the potential relevant testimony of requested deponents. Since the time of Plaintiffs' request, discovery has become further focused.

The first piece of new discovery came from Dr. Watson's deposition. Dr. Watson testified that his decision to use the Class III unapproved devices and not seek IRB approval was based on conversations he had with then General Counsel of the Medical Center, Sheila Zimmet, Esq.[1]

---

[1] Q: Doctor do you believe that the use of Histoacryl in the time that you injected it into Karyn Kerris was illegal?
Ms. Hills: Same Objection
The Witness: I asked this question to counsel in the past and present and been told it's not illegal.
Q: Who did you ask in the past?
A: Well, the immediate past, my current counsel.
Q: And before that?
A: Discussing Histoacryl in general would be Sheila Zimmet would be counsel.
Q: And why did you ask counsel Sheila Zimmet whether your use of Histoacryl was legal?
Ms. Hills: Object to form; mischaracterizes testimony, and calls for speculation
The Witness: I was never under the assumption it was illegal because it was used at Duke during my residency, it was used at UCLA, it was used many places around the country. The question to counsel evolved bu somebody questioning whether, or just a general discussion about should the use of this go through the, what's called the Georgetown IRB.
    I don't remember which board member I asked this to, to see who I should talk to. And then I was referred to Sheila Zimmet who is on the IRB and was also counsel. And I asked her, told her unapproved, and do we need to put this through the IRB. And She said no.
Q: And why not?
Ms. Hills: Object to form; calls for speculation?

The second piece of discovery was uncovered though both investigations of Court records and internet. Plaintiffs' counsel discovered that Leo J. O'Donovan (then President of the University) and Kenneth Bloem (then CEO of the Medical Center) instituted a policy in 1997 (which remained in effect through the relevant time period) that the medical staff had to generate up to 70% of their salary or face salary reductions of up to 30% per year. This policy resulted in 18 members of the faculty, including one Leonard Chiazze, Jr., M.D. (a member of the IRB) bringing suit against Georgetown University for interfering with their practice of medicine by basing it on volume and income. *Glazer v. Georgetown University,* CA. No. 0000321-99 (D.C. Sup. Ct, Nov 14, 1999). Based on the aforesaid, Plaintiffs continue to require the depositions of Kenneth D. Bloem, Leo O'Donovan, Paul Katz, Henry Yeager, M.D. and Dieter Schellinger, M.D., but do not believe at this time that the depositions of either Charles Crawley or J. Willard Marriott will be necessary. Instead, for the reasons aforesaid Plaintiffs are requesting the depositions of Sheila Zimmet, Esq. and Leonard Chiazze, Jr., M.D. in lieu of Charles Crawley

---

The Witness: You know, I'm not –
Q: Did she tell you?
A; I'm not a lawyer. The question she asked me was, "Are you doing research with thus or are you treating patients?" And I said, "I'm not doing research. I'm just using it to treat patients."
Q: Do I understand that you would have had no objection to going through and IRB with your use of Histoacryl?
A: If somebody asked me to submit something to the IRB, I would do it. I've submitted many applications.
(Watson p. 128, l. 9 - 130, l. 19)
 \*   \*   \*   \*
Q: Dr. Watson, before the last tape was over we had a discussed a question that you asked Sheila Zimmet. I believe there were two. One whether the use of glue involved the IRB. Another one was whether or not it was legal.
Ms. Hills: Objection; misstates prior testimony
By Mr. Newman:
Q: Doctor let me ask you a question: If Ms. Zimmet told you it was illegal to use the Histoacryl would you have continued to to so?
Ms. Hills:  Objection; calls for speculation, assumes facts not in evidence.
The Witness: I don't think I would have been given a choice. I mean if the counsel said that they would stop you. I mean, they would come over and say, "Give it up."
(Watson, p. 140, l. 13 - 141, l. 10 )

and J. Willard Marriott.[2] Plaintiffs therefore provide proffers for the depositions of: Kenneth D. Bloem, Paul Katz, Leo J. O'Donovan and Leonard Chiazze, Jr., M.D.[3]

1.  Kenneth D. Bloem (Then member Board of Directors and CEO for the Medical Center)
    a.  Tenure at the Medical Center (during the relevant time period) when he was sent from the Board of Directors to the Medical Center become CEO of the Medical Center in hopes of helping the ailing Medical Center increase its profits;
    b.  The implementation of a higher profit policy that required the staff and faculty to generate larger revenues or risk pay reduction, including defendant Vance E. Watson, M.D. and his department of interventional neuroradiology;
    c.  The lawsuit regarding Leo J. O'Donovan's decision to implement the higher profit policy and its effects on the use, or continued use, of the illegal Class III devices;
    d.  Reasons for his termination related to changing the method of physicians' practices;
    e.  Knowledge of the Board of Directors and the Medical Center Administration regarding the illegal use of Class III devices;
    f.  Interactions with the FDA and/or U.S. Customs officials;
    g.  Knowledge of the smuggling of the devices across the U.S. border;
    h.  Any risk/benefit evaluation of unapproved Class III devices that was conducted by the Board of Directors and/or the officers of the Medical Center;
    i.  Knowledge of Sheila Zimmet, Esq.'s position that Histoacryl and Lipiodol, non-approved Class III devices, were, in her opinion, "legal" devices;
    j.  His position regarding Sheila Zimmet's opinion that the use of non-approved Class III devices did not require IRB approval;
    k.  The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris;
    l.  Whether the use of non-approved Class III devices, subject to a seizure order, violated the Policies and Procedures of the Medical Center; and
    m.  What reprimand would occur if an employee such as Dr. Watson was found to have been violating the Board of Director's, University's and/or Medical Center's Policies and Procedures.

