IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, As Guardian of the Person and Property of KARYN A. KERRIS, <br><br> Plaintiffs, <br><br> v. <br><br> Georgetown University Hospital, GEORGETOWN UNIVERSITY, t/a Georgetown University, and VANCE E. WATSON, M.D., <br><br> Defendants. | Civ. Action No. 1:05CV02086 (PLF/AK) <br><br> Judge Paul L. Friedman <br><br> Magistrate Judge Alan Kay |

DEFENDANTS'[1] RESPONSE
TO PLAINTIFFS' STATEMENT AS TO RELEVANT WITNESS TESTIMONY

Plaintiffs' justification for taking the depositions of four former high-level Georgetown University officials is their alleged knowledge of a University compensation policy that Plaintiffs claim was the subject of the lawsuit, *Glazer v. Georgetown University*, CA No. 0000321-99 (D.C. Sup. Ct. 1999) ("*Glazer*").[2] Plaintiffs' rationale fails for at least three reasons. First, *Glazer* involved and was brought only by "**tenured members**" of Georgetown University

---

[1] Georgetown University and Vance E. Watson, M.D. (collectively, "Defendants"; singularly, "GU" and "Dr. Watson," respectively).

[2] Plaintiffs' Brief Statement As To Relevant Witnesses' Testimony, filed 7/2/07 ("Plts.' Stm."), at 2 ("Plaintiffs' counsel discovered that [Fr.] Leo J. O'Donovan (then President of the University) and Kenneth Bloem (then CEO of the Medical Center) instituted a policy in 1997 (which remained in effect through the relevant time period) that the medical staff had to generate up to 70% of their salary or face salary reductions of up to 30% per year. This policy resulted in [a] . . . suit against Georgetown University for interfering with their practice of medicine by basing it on volume and income. *Glazer v. Georgetown University*, CA No. 0000321-99 (D.C. Sup. Ct., Nov. 14 [sic], 1999)." *See Glazer* Complaint attached as Exhibit 1.

faculty and involved the impact of a compensation policy on certain **tenure** rights. **Dr. Watson was never tenured, nor has he ever been in a tenure track position;**[3] therefore, the lawsuit had no impact on him or his medical practice. Second, Dr. Watson testified that he knew virtually nothing about the compensation policy or the *Glazer* lawsuit. Third, Plaintiffs never explain how a lawsuit that did not affect the alleged negligent doctor and of which he was unaware bears upon the medical treatment rendered to Ms. Karyn A. Kerris ("Ms. Kerris").

The *Glazer* lawsuit involved and was brought only by "**tenured members**" of Georgetown University faculty and involved only the impact of the compensation policy on certain **contractual tenure rights of those individuals**; therefore, the litigation has no relevance or even connection to Plaintiffs' lawsuit. Plaintiffs' vague contention that the policy somehow "required [Dr. Watson] to generate larger revenues or risk pay reduction," and that the policy had some unspecified "effect . . . on treatments performed on patients such as [the plaintiff] Karyn Kerris"[4] is demonstrably false as the policy – even adopting Plaintiffs' mischaracterization – only applied to **tenured** faculty members, a group to which Dr. Watson did not and never belonged (as he was non tenured and in a non-tenure track position). Notwithstanding Plaintiffs' incorrect depiction of the *Glazer* litigation, even under Plaintiffs' description, the 1997 compensation policy could not and did not affect Dr. Watson as he was neither tenured nor has ever been in a tenure track position.

---

[3] *Compare Glazer* Complaint, Para. 2 ("In this case, Georgetown University . . . devised and implemented a compensation plan . . . that constitutes a direct and material breach of plaintiffs' tenure contracts with the University"; Attached as Ex. 1) *to* Dr. Watson Employment Contract, Art. I (Watson employment "shall continue in effect for successive terms of one year" and shall be "on the AT [non-tenure] track"; Attached hereto as Exhibit 2).

[4] Plts.' Stm. at 2.

