**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**
*Civil Division*

| | | |
|---|---|---|
| **FELICE I. IACANGELO,** *et al*. | : | |
| | : | |
| | : | **Civil No. 1:05CV02086** |
| Plaintiffs, | : | |
| | : | **Judge Paul L. Friedman** |
| vs. | : | |
| | : | **Magistrate Judge Alan Kay** |
| **GEORGETOWN UNIVERSITY**, *et al*. | : | |
| | : | |
| Defendants. | : | |

**Plaintiffs' Brief Statement as to Witnesses Testimony relevant to Plaintiffs' case**

On June 26, 2007, this Court Ordered Plaintiffs to file a brief statement proffering the potential relevant testimony the requested deponents may possess, thus this pleading sets forth in paragraph form the expected testimony. Since the time of the original request of the depositions of Leo J. O'Donovan, Charles Crowley, Paul Katz and J. Willard Marriott ( the potential deponents at issue) new discovery has further focused plaintiffs' the deposition.

One piece of information came from the second portion of Dr. Watson's deposition. It was there that Dr. Watson established that his decision to use the Class III unapproved devices and not run them through the IRB came after a conference with then General Counsel of the Hosiptal, Sheila Zimmet, Esq. [1]

---

[1] Q: Doctor do you believe that the use of Histoacryl in the time that you injected it into Karyn Karris was illegal?
Ms. Hills: Same Objection
The Witness: I asked this question to counsel in the past and present and been told it's not illegal.
Q: Who did you ask in the past?
A: Well, the immediate past, my current counsel.
Q: And before that?
A: Discussing Histoacryl in general would be Sheila Zimmet would be counsel.
Q: And why did you ask counsel Shelia Zimmet whether your use of Histoacryl was legal?
Ms. Hills: Object to form; mischaracterizes testimony, and calls for speculation
The Witness: I was never under the assumption it was illegal becuase it was used at Duke during my residency, it was used at UCLA, it was used many places around the country. The question to counsel evolved bu somebody questioning whether, or just a general discussion about should the use of this go through the, what's called the Georgetown IRB.
     I don't remember which board member I asked this to, to see who I should talk to. And then I was referred to Shelia Zimmet who is on the IRB and was also counsell. And I asked her, told her unapproved, and do we need to put this through the IRB. And She said no.
Q: And why not?
Ms. Hills: Object to form; calls for specualtion?
The Witness: You know, I'm not –
Q: Did she tell you?
A; I'm not a lawyer. The question she asked me was, "Are you doing research with thus or are you treating patients?" And I said, "I'm not doing research. I'm just using it to treat patients."
Q: Do I understand that you would have had no objection to going through and IRB with your use of Histoacryl?
A: If somebody asked me to submit something to the IRB, I would do it. I've submitted many applications.
(Watson p 128 1 9- 130 1 19)
          *     *     *     *
Q: Dr. Watson, before the last tape was over we had a discussed a question that you asked Shelia Zimmet. I believe there were two. One whether

the use of glue involved the IRB.  Another one was whether or not it was legal.
Ms. Hills: Objection; misstates prior testimony
By Mr. Newman:
Q: Doctor let me ask you a question: If Ms. Zimmet told you iot was illegal to use the Histoacryl would you have continued to to so?
Ms. Hills:   Objection; calls for speculation, assumes facts not in evidence.
The Witness: I don't think I would have been given a choice.  I mean if the counsel said thatm they would stop you.  I mean, they would come over and say, "Give it up."

(Waston p 140-l 13 - 141 l 10 )

The other piece of information, was uncovered though Court records and the internet. Plaintiffs' counsel discovered that Leo J. O'Donovan, the then president of the University and Kenneth Bloem, the then CEO of the Hospital instituted a policy in 1997 ( that remained in effect through the relevant time period) that the medical staff had to generate up to 70% of their salary or face salary reductions of up to 30% per year.  This policy resulted in a lawsuit by 18 members of the  faculty including one Leonard Chiazze, Jr., M.D. a member of the IRB against Georgetown University.  *Glazer v. Georgetown University,* CA. No. 0000321-99(D.C.Sup. Ct, Nov 14, 1999)

Based on the aforesaid limited discovery, Plaintiffs do not believe that the depositions of either Charles Crowley or J. Willard Marriott will be necessary at the present time.   Instead plaintiffs are requesting the depositions of and Sheila Zimmet, Esq.[2] and Lenoard Chiazze, M.D.[3]   Thus plaintiffs will provide the following proffers: Kenneth D. Bleom, Paul Katz, Leo J. O'Donovan and Leonard Chiazze, Jr., M.D.

> Kenneth D. Bloem
>  (Prior member Board of Directors and CEO for the Medical Center).
>
> He will be asked about his tenure at the Medical Center (specifically during the relevant time periods of this case) when, by mandate of the Board of Directors, he was sent down by the Board to become CEO of the Hospital in hopes of helping the ailing Hospital increase profits.  He will be asked about his higher profit policies ("pay plan") that required the staff and faculty to generate larger revenues or risk termination;  this included defendant Vance E. Watson, M.D.'s department of interventional neuroradiology.
>
> He will be asked to testify to the policies he implemented and how they were designed to pressure physicians and the Hospital to be more profitable. This included increasing high priced services (such as embolizations) which produced high profits and as an incentive, the physicians were told to risk termination.
>
> He will be asked to testify to the lawsuit that ensued and the reasons for his termination as well as the decision of  Leo J. O'Donovan to stop the "pay plan" and remove him from office.  It is plaintiff position that this "pay plan" was one of the motivations for use, or continued use of , the illegal Class III devices.
>
> As a member of the Board of Directors, he will be asked what knowledge the  Board of Directors and the Hospital Administration had regarding the illegal use of Class III devices, the past interactions with the FDA and/or Customs

---

[2] This Court does not need to address the issue of deposing Ms. Zimmet for Judge Friedman has already ordered her deposition to be conducted within 30 days (Order of June 27, 2007p. 4) .

