UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| FELICE I. IACANGELO and CICILY IACANGELO, Guardians of the Person and Property of KARYN A. KERRIS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> GEORGETOWN UNIVERSITY, *et al.*, <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 05-2086 (PLF/AK) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM ORDER

Pending before the Court is Defendants' Motion for a Protective Order ("Motion") [42],

Plaintiffs' opposition to the Motion ("Opposition") [44], and Plaintiffs' reply to the Opposition

("Reply") [45]. Defendants move for a Protective Order to prohibit or limit the depositions of

seven of the eight fact witnesses named by the Plaintiffs as proposed deponents, namely:

Kenneth D. Bloem; Paul Katz; Leo J. O'Donovan; Charles M. Crawley; J. Williard Marriott, Jr.;

Henry Yeager, M.D.; and Dieter Schellinger, M.D.[1] As a preliminary matter, this Court notes

that while Defendants argue at length in their Motion that Plaintiffs intend to exhaust the

presumed limit of ten depositions, it is self-evident that this argument is premature in light of the

fact that Plaintiffs have listed only eight potential fact witnesses, which is two less than the

---

[1] The deposition of the eighth named deponent, Dr. Vance Watson, will reconvene on May 31, 2007. According to Defendants, Reverend O'Donovan was the former president of Georgetown University; Mr. Marriott and Mr. Crawley were former Georgetown University Board members; Mr. Bloem was Georgetown University Medical Center's former Chief Executive Officer; and Dr. Katz was Georgetown University Hospital's former Chief Operating Officer. (Memorandum in support of Motion at 6-7.) Mr. Marriott and Mr. Crawley are now high level executives with Marriott International and MBNA Corporation, respectively. Mr. Bloem is a senior fellow at Johns Hopkins, Center for Civilian Biodefense. (*Id.*) Defendants indicate that Reverend O'Donovan retired in 2001 and Mr. Bloem and Dr. Katz left their positions by mid to late 2000. (*Id.*) The medical procedures at issue in this case were performed in 1998 and 1999.

presumptive limit.[2]

## Background

_____ In October 2005, Plaintiffs, Cicily and Felice Iacangelo, filed suit against Defendants, Georgetown University Hospital and Dr. Vance Watson, for medical malpractice, alleging that as a direct and proximate result of the Defendants' negligence, Karyn Kerris [Plaintiffs' daughter] has suffered permanent damage to her body, including seizures, ischemia and neurological impairments, "leaving her brain damaged and dysfunctional for the rest of her life."[3] (Am. Compl. ¶12.) Plaintiffs allege that the embolization procedures employed by Defendants should have been reviewed and approved by the Georgetown University Institutional Review Board ("IRB"). (Am. Compl. ¶11(h).) Plaintiffs also allege that the standard consent form used by Defendants, which did not mention the types of devices being used in the embolization or their names, the fact that the devices were procured from Canada, or the fact that the treatment was not approved in the United States, is insufficient to denote true informed consent. (Am. Compl., Count II.) Plaintiffs further allege that Dr. Watson concealed the illegality of the substances to be used in the embolization procedures and misrepresented the effectiveness of the embolization procedures. (Am. Compl., Count VIII.)

## Legal Standard

Federal Rule of Civil Procedure 26(b) provides that discovery is permitted "regarding any

---

[2] The trial court's Scheduling Order [37] limits each party "to a maximum of 10 depositions, unless otherwise agreed upon by the parties or unless the Court determines otherwise pursuant to motion." ([37] at 1.) This Court interprets that ten-person limitation to apply to fact witnesses only, particularly in light of the fact that the trial court set different schedules for fact discovery and expert discovery.

[3] Ischemia denotes a shortage of blood supply to an area of the brain.

matter, not privileged, which is relevant to the subject matter involved in the pending action,

whether it relates to the claim or defense of the party seeking discovery . . ." Under Fed. R. Civ.

P. 26(b)(2)(iii), the court may limit discovery on its own initiative, if it determines that the

"burden or expense of the proposed discovery outweighs its likely benefit, taking into account

the needs of the case, the amount in controversy, the parties' resources, the importance of the

issue at stake in the litigation, and the importance of the proposed discovery in resolving those

issues." *See Hammerman v. Peacock*, 108 F.R.D. 66, 67 (D.D.C. 1985) (Rule 26(b)(1) was

amended to give the court the power, *sua sponte*, to limit discovery.)

> Fed. R. Civ. P. 26(c) addresses protective orders, providing in part that:
>
> Upon motion by a party or the person from whom discovery is sought . . . and for good
> cause shown, the court in which the action is pending or alternatively, on matters relating
> to a deposition, the court in the district where the deposition is to be taken may make any
> order which justice requires to protect a party or person from annoyance, embarrassment,
> oppression, or undue burden or expense.

Fed. R. Civ. P. 26(c). Pursuant to Rule 26(c), the court may, *inter alia*, direct "(1) that the

disclosure or discovery not be had; . . . (3) that the discovery may be had only by a method of

discovery other than that selected by the party seeking discovery; (4) . . . that the scope of

disclosure or discovery be limited to certain matters . . . .." Fed. R. Civ. P. 26(c).

The party moving for a protective order bears the burden of making a showing of good

cause required by Rule 26(c). *See, e.g,. Fonville v. District of Columbia*, 230 F.R.D. 38, 40

(D.D.C. 2005); *Alexander v. FBI*, 186 F.R.D. 60, 64 (D.D.C. 1998). The party requesting a

protective order must present specific facts in support of the request as opposed to making

conclusory or speculative statements about why a protective order is needed and what harm will

result if such order is not entered. *Fonville, id.* A trial court possesses broad discretion in

issuing a protective order and determining what degree of protection is required. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984); *see also United States v. Microsoft Corp.*, 165 F. 3d 952, 959 (D.C. Cir. 1996). The decision to limit or deny discovery by means of a Rule 26 protective order requires the court to balance "the requestor's need for the information from this particular source, its relevance to the litigation at hand, the burden of producing the sought-after material; and the harm which disclosure would cause to the party seeking to protect the information." *Burka v. Dep't of Health and Human Servs.*, 87 F. 3d 508, 517 (D.C. Cir. 1996) (citation omitted); *see also Amfac Resorts, L.L.C. v. Dep't of the Interior*, 143 F. Supp. 2d 7, 14 (D.D.C. 2001).

Analysis

Defendants assert generally that the expense and burden of the proposed depositions outweigh the likely benefit, but Defendants fail to specifically establish how the proposed depositions will result in undue burden and expense to them, other than noting that their counsel would have to attend such depositions. Defendants instead focus most of their argument in favor of a protective order on their contentions that the depositions sought by Plaintiffs are of limited value because they are duplicative and such depositions are limited to "address[ing] plaintiffs' claim that Dr. Watson violated an IRB regulation" and do not relate to the breach of standard of care, which is the main issue in Plaintiffs' case. (Memorandum in support of Motion ("Memorandum") at 4.)[4] Plaintiffs respond to these contentions by asserting that they "have a

---

[4]Defendants' commentary regarding [their view of] the merit and focus of the proposed depositions does not demonstrate good cause why a protective order should be granted. *See Peskoff v. Faber*, 230 F.R.D. 25 (D.D.C. 2005) ("[T]he movant must articulate specific facts to support its request [for a protective order] and cannot rely on speculative or conclusory statements . . . .")

right to depose the GU and GUH officials to find out what they knew or should have known about Dr. Watson's IRB violations." Plaintiffs further assert that the issues to be addressed during the proposed depositions may also include "[Defendants'] failure to obtain an IDE [investigational device exemption](Count I ¶11(d)); negligent supervision, monitoring, ordering and invoicing (Count I ¶11(h)); failure to provide proper informed consent (Count II); breach of fiduciary obligations (Count VIII); punitive damages (Count IX); and violations of 21 U.S.C. §360(a)(II) (Count X), 21 U.S.C. §331(a),(b),(c),(g) and (k) (Count XI) and 21 C.F.R Ch. 1 §812.20(a)(2) (Count XII)." (Opposition at 3, 8.)

Plaintiffs generally assert that "the proposed depositions are quite relevant to this case as there are multiple counts against GU that relate to knowledge of high-ranking GU and GUH officials regarding Dr. Watson's conduct here" but Plaintiffs do not provide any specific information about the personal knowledge of any particular proposed deponent. (Opposition at 6.) While it appears that deponents Drs. Yeager and Schellinger would be qualified to testify about the IRB, because they are committee members of the IRB, there is no indication by Plaintiffs that any of the other contested deponents have knowledge about the IRB or any of the aforementioned issues mentioned by Plaintiffs such as failure to obtain an IDE, negligent supervision, and breach of fiduciary obligations.[5] This lack of personal knowledge is one factor for the Court to consider in weighing Plaintiffs' need to depose these individuals versus the burden imposed upon them.

---

[5]Defendants assert that [former] Board Members [Mr. Marriott and Mr. Crawley] served three year terms and their responsibilities, set forth in the Memorandum at 6, n.5, do not include the IRB. Defendants note that Mr. Bloem and Dr. Katz did not sit on the IRB, nor have direct responsibility for it when they were at GUMC. (*Id.* at 6.) In contrast, Drs. Yeager and Schellinger are Committee members of the IRB.

In considering the potential burden to the deponents, the Court notes that such proposed deponents are high level corporate executives or persons who are or were in public positions of power.   While the depositions of high ranking corporate officials are not automatically precluded, *see Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 1987 WL 11994, *4 (D.D.C. 1987), courts have found good cause for issuing a protective order to prohibit the depositions of executives where there is no evidence that such executives have personal knowledge of information relevant to the lawsuit.   *See e.g., Thomas v. Int'l Bus. Mach.*, 48 F. 3d 478, 483 (10th Cir. 1995); *Lewelling v. Farmers Ins. of Columbus*, 879 F. 2d 212, 218 (6th Cir. 1989); *acccord Low v. Whitman*, 207 F.R.D. 9, 13 (D.D.C. 2002) (issuing a protective order prohibiting the deposition of a high ranking government official in a discrimination case because he was not a participant in the employment decision at issue and the only relevant information he could provide was duplicative of information already provided during depositions); *Cmty. Fed. Savings and Loan Ass'n v. Fed. Home Loan Bank Board*, 96 F.R.D. 619 (D.D.C. 1983) (issuing a protective order prohibiting the depositions of two government officials where plaintiff presented no information to support the conclusion that these persons had unique personal knowledge about the contested matter.)

Courts have held that a protective order prohibiting an executive's deposition is necessary to guard against harassment, in cases where such executives do not have personal knowledge relating to the claims asserted.   *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985).   The *Mulvey* court noted that persons in executive level positions could be "easily subjected to unwarranted harassment and abuse . . . [and] ha[ve] a right to be protected, and the courts have a duty to recognize [the

-6-

executive's] vulnerability." 106 F.R.D. at 366.

