UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


-------------------------x

                         :

FELICE I. IACANGELO,     :

et al.                   :

                         :   VOLUME II

          Plaintiffs     :

                         : Case No.

   vs.                   : 1:05CV02086

                         : Judge Friedman

GEORGETOWN UNIVERSITY,   :

t/a Georgetown University :

Hospital, et al.         :

                         :

          Defendants     :

                         :

-------------------------x



                Washington, D.C.

                May 31, 2007

Videotaped Deposition of:

          VANCE E. WATSON, M.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

E. Barret Prettyman United States Courthouse,

333 Constitution Avenue, N.W., Washington,

D.C., beginning at 10:14 a.m., before

Lynell C.S. Abbott, a Notary Public in and for

the District of Columbia, when were present on

behalf of the respective parties:

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 64

1  in following them. But I'm setting them in
2  this case.
3        Only two matters will warrant a
4  direction to the deponent not to answer a
5  question. That is an issue that involves
6  privilege or work product. The objection will
7  be noted, the privilege, the basis for the
8  objection will be stated succinctly. And the
9  witness can be directed not to answer.
10       I have a matter beginning at 10:30
11 that will probably take until 12:00 o'clock.
12 I will try to get back to you as soon as
13 possible. I want you to go forward with the
14 deposition and save up those objections.
15       All other objections will be
16 noted, be noted briefly. They won't be long,
17 lengthy, speaking objections. There will be
18 no editorial comments. I don't want any
19 arguments between counsel. And the witness
20 will proceed to answer the question.
21       Now, I'm going to assume that
22 there will probably be minimal intervention on

Page 65

1  my part in the hope that that's the way it
2  will be. But as I say, I will make every
3  effort to get in as promptly as I can to
4  resolve any issues.
5        There may come a time when counsel
6  will have to sit down and try to resolve this
7  case by way of mediation and at that time
8  we'll have to work together. Now is a good
9  time to do it. I don't want you to continue
10 to argue during this deposition.
11       Now, I'm not sure to what extent I
12 want to get involved at this point with the
13 curriculum vitae, but is there -- the question
14 was asked, I understand, Mr. Newman, as to who
15 prepared the curriculum vitae. Is that
16 correct, sir?
17       MR. NEWMAN: Correct.
18       THE COURT: And there was
19 objection to the witness answering that
20 question.
21       MR. NEWMAN: The counsel stated an
22 objection that he may not answer to the extent

Page 66

1  that it invades the attorney-client privilege.
2        MS. HILLS: Your Honor, the
3  question was stated whether an attorney edited
4  it.
5        MR. NEWMAN: No.
6        MS. HILLS: And, you know, if
7  there is a dispute as to the question, we can
8  have it read back. I told the witness not to
9  answer to the extent it invaded
10 attorney-client communication.
11       THE COURT: Did the witness then
12 answer the question?
13       MS. HILLS: Yes.
14       MR. NEWMAN: Yes. He answered
15 that --
16       THE COURT: So that was the
17 objection and he answered the -- what was the
18 answer, Mr. Newman?
19       MR. NEWMAN: The answer was that
20 he had a prior version, that his attorney
21 edited it. And then the attorney moved to
22 strike.

Page 67

1        MS. HILLS: The part of the
2  communication that was an inadvertent
3  disclosure of the attorney-client
4  communication.
5        The witness clearly stated that
6  the substantive CV was the same and that only
7  cosmetic typographical errors, misspellings
8  and font consistency had been changed from
9  what was produced.
10       I didn't even understand the
11 relevance. But for some reason Mr. Newman
12 felt the need to intrude upon -- to get the
13 witness to say an attorney did this, "Your
14 attorney did this." And that's improper. And
15 so I continually instructed the witness to
16 say, "You may answer outside of anything that
17 involves an attorney-client privilege."
18       THE COURT: I have some question
19 as to whether or not that would constitute
20 attorney-client privileged material in terms
21 of preparing a CV. I don't know if that was
22 counsel advising the client as to matters that

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 68

1  were prospectively going to be viewed as
2  confidential.
3        But it seems to me whatever is in
4  the CV if it is to be challenged and you have
5  objective information that would lead you to
6  dispute, Mr. Newman, as to whether or not the
7  CV is accurate or not, clearly you can raise
8  that either with the witness or at some
9  subsequent time at trial. So I'm going to let
10 that rest.
11       But, again, I think the deposition
12 will have to proceed. And if it's going to be
13 constantly interrupted and if there's going to
14 be arguments between counsel, then I'm going
15 to come in and restrict the deposition to the
16 very, very limited rules that I've imposed
17 here. And if it's not complied with there
18 will be sanctions imposed.
19       So I want you to go forward and be
20 cooperative.
21       MS. HILLS: Your Honor, if I may
22 ask just one request.

Page 69

1        THE COURT: Yes, Ms. Hills.
2        MS. HILLS: Although one of your
3  rules did state there will be no
4  editorializing by counsel, I would ask the
5  Court to make it quite clear that there should
6  be no sidebar comments by any counsel.
7        THE COURT: All right. This
8  applies to all counsel. And it's going to
9  apply to the extent there are other
10 depositions that may well be monitored by me.
11 You've got deponents on each side of the issue
12 here. So as far as I'm going to be
13 responsible for monitoring any depositions in
14 discovery, those rules will apply during all
15 the depositions.
16       MR. NEWMAN: Then I hate to even
17 add this.
18       THE COURT: You can always appeal
19 to the trial court proceeding.
20       MR. NEWMAN: Here is the only
21 thing that I would say. Please instruct the
22 defense counsel not to say "I'm going to

Page 70

1  clarify a point by saying in this case" --
2        THE COURT: I've indicated, Mr.
3  Newman, the objections will be succinct and
4  brief.
5        MS. HILLS: Your Honor, I would
6  allow the only time it is not a point I've
7  said when Mr. Newman or the witness has said,
8  "Referring to this section of the document
9  book chapters," I've said, "For clarification
10 of the deposition, that's on Page 2."
11       MR. NEWMAN: That's not all you
12 said, Counsel. Please --
13       THE COURT: Counsel, the bickering
14 has to stop. Ms. Hills, you may note your
15 objection. This is discovery. If you want to
16 continue this when it's before Judge Friedman,
17 feel free to do it. If he permits it, that's
18 fine. It will not hold in this deposition.
19       Good. Thank you, Counsel. I'm
20 close by by phone. 3030 is all you have to
21 dial. You don't have to dial 9. Ms. Mullen
22 will be available. Let her know if there is a

Page 71

1  problem and I will try to get in.
2        I hope you don't call very often,
3  frankly. I'm not soliciting any business.
4  Lots of luck. Have a wonderful deposition.
5  Doctor, I hope it's brief so we can get you
6  back to doing whatever it is I'm sure you
7  prefer to do instead of sitting here having
8  your deposition taken. Counsel.
9        MR. NEWMAN: Thank you very much.
10       MS. HILLS: Thank you, Your Honor.
11       (Magistrate Judge Alan Kay departs
12 courtroom.)
13       VIDEOGRAPHER: We're back on the
14 record at 10:35 a.m.
15       BY MR. NEWMAN:
16    Q.  Thank you. Doctor, I'm going to
17 now ask you questions involved with your
18 declaration. And the reason I'm saying that
19 is --
20    A.  I think we got interrupted and we
21 didn't finish with this.
22    Q.  All right.

7  (Pages 68 to 71)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 72

1    A.   I just want to clarify the CV,
2  just a couple of things, which I don't know
3  what the semantics are.  One says Staff
4  Neuroradiologist NIH clinical center,
5  Georgetown University Hospital.  I'm on the
6  staff at Georgetown.  I'm not sure what
7  constitutes staff at NIH.  I am a consultant
8  or something there.  I have privileges, but
9  I'm not employed by the NIH.
10    Q.   Just one question on that.  Does
11  that actually mean you are on staff at NIH or
12  do you not even know if that's true?
13    A.   I don't know the definition of
14  exactly what "staff" is.
15    Q.   Fair enough.
16    A.   I mean I was given privileges to
17  do procedures there, particularly spinal AVMs,
18  that was some years ago, and some repair of
19  other blood vessel problems.  And the wordage
20  they use seems to change.  I think sometimes
21  it's consultant, sometimes something else.  So
22  I don't know, in case that becomes an issue.

Page 73

1    Q.   Let me ask you on that --
2    A.   The other thing.  You were asking
3  questions --
4    Q.   Hold on.  Let me just ask a
5  question regarding that.  And that is were you
6  given courtesy privileges to do treatments at
7  NIH or actually some other type of privilege?
8    MS. HILLS:  Object to form;
9  compound.
10    THE WITNESS:  I don't know what
11  courtesy privileges are.
12    BY MR. NEWMAN:
13    Q.   All right.  When's the last time
14  you were at NIH doing anything?
15    MS. HILLS:  Object to form; vague.
16    THE WITNESS:  Doing anything?
17    BY MR. NEWMAN:
18    Q.   Well, let me ask you this:  When
19  did you practice any kind of medicine at NIH
20  the last time?
21    A.   Well, that definition is difficult
22  because I've been there and talked to the

Page 74

1  physicians up there about different things, I
2  think maybe even last year.  The last time I
3  treated a patient there was some years ago.
4  And the person I primarily worked with
5  unfortunately passed away.
6    Q.   Who was that?
7    A.   John Dobman.
8    Q.   Do you know what year that was the
9  last time you treated a patient?
10    A.   No, I don't.
11    Q.   And do you know whether you have
12  enough privileges at the present time to treat
13  other patients at NIH?
14    MS. HILLS:  Object to form; vague,
15  ambiguous.
16    THE WITNESS:  My belief is that I
17  do, yes.
18    BY MR. NEWMAN:
19    Q.   Now, you're going to another issue
20  on the CV.
21    A.   Well, I believe on my prior
22  version I had active licenses to practice

Page 75

1  medicine, and that's California and D.C.
2  Obviously, when I was a resident in North
3  Carolina I had some sort of license.  And that
4  would have been while I was at Duke which
5  would be, what, '97 through -- I mean '87
6  through '91.
7    Q.   Did your license to practice
8  medicine in North Carolina lapse?
9    A.   I don't remember whether it was
10  attached to my training or it was an
11  individual license I had.  But I certainly
12  stopped paying for it when I left North
13  Carolina.  And you stop paying for it and then
14  they make you inactive or whatever they do.
15    Q.   Anything else on the CV?
16    MS. HILLS:  Object to current
17  positions as inaccurate.
18    MR. NEWMAN:  That's a speaking
19  objection.
20    MS. HILLS:  Object to sidebar.
21    THE WITNESS:  Well, under
22  Certifications I think member of RSNA is maybe

8 (Pages 72 to 75)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 76

1  a society that you are a member of. But I'm
2  not sure. Otherwise, I have gone through this
3  and everything looks pretty much like the
4  prior version except, like I said, the fonts
5  are better and the typos are corrected and
6  things are put in chronological order instead
7  of being mixed up a little bit. So it's
8  mainly cosmetic issues, plus what we
9  discussed.
10      BY MR. NEWMAN:
11      Q.  Does that complete the issues on
12  the CV?
13      A.  I believe so.
14      Q.  All right.
15      MS. HILLS:  Object to question not
16  directing the doctor.
17      BY MR. NEWMAN:
18      Q.  All right, Doctor. I'm going to
19  provide you with documents filed by your
20  lawyer in this case which are marked from
21  Exhibit 1 to Exhibit 23. You identified them
22  before for the Court, but I'm going to give

Page 77

1  you a copy. Exhibit 8 is your CV -- I'm
2  sorry. Is your declaration. And I've
3  actually separated it a little for you to see.
4      MS. HILLS:  Are these being marked
5  as exhibits for the deposition, both the CV
6  and this?
7      MR. NEWMAN:  The CV I marked as
8  Exhibit 1. This packet can be marked as
9  Exhibit 2.
10      MS. HILLS:  The court reporter is
11  indicating that nothing has been marked.
12      COURT REPORTER:  Also, from the
13  previous depo you had marked two exhibits. I
14  understand this should be Exhibit 3.
15      MR. NEWMAN:  All right. Make the
16  CV 3.
17      (Marked, Exhibit # 3, Vance Emery
18  Watson, M.D. Curriculum Vita.)
19      MR. NEWMAN:  Then this packet of
20  exhibits from the defense as 4.
21      (Marked, Exhibit # 4, Defendants's
22  Motion To Dismiss Document, Attachments.)

Page 78

1      MS. HILLS:  Do you have a copy for
2  counsel?
3      MR. NEWMAN:  Oh, of course.
4      MS. HILLS:  Thank you.
5      BY MR. NEWMAN:
6      Q.  All right, Doctor. What has been
7  pulled out in succession is your declaration,
8  and I have no problem in any way you wish to
9  review that document, but this comes from the
10  actual exhibits of the Court. I'm going to
11  ask you specific questions on that. So if we
12  can begin, if I may reach, these are all the
13  exhibits in the beginning, and here is your
14  declaration.
15      A.  Mmm-hmm.
16      Q.  All right. Page 2 of that, first
17  of all let me ask you this before we move
18  anywhere on it:  This eight-page document, the
19  Page 8 has your signature, is that correct, at
20  the end?
21      A.  Yes.
22      Q.  And it says above your signature,

Page 79

1  "I declare under the penalty of perjury that
2  the foregoing is true and correct." Do you
3  recall signing after such a statement?
4      A.  Yes.
5      Q.  Before you signed that statement
6  did you, in fact, read the eight pages that
7  are in front of you?
8      A.  I'll have to look through this to
9  make sure it's the same document.
10      Q.  This is the one filed by the
11  defense in court. So please go ahead and look
12  to see if there is anything different from
13  what you signed and what you have before you.
14      A.  It looks like the same document.
15      Q.  Well, let me ask you this, Doctor:
16  Is there anything on that document that
17  appears to be different from when you signed
18  that document?
19      A.  It's eight pages long and, you
20  know, I can't guarantee there wasn't a word
21  substitution or something. Without comparing
22  them side by side, it looks the same.

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 80

1    MS. HILLS: I'll represent to you,
2 Doctor, it is the same.
3    THE WITNESS: Okay. Then it's the
4 same.
5    BY MR. NEWMAN:
6    Q. All right. Assuming these
7 documents and counsel's statement that they
8 are identical, it's safe to agree now that
9 this is the declaration that you did sign?
10    A. Correct.
11    MS. HILLS: Or a copy of it.
12    BY MR. NEWMAN:
13    Q. It's an exact duplicate of the
14 declaration you signed. Is that correct,
15 Doctor, now that we've been through that
16 statement by your counsel?
17    A. Yes.
18    Q. Now, within that, if I ask you,
19 I'll direct you to certain pages and Page 2 of
20 that document -- and before we even ask this,
21 am I correct that, Doctor, you would not sign
22 a document under the penalty of perjury that

Page 81

1 was incorrect or did not state your opinions?
2    MS. HILLS: Objection; calls for
3 speculation, assumes facts not in evidence.
4    BY MR. NEWMAN:
5    Q. You can answer.
6    A. Could you --
7    Q. Would you sign something you know
8 is incorrect and then swear that it's correct?
9    A. No.
10    Q. Now, Page 2, there is a footnote
11 at the bottom of that page, and I'm not going
12 to read all of it except the -- which you're
13 free to. It states, "By reference to these
14 exhibits, Vance C. Watson, M.D., affirms that
15 these exhibits as well as all exhibits
16 attached to the aforementioned statement, are
17 true and accurate copies of documents
18 contained in Karyn Kerris's medical record."
19 I'm going to tell you that exhibits are in
20 front of you. Did you in fact, did you make
21 that affirmation that all those exhibits were
22 true and accurate copies of the medical

Page 82

1 record?
2    A. Well, there is something I didn't
3 pick up on when I signed this.
4    Q. What was that?
5    A. My middle initial is E, not C.
6 And--
7    Q. Go ahead.
8    A. I have to basically admit I don't
9 fully understand all this legal writing here.
10 I think it's okay, but you are entering a
11 realm where I'm not trained. So there could
12 be, you could have different interpretations,
13 I would have no way of knowing.
14    Q. Let me ask you this: When you saw
15 the affidavit and before you signed it, did
16 you in fact review medical records which I'm
17 going to show you are the exhibits that are
18 attached thereto?
19    A. Yes. I reviewed medical records
20 prior to signing this.
21    Q. Prior to signing this document,
22 did you ask anyone for the clarification of

Page 83

1 what affirms that these exhibits attached to
2 the aforementioned statement are true and
3 accurate copies, did you ask what that meant
4 to anybody?
5    MS. HILLS: Object to form; vague,
6 ambiguous.
7    BY MR. NEWMAN:
8    Q. I'll make it really simple.
9 Doctor, when you had those questions about
10 what was being said in Footnote 1, did you ask
11 anybody about it?
12    MS. HILLS: Object to form.
13    THE WITNESS: I just tried to
14 figure it out myself like I would if I was
15 reading a contract for life insurance or wills
16 or anything like that. There is legalese and
17 we lay people, we doctors think we understand
18 what it's saying and maybe we're right or
19 wrong. But I think this was simply saying
20 that I looked at the documents and some of
21 them were attached.
22    BY MR. NEWMAN:

10 (Pages 80 to 83)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 84

1    Q.   All right.  And is, in fact, it
2  from your recollection you did look at the
3  documents which are before you and review the
4  declaration before you signed it?
5       MS. HILLS:  Object to form.
6       BY MR. NEWMAN:
7    Q.   Did you do those things?
8    A.   I had reviewed a large amount of
9  documents, had been through the medical
10 record.  I didn't personally attach these.  So
11 I'm not following you.
12   Q.   Let me ask you this:  There are
13 references in the document, I'm sure you saw
14 it many times, to Exhibit 2, Exhibit 1,
15 Exhibit... et cetera.  Did you see those
16 before you signed it?
17   A.   I didn't see them paired, no.
18   Q.   Does that mean that when you
19 signed this declaration you had not compared
20 Exhibit 1, 2, 3, 4, et cetera, with the
21 references contained in your affidavit?
22      MS. HILLS:  Object to form;

Page 85

1  misstates doctor's testimony, vague,
2  ambiguous.
3       BY MR. NEWMAN:
4    Q.   Let's redo it.  Doctor, do I
5  understand that when you signed your
6  declaration you did not look at Exhibits 1
7  through 23 as they are listed in your
8  statements to see if, in fact, the statements
9  relate to the records?
10      MS. HILLS:  Object to form; vague,
11 misstates testimony, misstates,
12 mischaracterizes documents.
13      THE WITNESS:  I don't think I had
14 them matched.  I reviewed the medical records.
15 And my impression of the footnoting and the
16 Exhibit 1 is that that was reference by
17 counsel.
18      BY MR. NEWMAN:
19   Q.   Does that mean you basically
20 looked at the document, the declaration, saw
21 the statements appeared to be true, but didn't
22 cross-reference them to the listed exhibits?

Page 86

1       MS. HILLS:  Object to form;
2  mischaracterizes the document, misstates
3  doctor's testimony, vague.
4       BY MR. NEWMAN:
5    Q.   Is that what you did?
6    A.   Can you restate that?
7    Q.   When the paragraphs contained in
8  your declaration stated, "See" or "Exhibit"
9  number something, before signing it you didn't
10 go to look at those exhibits and see if they
11 had anything to do with those pages.
12      MS. HILLS:  Object to form;
13 mischaracterizes document, misstates doctor's
14 testimony, vague.
15      THE WITNESS:  I didn't see an
16 instruction telling me to compare it.  And I
17 don't see anywhere where it says "See"
18 whatever.  I thought this was like a counsel's
19 footnote for some...
20      BY MR. NEWMAN:
21   Q.   All right, Doctor.  Let me ask you
22 to turn to Page 4 of your declaration.  Within

Page 87

1  Paragraph 10 where it says "See 11/4/98 GUH
2  Radiology Report," et cetera -- first of all,
3  is that what that says, see the report?
4    A.   Yes.
5    Q.   And it mentions Exhibit 7.  Okay?
6  Do you see that?  Down at the bottom.
7       MS. HILLS:  Object to form;
8  mischaracterizes document.
9       BY MR. NEWMAN:
10   Q.   Fortunately, the jury will be able
11 to see this and have it right in front of them
12 while we go through this videotape.  But at
13 the end of Paragraph 10 does it say "Exhibit
14 7"?
15      MS. HILLS:  Object to sidebar.
16      THE WITNESS:  Yes.  It says
17 "Exhibit 7."
18      BY MR. NEWMAN:
19   Q.   And would you turn to Exhibit 7.
20 Your declaration is Exhibit 8, just for
21 knowledge.  So it's the first one right before
22 that.  And it should be -- it's in this pile

11  (Pages 84 to 87)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 88

1  here. They have flagged pages in front as
2  counsel provided them to the court.
3      A.   Well, I've got Exhibit 6, and then
4  there is nothing, then there is a blank page.
5      Q.   All right. Let me do this. And
6  I'm going to have to with trepidation ask
7  counsel to show you, because we have several
8  copies, her attachment of Exhibit 7.
9          MS. HILLS: For the record, since
10 the doctor previously testified that counsel
11 drafted the legal reference, it should say
12 instead of "See exhibit 7," it should be "See
13 Exhibit 3," as that is the document referenced
14 11/4/98 record, which is what is quoted. And
15 I am handing that to the doctor, as that
16 appears to be what you want him to look at.
17         MR. NEWMAN: No, Counsel. Do not
18 make these objections on the record.
19         BY MR. NEWMAN:
20     Q.   Now, Counsel, if she wishes to
21 question you on that, that is fine. I wish
22 you to turn to -- and if I may, Counsel,

Page 89

1  because I provided you these copies, could you
2  please -- thank you. This is Exhibit 7. And
3  connected to it is a document.
4          What document is connected to
5  Exhibit 7? The one referenced in Paragraph 10
6  of your affidavit.
7          MS. HILLS: Object to form;
8  mischaracterizes doctor's prior testimony in
9  his deposition in which he stated counsel did
10 the legal document.
11         MR. NEWMAN: Please, would you --
12         BY MR. NEWMAN:
13     Q.   Doctor, what is Exhibit 7?
14     A.   Exhibit 7 is a letter from
15 neurosurgeon Dr. Gary Steinberg saying he's
16 recommending embolization and radiation of
17 Karyn's lesion.
18     Q.   Fair enough, Doctor. Does Exhibit
19 7 -- and if I may, just to put it back in
20 order so we all have it -- have anything to do
21 with the Paragraph 10 in your declaration on
22 Page 4?

