UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


------------------------x

                        :

FELICE I. IACANGELO,    :

et al.                  :

                        :

        Plaintiffs    :

                        : Case No.

   vs.               : 1:05CV02086

                        : Judge Friedman

GEORGETOWN UNIVERSITY,    :

t/a Georgetown University :

Hospital, et al.        :

                        :

        Defendants    :

                        :

------------------------x


Washington, D.C.

July 23, 2007

Videotaped Deposition of:

SHEILA COHEN ZIMMET, ESQ.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the Law

Offices of Williams & Connolly, 725 12th

Street, N.W., Washington, D.C., beginning at

1:28 p.m., before Zev V. Feder, CSR, a Notary

Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

Page 2

1
2  On behalf of the Plaintiffs:
3  Newman, McIntosh & Hennessey
3  By: ANTHONY G. NEWMAN, ESQ.
4      7315 Wisconsin Avenue, Suite 700E
4      Bethesda, Maryland 20814
5      (301) 654-3400
5
6      - and -
6
7  Joseph, Greenwald & Laake
7  By: ANDREW E. GREENWALD, ESQ.
8      6404 Ivy Lane, Suite 400
8      Greenbelt, Maryland 20770
9      (301) 220-2200
9
10
10 On behalf of the Defendants:
11
11 Williams & Connolly
12 By: MEGAN E. HILLS, ESQ.
12 By: NICOLAS MUZIN, Esq.
13     725 12th Street, N.W.
13     Washington, D.C. 20005
14     (202) 434-5393
14
15     - and -
15
16 By: PAUL S. GRECO, ESQ.
16     Office of General Counsel
17     Georgetown University
17     202 Healy Hall
18     37th and O Streets, N.W.
18     Washington, D.C. 20057
19     (202) 687-2835
19
20 On behalf of Dr. Watson:
21 By: GEORGE R. CLARK, ESQ.
21     910 17th Street, N.W., Suite 800
22     Washington, D.C. 20006
22     (202) 331-3200

Page 3

1
2  Also Present:
3      Kenyan Hopchas, Videographer
4          +++
5
6          C O N T E N T S
7  WITNESS: SHEILA COHEN ZIMMET, ESQ.
8  EXAMINATION BY:              PAGE
9  MR. NEWMAN                    5
10 MR. CLARK                    130
11 MS. HILLS                     -
12
13          EXHIBITS
14 DEPOSITION NO.    MARKED FOR IDENTIFICATION
15  1. Resume              11
16  2. "Detentions for OASIS for Canada    27
17  3. "Violation Code translation"    28
17
18
19
20
21
22

Page 4

1
2          P R O C E E D I N G S
3      VIDEOGRAPHER:  This is the
4  videotaped deposition of Sheila Cohen Zimmet,
5  Esquire, taken by the Plaintiffs, in the
6  matter of Felice I. Iacangelo, et al. versus
7  Georgetown University, et al., Defendants, in
8  the United States District Court for the
9  District of Columbia, Case Number 1:05CV0286.
10 The videotaped deposition is being taken at
11 the location of Williams & Connolly, 725 12th
12 Street, N.W., Washington D.C. 20005.  Today is
13 Monday, June 23, 2007.  Excuse me, today is
14 Monday, July 23, 2007, at the time indicated
15 on the video screen of 1:33 p.m.  The
16 certified shorthand reporter is Zev Feder from
17 the firm of Feder Reporting.  The certified
18 legal-video specialist is Kenyan C. Hopchas,
19 also in association with Feder Reporting, 810
20 Capitol Square Place, S.W., Washington, D.C.
21 20024.
22      Would counsel please identify

Page 5

1  themselves for the record and the party or
2  parties whom they represent, beginning with
3  Plaintiff's counsel first, please.
4      MR. NEWMAN:  Anthony Newman and
5  Andrew Greenwald on behalf of the Plaintiff.
6      MS. HILLS:  Megan Hills and
7  Nicolas Muzin on behalf of Defendants.
8      MR. GRECO:  Paul Greco, Georgetown
9  University.
10     MR. CLARK:  George Clark,
11 independent conflicts counsel for Defendant
12 Dr. Watson.
13     VIDEOGRAPHER:  Would the court
14 reporter please swear the witness?
15 Whereupon,
16     SHEILA COHEN ZIMMET, ESQ.
17 was called for examination by counsel and,
18 having been duly sworn by the Notary, was
19 examined and testified as follows:
20 EXAMINATION BY COUNSEL FOR PLAINTIFFS
21     BY MR. NEWMAN:
22     Q.   State your full name for the

2 (Pages 2 to 5)

Page 6

1  record.
2     A.   Sheila Cohen Zimmet.
3     Q.   Ms. Zimmet, are you here
4  represented by counsel?
5     A.   Yes.
6     Q.   Who is that person?
7     A.   Ms. Hills and Mr. Muzin and
8  Mr. Greco.
9     Q.   Were you made aware of the court
10 ruling which stated, and I quote, by Judge
11 Friedman in this case, I am ruling that you,
12 Ms. Hills -- Mr. Muzin was there, as well --
13 that you cannot represent Sheila Zimmet at her
14 deposition?
15        Were you made aware of that?  I
16 have the quote here.
17        MS. HILLS:  Objection.  There was
18 a written court order, which I will get,
19 superseding whatever the judge said from the
20 bench from that transcript.  You will see from
21 that order that it does not state that
22 Ms. Zimmet may not be represented by me.

Page 7

1  Counsel, please do not quote from a transcript
2  when there is a subsequent written court order
3  which carries the force of what the judge
4  ordered.  And do not misrepresent the judge's
5  order.  If you would like I will go off the
6  record and obtain the judge's subsequent order
7  such that you may contemplate it.
8        MR. NEWMAN:  Do so, because you
9  are wrong.
10        MS. HILLS:  Off the record.
11        VIDEOGRAPHER:  The time is 1:35
12 p.m.  We are going off the record.
13        (A recess was taken.)
14        VIDEOGRAPHER:  We are back on the
15 record at 1:41 p.m.
16        MS. HILLS:  After the allegation
17 was raised by Mr. Newman for the inexplicable
18 reason of presumptively delaying this
19 deposition --
20        MR. NEWMAN:  Objection.  State
21 your --
22        MS. HILLS:  The court order is

Page 8

1  dated June 27, 2007, and directing Plaintiff's
2  counsel to page 2, states "The Court also
3  ruled at the status conference that Ms. Zimmet
4  is entitled to separate and independent
5  counsel for purposes of her deposition,"
6  closed quote.
7        The Court did not say she had to
8  have separate counsel.  Nor, if you turn to
9  the fourth page, under what the Court actually
10 ordered, does it order either that present
11 counsel may not represent Ms. Zimmet, nor does
12 it say that she may not be represented by me.
13 It merely states the obvious, that she is
14 entitled to separate counsel and is entitled
15 to make the determination as any individual is
16 as to who she wants to represent her.
17        So, Mr. Newman, please proceed
18 with your deposition.
19        MR. NEWMAN:  I will put on the
20 record that you told us that you were going to
21 get the order to show that it superseded not
22 only the following words, but let me give you

Page 9

1  the words before that, by Judge Friedman.
2  "Why don't you get Sheila Zimmet a lawyer and
3  let's go forward with her deposition."  The
4  court then said, "I am ruling you cannot
5  represent Sheila Zimmet at her deposition.
6  What you have now showed to me is confirmatory
7  of that fact by, A, stating Ms. Zimmet is
8  entitled to separate and independent counsel
9  for the purposes of her deposition."  And then
10 the Court says, "According to defendant's
11 counsel, independent counsel and preparing
12 Ms. Zimmet for her deposition.." -- "obtaining
13 independent counsel and preparing Ms. Zimmet
14 for her deposition..." --
15        MS. HILLS:  Objection.  You are
16 not reading the whole sentence.  It says --
17        MR. NEWMAN:  Counsel, I will walk
18 out if you don't keep your voice down.
19        MS. WYETH:  The Court also ruled
20 at the status conference that Ms. Zimmet is
21 entitled to separate and independent counsel
22 for purposes of deposition.  Sir, if you do

3 (Pages 6 to 9)

Page 10

1  not wish to continue this deposition, you are
2  free, as always, not to continue it.
3  Otherwise, please proceed with your questions.
4  If you do not wish to proceed with the
5  deposition, you do not -- you noticed it, you
6  received our objections in response.  You knew
7  perfectly well who was representing Ms. Zimmet
8  at this deposition.  To spring it on us on the
9  day of the deposition presumptively for some
10  strategical advantage is not only unseemly, it
11  is inappropriate.  If you wish to proceed,
12  proceed.  If you don't, then you can go to the
13  Court and explain why you didn't proceed.
14          MR. NEWMAN:  If you don't
15  apologize for the way you acted on camera now,
16  I will go to other authorities on the subject.
17  You must behave with some sense of decorum.
18  You interrupted my comments and you screamed.
19  Please, counsel, don't do that.  It is now on
20  the record in full volume.
21          BY MR. NEWMAN:
22      Q.   The point of the matter,

Page 11

1  Ms. Zimmet, if I may, were you made aware that
2  the court said you could have your own
3  counsel?  Were you made aware that the
4  defense -- that there was an order that said,
5  according to defendant's counsel, obtaining
6  counsel and preparing Ms. Zimmet for
7  deposition will take about two weeks.  Were
8  you made aware of any of those things?
9      A.   I am aware I had that choice.
10      Q.   Are you, as you sit here today,
11  waiving the right to have independent counsel?
12      A.   Yes.
13      Q.   Now, before the deposition I was
14  given a copy of your CV or what purports to be
15  your curriculum vitae.  It is a two-page
16  document.
17          You can mark it as Exhibit 1.
18          Is that in fact your CV?
19      A.   (Pause).  Yes.
20          (Document referred to marked
21  Deposition Exhibit No. 1 for identification
22  and subsequently attached to the deposition.)

Page 12

1          BY MR. NEWMAN:
2      Q.   It was a little unclear.  Did you
3  actually just recently prepare this document
4  or have you had a CV prior to my request for
5  one?
6          MS. HILLS:  Objection.  Do you
7  have a copy for the witness and for counsel at
8  the same time?
9          MR. NEWMAN:  No.  I have one copy.
10  It is her CV.  You gave it to me.  Now, I am
11  just asking her if she prepared it before the
12  deposition requested one or is that a document
13  just prepared, the nature of this depo.
14          MS. HILLS:  I ask you to let the
15  witness have the document at the same time she
16  has -- you ask the question.  She now has it.
17          THE WITNESS:  It previously
18  existed.
19          BY MR. NEWMAN:
20      Q.   And is it correct --
21      A.   Yes.
22      Q.   -- as you see it?

Page 13

1          Presently are you an employee of
2  Georgetown University?
3      A.   Yes.
4      Q.   Is your position Associate Vice
5  President for Regulatory Affairs?
6      A.   Yes.
7      Q.   At the time in question, at least
8  during this time, that is, 1998 to 1999, were
9  you employed by George Washington University?
10      A.   No.
11      Q.   At that time where were you
12  employed?
13      A.   Georgetown University.
14      Q.   Sorry.  Let me ask you this.
15      A.   Is that a test?
16      Q.   No, that was an inadvertent
17  comment by counsel.  But if you had answered
18  differently, it wouldn't have made a
19  difference.
20          Let me ask you this.  At that time
21  in 1998 and 1999, what was your position as an
22  employee of Georgetown?

4 (Pages 10 to 13)

Page 14

1          MS. HILLS:  For the record, since
2    counsel is asking about the CV, I am going to
3    provide the witness with my own copy.  And if
4    there are going to be further questions on
5    different documents, I ask at a break that you
6    provide me with them such that I can make
7    copies such that the deposition may be run as
8    an examination in court where all counsel have
9    copies of the documents.
10          MR. NEWMAN:  Counsel, it is a CV
11   that you gave to me.  Please.
12          BY MR. NEWMAN:
13     Q.    My only question, if I may
14   rephrase it, was at that time in 1998 to 1999,
15   the issue in this case up to March 3, 1999,
16   what was your position at Georgetown?
17     A.    Senior Associate Medical Center
18   Counsel.
19     Q.    What does that mean?  Go ahead,
20   tell me what that means.
21     A.    I was employed in the Medical
22   Center Counsel's Office to render general

Page 15

1    legal advice on matters that came to my
2    attention or were brought to my attention.
3      Q.    Did that general medical advice
4    include the decision as to whether certain
5    devices could be used at the institution?
6          MS. HILLS:  Objection.
7          I instruct you not to answer.
8    Attorney-client privilege on behalf of the
9    corporation.
10          BY MR. NEWMAN:
11     Q.    Now, Ms. Zimmet, I understood that
12   you waived the right to counsel.  Do you
13   understand that you are not bound by this
14   counsel if you wish to answer that question,
15   assuming that the court intended you to have
16   private counsel?
17     A.    I claim the privilege.
18     Q.    Let me ask you some broad
19   questions to save us a little bit of time.
20          As far as discussions that you had
21   with Vance Watson, M.D. regarding his use of
22   Histoacryl or Lipiodol, are you going to

Page 16

1    answer questions regarding that subject or are
2    you going to claim a privilege?
3          MS. HILLS:  Objection.  Vague.
4          BY MR. NEWMAN:
5      Q.    Let me make it easier then.  Do
6    you remember any conversations you had with
7    Vance Watson M.D. regarding Lipiodol or
8    Histoacryl?
9      A.    Not those terms.
10     Q.    What terms do you recall
11   discussing that are similar to those two
12   issues that I discussed?
13          MS. HILLS:  Objection.  Vague.
14          BY MR. NEWMAN:
15     Q.    You said not those terms.  What
16   did you mean?
17     A.    Those are not terms I was familiar
18   with until I saw your document request.  Or,
19   perhaps, immediately before that.  Those are
20   not terms I am or was aware of.
21     Q.    Am I then correct that to the time
22   of my document request in this case you had

Page 17

1    never heard the term Histoacryl or Lipiodol?
2      A.    I have no recollection of having
3    heard those terms.
4      Q.    Is there anything that you would
5    have in the way of a document that would
6    refresh your recollection as to whether you
7    have heard of Histoacryl or Lipiodol?
8          MS. HILLS:  Other than to the
9    extent it intrudes upon the attorney-client
10   privilege between yourself and the corporation
11   and your own work-product doctrine privilege,
12   or any other applicable privilege.
13          THE WITNESS:  I have done a
14   document search.  I find nothing filed, no
15   files, nothing related to those terms.
16          BY MR. NEWMAN:
17     Q.    Now before we have to go through
18   an issue with the Court one way or the other,
19   do I understand that you made a search
20   regardless of whether it could potentially
21   have a privilege or not, and have not come
22   across any documents regarding Histoacryl or

Page 18

1  Lipiodol?
2      A.   That's correct.
3      Q.   Am I correct that if that subject
4  had been at one time or another addressed to
5  you as to potentially its legality or its
6  requirement to go through IRB procedures, you
7  would have made some kind of document to
8  support the discussion?
9          MS. HILLS:  Objection.  Calls for
10 speculation, vague, and assumes facts not in
11 evidence.
12         THE WITNESS:  I remember no
13 conversation.  I have no recollection of ever
14 having heard those terms.  If I had heard
15 those terms, would I have written it down?
16 Perhaps.  I can't say.  It depends on the
17 context.  I don't know.
18         BY MR. NEWMAN:
19     Q.   Do you have any recollection of
20 doing any research or any kind of evaluation
21 through the FDA documents, IRB documents, or
22 any other document you were involved with

Page 19

1  involving Histoacryl or Lipiodol prior to my
2  request?
3          MS. HILLS:  Objection.  I instruct
4  you not to answer in terms of questions
5  regarding research into the legality of a
6  particular issue.  It falls squarely within
7  the corporation's attorney-client privilege
8  and your own work-product privilege.
9          THE WITNESS:  The question goes to
10 prior to your document request?
11         BY MR. NEWMAN:
12     Q.   Correct.
13     A.   No.  I did not do such a search.
14 I mean, I know there was a document request to
15 me, a document request to the University.  One
16 or the other.  Any search that was done was
17 pursuant to your request.
18         BY MR. NEWMAN:
19     Q.   And not before that, by your
20 recollection?
21     A.   To my knowledge, yes.
22         MS. HILLS:  Let me just clarify.