---

[2] Since Judge Friedman, in addressing Plaintiffs' request for the depositions of Ms. Zimmet, Dr. Kenneth Bloem, Dr. Leonard Chiazze and Paul Katz, mentioned that, "Magistrate Judge Kay has set forth in his Memorandum Order of June 26, 2007 a methodology for dealing with Plaintiffs' other deposition requests," (Memorandum Opinion and Order, June 27, 2007 p. 3), Plaintiffs felt it prudent to include the request and proffer for Dr. Chiazze at this time.

[3] This Court does not need to address the issue of deposing Ms. Zimmet for Judge Friedman has already ordered her deposition to be conducted and it has been scheduled for July 23, 2007. (Memorandum Opinion and Order of June 27, 2007 p. 4). This Court has already denied Defendant's Motion for Protective Order regarding Drs. Yeager and Shellinger. (Memorandum Order of June 26, 2007, p. 7).

2.     Paul Katz (Then COO for the Medical Center)
    a.     His tenure at the Medical Center (during the relevant time period) when, he became aware of the higher profit policyt mandate of the Board of Directors and Kenneth D. Bloem;
    b.     The lawsuit that ensued and the reasons for Mr. Bloem's termination;
    c.     Evidence of the knowledge of the Medical Center administration as to embolization procedures performed at their institution with illegal Class III devices;
    d.     Any risk/benefit evaluation of unapproved Class III devices that was conducted by the Board of Directors and/or the officers of the Medical Center;
    e.     Knowledge of Sheila Zimmet, Esq.'s position that Histoacryl and Lipiodol, non-approved Class III devices, were, in her opinion, "legal" devices;
    f.     His position regarding Sheila Zimmet's opinion that the use of non-approved Class III devices did not require IRB approval;
    g.     The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris;
    h.     Whether the use of non-approved Class III devices, subject to a seizure order, violated the Policies and Procedures of the Medical Center; and
    i.     What reprimand would occur if an employee such as Dr. Watson was found to have been violating the Medical Center's Policies and Procedures.

3.     Leo J. O'Donovan (Then President of Georgetown University)
    a.     The policy of the University during the relevant time period regarding the switch to a higher profit policy;
    b.     The time when Kenneth Bloem was sent by mandate of the Board of Directors, to become CEO of the Medical Center to help the ailing Medical Center increase profits;
    c.     His higher profit policies that required the staff and faculty to generate larger revenues or risk pay reduction, including defendant Vance E. Watson, M.D. and his department of interventional neuroradiology;
    d.     The lawsuit that ensued and his reasons why he removed the policies instituted by Kenneth Bloem and which ultimately removed him from office;
    e.     What knowledge he or the University had regarding the illegal use of Class III devices at the Medical Center;
    f.     Past interactions with the FDA and/or Customs officials;
    g.     Knowledge of the devices being smuggled across the U.S. border;
    h.     His position regarding Sheila Zimmet's opinion that the use of non-approved Class III devices did not require IRB approval;
    i.     The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris;
    j.     Whether the use of non-approved Class III devices, subject to a seizure order, violated the Policies and Procedures of the Medical Center; and
    k.     What reprimand would occur if an employee such as Dr. Watson was found to

      have been violating the University's Policies and Procedures.

4. Leonard Chiazze, Jr., M.D. (Then and present Institutional Review Board Member, Georgetown University)
   a. His tenure, during the relevant time period as an Institutional Review Board (IRB) Member;
   b. Knowledge of the Medical Center's or Medical Center Personnel's use of Histoacryl and Lipiodol and whether either were presented to, or approved by, the IRB;
   c. Whether he was aware of any statement made by Sheila Zimmet, Esq., regarding the legality of the devices or whether they needed IRB approval;
   d. Knowledge of any IRB approved informed consent ever generated for the use of Histoacryl, and what that consent would have included., i.e., the known risks of the treatment, a statement that the use of these devices was illegal, that enrollment was voluntary, a list of alternative (legal) treatments, and the risks if no treatment was provided, etc.;
   e. The law suit he and 17 other plaintiffs brought against Georgetown University, its officers, and Board of Directors;
   f. Knowledge of policies and procedures that required the staff and faculty to produce profits or risk pay reduction; when they were in effect; whether they involved the entire Medical Center, including the department interventional neuroradiology;
   g. His position regarding Sheila Zimmet's opinion that the use of non-approved Class III devices did not require IRB approval;
   h. The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris;
   i. Whether the use of non-approved Class III devices, subject to a seizure order, violated the Policies and Procedures of the Medical Center;
   j. What reprimand would occur if an employee such as Dr. Watson was found to have been violating the Medical Center's Policies and Procedures; and
   k. The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris.

                Respectfully submitted,
                By:    /s/ Anthony Newman
                Anthony Newman
                NEWMAN, MCINTOSH & HENNESSEY, LLP
                7315 Wisconsin Ave., Suite 700E
                Bethesda, MD 20814
                (301) 654-3400

/s/ Andrew E. Greenwald
Andrew E. Greenwald
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

Pursuant to the United States District Court Local Rule for the District of Columbia 5.4(d), I hereby certify that a copy of the foregoing Statement was served via electronic filing on the Court's CM/ECF website on July 2, 2007 to:

Megan Hills, Esq.
Nicolas Muzin, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005

/s/ Anthony Newman
Anthony Newman

-6-