Moreover, Dr. Watson was understandably (as it had no relevance to him) unaware of this compensation policy or the *Glazer* lawsuit:

> Q: What do you know about the lawsuit that occurred from the investigators and faculty of Georgetown against the Board of Directors and the then president of the hospital? This was in 1999. Now, what do you know about that?
> . . .
> A: Explain that again to me . . . You are saying there is a lawsuit between whom and whom?
>
> Q. **Did you not know about a lawsuit against Kenneth Bloom by members of the IRB and the research faculty in 1999 that as a result of requiring them to raise 70 percent of their revenue from research or other elements that they would either do so or have to be terminated?** You didn't hear about that?
> . . .
> A. Well, again, you are talking a long time ago now. You know, <u>**I heard rumors of a couple different kinds of lawsuits. This particular one I don't recall**</u> . . . It's kind of a vague memory. We had a number of administrative changes. And these people, you know, are at an administrative level far above me. I don't meet them. **If there are fights and suits, good chance I wouldn't know about it.**

Deposition of Vance E. Watson, M.D., 5/31/07, at 265-67 ("5/31/07 Watson Dep."; emphasis added). Attached as Exhibit 3.

Further, when Dr. Watson was specifically asked whether during the period at issue his department was evaluated on the basis of profits and revenues, he responded that he had "no idea":

> Q. **During the time of 1998-1999 was your department ever evaluated for its profit range** and decided whether or not the members within your department could keep their job based on how much revenue they were bringing in?
> . . .
> A. **I would have no idea.** I don't think we had anybody, at least to my recollection, nobody in our department has been terminated for financial reasons . . . .

3

5/31/07 Watson Dep. at 267 (Ex. 3; emphasis added). This testimony makes clear that the *Glazer* lawsuit and the compensation policy at issue therein are completely irrelevant to the medical malpractice claims asserted by Plaintiffs in this case.

Defendants respectfully request the Court deny Plaintiffs' request to take the depositions of four former high-level Georgetown officials – Kenneth D. Bloem, Paul Katz, Father Leo J. O'Donovan, and Leonard Chiazze, Jr. – because these people have no connection to the issues Plaintiffs allege as the basis for this litigation. Even if those individuals have some knowledge about an irrelevant compensation policy at issue in *Glazer*, Plaintiffs' Statement does **not** contain any evidence showing that the proposed deponents have **any knowledge** regarding any of the subjects Plaintiffs claim are at issue in this case:

- Use of Class III Medical Devices
- Embolization procedures
- Interactions with the FDA and/or Customs Officials
- Knowledge of smuggling of devices across the U.S. border
- Use of Histoacryl and/or Lipiodol
- Whether use of Class III devices requires IRB approval[5]

---

[5] Although one of the proposed deponents, Leonard Chiazze, Jr, was a member of the IRB, Dr. Watson has no knowledge of him as Plaintiffs' Attorney Anthony Newman demonstrated during Dr. Watson's May 31, 2007 deposition:

> Q.   Doctor, who is Leonard -- and I don't know if I can pronounce it correctly, but he was on the IRB -- Chiazze? C-h-i-a-z-z-e.
>
> **A.   I don't know.**
> . . . .
> Q.   [Y]ou've never come across Leonard Chiazze who is the head of the IRB numbered B, which is one that you are a part of?
> . . .
> A:   **I think I'm on IRB-A, which is why I would not have seen him.** Our head is Dr. Young.

4

- The events at issue in this case involving Dr. Watson or Felice Iacangelo, Cicily Iacangelo, and Karyn Kerris

Instead, Plaintiffs' Brief Statement centers on their theory that the *Glazer* lawsuit and the 1997 compensation policy gave Defendant Dr. Watson an incentive to perform more embolizations in order to boost his productivity, which led him to perform the three embolizations of Karyn Kerris at issue in this litigation. Plts' Stm. at 2-5. Plaintiffs' request for these depositions should be denied as they have proffered no factual basis whatsoever for a highly speculative theory that demonstrably could not have affected Ms. Kerris's medical treatment. *See Bastin v. Federal Nat. Mortg. Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997) ("the district court here did not abuse its discretion in refusing the . . . request for discovery inasmuch as [plaintiffs] were unable to offer anything but rank speculation to support their contention. . . . The district court does not abuse its discretion when it denies a discovery request that would amount to nothing more than a fishing expedition.").