[3] Since J. Friedman's Order of 6/27/07 states that, "Magistrate Judge Kay has set forth in his Memorandum Order of June26, 2007 a methodology for dealing with plaintiffs' other deposition requests." (Order June 27, 2007 p. 3) Plaintiffs felt it prudent to include the request for Dr. Chinazze at this time.

officials, and knowledge of the smuggling of the devices across the U.S. boarder.

He will be asked whether any risk/benefit evaluation of unapproved Class III devices was conducted by the Board and/or the officers of the Hospital.

He will be asked about his knowledge of Shelia Zimmet, Esq.'s position that even though Histoacryl and Lipiodol were Class III devices not approved for any purpose in the U.S. and were the subject of trade alerts, they were still "legal" devices and whether he and/or the University agreed that they should be used and were "legal."

Paul Katz
(prior COO for the Medical Center)

He will be asked about his tenure at the Medical Center (specifically during the relevant time periods of this case) when, he became aware of the"pay plan" mandate of the Board of Directors and Kenneth D. Bloem, to institute new policies and procedures that required the staff and faculty to produce a specific profit or risk termination, this included defendant Vance E. Watson, M.D.'s department of interventional neuroradiology. He will testify to the lawsuit that ensued and the reasons for Mr. Bloem's termination.

As a member of the Administration, he will be asked produce evidence of the knowledge of the Hospital administration as to embolization procedures performed at their institution with illegal Class III devices.

He will be asked whether any risk/benefit evaluation of unapproved Class III devices was conducted by the Board and/or the officers of the Hospital

He will be asked about his knowledge of Shelia Zimmet, Esq.'s position that even though Histoacryl and Lipiodol were Class III devices not approved for any purpose in the U.S. and were the subject of trade alerts, they were still "legal" devices and whether he and/or the Hospital agreed that they should be used and were "legal."

Leo J. O'Donovan
(Prior President of Georgetown University)

He will be asked about the policy of the University during the relevant time periods regarding the switch to a "pay plan." He will be asked about the time when Kenneth Bleom was sent by mandate of the Board of Directors, to become CEO of the Hospital to help the ailing Hospital increase profits. He will be asked about his higher profit policies that required the staff and faculty to generate larger revenues or risk termination; this included defendant Vance E. Watson, M.D.'s department of interventional neuroradiology.

He will be asked to testify to the lawsuit that ensued and the reasons why he removed the policies instituted by Kenneth Bloem and ultimately removed him from office.

As the President of the University he will be asked what knowledge he or

the University had regarding the illegal use of Class III devices, the past interactions with the FDA and/or Customs officials and knowledge of the devices being smuggled across the U.S. boarder.

He will be asked about his knowledge of Shelia Zimmet, Esq.'s position that even though Histoacryl and Lipiodol were Class III devices not approved for any purpose in the U.S. and were the subject of trade alerts, they were still "legal" devices and whether he and/or the University agreed that they should be used and were "legal."


Leonard Chiazze, Jr., M.D.
(Institutional Review Board Member)

He will be asked about his tenure, during the relevant time periods as an Institutional Review Board (IRB) Member.  He be asked about his knowledge of the use of Histoacryl and Lipiodol and whether either were presented to, or approved by, the IRB.  He will asked as to whether he was aware of any statement made by Shelia Zimmet, Esq., regarding the legality of the devices or whether they needed IRB approval.

He will be asked if any IRB approved informed consent was ever generated for the use of Histoacryl, and what that consent would have included., i.e., the known risks of the treatment, a statement that the use of these devices was illegal, that enrollment was voluntary,  a list of alternative (legal) treatments, and the risks if no treatment was provided, etc.

Dr. Chiazze will be asked about the law suit he and 18 other plaintiffs brought against Georgetown University, its officers, and Board of Directors. He will address the fact that there were policies and procedures that required the staff and faculty to produce profits or risk termination. These policies and procedures when they were in effect, involved the entire Hospital including the department interventional neuroradiology. He will be asked the effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris.


Respectfully submitted,
By:     /s/ Anthony Newman
Anthony Newman
NEWMAN, MCINTOSH & HENNESSEY, LLP
7315 Wisconsin Ave., Suite 700E
Bethesda, MD 20814
(301) 654-3400

   /s/ Andrew E. Greenwald
Andrew E. Greenwald
JOSEPH, GREENWALD & LAAKE, P.A.

6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

Pursuant to the United States District Court Local Rule for the District of Columbia 5.4(d), I hereby certify that a copy of the foregoing Reply was served via electronic filing on the Court's CM/ECF website on May 2, 2007 to:

Megan Hills, Esq.
Nicolas Muzin, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005

                                                          /s/ Anthony Newman
                                                          Anthony Newman