Plaintiffs cite *Taylor v. National Consumer Cooperative Bank*, Civ. A. No. 95-1918-LFO, 1996 WL 525322 (D.D.C. Sept. 10, 1996) for the proposition that a high-ranking corporate official need not possess "unique or superior knowledge of discoverable information" in order to be subject to deposition, but notably in *Taylor*, the plaintiff did make a "threshold showing to indicate that [the corporate official] [did] have unique knowledge with regard to certain relevant events." *Id.* at *1. In the instant case, the Court may summarily find that Dr. Yeager and Dr. Schellinger, current employees and members of the Institutional Review Board possess knowledge about the IRB, where the IRB plays an integral role in Plaintiffs' claims. Plaintiffs have made no showing however that the remaining proposed deponents, who are current or former high level executives or persons in positions of power, have relevant knowledge of the claims in this case that outweigh the burden and harassment that they will experience if they are deposed. Accordingly, it is this 26th day of June, 2007,

ORDERED that the Defendants' Motion for Protective Order [42] is **denied in part** with respect to the depositions of Drs. Yeager and Schellinger, and **deferred in part** with respect to the depositions of Kenneth Bloem, Paul Katz, Leo J. O'Donovan, Charles Cawley and J. Williard Marriott. Within five business days following the date of this Memorandum Order, Plaintiffs shall provide the Court with a **brief** statement demonstrating that each such proposed deponent likely possesses information relevant to Plaintiffs' claims. Defendants shall be allowed three

business days thereafter to respond.  Such response shall be **limited** to the statements set forth by

Plaintiffs and shall not include any extraneous argument.


_____/s/_____

ALAN KAY

UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### *Civil Division*

FELICE I. IACANGELO, *et al.*                  :
                                               :
                                               :       **Civil No. 1:05CV02086**
                    Plaintiffs,                :
                                               :       **Judge Paul L. Friedman**
vs.                                            :
                                               :       **Magistrate Judge Alan Kay**
**GEORGETOWN UNIVERSITY**, *et al.*           :
                                               :
                    Defendants.                :
                                               :

---

### PLAINTIFFS' BRIEF STATEMENT AS TO RELEVANT WITNESSES' TESTIMONY

On June 26, 2007, this Court Ordered Plaintiffs to file a brief statement proffering the

potential relevant testimony of requested deponents.  Since the time of Plaintiffs' request,

discovery has become further focused.

The first piece of new discovery came from Dr. Watson's deposition.  Dr. Watson

testified that his decision to use the Class III unapproved devices and not seek IRB approval was

based on conversations he had with then General Counsel of the Medical Center, Sheila Zimmet,

Esq.[1]

---

[1] Q: Doctor do you believe that the use of Histoacryl in the time that you injected it into Karyn Kerris was illegal?
Ms. Hills: Same Objection
The Witness: I asked this question to counsel in the past and present and been told it's not illegal.
Q: Who did you ask in the past?
A: Well, the immediate past, my current counsel.
Q: And before that?
A: Discussing Histoacryl in general would be Sheila Zimmet would be counsel.
Q: And why did you ask counsel Sheila Zimmet whether your use of Histoacryl was legal?
Ms. Hills: Object to form; mischaracterizes testimony, and calls for speculation
The Witness: I was never under the assumption it was illegal because it was used at Duke during my residency, it was used at UCLA, it was used many places around the country.  The question to counsel evolved bu somebody questioning whether, or just a general discussion about should the use of this go through the, what's called the Georgetown IRB.
I don't remember which board member I asked this to, to see who I should talk to.  And then I was referred to Sheila Zimmet who is on the IRB and was also counsel.  And I asked her, told her unapproved, and do we need to put this through the IRB. And She said no.
Q: And why not?
Ms. Hills: Object to form; calls for speculation?

The second piece of discovery was uncovered though both investigations of Court records and internet.  Plaintiffs' counsel discovered that Leo J. O'Donovan (then President of the University) and Kenneth Bloem (then CEO of the Medical Center) instituted a policy in 1997 (which remained in effect through the relevant time period) that the medical staff had to generate up to 70% of their salary or face salary reductions of up to 30% per year.  This policy resulted in 18 members of the  faculty, including one Leonard Chiazze, Jr., M.D. (a member of the IRB) bringing suit against Georgetown University for interfering with their practice of medicine by basing it on volume and income.  *Glazer v. Georgetown University,* CA. No. 0000321-99 (D.C. Sup. Ct, Nov 14, 1999).  Based on the aforesaid, Plaintiffs continue to require the depositions of Kenneth D. Bloem, Leo O'Donovan, Paul Katz, Henry Yeager, M.D. and Dieter Schellinger, M.D., but do not believe at this time that the depositions of either Charles Crawley or J. Willard Marriott will be necessary.  Instead, for the reasons aforesaid Plaintiffs are requesting the depositions of Sheila Zimmet, Esq. and Leonard Chiazze, Jr., M.D. in lieu of Charles Crawley

---

The Witness: You know, I'm not –
Q: Did she tell you?
A; I'm not a lawyer.  The question she asked me was, "Are you doing research with thus or are you treating patients?" And I said, "I'm not doing research.  I'm just using it to treat patients."
Q: Do I understand that you would have had no objection to going through and IRB with your use of Histoacryl?
A: If somebody asked me to submit something to the IRB, I would do it.  I've submitted many applications.
(Watson p. 128, l. 9 - 130, l. 19)
          *     *     *     *
Q: Dr. Watson, before the last tape was over we had a discussed a question that you asked Sheila Zimmet.  I believe there were two.  One whether the use of glue involved the IRB.  Another one was whether or not it was legal.
Ms. Hills: Objection; misstates prior testimony
By Mr. Newman:
Q: Doctor let me ask you a question: If Ms. Zimmet told you it was illegal to use the Histoacryl would you have continued to to so?
Ms. Hills:   Objection; calls for speculation, assumes facts not in evidence.
The Witness: I don't think I would have been given a choice.  I mean if the counsel said that they would stop you.  I mean, they would come over and say, "Give it up."
(Watson, p. 140, l. 13 - 141, l. 10 )

-2-

and J. Willard Marriott.[2]  Plaintiffs therefore provide proffers for the depositions of: Kenneth D.

Bloem, Paul Katz, Leo J. O'Donovan and Leonard Chiazze, Jr., M.D.[3]

1.    Kenneth D. Bloem (Then member Board of Directors and CEO for the Medical Center)
   a.   Tenure at the Medical Center (during the relevant time period) when he was sent
        from the Board of Directors to the Medical Center become CEO of the Medical
        Center in hopes of helping the ailing Medical Center increase its profits;
   b.   The implementation of a higher profit policy that required the staff and faculty to
        generate larger revenues or risk pay reduction, including defendant Vance E.
        Watson, M.D. and his department of interventional neuroradiology;
   c.   The lawsuit regarding Leo J. O'Donovan's decision to implement the higher profit
        policy and its effects on the use, or continued use, of the illegal Class III devices;
   d.   Reasons for his termination related to changing the method of physicians'
        practices;
   e.   Knowledge of the Board of Directors and the Medical Center Administration
        regarding the illegal use of Class III devices;
   f.   Interactions with the FDA and/or U.S. Customs officials;
   g.   Knowledge of the smuggling of the devices across the U.S. border;
   h.   Any risk/benefit evaluation of unapproved Class III devices that was conducted by
        the Board of Directors and/or the officers of the Medical Center;
   i.   Knowledge of Sheila Zimmet, Esq.'s position that Histoacryl and Lipiodol, non-
        approved Class III devices, were, in her opinion, "legal" devices;
   j.   His position regarding Sheila Zimmet's opinion that the use of non-approved
        Class III devices did not require IRB approval;
   k.   The effect these policies and procedures had on treatments performed on patients
        such as Karyn A. Kerris;
   l.   Whether the use of non-approved Class III devices, subject to a seizure order,
        violated the Policies and Procedures of the Medical Center; and
   m.   What reprimand would occur if an employee such as Dr. Watson was found to
        have been violating the Board of Director's, University's and/or Medical Center's
        Policies and Procedures.

---

[2]Since Judge Friedman, in addressing Plaintiffs' request for the depositions of Ms. Zimmet, Dr. Kenneth Bloem, Dr. Leonard Chiazze and Paul Katz, mentioned that, "Magistrate Judge Kay has set forth in his Memorandum Order of June26, 2007 a methodology for dealing with Plaintiffs' other deposition requests," (Memorandum Opinion and Order, June 27, 2007 p. 3), Plaintiffs felt it prudent to include the request and proffer for Dr. Chiazze at this time.

[3]This Court does not need to address the issue of deposing Ms. Zimmet for Judge Friedman has already ordered her deposition to be conducted and it has been scheduled for July 23, 2007. (Memorandum Opinion and Order of June 27, 2007 p. 4). This Court has already denied Defendant's Motion for Protective Order regarding Drs. Yeager and Shellinger. (Memorandum Order of June 26, 2007, p. 7).

2.    Paul Katz (Then COO for the Medical Center)
    a.    His tenure at the Medical Center (during the relevant time period) when, he became aware of the higher profit policyt mandate of the Board of Directors and Kenneth D. Bloem;
    b.    The lawsuit that ensued and the reasons for Mr. Bloem's termination;
    c.    Evidence of the knowledge of the Medical Center administration as to embolization procedures performed at their institution with illegal Class III devices;
    d.    Any risk/benefit evaluation of unapproved Class III devices that was conducted by the Board of Directors and/or the officers of the Medical Center;
    e.    Knowledge of Sheila Zimmet, Esq.'s position that Histoacryl and Lipiodol, non-approved Class III devices, were, in her opinion, "legal" devices;
    f.    His position regarding Sheila Zimmet's opinion that the use of non-approved Class III devices did not require IRB approval;
    g.    The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris;
    h.    Whether the use of non-approved Class III devices, subject to a seizure order, violated the Policies and Procedures of the Medical Center; and
    i.    What reprimand would occur if an employee such as Dr. Watson was found to have been violating the Medical Center's Policies and Procedures.

3.    Leo J. O'Donovan (Then President of Georgetown University)
    a.    The policy of the University during the relevant time period regarding the switch to a higher profit policy;
    b.    The time when Kenneth Bloem was sent by mandate of the Board of Directors, to become CEO of the Medical Center to help the ailing Medical Center increase profits;
    c.    His higher profit policies that required the staff and faculty to generate larger revenues or risk pay reduction, including defendant Vance E. Watson, M.D. and his department of interventional neuroradiology;
    d.    The lawsuit that ensued and his reasons why he removed the policies instituted by Kenneth Bloem and which ultimately removed him from office;
    e.    What knowledge he or the University had regarding the illegal use of Class III devices at the Medical Center;
    f.    Past interactions with the FDA and/or Customs officials;
    g.    Knowledge of the devices being smuggled across the U.S. border;
    h.    His position regarding Sheila Zimmet's opinion that the use of non-approved Class III devices did not require IRB approval;
    i.    The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris;
    j.    Whether the use of non-approved Class III devices, subject to a seizure order, violated the Policies and Procedures of the Medical Center; and
    k.    What reprimand would occur if an employee such as Dr. Watson was found to

have been violating the University's Policies and Procedures.