Page 90

1          MS. HILLS: Object to question;
2  mischaracterized document.
3          THE WITNESS: Well, as I said
4  previously, I don't understand the legal
5  footnoting. What I did understand was "See
6  the 11/4/98 radiology report," and I was
7  familiar with that document and the other
8  documents.
9          BY MR. NEWMAN:
10     Q.   And you did not compare Exhibit 7
11 with what we just did now before you signed.
12     A.   I did not know that that's what it
13 meant or what you're supposed to do.
14         MS. HILLS: Object -- you didn't
15 let me get my objection. Object to form;
16 mischaracterizes the document.
17         BY MR. NEWMAN:
18     Q.   Doctor, let me ask you now on Page
19 4, again, to turn to Paragraph 13. Do you
20 have that?
21     A.   Yes.
22     Q.   Doctor, I'm going to ask you if

Page 91

1  the statement that you have placed in that
2  declaration is true. And that is, quote, "I
3  had a previous patient whose cognitive decline
4  had improved after undergoing a series of such
5  embolizations, but another patient who had
6  died after experiencing complications
7  associated with the procedure." Doctor, is
8  that a true statement?
9          MS. HILLS: Object to form;
10 mischaracterizes doctor's prior testimony at
11 his prior deposition.
12         THE WITNESS: We discussed this,
13 and there are a couple of different ways to
14 interpret this. I think it's correct. And
15 what I'm trying to say here is I had a
16 previous patient with an arteriovenous
17 malformation that was treated, got better, and
18 then had a complication from surgery. And I
19 also had another patient that I believe was
20 probably after I treated Ms. Kerris, or close
21 to the same time, who got dramatically better
22 after embolization.

12 (Pages 88 to 91)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 92

1    But these are the facts. I don't
2 know whether I discussed this with Ms. Kerris.
3 I mean what I would have discussed is the
4 general fact that it was felt that her
5 symptoms could be attributable to the AVM, and
6 decreasing the flow can improve symptoms, and
7 I'd seen patients like her. I'd also seen a
8 patient that could not be treated that
9 deteriorated. But I don't understand the --
10    BY MR. NEWMAN:
11    Q.   Doctor, my question -- you
12 understand, did you not, that a declaration
13 which was to be filed with the court was your
14 sworn statements under oath?
15    A.   Mmm-hmm.
16    Q.   Is that correct?
17    A.   Correct.
18    Q.   And if you tell somebody, for
19 example, the Court, that you told a patient
20 something --
21    A.   Mmm-hmm.
22    Q.   -- then what you put in your

Page 93

1 declaration should be the truth of what you
2 told that patient. Correct? Did you
3 understand that?
4    MS. HILLS: Object to form;
5 compound, vague.
6    BY MR. NEWMAN:
7    Q.   Let me ask it easier, Doctor.
8    A.   Okay.
9    Q.   When you saw your declaration in
10 Paragraph 13, if you had any questions as to
11 whether you told Karyn Kerris those
12 statements, you would not have signed that,
13 would you? You would have said, "I didn't say
14 that."
15    A.   Umm, okay. I did describe the
16 embolization procedure and say it would not
17 cure or address her hemorrhage. I'm then in
18 my mind saying separately I had previous
19 experience with such patients who have done
20 quite well, but I don't, you know, totally
21 recall whether I told Karyn that or not and
22 probably would have soft-pedaled that because

Page 94

1 I wouldn't want her to think that I was
2 offering any guarantee or special wish. You
3 have to remember, this is 1999 -- 1998. So
4 nine years ago.
5    Q.   Doctor, do I understand from your
6 testimony you just put on this record you're
7 not even sure if the patient who got better
8 following the procedure happened after Karyn
9 Kerris's surgery? Treatment.
10    A.   What I'm saying is I never meant
11 to say -- this sounds like a guarantee to the
12 patient. There are actually three very
13 similar patients that I have experience with.
14    Q.   Do you know which order those
15 patients occurred? In other words, was Karyn
16 Kerris, if you will, the one in the middle?
17    MS. HILLS: Object to form; vague.
18    BY MR. NEWMAN:
19    Q.   Doctor, let's not play. There are
20 three patients.
21    A.   Mmm-hmm.
22    Q.   And they came in chronological

Page 95

1 sequence.
2    A.   Mmm-hmm.
3    Q.   Tell me which came first, when
4 Karyn Kerris came, and what came last.
5    A.   Well, I am recalling -- and this
6 would take two pages to really say what I'm
7 meaning. But if we count Karyn, then I think
8 that would be four patients.
9    Q.   All right.
10    A.   Ahh --
11    MS. HILLS: Please -- objection --
12 do not talk over the witness. Let the witness
13 finish his answer and then you may ask a
14 further question.
15    MR. NEWMAN: Watch your tone,
16 Counsel. It was inadvertent.
17    MS. HILLS: Object to sidebar.
18    BY MR. NEWMAN:
19    Q.   Doctor, I want to know first of
20 all what you told Karyn Kerris about the other
21 patients that you treated if you think you
22 told her anything.

13 (Pages 92 to 95)

Page 96

1      MS. HILLS: Object to form.
2      THE WITNESS: I believe that --
3   this is nine years ago now. I have a general
4   recollection of her saying, "Have you seen
5   patients like me before, a patient like me
6   before?" And this is a very unusual lesion.
7   I would have said, "No, I have never seen
8   anybody exactly like you before." And it's
9   what I tell these patients with a very unusual
10  -- but I have seen similar patients with
11  similar problems.
12      BY MR. NEWMAN:
13  Q.   Does that --
14      MS. HILLS: Doctor, are you
15  finished?
16      THE WITNESS: Yes.
17      MR. NEWMAN: Counsel, that's
18  leading.
19      MS. HILLS: Object to sidebar.
20      BY MR. NEWMAN:
21  Q.   I will wait for your pause,
22  Doctor, all right? If I interrupt, just raise

Page 97

1   your hand. And when you stop, I'm assuming
2   it's over. Okay?
3   A.   (Nodding.)
4      MS. HILLS: Object --
5      BY MR. NEWMAN:
6   Q.   Now, am I correct then as far as
7   Paragraph 13 is concerned that you did not,
8   you do not have a recollection of telling
9   Karyn Kerris, "I had a previous patient whose
10  cognitive decline had improved after
11  undergoing a series of such embolizations, but
12  another patient who had died after
13  experiencing complications associated with the
14  procedure"?
15      MS. HILLS: Object to form;
16  mischaracterizes the document.
17      THE WITNESS: I don't see a comma
18  in there and that's the whole problem with
19  what you are trying to do is we're talking --
20      BY MR. NEWMAN:
21  Q.   You mean after the word
22  "embolizations"? Where is the comma?

Page 98

1      MS. HILLS: Object to question.
2   You're over-talking the witness.
3      MR. NEWMAN: No, I'm not.
4      BY MR. NEWMAN:
5   Q.   Doctor, where is the comma that
6   you are talking about? I see one.
7   A.   Oh, okay. It's not clear on my
8   copy.
9   Q.   All right, Doctor, beyond the
10  comma, did you tell Karyn Kerris those words?
11      MS. HILLS: Object to form.
12      THE WITNESS: No. And I think I
13  was misquoted here. The complications weren't
14  really associated with the procedure.
15      BY MR. NEWMAN:
16  Q.   I'm waiting for the pause. Are
17  you finished? Let me ask you this: Did you,
18  in fact, have, quote, another patient who died
19  after experiencing complications associated
20  with the procedure?
21      MS. HILLS: Object to form.
22      THE WITNESS: I had a patient who

Page 99

1   did well after embolization, subsequently had
2   surgery because we could not cure the lesion,
3   and did poorly because of the surgery.
4      BY MR. NEWMAN:
5   Q.   And then died?
6   A.   They left the country and by third
7   or fourth-hand information was that they had
8   passed away.
9   Q.   Doctor, when you recognized that
10  you had been misquoted, as you stated on the
11  record, did you tell anyone that you refuse to
12  sign this document attesting to the truth
13  under the penalties of perjury because there's
14  a misstatement right there in Paragraph 13?
15      MS. HILLS: Object to form;
16  assumes facts not in evidence, calls for
17  speculation.
18      THE WITNESS: I interpreted this
19  incorrectly, probably because of my intimate
20  knowledge with all of this, had a different
21  way of reading this paragraph than you're
22  leading.

14 (Pages 96 to 99)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 100

1    BY MR. NEWMAN:
2    Q.    Doctor, you used the word "I was
3 misquoted." I didn't. Were you misquoted?
4    MS. HILLS: Object to form;
5 mischaracterized the document.
6    THE WITNESS: I don't think
7 "misquote" is the correct word. What this
8 seems to mean to you and some others is not
9 really what I had said. It's a condensed
10 version. And, you know, complications
11 associated with the procedure, to me I'm
12 thinking procedure being all the therapy. I'm
13 thinking of it being the embolization,
14 surgery, everything involved with the
15 treatments.
16    BY MR. NEWMAN:
17    Q.    Then I ask you, is Paragraph 13 as
18 you sit here today correct and still your
19 testimony under the penalty of perjury or is
20 it incorrect in any manner? So I have a final
21 testimony on that.
22    MS. HILLS: Object to form;

Page 101

1 mischaracterized previous testimony.
2    THE WITNESS: I think it could use
3 clarification. As I put the punctuations in
4 my mind, I would separate out that last
5 sentence and not use a hyphen.
6    BY MR. NEWMAN:
7    Q.    So in your opinion it, as you read
8 it, is unclear as to its message.
9    A.    Yes, I think it's unclear. And I
10 would be happy to clarify for you if you wish.
11    Q.    Doctor, wasn't it just as unclear
12 when you signed it in March the 3rd of 2006 as
13 it is today?
14    MS. HILLS: Object to form; calls
15 for speculation.
16    THE WITNESS: You know, I'm a
17 physician. Before that I was an engineer, not
18 an English major. I have written unclear
19 statements, not unclear statements, unclear
20 paragraphs that have been corrected in school
21 before. To me reading this, as I read through
22 it the first time, it made sense to me. And

Page 102

1 when it didn't, when it wasn't totally clear
2 to others, then I realized that I probably
3 have to clarify it since it's not.
4    BY MR. NEWMAN:
5    Q.    So what you are telling us is that
6 you have, in your engineering and in your
7 medical practice, have had issues with
8 writing, if you will, and verbiage.
9    MS. HILLS: Object to form;
10 mischaracterizes testimony, and is vague.
11    BY MR. NEWMAN:
12    Q.    Doctor, what excuses your
13 inability to find these errors in your own
14 declaration? Explain it to me and tell me
15 whether that's because you have problems, like
16 you said, with writing and back in engineering
17 and med school people corrected your work?
18    MS. HILLS: Object to form;
19 compound, badgering tone, and misstates prior
20 testimony.
21    THE WITNESS: I think what you are
22 doing is a complete mischaracterization. I

Page 103

1 had very high SAT scores. I did very well in
2 writing and did extremely well in medical
3 school. What I am saying is that those of us
4 who aren't professional writers who send
5 something to a professional writer, they will
6 frequently change it to clarify it. Like an
7 editor. I think even the greatest authors,
8 the editors change things around.
9    BY MR. NEWMAN:
10    Q.    You are not comparing a sworn
11 statement under oath to an article, are you,
12 Doctor?
13    MS. HILLS: Object to form.
14    BY MR. NEWMAN:
15    Q.    Or to some kind of book that's
16 edited?
17    MS. HILLS: Object to form;
18 mischaracterizes testimony, misstates prior
19 testimony.
20    BY MR. NEWMAN:
21    Q.    Doctor, let me ask you: Have you
22 reviewed your entries in the medical record in

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 104

1  this case?
2         MS. HILLS:  Object to form; vague.
3         THE WITNESS:  I have been through
4  binders upon binders of documents.  I think
5  that I have reviewed the medical records that
6  are available to us.
7         BY MR. NEWMAN:
8     Q.   Did you find errors in your
9  writing--
10    A.   Yes.
11    Q.   -- when you reviewed them?
12        MS. HILLS:  Object to form.
13        BY MR. NEWMAN:
14    Q.   All right, you said yes.  Can you
15 tell me what errors you recall?
16    A.   I remember finding a few typos
17 that I think I remember correcting.  But the
18 dictation system we had at the time sometimes
19 did not change the correction and you have no
20 way of seeing it.  We have some similar issues
21 even with the newest software.
22        One thing I do remember is an

Page 105

1  embolization report where clearly our header
2  is right and I think, I think the
3  transcription came left.  And there were some
4  issues with mixing up medial and middle.
5     Q.   Anything else that you found
6  besides the typos that you described in that
7  last reference?
8         MS. HILLS:  Object to form;
9  mischaracterizes testimony.
10        BY MR. NEWMAN:
11    Q.   Anything else that you found that
12 was in error?
13        MS. HILLS:  Object to form;
14 overbroad.
15        THE WITNESS:  You know, in my
16 review of those records I found I think other
17 errors of physicians and probably a few more
18 of my own.
19        BY MR. NEWMAN:
20    Q.   Do you recall finding any errors
21 in the record about medications that were
22 provided to Ms. Kerris?

Page 106

1         MS. HILLS:  Object to form.
2         THE WITNESS:  What do you mean by
3  medications?
4         BY MR. NEWMAN:
5     Q.   Do you recall on March the 8th of
6  1999 notes to the effect that Ms. Kerris had
7  been given more medication than she had been
8  prescribed?  Do you recall that?
9     A.   I don't recall that.
10    Q.   Now, Doctor, let me go back to a
11 question I didn't get answered.  I did get a
12 number of patients that apparently had similar
13 issues as Karyn Kerris.  I think you'd come to
14 the conclusion there might have been four.  Is
15 that right?  At the time of Karyn Kerris if
16 she was the fourth, because that's how we were
17 beginning to count.
18    A.   My experience of thinking of
19 patients similar to her -- and it depends what
20 we call similar.  I mean there's a lot of
21 overlap in medical conditions and how patients
22 present and where we're going to cut it off

Page 107

1  and how similar.  But I can think of four
2  clinical presentations that were very, very
3  similar to Karyn.  The clinical
4  presentation --
5     Q.   Okay.
6     A.   -- is the question.
7     Q.   Sorry.  Now, does that mean four
8  and Karyn, therefore, a total of five or were
9  you putting Karyn in that group?
10    A.   I'm putting Karyn in that group.
11    Q.   Do you know now as you sit here in
12 what chronological sequence they occurred?  In
13 other words, where did Karyn fall in that list
14 of four?
15    A.   Well, again, this is 1998.  I'm
16 trying to remember the sequence and it was not
17 clear to me until I went and tried to review
18 things.  And I think she was probably,
19 probably No. 3.
20    Q.   What did you review?
21    A.   I pulled up an old teaching file,
22 I believe.

16 (Pages 104 to 107)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1    Q.   What was in the old teaching file?
2    A.   Some images of a patient who got
3  remarkably better after this
4  embolization/radiation.
5    Q.   Anything else in the teaching file
6  before I ask another question?
7    A.   No.
8    Q.   When did that patient get treated
9  in relationship to Karyn Kerris?
10    A.   Well, I now believe that it was
11  afterwards or close to the same time.  I
12  haven't been able to get all the clinical
13  records.
14    Q.   Have you requested them?
15    A.   Pardon?
16    Q.   Have you tried to get them?
17    A.   Yes, I asked for them.
18    Q.   And who did you ask?
19    A.   Pardon?
20    Q.   Who did you ask to get these
21  records?
22    A.   I don't recall.

1    Q.   Do you remember anything about the
2  patient, the patient's age, gender, anything?
3    A.   Well, I recall, I believe he's in
4  his thirties or forties and it's a male.
5    Q.   Outside of going into your
6  teaching file and locating the documents
7  involving this male patient, anything else you
8  did to determine how many other patients you
9  had with a similar type of circumstance?
10    A.   No.  I could recall the other
11  patients.
12    Q.   All right.  What do you recall
13  about the other -- strike that.
14        They were not in any form or
15  document or folder, the references to them?
16  This is just in your recollection?
17    A.   Correct.
18        MS. HILLS:  Object to form.
19        BY MR. NEWMAN:
20    Q.   What was your recollection about
21  those patients?  And give me the chronology of
22  when they occurred.

1    A.   Well, you know, my -- actually,
2  I'd seen other patients as they, in training
3  and in conferences as well.  So again, any
4  opinions I had at the time or discussions with
5  Karyn would have likely included a general
6  impression.
7        The ones that came to mind were
8  patients that I had personally observed while
9  at Georgetown.  And I recall one patient that
10  we could not treat that had been previously
11  treated and because of the previous treatment
12  we couldn't, and then finding out that they
13  had progressed terribly after that.  And --
14    Q.   What was the prior treatment?
15    A.   Pardon?
16    Q.   You said that she already had some
17  prior treatment.  What was that?
18    A.   It was silastic beads.  And I
19  don't know whether that was at Georgetown or
20  elsewhere.  But there are a number of patients
21  who came to my practice with silastic beads in
22  place.

1    Q.   And I don't know if you told me
2  anything about that person, whether that was a
3  female, an age group, and if it was a similar
4  size AVM.
5    A.   It was a very large AVM.  So,
6  yeah, I would think similar.  And it was a
7  female, I believe, and also in that 30,
8  40-year-old age group.
9    Q.   Did that person survive?
10    A.   I don't know.  I had very limited
11  clinical interaction.
12    Q.   You mentioned, I guess, there was
13  at least another patient that comes to mind.
14  What do you recall about that patient?
15    A.   I recall a gentleman in his
16  forties with an arteriovenous malformation
17  that was close by, but we'd call it the dural
18  type.  And he had similar, very similar
19  symptoms and, like I said, got better with
20  embolization, couldn't be cured, was treated
21  with surgery and, like I said, I heard third
22  or fourth-hand that he may have passed away.