Page 20

1  If you would read it back.  I thought your
2  first question was research.
3          Did he say search or research?
4          (The pending question was read by
5  the reporter.)
6          MS. HILLS:  My instruction not to
7  answer went to whether you did any research.
8  I believe Ms. Zimmet answered in terms of
9  whether she did a search.  Just to clarify
10 both the question and the answer, and the
11 objection.
12         BY MR. NEWMAN:
13     Q.   Ms. Zimmet, to your recollection,
14 so, again, it saves us a lot of time and
15 effort, did you do any kind of even legal
16 research involving Histoacryl or Lipiodol at
17 any time prior to my involvement in this case?
18         MS. HILLS:  Objection.  I instruct
19 you not to answer in terms of your work
20 product doctrine privilege, and also the
21 attorney-client privilege on behalf of the
22 corporation.

Page 21

1          THE WITNESS:  I assert the
2  privilege.
3          BY MR. NEWMAN:
4      Q.   Ms. Zimmet, therefore -- and you
5  are allowed to answer this even with a
6  privilege -- there are such documents?
7          MS. HILLS:  Objection.  Assumes
8  facts not in evidence.
9          BY MR. NEWMAN:
10     Q.   You asserted a privilege as to
11 documents.
12         Let me do it this way.  Did you
13 create any documents, privileged or otherwise,
14 involving the legality of Histoacryl or
15 Lipiodol in your time at Georgetown prior to
16 the point in which I sent the notice?
17     A.   No.
18     Q.   As far as research on the legality
19 of devices, who would do that back in 1998,
20 1999 or 1997 at Georgetown?
21         MS. HILLS:  Let me instruct you
22 not to answer insofar as your answer includes

Page 22

1   the attorney-client privilege by a lawyer or
2   the work-product doctrine of a lawyer.
3   However, if you can answer the question
4   outside of those strictures in terms of who
5   would do, please do.
6           And I also lodge an objection as
7   it assumes facts not in evidence.
8           THE WITNESS:  I don't understand
9   the question.
10          BY MR. NEWMAN:
11      Q.   If there was a question that came
12  to the legal department or to you in the IRB
13  capacity about a device, and let's be
14  specific, about an adulterated device that was
15  going to be used at your institution, who
16  would be the one who would do the research,
17  determine if it could be used, or produce any
18  documents regarding that subject?
19          MS. HILLS:  Objection.  Again,
20  because it was directed as a question that was
21  presented to the legal office, to the extent
22  this invades attorney-client privilege or a

Page 23

1   work-product doctrine privilege, I instruct
2   you not to answer.  However, if you can answer
3   the question outside of those parameters, you
4   may answer.
5           I also lodge the objection that it
6   assumes facts not in evidence.
7           THE WITNESS:  To the extent you
8   are asking a question about an issue coming to
9   the legal office and someone making a
10  determination that a legal question or problem
11  exists that requires to be researched,
12  investigated, I am going to claim the
13  privilege on it.
14          BY MR. NEWMAN:
15      Q.   All right.  We will get to that in
16  a minute.
17          As to the other aspect of my
18  question, with regard to the IRB, for example,
19  who would do that research or who would do
20  that inquiry?
21      A.   State the question with respect to
22  the IRB.  I don't --

Page 24

1       Q.   All right.  Assuming there is to
2   be an adulterated device used at Georgetown,
3   and there was any kind of IRB member who would
4   be raising the issue to the IRB, who would do
5   the research into whether the device is
6   adulterated, what terms it could be used
7   under, or what the requirements are?
8           MS. HILLS:  Objection.  Vague.
9   Ambiguous.  Assumes facts not in evidence.
10          And, again, to the extent you can
11  answer the question without intruding upon any
12  privileges, please do so.
13          Also, calls for speculation.
14          THE WITNESS:  Please clarify, used
15  in what context?
16          BY MR. NEWMAN:
17      Q.   Let me make it easy.  If there is
18  a problem and somebody wants to know could we
19  use an adulterated device, and they go to the
20  IRB, who do they talk to and who does the
21  research to see if they can use it?
22          MS. HILLS:  Objection.  Calls for

Page 25

1   speculation.  Assumes facts not in evidence.
2           THE WITNESS:  Please tell me, use
3   in what context?
4           BY MR. NEWMAN:
5       Q.   All right.  Let's take it one step
6   at a time.  Are you aware that Histoacryl was
7   adulterated, was an adulterated device and
8   found to be so by the FDA?
9           MS. HILLS:  Objection.  Assumes
10  facts not in evidence.  Misstates a legal
11  premise.  And is overbroad as there is no time
12  frame attached to the question.
13          BY MR. NEWMAN:
14      Q.   Are you aware that it was an
15  adulterated device in 1998 and 1999 when it
16  was Histoacryl used in Karyn Kerris?
17          MS. WYETH:  Objection.  Misstates
18  legal terminology.  Assumes facts not in
19  evidence.
20          BY MR. NEWMAN:
21      Q.   Were you aware of that?
22          MS. HILLS:  Same objection.

7 (Pages 22 to 25)

1          THE WITNESS:  I had never heard of
2  Histoacryl or Lipiodol in 1998 or 1999.  I
3  would have no knowledge of that.
4          BY MR. NEWMAN:
5      Q.    Have you ever seen, since counsel
6  wishes to raise this, and I will make it on
7  the record, have you ever seen Detentions from
8  Oasis, those documents?  Have you ever seen
9  things like that?  And I will give everybody
10  one in a minute.  My first question is have
11  you ever seen Detentions from Oasis documents?
12          MS. HILLS:  Objection.  Let the
13  witness see the document if you are asking her
14  if she has ever seen it.
15          BY MR. NEWMAN:
16      Q.    Not it.  Oasis Detention
17  Documents, are you aware of those?
18      A.    I would like to see the document.
19      Q.    All right.  That's not the only
20  one.  There are hundreds of them.  My question
21  is, as a lawyer and a member of the IRB, are
22  you aware that Oasis creates detention

1  documents.
2          Counsel, I will give you one in a
3  moment.
4          MS. HILLS:  I would like to see it
5  as the witness does.
6          MR. NEWMAN:  There it is.
7          BY MR. NEWMAN:
8      Q.    I am not asking about that
9  document, for the last time.  I am asking,
10  Ms. Zimmet, are you aware that there are
11  detentions for Oasis that are produced by the
12  FDA?  Do you know anything about that?
13      A.    I am not familiar with a document
14  called a detention document.
15      Q.    Fair enough.  I will put in front
16  of you, which we will mark as Exhibit 2 -- put
17  a sticker on hers.
18          (Document referred to marked
19  Deposition Exhibit No. 2 for identification
20  and subsequently attached to the deposition.)
21          BY MR. NEWMAN:
22      Q.    If you turn to the second page,

1  and there are other references but the second
2  page will be sufficient.  There is a reference
3  to Yocan Medical Systems.  And across on the
4  right-hand side, "No PMA."  Do you see that?
5  That is the third one down.
6      A.    Yes.
7      Q.    All right.  And I understand you
8  don't know much about that.  Let me show you
9  this.
10          MR. NEWMAN:  Mark this as Exhibit
11  2.  I sorry, Exhibit 3.
12          (Document referred to marked
13  Deposition Exhibit No. 3 for identification
14  and subsequently attached to the deposition.)
15          MS. HILLS:  Do you have a copy for
16  counsel?
17          MR. NEWMAN:  I do.  I am just
18  marking it and I will give you a copy.
19          MS. HILLS:  Thank you.
20          BY MR. NEWMAN:
21      Q.    Let me ask you if you have ever,
22  in your practice as a Vice President of

1  Regulatory Affairs, as a Director of Research
2  Assurance and Compliance, as an Associate
3  Medical Center Counsel, as an instructor in
4  legal and ethical issues, if you have ever
5  seen the violation code translation by the
6  FDA?
7      A.    No, I have not.
8      Q.    Now, I am going to ask you,
9  although this will take a little bit of effort
10  on paging -- it is not numbered.  It is the
11  ninth page.  Three from the bottom.  And I am
12  going to tell you what it just says, and if
13  you can find it.
14          It describes what we just saw.  No
15  PMA.  Do you see that?
16          This is the page.  Maybe my count
17  is wrong.  But I will try to do it again.  It
18  looks like that.  Perhaps my page number count
19  is wrong.  One, two, three, four, five, six,
20  eight.  It is my ninth page.  But I can turn
21  to yours, whatever page it might be.  Do you
22  have it?

Page 30

1      A.   Yes.
2      Q.   Three from the bottom.  This is
3  the FDA's translation of the violation code.
4  Reason, says, no PMA.  Section 501 (f)(1)(B),
5  comma, 801 (a)(3).
6          MS. HILLS:  Objection.  The
7  document is dated March 17, 1999, which is
8  after the events in question.
9          MR. NEWMAN:  Counsel, you know, I
10  hope you know, that the FDA code on that
11  section hasn't been revised in years.  This is
12  by definition the same.
13          In any event --
14          MS. HILLS:  Same objection.
15          BY MR. NEWMAN:
16      Q.   Now, where it says adulteration.
17  I am going to ask you if you understand as a
18  lawyer that when you have a detention schedule
19  which says no PMA, and then you have a
20  translation of what no PMA means by the FDA,
21  and it says adulteration, do you understand
22  that is an adulterated device, by definition

Page 31

1  in the FDA, not by my invention?
2          MS. HILLS:  Objection.  The
3  adulteration statutes to which counsel is
4  referring are directed towards manufacturers
5  only and not to individual sole practitioners.
6  We already know counsel's interpretation of
7  these statutes.
8          BY MR. NEWMAN:
9      Q.   Ms. Zimmet, do you understand, at
10  least by what you just saw, that the FDA
11  regarded Histocryl as an adulterated device?
12          MS. HILLS:  Objection.  In and of
13  itself the adulteration goes to mislabeling,
14  and it is in the labeling sections of the FDA
15  regs.  If you are going to ask a lawyer to
16  interpret a statute, please provide her with
17  the full context of all the statutes.
18          MR. NEWMAN:  I am not asking her
19  to identify anything.
20          BY MR. NEWMAN:
21      Q.   Are you aware -- are you aware,
22  Ms. Zimmet, that there are adulterated

Page 32

1  devices?  More specifically, were you aware
2  back in the days of 1996, 1997 and 1998, 1999
3  that there were adulterated devices?
4          MS. HILLS:  Objection.  Calls for
5  speculation.  Vague, ambiguous, and unclear.
6          BY MR. NEWMAN:
7      Q.   Were you aware?
8      A.   I am aware of the statutory terms.
9      Q.   Do you understand that if a device
10  is adulterated it could not be used for any
11  purpose at Georgetown University?
12          MS. HILLS:  Objection.  Calls for
13  a legal definition by a witness who is not
14  here in the capacity to give a legal
15  definition.
16          BY MR. NEWMAN:
17      Q.   Do you understand --
18          MS. HILLS:  Also assumes facts not
19  in evidence, nor legally supported.
20          BY MR. NEWMAN:
21      Q.   Do you understand that?
22      A.   I don't think that is accurate.

Page 33

1      Q.   Is it correct that your testimony
2  under oath is that Georgetown University did,
3  in the course of its practice, use adulterated
4  devices on patients?
5          MS. HILLS:  Objection.  Misstates
6  prior testimony.  Assumes facts not in
7  evidence.
8          MR. NEWMAN:  We will note the
9  incredible list of speaking objections to this
10  moment.  Again, the motion will have to be
11  filed to stop counsel from doing so.
12          BY MR. NEWMAN:
13      Q.   With that being said, it is not
14  related to the last question.  I am asking you
15  under oath, as we sit here today, was it
16  proper and allowed at Georgetown University in
17  1998 and 1999 to use adulterated devices on
18  the patients at the hospital?
19          MS. HILLS:  Objection, vague.
20  Objection, calls for speculation.
21          BY MR. NEWMAN:
22      Q.   Ms. Zimmet, was it allowed?