In its June 26, 2007 Memorandum Order ("Mem. Order"), the Court stated that a protective order prohibiting an executive's deposition is necessary to guard against harassment, in cases where such executives do not have personal knowledge relating to the claims asserted. Mem. Order at 6 (citing *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985)). The Court also noted that in *Taylor v. National Consumer Cooperative Bank*, Civ. A. No. 95-1918-LFO, 1996 WL 525322 (D.D.C. Sept. 10, 1996), which Plaintiffs had cited for the proposition that high-ranking corporate officials might be subject to deposition, the *Taylor* plaintiff first made a "threshold

---

5/31/07 Watson Dep. at 263-65 (Ex. 3; emphasis added). Moreover, Plaintiffs have already designated Drs. Henry Yeager and Dieter Schellinger to speak to IRB issues. *See* Plaintiffs' Witness List, filed 4/24/07.

showing to indicate that [the corporate official] [did] have unique knowledge with regard to certain relevant events." Mem. Order at 7. In our case, **no such showing has been made**, a point that was recognized by Judge Paul Friedman with regard to the prospective deponent, Father Leo O'Donovan:

> THE COURT:  Okay, **you can't take Father O'Donovan's deposition**. Anybody that has anything **relevant** to say.

June 26, 2007 Status Conference Transcript at 15 (attached as Exhibit 4) (emphasis added).

Plaintiffs use the *Glazer* litigation as the main reason why they need the depositions of these four, former high-level officers and executives. *See* Plts' Stm. at 3-5.[6] In premising the relevancy proffer for depositions on a lawsuit that has no relevance to the issues at hand, Plaintiffs have not demonstrated that these proposed deponents likely possess information relevant to their claims.[7] As such, Defendants respectfully request that the Court uphold its own finding that "**[p]laintiffs have made no showing . . . that the remaining proposed deponents . . . have relevant knowledge of the claims in this case that outweigh the burden and harassment that they will experience if they are deposed**." Mem. Order at 7 (emphasis added).

---

[6] "**Kenneth D. Bloem** . . . in hopes of helping the ailing Medical Center [and] increase its profits; b. **The implementation of a higher profit policy that required the staff and faculty to generate larger revenues or risk pay reduction, including defendant Vance E. Watson, M.D.** . . . c. [t]he lawsuit . . ."; "**Paul Katz** . . . a. . . . when he became aware of the higher profit policyt [sic] mandate . . . b. [t]he lawsuit . . ."; "**Leo J. O'Donovan** . . . a. **The policy . . . regarding the switch to a higher profit policy**; b. The time when Kenneth Bloem was sent . . . [to the] Medical Center [to] **increase profits**; c. **His higher profit policies that required the staff and faculty to generate larger revenues or risk pay reduction** . . . d. [t]he lawsuit that ensued . . ."; "**Leonard Chiazze** . . . [t]he lawsuit . . . ."(emphasis added).

[7] On July 5, 2007, Plaintiffs noticed the deposition of Sheila Zimmet, Esq. so her alleged knowledge cannot be used to bootstrap the relevancy of other depositions.

## CONCLUSION

The Court ruled that Drs. Yeager and Schellinger (identified on Plaintiffs' Witness List, filed 4/24/07) "would be qualified to testify about the IRB, because they are committee members of the IRB." 6/26/07 Mem. Order at 5;[8] thus, Plaintiffs have already designated the depositions of individuals for discovery into the IRB.

Given that Plaintiffs have failed to show that the relevancy or personal knowledge of any of the four, former, high-level executives, Defendants respectfully request that the Court enter a protective order, prohibiting the depositions of Kenneth D. Bloem, Paul Katz, Father Leo J. O'Donovan, and Leonard Chiazze, Jr., unless and until Plaintiffs make the required showing.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated: July 6, 2007         By: /s/ Megan E. Hills
                                _____
                                Megan E. Hills (D.C. Bar #437340)
                                Nicolas D. Muzin (D.C. Bar # 500106)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)
mhills@wc.com
nmuzin@wc.com

Attorneys for Defendants

---

[8] Drs. Yeager and Schellinger sat on the IRB both during the time frame of the Amended Complaint and in 2007.

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the undersigned caused a true and accurate copy of Defendants' Response to Plaintiffs' Statement as to Relevant Witness Testimony to be served via electronic filing on the Court's CM/ECF website on this 6th day of July, 2007 on the forgoing:

>Anthony Newman, Esquire
>Wendy Wyeth, Esquire
>Newman & McIntosh
>7315 Wisconsin Avenue
>Suite 700E
>Bethesda, Maryland 20814
>
>Andrew Greenwald, Esquire
>Greenwald and Laake
>6404 Ivy Lane
>Suite 440
>Greenbelt, Maryland 20770
>
>Plaintiffs' Counsel

_____
Nicolas D. Muzin