4.    Leonard Chiazze, Jr., M.D. (Then and present Institutional Review Board Member, Georgetown University)

    a.    His tenure, during the relevant time period as an Institutional Review Board (IRB) Member;

    b.    Knowledge of the Medical Center's or Medical Center Personnel's use of Histoacryl and Lipiodol and whether either were presented to, or approved by, the IRB;

    c.    Whether he was aware of any statement made by Sheila Zimmet, Esq., regarding the legality of the devices or whether they needed IRB approval;

    d.    Knowledge of any IRB approved informed consent ever generated for the use of Histoacryl, and what that consent would have included., i.e., the known risks of the treatment, a statement that the use of these devices was illegal, that enrollment was voluntary,  a list of alternative (legal) treatments, and the risks if no treatment was provided, etc.;

    e.    The law suit he and 17 other plaintiffs brought against Georgetown University, its officers, and Board of Directors;

    f.    Knowledge of policies and procedures that required the staff and faculty to produce profits or risk pay reduction; when they were in effect; whether they involved the entire Medical Center, including the department interventional neuroradiology;

    g.    His position regarding Sheila Zimmet's opinion that the use of non-approved Class III devices did not require IRB approval;

    h.    The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris;

    i.    Whether the use of non-approved Class III devices, subject to a seizure order, violated the Policies and Procedures of the Medical Center;

    j.    What reprimand would occur if an employee such as Dr. Watson was found to have been violating the Medical Center's Policies and Procedures; and

    k.    The effect these policies and procedures had on treatments performed on patients such as Karyn A. Kerris.

Respectfully submitted,

By:      /s/ Anthony Newman

Anthony Newman
NEWMAN, MCINTOSH & HENNESSEY, LLP
7315 Wisconsin Ave., Suite 700E
Bethesda, MD 20814
(301) 654-3400

_/s/ Andrew E. Greenwald_
Andrew E. Greenwald
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

Pursuant to the United States District Court Local Rule for the District of Columbia 5.4(d), I hereby certify that a copy of the foregoing Statement was served via electronic filing on the Court's CM/ECF website on July 2, 2007 to:

Megan Hills, Esq.
Nicolas Muzin, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005

_/s/ Anthony Newman_
Anthony Newman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, | ) |
| As Guardian of the Person and Property of | ) |
| KARYN A. KERRIS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. Action No. 1:05CV02086 (PLF/AK) |
| | ) |
| Georgetown University Hospital, | ) Judge Paul L. Friedman |
| GEORGETOWN UNIVERSITY, t/a | ) |
| Georgetown University, and | ) Magistrate Judge Alan Kay |
| VANCE E. WATSON, M.D., | ) |
| | ) |
| Defendants. | ) |

DEFENDANTS'[1] RESPONSE
TO PLAINTIFFS' STATEMENT AS TO RELEVANT WITNESS TESTIMONY

Plaintiffs' justification for taking the depositions of four former high-level Georgetown

University officials is their alleged knowledge of a University compensation policy that Plaintiffs

claim was the subject of the lawsuit, *Glazer v. Georgetown University*, CA No. 0000321-99

(D.C. Sup. Ct. 1999) ("*Glazer*").[2]  Plaintiffs' rationale fails for at least three reasons.  First,

*Glazer* involved and was brought only by "**tenured members**" of Georgetown University

---

[1] Georgetown University and Vance E. Watson, M.D. (collectively, "Defendants"; singularly,
"GU" and "Dr. Watson," respectively).

[2] Plaintiffs' Brief Statement As To Relevant Witnesses' Testimony, filed 7/2/07 ("Plts.' Stm."),
at 2 ("Plaintiffs' counsel discovered that [Fr.] Leo J. O'Donovan (then President of the
University) and Kenneth Bloem (then CEO of the Medical Center) instituted a policy in 1997
(which remained in effect through the relevant time period) that the medical staff had to generate
up to 70% of their salary or face salary reductions of up to 30% per year.  This policy resulted in
[a] . . . suit against Georgetown University for interfering with their practice of medicine by
basing it on volume and income.  *Glazer v. Georgetown University*, CA No. 0000321-99 (D.C.
Sup. Ct., Nov. 14 [sic], 1999)."  *See Glazer* Complaint attached as Exhibit 1.

faculty and involved the impact of a compensation policy on certain **tenure** rights.  **Dr. Watson was never tenured, nor has he ever been in a tenure track position**;[3] therefore, the lawsuit had no impact on him or his medical practice.  Second, Dr. Watson testified that he knew virtually nothing about the compensation policy or the *Glazer* lawsuit.  Third, Plaintiffs never explain how a lawsuit that did not affect the alleged negligent doctor and of which he was unaware bears upon the medical treatment rendered to Ms. Karyn A. Kerris ("Ms. Kerris").

The *Glazer* lawsuit involved and was brought only by "**tenured members**" of Georgetown University faculty and involved only the impact of the compensation policy on certain **contractual tenure rights of those individuals**; therefore, the litigation has no relevance or even connection to Plaintiffs' lawsuit.  Plaintiffs' vague contention that the policy somehow "required [Dr. Watson] to generate larger revenues or risk pay reduction," and that the policy had some unspecified "effect . . . on treatments performed on patients such as [the plaintiff] Karyn Kerris"[4] is demonstrably false as the policy – even adopting Plaintiffs' mischaracterization – only applied to **tenured** faculty members, a group to which Dr. Watson did not and never belonged (as he was non tenured and in a non-tenure track position).  Notwithstanding Plaintiffs' incorrect depiction of the *Glazer* litigation, even under Plaintiffs' description, the 1997 compensation policy could not and did not affect Dr. Watson as he was neither tenured nor has ever been in a tenure track position.

---

[3] *Compare Glazer* Complaint, Para. 2 ("In this case, Georgetown University . . . devised and implemented a compensation plan . . . that constitutes a direct and material breach of plaintiffs' tenure contracts with the University"; Attached as Ex. 1) *to* Dr. Watson Employment Contract, Art. I (Watson employment "shall continue in effect for successive terms of one year" and shall be "on the AT [non-tenure] track"; Attached hereto as Exhibit 2).

[4] Plts.' Stm. at 2.

2

Moreover, Dr. Watson was understandably (as it had no relevance to him) unaware of this compensation policy or the *Glazer* lawsuit:

> Q:      What do you know about the lawsuit that occurred from the investigators and faculty of Georgetown against the Board of Directors and the then president of the hospital? This was in 1999. Now, what do you know about that?
>                                     . . .
> A:      Explain that again to me  . . . You are saying there is a lawsuit between whom and whom?
>
> Q.      **Did you not know about a lawsuit against Kenneth Bloom by members of the IRB and the research faculty in 1999 that as a result of requiring them to raise 70 percent of their revenue from research or other elements that they would either do so or have to be terminated?** You didn't hear about that?
>                                     . . .
> A.      Well, again, you are talking a long time ago now. You know, **I heard rumors of a couple different kinds of lawsuits. This particular one I don't recall** . . . It's kind of a vague memory. We had a number of administrative changes. And these people, you know, are at an administrative level far above me. I don't meet them. **If there are fights and suits, good chance I wouldn't know about it.**

Deposition of Vance E. Watson, M.D., 5/31/07, at 265-67 ("5/31/07 Watson Dep."; emphasis added). Attached as Exhibit 3.

Further, when Dr. Watson was specifically asked whether during the period at issue his department was evaluated on the basis of profits and revenues, he responded that he had "no idea":

> Q.      **During the time of 1998-1999 was your department ever evaluated for its profit range** and decided whether or not the members within your department could keep their job based on how much revenue they were bringing in?
>                                     . . .
> A.      **I would have no idea.** I don't think we had anybody, at least to my recollection, nobody in our department has been terminated for financial reasons . . . .

3

5/31/07 Watson Dep. at 267 (Ex. 3; emphasis added). This testimony makes clear that the *Glazer* lawsuit and the compensation policy at issue therein are completely irrelevant to the medical malpractice claims asserted by Plaintiffs in this case.

Defendants respectfully request the Court deny Plaintiffs' request to take the depositions of four former high-level Georgetown officials – Kenneth D. Bloem, Paul Katz, Father Leo J. O'Donovan, and Leonard Chiazze, Jr. – because these people have no connection to the issues Plaintiffs allege as the basis for this litigation. Even if those individuals have some knowledge about an irrelevant compensation policy at issue in *Glazer*, Plaintiffs' Statement does **not** contain any evidence showing that the proposed deponents have **any knowledge** regarding any of the subjects Plaintiffs claim are at issue in this case:

- Use of Class III Medical Devices
- Embolization procedures
- Interactions with the FDA and/or Customs Officials
- Knowledge of smuggling of devices across the U.S. border
- Use of Histoacryl and/or Lipiodol
- Whether use of Class III devices requires IRB approval[5]

---

[5] Although one of the proposed deponents, Leonard Chiazze, Jr, was a member of the IRB, Dr. Watson has no knowledge of him as Plaintiffs' Attorney Anthony Newman demonstrated during Dr. Watson's May 31, 2007 deposition:

> Q.    Doctor, who is Leonard -- and I don't know if I can pronounce it correctly, but he was on the IRB -- Chiazze? C-h-i-a-z-z-e.
>
> **A.    I don't know.**
>
> . . . .
>
> Q.    [Y]ou've never come across Leonard Chiazze who is the head of the IRB numbered B, which is one that you are a part of?
>
> . . .
>
> A:    **I think I'm on IRB-A, which is why I would not have seen him.** Our head is Dr. Young.

- The events at issue in this case involving Dr. Watson or Felice Iacangelo, Cicily Iacangelo, and Karyn Kerris

Instead, Plaintiffs' Brief Statement centers on their theory that the *Glazer* lawsuit and the 1997 compensation policy gave Defendant Dr. Watson an incentive to perform more embolizations in order to boost his productivity, which led him to perform the three embolizations of Karyn Kerris at issue in this litigation. Plts' Stm. at 2-5. Plaintiffs' request for these depositions should be denied as they have proffered no factual basis whatsoever for a highly speculative theory that demonstrably could not have affected Ms. Kerris's medical treatment. *See Bastin v. Federal Nat. Mortg. Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997) ("the district court here did not abuse its discretion in refusing the . . . request for discovery inasmuch as [plaintiffs] were unable to offer anything but rank speculation to support their contention. . . . The district court does not abuse its discretion when it denies a discovery request that would amount to nothing more than a fishing expedition.").

In its June 26, 2007 Memorandum Order ("Mem. Order"), the Court stated that a protective order prohibiting an executive's deposition is necessary to guard against harassment, in cases where such executives do not have personal knowledge relating to the claims asserted. Mem. Order at 6 (citing *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 335 (M.D. Ala. 1991); *Mulvey v. Chrysler Corp.*, 106 F.R.D. 364, 366 (D.R.I. 1985)). The Court also noted that in *Taylor v. National Consumer Cooperative Bank*, Civ. A. No. 95-1918-LFO, 1996 WL 525322 (D.D.C. Sept. 10, 1996), which Plaintiffs had cited for the proposition that high-ranking corporate officials might be subject to deposition, the *Taylor* plaintiff first made a "threshold

---

5/31/07 Watson Dep. at 263-65 (Ex. 3; emphasis added). Moreover, Plaintiffs have already designated Drs. Henry Yeager and Dieter Schellinger to speak to IRB issues. *See* Plaintiffs' Witness List, filed 4/24/07.

showing to indicate that [the corporate official] [did] have unique knowledge with regard to certain relevant events." Mem. Order at 7. In our case, **no such showing has been made**, a point that was recognized by Judge Paul Friedman with regard to the prospective deponent, Father Leo O'Donovan:

> THE COURT:     Okay, **you can't take Father O'Donovan's deposition**. Anybody that has anything **relevant** to say.