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 112

1     Q.   Doctor, how many times at
2  Georgetown since you were on staff have you
3  used, did you use Histoacryl prior to Karyn
4  Kerris?
5         MS. HILLS:  Object to form,
6  relevance.
7         THE WITNESS:  Well, we do not have
8  a database of that.  So I would just have to
9  estimate.
10        BY MR. NEWMAN:
11     Q.   Well, why don't you give me your
12  best opinion on it.  I mean you did.  There is
13  testimony from the prior deposition as to how
14  many times you've used glue.  But can you give
15  me a good estimate of how often you had used
16  Histoacryl prior to Karyn Kerris?
17        MS. HILLS:  Object to form; calls
18  for speculation.
19        THE WITNESS:  Histoacryl in AVMs,
20  is that the question?
21        BY MR. NEWMAN:
22     Q.   Yeah.  Let's start with that,

Page 113

1  that's fine.
2     A.   I think we said or I can safely
3  say it's over 100 less than 200 patients by
4  that time and probably an average of two or
5  three treatments, two or three injections for
6  each patient.  And I think I'd put the number
7  of injections in the, you know, 500 to 1,000
8  range.
9     Q.   When did you stop injecting
10  Histoacryl?
11        MS. HILLS:  Object to form;
12  relevance.
13        THE WITNESS:  Well, Histoacryl is
14  n-BCA.  So I'd been using n-BCA that whole
15  time.  An FDA-approved version of n-BCA came
16  on the market, I don't remember exactly when.
17  Probably about, I don't remember, maybe, you
18  know, I don't, maybe 2000 or something.  I
19  don't remember.  And that n-BCA was marketed
20  by Johnson & Johnson.  And so I started using
21  it.
22        BY MR. NEWMAN:

Page 114

1     Q.   You began using TruFill once it
2  became approved.  Is that safe to say?
3     A.   I used the n-BCA brand named as
4  TruFill when it was approved, correct.
5     Q.   Does that mean -- you do
6  understand that TruFill is not just n-BCA, but
7  it's also the base that it's mixed with?
8         MS. HILLS:  Object to form; vague,
9  ambiguous.
10        THE WITNESS:  N-BCA is
11  cyanoacrylate glue that I think is very
12  similar to Histoacryl, another brand of n-BCA.
13        BY MR. NEWMAN:
14     Q.   Doctor, you have read the package
15  insert of TruFill, have you not?
16        MS. HILLS:  Object to form;
17  assumes facts not in evidence.
18        THE WITNESS:  I think I read the
19  package insert back when it came out and I
20  don't recall if I've looked at it again.
21        BY MR. NEWMAN:
22     Q.   You do know, do you not, that the

Page 115

1  FDA only approved the use of TruFill with its
2  diluent and not as a single agent n-BCA?
3         MS. HILLS:  Object to form;
4  assumes facts not in evidence, calls for
5  speculation.
6         BY MR. NEWMAN:
7     Q.   Do you know that, Doctor?
8         MS. HILLS:  Same objection.
9         THE WITNESS:  What do you mean by
10  the diluent?
11        BY MR. NEWMAN:
12     Q.   The other vial that contains an
13  oleaginous mixture and a dye.  You understand
14  that the only way that TruFill was approved is
15  in combination of the n-BCA with the oily base
16  and the dye.
17        MS. HILLS:  Object to form; calls
18  for speculation, assumes facts not in
19  evidence.
20        THE WITNESS:  My understanding is
21  that that's how it's done by industry, to make
22  it a combination if you are -- instead of

18 (Pages 112 to 115)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 116

1  putting each drug through separately.
2       BY MR. NEWMAN:
3       Q.   Doctor, did you mix the n-BCA in
4  TruFill with Lipiodol?
5       MS. HILLS:  Object to form.
6       THE WITNESS:  Pardon?
7       BY MR. NEWMAN:
8       Q.   Did you use any other kind of base
9  when you were injecting TruFill other than
10 that which came with the manufacturer?
11      MS. HILLS:  Object to form; calls
12 for speculation, relevance.
13      THE WITNESS:  There are also two
14 very, very similar ethiodized oil, as you
15 mentioned, one with a brand name Ethiodol, one
16 with the brand name Lipiodol.  I believe the
17 choice of where it's used around the world is
18 usually who is the distributor in that
19 country.  I'm losing track of the -- what was
20 the question again?
21      BY MR. NEWMAN:
22      Q.   Let me go to a different question

Page 117

1  anyway.
2       A.   Mmm-hmm.
3       Q.   You did recognize, did you not, on
4  the some 500 occasions that you injected
5  Histoacryl into the brain, the blood vessels
6  of the brain of your patients, that you were
7  doing so with an unapproved, illegal device?
8       MS. HILLS:  Object to form;
9  mischaracterizes testimony and facts in the
10 record, and assumes facts not in evidence, and
11 asks for a legal definition from a layperson.
12      THE WITNESS:  I don't think it is
13 illegal.  And it was not disapproved.  I think
14 it was just not approved.
15      BY MR. NEWMAN:
16      Q.   Did you receive any notices from
17 the FDA in your time as an interventional
18 neuroradiologist that asked why you were
19 shipping Histoacryl into the country?
20      A.   I don't remember any from the FDA.
21 Ahh --
22      Q.   Well, who sent you those letters?

Page 118

1       MS. HILLS:  Object to talking over
2  the witness.
3       BY MR. NEWMAN:
4       Q.   What letters do you remember?
5       MS. HILLS:  Object to form; vague.
6       THE WITNESS:  Letter from whom?
7       BY MR. NEWMAN:
8       Q.   Do you remember any letters you
9  received about the shipment of Histoacryl and
10 the propriety of doing that in the time that
11 you were at Georgetown prior to treatment of
12 Karyn Kerris?
13      MS. HILLS:  Overbroad, objection.
14      THE WITNESS:  Yes.  I received one
15 letter from Customs saying that they were
16 withholding one of our shipments.  I then
17 called various people in Customs and they told
18 me it was the discretion of the local agent.
19 I then called the local agent and explained we
20 were using it in patients.  And then the
21 shipments started coming again.
22      BY MR. NEWMAN:

Page 119

1       Q.   Did that particular shipment that
2  was detained ever get to you?
3       MS. HILLS:  Object to form; calls
4  for speculation.
5       THE WITNESS:  I couldn't remember
6  that.  We were getting shipments all the time.
7       BY MR. NEWMAN:
8       Q.   First of all, do you still have
9  that letter from Customs?
10      A.   No.  I don't think I have any
11 office records from that long ago.
12      Q.   Did you destroy the letter from
13 Customs --
14      MS. HILLS:  Object to --
15      BY MR. NEWMAN:
16      Q.   -- or at your order was it
17 destroyed?
18      MS. HILLS:  Object to form;
19 assumes facts not in evidence, and
20 mischaracterizes question.
21      THE WITNESS:  No.
22      BY MR. NEWMAN:

19  (Pages 116 to 119)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1     Q.    Then where did it go?  Where is
2  it?
3           MS. HILLS:  Object to form; calls
4  for speculation.
5           THE WITNESS:  I have no idea.
6           BY MR. NEWMAN:
7     Q.    Did you write any letters to
8  Customs or put down in any memo form anything
9  about what we just discussed, this detainment?
10    A.    I don't really understand that
11 question.
12    Q.    Did you write anything about the
13 detainment on any interoffice memo, on any
14 document of any sort, of any note that you
15 took on your own?
16          MS. HILLS:  Object to form;
17 overbroad.
18          THE WITNESS:  My general
19 recollection, as I just said, was that it was
20 just phone conversations.  So that's not
21 writing.
22          BY MR. NEWMAN:

1     Q.    And none of those phone
2  conversations resulted in any form of writing.
3     A.    I can't recall this far out.  I
4  don't think so.
5     Q.    Doctor, how did you get the
6  Histoacryl?  In other words, how did it get to
7  your department?  Was it requisitioned?
8  Describe the process.
9           MS. HILLS:  Object to form;
10 overbroad, assumes facts not in evidence.
11          BY MR. NEWMAN:
12    Q.    Having given you no facts, Doctor,
13 let me rephrase this, because I am absolutely
14 tired of the same series of objections that
15 are baseless.
16          MS. HILLS:  Object to sidebar.
17          BY MR. NEWMAN:
18    Q.    Yes.  Tell me how you ordered the
19 Histoacryl, how it got paid for, and who was
20 involved in that chain of command.
21    A.    Obtaining the Histoacryl was
22 constantly in evolution since we didn't have a

1  U.S. distributor.  For a long time I wasn't
2  involved at all.  I have no idea.
3     Q.    When did you become involved?
4     A.    The stocking order is there.
5  There was a time when the distributor -- we
6  obtained it from a Canadian distributor --
7  said that in order to expedite the shipping
8  process we should send a prescription and then
9  I believe also for a short period of time a
10 letter saying that we would like this agent,
11 and because there's no FDA-approved identical
12 or similar agent --
13    Q.    Are you finished?
14    A.    Yeah.
15    Q.    Thank you.  Now, Doctor, first of
16 all, the Canadian distributor was Yocan
17 Pharmaceutical?
18    A.    I believe so.
19    Q.    Do you know anything about Yocan
20 Pharmaceuticals?
21    A.    I know it was founded by Yoca
22 Trabruga who is the wife of a very famous

1  neurointerventionalist.
2     Q.    Do you also know that Yocan
3  Pharmaceuticals in Thornhill, Canada is a home
4  in the suburbs and is not a pharmaceutical
5  company?
6           MS. HILLS:  Object to form; calls
7  for speculation, asks for a legal definition
8  from a layperson.
9           THE WITNESS:  I think she was the
10 distributor.  The manufacturer is a large
11 German corporation.
12          BY MR. NEWMAN:
13    Q.    You mean Brawn.
14    A.    Mmm-hmm.
15    Q.    Doctor, have you been to Yocan's
16 home in Canada?
17    A.    I don't think I've ever been to
18 her home, no.
19    Q.    You do know that she has no
20 manufacturing facility whatsoever, don't you?
21          MS. HILLS:  Object to form;
22 misstates prior testimony.

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 124

1       THE WITNESS: Well, she's the
2   distributor and quite frankly almost every day
3   I have people bring in medical devices that
4   they had at their home, they got FedEx'd to
5   their home, whatever. That's how things are
6   frequently distributed. They don't come from
7   some warehouse, you know. I mean our device
8   reps bring things all the time that way. And
9   they're distributing. They're not
10  manufacturing.
11      BY MR. NEWMAN:
12      Q.   And do you write to those people
13  as you did in these forms, which I will
14  identify and give you a copy since counsel
15  gave them to me, DGUH0001, in those other
16  circumstances do you write to Yocan Medical
17  Systems or to some other medical systems and
18  ask for those devices? Is that the process
19  that you go and get devices from distributors?
20      MS. HILLS: Object to form;
21  mischaracterizes and misstates prior
22  testimony. If the doctor is being directed to

Page 125

1   a document, give it to him.
2       MR. NEWMAN: No problem, Counsel.
3   Again, these are the documents provided by
4   counsel to me or else I would not have had
5   them.
6       MS. HILLS: Do you have a copy for
7   counsel?
8       MR. NEWMAN: Why don't you bring
9   your documents with you. But of course, I do.
10      MS. HILLS: Object to sidebar.
11      MR. NEWMAN: And I object to your
12  behavior.
13      MS. HILLS: Object to sidebar.
14      MR. NEWMAN: I object to your
15  continuance.
16      MS. HILLS: Object to sidebar.
17  Thank you.
18      BY MR. NEWMAN:
19      Q.   Now, Doctor, first of all, did you
20  understand, do you understand that contained
21  within that -- by the way, just so I'm on the
22  same document with you, at least on DGUH0003,

Page 126

1   that appears to be a prescription copied on
2   the top of the page. Is that what you see?
3       A.   That appears to be a prescription.
4       Q.   Is that your prescription? Is
5   that your signature?
6       A.   That's my signature.
7       Q.   Are you aware that under federal
8   law you cannot write prescriptions for
9   unapproved devices?
10      MS. HILLS: Object to form; calls
11  for a layperson to make a legal determination
12  and interpret the statute. I also object to
13  form so far as no statute is referenced.
14      BY MR. NEWMAN:
15      Q.   Doctor, do you know that as a
16  doctor you can't write for illegal items?
17      MS. HILLS: Objection;
18  mischaracterizes the facts of the case, calls
19  for a legal definition from a layperson, and
20  calls for speculation.
21      THE WITNESS: Well, first, I think
22  I said we don't think this is illegal.

Page 127

1   Whether you need a prescription for an
2   unapproved versus an approved product, you
3   know, I don't know. But this was -- and these
4   forms changed over time, as you see.
5       I mean just trying to satisfy
6   whatever the Customs people wanted. And the
7   Customs people looked at these each time the
8   agent came through. So if there was something
9   illegal, I would have thought Customs would
10  have told me it was illegal.
11      BY MR. NEWMAN:
12      Q.   Doctor, why do you think
13  Histoacryl was not illegal?
14      MS. HILLS: Object to form; calls
15  for a legal definition from a layperson,
16  mischaracterizes the facts in the case, and
17  asks a layperson to adopt a legal definition
18  not supported in the facts or the law.
19      BY MR. NEWMAN:
20      Q.   If you still remember my question
21  through that -- and I'll give counsel a
22  continuing objection to the exact same

21 (Pages 124 to 127)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 128

1  diatribe if she wishes so that we don't have a
2  big gap between my question and the answer.
3          Doctor, you said that you do not
4  believe Histoacryl was illegal; isn't that
5  what you said?
6          MS. HILLS:  Object to sidebar and
7  same objection.
8          BY MR. NEWMAN:
9      Q.   Doctor, do you believe that the
10 use of Histoacryl in the time that you
11 injected it into Karyn Kerris was illegal?
12     A.   I asked --
13         MS. HILLS:  Same objection.
14         THE WITNESS:  I asked this
15 question to counsel in the past and present
16 and been told it's not illegal.
17         BY MR. NEWMAN:
18     Q.   Who did you ask in the past?
19     A.   Well, the immediate past, my
20 current counsel.
21     Q.   And before that?
22     A.   Discussing Histoacryl in general

Page 129

1  would be Sheila Zimmet would be counsel.
2      Q.   And why did you ask counsel Sheila
3  Zimmet whether your use of Histoacryl was
4  legal?
5          MS. HILLS:  Object to form;
6  mischaracterizes testimony, and calls for
7  speculation.
8          THE WITNESS:  I was never under
9  the assumption it was illegal because it was
10 used at Duke during my residency, it was used
11 at UCLA, it was used many places around the
12 country.  The question to counsel evolved by
13 somebody questioning whether, or just a
14 general discussion about should the use of
15 this go through the, what's called the
16 Georgetown IRB.
17         I don't remember which board
18 member I asked this to, to see who I should
19 talk to.  And then I was referred to Sheila
20 Zimmet who is on the IRB and was also counsel.
21 And I asked her, told her unapproved, and do
22 we need to put this through the IRB.  And she

Page 130

1  said no.
2          BY MR. NEWMAN:
3      Q.   And why not?
4          MS. HILLS:  Object to form; calls
5  for speculation.
6          THE WITNESS:  You know, I'm not --
7          BY MR. NEWMAN:
8      Q.   Did she tell you?
9      A.   I'm not a lawyer.  The question
10 she asked me was, "Are you doing research with
11 this or are you treating patients?"  And I
12 said, "I'm not doing research.  I'm just using
13 it to treat patients."
14     Q.   Do I understand that you would
15 have had no objection to going through an IRB
16 with your use of Histoacryl?
17     A.   If somebody asked me to submit
18 something to the IRB, I would do it.  I've
19 submitted many applications.
20     Q.   Did this discussion happen around
21 1999 when you started on the IRB Safety
22 Committee?

Page 131

1      A.   No, no.  A long --
2      Q.   When did it occur?
3      A.   Very shortly after arriving to
4  Georgetown.
5      Q.   Give me a year or a rough estimate
6  of the year.
7      A.   Well, let's see, when did I arrive
8  at Georgetown.  19 -- sometime in the fall of
9  1994 is when I arrived.  I don't know when I
10 asked exactly the question.  It would have
11 been somewhat early on.
12     Q.   Did you understand that UCLA and
13 Duke both had an IDE for the use of
14 Histoacryl?
15     A.   In --
16         MS. HILLS:  Object to form; calls
17 for speculation, assumes facts not in
18 evidence.
19         THE WITNESS:  In 1994?  No, I
20 didn't know.
21         BY MR. NEWMAN:
22     Q.   Do you understand that there were

22 (Pages 128 to 131)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 132

1  individuals who had an IDE for Histoacryl?
2      MS. HILLS:  Object to form; vague
3  and overbroad.
4      THE WITNESS:  My general
5  understanding talking to colleagues about this
6  issue throughout that time period, was that
7  some individuals were doing research on
8  patients with the Histoacryl.  If you do
9  research, I think some institutions ask you to
10 get an IDE.
11     BY MR. NEWMAN:
12     Q.   All right, Doctor.  Let me, out of
13 order that it may be but since counsel had
14 this document, I just want to put that over
15 here so I don't lose it.
16     MS. HILLS:  Are we marking these
17 as an exhibit?
18     MR. NEWMAN:  Oh, that's fine.
19 Those four pages can be marked as Exhibit 5
20 and attached as well.
21     (Marked, Exhibit # 5, Letter,
22 dated 7/2/95, Attachments.)

Page 133

1      BY MR. NEWMAN:
2      Q.   I'll give them back to you if you
3  need them.  I'll just put them here for a
4  moment.
5      Doctor, in the time when these
6  letters and prescriptions marked as Watson 5
7  were generated, at that time how did you get
8  payment for Histoacryl?  Who did you go to?
9      MS. HILLS:  Objection; calls for
10 speculation, and assumes facts not in
11 evidence, vague.
12     THE WITNESS:  I don't know who
13 paid for it.
14     BY MR. NEWMAN:
15     Q.   Let me ask you this, Doctor:  In
16 the time when you began at Georgetown until
17 the time at least of Karyn Kerris, do I
18 understand that basically Histoacryl was
19 available to you, the tubes if you will, were
20 available to you through some process that had
21 nothing to do with you?
22     MS. HILLS:  Object to form; vague,

Page 134

1  compound.
2      BY MR. NEWMAN:
3      Q.   Let's just do it easy, Doctor.
4  How did you get the Histoacryl which you
5  wanted to inject into patients?  Was it
6  supplied to you by the hospital?
7      MS. HILLS:  Object to form.
8      THE WITNESS:  Well, it changed
9  through the years, as I said.  At one time I
10 suppose they supplied it.  It was always
11 there.  And then like I said, at a certain
12 time Yoca asked me to write a letter to Yocan.
13 So we did that.  And I told you I had a
14 conversation with a Customs agent who
15 basically wanted to know what we were doing
16 with it.  And mostly most of the time it just
17 came.  And I have no idea who paid for it.
18 You know, I would sign the letter and the
19 prescription and that's the same with almost
20 all our medical devices.
21     BY MR. NEWMAN:
22     Q.   Just so I understand your

Page 135

1  testimony, outside of the letters that we have
2  in front of us as a sample, you had no
3  involvement with the procurement, ordering or
4  payment of the Histoacryl in the time that
5  you've used it.
6      A.   No.
7      MS. HILLS:  Object to form;
8  misstates prior testimony.
9      BY MR. NEWMAN:
10     Q.   Did you have anything else to do
11 with it besides these letters that we've
12 attached as Exhibit 5?
13     A.   The only thing I generally have to
14 do with medical devices is say, "Well, you
15 know, we need to keep 20 of this around."  And
16 the supply level is just kept.  I never paid
17 Yocan anything.
18     Q.   Who did you go to if you were
19 running low on Histoacryl?  In other words,
20 what's the process?  Who did you talk to?
21     MS. HILLS:  Object to form.
22 Assumes facts not in evidence.

23  (Pages 132 to 135)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 136

1    THE WITNESS: I would think
2  whoever was, whoever the technologist or
3  purchasing person was or whatever in the lab.
4    BY MR. NEWMAN:
5    Q.  Do you know who that was in 1999,
6  let's say?  1998-1999.
7    A.  No.
8    Q.  While we do have these four pages
9  as Exhibit 5, how many letters do you believe
10  you sent to Yocan, letters under your
11  signature or prescriptions under your
12  signature went to Yocan Pharmaceutical?
13    MS. HILLS: Objection; calls for
14  speculation.
15    THE WITNESS: I really have no
16  idea.
17    BY MR. NEWMAN:
18    Q.  More than 50?
19    MS. HILLS: Objection; asked and
20  answered, calls for speculation.
21    THE WITNESS: You know, I don't
22  remember. This is -- you are asking about

Page 137

1  things more than, you know, '94, you are
2  talking up to 13, 14 years ago.  And there
3  were times when we were asked to send letters.
4  Sometimes you didn't need letters.  And I
5  can't speculate.
6    BY MR. NEWMAN:
7    Q.  How many procedures from 1995 to
8  1999 involving glue would be performed in an
9  average month, week, however you can tell us?
10    MS. HILLS: Object to form;
11  ambiguous.
12    THE WITNESS: Well, I think as I
13  said before, I think we were doing between 15
14  and 25 procedures a year or patients a year.
15  And I've already answered that question.
16    BY MR. NEWMAN:
17    Q.  And for how many years do you
18  believe you had to write these letters or sign
19  these letters?  Do you have an idea how many
20  years that occurred?
21    MS. HILLS: Object to form; calls
22  for speculation, asked and answered.

Page 138

1    THE WITNESS: I think I answered
2  that.  Sometimes you needed it.  Sometimes you
3  didn't.  How many procedures were done during
4  the time period when we were asked to send
5  these letters versus how many were done when
6  we weren't asked, I have no idea.
7    BY MR. NEWMAN:
8    Q.  Did you understand that the reason
9  why Customs was detaining the device was
10  because there was a trade alert that said it
11  should not enter the United States?
12    MS. HILLS: Object to form;
13  mischaracterizes a legal trade alert and fails
14  to provide said trade alert to the witness,
15  and asks a legal conclusion from a layperson.
16    BY MR. NEWMAN:
17    Q.  Did you know that that's why it
18  was being detained?
19    MS. HILLS: Same objection.
20    THE WITNESS: I did not know about
21  a trade alert and probably wouldn't have known
22  what it meant at that time.  I have been told

Page 139

1  that it has to do with distribution.
2    BY MR. NEWMAN:
3    Q.  Have you been told anything with
4  regard to the fact that the device was both
5  misbranded and mislabeled?
6    MS. HILLS: Object to form;
7  mischaracterizes a legal statute to a
8  layperson and asks a layperson to make a legal
9  assessment.
10    BY MR. NEWMAN:
11    Q.  Had you heard of that, is the
12  question.
13    MS. HILLS: Same objection.
14    THE WITNESS: I don't understand
15  the legalese.
16    MR. NEWMAN: If we can go off, I
17  believe there is only a minute left on this
18  tape. It's simply a tape switching.
19    VIDEOGRAPHER: The time is 11:58
20  a.m. We're going off the record in the
21  continuing videotaped deposition of Vance E.
22  Watson, M.D., ending tape No. 1.