Page 34

1    A.   I am not aware of any specific
2  policy addressing that issue.
3    Q.   Does that mean it could be done?
4  In other words, you could use in 1998 and 1999
5  adulterated devices on patients by your
6  understanding of the rules of Georgetown
7  University?
8    MS. HILLS:  Objection, vague.
9  Objection, assumes facts not in evidence.
10    THE WITNESS:  I can't speculate on
11  specifics.  I don't have any facts.  I can't
12  answer a general question like that.
13    BY MR. NEWMAN:
14    Q.   Well, let me ask you this.  If, in
15  fact, you had read the two documents I gave to
16  you, the detention from Oasis, and the
17  definition by the FDA that a particular
18  device, in this case Histoacryl, was
19  adulterated, would you have told any
20  practitioner at Georgetown that it was all
21  right to use such a device?
22    MS. HILLS:  Objection.  Calls for

Page 35

1  speculation.
2    THE WITNESS:  To the extent you
3  are asking what my legal advice would have
4  been, what my thought process, I believe there
5  is a privilege there.  You are asking me what
6  legal advice I gave or would have given at
7  Georgetown Hospital on the set of facts that
8  you are presenting, I am claiming a privilege
9  on that.
10    BY MR. NEWMAN:
11    Q.   Yes.  Am I correct that you have
12  never even seen any documents regarding
13  Histoacryl and Lipiodol, am I correct, until
14  this case?
15    MS. HILLS:  Objection.  Misstates
16  prior testimony.
17    BY MR. NEWMAN:
18    Q.   Well, let me ask you this.  Had
19  you seen or knew of the existence of
20  Histoacryl or Lipiodol prior to my notice of
21  your deposition?
22    A.   Yes.  There were document requests

Page 36

1  to the University prior to the notice of my
2  deposition.
3    Q.   Fair enough.  Prior to my document
4  request, did you know or had even heard of the
5  term Lipiodol or Histoacryl?
6    A.   I may have been asked to do a
7  search before I saw the document.  But it was
8  only in the context of your asking for it.
9  You asked prior to me seeing the document
10  request.  I don't know if I saw the original
11  document request or I was requested to do the
12  search without seeing the document.
13    BY MR. NEWMAN:
14    Q.   Let me do it this way.  Prior to
15  suit being filed in this case, had you ever
16  heard of Lipiodol or Histoacryl?
17    A.   I was not familiar with those
18  terms, no.
19    Q.   Let me ask you this then and
20  broaden it.  Are you aware of the chemical
21  structure n-BCA or n-butyl cyanoacrylate --
22    MS. HILLS:  Objection.

Page 37

1    BY MR. NEWMAN:
2    Q.   -- prior to the complaint being
3  filed in this case?
4    A.   No.
5    Q.   Were you involved -- did you know
6  that cyanoacrylates, prior to the complaint
7  being filed, were being used as embolization
8  devices at Georgetown?
9    A.   Cyanoacrylates?  I am not familiar
10  with what cyanoacrylates are.
11    Q.   And you weren't then, as well, it
12  is safe to say?
13    A.   Correct.
14    Q.   Now, let's use a different term.
15  Did you know that a compound similar to Super
16  Glue was being injected into individuals'
17  vasculature of their brain?
18    A.   Yes.
19    Q.   How did you first learn of that?
20    A.   Dr. Watson inquired whether
21  clinical use of a glue-like substance that was
22  not approved by the FDA should be submitted to

Page 38

1  the IRB for approval.
2      Q.   When did that happen?
3      A.   I don't know what point in time.
4      Q.   You don't know the year?
5      A.   No.
6      Q.   Was it close to the time
7  Dr. Watson first got on staff at Georgetown?
8      A.   I don't know that.
9      Q.   Could it have been as late as 1999
10 that that question was asked?
11     A.   I have no way to set a point in
12 time.
13     Q.   In what setting did Dr. Watson
14 address that question to you?
15         MS. HILLS:  Objection.  Vague.
16         BY MR. NEWMAN:
17     Q.   How about this?  Where did it
18 happen?
19     A.   I don't know.
20     Q.   Was it in connection with you
21 being a member of the IRB or you being
22 assistant or associate counsel?

Page 39

1          MS. HILLS:  Objection.  Assumes a
2  distinction of facts not in evidence.  And
3  compound.
4          THE WITNESS:  I can't answer that.
5  I was counsel and I was the attorney member on
6  the IRB at the time.  I can't distinguish
7  those things.
8          BY MR. NEWMAN:
9      Q.   Was your role on the IRB to
10 address issues such as this, meaning if a
11 clinician wished to use a particular device
12 and wanted to know if it required IRB
13 approval, would you be the person that the
14 clinician would go to?
15         MS. HILLS:  Objection.  Vague.
16 Calls for speculation.
17         BY MR. NEWMAN:
18     Q.   The question is, was that the
19 procedure to go to you if there was an issue
20 about the use of a device and going through
21 the IRB?
22     A.   I don't know that there was a

Page 40

1  procedure.  People routinely ask me questions
2  regarding legal issues or IRB issues.  I can't
3  say that there was a policy.
4      Q.   Beyond Dr. Watson talking to you,
5  was there actually an application to the IRB
6  or any type of protocol ever given to you
7  involving the use of this, as you said, Super
8  Glue-like compound?
9          MS. HILLS:  Objection.  Overbroad,
10 with no date attached.  And to the extent
11 anything was given to you in the context of
12 your legal advice to the IRB and to the
13 corporation, I will instruct you not to answer
14 in terms of attorney-client privilege.  But --
15         THE WITNESS:  No.
16         BY MR. NEWMAN:
17     Q.   You do recognize, do you not,
18 Ms. Zimmet, that the policies and procedures
19 of the IRB are not privileged documents?
20     A.   Yes.
21     Q.   Do you know where the 1998, 1999
22 policies and protocols for the IRB, where

Page 41

1  those documents are at the present time?
2      A.   If they existed at all, they would
3  have been in storage.  The IRB has called back
4  boxes of old documents from storage and have
5  not located any that were in effect during
6  that period of time.
7      Q.   Does that mean that -- let me do
8  it this way.  Were documents destroyed past a
9  certain year or are there potentially, let's
10 say, documents earlier in the year and later?
11 Just not this particular IRB protocol?
12         MS. HILLS:  Objection.  Calls for
13 speculation.  And, protocol, you have changed
14 your question.
15         Please read it back.
16         MR. NEWMAN:  Don't bother.  Let me
17 strike it, in an effort to do something
18 counsel does not do, that is, move it along.
19 It is a bad question.  Let me do it this way.
20         BY MR. NEWMAN:
21     Q.   Did you find any policies and
22 procedures for the IRB that were before 1998?

11 (Pages 38 to 41)

Page 42

1    A.  No.
2    Q.  Did you find any documents
3  involving the IRB before 1998?  Protocols,
4  Treatment procedures, informed consent sheets,
5  any of that?  Did that exist?
6        MS. HILLS:  Assumes facts not in
7  evidence.  Vague.
8        THE WITNESS:  The search was for
9  policies and procedures during this period of
10  time.  I did not search for protocols.  Those
11  are studies.  IRB does -- studies protocols.
12        BY MR. NEWMAN:
13    Q.  I understand.  Do you know whether
14  there was a protocol involving Histoacryl or
15  Lipiodol ever in the course of Georgetown
16  University's practice?
17    A.  I did a database search and did
18  not locate any such.
19    Q.  Beyond that -- I am sorry.  That
20  being said, does that mean no?
21    A.  Correct.
22        Well, no.  The question was

Page 43

1  whether any -- you will have to read the
2  question back before I know if no is the
3  proper answer.
4        MR. NEWMAN:  Counsel, do not nod
5  your head to the witness.  Shaking it no, that
6  is more than improper.
7        THE WITNESS:  My "no" is that none
8  exist.
9        MR. NEWMAN:  Correct.
10        MS. HILLS:  I was clarifying that
11  as the witness stated --
12        MR. NEWMAN:  You can't do that.
13        MS. HILLS:  -- in terms of a
14  document search which is in charge of -- there
15  was a database search.  Whether or not
16  something exists, it was not turned up with
17  the database search.
18        MR. NEWMAN:  You are testifying.
19  It is improper.  You are telling the witness
20  how to testify or what your opinion is, is
21  improper.  It is actually sanctionable and
22  probably reprimandable.  Please, counsel,

Page 44

1  don't signal the witness.
2        THE WITNESS:  Tony, I was just
3  trying to make sure you understood my answer.
4  No meant there were no documents.  We did the
5  database search and there were no documents.
6        BY MR. NEWMAN:
7    Q.  Now, same with regard to did you
8  look up things like surgical glue or n-BCA, as
9  well, besides the term Histoacryl and
10  Lipiodol?
11    A.  I believe the IRB -- no, the
12  search was for Histoacryl and Lipiodol.
13    Q.  All right.  So you did not perform
14  a search with regard to surgical glue?
15    A.  Surgical glue?
16    Q.  Yes.
17    A.  No, I don't believe they did a
18  search on surgical glue.
19    Q.  Let me ask you this question.  Did
20  you do a search on n-BCA?
21        MS. HILLS:  Objection.  Assumes
22  this witness did the search.

Page 45

1        BY MR. NEWMAN:
2    Q.  Fair enough.  Was there a search
3  done on n-BCA, for n-BCA?
4        MS. HILLS:  Objection.  Calls for
5  speculation.
6        THE WITNESS:  The term n-BCA was
7  not searched.
8        BY MR. NEWMAN:
9    Q.  At least so far, then, as to
10  whether there were or were not any protocols
11  regarding surgical glue, its use, or n-BCA,
12  you do not know one way or the other, because
13  the searches were not done.  Is that correct?
14    A.  No, that's not correct.
15    Q.  All right.  Do you know one way or
16  the other whether there had been any protocols
17  created for the use of surgical glue or n-BCA?
18    A.  I am aware of one protocol
19  involving n-BCA.
20    Q.  Tell me what that is.
21    A.  I saw this protocol in 1990.
22    Q.  You are aware that protocols are

12 (Pages 42 to 45)

1  not privileged documents?  Aren't you?
2      A.   I believe that's accurate.
3      Q.   Where is that protocol?  Where is
4  the document?
5      A.   In storage.
6      Q.   All right.  Besides the protocol,
7  does that also involve any IRB generated
8  informed consent?
9          MS. HILLS:  Objection.  Vague.
10         MR. NEWMAN:  No, it is very
11 specific, counsel.
12         MS. HILLS:  Object to sidebar.
13         BY MR. NEWMAN:
14     Q.   Ms. Zimmet, you know what an IRB
15 approved consent form is?
16     A.   That's not what you asked me.  You
17 asked me for an IRB generated consent form,
18 not an IRB approved consent form.
19     Q.   Good.  Is there an IRB approved
20 consent form --
21     A.   There may be.
22     Q.   -- with that protocol.

1          Is there a roster of individuals
2  who were given -- who would be involved in the
3  protocol?
4          MS. HILLS:  Objection.  Assumes
5  facts not in evidence.
6          THE WITNESS:  No, the IRB would
7  not have such information.
8          BY MR. NEWMAN:
9      Q.   Was there a risk/benefit
10 assessment?
11     A.   I don't know that.
12     Q.   Who was the investigator for that
13 protocol?
14     A.   Dr. Duveikis.
15     Q.   What was Dr. Duveikis' position at
16 that time?
17     A.   He would have been a
18 neuro-interventionalist in radiology.
19     Q.   Did you have anything to do with
20 that protocol?  I.e., did you sit on the IRB
21 when that was generated or when that was
22 approved?

1      A.   I was a member of the IRB.  I
2  don't know if I was present at the time.  I
3  wasn't familiar with it.
4      Q.   Does that mean you -- beyond the
5  fact that this document exists, which do I
6  understand you can put your hands on?  You can
7  get the protocol and the other documents
8  related to that study?
9      A.   I believe it exists.
10     Q.   Where is it?  You said it is in
11 storage.  Where is it in storage?
12     A.   It is likely in storage.  It is
13 off campus.  I don't know exactly where the
14 warehouse is.
15     Q.   I am going to ask that you find
16 the document and tell us if there is any issue
17 with being able to recover it.
18         MR. NEWMAN:  Is that all right?
19         MS. HILLS:  We will take that
20 under advisement.
21         THE WITNESS:  I will confer with
22 counsel on the matter.

1          BY MR. NEWMAN:
2      Q.   By document, I didn't mean to be
3  specific as to just the protocol.  Any
4  documents relating to the protocol itself.
5  There may be minutes of the meeting of IRB.
6  There may be edits to the informed consent
7  sheet.  There may be versions of the protocol.
8  Whatever there is, I am asking for it.  Do you
9  understand?
10     A.   I understand your request.
11     Q.   Now, any other study or any other
12 protocol besides the one we just discussed?
13 By the way, was there a title for that
14 protocol?
15     A.   There would be a title.  I offhand
16 don't know what it is.
17     Q.   Let's just refer to it as the one
18 n-BCA protocol you discussed.  Is there
19 another one?  Are there other protocols that
20 you found involving n-BCA?
21     A.   I believe that's the only one
22 specific to n-BCA.  These are not terms I am

13 (Pages 46 to 49)

Page 50

1    particularly familiar with.  Counsel -- these
2    are terms you have become accustomed to.  They
3    are new for me, so.
4        Q.    All right.  And if I understand,
5    you did not turn up or recognize, find any
6    protocols involving surgical glue?
7        A.    Surgical glue, no.
8        Q.    Did you find any protocols
9    involving embolizations?  Let's make it
10   interventional neuroradiology embolizations as
11   opposed to other parts of the body.
12       A.    Well, that's how I found -- not
13   using the term n-BCA, that's how I found the
14   1990 study I referred to.  There may be
15   something more recent, subsequent.  But
16   nothing during the period of time in your
17   document request.
18       Q.    Do you mean prior to 1999?
19       A.    Correct.  In the period of time in
20   which you made the request, I did not come up
21   with any.  Nor did the 1990 one come within
22   that period of time.

Page 51

1        Q.    Am I correct, then, there has been
2    another study done by interventional
3    neuroradiology involving embolization since
4    1999?
5        A.    I believe that's accurate.
6        Q.    Was the investigator Dr. Watson?
7        A.    I believe Dr. Watson is one of the
8    investigators.  Whether he is the principal
9    investigator or not, I don't specifically
10   recall.
11       Q.    What was that protocol?  Do you
12   remember the name or what it is called?
13       A.    I wouldn't know offhand.
14       Q.    Any other related protocols that
15   you came across by whatever method you did the
16   search besides this one n-BCA protocol and
17   this other embolization protocol that
18   postdated 1999?
19       A.    The only ones I recall right now.
20   But it is outside the scope of the document
21   request, so I wasn't specifically focused on
22   that.