June 26, 2007 Status Conference Transcript at 15 (attached as Exhibit 4) (emphasis added).

Plaintiffs use the *Glazer* litigation as the main reason why they need the depositions of these four, former high-level officers and executives. *See* Plts' Stm. at 3-5.[6] In premising the relevancy proffer for depositions on a lawsuit that has no relevance to the issues at hand, Plaintiffs have not demonstrated that these proposed deponents likely possess information relevant to their claims.[7] As such, Defendants respectfully request that the Court uphold its own finding that "**[p]laintiffs have made no showing . . . that the remaining proposed deponents . . . have relevant knowledge of the claims in this case that outweigh the burden and harassment that they will experience if they are deposed**." Mem. Order at 7 (emphasis added).

---

[6] "**Kenneth D. Bloem** . . . in hopes of helping the ailing Medical Center [and] increase its profits; b. **The implementation of a higher profit policy that required the staff and faculty to generate larger revenues or risk pay reduction, including defendant Vance E. Watson, M.D.** . . c. [t]he lawsuit . . ."; "**Paul Katz** . . . a. . . . when he became aware of the higher profit policyt [sic] mandate . . . b. **[t]he lawsuit** . . ."; "**Leo J. O'Donovan** . . . a. **The policy . . . regarding the switch to a higher profit policy**; b. The time when Kenneth Bloem was sent . . . [to the] Medical Center [to] **increase profits**; c. **His higher profit policies that required the staff and faculty to generate larger revenues or risk pay reduction** . . . d. **[t]he lawsuit that ensued** . . ."; "**Leonard Chiazze** . . . [t]he lawsuit . . . ."(emphasis added).

[7] On July 5, 2007, Plaintiffs noticed the deposition of Sheila Zimmet, Esq. so her alleged knowledge cannot be used to bootstrap the relevancy of other depositions.

6

**CONCLUSION**

The Court ruled that Drs. Yeager and Schellinger (identified on Plaintiffs' Witness List, filed 4/24/07) "would be qualified to testify about the IRB, because they are committee members of the IRB." 6/26/07 Mem. Order at 5;[8] thus, Plaintiffs have already designated the depositions of individuals for discovery into the IRB.

Given that Plaintiffs have failed to show that the relevancy or personal knowledge of any of the four, former, high-level executives, Defendants respectfully request that the Court enter a protective order, prohibiting the depositions of Kenneth D. Bloem, Paul Katz, Father Leo J. O'Donovan, and Leonard Chiazze, Jr., unless and until Plaintiffs make the required showing.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated:  July 6, 2007        By:        /s/ Megan E. Hills

Megan E. Hills (D.C. Bar #437340)
Nicolas D. Muzin (D.C. Bar # 500106)

725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000
(202) 434-5029 (fax)
mhills@wc.com
nmuzin@wc.com

Attorneys for Defendants

---

[8] Drs. Yeager and Schellinger sat on the IRB both during the time frame of the Amended Complaint and in 2007.

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that the undersigned caused a true and accurate copy of

Defendants' Response to Plaintiffs' Statement as to Relevant Witness Testimony to be served via

electronic filing on the Court's CM/ECF website on this 6th day of July, 2007 on the forgoing:

> Anthony Newman, Esquire
> Wendy Wyeth, Esquire
> Newman & McIntosh
> 7315 Wisconsin Avenue
> Suite 700E
> Bethesda, Maryland 20814
>
> Andrew Greenwald, Esquire
> Greenwald and Laake
> 6404 Ivy Lane
> Suite 440
> Greenbelt, Maryland 20770
>
> Plaintiffs' Counsel

Nicolas D. Muzin

# EXHIBIT 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

Robert I. Glazer
11352 Palatine Drive
Potomac, MD 20854

Leonard Chiazze, Jr.
11237 Waycross Way
Kensington, MD 20895

Steven Byers
1723 Webster Street, NW
Washington, DC 20011

Jack G. Chirikjian
8726 Hickory Bend Trail
Potomac, MD 20854

Mark Danielson
20130 Seabreeze Court
Germantown, MD 20874

Karen N. Gale
4453 Volta Place, NW
Washington, DC 20007

Richard Gillis
1500 44ᵗʰ Street, NW
Washington, DC 20007

Alfred B. Jenson
14220 Briarwood Terrace
Rockville, MD 20853

Gloria D. Massaro
4034 Chancery Court, NW
Washington, DC 20007

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 0000321-09

RECEIVED
Civil Clerk's Office

JAN 1 5 1999

Superior Court of the
District of Columbia

Donald Massaro                                    )
4034 Chancery Court, NW                            )
Washington, DC 20007                               )
                                                   )
Carlos Suarez-Quian                                )
5803 Roosevelt Street                              )
Bethesda, MD 20817                                 )
                                                   )
Charles B. Underhill                               )
4453 Volta Place, NW                               )
Washington, DC 20007                               )
                                                   )
                         Plaintiffs,               )
                                                   )
v.                                                 )
                                                   )
Georgetown University,                             )
a non-profit corporation,                          )
37th and O Streets, NW                             )
Washington, DC  20057;                             )
                                                   )
The Board of Directors of Georgetown               )
University;                                        )
                                                   )
Leo J. O'Donovan, S.J., individually and in his    )
   capacity as President of Georgetown             )
   University,                                     )
204 Healy Hall                                     )
Box 571789                                         )
Washington, DC 20057;                              )
                                                   )
Sam W. Wiesel, M.D., individually and in his       )
   capacity as Georgetown University's             )
   Executive Vice President for Health Services,   )
6410 Shadow Road                                   )
Chevy Chase, MD 20815; and                         )

2

Kenneth Bloem, individually and in his                    )
   capacity as Chief Executive Officer of the       )
   Georgetown University Medical Center,           )
4546 Cathedral Avenue, NW                                 )
Washington, DC  20016                                     )
                           )
           Defendants.                               )
_____)

## COMPLAINT FOR
### BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, TORTIOUS INTERFERENCE WITH CONTRACT AND KNOWING PARTICIPATION IN FIDUCIARY BREACH

As and for their Complaint in this action, plaintiffs, all tenured members of the

faculty of defendant Georgetown University, hereby allege and state as follows:

### PRELIMINARY ALLEGATIONS

1.     As tenured members of the faculty of defendant Georgetown University, plaintiffs

work pursuant to contracts with the University, which contracts guarantee them,

above all else, academic freedom and economic security.  Those contracts also

require plaintiffs to adjudicate complaints concerning administrative actions by the

University pursuant to the terms of a Faculty Grievance Code approved by

defendant Board of Directors of Georgetown University.  Those same contracts

bind the University to honor the results of the grievance process.

2.     In this case, Georgetown University President O'Donovan, Executive Vice

President Wiesel and Medical Center Chief Executive Officer Bloem devised and

3

implemented a compensation plan, including productivity standards, that constitutes a direct and material breach of plaintiffs' tenure contracts with the University. When the plaintiffs successfully challenged that breach in a grievance prosecuted in strict conformance with the Faculty Grievance Code, defendants O'Donovan, Wiesel and Bloem persuaded defendant Board of Directors of Georgetown University to nullify and negate the grievance process and its results in order to maintain the wrongful compensation policy and to retaliate against plaintiffs for their success in the grievance. As a result of those actions, plaintiffs have suffered both monetary and non-monetary harm.

3. By virtue of the acts set forth in this Complaint, defendant Georgetown University breached its contracts with the plaintiffs, and defendant Board of Trustees breached its fiduciary duties to the plaintiffs. Defendants O'Donovan, Wiesel and Bloem, who devised and engineered these wrongful acts, tortiously interfered with plaintiffs' contracts with the University and knowingly participated in defendant Board of Trustees' breaches of fiduciary duty.

4. To remedy the wrongful acts set forth herein, the plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages and the costs, including attorneys fees, of prosecuting the instant lawsuit.

## JURISDICTION

5. Jurisdiction over this action is founded on D.C. Code Ann. § 11-921(a). The

4

defendants are all located in and doing business in the District of Columbia, and the events alleged in this Complaint took place in the District of Columbia.

## PARTIES

6.  Plaintiff Robert I. Glazer, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Pharmacology of the Georgetown University Medical Center ("GUMC"). Professor Glazer resides at 11352 Palatine Drive, Potomac, Maryland 20854.

7.  Plaintiff Leonard Chiazze, Jr., Sc.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Family Medicine of the GUMC. Professor Chiazze resides at 11237 Waycross Way, Kensington, Maryland 20895.

8.  Plaintiff Steven Byers, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and an Associate Professor in the Department of Cell Biology of the GUMC. Professor Byers resides at 1723 Webster Street, NW, Washington, DC 20007.

9.  Plaintiff Jack G. Chirikjian, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Biochemistry and Molecular Biology of the GUMC. Professor Chirikjian resides at 8726 Hickory Bend Trail, Potomac, Maryland 20854.

10. Plaintiff Mark Danielson, Ph.D., is and at all relevant times has been a tenured

member of the Georgetown University Faculty and an Associate Professor in the

Department of Biochemistry and Molecular Biology of the GUMC. Professor

Danielson resides at 20130 Seabreeze Court, Germantown, Maryland 20874.

11.  Plaintiff Karen N. Gale, Ph.D., is and at all relevant times has been a tenured

member of the Georgetown University Faculty and a Professor in the Department

of Pharmacology of the GUMC. Professor Gale resides at 4453 Volta Place, NW,

Washington, DC 20007.

12.  Plaintiff Richard Gillis, Ph.D., is and at all relevant times has been a tenured

member of the Georgetown University Faculty and a Professor in the Department

of Pharmacology of the GUMC. Professor Gillis resides at 1500 44th Street, NW,

Washington, DC 20007.

13.  Plaintiff Alfred B. Jenson, M.D., is and at all relevant times has been a tenured

member of the Georgetown University Faculty and a Professor in the Department

of Pathology of the GUMC. Professor Jenson resides at 14220 Briarwood Terrace,

Rockville, Maryland 20853.

14.  Plaintiff Gloria D. Massaro. M.D., is and at all relevant times has been a tenured

member of the Georgetown University Faculty and a Professor in the Department

of Pediatrics of the GUMC. Professor Massaro resides at 4034 Chancery Court,

NW, Washington, DC 20007.

15.  Plaintiff Donald Massaro, M.D., is and at all relevant times has been a tenured

member of the Georgetown University Faculty and Professor in the Department of Medicine of the GUMC. Professor Massaro resides at 4034 Chancery Court, NW, Washington, DC 20007.

16.    Plaintiff Carlos Suarez-Quian, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and an Associate Professor in the Department of Cell Biology of the GUMC. Professor Suarez-Quian resides at 5803 Roosevelt Street, Bethesda, Maryland 20817.

17.    Plaintiff Charles B. Underhill, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Cell Biology of the GUMC. Professor Underhill resides at 4453 Volta Place, NW, Washington, DC 20007.