24 (Pages 136 to 139)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 140

1        MS. HILLS:  Would this be a good
2    time to take lunch?
3        (Whereupon, at 11:58 a.m., the
4    deposition was recessed, to be reconvened at
5    1:00 p.m., the same day.)
6        AFTERNOON SESSION
7        (1:05 p.m.)
8        VIDEOGRAPHER:  The time is 1:05
9    p.m.  We're back on the record in the
10   continuing videotaped deposition of Vance E.
11   Watson, M.D., Volume II, beginning Tape No. 2.
12       BY MR. NEWMAN:
13   Q.   Dr. Watson, before the last tape
14   was over we had discussed a question that you
15   asked of Sheila Zimmet.  I believe there were
16   two.  One was whether the use of the glue
17   involved an IRB.  Another one was whether or
18   not it was legal.
19       MS. HILLS:  Objection; misstates
20   prior testimony.
21       BY MR. NEWMAN:
22   Q.   Doctor, let me ask you a question:

Page 141

1    If Ms. Zimmet told you it was illegal to use
2    the Histoacryl would you have continued to do
3    so?
4        MS. HILLS:  Objection; calls for
5    speculation, assumes facts not in evidence.
6        THE WITNESS:  I don't think I
7    would have been given a choice.  I mean if the
8    counsel said that, they would stop you.  I
9    mean, they would come over and say, "Give it
10   up."
11       BY MR. NEWMAN:
12   Q.   I'm going to continue back on the
13   declaration.  So I'm going to tell you it's
14   Page 5.
15   A.   I have one clarification to make
16   before I go back, if you don't mind.  It's
17   about the CV again.
18   Q.   All right.  Well, I'll -- go
19   ahead, do it now.  I don't care.
20   A.   It's fairly simple.  There's just
21   been a name change in the hospital.  I mean
22   we're still Georgetown University Hospital.

Page 142

1    But it's MedStar Georgetown University
2    Hospital, so.
3        Q.   The title that was on the CV,
4    Exhibit 3, that called the hospital Georgetown
5    University Hospital, that's what we are
6    discussing, those words?
7        A.   Yeah.  There's been a legal name
8    change, I believe, so that it's now MedStar
9    Georgetown University Hospital.
10       Q.   All right.  And counsel prepared
11   that, but didn't know that.  Is that what you
12   are saying?
13       MS. HILLS:  Objection; assumes
14   facts not in evidence and intrudes upon
15   attorney-client communications.  So insofar as
16   you are asked what counsel thought, do not
17   answer the question.
18       BY MR. NEWMAN:
19   Q.   When was this document generated?
20   The date.  How long ago?
21   A.   This particular document?
22   Q.   Yeah.

Page 143

1    A.   Or --
2    Q.   Exhibit 3.
3    A.   -- the origins of it?
4    Q.   Well, this is a copy of what we
5    got from your lawyer.
6    A.   Mmm-hmm.
7    Q.   My question is when did this come
8    into being, the last version of Watson 3?  Was
9    it recently?  Do you have an idea?
10   A.   The revised version is relatively,
11   or the cleaned up version is relatively
12   recent.  The document that it started with has
13   been years and just little additions put in
14   and so forth.  And that's why the fonts
15   weren't matching.
16   Q.   All right.  Does that mean that it
17   was -- I'm just getting, if you know -- within
18   the last month this was generated, that Watson
19   3 was generated?
20       MS. HILLS:  Object to form.  It
21   mischaracterizes prior testimony.
22       MR. NEWMAN:  No, it doesn't.  It

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1  asks a question.
2         BY MR. NEWMAN:
3     Q.   Doctor, let me rephrase.
4     A.   Mmm-hmm.
5     Q.   You said relatively recently. How
6  recently?
7         MS. HILLS: Object to form; vague,
8  ambiguous.
9         THE WITNESS: It would be
10  speculative to know when that was created. I
11  mean I think I saw it for the first time
12  within a week or two.
13         BY MR. NEWMAN:
14     Q.   Do you believe it was created,
15  this final version Exhibit 3, after MedStar
16  took over Georgetown University Hospital?
17     A.   Well, the original document may
18  have been before. And the --
19     Q.   I'm talking about -- excuse me.
20  I'm talking about Exhibit 3. That was --
21     A.   The revision.
22     Q.   That was definitely generated --

1  let me finish my question. Exhibit 3 was
2  definitely generated after MedStar bought over
3  Georgetown University Hospital. Correct?
4     A.   I would -- well, since I didn't
5  print it, it's speculative. The purchase by
6  MedStar was sometime ago, though.
7     Q.   All right, Doctor, does that
8  complete your -- any other issue with the CV
9  that you wanted to raise?
10     A.   Not at the moment.
11     Q.   All right. Now, back to Page 5 of
12  your declaration. And so that we don't have
13  any confusion, I'm going to ask you to refer
14  only to the exhibits that are attached in the
15  piles that you have, not to anything that
16  anyone else will hand you, including counsel.
17         MS. HILLS: Object to sidebar.
18         BY MR. NEWMAN:
19     Q.   So, therefore, my question relates
20  to Paragraph 18. And, first of all, is there
21  an error in Paragraph 18 as you read it?
22     A.   Okay. Let me look at the exhibit.

1  Okay. Exhibit 9. Oh, okay. Well --
2     Q.   Exhibit 9 actually, I believe, is
3  in your hand. This is 10. Excuse me, I'm
4  just reaching. Yeah. That is Exhibit 9,
5  which is everyone's Page G001007, which is the
6  consent for surgery for 11/4/98.
7     A.   So you are saying the consent for
8  surgery is Exhibit 9.
9     Q.   That's correct, as counsel
10  prepared it. Now, my question to you before
11  you go any further is simply is there any
12  error in Paragraph 18?
13         MS. HILLS: Object to form;
14  mischaracterizes the document.
15         THE WITNESS: Well, I'm just
16  starting to understand this exhibit thing, as
17  I told you. I didn't realize they were
18  matched before. There is a Blue Cross/Blue
19  Shield reference, a little note I've seen,
20  from the office staff about glue somewhere in
21  my review of the records.
22         BY MR. NEWMAN:

1     Q.   Well, first of all, does that mean
2  that other than --
3     A.   This is not what was referred to.
4     Q.   All right. Exhibit 9 was not what
5  was referred to. That's what you are saying.
6         MS. HILLS: Objection;
7  mischaracterizes the testimony.
8         BY MR. NEWMAN:
9     Q.   I'm just trying to understand what
10  you just said. When you put this in your
11  hand, that Exhibit 9 is not what's referenced
12  in Paragraph 18. Is that what you are saying?
13         MS. HILLS: Objection;
14  mischaracterizes the document.
15         THE WITNESS: What I recall seeing
16  and what I thought was referenced by this is
17  not a consent. And this is a consent.
18         BY MR. NEWMAN:
19     Q.   Do you know when you reviewed your
20  declaration before you signed it under the
21  penalty of perjury, whether you looked to see
22  what Exhibit 9 was?

26 (Pages 144 to 147)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 148

1    A.   As I told you, I did not
2 understand this "Ex" stuff.
3    Q.   In any event, since then we've
4 been provided from counsel Page, or at least
5 reference GT-1000368.
6    MS. HILLS:  Object to form.
7 Counsel was provided with that record on March
8 9th, 2007.
9    BY MR. NEWMAN:
10    Q.   So therefore, Doctor, just as
11 said, six days and a year after your
12 affidavit, counsel received this document.
13 And what I am going to ask you is is this the
14 document that you believe is referenced in the
15 Paragraph 18?
16    MS. HILLS:  Object to form;
17 mischaracterizes the document and Paragraph
18 18.
19    THE WITNESS:  This is -- let me
20 re-read this 18 again.
21    MR. NEWMAN:  While you do that,
22 No. 6, I'll identify that.

Page 149

1    (Marked, Exhibit # 6, Document
2 GT-1000368.)
3    THE WITNESS:  Yes.  This is what I
4 recall seeing as the contact with -- well,
5 this, yes, this is one of them that I recall
6 seeing in the review of medical records that
7 referred to some sort of contact with Blue
8 Cross/Blue Shield.  So yes.
9    BY MR. NEWMAN:
10    Q.   If you may, can I have that just
11 to identify it as Exhibit 6 from now on so we
12 know what we are talking about.
13    MS. HILLS:  Do you have a copy for
14 counsel?
15    MR. NEWMAN:  Yes.  Once again, I'm
16 returning your copies that you provided to me,
17 Counsel, to you since you refused to bring any
18 to the deposition.
19    MS. HILLS:  Object to sidebar.
20    MR. NEWMAN:  I object to your
21 behavior.
22    MS. HILLS:  Object to sidebar.

Page 150

1    BY MR. NEWMAN:
2    Q.   Doctor, you stated that this is
3 one -- first of all, let me ask you this:  Do
4 you believe you saw that document, Exhibit 6,
5 before you signed and attested to your
6 declaration?
7    A.   That was my recollection.  But
8 that was, again, I wasn't matching thing to
9 thing.  I didn't understand this "Ex."  I was
10 signing the declaration based upon my recall
11 of reviewing all the medical records presented
12 to me.
13    Q.   All right.  But my question was
14 specific to you.  Do you believe that you
15 actually did review Exhibit 6 before you
16 signed the affidavit?  Your Exhibit 6, I'm
17 talking about.
18    A.   I saw insurance approval, I think
19 it was this, prior to.  That's what we are
20 saying in 18.
21    Q.   Now, Doctor, you just testified
22 that there were other documents involving

Page 151

1 insurance approval that you've seen besides
2 this one, Exhibit 6.  Is that --
3    MS. HILLS:  Object to --
4    BY MR. NEWMAN:
5    Q.   My question is is that correct?
6 Are there other documents involving insurance
7 approval on the glue besides Exhibit 6?
8    A.   I don't think I testified to that.
9 If I did, then it's a slip.  I went through,
10 as we discussed, about four or five binders.
11 This one sticks to my recollection.
12    Q.   Now, first of all, who generated
13 that document?  And what I'm talking about is
14 there is at the top apparently a Xerox of some
15 type of strip or form.  Below it there is
16 handwriting within the document.  My question
17 is on any part of it do you know who generated
18 any particular part of that document?
19    A.   Well, that would require extreme
20 speculation, again.  I don't remember who was
21 in the office in 1998 or where the
22 pre-certification was done in 1998.  And I

27  (Pages 148 to 151)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 152

1    don't specifically recognize the handwriting.
2         Q.    It's certainly not yours.
3         A.    No.  It's not my handwriting.
4         Q.    Do you know what the "C" at the
5    top of the document refers to?  It's circled.
6         A.    No idea.
7         Q.    You do not know whether there were
8    other pages to that document and this is Page
9    C?
10        A.    I would have to speculate.
11        Q.    Doctor, where on that document is
12   the year contained?
13        A.    Well, which year?
14        Q.    Well, any year, Doctor.  There is
15   a year of her birth, which I see as 8/2/70.
16        A.    Yeah.
17        Q.    Now --
18        A.    And there is effective date is the
19   insurance and --
20        Q.    Excuse me.  That's 11/10/96.
21        MS. HILLS:  Objection.  Please
22   don't speak over the witness when he's

Page 153

1    testifying.
2         MR. NEWMAN:  Stop it.
3         BY MR. NEWMAN:
4         Q.    I'm just giving --
5         MS. HILLS:  Object to sidebar.
6         BY MR. NEWMAN:
7         Q.    -- you the date so we have it.
8    11/10/96, that's the effective date of
9    insurance.
10        A.    Mmm-hmm.  Date of procedure, 11/4.
11   And then I can't see anything else.  It's a
12   Xerox.  There may be something there.  There
13   may not be.
14        Q.    Well, my question was is there a
15   year 1998 anywhere on that document?
16        A.    Well, I just looked it over again.
17   I don't see 1998.
18        Q.    Also, across from "Date of
19   Procedure," does there appear to have been a
20   prior date that is scratched out?
21        MS. HILLS:  Object to form; calls
22   for speculation.

Page 154

1         THE WITNESS:  Yeah, that's extreme
2    speculation.  I have no idea if someone wrote
3    the wrong number down or there are times when
4    I'm filling a form out like this where I don't
5    like the way it's written or it's not what I
6    want and just scratch it out.  It's completely
7    speculative if a date has been changed.
8         BY MR. NEWMAN:
9         Q.    What does it say under the
10   scratch?  Do you know?
11        MS. HILLS:  Object to form.  Calls
12   for speculation.
13        THE WITNESS:  If I knew what was
14   under the scratch I wouldn't be speculating,
15   would I?
16        BY MR. NEWMAN:
17        Q.    That's not answering my question.
18   Now --
19        MS. HILLS:  Object to sidebar.
20        BY MR. NEWMAN:
21        Q.    -- across from 7/30 there's
22   another scratch-out and then some initials.

Page 155

1         A.    Mmm-hmm.
2         Q.    First of all, do you know who
3    those SDS initials are?
4         A.    Well, I can speculate for you on
5    this one.  Would you --
6         Q.    If you have an idea who that might
7    be, that would help.
8         A.    I don't think it's a person.
9         Q.    All right.  Is it a code or some
10   kind of acronym?
11        A.    Yes.
12        Q.    And what does it mean?
13        A.    It probably means same day
14   surgery.
15        Q.    And next to it something else is
16   crossed out.  Is that another thing that you
17   can't speculate as to whether there was a
18   prior time or anything else in there?
19        MS. HILLS:  Object to form; calls
20   for speculation.
21        THE WITNESS:  If something is
22   scratched out and there's something under it,

28 (Pages 152 to 155)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 156

1   again, how do I know what was under it?
2        BY MR. NEWMAN:
3        Q.   Doctor, is it your testimony then
4   based on Paragraph 18 and now what we have
5   given to you as Exhibit 6 for this deposition,
6   that this document, Exhibit 6, establishes
7   that Blue Cross and Blue Shield approved the
8   use of glue?
9        MS. HILLS:  Object to form; calls
10  for speculation.
11       THE WITNESS:  Well, it's
12  speculative and it's also getting into
13  legalese, you know, what is approval.  I mean
14  our coders have to constantly teach us.  If
15  your question is was this from 1998, well,
16  it's 11/4.  That's the procedure date.  It
17  came with '98 records.  I think it is very
18  reasonable to assume it's from '98.
19       BY MR. NEWMAN:
20       Q.   Doctor, did Blue Cross and Blue
21  Shield approve of the use of glue and is that
22  -- first of all, did they approve the use of

Page 157

1   glue?
2        MS. HILLS:  Objection; asked and
3   answered.
4        THE WITNESS:  You know, I have no
5   idea.  I did not do the approvals.
6        BY MR. NEWMAN:
7        Q.   And, Doctor, am I correct that
8   then if we take Paragraph 18 where it says,
9   "These notes establish that 'process needs
10  glue' was approved," that is not a statement
11  you can make because you do not know that Blue
12  Cross and Blue Shield approved the use of
13  glue?
14       MS. HILLS:  Objection; misstates
15  his testimony; mischaracterizes the document,
16  both documents.
17       THE WITNESS:  Yeah, again, I'd
18  have to speculate.  I don't recall personally
19  getting involved in pre-approvals.  It's a
20  front office, out of office function.
21       BY MR. NEWMAN:
22       Q.   Doctor, then you cannot swear

Page 158

1   under oath, as you did in Paragraph 18, that
2   these notes which we just reviewed establish
3   that the "process needs glue was approved,"
4   you have no idea whether there was approval
5   for the glue in this case, do you?
6        MS. HILLS:  Objection; form,
7   compound, asked and answered, calls for
8   speculation, and mischaracterizes both
9   documents.
10       THE WITNESS:  This isn't the only
11  case that, as you've noticed, that we've used
12  glue with.  And it's my general recollection
13  that we did not have issues.  But all I can
14  say is that the front office people
15  pre-certified, told them we were doing the
16  procedure, and they certified it.
17       BY MR. NEWMAN:
18       Q.   And whether it was approved or
19  not, you don't know.
20       MS. HILLS:  Objection;
21  mischaracterizes testimony, mischaracterizes
22  both documents, and misstates testimony.

Page 159

1        BY MR. NEWMAN:
2        Q.   Do you know one way or the other
3   if the use of glue in Karyn Kerris was
4   approved?
5        MS. HILLS:  Same objection.
6        THE WITNESS:  I would have no way
7   of knowing unless I became personally involved
8   in the discussion.  The reasonable assumption
9   is that this was approved if you read this
10  note.
11       BY MR. NEWMAN:
12       Q.   Do I understand that your
13  recollection is that Blue Cross and Blue
14  Shield approved the use of glue for the
15  treatment of AVMs on many occasions before
16  Karyn Kerris?
17       MS. HILLS:  Object to form; calls
18  for speculation, misstates prior testimony,
19  and irrelevant.
20       THE WITNESS:  As I stated before,
21  I don't remember getting on the phone and
22  talking personally to an insurer.  That's not

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 160

1  my function unless something is not approved,
2  if an insurer does not approve something then
3  generally the front office would ask you to
4  talk to someone because you wouldn't be, they
5  wouldn't allow you to do it if it's not
6  approved.
7          BY MR. NEWMAN:
8      Q.   Prior to Karyn Kerris, do you have
9  any recollection of speaking to Blue Cross and
10  Blue Shield at any time about their refusal to
11  provide approval for the use of glues to treat
12  AVMs?
13          MS. HILLS:  Objection; calls for
14  speculation and irrelevant.
15          THE WITNESS:  It's completely
16  speculative.  I --
17          BY MR. NEWMAN:
18      Q.   You don't remember if that ever
19  happened?  That's my question.  Do you
20  remember ever talking to Blue Cross and Blue
21  Shield because they didn't approve your use of
22  glue?