Page 52

1        Q.    Does that mean you saw other
2    studies or does that mean --
3        A.    I said I don't know.  I know I saw
4    those, but I didn't ask people to search for
5    different time periods exactly.
6        Q.    Let's go back to where we
7    originally started from.  That is, that
8    Dr. Watson made this inquiry of you.  What was
9    your response?
10       A.    I inquired whether it was being --
11   well, he asked if it was clinical use.  I
12   clarified it was clinical use, not research.
13   I told him that the jurisdiction of the IRB
14   relates to research use and that the IRB does
15   not have jurisdiction to consider clinical use
16   of drugs or devices.
17       Q.    Do I understand that you, from
18   that, that you basically took Dr. Watson's
19   word?  If he said that it involved research,
20   you would have put it through the IRB?  If he
21   said it involved something other than
22   research, you would not?

Page 53

1        MS. HILLS:  Objection.  Vague.
2        BY MR. NEWMAN:
3        Q.    What if Dr. Watson said this does
4    involve research?  Would that immediately
5    trigger and you would have then told him he
6    has to go through the IRB?
7        A.    I asked him if he was engaged in a
8    systematic investigation for the purpose of
9    analyzing data for generalizable knowledge or
10   was he intending to treat patients.  He was
11   treating patients.  If he was conducting
12   research within the definition of research
13   within the jurisdiction of the IRB, I would
14   have said yes.
15       Q.    Am I correct that it was simply
16   Dr. Watson's answer that you required in order
17   to say that the IRB approval was not
18   necessary?  You didn't do any independent
19   research or investigation as to the nature of
20   what Dr. Watson was doing?
21       MS. HILLS:  Objection.  Compound.
22       BY MR. NEWMAN:

14 (Pages 50 to 53)

Page 54

```
 1        Q.   That's fair enough.  Did you do
 2   any investigation beyond what Dr. Watson was
 3   doing beyond him coming in and saying do I
 4   need to go through the IRB for this device?
 5        A.   I am going to claim a privilege
 6   with respect to any activity subsequent to my
 7   conversation with Dr. Watson.
 8        Q.   Let me ask you this.  In the
 9   normal course of business would you, in fact,
10   as a lawyer, not simply take the doctor's word
11   that he was only doing -- treating patients,
12   but you would have to do some kind of
13   independent investigation to determine if that
14   was true before you could simply say no IRB?
15             MS. HILLS:  Objection.
16             I instruct you not to answer
17   insofar as the question is premised on the
18   fact that you, as a lawyer, and you have a
19   privilege to your client, the corporation, as
20   well as your own work-product doctrine
21   privilege.
22             THE WITNESS:  I am claiming
```

Page 55

```
 1   privilege.
 2             BY MR. NEWMAN:
 3        Q.   You do realize, do you not, that
 4   if you do claim the privilege you will not be
 5   able to defend any action that you made in
 6   court if you did not do -- did not tell us
 7   whether you did research or not.  So it is
 8   fine to claim your privilege if you believe
 9   this is your attorney, which I told you that
10   may be at issue, but I am telling you right
11   now, that if you do not tell us that you did
12   any other investigation, you will go to court
13   saying, based on Dr. Watson, I said don't go
14   to the IRB.
15             MS. HILLS:  Objection to --
16             BY MR. NEWMAN:
17        Q.   My question is -- I will do it
18   this way -- did you, in fact, do
19   investigations as to whether Dr. Watson was
20   treating patients with this device or doing
21   research?
22             MS. HILLS:  Objection.
```

Page 56

```
 1             MR. NEWMAN:  Not what
 2   investigation she did, counsel.
 3             BY MR. NEWMAN:
 4        Q.   To make it clear.  Did you do an
 5   investigation?  Or did you take his word for
 6   it?
 7             MS. HILLS:  Objection.
 8             THE WITNESS:  I am claiming a
 9   privilege.
10             MS. HILLS:  Also, I object to
11   threatening the witness.
12             MR. NEWMAN:  It is not
13   threatening.  It is the truth.
14             MS. HILLS:  The objection stands.
15             BY MR. NEWMAN:
16        Q.   Did you have a policy or procedure
17   wherein you had to investigate, as your role
18   on the IRB, whether a clinician was simply
19   treating patients or doing an investigation if
20   a question was presented to you?
21             MS. HILLS:  Objection.  I instruct
22   you not to answer in terms of your policy and
```

Page 57

```
 1   practice as an attorney advising the IRB.
 2             THE WITNESS:  I am aware of no
 3   such IRB policy.
 4             BY MR. NEWMAN:
 5        Q.   Did you, in fact, generate any
 6   documents as a result of your discussion with
 7   Dr. Watson about this topic?
 8             MS. HILLS:  To the extent you can
 9   answer outside of the privileges belonging to
10   yourself and the corporation, go ahead and
11   answer.  Otherwise, I instruct you not to
12   answer.
13             THE WITNESS:  I don't know whether
14   I did or not.  So I have been doing research
15   of files.  I haven't come up with anything.
16   It is ongoing.  I don't have direct access to
17   files from the legal office.  I have requested
18   them, a search by university counsel for
19   anything from that period of time.  I don't
20   have a specific recollection of whether I did
21   a memo to the file or not.
22             BY MR. NEWMAN:
```

15 (Pages 54 to 57)

Page 58

1    Q.   Do you realize that -- fine.  Let
2  me ask you this.  Is it your suspicion, based
3  on the nature of this issue, that you would
4  have made some kind of document?
5         MS. HILLS:  Objection.  Calls for
6  speculation.
7         So, again, to the extent you can
8  answer that without intruding upon applicable
9  privilege, go ahead and answer.
10        THE WITNESS:  I don't know that.
11 I may or may not have.
12        BY MR. NEWMAN:
13    Q.   You are aware, are you not, that
14 there is no privilege as to whether that
15 document exists?
16    A.   That's correct.
17    Q.   So when counsel says don't --
18 based on the privilege, do not respond as to
19 whether there is a document, you, as I
20 understand, are clear that whether one exists
21 is not the privilege --
22    A.   I believe I answered.  I believe I

Page 59

1  answered indicating I have searched for such a
2  document if one exists and I will continue to
3  do that.
4     Q.   And if one exists, then I ask you
5  to alert us to the fact that one exists and
6  just identify it by some method.
7     A.   I certainly will.
8     Q.   I understand now that you asked
9  Dr. Watson a question in response to his
10 question.  What did Dr. Watson tell you when
11 you asked him if it was a matter of treating
12 patients or conducting research?
13    A.   He indicated that he was not
14 conducting research.  He didn't intend to
15 conduct research.  He was treating individual
16 patients.
17    Q.   And I understand that we are
18 looking to see if there is any document
19 regarding that moment.  But do you recall what
20 you did at that point following his statement?
21        MS. HILLS:  Objection.
22        To the extent it intrudes upon the

Page 60

1  attorney-client privilege held by the
2  corporation, and to the extent that it
3  intrudes upon your work-product, I instruct
4  you not to answer.  But, otherwise, go ahead.
5         THE WITNESS:  What I did?
6         BY MR. NEWMAN:
7     Q.   What did you say?  What did you
8  tell him?
9     A.   What did I say?
10    Q.   (Indicating.)
11    A.   I asked -- sorry, it is my throat.
12    Q.   Are you okay?  Go ahead, have some
13 water.
14    A.   I asked what the standard of care
15 was for treating the particular -- I mean, he
16 did indicate it was for embolization of AVMs.
17 I asked what the standard of care was for
18 treatment of this particular condition.  He
19 indicated this was the standard of care and it
20 was used throughout the country.
21        I asked if the manufacturer had
22 obtained IDE for it.  He indicated the

Page 61

1  manufacturer had not.  I understood apparently
2  for some business reasons, is what I recall.
3     Q.   Why did you ask if the
4  manufacturer had obtained an IDE?
5     A.   Because I wondered if the
6  manufacturer was going to conduct, sponsor any
7  research studies on the device.
8     Q.   Therefore, you were aware that it
9  was a Class III device that was unapproved?
10    A.   I was aware that it was an
11 unapproved device.
12    Q.   A Class III unapproved device.
13 That's why you need an IDE.  Correct?
14    A.   I didn't at the time think in
15 terms of class.  I knew it was a device and an
16 option was for a sponsored IDE.
17    Q.   All right.  Do I understand back
18 at the time Dr. Watson was talking to you
19 you didn't know what Class III devices were?
20    A.   I may or may not have.  It is hard
21 for me to set myself back.  But I knew it was
22 a device and an option was an IDE to be

16 (Pages 58 to 61)

Page 62

1  obtained by the manufacturer to sponsor
2  research.  Did I think in terms of Class I, II
3  or III?  I don't recall that being a thought
4  at the time of the conversation.
5      Q.   Fair enough.  You do understand
6  that neither Class I or II require an IDE,
7  only Class III?
8          MS. HILLS:  Objection.  Assumes
9  facts not in evidence.
10         MR. NEWMAN:  No, it is a statute.
11         BY MR. NEWMAN:
12     Q.   But are you aware of that?
13         MS. HILLS:  Objection.  Misstates
14  the statute.  Class II devices actually do
15  require an IDE.  Your statement is incorrect.
16         BY MR. NEWMAN:
17     Q.   Is it your testimony in this case
18  you had no idea whether this was a Class II, a
19  Class III or a Class I device at the time
20  Dr. Watson was talking to you?
21         MS. HILLS:  Objection.  Misstates
22  the testimony.

Page 63

1          MR. NEWMAN:  That's why I asked.
2          BY MR. NEWMAN:
3      Q.   Is that your testimony?
4      A.   I said I didn't think in terms of
5  whether it was a Class I, II or III.
6      Q.   Please tell me what a Class I, a
7  Class II and a Class III device are, what the
8  classification is.
9          MS. HILLS:  Objection.  Overbroad.
10  At what time?
11         BY MR. NEWMAN:
12     Q.   Fine.  Back at the time Dr. Watson
13  was talking to you, what did it mean if the
14  device was Class I?
15         MS. HILLS:  Objection.  Calls for
16  speculation.
17         MR. NEWMAN:  Hardly.
18         BY MR. NEWMAN:
19     Q.   What did it mean to be Class I
20  back at that time that Dr. Watson talked to
21  you?
22         MS. HILLS:  Object to counsel's

Page 64

1  sidebar.
2          THE WITNESS:  I know that a Class
3  III device is a device with potential risk or
4  one in which there isn't sufficient
5  information to make that determination whether
6  it is or is not potential significant risk.
7          BY MR. NEWMAN:
8      Q.   Do I understand from that you
9  don't know what a Class I device -- what the
10  definition of a Class I device was, or at
11  least you didn't at the time that Dr. Watson
12  talked to you?
13     A.   I don't recall whether I did or
14  not.
15     Q.   Do you know now?
16     A.   I know Class I and II are less
17  than significant risk.  I couldn't cite it to
18  you.
19     Q.   Did you know that there was --
20  what about -- strike that.
21         Did you understand that Class III
22  presented the greatest risk and that was the

Page 65

1  highest classification you could have for a
2  device?
3          MS. HILLS:  Objection to form.
4  Assumes facts not in evidence.
5          THE WITNESS:  I understand a Class
6  III device is one that is classified as either
7  significant risk or one in which there is not
8  sufficient evidence in which to make a
9  decision whether it is or is not.
10         BY MR. NEWMAN:
11     Q.   So, therefore, when Dr. Watson
12  said he was using a class -- what you
13  understood to be a device with a significant
14  risk, it did not have sufficient evidence of
15  whether it was or was not -- strike that.
16         You understood that the Class III
17  device, which had a significant risk, was the
18  type of device that Dr. Watson was using in
19  these embolizations?
20     A.   I did not think in terms of class.
21  I know it is a device.  I don't understand
22  your question.

Page 66

1    Q.   All right.  Did you understand
2  that the device Dr. Watson was going to use in
3  his embolization, A, potentially represented a
4  significant risk to his patients; B, was
5  unapproved?
6    A.   I understood that it was an
7  unapproved device.  If used in the context of
8  research, would have an IDE and be submitted
9  to the IRB.  I understood that to be the case.
10   Q.   Did you have any knowledge
11 whatsoever of the involvement of U.S. Customs
12 as to the importation of this device, meaning
13 Histoacryl?
14   A.   I inquired.  I asked if it is used
15 nationwide as a standard of care, where do
16 practitioners obtain it if it is not approved.
17 I was told it is obtained in Canada.  I asked,
18 are there any issues with Customs?  No
19 problem.  I was told there was no problem with
20 Customs.  Is Customs advised what this
21 substance is?  Yes.  And I jokingly said,
22 well, if anyone related to Georgetown, you or

Page 67

1  anyone else, is bringing it in, please be sure
2  that customs is absolutely informed what it
3  is.
4    Q.   Were you ever told at any time
5  that Dr. Watson had an inquiry or talked to
6  Customs about importation?
7    A.   I am not aware of that.  I have no
8  knowledge about that.
9    Q.   In your capacity as counsel or in
10 your capacity of the IRB, would it be
11 significant to you if Dr. Watson had had
12 discussions with U.S. Customs about the
13 importation of this device?
14      MS. HILLS: Objection.  Calls for
15 speculation.  Again, to the extent it intrudes
16 upon any privilege that the corporation has or
17 your own work-product.  But outside of that,
18 please answer.
19      Also, objection on ambiguous and
20 vague.
21      THE WITNESS: I suppose whether it
22 was relevant to me would be the context.  I

Page 68

1  don't know.  I already said, I indicated that
2  if he or anyone else on behalf of Georgetown
3  was obtaining the substance, they should fully
4  advise Customs what it was and what it was
5  for.  So I was assuming there would be some
6  conversation.
7      BY MR. NEWMAN:
8    Q.   And had that occurred, you would
9  be contacted?
10   A.   No, I didn't make that request.
11   Q.   Why would it matter to you even in
12 any sense as to whether Customs was kept
13 completely informed?  What effect did it have
14 on the liability or anything of Georgetown?
15      MS. HILLS: Objection.
16 Attorney-client privilege to the corporation
17 or your own work product.  When they talk
18 about the liability of Georgetown, that
19 clearly intrudes upon the privilege.  And I
20 instruct you not to answer, unless you can see
21 a way to answer it without intruding on the
22 privilege.