18.    Defendant Georgetown University is a non-profit corporation, chartered by the United States Government and incorporated by Act of Congress. The University employees over 1,500 full-time faculty members, including plaintiffs, and enrolls 12,500 students at three campuses: Main Campus, the Medical Center and the Law Center. The University's central offices are located at 37th and O Streets, NW, Washington, D.C.

19.    Defendant Board of Trustees of Georgetown University is a body corporate with the authority to manage the property and business of Georgetown University.

20.    Leo O'Donovan, S.J., is the President of Georgetown University and, as such, the

7

University's chief academic and administrative officer. Defendant O'Donovan's

University address is 204 Healy Hall, Box 571789, Washington, D.C. 20057.

This suit is brought against defendant O'Donovan in both his individual and

official capacities.

21.    Defendant Sam W. Wiesel, M.D., is Georgetown University's Executive Vice

President for Health Sciences. Defendant Wiesel resides at 6410 Shadow Road,

Chevy Chase, MD 20815. This suit is brought against defendant Wiesel in both

his individual and official capacities.

22.    Defendant Kenneth Bloem is Chief Executive Officer of the Georgetown

University Medical Center. Defendant Bloem resides at 4546 Cathedral Avenue,

NW, Washington, D.C. 20016. This suit is brought against defendant Bloem in

both his individual and official capacities.

## GENERAL ALLEGATIONS
## THE UNIVERSITY AND ITS CONTRACT WITH ITS TENURED FACULTY

23.    Georgetown University is composed of three principal subdivisions: Main

Campus, which consists of the College of Arts and Sciences, the Graduate School

of Arts and Sciences and the Schools of Foreign Service, Business Administration

and Languages and Linguistics; the Medical Center and the Law Center.

24.    Although faculty members employed by the University are typically affiliated with

one of the University's subdivisions, and with individual departments within those

8

subdivisions, all University faculty members, including the plaintiffs, are members of the faculty of the University as a whole.

25.    The highest form of recognition the University accords its faculty is tenure, which can only be achieved upon demonstration of excellence in teaching, scholarly accomplishment and service (both inside and outside the University.

26.    Tenure is a contractual relationship between the individual tenured faculty member and the University as a whole; it is not a relationship between the faculty member and any given subdivision of the University.

27.    Tenure is a mutually acknowledged expectation between the University and an individual faculty member of continuing employment for the faculty member, which can be terminated by the University only for just cause: i.e., professional or moral inadequacy, grave economic stringency on the part of the University as a whole or major changes in institutional aims.

28.    Tenure is also a mutually acknowledged expectation between the faculty member and the University that the faculty member is to be guaranteed academic freedom and economic security.

29.    Academic freedom means the freedom to teach, to pursue research and scholarly interests and to serve the University and society at large.

30.    Economic security means, among other things, a protection against diminution of compensation.

31.    Until the events alleged herein, the University had honored this particular aspect of the economic security guarantee throughout its history; in fact, during that entire history, regardless of the financial health of the University, the University has never reduced the compensation of any of its tenured faculty members.

## THE NEW MEDICAL CENTER COMPENSATION POLICY

32.    On or about September 19, 1997, defendants O'Donovan and Wiesel announced a new compensation policy for tenured University faculty members at the Medical Center only.

33.    That policy expressly reaffirmed the University and Medical Center's "commitment to tenure as the definitive reward for scholarly and professional achievement and the foundation of academic freedom."

34.    However, the September 19, 1997, policy called for the decrease in compensation for certain tenured Medical Center faculty members beginning with the University's 1999 fiscal year, which would start on July 1, 1998.

35.    The policy also permitted further compensation decreases for tenured faculty members in the future.

36.    The policy also indicated that further adjustments to the compensation of tenured faculty would follow, based on an as yet undefined measurement of faculty "productivity."

37.    Thus, as defendants O'Donovan and Wiesel knew or had reason to know, the

10

policy violated the tenured faculty members' contractual guarantees of academic freedom and economic security.

## THE GEORGETOWN UNIVERSITY FACULTY GRIEVANCE CODE

38.   Pursuant to the University's Faculty Grievance Code, a system approved by the Board of Directors, a Georgetown University faculty member aggrieved by administrative action is required to seek relief by pursuing a grievance through a series of steps and tribunals staffed by members of the University faculty.

39.   Pursuant to that same faculty Grievance Code, a Georgetown University faculty member also has an express right to have his or her grievance determined according to the procedures set forth in the Code.

40.   Pursuant to the Code, a grievance is first considered by a three member faculty Grievance Panel.

41.   Appeals from decisions of Grievance Panels are heard by a 14 member faculty Grievance Code Committee.

42.   Appeals from the Grievance Code Committee are to be brought to the University President unless the President is a party to the grievance. In that case, the Grievance Code requires the President to designate as the final appeal officer an Executive Vice President from a University campus other than that from which the grievance arises.

43.   Pursuant to the Faculty Grievance Code the Board itself approved, the Board of

11

Directors plays no role in the adjudication of a faculty grievance.

## THE PLAINTIFFS GRIEVE THE NEW COMPENSATION POLICY

44.   As required by the Grievance Code, which forms an element of each Georgetown

faculty member's contract with the University, on or about December 23, 1997,

the plaintiffs and others filed a formal grievance to set aside the compensation

policy. That grievance named defendants O'Donovan and Wiesel as respondents.

45.   A three member Grievance Panel was designated to hear the grievance, and the

Panel was chaired by Professor Samuel Dash of the Law Center.

46.   As required by the Grievance Code, the Panel first considered whether it had

jurisdiction to entertain the grievance.

47.   Although the Code expressly authorized defendants O'Donovan and Wiesel to

challenge jurisdiction, they made no effort to do so, and the Panel determined it

had jurisdiction to entertain the grievance.

48.   Defendants O'Donovan and Wiesel responded to the substance of the grievance on

or about April 3, 1998. In that response, defendants O'Donovan and Wiesel made

no claim that the grievance did not fall within the jurisdiction of the University

grievance mechanism.

49.   The grievants made their own submissions in support of their grievance, and the

duly constituted Grievance Panel convened a lengthy formal hearing on the

grievance on May 5, 1998. At that hearing, both sides were granted ample time to

12

present their views on the issues at hand.

50.   After the hearing, both sides were asked to submit and did submit written submissions on particular questions raised by the Panel Chair at the hearing. Again, in their submission, defendants O'Donovan and Wiesel raised no claim that the Grievance Panel lacked jurisdiction to entertain the grievance.

51.   Subsequent to the filing of the post-hearing submissions, on May 14, 1998, defendants Wiesel and Bloem, with the approval of defendant O'Donovan, issued a set of Faculty Compensation Guidelines, which spelled out the productivity measures for Medical Center faculty referenced in the September 19, 1997 compensation policy.

52.   As defendants expressly indicated in the Guidelines, the Guidelines represented "a profound cultural change" for tenured faculty members at the Medical Center and for the University as a whole.

53.   The Guidelines made clear that henceforth each Medical Center faculty member's compensation would be determined only by reference to the faculty member's income generating activities and not, as in the past, on the basis of the faculty member's achievement of excellence in teaching, scholarship and service.

54.   The Guidelines further required the faculty to fund a specified portion of their salaries from external sources, a system later characterized as an "eat what you kill" approach.

13

55. Immediately recognizing that the Guidelines destroyed any semblance of academic freedom or economic security at the Medical Center, the plaintiffs submitted the Guidelines to the Grievance Panel for consideration along with the September 19, 1997, compensation policy.

56. The Grievance Panel rendered its decision in the matter on June 23, 1998, in a decision written by Panel Chair Samuel Dash. That decision held that the compensation policy and Guidelines violated the contracts of tenured faculty members in that they violated the faculty members' academic freedom and economic security.

57. Based on that finding, the Panel expressly directed that the policy and Guidelines "cannot be implemented."

## DEFENDANTS DEFY THE GRIEVANCE PANEL'S ORDER

58. On July 20, 1998, pursuant to the requirements of the Grievance Code, defendants O'Donovan and Wiesel appealed the Grievance Panel's decision to the full University Grievance Code Committee.

59. In that appeal, defendants made no claim that the Panel or the Committee lacked jurisdiction to entertain the grievance.

60. The day after their appeal was filed, and in direct defiance of the Grievance Panel's unambiguous ruling that the policy and Guidelines could not be implemented, on July 21, 1998, defendants O'Donovan, Wiesel and Bloem,

14

through University counsel, announced that the policy and Guidelines would nonetheless be implemented as planned with a retroactive effective date of July 1, 1998.

61. As a result of the implementation of the policy and Guidelines, the plaintiffs and other tenured Medical Center faculty members suffered tangible and material harm.

62. In their July 21, 1998 implementation announcement, however, defendants pledged that "If the grievants ultimately prevail and the compensation policy is modified or rescinded, the Medical Center obviously recognizes its obligation to make affected faculty members whole for any salary they would otherwise be owed."

## DEFENDANTS LOSE THEIR APPEAL AND ACT TO NULLIFY THE GRIEVANCE PROCESS

63. After receiving the plaintiffs' response to the defendants' appeal, on October 2, 1998, the Grievance Code Committee affirmed the decision of the Grievance Panel, holding that the policy and guidelines constituted "a fundamental and dramatic change" that "violates the Grievants' rights as tenured faculty members."

64. With the rejection of their appeal by the Grievance Code Committee, defendants O'Donovan, and Wiesel had one more level of appeal to an administrative official of the University to be designated within specified time limits by defendant

15

O'Donovan.

65.    Defendants O'Donovan and Wiesel noticed their final appeal on October 26, 1998.

66.    In that appeal, and for the first time in a process that had thus far lasted over ten months, the defendants challenged the jurisdiction of the grievance mechanism to entertain the grievance in the first place.

67.    Notwithstanding the filing of the appeal, defendant O'Donovan failed and refused to designate a final appeal official as required by the Grievance Code.

68.    Accordingly, on November 4, 1998, the Chair of the Grievance Code Committee declared the proceeding at an end and further declared as final the Grievance Code Committee's October 2, 1998 decision.

69.    As expressly provided by the Grievance Code, that final decision was to be "immediately implemented by the appropriate University authorities."

70.    Having lost at each stage of the grievance process, defendants O'Donovan, Wiesel and Bloem knowingly, willfully and with malice sought to undo the result reached in strict conformance with the Faculty Grievance Code. They also acted to nullify their express promise to make the plaintiffs whole should the compensation policy and Guidelines be rescinded.

71.    Unbeknownst to the plaintiffs or to the members of the Grievance Code Committee, on or about October 30, 1998, defendant O'Donovan, in concert with defendants Wiesel and Bloem, surreptitiously persuaded defendant Board of

16

Directors to preempt the grievance process and to suspend all proceedings relating to plaintiffs' grievance.

72. Defendant Board of Directors issued a resolution to that effect on October 30, 1998, notwithstanding the fact that the Faculty Grievance Code, which the Board itself had approved, contained no provision for Board participation in the grievance process.

73. That Board resolution was kept secret from the Grievance Code Committee until November 4, 1998.

74. Also on October 30, 1998, moreover, defendant O'Donovan, in concert with defendants Wiesel and Bloem, persuaded the Board of Directors to maintain in effect the policy and Guidelines, effectively nullifying the decisions of the Grievance Panel and Grievance Code Committee to the contrary.