Page 161

1          MS. HILLS:  Objection; asked and
2  answered, badgering the witness, calls for
3  speculation.
4          THE WITNESS:  I have only had a
5  few discussions involving any procedure or
6  device over the years primarily with an
7  insurer.  It's not a common thing.  And I have
8  no general recollection about talking with
9  Blue Cross and n-BCA.
10          BY MR. NEWMAN:
11      Q.   If you can turn now to Page 6 of
12  your declaration, while there is no number to
13  the first paragraph on the page, I am going to
14  ask you to reflect on it.  My question is was
15  there, in fact, a multidisciplinary
16  neurovascular conference consisting of
17  neurosurgeons, neurologists, radiologists from
18  Georgetown University, other hospitals, and
19  private practice who discussed the use of glue
20  in Karyn Kerris's case?
21      A.   We had a, and we still do have
22  vascular conferences where such cases are

Page 162

1  discussed.  We have one next week where I'll
2  show some of the cases I've done and we'll
3  show some we're thinking of doing and there'll
4  be a general discussion.
5      Q.   All right.  Now, to specifics
6  about Karyn Kerris, when was this conference
7  held?  And I'm talking about before her first,
8  second or third embolization.  Just tell me
9  when, or if there was more than one.
10      A.   Well, it was for her first
11  treatment.  And somewhere in the medical
12  records we documented that.  I remember that
13  from my review.
14      Q.   Well, let me ask you this:  Are
15  you recalling a typewritten documentation?
16  Are you recalling any handwritten
17  documentation?  When you say you recalled it.
18      A.   I recall reading that it was
19  discussed in the multidisciplinary conference.
20  I don't remember how many times I read it.  I
21  don't remember the specific document.
22      Q.   All right.  Well, let me see if

Page 163

1  this refreshes your recollection.  First of
2  all, before I get copies for -- I just need a
3  moment.
4          First of all, in your affidavit or
5  declaration it, again, references Exhibit 7
6  which we've been through before.  And just for
7  your recollection, without turning to it, it
8  is the Gary Steinberg letter.  Am I correct in
9  assuming that is not a documentation of the
10  neurovascular conference?
11      A.   We keep going through this.  I
12  guess I have to keep saying the same thing,
13  which is I didn't understand this "Ex" thing.
14      Q.   Now --
15      A.   I did understand the inference of
16  the paragraph.
17      Q.   Now, Doctor, I'm going to show you
18  which we'll mark as Exhibit 7, and I'll do it
19  ahead of time because I don't want to keep
20  going back and forth, Pages 1010, G-1010, and
21  G-1011.
22          MS. HILLS:  Is there a copy for

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 164

1 Counsel?
2          MR. NEWMAN:  You need not ask
3 again.  All things will be given to you during
4 the deposition.
5          MS. HILLS:  Thank you.
6          (Marked, Exhibit # 7, Radiology
7 Report, 11/4/98.)
8          BY MR. NEWMAN:
9     Q.    Now, is this what you are talking
10 about, 1010 and 1011, as far as the -- and I
11 can even tell you that we're looking to the
12 next, the 1010 and beginning of 1011 as far as
13 the neurovascular conference, but with that
14 being said you can look at the whole document.
15 And my question is that what it should be
16 referencing in Paragraph 18?
17     A.    Oh, here we go.  All right.  Yeah.
18 This is at least one of the documents that I
19 believe made this statement and this refers to
20 a radiology report from 11/4/98, and this is a
21 radiology report from 11/4/98.
22     Q.    Do you believe, Doctor, I'm asking

Page 165

1 you a question based on your prior answer,
2 that there are other documents that establish
3 that there was this multidisciplinary
4 neurovascular conference besides what I've now
5 given you?
6     A.    You know, I went through so many
7 documents I'm not sure.  But this is, it
8 says "Radiology Report, 11/4," and this is
9 Radiology Report, 11/4.
10     Q.    Now, Doctor, my first questions
11 are:  What other hospital was involved in that
12 multidisciplinary neurovascular conference
13 regarding Karyn Kerris besides Georgetown
14 University?
15          MS. HILLS:  Objection; vague.
16          THE WITNESS:  I do not understand
17 your question at all.
18          BY MR. NEWMAN:
19     Q.    Well, why don't we look at the
20 paragraph again on Page 6, which states, "The
21 multidisciplinary neurovascular conference is
22 a group consisting of neurosurgeons,

Page 166

1 neurologists and radiologists from Georgetown
2 University, other hospitals and private
3 practice which meets regularly."
4          Now, do you have any recollection
5 of there being any other hospitals represented
6 at this multidisciplinary neurovascular
7 conference involving Ms. Kerris?
8     A.    I don't remember exactly any of
9 the individuals who'd be at that conference.
10 We didn't keep a record.
11     Q.    Just so I complete that, no
12 minutes of the meetings, no rosters, no
13 documents whatsoever for this
14 multidisciplinary neurovascular conference.
15 Is that correct?
16     A.    You are asking about something in
17 1998.
18     Q.    Was it -- go ahead.
19     A.    I mean certainly even to this date
20 I don't think we keep minutes.  I'm not sure.
21 Things are evolving in medicine because of
22 training requirements for the residents to

Page 167

1 keep rosters.  But, in fact, in 1998 I would
2 not have expected anything.
3     Q.    Well, my question is whether there
4 was any documentation generated whatsoever
5 besides what we now have as 1010 and 1011
6 about this multidisciplinary neurovascular
7 conference.
8          MS. HILLS:  Objection; calls for
9 speculation.
10          THE WITNESS:  That's entirely
11 speculative.  And, as you know, we don't even
12 have all the records.
13          BY MR. NEWMAN:
14     Q.    First of all, what records are we
15 missing?
16          MS. HILLS:  Objection; calls for
17 speculation.
18          THE WITNESS:  Before we started
19 this deposition I heard you talking to Ms.
20 Hills, saying that there were some missing
21 records, you had some missing records and she
22 had some.  So you are the one who knows.  I

31 (Pages 164 to 167)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 168

1  don't really know.
2         BY MR. NEWMAN:
3      Q.   Well, I'm asking about the
4  multidisciplinary meeting.  Are there any
5  missing records that you know of from that
6  conference?
7      A.   Are you saying is there reference
8  to the multi -- would there be another similar
9  note to this within the missing records?  How
10 could I know that?
11     Q.   In the normal course of business
12 when you were at Georgetown University in
13 1998, when you had a multidisciplinary
14 neurovascular conference, did anybody write
15 down anything, who was there, what happened or
16 in any way what was decided on any patient?
17        MS. HILLS:  Objection; calls for
18 speculation.
19        THE WITNESS:  I don't know.  In
20 most conferences like that there's a free
21 exchange of ideas and throughout the free
22 exchange of ideas generally minutes are not

Page 169

1  kept.  A consensus is made upon treating
2  regimens.  I mean there are other types of
3  conferences where the goal is very different.
4  And, you know, there are minutes and logs.
5         BY MR. NEWMAN:
6      Q.   I just want to know for this
7  record in the usual course of business at
8  Georgetown University when a multidisciplinary
9  neurovascular conference was held, is it your
10 testimony there was no documentation
11 maintained?
12        MS. HILLS:  Objection; calls for
13 speculation, asked and answered.
14        BY MR. NEWMAN:
15     Q.   In the normal course of business.
16 Not if someone else wrote something on their
17 own.
18        MS. HILLS:  Same objection.
19        THE WITNESS:  Well, in the normal
20 course of business, the documentation would be
21 something like me writing down "People agree
22 embolization is right," or "She should have

Page 170

1  surgery."  And then I would tell my front
2  office people, you know, "We talked about it.
3  Everyone says the patient should have surgery
4  and it was agreed that Dr. X would see her.
5  Will you have them go see her," or go see
6  them, him or her, "to discuss that option and
7  they can come back and see me again if they
8  wish."
9         BY MR. NEWMAN:
10     Q.   And is it your testimony that
11 whatever you wrote on, if you wrote on
12 anything, does not exist?
13        MS. HILLS:  Objection; calls for
14 speculation.
15        THE WITNESS:  Do I have my note
16 cards, daytimers, whatever I was using in
17 1998?  I don't think so.
18        BY MR. NEWMAN:
19     Q.   Doctor, we're here to decide
20 whether or not anybody else was at that
21 meeting and I want to know who so I can get
22 their deposition.  So I'm trying to tell you,

Page 171

1  you need to tell me who was there and what
2  decisions were made and if there is any
3  documents related to it.  I don't know.  You
4  do.  If there are no documents, then you tell
5  me that.
6         MS. HILLS:  Objection; badgering
7  the witness, asked and answered, calls for
8  speculation, asked and answered.
9         THE WITNESS:  I have not seen any
10 documents to that effect which I have
11 reviewed.  Again, as I said, you know there
12 are missing records.  I don't know where they
13 are.  This conversation could have taken part
14 anytime between her angiogram and the
15 procedure, based on what's written here.
16        BY MR. NEWMAN:
17     Q.   Do you know who, do you know the
18 name of one single neurosurgeon who was
19 involved in that conference?
20        MS. HILLS:  Objection; calls for
21 speculation.
22        THE WITNESS:  Absolutely not.  How

32  (Pages 168 to 171)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 172

1  would I know that when I don't know the date
2  the conference, which date we discussed it?
3  It could have been, as I said, anytime after
4  her angiogram.
5         BY MR. NEWMAN:
6     Q.   Doctor, if the multidisciplinary
7  neurovascular conference had voted to not
8  embolize Ms. Kerris, would you have gone with
9  the consensus or with your own opinion?
10        MS. HILLS:  Objection; calls for
11 speculation.
12        THE WITNESS:  Well, that is
13 extremely speculative, because it would depend
14 upon my conviction and belief.  But to my
15 general recollection, I have not gone against
16 the consensus before.
17        BY MR. NEWMAN:
18    Q.   Now, Doctor, I'm going to ask you
19 in group this next so we don't have to spare a
20 little time.  Do you remember any or any one
21 of the neurologists or radiologists besides
22 yourself who was at that conference from

Page 173

1  Georgetown?
2         MS. HILLS:  Objection; asked and
3  answered.  The same objections as before.
4         MR. NEWMAN:  And you have a
5  continuing objection.  You need not note it.
6  I'll give it to you.
7         THE WITNESS:  As I said, we don't
8  know which conference, we don't know -- so if
9  I don't know which conference, even if there
10 was an attendance log, I'd never be able to
11 know which group was present.  And I'm
12 providing the same information as on which you
13 called Exhibit 7 which was Dr. Steinberg's
14 note where he says something to the effect
15 that "At Stanford we had a multidisciplinary
16 conference and we agreed the patient should be
17 embolized and radiated."
18        BY MR. NEWMAN:
19    Q.   Doctor, what other hospitals were
20 involved in that meeting?
21        MS. HILLS:  Objection; asked and
22 answered.

Page 174

1         THE WITNESS:  To me a hospital is
2  a building.  So I don't think anyone moved a
3  building to here.  Are you --
4         BY MR. NEWMAN:
5     Q.   Well, Doctor, again, if you look
6  at Paragraph 18, these are the words you
7  attested to.  It said besides neurosurgeons,
8  neurologists, radiologists from Georgetown
9  University, "other hospitals and private
10 practice."  Am I correct that as far as which,
11 if any, hospitals were involved at that
12 meeting you don't know?
13        MS. HILLS:  Objection;
14 mischaracterizes the document.
15        THE WITNESS:  Yeah.  This is 1998.
16 As I said, there is no log.  All I can do is
17 explain to you how it works now which is very
18 similar.  At one of our recent stroke
19 conferences where we discuss this sort of
20 thing there was a neurosurgeon from Fairfax
21 who showed up.  What we are saying here is
22 that this conference is not limited to

Page 175

1  Georgetown people.  And it was not mandatory.
2  So if you care to show up and discuss the
3  cases, you are welcome.
4         BY MR. NEWMAN:
5     Q.   Do you in fact know if there is --
6  let me ask you this:  In that conference is
7  there a minimum number of attendees and is
8  there a minimum number of attendees from
9  different specialist groups --
10        MS. HILLS:  Objection.
11    Q.   -- in general back at that time in
12 1998?
13    A.   I would have to speculate.  Based
14 on my experience being in other hospitals and
15 at Georgetown, this kind of conference, that's
16 not the forum.
17    Q.   I just want to know your
18 recollection of one thing:  Are you telling
19 the Ladies and Gentleman of the Jury that you
20 don't know whether there was a single
21 neurosurgeon at that conference involving
22 Karyn Kerris?

33  (Pages 172 to 175)

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 176

1    A.   If there was not a neurosurgeon
2 then we don't discuss this kind of case.  If
3 there's not a neurologist we tend not to
4 discuss the pure stroke cases.  Almost always
5 there's lots of each.  And to my recollection,
6 there have always been lots of each.  And it's
7 not formal, but if there were less than ten
8 people there, you know, physicians of
9 different types, usually we'd cancel it.
10    Q.   But you cannot tell us the
11 identity of any of those people of ten or
12 more.  Is that correct?
13        MS. HILLS:  Objection; asked and
14 answered.
15        THE WITNESS:  It's the same
16 questions.  It's the same answer.  We don't
17 know the date.  So even if there was an
18 attendance log, which I don't think or know
19 there was, I could not tell you.
20        BY MR. NEWMAN:
21    Q.   And you cannot tell us then if
22 that conference even took place because you

Page 177

1 don't know what day it was or who was there.
2        MS. HILLS:  Objection;
3 mischaracterizes Exhibit 7 and misrepresents
4 the doctor's prior testimony.
5        THE WITNESS:  Very clearly it
6 states there was a multidisciplinary
7 conference.  This was discussed and
8 embolization encouraged.  That's almost the
9 same line as in Dr. Steinberg's letter.  So I
10 mean both practitioners are doing exactly the
11 same thing.
12        BY MR. NEWMAN:
13    Q.   Are you saying that Dr. Steinberg
14 has no record whatsoever of any of the
15 attendees at that meeting?
16        MS. HILLS:  Objection; calls for
17 speculation.
18        BY MR. NEWMAN:
19    Q.   Correct, Doctor, it is speculation
20 because you have no idea whether they keep
21 minutes of the meeting at that institution,
22 they keep a roster of people or they are in

Page 178

1 some way able to identify to the jury who
2 agreed with their treatment.
3        MS. HILLS:  Objection; calls for
4 speculation, improper sidebar.
5        THE WITNESS:  That's speculative.
6 I have been to a number of other hospitals in
7 my travels and training.  And in this kind of
8 conference until recently I didn't see people
9 sign in for the most part.  And if they did,
10 it was for a conference approved for
11 continuing medical education.  But, then
12 again, we'd need to know which date it was
13 that this was discussed.  There are, as I
14 said, other conferences typically where there
15 is a roster like there is for us today.
16        BY MR. NEWMAN:
17    Q.   Doctor, why didn't you put the
18 date that the conference occurred since you're
19 telling me that that's the problem?  Why
20 didn't you include that in your conclusion?
21        MS. HILLS:  Objection; calls for
22 speculation, assumes facts not in evidence.

Page 179

1        THE WITNESS:  It's not my habit
2 and it's obviously not Dr. Steinberg's habit.
3 Based on that one, or it could be, but based
4 on the one document which you recently gave
5 me, I don't remember seeing him put a date
6 down.
7        BY MR. NEWMAN:
8    Q.   Doctor, can you tell us in general
9 back in 1998 what other hospitals attended
10 those conferences?
11        MS. HILLS:  Objection; vague.
12        BY MR. NEWMAN:
13    Q.   Well, did GW attend?
14    A.   I think we also said that
15 hospitals did not attend.  Practitioners who
16 practice primarily or secondary in other
17 hospitals did attend.  Ahh --
18    Q.   Do you know if Bill Bank was
19 there, Doctor?
20        MS. HILLS:  Objection; talked over
21 witness.  Were you done with your answer?
22        THE WITNESS:  No, I wasn't.

34  (Pages 176 to 179)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 180

BY MR. NEWMAN:
1  
2    Q.  Go ahead, Doctor.  Finish the
3  discussion about hospitals that comes from
4  your own statement, please.
5        MS. HILLS:  Object to sidebar.
6        THE WITNESS:  This was not a
7  closed conference to Georgetown people.
8  Physicians from other practices either
9  habitually came for a while or intermittently
10  came.  Who was coming, who was not in 1998, I
11  would have no way of knowing.
12        BY MR. NEWMAN:
13    Q.   Do you remember Bill Bank being
14  there in 1998 on one or many of those
15  conferences?
16        MS. HILLS:  Objection; assumes
17  facts not in the record.
18        THE WITNESS:  I don't think Dr.
19  Bank came to many of our conferences.
20        BY MR. NEWMAN:
21    Q.   All right, Doctor.  Let's turn to
22  Paragraph 21 of your affidavit.  First of all,

Page 181

1  I'm going to ask you if what's contained in
2  Paragraph 21 is correct.  You can read it.
3    A.   Well, I need to see these exhibits
4  again.
5    Q.   Well, just to reach over, Exhibit
6  11, wherever all the documents were unless
7  counsel moved them from -- they were in a
8  pile.  There you go.  If you keep going --
9        MS. HILLS:  Object to sidebar.
10        MR. NEWMAN:  I'm just asking where
11  they are.
12        BY MR. NEWMAN:
13    Q.   Here, I'll show you.  Exhibit 7
14  we've been through a number of times, but you
15  can turn to it, right before the affidavit.
16  And Exhibit 11, it seems to be, I don't know
17  if counsel has Exhibit 11 in front of her, I
18  can give you mine.  But let's see, make sure
19  we've got everything.  Yeah.  That's fine.
20  That's Exhibit 11.
21        MS. HILLS:  And why don't we state
22  what Exhibit, the name of the document that is

Page 182

1  referred to in the paragraph.
2        MR. NEWMAN:  I have no problem
3  with stating that it says the 11/4/98 GUH
4  Patient Care Summary.
5        MS. HILLS:  And prior to that?
6        MR. NEWMAN:  That's all I wish to
7  do, Counsel, but I did mention that I am in
8  Paragraph 21.
9        MS. HILLS:  Under the rule of
10  completeness, I request contemporaneously that
11  the doctor refer to 11/4/98 GUH Radiology
12  Report.  As you have brought in Paragraph 21
13  into issue, I am entitled to have the complete
14  Paragraph 1 and records before the doctor
15  under the rule of completeness.
16        MR. NEWMAN:  The rule of
17  completeness does not apply in discovery.  You
18  have misstated that on many occasions.  This
19  is a discovery pleading, not a trial.
20        And by the way, Doctor, I don't
21  care which documents you look at.  If counsel
22  wants you to look at every single page of

Page 183

1  what's in there, you may, at all times.  I'm
2  not limiting you.  I am simply directing my
3  comment to Exhibit 11 which I think you have
4  in front of you.
5        MS. HILLS:  And the identified
6  document of 11/4/98 Radiology Report under the
7  rule of completeness.
8        THE WITNESS:  Is this supposed to
9  be --
10        BY MR. NEWMAN:
11    Q.   That's Exhibit 11.
12    A.   Is it tagged?  Is it supposed to
13  be tagged.
14    Q.   No, it's not, but it is Exhibit
15  11.  I will tell you that, and I don't think
16  counsel is going to argue with it, and it is
17  Exhibit 11 in every copy except for some
18  reason with all the papers, it got shuffled.
19        In any event, now that you've seen
20  Exhibit 11 and the exhibit that counsel wishes
21  you to see which is now marked as Exhibit 7 --
22        MS. HILLS:  Referred to in

35 (Pages 180 to 183)

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1  Paragraph 21.
2      THE WITNESS:  Mmm-hmm.  Okay.
3      MR. NEWMAN:  Actually that refers
4  to Exhibit 7 in your documents, Counsel, which
5  do not --
6      MS. HILLS:  Sir, the paragraph
7  under 21 clearly says, "See 11/4/98 GUH
8  Radiology Report."  It is mistyped to be
9  labeled as Exhibit 7, but clearly that is the
10  document referred to.
11      BY MR. NEWMAN:
12      Q.   All right.  Can we go back,
13  Doctor.  Let me ask you first of all if you
14  agree with the Paragraph 21, and we'll allow
15  counsel's change of our exhibit for this
16  deposition 7 in place of the Exhibit 7 that
17  was at one time attached.  So we're all on the
18  same point now.  We have a document to your
19  right hand and the one to your left hand, and
20  I'm also asking you if, again now, Paragraph
21  21 is correct as stated with that one
22  correction.

1      A.   I think what was paraphrased here
2  and matches what's written on what you are
3  calling 11 --
4      Q.   Mmm-hmm.
5      A.   And, yeah, and this Exhibit 7 says
6  that there are no clinical complications.
7      Q.   Does that complete your answer?
8      A.   Yes.
9      Q.   Okay.  Now, from what you said,
10  since Exhibit 11 has in its body goal to
11  maintain optimal cerebral tissue perfusion,
12  and since Paragraph 21 says that on November
13  4, 1998 Ms. Kerris underwent her first
14  embolization to maintain optimum cerebral
15  tissue perfusion, you believe that at least
16  that portion of the statement is correct.
17      MS. HILLS:  Objection to form;
18  vague.
19      THE WITNESS:  I'd have to agree, I
20  didn't understand.
21      BY MR. NEWMAN:
22      Q.   Doctor, am I not correct that the

1  first line of Paragraph 21 is also greatly in
2  error because on November 4th, 1998 there is
3  no such reference?  The reference that is
4  included in your affidavit or declaration is
5  related to 1/13/99, not anything to do with
6  November 4th of 1998.  And if you look at
7  Exhibit 11, it is dated on top 1/13/99; it is
8  dated admission, 1/13; and it is initiated
9  under another date of 1/13/99.  Is that
10  correct, Doctor?  That is an error.  That was
11  not the reason to do the November 4th, 1998
12  embolization.  That was the reason to do the
13  January 13th, 1999 embolization.
14      A.   That's the reason to do any
15  embolization for AVMs.
16      Q.   Is, in fact, once again, the
17  document which you reviewed which you said,
18  this time you attested to was correct, the
19  document from January 13, 1999 is misstated in
20  your declaration as from November 4th, 1998?
21      MS. HILLS:  Object to form;
22  mischaracterizes document, mischaracterizes --

1      BY MR. NEWMAN:
2      Q.   Isn't that --
3      MS. HILLS:  -- the doctor's prior
4  testimony.
5      MR. NEWMAN:  Counsel, please.
6      MS. HILLS:  Object to sidebar.
7      THE WITNESS:  In review of these
8  documents that counsel had provided me prior
9  to drafting this, I remembered seeing this
10  statement.  And this is a true statement for
11  all AVM embolizations.  And since I wasn't
12  matching them like we said, I would have no
13  way of knowing at the time.
14      The statement sounds true.  The
15  dates as we matched them are not the same.
16  But I don't know that the same thing wasn't
17  written in the nursing assessment from
18  November.  And it probably was -- this kind of
19  assessment was probably almost a rubber stamp
20  assessment on all patients by whoever wrote
21  this.
22      BY MR. NEWMAN:

36  (Pages 184 to 187)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 188

1    Q.    Would you be surprised to know,
2  Doctor, that it does not say that in November
3  4th, 1998, in the assessment on the same
4  active problem list?
5        MS. HILLS:  Objection; calls for
6  speculation.
7        BY MR. NEWMAN:
8    Q.    Would that surprise you?
9        MS. HILLS:  Same objection.
10       THE WITNESS:  Trying to make the
11  flow as close to normal is the goal in any AVM
12  procedure.
13       BY MR. NEWMAN:
14   Q.    In this case, Doctor, before you
15  signed under the penalty of perjury your
16  declaration in this case, at Paragraph 21 I
17  understand that you did review Exhibit 11 and
18  simply didn't recognize that you were talking
19  about the wrong day; is that what happened?
20       MS. HILLS:  Objection; calls for
21  speculation.
22       THE WITNESS:  I think I told you