Page 69

1      THE WITNESS: The tone of my
2  conversation with Dr. Watson, my understanding
3  is this is standard of care that was used
4  throughout the country.  Customs was well
5  aware that it was coming in.  And it was out
6  in the open and above board and I was
7  interested in making sure it stayed that way.
8      BY MR. NEWMAN:
9    Q.   If you had been told that, in
10 fact, there had been an automatic detention on
11 this device, and that it was being seized on
12 the border, would that have changed your
13 comments?
14      MS. HILLS: Objection.  Calls for
15 speculation.
16      THE WITNESS: I don't understand
17 that, since my information is Customs readily
18 let it through for individual patient use and
19 that's what I was informed.
20      BY MR. NEWMAN:
21   Q.   Let me ask you to simply assume
22 what now has been listed as a trade alert --

18 (Pages 66 to 69)

Page 70

1  first of all, do you even know there was a
2  trade alert on Histoacryl in effect at the
3  time that you were talking to Dr. Watson?  Did
4  you know about that?
5      A.  No.  But I didn't know what a
6  trade alert was.  In your document request you
7  ask for any documents about trade alerts.
8      Q.  Does that mean that you don't know
9  what a trade alert is?
10     A.  I believe I learned it was
11  something that was given to Customs.
12     Q.  Do I understand then that until I
13  ask the questions, and specifically in my
14  notice duces tecum, you had never heard of a
15  trade alert?
16     A.  Yes, I was unaware what a trade
17  alert was.
18     Q.  I am going to ask you to assume
19  that this detention document that we have
20  already looked at is pursuant to a trade
21  alert, meaning things are grabbed and
22  detained.  I am going to simply ask, if you

Page 71

1  had known that Histoacryl was being detained
2  one or more times at the border by Customs,
3  would that have changed your view as to
4  whether Histoacryl should have been used at
5  your institution at all?
6      MS. HILLS:  Objection.  Calls for
7  speculation.
8      THE WITNESS:  I don't believe I
9  have sufficient information on that.  Grabbed
10  from whom?
11     BY MR. NEWMAN:
12     Q.  Did you know that it was being
13  detained?  I mean literally many, many, many
14  shipments were detained from Georgetown.
15  There was an issue Dr. Watson testified to
16  from GW or other institutions.  Are you aware
17  of any of that?
18     MS. HILLS:  Objection.  Calls for
19  speculation.
20     BY MR. NEWMAN:
21     Q.  No.  Just are you aware of that?
22     A.  I don't have specific information.

Page 72

1  To the extent this information goes beyond my
2  conversation with Dr. Watson, for which there
3  would be a waiver, I am not going to respond
4  to it.  But I will tell you, I don't have any
5  specific information.  My information was that
6  it was readily gotten through.
7      BY MR. NEWMAN:
8      Q.  Would you agree that if you knew
9  in any way Customs was seizing any of these
10  shipments, you would not say, "Go ahead and
11  use it, Dr. Watson"?
12     MS. HILLS:  Objection.  Misstates
13  prior testimony.  Assumes facts not in
14  evidence.  And calls for speculation.
15     BY MR. NEWMAN:
16     Q.  We have to ask this question in
17  this case.  If you were told that there had
18  been seizures of Histoacryl on the border from
19  Canada because the device was adulterated in
20  Class III, would you have still told
21  Dr. Watson it was okay to use that device,
22  understanding you were not told?

Page 73

1      MS. HILLS:  Objection.  Calls for
2  speculation.  Objection.  To the extent it
3  intrudes upon the privilege regarding your
4  role as counsel for the corporation and what
5  you would have done, I instruct you not to
6  answer.  To the extent you can answer this
7  hypothetical not intruding upon the privilege,
8  please, go ahead.
9      THE WITNESS:  It misrepresents
10  what I said before.  I said Dr. Watson asked
11  me if clinical use of this glue-like substance
12  for the purpose of embolizing AVMs was within
13  the jurisdiction of the IRB, and if an IRB
14  application should be filed.  I said no.  You
15  just asked me a different question.
16     BY MR. NEWMAN:
17     Q.  I did.  That is my question,
18  though.
19     First of all, am I correct that in
20  your recollection of the conversation with
21  Dr. Watson he never discussed with you that it
22  was a Class III device?  Is that correct?

19 (Pages 70 to 73)

Page 74

1  Those words weren't used?
2      A.  I don't recall Class III being
3  used.  But it was a device.  I understood it
4  was a device.
5      Q.  Did you understand that it was a
6  device that had been seized on the border by
7  Customs on many occasions by many of his
8  brethren who were using it?  Did you know
9  that?
10      MS. HILLS:  Objection.  Misstates
11  facts not in evidence.
12      BY MR. NEWMAN:
13      Q.  Did you know that?
14      A.  That is not something that was
15  told to me.  I don't know that that is true,
16  actually.  Before you were talking about
17  detaining.  Then you started talking about
18  seizing as if they were the same thing.  I am
19  not exactly sure where you are now on that.
20      Q.  First of all, are you aware of
21  there being detentions of this compound versus
22  seizures of this compound?

Page 75

1      A.  No.
2      Q.  Did Dr. Watson tell you that at
3  his meetings, the interventional
4  neuroradiologists, specifically at Jackson
5  Hole, Wyoming, the legality of the compound
6  device was discussed and it was determined
7  that many of his practitioners had had their
8  Histoacryl seized on the border, or seized
9  actually, as well, in Tennessee from Federal
10  Express?  Did you know any of that?
11      MS. HILLS:  Objection.  Assumes
12  facts not in evidence.
13      MR. NEWMAN:  They will be,
14  counsel.
15      BY MR. NEWMAN:
16      Q.  Did you, in fact, know any of
17  that?
18      A.  That is not information I am aware
19  of.
20      Q.  Am I correct, is it your testimony
21  today that if you knew that there was a trade
22  alert, and knew what it was, knew that there

Page 76

1  had been detentions or seizures on the border
2  of this device, knew that it was a Class III
3  unapproved device, that you would have still
4  behaved in the same fashion that you did, and
5  that is, tell Dr. Watson it doesn't need IRB
6  approval, go ahead and use it?
7      MS. HILLS:  Objection.  Compound.
8  Assumes facts not in evidence.  And misstates
9  prior testimony.
10      MR. NEWMAN:  It is a question, not
11  a statement of what you said.
12      BY MR. NEWMAN:
13      Q.  Is that true?  If you knew all
14  that, would it make any difference to you?
15      MS. HILLS:  Same objection.
16      THE WITNESS:  To me it is
17  speculative.  It is not information I had.
18  And I do think it misrepresented what I have
19  stated.
20      BY MR. NEWMAN:
21      Q.  If at the time of trial all of
22  those are proven, are you going to testify --

Page 77

1  that's why I have to ask it in terms of a
2  hypothetical.  Are you going to testify it
3  wouldn't have made a difference to you, or
4  will you testify if you were told any of those
5  things it would have changed your opinion?
6      MS. HILLS:  Objection.
7      THE WITNESS:  It would not have
8  changed my opinion with respect to the
9  response I gave to Dr. Watson.
10      BY MR. NEWMAN:
11      Q.  Did Dr. Watson ever ask you about
12  the legality of the compound, of the device?
13  We discussed the requirement of the IRB.
14      A.  Right.
15      Q.  Did he discuss the legality of the
16  device with you?
17      A.  I don't recall those terms ever
18  being used, legality or --
19      Q.  Fair enough.  Let's do it simple.
20  You are an attorney.  Did he discuss in any
21  way, shape or form whether it was legal to use
22  the device, whether there was a problem with

20 (Pages 74 to 77)

Page 78

1  using the device from the aspect of the Food,
2  Drug and Cosmetic Act or anything like that?
3  Do you remember anything like that?
4      A.   Not in terms of legality.  I said
5  I did not know what the position of the FDA
6  would be on that.  But I indicated that it
7  appeared to me, if it was standard of care and
8  used all over the country -- this is in the
9  course of our conversation -- it seems to me
10 that the FDA was acquiescing to clinical use
11 in medical practice.
12     Q.   Is that, in fact, what your
13 determination was, you took Dr. Watson's
14 comments that it was being used everywhere and
15 said, therefore, the FDA must be acquiescing
16 to its use?  That was your determination?
17     MS. HILLS:  Objection.
18     THE WITNESS:  During our
19 conversation, that is what I said during our
20 conversation, that it sounded as if the FDA
21 was acquiescing in clinical use in medical
22 practice.

Page 79

1      BY MR. NEWMAN:
2      Q.   Acquiescing to the use of an
3  unapproved device that was otherwise
4  unavailable in the United States.  Correct?
5      MS. HILLS:  Objection.  Vague.
6      BY MR. NEWMAN:
7      Q.   First of all, you are aware then,
8  when Dr. Watson talked to you, as you said,
9  that it was not available, there was no
10 distributor in the United States, but there
11 was a distributor, if I understand, in Canada?
12     A.   That's correct.
13     Q.   And that's where you believed it
14 would come from?  Canada?
15     A.   Yes.
16     Q.   Then you understood that there was
17 no other person distributing it so you had to
18 go outside the United States to get the
19 device?
20     A.   I understood that's where it was
21 obtained.
22     Q.   Your understanding was that

Page 80

1  because Dr. Watson said it is standard
2  practice, that the FDA must be letting this
3  unapproved device come through its borders
4  because they are not doing anything about it?
5      MS. HILLS:  Objection.
6      BY MR. NEWMAN:
7      Q.   Right?  That's what acquiescence
8  is.
9      MS. HILLS:  Objection.  Misstates
10 prior testimony.  Vague.
11     THE WITNESS:  At the time of my
12 conversation with Dr. Watson, yes.  As I
13 indicated, if it was being used all over the
14 country, and it was standard of care, that the
15 FDA was acquiescing and not interfering with
16 clinical practice on individual patients.
17     BY MR. NEWMAN:
18     Q.   Were you aware of any, in fact,
19 meetings by the FDA about that very subject,
20 whether this device should be legalized or
21 whether it should be detained?
22     A.   No, I am not.

Page 81

1      Q.   Did you make any inquiry to the
2  FDA, whatsoever, any inquiry into the FDA
3  whatsoever, as to whether in fact they had
4  acquiesced to the use of this device?
5      MS. HILLS:  To the extent you can
6  answer without invading your privilege, go
7  ahead.
8      THE WITNESS:  No, I did not.
9      BY MR. NEWMAN:
10     Q.   Did you look on the internet and
11 put the words in of Super Glue, or surgical
12 glue, or anything like that, to search to see
13 whether there had been an issue with the FDA?
14     MS. HILLS:  Objection.  Assumes
15 the internet existed in 1998.  And, objection,
16 calls for speculation.
17     And to the extent you can answer
18 without invading the privileges, go ahead.
19     THE WITNESS:  No, I did not.
20     BY MR. NEWMAN:
21     Q.   Since counsel raises that, did you
22 look into the FDA files, which by law were at

21 (Pages 78 to 81)

1  that point wide open to the public, and ask in
2  any manner, whether it be by the FDA's own
3  search engine or by any other person, to look
4  into this particular device and to know what
5  its legality was?
6      MS. HILLS:  Same objections.
7      BY MR. NEWMAN:
8      Q.  Any other method at all?
9      MS. HILLS:  Same objections.
10     THE WITNESS:  I did not.
11     BY MR. NEWMAN:
12     Q.  And you didn't order anybody to do
13 so.  Is that correct?
14     MS. HILLS:  Same objections.
15     THE WITNESS:  I am not going to
16 discuss any, you know, further action.  There
17 is a privilege (inaudible) with respect to the
18 conversation.
19     BY MR. NEWMAN:
20     Q.  Does that mean -- first of all,
21 just so I know the parameters.  Does that
22 mean, beyond what you have told us today,

1  there were other things you discussed with
2  Dr. Watson than what you are now telling us?
3  Or is this the sum total of what you talked
4  with Dr. Watson about this subject?
5      MS. HILLS:  Objection.  Vague.
6      BY MR. NEWMAN:
7      Q.  I want to know, is this it or is
8  there something more?
9      A.  I have had many conversations with
10 Dr. Watson over the years.  I don't know how
11 to respond to that.
12     Q.  Fair enough.  Many conversations
13 with Dr. Watson about his embolization
14 procedures and about the devices that he used?
15 Or many conversations about other issues?
16     A.  Many conversations in general.
17     Q.  Do you remember any other
18 conversations you had with Dr. Watson about
19 the use of -- about his embolization with this
20 device?
21     A.  No.
22     Q.  Did you -- I understood your

1  objection before, but let me see if it is
2  clear.  Are you claiming privilege as to
3  whether you asked anyone to look into the
4  issue of the device and its legality?
5      A.  I am claiming privilege with
6  respect to any conversations I might have had
7  with anyone on any topic relating to this
8  specific topic beyond my conversation with
9  Dr. Watson, whether there were or were not any
10 such conversations.
11     Q.  All right.  Do you believe that
12 there would be a privilege to simply say
13 whether you had other individuals look into
14 it?
15     A.  Yes.
16     Q.  Did Dr. Watson describe at any
17 time that he -- first of all, did you
18 understand anything about Dr. Watson's ability
19 to write prescriptions in Canada?
20     MS. HILLS:  Objection.  Vague.
21     THE WITNESS:  I don't know if that
22 is anything I thought about at the time.

1      BY MR. NEWMAN:
2      Q.  Did Dr. Watson describe to you at
3  any time that he had written prescriptions for
4  this device?
5      A.  I recall no discussion of
6  prescriptions.
7      Q.  Do you recall at any time
8  Dr. Watson had patients generate a letter of
9  need?  First of all, have you ever heard of
10 that?
11     A.  I do recall him mentioning that a
12 letter of need is -- was used in Canada and
13 Customs accepted the letter of need for
14 individual patient care.  I have a general --
15 I don't know if it had a specific name.  But
16 there would be a document and Customs would
17 accept it for individual patient care.
18     Q.  Did you know what legal effect
19 that letter had?  In other words, why Customs
20 would accept it?
21     A.  It was my understanding at the
22 time that, if the device was to be used for

Page 86

1   individual patient care, then Customs didn't
2   have a problem with it coming through.
3       Q.   So you did not have any knowledge
4   that, in fact, those letters -- whether those
5   letters had anything to do with exemptions, in
6   other words, compassionate use, IDEs,
7   et cetera?
8           MS. HILLS: Objection. Vague.
9           THE WITNESS: No.
10          MR. NEWMAN: Counsel, can you stop
11  snickering? It is all on the tape.
12          MS. HILLS: On the tape?
13          MR. NEWMAN: I have no problem to
14  your objections. Just make them and move on.
15          MS. HILLS: The tape will reflect
16  that the only poor behavior is your own, sir.
17          Should I say, let the record
18  reflect that Andrew Greenwald was, in fact,
19  snickering. So, perhaps, Mr. Newman --
20          MR. GREENWALD: No, Mr. Greenwald
21  choked on your last statement based upon your
22  behavior at the beginning of this deposition,

Page 87

1   which is clearly on the tape.
2           BY MR. NEWMAN:
3       Q.   Ms. Zimmet, are you aware that
4   under the USCA, specifically, which I will
5   show you if you don't know about it, that
6   there is a prohibition to receiving in
7   interstate commerce any food, drug, device or
8   cosmetic that is adulterated? Were you aware
9   of that?
10          MS. HILLS: Objection. Overbroad.
11  Calls for speculation. Depending on the time
12  frame.
13          THE WITNESS: I assume you are
14  reading to me a provision from the U.S. Code.
15  I need more information about that.
16          BY MR. NEWMAN:
17      Q.   I will gladly give you the
18  document. My first question is, were you
19  aware that the receipt in interstate commerce
20  of a device that was adulterated is a
21  prohibited act under the Food, Drug and
22  Cosmetic Act?