75. Thus, due to the instigation of defendants O'Donovan. Wiesel and Bloem, and with the direct assistance of defendant Board of Directors, the violations of plaintiffs' tenure contracts encompassed in the compensation policy and Guidelines remain in effect to this day.

76. As a result of defendants' actions, then, plaintiffs continue to suffer tangible and material harm and will continue to suffer such harm until defendants' wrongful acts are set aside and plaintiffs made whole for their injuries.

77. Although the plaintiffs have made repeated requests to defendants that they honor

17

the results of the grievance process and honor the terms of plaintiffs' tenure

contracts with the University as enunciated in the two decisions issued in that

process, defendants have repeatedly refused to do so.

## COUNT I
## BREACH OF CONTRACT
## (COMPENSATION POLICY AND GUIDELINES)

78. Plaintiffs reallege and incorporate by reference the allegations set forth in

paragraphs 1-77 of this Complaint as if fully stated herein.

79. The relationship between plaintiffs, as tenured faculty members, and defendant

Georgetown University is contractual in nature.

80. The compensation policy and Guidelines enunciated on or about September 19,

1997, and May 14, 1998, respectively, and implemented effective July 1, 1998

constitute a material breach of that contract.

81. Due to the breach of their tenure contracts with Georgetown University, plaintiffs

have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT II
## BREACH OF CONTRACT,
## (NULLIFICATION OF GRIEVANCE PROCESS)

82. Plaintiffs reallege and incorporate by reference the allegations set forth in

paragraphs 1-81 of this Complaint as if fully stated herein.

83. Pursuant to plaintiffs' contracts with the University, plaintiffs are guaranteed

access to and required to make use of a grievance process to adjudicate

18

deprivations of their rights as tenured faculty members of the University.

84. The unilateral suspension and nullification of the grievance process set forth above deprives the plaintiffs of their contractual rights and constitutes a material breach of plaintiffs' contracts with the University.

85. Due to the violation of their contractual rights to a specified grievance process, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
## (COMPENSATION POLICY AND GUIDELINES)

86. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-85 of this Complaint as if fully stated herein.

87. At all times relevant to this Complaint, defendants O'Donovan, Wiesel and Bloem knew that plaintiffs had a contract with the University and further knew or should have known that the compensation policy and Guidelines developed and implemented by the same defendants constituted a material breach of that contract.

88. Nevertheless, defendants O'Donovan, Wiesel and Bloem knowingly, willfully, wrongfully and with malice and bad faith first developed and later implemented the policy and Guidelines, thereby wrongly interfering with plaintiffs' contracts with the University and effecting a material breach of those contracts.

89. Defendants' actions in developing and implementing the policy and Guidelines

19

advanced no legitimate interest of the University and were taken outside the scope of their employment by the University; instead, their actions advanced only the personal agendas of the defendants, which directly conflicted with the expressly stated interests and principles of the University.

90. As a direct and proximate result of defendants' wrongful actions, plaintiffs have suffered and will continue to suffer monetary, and non-monetary harm.

### COUNT IV
### TORTIOUS INTERFERENCE WITH CONTRACT
### (NULLIFICATION OF GRIEVANCE PROCESS)

91. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-90 of this Complaint as if fully stated herein.

92. At all times relevant to this Complaint, defendants O'Donovan, Wiesel and Bloem knew that plaintiffs had a contractual right and obligation to adjudicate violations of their rights pursuant to the grievance process made mandatory by the Faculty Grievance Code.

93. Nevertheless, defendant O'Donovan, in concert with defendants Wiesel and Bloem, knowingly, willfully, wrongfully and with malice and bad faith engineered the suspension and nullification of the grievance process in order to nullify the decisions in plaintiffs' favor reached in that process. In so doing, defendants wrongfully interfered with plaintiffs' contracts with the University and effected a material breach of those contracts.

20

94. Defendants' wrongful actions in engineering the suspension of the grievance process advanced no legitimate interest of the University and were taken outside the scope of their employment by the University; instead, those actions merely advanced defendants' personal agendas, including their desire to retaliate against and injure plaintiffs for successfully exercising their contractual right to adjudicate their claims through the grievance process.

95. As a direct and proximate result of defendants' wrongful actions, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT V
## BREACH OF FIDUCIARY DUTY
## (COMPENSATION POLICY AND GUIDELINES)

96. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-95 of this Complaint as if fully stated herein.

97. Defendant Board of Trustees occupies a position of trust with respect to the affairs of the University and, by virtue of that position, owes a fiduciary duty to the University and its constituent elements, including tenured faculty members like plaintiffs.

98. Specifically, defendant Board of Trustees has a fiduciary duty to uphold the core principles of the contract between the University and its tenured faculty — namely, academic freedom and economic security.

99. Defendant Board of Directors breached that fiduciary duty by adopting the

21

compensation policy and permitting that policy and the Guidelines to be implemented notwithstanding the fact that, taken together or separately, both devices directly violated the principles of academic freedom and economic security.

100.  As a direct and proximate result of the Board's breach of fiduciary duty, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT VI
## KNOWING PARTICIPATION IN FIDUCIARY BREACH
## (COMPENSATION POLICY AND GUIDELINES)

101.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-100 of this Complaint as if fully stated herein.

102.  At all times relevant to this Complaint, defendants O'Donovan, Wiesel and Bloem knew that defendant Board of Directors had a fiduciary duty to the University and its constituent elements, including tenured faculty members like the plaintiffs.

103.  At all times relevant, defendants O'Donovan, Wiesel and Bloem knew or had reason to know that the compensation policy and Guidelines violated the principles of academic freedom and economic security that the Board of Directors had a fiduciary duty to preserve for tenured faculty members of the University.

104.  Nevertheless, defendants O'Donovan, Wiesel and Bloem knowingly, willfully, wrongfully and with malice and bad faith instigated the Board of Directors to adopt the compensation policy and to permit the policy and the Guidelines to be

22

implemented.

105.  In so doing, defendants knowingly participated in the Board of Director's breach of fiduciary duty to the plaintiffs and are to be held jointly and severally liable for all of the harm proximately caused by that breach of duty.

106.  As a direct and proximate result of the Board's breach of duty, which defendants O'Donovan, Wiesel and Bloem instigated and in which they knowingly participated, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT VII
## BREACH OF FIDUCIARY DUTY
## (NULLIFICATION OF GRIEVANCE PROCESS)

107.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-106 of this Complaint as if fully stated herein.

108.  Having approved the Faculty Grievance Code and having made the process set forth in the Code the mandatory method for adjudicating faculty complaints within the University, defendant Board of Trustees took on a fiduciary duty to ensure that the provisions of the Code were enforced and that members of the University's faculty received a full and final determination of their grievances pursuant to the terms of the Code.

109.  By directing that plaintiffs' grievance be suspended and thereby nullified and that the subject of that grievance, the compensation policy and Guidelines, continue in

23

effect notwithstanding decisions to the contrary by the Grievance Panel and the Grievance Code Committee, defendant Board of Trustees breached its fiduciary duty to the plaintiffs.

110. As a direct and proximate result of the Board's breach of duty, the plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT VIII
## KNOWING PARTICIPATION IN FIDUCIARY BREACH
## (NULLIFICATION OF GRIEVANCE PROCESS)

111. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-110 of this Complaint as if fully stated herein.

112. At all times material to this Complaint, defendants O'Donovan, Wiesel and Bloem knew that defendant Board of Directors had a fiduciary duty to uphold the provisions of the Faculty Grievance Code, which the Board itself had approved.

113. Nevertheless, defendants O'Donovan, Wiesel and Bloem knowingly, willfully, wrongfully, with malice and bad faith and with an intent to harm the plaintiffs persuaded the Board to suspend and nullify the grievance process for plaintiffs and therefore caused the Board to breach its fiduciary duty to plaintiffs and to the rest of the University community.

114. In so doing, defendants O'Donovan, Wiesel and Bloem knowingly participated in the Board's breach of fiduciary duty and are to be held jointly and severally liable for all of the harm proximately caused by that breach of duty.

115.   As a direct and proximate result of that breach of duty, which defendants O'Donovan, Wiesel and Bloem instigated and in which they fully and knowingly participated, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

WHEREFORE, plaintiffs pray that this Court award them the following relief:

1.   enter a declaratory judgment declaring the wrongfulness of the acts complained of in this Complaint;

2.   enter the appropriate injunctions necessary to vacate, set aside and nullify the wrongful acts complained of in this Complaint; to prohibit defendants from instituting in the future, in whole or in part, the illicit Compensation Policy and Guidelines and to prohibit defendants from interfering in the future with the duly authorized and constituted grievance process at Georgetown;

3.   award plaintiffs compensatory and punitive damages in amounts to be determined but in excess of $50,000;

4.   award plaintiffs the costs incurred, including attorneys fees and expenses, in prosecuting this action; and

5.   award plaintiffs such other relief as this Court may deem just and proper.

Plaintiffs further demand a trial by jury on all claims.

Respectfully submitted,

Steven K. Hoffman, Esq.
Marie Chopra, Esq.
JAMES & HOFFMAN, P.C.
1146 19th Street, NW, Ste. 600
Washington, DC  20036

Dated:  January 15, 1999

26

# EXHIBIT 2

## AGREEMENT BETWEEN
## GEORGETOWN UNIVERSITY MEDICAL CENTER
## AND
## VANCE E. WATSON, M.D.

WHEREAS, Vance E. Watson, M.D. (hereinafter "Dr. Watson") is a licensed, board certified physician specializing in the field of neuroradiology, and;

WHEREAS, Georgetown University Medical Center (hereinafter "GUMC") (Georgetown University Medical Center, Washington, D.C. 20007) maintains a Department of Radiology (hereinafter the "Department") and a Department of Neurosurgery (hereinafter "Neurosurgery") and desires to employ Dr. Watson on a full-time basis for the provision of professional services within those Departments; and

WHEREAS, Dr. Watson desires to be employed by GUMC; and

NOW THEREFORE, for the mutual promises and consideration set forth herein, the parties agree as follows:

## ARTICLE I
## CONTRACT TERM

The term of this Agreement shall be from September 1, 1994 to June 30, 1995.  This Agreement shall continue in effect for successive terms of one year running from July 1 to June 30 unless terminated by either party as provided herein.  This Agreement is contingent upon Dr. Watson receiving an appointment to the full time faculty of GUMC, on the AT track.  Any successive terms are contingent upon Dr. Watson maintaining his status as a faculty member in good standing and are subject to the annual review, reappointment, and termination processes of GUMC as set forth in the Faculty Practice Plan and in the Georgetown University Faculty Handbook.