Page 189

1  at the beginning and multiple times through, I
2  didn't understand this "Ex" business.  I don't
3  think I had -- I went through all the medical
4  records prior to, or records shown to me,
5  prior to this.  And since they're not paired,
6  I just have to be going off my recollection.
7  So I think it's very reasonable that the dates
8  could be missed.  But the statement is
9  accurate and the statement is accurate in
10  every patient in every procedure for AVMs.
11       BY MR. NEWMAN:
12   Q.    But you didn't bother to tell
13  anyone that the dates were wrong before you
14  signed and swore that it was true.
15       MS. HILLS:  Objection; calls for
16  speculation.
17       BY MR. NEWMAN:
18   Q.    Did you?  You didn't tell anyone.
19       MS. HILLS:  Objection.
20       THE WITNESS:  Why would I tell
21  somebody if I didn't know it?
22       BY MR. NEWMAN:

Page 190

1    Q.    Doctor, do you believe that you
2  should review every document you sign,
3  especially where you are swearing under oath
4  that it's true before you sign it and know
5  that everything in it is correct?
6        MS. HILLS:  Object to form;
7  compound, badgering, relevance.
8        BY MR. NEWMAN:
9    Q.    Isn't that why you sign under
10  penalty of perjury in your understanding,
11  Doctor?
12       MS. HILLS:  Object; relevance,
13  badgering the witness.
14       THE WITNESS:  I read the document.
15  I did not have paired exhibits.  I did not
16  know that's the way it's done.  To the best of
17  my recollection, this was true.
18       BY MR. NEWMAN:
19   Q.    Now, Doctor, let me ask you to
20  turn to Page 7, of the same document,
21  Paragraph 26.  I'm going to ask you this:  In
22  your review of the records did you find any

Page 191

1  reference in any consent form on March the
2  3rd, 1999 that you spoke with Ms. Kerris about
3  the risks and complications of the procedure?
4  My question is first of all, do you remember
5  seeing that in a consent form?
6    A.    I don't remember.  It's hospital
7  policy that the attending needs to finalize
8  the consent and identify the patient.
9    Q.    And identify the declarant,
10  correct?
11   A.    Pardon?
12   Q.    Who told the patient.  You have to
13  write down, "Dr. Somebody told the patient the
14  risks and complications."  That's the policy,
15  correct?
16   A.    And then the attending needs to
17  say, "Do you understand?"  By this time,
18  remember, I had spent hours and I consented
19  her multiple times.  It could have been a very
20  lengthy consent that she was concerned or it
21  could be "Do you remember the same risks we
22  had before?  Stroke, death, loss of limb,

37 (Pages 188 to 191)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 192

1  hemorrhage, death. And did you understand the
2  other doctor who was talking to you? And are
3  you patient X?" I mean that's the key thing
4  because you don't want patient Y to be brought
5  into an operative procedure room for patient
6  X's procedure. That's why we do things this
7  way.
8      Q.  All right, Doctor. My question is
9  then am I correct that after you have under
10  policy of the hospital provided informed
11  consent or at least provided the risks and
12  complications of the procedure, that you fill
13  out, as you must, a paragraph in the consent
14  form that says, "I acknowledge that Dr." --
15  somebody -- "described the procedure, provided
16  me the risks and complications," and that name
17  in there if you did it is yours? If the name
18  in there is someone else's, someone else gave
19  that.
20         MS. HILLS: Object to form and
21  assumes facts not in evidence.
22         THE WITNESS: You know, the person

Page 193

1  obtaining the consent and having the patient
2  sign it can be another provider. And then
3  before we get started it's always been my
4  habit and I think only recently with JCAHO
5  rules has it become policy that you sign a
6  form to say you've done it. But that's a
7  relatively new thing.
8         BY MR. NEWMAN:
9      Q.  All right. Doctor, am I correct
10  from Paragraph 26 that it does say, quote, and
11  this is correct, "I had satisfactorily
12  explained the procedure, all material
13  aspects," there's a parenthetical, "possible
14  risks, benefits, complications, alternative
15  treatments, et cetera," close of the
16  parenthetical, "of the procedure in terms she
17  could understand and answered any questions
18  that she might have"? It then references the
19  March 3rd, 1999 consent form listed as Exhibit
20  15. Is that true that you did that?
21      A.  Yes. I also would have seen Karyn
22  at that time, too.

Page 194

1      Q.  Now, let me ask you to turn to
2  Exhibit 15, which is in that pile, which is
3  reference to what we just discussed.
4      A.  Okay.
5      Q.  And does that document say in
6  Paragraph 2, "I acknowledge that Paul Goldberg
7  has described the nature of this procedure to
8  me in terms which I understand, and has
9  answered all questions I have asked about it
10  to my satisfaction. He has also explained
11  significant complications and risks which may
12  be associated with this procedure, including
13  the complications and risks of anesthesia, and
14  has advised me of possible alternatives to
15  this treatment, including the possible
16  consequences of no treatment at all, and the
17  significant complications and risks associated
18  with such alternatives"?
19         MS. HILLS: Objection; misread
20  first line of document that you read. It's
21  Dr. Paul Goldberg.
22         BY MR. NEWMAN:

Page 195

1      Q.  Doctor, with that change, was it
2  Dr. Goldberg who described the nature of the
3  procedure and answered all the questions as
4  that document says?
5      A.  Well, I did it myself for sure.
6  And the person obtaining the patient's
7  signature appears to have been Paul Goldberg,
8  and it would have been his job to go before me
9  and do the exact same thing, explain all the
10  risks and benefits. And then I would come
11  afterwards, explain all the risks and
12  benefits, make sure that's okay, make sure you
13  are patient X, and then proceed to the
14  procedure room.
15      Q.  Doctor, whose initials is down as
16  the witness?
17      A.  I have no idea.
18      Q.  Does your signature appear or name
19  appear anywhere except in Section 1 which says
20  that the procedure would be performed by you?
21  Did you sign anywhere else does it mention
22  you?

Feder Reporting Company
(202) 863-0000

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1    A.    That's not my signature.

2    Q.    I said you didn't sign this

3    document.  That's what I was getting at.

4    A.    This particular form doesn't have

5    a space for me to sign.

6    Q.    Do you have any doubt that Dr.

7    Goldberg was the one that stated the risks and

8    complications, et cetera, that are in

9    Paragraph 2, to the patient?

10    A.    Well, this is 1998.  I can only

11    tell you how it is supposed to have been done.

12    I don't remember seeing Dr. Goldberg do it.

13    As I said, I know I talked to her.  And the

14    proper procedure and what was very likely done

15    is Dr. Goldberg would have gone through the

16    exact same thing.  He had heard it many, many

17    times and gone before me.

18    Q.    What was Dr. Goldberg's status at

19    that time?

20    A.    He was a fellow.

21    Q.    Was he trained at Georgetown,

22    receive any other kind of med training before

1    his fellowship, or did he begin as a fellow at

2    Georgetown?

3    A.    You know, I can't recall where he

4    did his other medical training.

5    Q.    Is he still at Georgetown?

6    A.    No.

7    Q.    Do you know where he is?

8    A.    I really don't know.  He was in a

9    practice in Florida sometime ago.  And I had

10    talked to him on the phone because I think he

11    was maybe considering moving back to the area,

12    and never heard from him since.  So I don't

13    know where he is.

14    Q.    Did you understand him to be

15    practicing interventional neuroradiology?

16    A.    No.  He was a diagnostic

17    neuroradiology fellow.  So he performed

18    invasive procedures such as angiography, and

19    he would have scrubbed and assisted in the

20    interventions, but not specifically trained in

21    them and would not have been doing the

22    embolization itself.

1    Q.    Where in Florida was he the last

2    time you talked to him?

3    A.    I have no idea.

4    Q.    Do you have his number?

5    A.    No.

6    Q.    How did you get him?

7    A.    Pardon?

8    Q.    You said you talked to him in

9    Florida, I believe.

10    A.    Yeah.  He called me, to the best

11    of my recollection -- and I don't remember how

12    long ago this was -- because I think he heard

13    we were recruiting or he may have seen an ad,

14    I have no idea, and said he might be thinking

15    about leaving Florida.  And I said, "Great.

16    If you want to do that, why don't you let us

17    know.  We'll set you up with an interview."

18    And I guess he had a better offer or he got

19    happy where he was.  How would I know where he

20    is?  I think, as I told you, our last

21    conversation was kind of like "Yeah, yeah,

22    I'll get back to you," and he never got back

1    to me.

2    Q.    In the time when -- then if I'm

3    correct he wasn't being trained as an

4    interventional neuroradiologist when you were

5    seeing him as a fellow?

6    A.    I don't specifically train people

7    in interventional neuroradiology.  We've had

8    people leave our program and practice that

9    because they had a tremendous amount of

10    experience.  But I don't accept people who

11    say, "I want to be an interventional

12    neuroradiologist.  Will you train me?"

13    What I do is I say, "Well, right

14    now I'm working by myself.  I came from a

15    program that had four or five attendings and

16    viewpoints to learn.  That's the kind of

17    program I'd like you to matriculate in.  If

18    you want to go someplace for a year, come

19    back, you can spend a year with us.  But I'm

20    not going to accept you as an interventional

21    neuroradiology fellow."

22    Q.    Had he ever performed an

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 200

1  embolization as the primary physician while he
2  was with you?
3      A.   I think I just told you that I
4  don't let the fellows perform the
5  embolizations.
6      Q.   Now, Doctor, let me ask you a
7  question.  You have in front of you, which is
8  Exhibit 7, I believe now, I'm a little
9  confused on what number, but it's the 11/4/98
10 radiology report, the typewritten one I
11 suspect.  It's right in front of your hand
12 there.
13     A.   Mmm-hmm.
14     Q.   Okay.  Do you recall this
15 procedure?  I mean I can see it's typewritten
16 here, but do you recall anything about it
17 beyond --
18     A.   Oh, I recall this procedure quite
19 well.  That's why I recognize the
20 transcription corrections didn't take.  There
21 were some errors in here that we talked about
22 earlier.

Page 201

1      Q.   Well, then can you walk through
2  with me basically what happened and what
3  stopped the procedure?
4      A.   Okay.
5      Q.   Let me ask you this:  I don't want
6  you to read what's just typed.  If you have
7  any recollection other than exactly what's
8  typed in the document, that's fine.  If you
9  want to give a general understanding, that's
10 okay as well.  If you are simply, your
11 recollection is limited to what's typed, I
12 don't need --
13     A.   No.
14     Q.   Okay.
15     A.   What I'd like to do is go through
16 this, correct verbally the typos that I
17 remember trying to correct computer-wise, and
18 that will explain what we did.  And if there
19 are any other questions -- because I've looked
20 at this recently.  It seemed to represent
21 things.
22         It says right carotid angiogram.

Page 202

1  Then it says "Caths: left."  Well, it can't be
2  left and it was the right.  Right internal
3  carotid artery.  "Microcaths: left."  Well, it
4  has to be right.  And it's, instead of middle
5  cerebral artery, it's posterior cerebral
6  artery vessels, because there really were no
7  big middle cerebral artery branches there.
8          It required several explorations
9  to find the first vessel with perinidal
10 position.  This was a, it should be posterior
11 medial cerebral artery, so a branch of the
12 posterior cerebral artery.  Embolization of
13 the nidus was performed with 0.3 cc's at 20
14 percent n-BCA without complication or
15 difficulty and with intranidal deposition.
16 That means we were within the heart of the
17 AVM.
18         A second posterior medial or
19 posterior cerebral artery branch was entered
20 and injection of 20 percent n-BCA halted at
21 0.2 cc's after noting leakage through the
22 fistula.  This was not identified, the fistula

Page 203

1  was not identified on pre-embolization
2  angiography.  And the leakage was into the
3  draining vein.
4          Approximately 0.1 cc's of the
5  venous embolic material passed to the torcula,
6  which is a big vein outside the brain, far
7  downstream from the AVM, and did not appear to
8  impede drainage.  And there were no apparent
9  clinical complications.
10     Q.   Does that complete your comment?
11     A.   Yes.
12     Q.   All right.  Am I correct that
13 having the glue leak through a fistula which
14 then halts the procedure in your opinion is
15 not a complication?
16     A.   That is a technical, not a
17 clinical, complication.
18     Q.   How many cc's were you planning to
19 deposit?  What fragment of a cc if that's what
20 it was?
21         MS. HILLS:  Objection; calls for
22 speculation.

40  (Pages 200 to 203)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 204

1    THE WITNESS: That is extremely
2 speculative. Sometimes you can guess before
3 you start injecting with the downstream volume
4 it would be. Sometimes you can't. I would
5 have expected, my recollection of these very
6 torturous, very distal PCA feeders, we
7 wouldn't get more than a cc. It would have
8 been a fraction of a cc in.
9    BY MR. NEWMAN:
10   Q.   Go through the procedure, if you
11 will, of opening the vial or the tube of
12 Histocryl, the mixture that you go through,
13 where you mix the compounds and how you get it
14 into the vessel.
15    MS. HILLS: Objection; calls for
16 speculation.
17    BY MR. NEWMAN:
18   Q.   Doctor -- that's amazing. Doctor,
19 do you know how you open the vial of
20 Histoacryl, I mean the actual tube?
21    MS. HILLS: Objection; overbroad,
22 vague.

Page 205

1    THE WITNESS: Like we've said,
2 I've done hundreds of embolization procedures
3 on of course a smaller number of patients and
4 as I probably said, 500 or 1,000 injections.
5 So I can tell how most of the time it's
6 prepared. I would have to have a videotape of
7 myself that day to know for sure. But in --
8    BY MR. NEWMAN:
9   Q.   I was just going to ask, first of
10 all, there is no tape that you --
11    MS. HILLS: Objection to speaking
12 over the doctor. Doctor, were you finished
13 with your answer?
14    THE WITNESS: No.
15    MR. NEWMAN: He braked and I
16 braked, Counsel.
17    MS. HILLS: Doctor, would you
18 finish your answer?
19    THE WITNESS: Okay. Generally and
20 with really no exception that I can think of
21 for a brain AVM such as this, we have a
22 separate table so that we can't inadvertently

Page 206

1 mix embolic material up with angiographic
2 material. And we do that with a lot of our
3 different procedures to make sure that your
4 can't mix things up.
5    One syringe can look very similar
6 to another, so you keep them on separate
7 tables. And that's not just with AVMs. But
8 with n-BCA, both Histocryl and TruFill, it's
9 pretty much the same routine. You take a
10 small metal shot glass like container, put it
11 on the table, make sure it's absolutely clean.
12    Then we get the n-BCA and we get
13 the ethiodized oil, either the Ethiodol or
14 Lipiodol out, and inspect the packaging off
15 the table to make sure that the packaging
16 looks intact, look at the material within the
17 vial to, again, try to establish whether the
18 packaging was not violated and everything is
19 fine.
20    And I've seen from Onyx to TruFill
21 to, oh, Histocryl to other agents where there
22 was damage to the packaging which leads to

Page 207

1 some evaporation, there's not the exact amount
2 that's supposed to be there or something else,
3 and then we just throw that material away. Or
4 in the case of -- well, that's getting off a
5 tangent. I'm thinking of other devices. But
6 anyway, you inspect the packaging of
7 everything, including things we don't use in
8 AVMs.
9    Then to get it onto the table you
10 require opening the tops, and the nature of
11 Histoacryl or TruFill, you open the top, too.
12 Then you draw the material out with sterile
13 syringes. It's my habit to do the
14 measurements with one cc syringes, although I
15 know some people use two or three cc's.
16    You calculate the mixture we want.
17 So if it's 25 percent n-BCA we might put one
18 cc of n-BCA in there and then add three of
19 lipidized oil. Another team member, one of
20 the nurses or techs, are supposed to
21 doublecheck your calculation so that your math
22 is correct on fractions. And we do that with

41 (Pages 204 to 207)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 208

1  everything, check, check, doublecheck.
2          Then you mix the material with a,
3  usually a sterile syringe cap, make sure
4  you're happy with how it's mixing.  If your
5  x-ray machine is not so good or if you are not
6  using much radiopaque or can't see on x-ray
7  iodinated oil, you might want to add some
8  Templum powder which makes it easier to see on
9  x-ray.  But it's not necessary with the newer
10  equipment.  And with these low percentages of
11  n-BCA it's quite easy to see.
12          After it's sufficiently mixed you
13  would draw the maximum quantity you think
14  you're going to use into a syringe, flush and
15  clean your catheter with dextrose and inject
16  the embolic mixture at that point or sometimes
17  inject a little bit and put dextrose behind
18  it, we call it a sandwich, to send a very
19  small amount out.  And that potentially
20  preserves the catheter, because after you
21  finish an injection with this material you
22  can't use the catheter anymore.  So you'd have

Page 209

1  to recatheterize.
2      Q.    All right?
3      A.    I'm finished.
4      Q.    All right.  I'm waiting for that.
5  Doctor, first of all, how did you determine
6  the percentage to be used in this case?  In
7  other words, here I believe you said it was 20
8  percent n-BCA.
9      A.    The way you learn to judge
10  percentages with n-BCA, whether it be
11  Histoacryl or TruFill, is experience,
12  deciding, you know, how fast the channel is
13  you are injecting to is.
14          If it's very fast you'd use a glue
15  mixture that hardens faster.  And also the
16  geometry of what's in front of you, that's
17  going to change how far you can get into the
18  AVM, with the goal of the job being to get as
19  far into the AVM as you can.
20          And, you know, either stop right
21  before the vein or if a little leaks out, stop
22  right then and avoid backing the glue back up

Page 210

1  over the catheter.
2          So if I'd used 90 percent glue in
3  this case it would not have penetrated the
4  AVM, would not have created any of the
5  blockage we wanted and could very well have in
6  this kind of location stuck the catheter and
7  glued it into the brain.  So it's experience.
8      Q.    First of all, how do you determine
9  optimal catheter placement before you inject
10  the glue and how would you have done it in
11  this case?
12          MS. HILLS:  Objection; form,
13  compound.
14          THE WITNESS:  Well, my goal is to
15  get as -- it depends on each individual.  Are
16  you talking this specific embolization or
17  embolizations in general?  Because it's very
18  different.
19          BY MR. NEWMAN:
20      Q.    Well, let's start with this
21  particular embolization.  What would be the
22  optimum catheter placement and how -- in this

Page 211

1  particular case, what were you looking for?
2      A.    I see a note being passed around.
3      Q.    It says that the videotape is
4  about to go, but not quite this minute.
5      A.    Okay.  In this case I was trying
6  to get as close to the nidus as possible.
7  That means the main tangle.  And that was the
8  main goal.  And then evaluate whether I could
9  see any dangerous anatomies in front of me.
10      Q.    Do you recall that in subsequent
11  procedures you used the 25 percent n-BCA?  And
12  on Ms. Kerris.
13          MS. HILLS:  Objection; calls for
14  speculation.
15          THE WITNESS:  You know, what
16  percentage of n-BCA I used I'd have to get
17  from the records.  And the main reason for
18  recording it is so that I would have a good
19  idea of what worked for me before.
20          BY MR. NEWMAN:
21      Q.    I understand completely, Doctor.
22  My question: In all your review of the

42 (Pages 208 to 211)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 212

1 records which you said you went through, did
2 you remember or know that you used 25 percent
3 on a subsequent procedure as opposed to 20?
4     MS. HILLS: Objection; calls for
5 speculation, asked and answered.
6     THE WITNESS: I'd have to review
7 my records.
8     BY MR. NEWMAN:
9     Q.   All right.  Well, let's see if we
10 can give you that page then.  Actually, since
11 we're going to be running low on this tape let
12 me finish one other area then I will provide
13 you with that.
14     Why was it necessary to stop the
15 embolization on 11/4/98 when you realized that
16 there was leakage through the fistula?
17     A.   I saw a few drops of embolic
18 material pass through a rapid channel that was
19 not as apparent on the angiography beforehand
20 and washed downstream out of the brain into a
21 large draining vein.  Just to be cautious I
22 didn't want any more leakage.  I wanted to

Page 213

1 make sure everything was fine and she was
2 fine.
3     She was fine.  The follow-up
4 imaging showed no damage to any of the veins.
5 In fact, the following up images when you look
6 at the angiogram pictures from the second and
7 third embolization show that that glue
8 material that passed through is no longer even
9 in the head.
10     And during the course of the
11 review I think I've seen MRI's well into the
12 2000ths, maybe just a few years ago where the
13 veins are widely open and probably getting
14 bigger because the AVM is getting bigger.
15     Q.   Who is watching or by what
16 radiographic device are you watching the
17 procedure?
18     MS. HILLS: Objection; vague.
19     BY MR. NEWMAN:
20     Q.   When you --
21     A.   Mmm-hmm.
22     Q.   Just tell me whatever radiographic