Page 88

1           MS. HILLS: Objection. Overbroad
2   and calls for speculation.
3           BY MR. NEWMAN:
4       Q.   Were you aware of that, is the
5   question.
6           MS. HILLS: And it misstates facts
7   not in evidence.
8           THE WITNESS: That it is illegal?
9   I am aware that manufacturers may not submit
10  into interstate commerce for commercial
11  purposes adulterated substances. To say it is
12  illegal, it depends on who you are addressing.
13          BY MR. NEWMAN:
14      Q.   Let me do it this way. You were
15  aware that when Yocan was shipping into
16  interstate commerce this adulterated device
17  that Dr. Watson was using, that it was
18  prohibited under the Food, Drug and Cosmetic
19  Act for that manufacturer to do so?
20          MS. HILLS: Objection. Misstates
21  facts not in evidence.
22          THE WITNESS: I didn't look into

Page 89

1   the manufacturer's action or legality of the
2   manufacturer's action.
3           BY MR. NEWMAN:
4       Q.   Is it your testimony that you are
5   not aware that simply the receipt in
6   interstate commerce of a device that is
7   adulterated was a prohibited act? In other
8   words, not by the manufacturer but to get it
9   was itself a prohibited act?
10          MS. HILLS: Objection. Misstates
11  facts not in evidence.
12          BY MR. NEWMAN:
13      Q.   Did you know that?
14      A.   I don't know that to be the case.
15      Q.   Am I correct then, back in 1998
16  and 1999, at least at the time of this case,
17  you were not aware that there was any statute
18  that said that receiving an adulterated device
19  was a prohibited act under the Food, Drug and
20  Cosmetic Act?
21          MS. HILLS: Objection. Misstates
22  facts not in evidence.

23 (Pages 86 to 89)

Page 90

1      THE WITNESS:  I don't know how to
2  answer that since it is not directed at who is
3  doing the receiving and for what purpose.  To
4  the extent that you are saying anyone for any
5  purpose, I don't believe that is accurate.
6      BY MR. NEWMAN:
7      Q.  Who do you think can receive
8  adulterated devices?  Who do you think can
9  legally receive an adulterated device in the
10  United States?
11      MS. HILLS:  Objection.  Calls for
12  speculation.  Overbroad.
13      THE WITNESS:  Well, I believe the
14  Food, Drug and Cosmetic act is focusing on
15  manufacturers of products who introduce those
16  products into interstate commerce for
17  commercial purposes.  Beyond that, the
18  question is too broad for me to --
19      BY MR. NEWMAN:
20      Q.  Beyond that, am I correct, as you
21  were saying, that Dr. Watson at Georgetown
22  University was free to use adulterated devices

Page 91

1  in his practice because he was not a
2  manufacturer?
3      MS. HILLS:  Objection.  Assumes
4  facts not in evidence.  Misstates facts that
5  are in evidence.
6      BY MR. NEWMAN:
7      Q.  Could Dr. Watson use adulterated
8  devices at Georgetown?
9      MS. HILLS:  Objection.  Misstates
10  facts not in evidence.  Also assumes facts not
11  in evidence.
12      BY MR. NEWMAN:
13      Q.  Could he?
14      A.  My conversation with Dr. Watson
15  related to whether or not clinical use of
16  these devices required prior IRB review and
17  approval.
18      Q.  Do I understand, then, that as far
19  as whether it was, in fact, illegal to receive
20  an adulterated device, that, because it is not
21  related to IRB, is going to be something you
22  are going to stand on the privilege on as to

Page 92

1  whether it is, in fact, okay at Georgetown to
2  receive adulterated devices or to use them in
3  practice?
4      MS. HILLS:  Objection.  Assumes
5  facts not in evidence.  Misstates prior
6  testimony, and misstates facts not in
7  evidence.
8      THE WITNESS:  That is not a
9  discussion that Dr. Watson and I had at that
10  time.  I believe I testified that I did not
11  know what the FDA's position would be on that
12  point.
13      BY MR. NEWMAN:
14      Q.  I didn't ask the FDA's position.
15  Are you testifying that it is privileged for
16  you to tell the ladies and gentlemen of this
17  jury that Georgetown allowed its physicians or
18  didn't allow its physicians to use unapproved
19  devices?  Is that a privilege that you are
20  exerting, the answer to that question?  Or can
21  you answer it?
22      A.  I am saying that I was aware it

Page 93

1  was in use for clinical purposes in medical
2  practice for treatment of specific patients.
3      Q.  Ergo, whether it was approved,
4  unapproved, adulterated or not adulterated, it
5  made no difference to your decision as to
6  whether Dr. Watson could use it?
7      MS. HILLS:  Objection.  Misstates
8  prior testimony and misstates facts not in
9  evidence.
10      BY MR. NEWMAN:
11      Q.  Are you going to tell us it is
12  wrong to use adulterated products or are you
13  not?
14      MS. HILLS:  Objection.  Misstates
15  the definition of adulterated as used in the
16  FDCA.
17      BY MR. NEWMAN:
18      Q.  Can you please answer the
19  question?  Was it okay at Georgetown
20  University to use adulterated products,
21  adulterated devices in the treatment of
22  patients?

24 (Pages 90 to 93)

1        MS. HILLS: Objection. Assumes
2  facts not in evidence. Therefore, calls for
3  speculation. Vague.
4        THE WITNESS: I am aware that this
5  device was in use for clinical purposes, and
6  unapproved adulterated means unapproved is one
7  of the definitions. It was unapproved, and I
8  was aware it was in use.
9        BY MR. NEWMAN:
10       Q.   Therefore, as you just said, it
11  was also then adulterated, by definition?
12       A.   That is within the definition as I
13  understand it.
14       Q.   Therefore, it was proper for
15  Dr. Watson in this circumstance to use an
16  adulterated device on his patients?
17       MS. HILLS: Objection. Assumes
18  definition is somewhat other than the
19  manufacturer. Objection, assumes facts not in
20  evidence. Objection, misstates prior
21  testimony.
22       BY MR. NEWMAN:

1        Q.   Is that correct?
2        A.   I can't answer the question. I
3  had a specific discussion with Dr. Watson on
4  specific topics. Any subsequent conversation,
5  I won't address. Any subsequent conclusions,
6  conversations, I will not address.
7        Q.   And just for the sake of the
8  record, there were subsequent conversations
9  and subsequent conclusions?
10       MS. HILLS: Objection. Misstates
11  prior testimony. Vague. Ambiguous.
12       THE WITNESS: I indicated before
13  that, whether there were or were not any
14  subsequent conversations, I would not discuss
15  any action that I took.
16       MR. NEWMAN: Actually, if you want
17  to change your tape now, this is as good
18  timing as any. I have a few minutes left.
19       VIDEOGRAPHER: The time is 3:05
20  p.m. This is ending tape number one in the
21  continuing videotaped deposition of Sheila
22  Cohen Zimmet, Esq.

1        (A recess was taken.)
2        VIDEOGRAPHER: The time is
3  3:15 p.m. We are back on the record in the
4  continuing videotaped deposition of Sheila
5  Cohen Zimmet, Esq. Beginning tape number 2.
6        BY MR. NEWMAN:
7        Q.   Ms. Zimmet, have you ever seen the
8  package insert for Histocryl?
9        A.   No.
10       Q.   Did you make any -- after
11  Dr. Watson spoke with you or before, did you
12  make any inquiry to U.S. Customs about this
13  device that he was going to use?
14       MS. HILLS: Object to the compound
15  nature. To the extent you can answer that in
16  terms of what you did after, without invading
17  the privilege the corporation holds and your
18  own work property privilege, go ahead and
19  answer.
20       THE WITNESS: No.
21       BY MR. NEWMAN:
22       Q.   Did you make any inquiry before or

1  after Dr. Watson spoke with you to Yocan
2  Pharmaceuticals, the distributor of the device
3  that Dr. Watson was going to use?
4        MS. HILLS: Same objections.
5        THE WITNESS: No.
6        BY MR. NEWMAN:
7        Q.   Now, prior to the deposition, did
8  you receive a request for documents?
9        A.   I received a notice of video
10  deposition and on that was a request for
11  documents.
12       Q.   Fair enough. I am just going to
13  go through them in short order. Let's see if
14  we are correct.
15       Number one asked for your CV.
16  That is what we provided.
17       A.   Yes.
18       Q.   Number two asked for the
19  Institutional Review Board's policies and
20  procedures in effect from '98 to '99. If I
21  understand, you have not found those and you
22  are still continuing to look?

Page 98

1    A.   Yes.
2    Q.   Do I also understand any IRB --
3  let me ask you this.  You said that nothing
4  before 1998 as far as IRB procedures and
5  policies could you locate.  What was the last
6  year you could locate the IRB policies and
7  procedures?
8    A.   The most recent?
9    Q.   Yes.
10   A.   2003 is the date on the policies
11 and procedures that currently exist.  There is
12 a 2000 document that is a handbook of sorts.
13 It is not called a policy and procedure.
14   Q.   It is simply called the IRB
15 Handbook or is it called something else?
16   A.   Investigator handbook.
17   Q.   Investigative?
18   A.   Investigator.
19   Q.   Can you provide me with a copy of
20 that document?
21        MS. HILLS:  We will take the
22 request under advisement.

Page 99

1        BY MR. NEWMAN:
2    Q.   Ms. Zimmet, you realize that is
3  not privileged, as well, investigator's
4  handbook.
5    A.   Attorney-client privilege?  I
6  wouldn't think so.
7    Q.   And is that the earliest handbook
8  you also located --
9    A.   Yes.
10   Q.   -- 2000?
11        Document request number three
12 asked for any and all files in your possession
13 regarding Histoacryl and/or Lipiodol.  Because
14 there was an objection and specifically
15 mentioned that after a reasonably diligent
16 search no privilege, nonprivileged responsive
17 documents have been identified, I just need to
18 know if at the present time any documents were
19 identified responsive.
20   A.   No documents have been identified.
21   Q.   Do I understand that that search
22 is continuing or is that search terminated?

Page 100

1    A.   We have done the search.  We will
2  continue.  I frankly don't know where else to
3  look.  But we will keep doing it.
4    Q.   Document request number four,
5  which asked for any and all documents in your
6  possession involving contacts between yourself
7  and/or agent, employee or servant of
8  Georgetown and the U.S. Customs Office
9  relating to Histoacryl and/or Lipiodol, do I
10 understand from your testimony that there are
11 none?
12   A.   That's correct.
13        MS. HILLS:  Objection.  Compound.
14 Full objection is stated in the responses
15 here.  But it calls for speculation.
16        BY MR. NEWMAN:
17   Q.   Ms. Zimmet --
18   A.   I have located no documents that
19 would be within number four.
20   Q.   And do I understand there is no
21 degree of speculation involved in that?  You
22 in fact don't have any?

Page 101

1    A.   I don't have any.  It is
2  speculative with respect to anybody affiliated
3  with Georgetown.  I wouldn't know where to
4  look for that.
5    Q.   Do you have any idea who else or
6  where else those documents might be?
7    A.   No, I don't.
8        Let me clarify.  You said where
9  are those documents.  I don't know there are
10 any documents.
11   Q.   That's what I am asking.  If you
12 don't know of anything --
13   A.   I don't know of anything.
14   Q.   Number five, which basically
15 refers to documents involving contacts between
16 yourself and/or agent, employee or servant of
17 Georgetown and the FDA relating to the same
18 two devices, it is the same answer, that you
19 have not located any?
20   A.   That's correct.
21   Q.   And you would not know where any
22 would be, besides where you have looked?

26 (Pages 98 to 101)

Page 102

1    A.    That's correct.
2    Q.    Document request number six says
3  any and all research involving the legality of
4  Histocryl and/or Lipiodol.  Let me ask, first
5  of all, globally, are you objecting to
6  producing any documents involving the legality
7  of those devices under attorney-client
8  privilege or work-product?
9    A.    If any such documents existed, I
10 would.
11   Q.    And, to your knowledge, at least
12 presently from your own searches, there are
13 none?
14   A.    I have identified none.
15   Q.    Number seven asks for notes,
16 memos, files, dictation, et cetera, between
17 you and any agent, employee or servant of
18 Georgetown and Vance Watson regarding
19 Histocryl and Lipiodol.
20        First of all, do you believe there
21 are any such documents?
22   A.    I am aware of no documents

Page 103

1  regarding Histocryl and Lipiodol -- and/or
2  Lipiodol.
3    Q.    Is the same true if I were to ask
4  you if there had been documents regarding the
5  legality -- regarding your discussions with
6  Dr. Watson about embolizations?
7    A.    I am continuing to look.  I have
8  located no such document.
9    Q.    Is there a procedure at Georgetown
10 if the clinician, physician, requests a
11 particular device to be used, is there a
12 procedure of who he, A, directs that request
13 to; B, whether any documents are formed by it;
14 and C, who finally signs off on it?  Is there
15 some procedure that is usually followed?
16        MS. HILLS:  Objection.  Calls for
17 speculation.  Ambiguous, compound and vague.
18 And overbroad.
19        THE WITNESS:  Well -- MedStar
20 Health runs Georgetown Hospital.  I --
21        BY MR. NEWMAN:
22   Q.    Let's do this.  Back in the days

Page 104

1  1998, 1999, if a physician wanted to use an
2  unapproved device, who would he talk to, what
3  documents would be generated, and how would he
4  get the device?
5        MS. HILLS:  Objection.  Calls for
6  speculation.
7        MR. NEWMAN:  It is asking for the
8  general practice --
9        THE WITNESS:  I don't know.
10        BY MR. NEWMAN:
11   Q.    You don't know?
12   A.    I don't know.  As far as the
13 practice for obtaining a device?  I don't know
14 that.
15   Q.    Was there a requirement that the
16 physician receive permission to use such a
17 device?  Did he have a process where he had to
18 ask?
19   A.    I am not aware if there were such
20 policies or practice.
21   Q.    Am I correct that if you are not
22 aware of it, given your vast background in

Page 105

1  IRB, working as general counsel, as well as on
2  oversight committees, there probably was no
3  such policy?
4        MS. HILLS:  Objection.  Misstates
5  title.  General counsel would be irritated.
6        BY MR. NEWMAN:
7    Q.    You know, let's just call you what
8  you are.  Let me ask you this.  In your
9  capacity at Georgetown, as senior associate
10 medical center counsel, as associate medical
11 center counsel, as associate counsel, as
12 instructor of legal and ethical issues in
13 health care management, school of nursing
14 graduate program, as the lecturer at
15 Georgetown, and a clinical scholar in clinical
16 bioethics, are you aware of any policy at
17 Georgetown in any of your capacity where a
18 physician had to ask for permission to use an
19 unapproved device?
20        MS. HILLS:  Objection.  Overbroad.
21 Vague.  And calls for speculation.
22        THE WITNESS:  In what context?