## ARTICLE II
## SCOPE AND DEFINITION OF DUTIES

A.    Dr. Watson shall provide professional services in the field of neuroradiology to patients of the Department on a full-time basis including but not limited to evaluation, treatment, and management of neuroradiology patients, on an inpatient and outpatient basis.  Dr. Watson's duties shall include providing professional services as needed at other institutions where the Department has or develops extensions of its endovascular program.  Dr. Watson shall be responsible for taking call as

GUPR 00001

designated by the GUMC Chief of Neuroradiology.  Dr. Watson shall serve as the Director of the Section of Endovascular Therapy Service within the Division of Neuroradiology, Department of Radiology.  Specifically, Dr. Watson duties shall include, but are not limited to:

     1.  PRIMARY CLINICAL DUTIES:  To provide inpatient and outpatient neuroradiology services in the development of an endovascular therapy service.  Initially, one (1) day per week will be devoted to general neuroradiology coverage.

     2.  ACADEMIC DUTIES:  To include, but not be limited to, medical student and/or resident teaching in the office practice and hospital setting, strengthening of the radiology residency training program as it relates to the teaching of neuroradiology and component technologies, committee or administrative responsibilities, research and scholarly writing or as otherwise assigned by the Chairman of the Department.

     B.  Throughout the term of this Agreement, Dr. Watson at all times must be qualified, professionally competent, board certified, duly licensed in the District of Columbia and have a current narcotics number.  Dr. Watson must maintain a full-time faculty appointment in good standing in the Georgetown University School of Medicine, and appropriate clinical privileges at the Georgetown University Hospital (hereinafter "GUH") and such other facilities as the Chairman of the Department may designate.

     C.  In order to assist Dr. Watson in fulfilling his clinical and academic responsibilities, GUMC, through the Department, agrees to provide the following:

     1.  ADMINISTRATIVE SUPPORT:  Secretarial assistance, to be shared with the Division of Interventional Angiography, will be provided to handle phone calls, patient-related tasks, typing of manuscripts, grants and papers.  Although a secretary is assigned to a particular physician for specified periods of time, no secretary is considered to be associated exclusively with one physician.

     2.  CLINICAL SUPPORT:  Dr. Watson will be provided with an office in the immediate vicinity of the Neuroangiography room, a dedicated nurse and appropriate technical support.  In addition, Neurosurgery will supply Dr. Watson with examining facilities in the outpatient department of Neurosurgery on an as-needed basis.

GUPR 00002

3.    MONEY FOR RESEARCH:    A start-up research fund of Twenty-Five Thousand Dollars ($25,000.00) per year during the initial two (2) years of this Agreement will be provided to be used solely for the purposes of research, as needed. This fund is a one time allocation.  It is expected that research begun with monies from this fund will provide the basis to generate research grants from outside sources to provide for continued research needs.

D.    GUMC shall withhold, on behalf of Dr. Watson as an employee of GUMC, all necessary sums for income tax, unemployment insurance, social security or other withholdings or benefits pursuant to any law or requirement of any governmental body.

### ARTICLE III
### COMPENSATION AND BILLING

A.    GUMC, through the Department, shall pay to Dr. Watson a base salary in the sum of

per year to be paid in twelve equal     REDACTED
monthly payments of

each as compensation for professional and academic services rendered under this Agreement.  In addition, Dr. Watson will be provided with a "Discretionary Account" in the amount of Five Thousand Dollars ($5,000.00) per year.

B.    Upon the determination of the Chairman of the Department and after the net expenses of the endovascular section have been met through the revenues generated by the endovascular section, Dr. Watson will be eligible to participate in the Faculty Plan Program's incentive bonus program on a fifty per cent (50%) per case sharing formula.  This formula shall allocate fifty percent (50%) of the net collections for each case to the endovascular section account and fifty percent (50%) of the net collections for each case to the department's account.  The monies due under this formula shall be paid bi-annually.

1.    For purposes of this paragraph, net expenses shall be defined to include the cost of salary, fringe benefits, including but not limited to, health, life, and disability insurance, expense account and professional liability coverage.

C.    GUMC shall have the exclusive obligation and right to establish the schedule of charges and to bill for the services rendered by Dr. Watson at GUMC or any of its satellite locations

and to bill and collect revenues for services rendered by and under the direction of Dr. Watson. All such revenues shall become the sole property of GUMC.

D.    Dr. Watson shall be entitled to those benefits normally accruing to members of the full time faculty at GUMC. Specifically, Dr. Watson shall be entitled to receive twenty-two (22) days of annual leave, and fifteen (15) days of meeting time per year. Any additional meeting time must be approved by the Chief of the Division of Neuroradiology.

## ARTICLE IV
## NONCOMPETITION

GUMC has a responsibility to undertake reasonable efforts to protect its ability to provide adequate levels of financial support to the Georgetown University School of Medicine and the Georgetown University Hospital.

The terms of the following restrictive covenant are designed to accomplish these objectives in a reasonable and fair manner, taking into account the special circumstances attendant to faculty practice plans in academic medical centers. Individuals receiving full-time faculty appointments to the School of Medicine on or after July 1, 1993, agree as follows:

A.    In the event that Dr. Watson voluntarily leaves the GUMC full-time faculty, or is terminated for cause, for a period of two (2) years from the date of termination of employment, Dr. Watson shall not engage in or carry on, directly or, indirectly, or through an affiliate, or a s member of a partnership or joint venture, or as a stockholder or investor or as an agent, associate, employee or consultant of any person, partnership or corporation, the practice of neuroradiology or any business which offers the services of neuroradiology within a fifteen (15) mile radius of 3800 Reservoir Road, NW, Washington, DC.

B.    It is acknowledged that the covenants set forth in this paragraph are reasonable and necessary in order to protect GUMC's legitimate business interest and that any violation thereof by Dr. Watson would result in irreparable injury to GUMC. Consequently, in the event of Dr. Watson's breach of Article IV, Section A, Dr. Watson hereby consents to the granting of injunctive relief against him by a court of competent jurisdiction. Such relief shall be in addition to any and all remedies available to GUMC at law.

GUPR 00004

C.    If the covenants contained in Article IV, Section A., or any part thereof, are held to be unenforceable because of the duration or scope of such provisions, the court making such determination shall have the power, duty, and obligation to modify the duration or scope so as to bring the covenants within the bounds permitted by law, and the covenants, in their modified form, shall then be enforceable.

### ARTICLE V
### PROFESSIONAL LIABILITY COVERAGE AND INDEMNIFICATION

A.    GUMC shall provide professional liability coverage of the same kind and with the same limits of coverage as provided other full-time physician employees of GUMC for the provision of professional services on behalf of and within the scope of employment with GUMC in accordance with "The University Policy Concerning the Indemnification of faculty members" as set forth in the Georgetown University Faculty Handbook as it may be amended from time to time.

B.    Dr. Watson agrees to indemnify and hold harmless, and to defend at GUMC's election, Georgetown, its personnel, directors, administrators, officers, employees, agents, executors and assigns, with respect to any and all claims, damages, judgments, actions and causes of action arising out of Dr. Watson's actions or omissions outside the scope of his employment with GUMC, including all costs, expenses and reasonable attorneys' fees incurred in the defense of any and all claims and/or litigation.

### ARTICLE VI
### TERMINATION

A.    This Agreement may be terminated by Dr. Watson upon six (6) months prior written notice in accordance with the provisions of the Georgetown University Faculty Handbook.  Such notice shall be delivered certified mail, return receipt requested.

B.    GUMC may terminate this Agreement immediately and without notice in the event that:

     1.    Dr. Watson's license to practice medicine in the District of Columbia is suspended, revoked or not renewed; or

     2.    Dr. Watson's faculty appointment in the GUMC School of Medicine is terminated or not renewed;

or

3.   Dr. Watson's Medical Staff privileges at GUH, or
     at any other hospital at which Dr. Watson renders
     services, are suspended, restricted, revoked or
     not renewed; or

4.   Dr. Watson becomes the subject of any professional
     disciplinary action; or

5.   Dr. Watson fails to cooperate with GUMC in
     defending any malpractice claims.

C.   Dr. Watson must report to GUMC immediately and in
writing any of the events set forth in Article VI Section B
above.

D.   Effect of termination.  Neither Party shall have any
further obligation hereunder except for obligations accruing
prior to the date of termination and as set forth in Article IV
(Noncompetition) and Article V (Professional Liability Coverage
and Indemnification).

## ARTICLE VII
## GENERAL PROVISIONS

A.   Proprietary Information.  Dr. Watson shall not at any
time during the term of this Agreement and thereafter, except
with written permission by GUMC, disclose information relating to
GUMC's operations to persons other than members of GUMC's Medical
Staff, state licensing boards, Joint Commission on Accreditation
of Health Organizations or third party reimbursement agencies, or
other duly constituted governmental agencies, or pursuant to
subpoena and in all such cases Dr. Watson shall notify GUMC in
advance of making any such disclosure.  It is understood that in
the event of any violation of the restrictions set forth in this
Section, GUMC shall be entitled to preliminary and permanent
injunctive relief from any Court which may have jurisdiction, in
addition to any other remedies available under this agreement or
at law or in equity.

B.   Publication and Advertisement.  Dr. Watson agrees that
he will adhere to the policies on publication and advertisement
pertaining to GUMC faculty members as published in the Faculty
Handbook, Faculty Practice Group Practice Plan, Hospital Policy
and Procedure Manual or as otherwise adopted by the Board of
Trustees.  It is understood that in the event of any violation of
the restrictions set forth in this Section, GUMC shall be

entitled to preliminary and permanent injunctive relief from any Court which may have jurisdiction, in addition to any other remedies available under this agreement or at law or in equity.

C. <u>Intellectual Property/Inventions and Patents.</u>  Dr. Watson agrees that he will adhere to the policies on copyrights, inventions, patents and grants as published in the Georgetown University Faculty Handbook whereas otherwise adopted by the Board of Trustees.

D. <u>Non-Assignment.</u>  This agreement is personal to Dr. Watson and may not be assigned without the prior written consent of GUMC.

E. <u>Governing Law.</u>  This Agreement shall be deemed to have been made and shall be construed and all of the rights, powers, and liabilities of the parties hereunder shall be determined in accordance with the laws of the District of Columbia.

F. <u>Integrated Agreement.</u>  This Agreement contains the whole understanding of the parties and supersedes all prior oral or written representations and statements between the parties. In the event that specific terms of this Agreement shall be in conflict with the Faculty Handbook, the Faculty Practice Group Practice Plan, or GUMC policies and procedures, the terms of this Agreement shall prevail.

G. <u>Waivers and Amendments.</u>  No waiver of any term, provision, or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further and continuing waiver of any such term, provision or condition of this Agreement.  No amendment to any provision of this Agreement shall be effective unless in writing and signed by each party.

H. <u>Severability.</u>  If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of the agreement shall be valid and enforceable to the fullest extent permitted by law.

I. <u>Captions.</u>  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, or extend the scope or intent of this Agreement or any provision hereof.

GUPR 00007

J.   <u>Medical Records.</u>  Any and all medical and billing records pertaining to patients seen by Dr. Watson at GUMC or any of its satellite locations shall be the sole property of GUMC. Dr. Watson may have access to such records at reasonable times upon reasonable notice, and may obtain photocopies of such records at Dr. Watson's expense.

K.   <u>Notice.</u>  Every notice, demand, request, consent, approval or other communication which the parties hereto are required or desire to give shall be in writing and shall be given by personally delivering the same or by mailing the same, registered or certified mail, first class postage and fees prepaid, return receipt requested as follows:

GUMC -       Larry P. Elliott, M.D., Chairman
             Department of Radiology
             Georgetown University Medical Center
             3800 Reservoir Road, NW
             Washington, D.C. 20007


Dr. Watson - Vance E. Watson, M.D.