Page 214

1 device or whatever device was there so you
2 knew where you were and how the glue began to
3 go into the fistula.
4     A.   Well, we use the same sort of
5 equipment we use in angioplasties, similar to
6 what cardiologists use in angioplasties or
7 aneurysm repairs.  It's the same equipment
8 which is the angiography unit which has
9 capability of real-time imaging with x-ray and
10 some very sophisticated ways of seeing.  We
11 can potentially take away everything except
12 the embolic material so that it becomes easy
13 for the eye to recognize.
14     So you watch it with that.  It's
15 x-ray equipment on the video camera.  The same
16 machine also takes very high resolution
17 pictures if you want, which is the x-ray
18 equivalent of a digital still camera.  So
19 you've got both.
20     And our machine is kind of special
21 compared to the run-of-the-mill such machine
22 insofar as it's -- well, first, it's very,

Page 215

1 very good resolution and, second, it's got two
2 cameras instead of one.  So you can look from
3 two angles to see where the material is going.
4     Q.   Is there somebody else watching
5 while you're doing the procedure?  In other
6 words --
7     A.   Are you talking in general with
8 me, in general around the country or the world
9 or--
10     Q.   Did you have a practice in '98 to
11 '99 of having anyone else either watch the
12 procedure, be present when you were doing the
13 procedures or having some involvement with
14 seeing what was going on?
15     A.   Well, what I personally do as a
16 routine in embolization procedures of all
17 types, both the AVMs and aneurysms in
18 particular, is I've got all my trusted
19 assistants.  If they've been with me and
20 they're experienced, they're very trusted
21 technologists.
22     And if my physician assistant is

43  (Pages 212 to 215)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 216

1  with me who has done hundreds or thousands of
2  cases both with me and elsewhere. or say the
3  fellow, but whoever is there they're all
4  tasked to watch for certain things and tell me
5  if they see it just in case -- like I said, we
6  have two cameras -- I'm looking up here, down
7  here, up here, something is going on on the
8  one where my head cannot possibly be, they
9  say, "Watch it."
10      It's no different than the
11  passenger in your car looking out there and
12  saying, "Uh, car is running the red light" and
13  you run over it, but I'm still the driver.
14      Q.  Can you tell from anything that
15  you've seen if there was anyone else there at
16  the time or if you can identify that party?
17      MS. HILLS: Objection; calls for
18  speculation.
19      THE WITNESS: It's 1998. You
20  know, I would completely have to speculate.
21  We know Dr. Goldberg consented the patient.
22  Was he in the procedure room or not? I have

Page 217

1  no idea. Who our technologists were at that
2  time, I have no idea.
3      BY MR. NEWMAN:
4      Q.  Does anybody have their hand on
5  the catheter besides yourself?
6      A.  No.
7      Q.  And if there is a withdrawal of
8  the catheter, let's say in this case, after
9  some--
10      A.  Oh.
11      Q.  Go ahead. I want to know who does
12  that.
13      A.  As far as pulling the catheter,
14  it's either somebody who has done it for me
15  before and I trust which could be a
16  technologist or a fellow, sometimes it's me
17  but it's clumsy, so it's a trusted assistant
18  and I'm doing the injection myself, which is
19  the critical part. The pulling is not really
20  all that critical as long as you don't have a
21  lot of reflux around the catheter.
22      And, you know, like I said, we've

Page 218

1  done maybe a thousand of these injections
2  without any -- I only had TruFill. It's even
3  more without any problems with the pulling
4  part. We have a very good process for that.
5      Q.  All right. One last question on
6  this. Was there ever any taping of the
7  procedure on, or any procedures, on Ms. Kerris
8  or videotaping or in any way digitally saving
9  a moving picture of the procedure?
10      A.  We don't have video cameras in the
11  angio labs. There is some VCR type equipment
12  that you could use if you're trying to put a
13  lecture together or something. One of my
14  partners is teaching a course on embolization
15  of uteruses. So he recorded some in that, in
16  our room, and purely for the purpose of
17  teaching. Nobody that I know of at our
18  hospital records procedures.
19      Q.  And certainly, and you know in
20  your own practice you didn't do so back in
21  '98, '99, these types of procedures.
22      A.  There would be no real purpose

Page 219

1  that I can see. These procedures could take
2  hours, and we simply wouldn't have the storage
3  space to save all those VCRs.
4      Q.  All right.
5      VIDEOGRAPHER: The time is now
6  2:37 p.m. We're going off the record, ending
7  Tape No. 2 in the continuing videotaped
8  deposition of Vance E. Watson, M.D.
9      (Recess taken.)
10      VIDEOGRAPHER: The time is 2:48
11  p.m. We're back on the record in the
12  continuing videotaped deposition of Vance E.
13  Watson, M.D., beginning Tape No. 3.
14      BY MR. NEWMAN:
15      Q.  Dr. Watson, before we took that
16  last quick break, I asked you a question as to
17  whether you recalled using a different
18  strength in a subsequent procedure on Karyn
19  Kerris. And you said that it would be
20  guesswork without looking at the record.
21      So I do not have multiple copies
22  of this because I had to pull it out of the

44 (Pages 216 to 219)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1  originals as we spoke, but I'm sure with the
2  only question being raised is on document
3  G-000653, if the word "25 percent" appears at
4  the base of the document, that's all I'm going
5  to ask you about, which appears to be a
6  consultation report of 3/3/99.
7      A.    This, we use the consultation
8  report forms to record the procedures at this
9  time period, it appears.  And the handwriting
10 is not mine but I -- but 25 percent n-BCA is
11 very likely what was used.
12     Q.    Now, my question on that is why
13 switch from 20 to 25 percent?
14     A.    Well, it's a fairly subtle
15 difference in the behavior of the material.
16 And the percentage is picked based upon the
17 downstream anatomy of the AVM.  So in one
18 particular procedure, one particular day, in
19 one pedicle it's very fast, maybe I'd use 50
20 percent.
21         I end up in a deep internidal
22 location where I'd want to penetrate, I'd be

1  using anywhere from 12 and a half to probably
2  30 percent, depending upon what the anatomy in
3  front of me looked like.  So sometimes we end
4  up throwing away a batch, making a new batch
5  for the second pedicle, the second thing we
6  blocked.
7      Q.    Well, Doctor, let me ask you this:
8  Do you know from looking at your records why
9  you changed from 20 to 25 percent?
10     A.    From the record, no, but from my
11 practice it depends what's in front of you.
12 The anatomy in front of me probably looked
13 different.
14     Q.    So I just want to understand your
15 testimony, is that the change was probably a
16 result of the anatomy that you were looking at
17 at the second procedure versus the anatomy at
18 the first procedure.
19         MS. HILLS:  Objection;
20 mischaracterizes testimony.
21         BY MR. NEWMAN:
22     Q.    Actually, I want to know what you

1  mean by that, Doctor.  It seems to be the same
2  patient, the same anatomy.  So I'm kind of
3  asking you why.
4      A.    Well, I guess I need to -- I don't
5  mean to be sounding flippant but I need to
6  educate you as to what anatomy of an AVM is
7  because that was a fairly misinformed
8  statement.  Umm --
9      Q.    Well, please do that.
10         MS. HILLS:  Please do not talk
11 over the witness.
12         MR. NEWMAN:  Counsel, stop this.
13         THE WITNESS:  Most of the time
14 when you embolize a given branch and as you go
15 into an AVM frequently you get more and more
16 and more, not all the time, but more and more
17 feeding branches, so it can be like the
18 anatomy of a tree.  The trunk gives you tubes.
19         If you were to saw off one branch
20 of the tree while you're pruning what you need
21 to do to saw a branch off on the other side of
22 the tree could be quite different.  One could

1  be very small and you could use snips and the
2  other side you might need a chain saw.  So
3  it's a very different approach, depending.
4  It's not the same anatomy.  It's not the same
5  blood vessel.  It's not the same thing
6  downstream.
7          And likely, the thing you blocked
8  off the first time is blocked off.  It's no
9  longer even there.  It's like the tree branch
10 that's gone.  On the other hand, there are
11 occasions where it's not totally blocked off,
12 but what's downstream might be different
13 because it's partially blocked off.  So the
14 choice for each vessel is individual.
15         BY MR. NEWMAN:
16     Q.    Can you tell me right now as we
17 sit here, you under oath, what the difference
18 was?  Not about trees but about this case, why
19 you picked 20 the first procedure and at least
20 at March the 3rd, 25.  What was different in
21 particular?
22         MS. HILLS:  Objection; asked and

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1  answered. Objection; calls for speculation.
2        THE WITNESS: What you do when you
3  make the choice is you inject under
4  fluoroscopy. You may even inject while taking
5  digital pictures. You look at it, you get a
6  feel for how occlusive you are, how much
7  you've slowed the flow down with your
8  catheter, what's in front of me. And out of
9  experience with a lot of injections, you
10  choose the mixture.
11        BY MR. NEWMAN:
12     Q.   Why did you do so in this case?
13  What was the specific anatomy, the specific
14  things you were looking at that made you
15  change the percentage? I need to know.
16        MS. HILLS: Objection; asked and
17  answered, calls for --
18        BY MR. NEWMAN:
19     Q.   Not the general concept, Doctor.
20        MS. HILLS: Objection; asked and
21  answered, calls for speculation.
22        THE WITNESS: Well, I guess I'm

1  going to have to kind of rephrase in order to
2  try to educate again. I said that the flow --
3        BY MR. NEWMAN:
4     Q.   What was the flow then, Doctor?
5     A.   I can't --
6        MS. HILLS: Please do not speak
7  over the witness.
8        BY MR. NEWMAN:
9     Q.   No. I do not want a lecture
10  series, Doctor. I want my answer to my
11  question. Now, what I'm asking you is if you
12  know the specific issues of flow, the specific
13  rates, the specific vessels you were looking
14  at and why you changed it, then tell me. If
15  you don't, I don't want a lecture series about
16  what could be or what generally is.
17        Do you know in this case why you
18  changed from 20 to 25 percent, the specifics?
19  If you don't, I'll move to the next question.
20        MS. HILLS: Objection. A witness
21  will finish his answer as he or she chooses to
22  answer a question. Objection to counsel's

1  interrupting the witness. And also badgering
2  the witness.
3        THE WITNESS: As stated, and I am
4  sorry if I'm not being clear, we look at the
5  flow under fluoroscopy, okay? Which is not on
6  the pictures. The fluoroscopy is real time.
7  We also have some digital pictures. But most
8  of this for choosing an injection rate is a
9  composite of looking at both and heavily,
10  heavily relies on the fluoroscopy for which
11  there is no legacy, there is nothing, it's
12  gone.
13        That was in 1998 and in my head in
14  1998 for however long you can remember it.
15  And since that time I've done hundreds and
16  hundreds of injections.
17        BY MR. NEWMAN:
18     Q.   Now, Doctor, do you recall
19  performing neuropsychological examinations or
20  evaluate having them performed -- strike that.
21  Let me ask you this.
22        Do you recall ordering neuropsych

1  exams on Karyn Kerris before the first
2  embolization and then at the end of the third?
3     A.   I recall asking for neuropsych
4  exams. And I don't specifically recall when
5  they were performed, but I'd have to see the
6  records.
7     Q.   Do you do neuropsychological
8  examinations on all your AVM patients before
9  and after procedures?
10     A.   No.
11        MS. HILLS: Objection;
12  mischaracterizes the testimony.
13        BY MR. NEWMAN:
14     Q.   Why did you do so on Ms. Kerris?
15     A.   Well, because Ms. Kerris came to
16  me with complaints and documentation of, you
17  know, very bad gait, difficulty using her
18  throat, difficulty talking, confusion, not
19  being able to concentrate. So one of the
20  things we could evaluate to make sure we had
21  objective measures to follow should there be
22  any question of is the AVM getting worse and

46 (Pages 224 to 227)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1  continuing to hurt her or, you know, could
2  there be any procedural, would be a neuropsych
3  test.
4         Q.   Did you ever plan to publish
5  anything about Karyn Kerris's treatment of her
6  AVM because of the particular nature of that
7  abnormality?
8         MS. HILLS:  Objection; vague.
9         THE WITNESS:  I don't remember
10  having intent to publish about Karyn.
11         BY MR. NEWMAN:
12         Q.   Is one of the reasons you went and
13  ordered neuropsych tests before and after that
14  if you were successful dealing with this large
15  AVM that you wanted to have documentation for
16  not just potentially literature but for your
17  other brethren in the field to describe what
18  was done and what the results were?
19         MS. HILLS:  Objection; calls for
20  speculation, misstates prior testimony.
21         THE WITNESS:  The idea was not to
22  publish.  We also, if I'm working on the eye,

1  we get formal visual field tests which we
2  don't in a lot of the other patients because
3  one of the benchmarks we're going to be
4  looking for are changes in, say, vision if it
5  was an eye problem.  This was one of her main
6  complaints, and it is one that is difficult to
7  quantify without some formal testing.
8         BY MR. NEWMAN:
9         Q.   Was it your determination at that
10  time before the first procedure in 1998 that
11  to a reasonable degree of medical certainty
12  Karyn Kerris had not bled from her AVM?
13         MS. HILLS:  Objection; overbroad,
14  vague, calls for an expert opinion from a fact
15  witness.
16         THE WITNESS:  So the question was,
17  was I certain she had never bled.  You can
18  never be certain someone hasn't bled,
19  especially a relatively small bleed.  But I
20  had no evidence that she had.
21         BY MR. NEWMAN:
22         Q.   So then your opinion as a treater

1  back in 1998 that more likely than not she had
2  not bled.
3         MS. HILLS:  Objection; misstates
4  prior testimony.
5         THE WITNESS:  In general, there
6  would be evidence -- if the bleed is large
7  there's generally evidence.  I couldn't
8  exclude a small bleed.
9         BY MR. NEWMAN:
10         Q.   In your diagnostic evaluations did
11  you ever come to the conclusion that, in fact,
12  you had documented any small bleed?
13         MS. HILLS:  Objection; calls for
14  speculation.
15         THE WITNESS:  Well, unfortunately,
16  again, I can't answer that.  With a degree of
17  medical certainty, I can say I don't think she
18  had a big bleed.  A very tiny bleed you can
19  never exclude.
20         BY MR. NEWMAN:
21         Q.   Doctor, are you familiar or were
22  you familiar back in 1998 and 1999 with

1  literature that said that treatment of AVMs
2  with embolizations that have not bled are
3  experimental treatments?
4         MS. HILLS:  Objection; calls for
5  speculation, fails to identify the literature,
6  the basis for the question.
7         THE WITNESS:  There were a lot of
8  articles by 1998 on embolization.  The vast
9  majority of them do not say anything about
10  experimentation.  And the vast majority of the
11  practitioners did not consider it
12  experimentation.  They considered it treatment
13  of the patient.
14         BY MR. NEWMAN:
15         Q.   Did you recognize back in 1998 and
16  1999 that very few interventionalists were
17  attempting to embolize AVMs of the size of
18  Karyn Kerris and most rated them as
19  non-operable and non-embolizable?
20         MS. HILLS:  Objection; calls for
21  speculation, assumes facts not in evidence.
22         THE WITNESS:  I would say given a

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 232

1 patient that is having clinical decline in
2 front of you who could follow a course I'd
3 seen before, as I mentioned, who also has very
4 severe headaches -- and I had patients with
5 very large AVMs who got better from that. So
6 we are, you know, we're stumbling, losing
7 control of our throat, we've got severe
8 headaches, we've got rapidly progressive
9 cognitive problems. Reducing the flow within
10 an AVM like that could help those symptoms,
11 and that would be reasonable.
12        BY MR. NEWMAN:
13    Q.   Am I correct though, Doctor, most
14 interventionalists at the time in 1998 and
15 1999 would not have chosen to embolize this
16 lesion even given her symptoms?
17        MS. HILLS: Objection; calls for
18 speculation, asked and answered.
19        THE WITNESS: Yeah, that's
20 complete speculation. The converse of it is
21 that a lot of very large lesions there at
22 Georgetown treated before I got there,

Page 233

1 patients I've seen, and if Ms. Kerris came to
2 me asymptomatic without hemorrhage, I probably
3 would have not treated her.
4        BY MR. NEWMAN:
5    Q.   Doctor, let me ask you: You said
6 that given her symptoms that you believe that
7 reducing the flow could help. What was the
8 likelihood of the procedure you were
9 performing on Karyn Kerris benefiting her,
10 providing her some palliative benefit?
11        MS. HILLS: Objection; calls for
12 speculation.
13        THE WITNESS: I believed we had a
14 chance of being able to help her by decreasing
15 the flow. She has a very, very rare lesion.
16 So there is no way to come up with statistics.
17        BY MR. NEWMAN:
18    Q.   Did you tell her what her chances
19 were of it getting better? In other words,
20 give her any idea?
21    A.   I told her I didn't know. This is
22 a very, very unusual lesion. First, the size

Page 234

1 makes it unusual. And the fact that it is
2 deep is unusual. And the symptoms complex is
3 unusual.
4    Q.   What was the likelihood of her at
5 the time you were first beginning the
6 embologic having some kind of major
7 neurologic compromise from the procedures?
8        MS. HILLS: Objection; calls for
9 speculation.
10        THE WITNESS: That's, again,
11 speculation. Our plan was to stage this, go
12 slowly, look for improvement and when we were
13 at a size we thought we could do radiation, do
14 radiation, which is exactly what we did with a
15 patient I told you we treated after her, in
16 exactly the same fashion with the same
17 symptoms in a wheelchair, drooling, sleeping
18 20 hours a day, who now is almost normal.
19        BY MR. NEWMAN:
20    Q.   Because you said that last part,
21 am I correct that Karyn Kerris was never in a
22 wheelchair and drooling 24 hours a day when

Page 235

1 you saw her before she was treated?
2    A.   Karyn Kerris was walking but
3 unable to continue her daily working. And she
4 was having these terrible headaches, gait
5 problems. She was progressing.
6    Q.   Doctor, what did you tell Karyn
7 Kerris as to the potential benefit of this
8 procedure helping her versus the potential for
9 the complications, severe neurologic
10 complications that may occur from the
11 procedure?
12    A.   I told her her case was very
13 unique, very rare. We don't have any
14 statistics. I personally felt it would be
15 reasonable. I had embolized in the thalamus
16 before without issues and without problems.
17 And, again, I couldn't give her statistics
18 because it's a very, very rare presentation.
19    Q.   You did tell her, did you not,
20 that this was not going to cure her AVM?
21    A.   Yes.
22    Q.   And did you also tell her that it

48  (Pages 232 to 235)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 236

1  was not going to reduce in any manner her
2  chances of future hemorrhage from the AVM?
3      A.   I think what I told her is that
4  this may not reduce the chance of hemorrhage
5  and that it was a controversial issue, and
6  still remains a controversial issue.
7      Q.   Did you tell her that the risks
8  outweighed the benefits, that the potential of
9  multiple embolizations was more likely to give
10 complications to her than palliative benefit?
11      MS. HILLS:  Objection; calls for
12 speculation.
13      THE WITNESS:  If I thought the --
14 and by multiple embolizations, remember,
15 within an embolization you can take out a very
16 large area or very small one.  So ten
17 embolizations with a small amount of material
18 is equal to one embolization with a large
19 amount.  So you can't say multiple
20 embolizations, per se, are bad.  It could be
21 safer.  It could be moving slowly and
22 carefully.

Page 237

1      I believe you just told me that I
2  said to Karyn the risks are greater than the
3  benefits, in which case I wouldn't have done
4  the procedure.
5      BY MR. NEWMAN:
6      Q.   Just so I understand, I am correct
7  that you said to not cure her, it would
8  not reduce her chance of bleed; you don't know
9  whether or not it will help her, but there are
10 complications that could lead to neurologic
11 impairment.  Is that correct?
12      MS. HILLS:  Objection; misstates
13 the doctor's testimony and the documents.
14      THE WITNESS:  Yeah.  That's not
15 what I said.  I said that I don't know, and
16 it's 1998, I don't know whether this would
17 reduce the risk of hemorrhage or not.  There
18 was controversy, different feelings in 1998
19 within the medical community.  And, in fact,
20 that controversy continues.
21      Making a focal deficit better with
22 embolization by making it so that the AVM

Page 238

1  stops stealing blood from the normal brain or
2  -- and that's just a theory of why it does it
3  or that the mass effect is pressing on the
4  normal brain, if you can reduce the flow that
5  can help or change the pressures of the vein
6  so that the normal brain can drain better,
7  whatever, if you can reduce the AVM the focal
8  symptoms can go away.
9      And I've seen this before with
10 other deficits with things like this.  Venous
11 hypertension from intracranial arteriovenous
12 malformations, particularly the dural type, a
13 series had been published earlier in the
14 summer of that year showing, I forget, a
15 significant number of patients with dementia
16 with most of them getting better.
17      There were reasons to have hope.
18 And I told Karyn, "but I can't, I'm unlikely
19 to cure you, and you have to decide whether
20 you want to go forward given what I'm able to
21 teach you about it."  And she was a very
22 strong-willed person who did not want to keep

Page 239

1  declining.
2      BY MR. NEWMAN:
3      Q.   Did you tell her she was likely to
4  die if she did not receive treatment from the
5  AVM?
6      A.   No.  That's not something we tell
7  AVM patients.
8      Q.   We've been through a number of
9  generalities of what would normally be told to
10 a patient.  Do you specifically recall each
11 word or words you said to Karyn Kerris when it
12 comes to the risks, the complications, the
13 benefits, or are you speaking in generalities?
14      MS. HILLS:  Object to
15 mischaracterizing the deponent's statement;
16 misstates prior testimony, and compound.
17      THE WITNESS:  I thought I answered
18 that question with some specificity about what
19 we told Karyn.  And I've also answered the
20 question where I said no, I did not say that
21 to Karyn.  A word by word transcript is
22 something that's not available.