27 (Pages 102 to 105)

Page 106

1    BY MR. NEWMAN:
2        Q.   A physician is going to use --
3    let's make it easy -- an unapproved device in
4    a context such as we have here.  Did
5    Dr. Watson have to ask permission from
6    anybody, based on what you know the policies
7    and procedures to have been?
8        A.   I am not aware of a policy that
9    addresses that issue.
10        Q.   Do you believe there is none,
11    based on your knowledge of the policies and
12    procedures?
13        A.   I have never seen one that
14    addresses that issue.
15        Q.   Let's go to number eight.  That is
16    whether there was any such documents generated
17    between discussions of you, any agent,
18    employee or servant of Georgetown, the board
19    of directors, and Georgetown University
20    Medical Center regarding the same devices.  Is
21    your answer the same, that you have made a
22    search into said documents and, to date, have

Page 107

1    not recovered any?
2        A.   Yes.
3        Q.   Number nine, any and all documents
4    related to Georgetown's Institutional Review
5    Board's decision to either require or not to
6    require IRB review of Dr. Watson's use of
7    Histoacryl and Lipiodol, am I correct that
8    there are no such documents?
9        A.   I don't recall a decision by the
10    IRB one way or the other on this point.
11        Q.   Let me ask you that question.
12    When Dr. Watson asked you about whether they
13    needed IRB review --
14        A.   Yes.
15        Q.   -- did that require a vote by the
16    IRB?
17        A.   This was -- what was presented to
18    me and I addressed is not a matter within the
19    jurisdiction of the IRB.  So there was nothing
20    to require an IRB vote on.
21        Q.   You have sat on IRBs wherein the
22    members vote as to whether the protocol or the

Page 108

1    use of a particular agent, device or procedure
2    requires IRB review, haven't you?
3        MS. HILLS:  Objection.  Vague,
4    ambiguous.
5        BY MR. NEWMAN:
6        Q.   Ms. Zimmet, you have sat on IRBs
7    deciding whether or not people needed to bring
8    things through IRBs; correct?
9        A.   On occasion an application will be
10    filed with the IRB and a determination will be
11    made as to whether or not that particular
12    matter requires IRB review.
13        Q.   Am I correct that there was no
14    such application by Dr. Watson?
15        A.   I have located none.  That's my
16    understanding.
17        Q.   If he had made an application,
18    therefore, the process would have been IRB
19    review, at least to the extent of voting
20    whether it needed any further action?
21        A.   If he had filed an application or
22    any type of document with the IRB, it would

Page 109

1    have been considered in due course, whatever
2    the document or request would have been.
3        Q.   Did you ask him to file an
4    application to decide whether or not the IRB
5    was required?
6        A.   I am not aware of any particular
7    filing where that type of request is made.  If
8    someone files an application with the IRB, it
9    is for review.  And that is what my response
10    was to.  On occasion the IRB may have an
11    application for approval of research and
12    conclude that it is not appropriate for IRB
13    review.
14        Q.   In any event, you did not ask
15    Dr. Watson to generate an application for the
16    IRB?
17        A.   That's correct.
18        Q.   Number ten, with regard to trade
19    alerts, without going through it, do I
20    understand that until documents produced in
21    this case, you had no knowledge of there being
22    trade alerts?

28 (Pages 106 to 109)

Page 110

1      A.   That's correct.
2      Q.   And it is safe to say that your
3  research has not uncovered any other documents
4  than what plaintiff already had?
5      A.   Related to what?
6      Q.   Trade alerts.
7      A.   That's correct.
8      Q.   Number 11, have you -- I think I
9  asked but, in any event, have you ever seen --
10 I believe you said you did not ever see
11 Histoacryl's package insert?
12     A.   That's correct.
13     Q.   The same with Lipiodol?
14     A.   Yes.
15     Q.   And beyond you seeing it, have you
16 made any inquiry as to whether those package
17 inserts exist at Georgetown in some archive?
18     A.   Whether they exist an archive at
19 Georgetown?  I have not looked to see if there
20 is a package insert for Histoacryl and/or
21 Lipiodol outside anything I would have access
22 to.

Page 111

1      Q.   Am I correct that you did not ask
2  Dr. Watson for the package insert on
3  Histoacryl when he made his inquiry to you?
4      A.   That's correct.
5           I had never heard of Histoacryl
6  and Lipiodol at that time.
7      Q.   Do you recall receiving any
8  package insert of a glue-like embolic device
9  in your time at Georgetown up to 1999 at
10 issue, March?
11     A.   No, I don't recall ever seeing
12 such a package insert.
13     Q.   Request number 12 asked for
14 Georgetown University's policy and procedures
15 involving the use of unapproved Class III
16 devices.  Do I understand from your testimony
17 there are none?
18     A.   I am aware of no policies and
19 procedures relating to clinical use.  There
20 are IRB policies and procedures for research
21 using unapproved devices.  This is a general
22 question.

Page 112

1      Q.   I understand.  With regard to the
2  research involving unapproved Class III
3  devices, would the sum total of what the rules
4  and regulations would be be contained in the
5  policies and procedures manual of that time
6  that we can't locate?
7      A.   I am not aware of any other.
8      Q.   On your own recollective ability,
9  are you able to look at the policies and
10 procedures of 2003 and determine which were
11 the same policies that were in effect back in
12 1998 and 1999 and which were changed over the
13 course of time?
14     A.   I can't tell which were or not but
15 I think there were extensive revisions.
16     Q.   Were you actually involved in
17 those revisions?
18     A.   I worked with an outside
19 consultant on those revisions, on creation of
20 that policy and procedure manual.
21     Q.   Who was that?
22          MS. HILLS:  Objection.  Overbroad.

Page 113

1           BY MR. NEWMAN:
2      Q.   Who did you work with on this,
3  revisions of the policies and procedure
4  manual?
5      A.   We had outside consultants.  Price
6  Waterhouse Coopers.
7      Q.   Do I understand those would have
8  been revisions that occurred between 1998 and
9  2003?
10     A.   Yes.
11     Q.   So they --
12     A.   I don't know if it is fair to call
13 them revisions or a whole new manual.  So I
14 don't know if they would ever have actually
15 seen the old one.
16     Q.   But, in fact, they may have?
17     A.   No.
18     Q.   Copies?
19     A.   I can't speak for them.  I think
20 not likely.  They created a whole new manual.
21     Q.   Just on one specific, then.  Did
22 you -- let me ask you if you agree with this

29 (Pages 110 to 113)

Page 114

1  statement, in your capacities that we listed
2  now on your CV. That good medical practice
3  and the best interests of patients require
4  that physicians use legally available marketed
5  drugs, biologics and devices according to
6  their best knowledge and judgment.
7         MS. HILLS: Objection.
8  Speculation.
9         You may answer to the extent as
10 your own opinion but to the extent counsel is
11 trying to get an opinion as your legal
12 position for the client, Georgetown
13 University, I instruct you not to answer.
14        MR. NEWMAN: Objection to the
15 leading nature of all of your objections. The
16 problem is, counsel, this is an attorney, not
17 a lay witness. She knows. You don't need to
18 direct the witness.
19        BY MR. NEWMAN:
20     Q.  Now, do you agree with that
21 statement?
22        MS. HILLS: Objection to counsel's

Page 115

1  sidebar.
2         MR. NEWMAN: That was not a
3  sidebar.
4         BY MR. NEWMAN:
5     Q.  Do you agree with that statement?
6         MS. HILLS: Same --
7         BY MR. NEWMAN:
8     Q.  Do you want me to tell it again?
9     A.  I understand that that is a
10 statement of opinion and there are exceptions,
11 and there are exclusions, and there are
12 circumstances where an alternative method of
13 treatment and innovative care may be
14 appropriate. I don't know how to answer that.
15    Q.  Are you aware that that particular
16 phrase existed not only in the IRB policies
17 and procedural manuals of 1998 and 1999 but
18 also in the policy and procedure manual at
19 Georgetown in 2003 and in the Cornell policies
20 and procedures of the IRB?
21        MS. HILLS: Objection. Calls for
22 speculation.

Page 116

1         MR. NEWMAN: She hasn't answered.
2  Go ahead.
3         THE WITNESS: I am familiar with
4  the statement.
5         BY MR. NEWMAN:
6     Q.  Have you been involved in reading
7  that statement on a number of occasions and
8  not editing it? In other words, changing it
9  in any of those particular IRBs, at least
10 Cornell and Georgetown University?
11    A.  I have read it on a number of
12 occasions, yes, that's correct.
13    Q.  And your job at both Cornell and
14 Georgetown was to, at times, modify, amend,
15 edit the IRB policies and procedures. Is that
16 correct?
17    A.  If I believed a correction was
18 needed, I could recommend that that be done,
19 yes.
20    Q.  And you never recommended any
21 changing of that particular verbiage that is
22 contained in both of those or all those IRBs,

Page 117

1  policies and procedure --
2     A.  That's correct.
3         MR. NEWMAN: Quick break. Go off
4  the record for a minute.
5         VIDEOGRAPHER: The time is 3:38
6  p.m. We are going off the record.
7         (A recess was taken.)
8         VIDEOGRAPHER: The time is 3:39
9  p.m. We are back on the record.
10        BY MR. NEWMAN:
11    Q.  So that I am clear, during this
12 deposition we did discuss the issues of
13 policies and procedures involved in use of
14 embolization devices and the fact that your
15 research didn't uncover any.
16        MS. HILLS: Objection. Misstates
17 prior testimony.
18        BY MR. NEWMAN:
19    Q.  Let's go through it then. Did
20 your research undercover any policies and
21 procedures regarding the embolization, the
22 practices of the interventional

Feder Reporting Company
(202) 863-0000

Page 118

1  neuroradiologist?
2        MS. HILLS:  Objection.  Misstates
3  document request.
4        MR. NEWMAN:  It is a question,
5  counsel, not a statement.
6        BY MR. NEWMAN:
7    Q.   Did you find any?
8    A.   I did not do -- no, I found no
9  documents, nor did I look for any documents,
10  on policies and procedures for doing
11  embolizations.
12    Q.   So, in fact, such may exist.  You
13  just didn't check one way or the other?
14    A.   I don't know.  You didn't ask for
15  them.  I don't know whether the department
16  would have -- I don't know.
17    Q.   You had nothing to do with such
18  policies and procedures in your time at
19  Georgetown?
20    A.   Policies and procedures for
21  clinical embolizations?  No, I would not have
22  had anything to do with it.

Page 119

1    Q.   How about research embolizations?
2    A.   Any IRB applications I may have
3  seen as a member of the IRB.  That's the only
4  thing I would have seen, and we have already
5  discussed looking for those.  Those would have
6  been protocols.  Policies and procedures?
7  They would have been filed IRB protocols.
8  That's not the same as a policy and procedure.
9    Q.   So we don't get into a semantic
10  game as to particulars of what they are
11  called, any other documents you are aware of,
12  no matter what they are entitled, that relate
13  to embolizations and clinical practice or
14  research practice?
15        MS. HILLS:  Objection.  Overbroad
16  and vague.
17        MR. NEWMAN:  I am asking, counsel,
18  for the totality of names, because I don't
19  want to be caught with a title I don't know.
20        BY MR. NEWMAN:
21    Q.   Are you aware of any other
22  documents that relate to the use, for example,

Page 120

1  of embolization devices or a procedure of
2  embolizing a patient, other than what you
3  mentioned that there may be some applications
4  to the IRB?
5        MS. HILLS:  Objection.  Overbroad.
6        THE WITNESS:  What type of
7  embolizations?
8        BY MR. NEWMAN:
9    Q.   To deal with interventional
10  neuroradiology.  And, again, don't limit it to
11  simple policies and procedures.  Whether they
12  are called rules and regulations, whether they
13  are called practice guidelines, or anything.
14  Are you aware of any documents relating to the
15  procedures, or the practice, or the research,
16  of neuroembolizations?
17        MS. HILLS:  Objection.  Assumes
18  facts not in evidence.  Calls for speculation.
19        THE WITNESS:  I am not personally
20  aware of general files other than what I
21  looked for in the legal office of the IRB
22  dealing with AVM embolizations.

Page 121

1        BY MR. NEWMAN:
2    Q.   Do I understand that we have been
3  through the issue at the IRB but there is no
4  legal file on that subject?
5    A.   I located no applicable file in
6  the lists of legal files or in the files that
7  are in hard copy in my office.
8    Q.   As far as general policies and
9  procedures, the rules and regulations that
10  don't deal with the legal aspect or the IRB,
11  who would know about those?  Who would be the
12  person that would be aware of them, for
13  embolizations involving neuroradiology?
14    A.   You are talking about clinical or
15  research?
16    Q.   Anybody -- start at one time.  As
17  far as research is concerned, anyone other
18  than yourself or the IRB, that would be
19  involved with policies and procedures, rules
20  or regulations, or any other title of
21  documents relating to the research involving
22  embolizations?