             _____

             _____

             _____

GUPR 00008

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers duly authorized and empowered.


FOR GEORGETOWN UNIVERSITY MEDICAL CENTER:

_Larry P. Elliott_ 11/5/93
_____
Larry P. Elliott, MD,                Date
Chairman, Department of Radiology


_Robert L. Martuza_ 4/24/93
_____
Robert L. Martuza, MD,               Date
Chairman, Department of Neurosurgery



_Nelson M. Ford_ 11/15/93
_____
Nelson M. Ford,                      Date
Chief Financial and Operating Officer



N/A
_____
George R. Lasnier,                   Date
Assistant Treasurer and Vice President,
   Financial Affairs



FOR  Vance E. Watson, M.D.:

_Vance E. Watson_ 11/9/93
_____
Vance E. Watson, M.D.                Date



GUPR 00009

EXHIBIT 3

47

1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLUMBIA

3      -------------------------x
                                 :
4      FELICE I. IACANGELO,      :
       et al.                    :
5                                :   VOLUME II
                  Plaintiffs     :
6                                : Case No.
          vs.                    : 1:05CV02086
7                                : Judge Friedman
       GEORGETOWN UNIVERSITY,    :
8      t/a Georgetown University :
       Hospital, et al.          :
9                                :
                  Defendants     :
10     -------------------------x

11                          Washington, D.C.

12                          May 31, 2007

13     Videotaped Deposition of:

14             VANCE E. WATSON, M.D.,

15     called for oral examination by counsel for

16     Plaintiffs, pursuant to notice, at the

17     E. Barret Prettyman United States Courthouse,

18     333 Constitution Avenue, N.W., Washington,

19     D.C., beginning at 10:14 a.m., before

20     Lynell C.S. Abbott, a Notary Public in and for

21     the District of Columbia, when were present on

22     behalf of the respective parties:

                  FEDER REPORTING COMPANY
            (202) 863-0000    (800) 956-8996

263

1    first five 10-K was asked for for Onyx?

2            MS. HILLS:  Objection; calls for

3    speculation.

4            BY MR. NEWMAN:

5        Q.    If you don't know, just tell me.

6        A.    I don't know.

7        Q.    Do you have any financial stake in

8    the outcome of Onyx?  Do you make any money

9    off the product sales?

10           MS. HILLS:  Objection; irrelevant

11   and vague and ambiguous.

12           THE WITNESS:  Do I have equity

13   interest, stock options, anything like that?

14   No, I do not.

15           BY MR. NEWMAN:

16       Q.    Doctor, who is Leonard -- and I

17   don't know if I can pronounce it correctly,

18   but he was on the IRB -- Chiazze?

19   C-h-i-a-z-z-e.

20       A.    I don't know.

21       Q.    How long have you been on the IRB

22   at Georgetown?

264

1          A.     Well, the full IRB?

2          Q.     Yes.  How long have you been a

3     member of IRB?

4          A.     It's a difficult, that's not a

5     straightforward question.  I said I was on

6     what's called our safety committee where we

7     looked at applications and gave preliminary

8     recommendations for people to make changes in

9     their application prior to sending it to the

10    full IRB which is a voting body.

11             So it's like a, I don't know what

12    you call it, a subcommittee or a panel of the

13    IRB.  But the full voting IRB, it's on my CV,

14    I think it's been a couple years or something

15    like that.

16         Q.     Well, just on that point, in your

17    CV it does say that you've been on the safety

18    committee from '99 to 2001, and from 2005 to

19    the present been on the full voting IRB.

20    Correct?

21         A.     Yes, about two years.

22         Q.     And in that time you've never come

FEDER REPORTING COMPANY
(202) 863-0000     (800) 956-8996

265

1    across Leonard Chiazze who is the head of the

2    IRB numbered B, which is one that you are a

3    part of?

4              MS. HILLS:  Objection; calls for

5    speculation, asked and answered.

6              THE WITNESS:  I think I'm on

7    IRB-A, which is why I would not have seen him.

8    Our head is Dr. Young.

9              BY MR. NEWMAN:

10        Q.    What do you know about the lawsuit

11   that occurred from the investigators and

12   faculty of Georgetown against the Board of

13   Directors and the then president of the

14   hospital?  This was in 1999.  Now, what do you

15   know about that?

16             MS. HILLS:  Objection; irrelevant.

17             THE WITNESS:  Explain that again

18   to me.  This is kind of a -- or say that

19   again.  I'm going to get some water.  You are

20   saying there is a lawsuit between whom and

21   whom?

22             BY MR. NEWMAN:

266

1      Q.    Did you not know about a lawsuit

2  against Kenneth Bloom by members of the IRB

3  and the research faculty in 1999 that as a

4  result of requiring them to raise 70 percent

5  of their revenue from research or other

6  elements that they would either do so or have

7  to be terminated?  You didn't hear about that?

8           MS. HILLS:  Objection; asked and

9  answered, calls for speculation.

10          THE WITNESS:  You know, I am not

11  -- well, how can I answer that?  I mean I --

12          BY MR. NEWMAN:

13     Q.    If you didn't hear about it, just

14  tell me you didn't hear about it.  I'm just

15  asking if you know.

16     A.    Well, again, you are talking a

17  long time ago now.  You know, I heard rumors

18  of a couple different kinds of lawsuits.  This

19  particular one I don't recall.

20     Q.    Do you recall there being anyone

21  -- first of all, do you recall when Kenneth

22  Bloom was the president of the hospital?

267

1          A.    It's kind of a vague memory.  We

2     had a number of administrative changes.  And

3     these people, you know, are at an

4     administrative level far above me.  I don't

5     meet them.  If there are fights and suits,

6     good chance I wouldn't know about it.

7          Q.    During the time of 1998-1999 was

8     your department ever evaluated for its profit

9     range and decided whether or not the members

10    within your department could keep their job

11    based on how much revenue they were bringing

12    in?

13              MS. HILLS:  Objection; calls for

14    speculation and vague.

15              THE WITNESS:  I would have no

16    idea.  I don't think we had anybody, at least

17    to my recollection, nobody in our department

18    has been terminated for financial reasons,

19    but...

20              BY MR. NEWMAN:

21          Q.    Do you recall the diversion of

22    drugs within neuroradiology during about that

319

| | |
|---|---|
| | CERTIFICATE OF NOTARY PUBLIC |
| 1 | |
| 2 | I, Lynell C.S. Abbott, the officer |
| 3 | before whom the foregoing deposition was |
| 4 | taken, do hereby certify that the witness, |
| 5 | whose testimony appears in the foregoing |
| 6 | deposition, was duly sworn by me; that the |
| 7 | testimony of said witness was taken by me in |
| 8 | shorthand and thereafter reduced to computer |
| 9 | type under my direction; that said deposition |
| 10 | is a true record of the testimony given by |
| 11 | said witness; that I am neither counsel for, |
| 12 | related to, nor employed by any of the parties |
| 13 | to which this deposition was taken; and |
| 14 | further, that I am not a relative or employee |
| 15 | of any attorney or counsel employed by the |
| 16 | parties hereto, nor financially or otherwise |
| 17 | interested in the outcome of the action. |

18

19    _____

20    Notary Public in and for
      The District of Columbia

21    My Commission Expires:
      April 30, 2012

22

FEDER REPORTING COMPANY
(202) 863-0000    (800) 956-8996

# EXHIBIT 4

1

1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
2

FELICE I. IACANGELO, et al,    . Docket No. CV-05-2086 (PLF)
3                           .
      Plaintiff,            .
4                       . Washington, D.C.
        v.           . June 26, 2007
5                       . 10:00 a.m.
GEORGETOWN UNIVERSITY,       .
6 trading as Georgetown University  .
Hospital, et al,           .
7                       .
      Defendants.        .
8 . . . . . . . . . . . . . . . . .

9             TRANSCRIPT OF STATUS CONFERENCE
         BEFORE THE HONORABLE PAUL L. FRIEDMAN
10           UNITED STATES DISTRICT JUDGE

11 APPEARANCES:

12 For the Plaintiff:      Newman, McIntosh and Hennessey
                       By: Anthony G. Newman, Esquire
13                    7315 Wisconsin Avenue
                       Bethesda, Maryland 20814
14                    301.654.3400

15                    Joseph, Greenwald and Laaker, PA
                       By:  Andrew E. Greenwald, Esquire
16                    6404 Ivy Lane
                       Greenbelt, Maryland 20770
17                    301.220.2200

18 For the Defendant:      Williams and Connolly, LLP
                       By: Megan E. Hills, Esquire
19                       Nicolas D. Muzin, Esquire
                       725 Twelfth Street, Northwest
20                    Washington, D.C. 20005
                       202.434.5393
21

22 Court Reporter:        Linda L. Russo, RPR
                       Official Court Reporter
23                    Room 6403, U.S. Courthouse
                       Washington, D.C. 20001
24                    202.354.3244

25 Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription

1           MR. NEWMAN:  Thank you.

2           THE COURT:  That's how I rule.  You can take a

3  deposition from anybody at Georgetown you want to.

4           MR. NEWMAN:  Thank you.

5           THE COURT:  Period, end of discussion.

6           MS. HILLS:  Your Honor, Father Leo O'Donovan one the

7  people --

8           THE COURT:  Okay, you can't take Father O'Donovan's

9  deposition.  Anybody that has anything relevant to say.

10          MS. HILLS:  Well, that's the whole issue.  A

11  protective order is pending in front of Judge Kay for just that

12  reason.  If they're asking for people -- J.W. Marriott, the

13  head of Marriott Corporation, they want to take his deposition

14  because he sat on the Board of Directors at Georgetown in the

15  '80s, on the theory that he might have some relevant

16  information.

17          There's a protective order that lays out -- Father

18  Leo O'Donovan they've identified, J.W. Marriott they have

19  identified.  These are -- so, it's not as easy as saying, oh,

20  they can take anyone they want.  We say identify somebody

21  relevant.  How about a 30(b)(6) witness, as opposed to

22  identifying nine people from the '80s who they -- on the

23  thought.

24          Your Honor, my belief is that this was brought on by

25  plaintiff's comment, not Georgetown's.  Trying to depose Father

1   of now I do not have a conflict with either of my

2   representation, and that now that that conflict has been lifted

3   over me, I may advise my clients on settlement counteroffer, on

4   their responses to written discovery.  So, therefore, I need a

5   two week extension on defense's discovery responses, which are

6   due July 4th.  In my mind, I was told I had a conflict by

7   plaintiffs.

8          THE COURT:  Okay.  I'll talk with Judge Kay and one

9   of us will be in touch.

10          MR. NEWMAN:  Thank you, Your Honor.

11          MS. HILLS:   Thank you, Your Honor.

12     (Proceedings concluded.)

13

14                    CERTIFICATE

15     I, LINDA L. RUSSO, Official Court Reporter, certify

16   that the foregoing pages are a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19

20   _____
     Linda L. Russo, RPR
21   Virginia CCR No: 0313102

22

23

24

25