49 (Pages 236 to 239)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 240

BY MR. NEWMAN:

Q.   Did you record anywhere in the
medical record beyond the concept forms that
we've seen where you actually went through
these complications, risks, potential
benefits?  Listing them.

A.   I think on -- you know, we haven't
gone through all the consent forms.  I thought
I remembered somewhere in one of the records,
I don't remember which, these discussions.
But with Karyn I remember the, as is -- I have
a habit of what to say, but with Karyn there
were some very specific and unique things to
discuss with her because it wasn't just a
run-of-the-mill AVM consent.

Q.   Did you ever tell Karyn Kerris
that the devices you were going to inject into
her bloodstream had no FDA approval?

A.   I think what I told her, because
the words are just coming out of my mouth as I
usually say them, I said this, you know, "The
agents we're going to use are not

Page 241

FDA-approved.  And I don't have an
FDA-approved n-BCA available."
        And I have a little kit that I use
to consent patients.  And for the AVM patients
I used to have a little bag of these silastic
beads which I believe were still approved at
the time.  This is a device that you inject it
into the neck and they flew downstream and
hopefully went to the AVM, sometimes did,
sometimes didn't, temporary.
        We also had the polyvinyl alcohol,
little ground up plastic to show the patients,
a variety of different coils, these little,
kind of like thread but manufactured out of
metals.  We had a little vial of pure alcohol
and I think along with the PVA and alcohol
thing, discussed silk sutures.
        Some people just injected silk
suture directly into the brain to block off
the blood vessels.  And I explained to her
that with her anatomy and the fact that most
of these things were temporary, it really

Page 242

wouldn't help her, wouldn't achieve our goal
of trying to decrease the lesion in size and
then treat her with the radiation to make it
even smaller to help her clinical course.

Q.   First of all, I want to be clear.
Did you actually have this little, what you
said, sample pad or bag with these devices in
them back in 1998 that you were showing to the
patients?  Is that correct?

A.   Yes.  I had such a little kit.  I
remember, the reason I know that I showed her
that is when she saw the beads and I explained
the alternatives, she mentioned something
about, "Oh yeah, I understand.  I work at the
NIH."

Q.   Now, let me ask you if I'm
correct, that when you showed her the beads,
the polyvinyl alcohol, little microspheres I
suspect, the coil, the alcohol and the silk
sutures, you said, "These would not work for
you or would be temporary," but your opinion
was the glue would be the correct treatment.

Page 243

A.   In my opinion the glue would be
superior to these alternatives, correct.

Q.   Now, did you ever tell Karyn
Kerris that as a result of the embolizations
she may become non-ambulatory, suffer severe
brain damage?  Did you ever tell her that?

A.   Yeah.

        MS. HILLS:  Objection; assumes
facts not in evidence.

        THE WITNESS:  It would have been
explained to her with an AVM embolization, and
she would have heard it more than once, you
know, paralysis, other stroke symptoms, coma,
death, inability to speak, these are all
symptoms of stroke and stroke is a
complication of AVM embolization and so is
bleeding into the brain potentially.
        It's a little controversial, but
there are sometimes hemorrhages that happen
soon after an embolization and it sometimes
can be perhaps attributed to the embolization.

        BY MR. NEWMAN:

50  (Pages 240 to 243)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 244

```
 1      Q.   Did you tell her that if nothing
 2  was done that she would be nonfunctional and
 3  have neurologic impairment that would not
 4  allow her to perform activities of daily
 5  living?
 6          MS. HILLS:  Objection; calls for
 7  speculation.
 8          THE WITNESS:  No.  I said, "You
 9  seem to be getting worse and you seem to be
10  progressing.  The radiation can take two to
11  three years to work.  So if we're going to do
12  embolization and radiation, we're not going to
13  be able to -- the AVM is not going to be
14  maximally affected for a year or two."  So she
15  had to judge based on how rapidly she was
16  progressing whether she was willing to take
17  these risks.
18          BY MR. NEWMAN:
19      Q.   Did you ever offer to her the
20  choice of having a coil -- you mentioned
21  showing her the coils and the kit.
22      A.   Mmm-hmm.
```

Page 245

```
 1      Q.   Did you ever tell her that the
 2  glue could be used in conjunction with coil?
 3      A.   There are a couple of ways you can
 4  use glue with coil, more than one.  I don't
 5  remember if I discussed using the combination
 6  with her.  But coils can be used in the
 7  arterial side, occasionally on the venous
 8  side.  I think in that, one of the early notes
 9  we said we might think about transvenous
10  coiling.  But in giving it, looking at the
11  anatomy and giving it more thought, and
12  analyzing it, I didn't think that was a good
13  idea.  So we never offered it to her.
14      Q.   Do you remember which discussions
15  you had with Karyn Kerris by herself?  In
16  other words, if you recall discussions without
17  her father, mother or husband?
18      A.   I had one and possibly two
19  conversations with Karyn alone.  And of the
20  one with her alone, the reason I remember is
21  she is one of those patients whom I needed to
22  get a better handle on her cognition, without
```

Page 246

```
 1  coaching and without distraction, to feel that
 2  she could consent for herself.  And I came to
 3  the conclusion that she was competent to
 4  consent for herself.  I can't do that with the
 5  family around.
 6          And the family, particularly the
 7  parents, were deeply involved in her life as
 8  they had been helping her with her Turner's
 9  syndrome which causes decreased IQ.  And
10  they'd coach her and help her deal and do well
11  with this.
12          But because of the nature of the
13  relationship I felt it necessary to talk to
14  Karyn alone so that I could also be sure not
15  only was she competent but she was not being
16  coerced by her family members to go ahead with
17  treatment.
18      Q.   I understand the general concept
19  of why you met with her.  Do you remember the
20  specifics of what you said to discover whether
21  she was cognitively capable of making consent?
22          MS. HILLS:  Objection; asked and
```

Page 247

```
 1  answered.
 2          THE WITNESS:  Well, l told you
 3  what we consented her for and would describe
 4  it, also describe what an AVM is, what an
 5  artery is, what a vein is, and asked her along
 6  the way, as you would with Socratean teaching,
 7  "Did you understand what I said?  Okay?  And
 8  what do you want to" -- eventually -- "what do
 9  you want to do?"
10          BY MR. NEWMAN:
11      Q.   And this is what you said to her
12  in private is the questions that I'm asking.
13  Is that correct?
14      A.   That's what we said in private.
15  And we also had discussions about her problem
16  with parents, and I believe the husband.  I
17  can't remember if they were all together at
18  the same time or not.
19      Q.   All right.  Anything else?  I just
20  really want to make sure I exhaust your memory
21  of what you talked to her in private about
22  besides what we've already said.
```

51 (Pages 244 to 247)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 248

1      A.    Well, we, again, talked about the
2  fact it was very rare, no statistics. "I
3  can't guarantee anything." And, "We may be
4  able to help your symptoms, I don't know." I
5  said, "We're not going to be able to cure you.
6  You're most likely going to require radiation
7  afterwards. There are significant risks,"
8  which we went through. And, again, the reason
9  I had my little kit was to explain, "This is a
10  non-FDA-approved agent that we usually get
11  from Canada. And it's been working well for
12  me, but it's not FDA-approved.
13      When we had an FDA-approved agent,
14  then we just changed the kit because there's
15  no longer a reason to show them some of the
16  other...
17      Q.    Did you ever tell her that if
18  nothing was done to her AVM that she would
19  become mentally incompetent in the future?
20      MS. HILLS:  Objection; asked and
21  answered, calls for speculation.
22      THE WITNESS:  I don't tell

Page 249

1  patients with AVMs certain things. One of
2  them is, "You're going to become incompetent."
3  The other is, "You're going to die." And the
4  other thing I tell them is I don't tell them,
5  "There's a time bomb in your head." Some
6  other physicians do. And it becomes quite
7  difficult when you have these patients when
8  you're trying to tell them, "I'm looking for a
9  more conservative course with you." Well,
10  they've been told this terrible thing, and so
11  I'm very careful not to tell that to the
12  patients.
13      BY MR. NEWMAN:
14      Q.    But did you, in fact, at the time
15  you saw Karyn Kerris in 1998 believe she did
16  have a time bomb in her head but you just
17  didn't want to tell her or did you not believe
18  that she had a time bomb in her head?
19      MS. HILLS:  Objection; calls for
20  speculation.
21      THE WITNESS:  I don't like the
22  word "time bomb." So I wouldn't use it myself

Page 250

1  or not. Could this AVM hemorrhage? The
2  answer is yes. And we had some evidence at
3  the time that deep AVMs were more dangerous.
4  And the size of the AVM, it was controversial
5  whether large is more dangerous than small.
6      I was becoming to believe large is
7  more dangerous. And over the last four or
8  five years it's borne out that deep AVMs were
9  far more dangerous than superficial ones as
10  far as hemorrhage.
11      There is a paper by Dr. Steinberg
12  you have there that says it's a ten percent
13  risk a year for a deep AVM to hemorrhage and
14  result in severe mortality or death. That's
15  much higher than the usual one and a half to
16  two percent we quote for a small superficial
17  lesion. And there's two or three other
18  studies that have shown, again, that the large
19  AVMs are perhaps more dangerous.
20      But at the time in 1998 we didn't
21  know. We just had a feeling or I had a
22  feeling. And I told her it was controversial

Page 251

1  where people say the big ones are less
2  dangerous, the big ones are more dangerous, or
3  it's the same.
4      Again, it's only in subsequent
5  times that we've begun to learn that the big
6  ones really are more dangerous. But I didn't
7  know that in 1998, so I couldn't have told
8  her. But deep lesions in 1998, my feeling was
9  that they were somewhat more dangerous. But I
10  didn't realize in 1998 the full extent. And
11  ten percent a year for a major problem for
12  AVMs in the thalamus and basal ganglia is
13  quite dangerous. When you're a young person
14  it's eventually going to happen.
15      BY MR. NEWMAN:
16      Q.    You do realize that that document
17  that you are referring to by Dr. Steinberg
18  involved patients that had already hemorrhaged
19  when they arrived under the care and the vast
20  majority had bled to begin with and that ten
21  percent is the re-bleed chance?
22      A.    It's the --

52  (Pages 248 to 251)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 252

1    MS. HILLS: Objection.
2        THE WITNESS: There is also a
3    discussion, and, again, we didn't quote ten
4    percent, because it wasn't ten percent. But
5    there is other evidence, looking back, that
6    the deep ones are more dangerous. So that's
7    my simple statement. The deep ones are more
8    dangerous. We had a feeling but I couldn't
9    strongly tell her that, in 1998. And the size
10   thing, what I told her is I had no idea, that
11   it was controversial and the size thing has
12   shown to be more dangerous, too.
13       BY MR. NEWMAN:
14   Q.  Doctor, I'm going to ask you a
15   question. I have not been able to get by the
16   time this deposition was taken an actual
17   1998-1999 IRB policy and procedures manual. I
18   do have a 2003. And I know that you've been
19   on the IRB at least for quite sometime. And
20   I'm going to give you the entire manual, not
21   that you need to look at it, but it's there in
22   case you have any questions on what I'm

Page 253

1    referring to. And it's Page 13-4.
2        And what I am looking at is if you
3    recall, because we will later get it, that in
4    fact H on Page 13-4, which is the section
5    called "Off-Label" -- quote -- "Unapproved use
6    of FDA-regulated products in medical practice
7    versus research," there is a comment that
8    says, "Good medical practice and the best
9    interests of the patient require that
10   physicians use legally available marketed
11   drugs, biologics and devices according to
12   their best knowledge and judgment."
13       First of all, do you agree with
14   that statement?
15       MS. HILLS: Objection as stated;
16   irrelevant document from this time period and
17   taken out of context.
18       BY MR. NEWMAN:
19   Q.  Doctor, first of all, do you agree
20   with that statement regardless of what year
21   that was written?
22   A.  I feel it's being used out of

Page 254

1    context. What this is saying is if for the
2    treatment of a certain disease you have a --
3    well, it doesn't even say "approved." It just
4    says "legally available." But if you have a
5    legally available agent, you should use it.
6    Q.  Doctor, you do realize that
7    Histoacryl was not legally available in the
8    United States.
9        MS. HILLS: Objection; assumes
10   facts not in evidence and mischaracterizes the
11   state of facts.
12       THE WITNESS: Well, this statement
13   does not -- first, this is not from that time
14   era. It says "legally available." It doesn't
15   say United States. And we didn't have a
16   legally available agent, which is the reason
17   why we used n-BCA Histoacryl. When we had a
18   legally or a FDA-approved device, TruFill, we
19   switched to that because that understanding is
20   how it should be distributed.
21       BY MR. NEWMAN:
22   Q.  Doctor, you chuckled when you said

Page 255

1    this is the wrong year. Let me ask you a
2    question. Are you so sure that this is an
3    exact duplicate of the 1998-1999 IRB policies
4    and procedures and that Section H doesn't read
5    exactly the same back then as it does in 2003?
6    Do you know it didn't?
7        MS. HILLS: Objection; calls for
8    speculation and mischaracterizes both the
9    doctor's demeanor and badgers the witness.
10       BY MR. NEWMAN:
11   Q.  Do you know if there is any
12   difference in the two versions, Doctor?
13       MS. HILLS: Same objections.
14       THE WITNESS: I know I didn't
15   chuckle. I know the way I handled the IRB
16   question is as I explained earlier. I asked
17   the counsel of the IRB, "Do I need an IRB,"
18   was told no.
19       BY MR. NEWMAN:
20   Q.  Doctor, you asked because you
21   weren't sure and you thought this may require
22   an IRB approval. Correct?

53  (Pages 252 to 255)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

1      MS. HILLS:  Objection; assumes
2  facts not in evidence; misstates the doctor's
3  prior testimony, and calls for speculation.
4      THE WITNESS:  As I said before,
5  somebody else, and I don't remember who said,
6  "Maybe you should check with the IRB."  And I
7  asked an IRB member.  I don't even remember
8  who that would be now.  And they said, "Well,
9  the appropriate person is university counsel
10  on the IRB," which makes perfect sense.  And
11  that's who told me.  And I'm glad you gave me
12  the whole document.  On 13-5, Off Label Use --
13  oh, that's a marketed product.
14      MR. NEWMAN:  Counsel, do not lead
15  a witness by pointing to a term on the paper.
16  That is at best reprehensible conduct.
17      MS. HILLS:  Object to sidebar.
18  And since you have not provided counsel, as
19  was requested, a copy of the entire document,
20  it is completely appropriate to point out to
21  the doctor that the page of the document you
22  have given him is not only in the middle of a

1  section but it's in the middle of a
2  overwidened division of the document.  And
3  that's inappropriate, Counsel.
4      THE WITNESS:  Well, this is a
5  fairly -- I haven't had time to review this.
6  It is in legalese.  It's not the right year.
7  And I just stand by the fact, and I think this
8  works in a lot of other fields, if you have a
9  question like this you ask or you can ask your
10  counsel and take your counsel's advice.  And
11  that's what I did, which I thought was
12  prudent.
13      BY MR. NEWMAN:
14      Q.  Right.  This was Sheila Zimmet
15  that we discussed earlier.
16      A.  Yes.
17      Q.  Now, Doctor, was the use of
18  Histocryl or Histoacryl, or whatever you wish
19  to call it, at the time, did it go through the
20  Duke IRB when it was used or did it go through
21  the UCLA IRB when it was used?
22      MS. HILLS:  Objection; compound.

1  Objection; calls for speculation.
2      THE WITNESS:  Well, the IRB
3  requirement is if you are doing
4  experimentation.  I wasn't doing
5  experimentation.  I don't need it.  I don't
6  know whether they were doing experimentation
7  at those institutions and when.  I do know the
8  only time I've used n-BCA experimentally at
9  Georgetown, we went through the IRB because we
10  were experimenting.
11      One patient gets one drug, the
12  other patient gets the other.  The intent was
13  more than treatment.  It was to experiment and
14  provide proof that a drug should be approved
15  by the FDA for marketing.  That's an
16  experiment.
17      BY MR. NEWMAN:
18      Q.  Now, you used the word "drug."
19  But did you say that there was actually a time
20  that you had a protocol through the IRB for
21  n-BCA?
22      MS. HILLS:  Objection; misstates

1  testimony.
2      MR. NEWMAN:  It's not.  It's a
3  question.
4      BY MR. NEWMAN:
5      Q.  Did you use the word "drug"?  And
6  we're talking about device.  I want to know if
7  there is a difference.
8      THE WITNESS:  I'm getting tired.
9  There are IRBs on drugs.  There are IRBs on
10  devices.  As I think you saw on my CV, I did a
11  research study years later with n-BCA versus
12  Onyx, ethyl vinyl alcohol, sponsored by a
13  manufacturer for the purpose of doing an
14  experiment to get their drug approved.  And
15  that's why it goes through the IRB.  I did not
16  have the ability to use in that trial whatever
17  agent I wanted.
18      So it's an experiment.  I commit
19  and start with one thing.  I have to stick
20  with that, with all its risks and benefits and
21  unknowns.  That's an experiment.  We were
22  treating patients with n-BCA Histocryl, not

54 (Pages 256 to 259)

ac43ba7e-04fa-4050-a5dd-39fa07e6f023

Page 260

1  experimenting.
2      BY MR. NEWMAN:
3      Q.    Who was the interventional
4  neuroradiologist that developed Onyx?
5      MS. HILLS:  Objection; calls for
6  speculation.
7      BY MR. NEWMAN:
8      Q.    No, it doesn't, does it, Doctor?
9  He's on the West Coast.  Do you know who he
10  is?
11      MS. HILLS:  He's not at
12  Georgetown.  Calls for speculation.
13      THE WITNESS:  No I don't.
14      BY MR. NEWMAN:
15      Q.    Were you in any way involved with
16  preliminary studies on Onyx when it was done
17  in his garage?  Do you remember any of this,
18  Doctor?
19      A.    In a garage.
20      Q.    I have his testimony, Doctor.  Do
21  you know anything about the creation of Onyx?
22      MS. HILLS:  Objection; vague.

Page 261

1      BY MR. NEWMAN:
2      Q.    Who --
3      MS. HILLS:  Objection; overbroad.
4  Do not speak over my objection, Counsel.
5  Objection; badgering the witness.  Do not
6  threaten another witness with testimony from
7  another case unless you intend to produce that
8  testimony.
9      MR. NEWMAN:  Counsel, you should
10  apologize for that raising voice.  That's
11  outrageous.
12      BY MR. NEWMAN:
13      Q.    Now, Doctor --
14      MS. HILLS:  Object to sidebar.
15      BY MR. NEWMAN:
16      Q.    -- I only want to know if you know
17  anything about who developed Onyx.
18      MS. HILLS:  Objection; overbroad
19  and irrelevant.
20      THE WITNESS:  By the time I was
21  involved with Onyx with this trial I was
22  meeting with engineers.  I thought they

Page 262

1  developed it.  I don't see what the relevance
2  is.
3      BY MR. NEWMAN:
4      Q.    Is the benefit of Onyx in use is
5  that it does not break up into little droplets
6  like n-BCA?  In fact, it stays kind of sticky
7  and remains cohesive when it's embolizing an
8  area.
9      MS. HILLS:  Objection; calls for
10  speculation.  Objection; irrelevant.
11      THE WITNESS:  I wouldn't say
12  that's the main benefit.  And as you see in my
13  CV, I've proctored and taught Onyx injection
14  in many, many, many hospitals and
15  universities.  And, you know, Onyx has several
16  characteristics, like one, it's non-adhesive.
17  It doesn't stick to a catheter.  What you
18  said, and you can manipulate it to go to
19  different parts of the AVM easier.  But I
20  don't see, that was not available.  I don't...
21      BY MR. NEWMAN:
22      Q.    Do you actually know when the

Page 263

1  first five 10-K was asked for for Onyx?
2      MS. HILLS:  Objection; calls for
3  speculation.
4      BY MR. NEWMAN:
5      Q.    If you don't know, just tell me.
6      A.    I don't know.
7      Q.    Do you have any financial stake in
8  the outcome of Onyx?  Do you make any money
9  off the product sales?
10      MS. HILLS:  Objection; irrelevant
11  and vague and ambiguous.
12      THE WITNESS:  Do I have equity
13  interest, stock options, anything like that?
14  No, I do not.
15      BY MR. NEWMAN:
16      Q.    Doctor, who is Leonard -- and I
17  don't know if I can pronounce it correctly,
18  but he was on the IRB -- Chiazze?
19  C-h-i-a-z-z-e.
20      A.    I don't know.
21      Q.    How long have you been on the IRB
22  at Georgetown?

55 (Pages 260 to 263)