31 (Pages 118 to 121)

Page 122

1       A.   I don't know what the department
2  would have.
3       Q.   You don't know --
4       A.   If they had copies of what was
5  filed with the IRB, I wouldn't know that.
6       Q.   Do you know who the person to go
7  to to ask that question, the name of the
8  person?
9       A.   I don't currently.
10       Q.   Who was it back then?
11       A.   MedStar.
12            I don't know who would have been
13  custodian of those types of records.
14       Q.   Then as far as the clinical
15  practice, is that the same answer you have,
16  and that is, as far as who would be the
17  custodian of any other such policies,
18  procedures, rules, regulations, guidelines?
19  Do you know who that would have been on the
20  clinical end?
21       A.   I would not know who the custodian
22  was in that department.

Page 123

1            (Discussion off the record.)
2            BY MR. NEWMAN:
3       Q.   What role did Leonard, is it,
4  Chiazze have on the IRB?
5       A.   He was a member of the IRB.
6            MS. HILLS:  Objection.
7  Irrelevant.
8            BY MR. NEWMAN:
9       Q.   Do you know if he had anything to
10  do, whatsoever, with those particular
11  protocols you discussed involving
12  interventional neuroradiology?
13            MS. HILLS:  Objection.  Misstates
14  prior testimony.
15            THE WITNESS:  I don't know that.
16            BY MR. NEWMAN:
17       Q.   Are you aware at all anything that
18  Dr. Chiazze was involved with litigation
19  against the hospital?
20            MS. HILLS:  Objection.
21  Irrelevant.  Overbroad.
22            THE WITNESS:  No, I am not.

Page 124

1            BY MR. NEWMAN:
2       Q.   Do you remember anyone at the IRB
3  discussing the fact that tenured professors
4  and others had to raise their revenues?
5       A.   No.
6       Q.   What financial trouble was the
7  hospital in in 1998 and 1999?
8            MS. HILLS:  Objection.  Relevance.
9            THE WITNESS:  I don't think I can
10  speak to that.  I don't have specific
11  information.
12            BY MR. NEWMAN:
13       Q.   You are --
14       A.   Generally aware, but I have no
15  specific to ask what type.  I don't know that.
16       Q.   You were generally aware there was
17  financial trouble with the hospital and that
18  ultimately led to the buyout by MedStar?
19            MS. HILLS:  Objection.  Calls for
20  speculation.
21            THE WITNESS:  Generally aware of
22  financial problems at the hospital?  No.

Page 125

1            BY MR. NEWMAN:
2       Q.   Do I understand from your prior
3  testimony that you have no idea how, in
4  Dr. Watson's treatments, the Histoacryl or
5  Lipiodol was received or how it was paid for?
6            MS. HILLS:  Objection.  Vague.
7  Ambiguous.
8            THE WITNESS:  I testified that I
9  knew from a conversation with Vance that it
10  was obtained from Canada.
11            BY MR. NEWMAN:
12       Q.   Correct.
13       A.   And I told you at the conversation
14  about customs.  There was no problem bringing
15  it over.  So to the extent that I know -- it
16  was received, yes, I knew that.  Paid for, no,
17  I don't know that.
18       Q.   And more specifically on receipt,
19  you don't know anything beyond the fact that
20  it came from Canada, not who got it into the
21  department, who put it on the shelf, who dealt
22  with it --

32 (Pages 122 to 125)

Page 126

```
 1        A.   Correct.
 2        Q.   -- beyond (inaudible.)
 3        Do I understand your testimony
 4  that Dr. Watson -- let me ask you this.  With
 5  regard to the U.S. Customs and conversation
 6  with Dr. Watson, did Dr. Watson tell you that
 7  he had interaction with U.S. Customs or did
 8  you simply say, as you testified, that
 9  everything should be done in accordance with
10  U.S. Customs?
11        MS. HILLS:  Objection.  Misstates
12  prior testimony.
13        THE WITNESS:  I don't recall him
14  specifically stating that he had an
15  interaction.  As I testified, I did say,
16  whoever brings it over, you or an agent or
17  whoever, needs to be totally honest with
18  Customs.  And he indicated, yes, that's the
19  case.
20        BY MR. NEWMAN:
21        Q.   Does that mean, to your
22  recollection, you do not recall Dr. Watson
```

Page 127

```
 1  telling you he actually did have an
 2  interaction with Customs?
 3        A.   No, I don't recall that.
 4        Q.   Who would be the person that would
 5  know how these devices were paid for?
 6        MS. HILLS:  Objection.  Overbroad.
 7        THE WITNESS:  Perhaps purchasing.
 8  There is central purchasing.  Perhaps it would
 9  have gone through them.  I don't know.
10        BY MR. NEWMAN:
11        Q.   Who was in central purchasing in
12  1998 and 1999?  Was there a head purchasing
13  agent or person?
14        A.   I don't know who would have been
15  head at this point.
16        Q.   Did you have any discussion with
17  Dr. Watson as to whether or not he could write
18  prescriptions that would be filled in Canada?
19        A.   No.
20        Q.   Did you understand that physicians
21  who are not licensed in Canada cannot write
22  prescriptions in the United States and have
```

Page 128

```
 1  them be valid in Canada?
 2        A.   Did I understand?  I don't believe
 3  I considered it.  I mean, I had no discussion
 4  about it.  (Inaudible.)
 5        Q.   Are you aware as to whether or not
 6  it is legal for, say, Vance Watson to write
 7  prescriptions to be filled in Canada?
 8        MS. HILLS:  Objection.  Vague.
 9        THE WITNESS:  Legal to write it?
10  I think it up to the person to whom it is
11  presented whether or not it would be filled or
12  not, as a general matter in a prescription.  I
13  don't know of anything that would make it
14  illegal.
15        BY MR. NEWMAN:
16        Q.   Do you have an understanding that
17  physicians can write prescriptions for
18  adulterated devices?
19        MS. HILLS:  Objection.  Misstates
20  facts not in evidence.
21        THE WITNESS:  I have never
22  researched the question.
```

Page 129

```
 1        BY MR. NEWMAN:
 2        Q.   Did you discuss the issue of the
 3  embolization devices used by Dr. Watson, be
 4  they referred to as blue, n-BCA, Histoacryl,
 5  Lipiodol, with any other individuals at the
 6  hospital besides Dr. Watson, who we discussed?
 7        MS. HILLS:  I instruct you not to
 8  answer to the extent that it invades the
 9  attorney-client communication and -- the
10  attorney-client communication.  To the extent
11  you can answer -- also, because it is
12  overbroad, and no time frame is attached to
13  it, you need to keep that in mind.
14        BY MR. NEWMAN:
15        Q.   Besides Dr. Watson, with the same
16  objections.
17        A.   I am declining to answer the
18  question as to whether there were or were not
19  any such conversations.
20        Q.   Is it your opinion that it is
21  privileged to give the name of the individual?
22        A.   Yes.
```

33 (Pages 126 to 129)

Page 130

1        MR. NEWMAN:  That's all I have.
2        EXAMINATION FOR DEFENDANT DR. WATSON
3        BY MR. CLARK:
4        Q.   Ms. Zimmet, I think I identified
5   earlier.  My name is George Clark.  I have
6   been brought in as conflicts counsel for
7   Dr. Watson on this matter.  And I have just a
8   couple of questions for you.
9        One, in response to Mr. Newman's
10  question a few moments ago about your
11  conversations with Dr. Watson, you referred to
12  you meaning Dr. Watson or agent bringing it
13  over.
14       Did you discuss with Dr. Watson
15  whether he, in fact, could bring the glue into
16  the country?
17       A.   I don't have specific
18  recollection.  I know there was, during the
19  course of our conversation, the fact that it
20  came in from Canada was mentioned.  Who
21  brought it in, whether it was him or someone
22  else, I don't recall discussing that.  I do

Page 131

1   recall saying that whether it was him or
2   someone else, they should be totally truthful
3   with customs.  So whether he could or could
4   not, I suppose that's -- it didn't come up in
5   that context.
6        Q.   So what you told him didn't
7   depend, as far as you recall, on who brought
8   it in?
9        A.   Correct.
10       Q.   With respect to your conversations
11  with Dr. Watson about this subject, do you
12  remember whether it was one or more than one
13  conversation?
14       A.   I only recall one conversation.
15  But it is a long time ago so I am -- you know,
16  I can't be totally sure.  I recall one
17  conversation.
18       Q.   Do you recall whether, when he
19  asked you the questions that he did, that you
20  said to him -- let me strike that.
21       When he asked you the questions
22  that he did, did you tell him, "I need a

Page 132

1   minute, I need to get back to you"?
2        A.   I don't recall that.
3        MR. CLARK:  I said I had a little
4   and that's it.
5        MR. NEWMAN:  I have nothing else.
6        VIDEOGRAPHER:  The time is now
7   3:56 p.m.  This concludes the videotaped
8   deposition of Sheila Cohen Zimmet, Esquire,
9   with tape number two.
10       (Discussion off the record.)
11       MR. GREENWALD:  My understanding
12  is, of the conversation with Judge Kay and
13  Mr. Muzin, that Mr. Muzin advised the judge
14  that he did have documents and the judge
15  wanted a privilege log.  My only question is,
16  have you done the privilege log?
17       MS. HILLS:  My understanding
18  regarding conversation with Judge Kay is that
19  we were first to meet and confer prior to any
20  privilege log being created and, secondly,
21  whatever Mr. Muzin said during the call, you
22  have now requested the documents themselves

Page 133

1   from the witness to whom the document requests
2   were made.  And she has stated that there are
3   no responsive documents able to be located.
4   Ergo, I am not aware of what I would put on a
5   privilege log, since no documents from the
6   witness, who subsequently is stating, exist.
7        MR. NEWMAN:  Counsel,
8   unfortunately, I hate to respond, since I was
9   on a phone call.  This does not just take into
10  account the duces tecum.  This takes into
11  account no production of documents with regard
12  to anything other than what has already been
13  given to us in records on request for
14  production, no response to the
15  interrogatories, no response to request for
16  admissions.
17       I would like to have that meeting
18  right now because I suspect that you are going
19  to have nothing else to say.  If you have
20  something to say, or a document to produce, or
21  an answer to change, we will be free to have
22  the meeting and I am free to do it Wednesday.

34 (Pages 130 to 133)

Page 134

1   If you don't have anything, just tell me,
2   because this is a game. I don't want to
3   continue to go looking for something that
4   isn't there. I do know what this witness said
5   but this is not the only issue.
6          MS. HILLS: Why don't we have a
7   meeting.
8          MR. MUZIN: I sent an email to you
9   last weekend. I suggested either tomorrow or
10  Wednesday after the deposition.
11         MR. NEWMAN: Tomorrow is fine. We
12  can do it. I am just saying, the answer is
13  going to be, is there anything to give us or
14  not. Not anything further than that. But,
15  yes, that's fine.
16         MS. HILLS: Actually, since I am
17  taking the deposition tomorrow, and I would
18  like some time to go over your five-page,
19  single-spaced comments so that I can provide
20  them the reasonable and considered judgment to
21  meet and confer, why don't we have the
22  discussion on Thursday after Mr. Kerris'

Page 135

1   deposition.
2          MR. NEWMAN: That's of no import.
3   That's fine.
4          MS. HILLS: Terrific.
5          MR. GREENWALD: I just was curious
6   as to whether you were saying that Mr. Muzin
7   misspoke in the conference with the judge
8   about having documents.
9          MS. HILLS: Regarding the subpoena
10  duces tecum, I believe the comment was either
11  that the witness has better knowledge than
12  whether we do and you have ascertained whether
13  there are responsive documents regarding the
14  duces tecum.
15         MR. MUZIN: I recall the
16  conversation pretty well. I mean, the judge
17  said, "Mr. Newman said you haven't turned over
18  all the documents." I said, "There are no
19  responsive, nonprivileged documents which we
20  haven't turned over." The judge said, "Do I
21  understand from your response that there are
22  some documents which you are claiming are

Page 136

1   privileged?" I said, "There may be some
2   documents but those would be covered by
3   attorney-client privilege."
4          MR. NEWMAN: Actually what you
5   said was it is going to involve Ms. Zimmet's
6   notes and memoranda and stuff. And those
7   things can be privileged.
8          MR. MUZIN: If there are such
9   documents, it would be attorney work-product.
10         MS. HILLS: Why don't we go off
11  the record. We don't need to have the fight.
12         MR. GREENWALD: The judge said to
13  prepare a privilege log.
14         MR. MUZIN: The judge said he is
15  not excusing the meet and confer. There needs
16  to be a meet and confer. If, after that, you
17  have challenges arising from attorney-client
18  privilege, then a log will be appropriate.
19         MR. NEWMAN: You have to do a log
20  any time you stand on privilege, any time you
21  do not answer or respond. That should have
22  been in your response to interrogatories, that

Page 137

1   should have been in your answers to
2   interrogatories, or whatever is --
3          MS. HILLS: We will confer on
4   Thursday.
5          (Whereupon, at 4:01 p.m., the
6   deposition was concluded.)
7                  +++

Feder Reporting Company
(202) 863-0000

Page 138

```
 1
 2        CERTIFICATE FOR READING AND SIGNING
 3
 4            I hereby certify that I have read
 5   and examined the within transcript and the
 6   same is a true and accurate record of the
 7   testimony given by me.
 8            Any corrections I have listed on
 9   the separate errata sheet enclosed, indicating
10   the page and line number of each correction.
11
12
13
14
14       _____
15       Sheila Cohen Zimmet, Esq.
15
16
16       _____
17       Date
18
19
20
21
22
```

Page 139

```
 1        CERTIFICATE OF NOTARY PUBLIC
 2            I, Zev V. Feder, the officer
 3   before whom the foregoing deposition was
 4   taken, do hereby certify that the witness,
 5   whose testimony appears in the foregoing
 6   deposition, was duly sworn by me; that the
 7   testimony of said witness was taken by me in
 8   shorthand and thereafter reduced to computer
 9   type under my direction; that said deposition
10   is a true record of the testimony given by
11   said witness; that I am neither counsel for,
12   related to, nor employed by any of the parties
13   to which this deposition was taken; and
14   further, that I am not a relative or employee
15   of any attorney or counsel employed by the
16   parties hereto, nor financially or otherwise
17   interested in the outcome of the action.
18
19
19       _____
19       Notary Public in and for
20       The District of Columbia
21   My Commission Expires:
21   April 14, 2012
22
```

Feder Reporting Company
(202) 863-0000