<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
    FELICE I. IACANGELO, et al,      . Docket No. CV-05-2086 (PLF)
 3                                   .
         Plaintiff,                  .
 4                                   . Washington, D.C.
              v.                     . June 26, 2007
 5                                   . 10:00 a.m.
    GEORGETOWN UNIVERSITY,           .
 6  trading as Georgetown University .
    Hospital, et al,                 .
 7                                   .
         Defendants.                 .
 8  . . . . . . . . . . . . . . . .
 9             TRANSCRIPT OF STATUS CONFERENCE
          BEFORE THE HONORABLE PAUL L. FRIEDMAN
10             UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiff:         Newman, McIntosh and Hennessey
                               By: Anthony G. Newman, Esquire
13                             7315 Wisconsin Avenue
                               Bethesda, Maryland 20814
14                             301.654.3400

15                             Joseph, Greenwald and Laaker, PA
                               By:  Andrew E. Greenwald, Esquire
16                             6404 Ivy Lane
                               Greenbelt, Maryland 20770
17                             301.220.2200

18  For the Defendant:         Williams and Connolly, LLP
                               By: Megan E. Hills, Esquire
19                                 Nicolas D. Muzin, Esquire
                               725 Twelfth Street, Northwest
20                             Washington, D.C. 20005
                               202.434.5393
21

22  Court Reporter:            Linda L. Russo, RPR
                               Official Court Reporter
23                             Room 6403, U.S. Courthouse
                               Washington, D.C. 20001
24                             202.354.3244

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription
</pre>

P R O C E E D I N G S

1

THE CLERK:  Civil action 05-2086, Felice I.

2

Iacangelo, et al, versus Georgetown University, et al.

3

Counsel, please identify yourselves for the record.

4

MS. HILLS:  Your Honor, Megan Hills and Nicholas

5

Muzin on behalf of -- well, unknown at this time, but we are

6

the named representatives for both defendants, Georgetown

7

University and Dr. Vance Watson.

8

If I may approach the court reporter, I would give

9

her my card such that my name is easy to spell.  Thank you,

10

Your Honor.

11

MR. NEWMAN:  Anthony Newman and Andrew Greenwald on

12

behalf of the plaintiff.

13

THE COURT:  Good morning.  All right, the last time

14

we were here we talked about a number of things, one of which

15

was whether or not it would make any sense sooner rather than

16

later to proceed down the road of settlement discussions or

17

mediation either with Judge Facciola, since Judge Kay is

18

supervising discovery, or with a private mediator.  And among

19

other things, we thought we should wait at least until after

20

Dr. Watson's deposition, which I gather is over.  There may be

21

other issues on your mind as well, including Ms. Hills' cryptic

22

comment when we started.

23

MS. HILLS:  Your Honor, if I may?

24

THE COURT:  Yes.

25

 1          MS. HILLS:   While there may be a dispute, the Court

 2    can see the defense's position that is stated in the affidavit.

 3    There is no dispute about the basic fact of what occurred,

 4    which is at the deposition of one of the defendants, Dr. Vance

 5    Watson, on May 31, 2007, in his presence plaintiff's counsel

 6    referred in front of him to the fact that his representation,

 7    Dr. Watson's legal representation, was not acting in his best

 8    interest because there was a conflict between his legal

 9    representation in that they represented both Georgetown

10    University and Dr. Watson.

11          Immediately within three business days, the said

12    letter on June 5th was sent to the Court and simultaneously to

13    plaintiff's counsel.

14          THE COURT:   Sent to Judge Kay?

15          MS. HILLS:   Yes, Your Honor.   There was a telephonic

16    hearing on June 12, 2007.   Judge Kay recognized that defense

17    counsel was in a quandary, that although both our own internal

18    conflict system couldn't find a conflict that we had taken it

19    to John Buckley who represented the account, that we had taken

20    it to the clients who didn't see a conflict, and that we had

21    taken it to the two ethics partners at our firm and didn't see

22    a conflict.   Still, there's this allegation, and the client,

23    Dr. Watson, asked what is the conflict?

24          And Magistrate Judge Kay recognized that defendants

25    were effectively robbed of their legal representation for the

4

1    past three weeks, as a conflicted lawyer has a very difficult

2    time explaining the conflict.  It's almost like a cafeteria, if

3    I tell one of your clerks they should get the lasagna as

4    opposed to the meatloaf, and Mr. Newman comes in and says,

5    well, she has stock in the lasagna maker.  She is conflicted,

6    her recommendation isn't appropriate.  I must turn to the

7    cafeteria lady, you, without the hairnet, to say, well, she

8    honestly likes the lasagna over the meatloaf.

9              I can't explain a conflict that I don't understand

10   myself, yet there is this allegation made by plaintiff's

11   counsel.

12             In anticipating arguments that plaintiff's counsel

13   made in front of Magistrate Kay, while normally a lawyer would

14   not have the duty to explain a conflict to a defense counsel,

15   once the allegation is made in front of the client such that

16   defense counsel can't explain it, because anything I say is

17   now, and anything that comes from my firm, is now questioned

18   because there's this allegation of conflict.

19             THE COURT:  Should he move to disqualify you?

20             MS. HILLS:  Well, Your Honor, if there's a conflict

21   that Mr. Newman can state -- he either has to state what the

22   conflict is such that I can take the transcript to the clients

23   where they can have the option of waiving or finding new

24   counsel and disqualifying me, or he can state on the record

25   that there is no conflict.

1          Your Honor, the only conflict I can see is if
2     Georgetown told Dr. Watson he didn't have to take his
3     Histoacryl through the Research Board, and they were wrong in
4     doing that.
5          THE COURT:  Why am I listening to all of this if
6     Judge Kay has a motion before him?
7          MS. HILLS:  Because he referred it -- he told us on
8     the phone that although he recognized that defense counsel
9     could not conduct discovery, other than collect documents,
10    which any lawyer could take, I could pass off to, he said he
11    referred it to you.
12         THE COURT:  This is the first I've heard of that.
13         MS. HILLS:  He said -- on the 12th he said he
14    recognized what an emergency it was, and that he would refer it
15    immediately to you.
16         THE COURT:  This is the first I've heard of that.
17    You've heard of it?  I haven't heard of it.  My law clerk
18    hasn't heard of it.
19         MS. HILLS:  Your Honor, I have three requests --
20         THE COURT:  Somebody should file a motion.  Do you
21    want to file a motion to disqualify them?
22         MR. NEWMAN:  No, Your Honor.
23         THE COURT:  Well, what do you want to do?
24         MR. NEWMAN:  The answer to our commentary in the
25    conflict was if Sheila Zimmett's (phonetic) deposition -- there

1    are two issues, by the way, in potential conflict.

2            Let me first of all state for the Court, Judge Kay

3    never said those things, and I'm getting pretty tired of having

4    representation by counsel which is false. He did not say no

5    discovery continues, this matter would be addressed. He said

6    he would send forth information of this two letters to this

7    Court when and if he felt that was necessary. There was no

8    stopping of an issue in the case, nor do we request that that

9    be done.

10            What happened was, Dr. Watson testified that his --

11    the general counsel, Sheila Zimmett of Georgetown said, it's

12    not illegal to use this stuff that is not approved and is being

13    smuggled across the border, so go ahead and use it, some 500 to

14    a thousand times he testified.

15            Two, she said, you don't need to go through the

16    Institutional Review Board. Don't worry about it. So, my

17    comment at the end of the deposition was, if there's a

18    conflict, if that's what Sheila Zimmett is going to say, fine,

19    let's get past this --

20            THE COURT: Why would you say that in front of the

21    doctor?

22            MR. NEWMAN: Your Honor, it was not meant to be in

23    front of the doctor. It was meant at the end of the deposition

24    to simply say we need to depose doctor -- Sheila Zimmett. And

25    if there's any issue, that's what we need to get under way and

1   finished.  I just asked for the deposition of Sheila Zimmett.

2   If she testifies that she didn't say those things, there's no

3   conflict.

4          And I did not say in front of the client whatsoever

5   that his representation was at issue.  I made no such

6   statements that there was any problem with who is -- I simply

7   said that we have a conflict based on Sheila Zimmett's

8   testimony if she says that she told Watson go ahead and break

9   the law, go ahead and use this without IRB approval, when he

10  said if he had not been told that, he wouldn't do it.

11         I don't believe Sheila Zimmett is going to testify to

12  that.  I think she's going to say I never said those things,

13  and then there's no issue at all.

14         I know Sheila Zimmett personally.  I don't believe

15  that's what's going to happen.  If we do that, we can end this

16  issue.  What happens now, though, is the defense is using this

17  as another stall tactic and saying now we can't do anything.

18  Sheila Zimmett's deposition, their general counsel, can go

19  forward.  And then if there's a no issue of conflict, there's

20  no issue.  Certainly if there's an issue where she testifies

21  that I didn't say those things, and Watson says I did say

22  them -- she did say them, there will be an issue there.  But

23  that's what I was waiting on, and trying to get Sheila

24  Zimmett's deposition.

25         THE COURT:  What have you done to try to get Sheila

1    Zimmett's deposition?

2              MR. NEWMAN:  We requested Sheila Zimmett's deposition

3    by letter, and the defense said, responding to your letter we

4    are aware that from being present during the June 12th

5    conversation, the allegations made by plaintiff are in

6    conflict, so on and so forth, such that no scheduling of

7    depositions can take place, nor may any deposition take place

8    at this time.  So it's a blanket refusal to do any discovery.

9    That's not what Judge Kay said whatsoever.

10             Judge Kay simply said, if there is an issue of a

11   conflict, then I -- this is not a matter for me in a discover

12   dispute.  That's the sum total of it.

13             Now, we will not know anything until Sheila Zimmett's

14   deposition is taken.  It's a short deposition.  She has about

15   ten things that she possibly could have said, and we will know

16   the answer to that question.  But in advance of that, it was --

17   the point was made that if this is true, then there's going to

18   be some issue here.  If it's not, and Sheila Zimmett denies it,

19   then there's a conflict.  If she agrees and says everybody

20   agrees to that, there won't be.

21             But the sum total is I don't think we should stop

22   discovery on this point.  There is no -- Dr. Watson's

23   deposition has taken place, and there's a little bit of time

24   left to continue, but we do need to move this case forward.  I

25   think Sheila Zimmett will render the answer to all of that, and

1      maybe the whole issue mute.

2            THE COURT:  She is the one person who Dr. Watson said

3      gave her this advice, or said this?

4            MR. NEWMAN:  Correct.  He is the one -- he said -- I

5      said why did you use it?  He said, I talked to Sheila Zimmett,

6      she said it's okay to use this stuff that's unapproved.  And

7      then I said, why did you not run it through an IRB?  It turns

8      out Sheila Zimmett sat on the IRB, Institutional Review Board,

9      as the lawyer member, and also said don't worry about it.

10           THE COURT:  According to Dr. Watson, Sheila Zimmett

11     said don't worry --

12           MR. NEWMAN:  According.  Now, we don't know whether

13     Sheila Zimmett is going to agree to any of that.  That's why

14     the deposition should take place, and that will end this issue

15     completely, depending on what her testimony is.

16           THE COURT:  Presumably, if Sheila Zimmett says I

17     never said that to Watson, then Watson has a credibility

18     problem.  Well, it depends, I mean --

19           MR. NEWMAN:  Correct.

20           THE COURT:  Watson's counsel has to stand by Watson's

21     credibility, but Watson's counsel also has to stand by Sheila

22     Zimmett's credibility since she is a Georgetown employee.

23           MR. NEWMAN:  Correct.

24           THE COURT:  If Sheila Zimmett confirms what Watson

25     said --

1          MR. NEWMAN:  Then everybody -- the defense is in a

2     solid front.  There may be a defense Watson has to saying,

3     look, I didn't mean to break any rules, I was told to do so.

4     There might be that issue.

5          THE COURT:  Well --

6          MR. NEWMAN:  But, I mean, that's a lesser point and,

7     you know, can be dealt with.  But I think that if she denies

8     it, that's an issue.

9          THE COURT:  Well, I'm not sure.  If she denies it --

10          MR. NEWMAN:  Then it's a credibility on Watson's

11     point.

12          THE COURT:  I guess we have to see.  Ms. Hills.

13          MS. HILLS:  Your Honor, instead of taking whatever

14     representations were said by Judge Kay by plaintiff's counsel

15     or defense counsel, I'd ask the Court speak to Judge Kay about

16     this issue.  Judge Kay was concerned that obviously if I was

17     conflicted, how do I represent both defendants at a deposition?

18     And he recognized that.  And obviously there's a dispute.

19          Let me just say for the Court, regardless of what Ms.

20     Zimmett testifies to, we still don't believe there's a conflict

21     because of the following.

22          If Ms. Zimmett testifies, I never said that, and Dr.

23     Watson used, according to plaintiffs, an illegal substance,

24     then he would be negligent and Georgetown still, under

25     Respondeat Superior, which plaintiffs have sued under, would be

1    negligent.  There would be no conflict.  If Sheila Zimmett said

2    I did say that, Dr. Watson can say, yes, I used these

3    unapproved substances but I was given permission.

4            But still, Your Honor, they have to prove it caused

5    damage.  And therefore as a -- it's not just the use of the

6    substances.  They have to prove that there was something wrong

7    with the patient, and so Georgetown would still be negligent

8    under either scenario.  But it has stopped discovery, and we

9    would ask --

10           THE COURT:  I'm not sure it stopped discovery, and

11   I'm not sure that I agree with your conflict analysis.

12           MS. HILLS:  Your Honor, I don't know what the

13   conflict is.

14           THE COURT:  According to Judge Kay's law clerk,

15   discovery has not been stopped.

16           MS. HILLS:  Your Honor, how do I represent -- if I

17   don't have the best interests of the client at heart, how do I

18   represent that person?

19           THE COURT:  Which client?

20           MS. HILLS:  Dr. Watson.  That's what was said to him,

21   that I am conflicted, I don't have his best legal

22   representation at heart.  How do I then sit at a deposition --

23           THE COURT:  Why don't you get him another lawyer?

24           MS. HILLS:  What is the conflict?

25           THE COURT:  Why don't you get him a lawyer to advise

1    him on whether there's a conflict, and why don't you get Sheila

2    Zimmett a lawyer and let's go forward with her deposition.

3         I'm ruling that you cannot represent Sheila Zimmett

4    at her deposition.  And I'm ruling that you have to get

5    independent counsel to separately advise Dr. Watson

6    immediately, so discovery can proceed.

7         MS. HILLS:  Yes, Your Honor.  Because of this haze,

8    would you allow -- because at least from defense counsel -- and

9    it's probably my fault, from hearing the Court's ruling, I need

10   a two week extension for defense discovery responses to

11   plaintiffs because I haven't been able to advise my clients on

12   anything since the 31st.

13        THE COURT:  I don't believe that that isn't -- that

14   you haven't been able to advise your clients of anything.

15   Which clients?  Neither client.

16        Look, this happens all the time.  Somebody raises an

17   issue of potential conflict, you go out and you get an

18   independent lawyer.  You say I'm not sure there's a conflict

19   but I will give you an independent lawyer.  You talk to that

20   lawyer, you figure it out.  You can waive the conflict if you

21   think there's a conflict.

22        Now, if Sheila Zimmett says that what Watson says is

23   true, yes, they have to prove causation on that claim.  I'm not

24   sure how the conflict comes out if she says it's true.  If she

25   says it's not true, then can you really put both Watson and --

13

1    you, Ms. Hills, really put both Watson and Zimmett on the

2    stand, or does one of them need a different lawyer at trial.

3              You've got two clients, Georgetown and Watson.  Their

4    interests are identical, unless a primary spokesperson for

5    Georgetown says that your other client isn't telling the truth.

6    And we certainly can't find ourselves in a situation mid-trial

7    where that happens.

8              If there are two separate claims here, one is medical

9    malpractice against Dr. Watson, and the other is the use of

10   certain devices, procedures, whatever they're called, that

11   haven't been approved by the FDA or are experimental or

12   whatever.  And I'm sure --

13             MS. HILLS:  It's still medical malpractice.  It's

14   that the use of these unapproved substances breached the

15   standard of care.  At the end of the day, it's all medical

16   malpractice.

17             So I can't see a situation where Georgetown -- if Dr.

18   Watson is liable for anything, Georgetown is liable, period.

19   Because at the end of the day --

20             THE COURT:  If Dr. Watson went off on his own and

21   used something that was not approved, that the Review Board

22   didn't authorize him to use, and he knew that it wasn't

23   authorized to be used --

24             MS. HILLS:  It would still be in the scope of

25   employment.  He's hired and works as an interventional neural

 1    radiologist.  Whatever he used --

 2              THE COURT:  If I were representing Georgetown I would

 3    say, wait a minute, if this guy is off on a frolic of his own,

 4    isn't there some way we could get out of this?

 5              MR. NEWMAN:  Your Honor, may I make one observation.

 6    I wasn't at the deposition when all of this took place but I

 7    would like to say this.  We have been trying to get Sheila

 8    Zimmett's deposition.  As you know, I wrote a letter almost

 9    three weeks ago asking for dates.  Second of all, we have asked

10    for dates for the head of the hospital and some folks at

11    Georgetown so we could find out whether or not they had

12    approved using this at higher levels in the hospital

13    administration, because that's important also for the question

14    of whether Georgetown has liability or not.

15              At every step of the way we are blocked from taking a

16    deposition.  This case has been going on, as you know, for a

17    long time and we have --

18              THE COURT:  Why can't you take a deposition of

19    anybody at Georgetown you want to?

20              MR. NEWMAN:  They have objected.

21              THE COURT:  On what ground?

22              MR. NEWMAN:  We've had conferences with Judge Kay --

23    I'm sorry?

24              THE COURT:  On what ground?  You can take a

25    deposition from anybody at Georgetown you want to.

1          MR. NEWMAN:  Thank you.

2          THE COURT:  That's how I rule.  You can take a

3     deposition from anybody at Georgetown you want to.

4          MR. NEWMAN:  Thank you.

5          THE COURT:  Period, end of discussion.

6          MS. HILLS:  Your Honor, Father Leo O'Donovan one the

7     people --

8          THE COURT:  Okay, you can't take Father O'Donovan's

9     deposition.  Anybody that has anything relevant to say.

10          MS. HILLS:  Well, that's the whole issue.  A

11     protective order is pending in front of Judge Kay for just that

12     reason.  If they're asking for people -- J.W. Marriott, the

13     head of Marriott Corporation, they want to take his deposition

14     because he sat on the Board of Directors at Georgetown in the

15     '80s, on the theory that he might have some relevant

16     information.

17          There's a protective order that lays out -- Father

18     Leo O'Donovan they've identified, J.W. Marriott they have

19     identified.  These are -- so, it's not as easy as saying, oh,

20     they can take anyone they want.  We say identify somebody

21     relevant.  How about a 30(b)(6) witness, as opposed to

22     identifying nine people from the '80s who they -- on the

23     thought.

24          Your Honor, my belief is that this was brought on by

25     plaintiff's comment, not Georgetown's.  Trying to depose Father

1   Leo O'Donovan was asked for by plaintiffs, not Georgetown.

2              THE COURT:  I understand.

3              MS. HILLS:  So when they say we stall, yeah, it's

4   hard to call the Vatican for retired people -- you know,

5   Fathers, and get them here for a deposition on the off

6   chance that --

7              THE COURT:  You don't have to call the Vatican.

8   Father O'Donovan is somewhere around.  Isn't he in New York or

9   something?

10             MR. NEWMAN:  He's not New York.  Maybe Rome, Your

11  Honor.

12             THE COURT:  He's not in Rome, he's in New York.

13             MS. HILLS:  But there is a protective order pending.

14  We would ask again, there's been a three week delay.  This has

15  been pending.  Whether or not I believe I was directed by Judge

16  Kay that he would take it to you and that I was -- there was

17  this allegation that I could not properly represent both

18  people.  I dispute that.

19             However, I will get independent lawyers to advise

20  both Dr. Watson -- this could all be cleared up, by the way, if

21  plaintiffs just said there's no conflict.  Because there's no

22  way Georgetown can be liable unless Dr. Watson is liable.

23  There's no way.

24             MR. NEWMAN:  That's not true.

25             THE COURT:  Wait a minute.  Dr. Watson is a doctor,

1  right?

2      MS. HILLS:  Right.

3      THE COURT:  If a doctor operates on me at Georgetown

4  University Hospital, and that doctor commits blatant

5  malpractice, both are liable?

6      MS. HILLS:  Yes.  Respondeat Superior.  They have

7  sued under that.  Negligent supervision, negligent hiring.

8      THE COURT:  What if this doctor uses a procedure, a

9  device, a whatever it's called, that he's been expressly

10  directed not to use?

11      MS. HILLS:  It's still Respondeat Superior.  He's

12  still hired and employed by the hospital.  They could have

13  fired him.  If they said don't use it, and by the way you're

14  fired, their liability would stop.  But how can -- and at the

15  end of the day he has to have breached the standard of medical

16  care, and the hospital has to have continued to employ him.

17      And remember, this is 1998.  So they have employed

18  him up to this very day, even through the change-over he's now

19  at Medstar, because it owns the hospital.

20      But Your Honor, I can't pick a client and say, well,

21  I advise you on your admissions but I can't advise you on your

22  Interrogatories.  So we do need a two week extension to give

23  those defense answers.

24      MR. NEWMAN:  Your Honor, if I may on one point.

25  Excuse me.  There's a little more to this, even than that story

1   says.  And I'll tell you why.  It's very simple.

2          There was a lawsuit by the doctors, including the

3   Director of the IRB at the time of our case against the Board

4   of Directors, because you know what's happening, Georgetown was

5   losing money.  And it said, we need more grant money, and we

6   need you doctors to do procedures or other things to raise your

7   revenues.  It was Kenneth Blum (phonetic) who was taken from

8   the Board of Directors, who said go down and save Georgetown.

9   It didn't work, that's why Medstar bought them over.

10          But there was a lawsuit by the doctors at Georgetown

11   against the Board, saying we need to practice medicine not just

12   raise revenue.  This issue in this case of using, they are,

13   illegal Class 3 devices that were shipped across the border,

14   was that a directive of the hospital?

15          Look, Dr. Watson testified 500 to 1,000 times he did

16   it.  Was that because it made so much money per procedure, or

17   did Vance Watson decide that he was going to practice

18   embolizations and not tell them what he was using?  By the way,

19   that did happen in another case where the doctor basically

20   ordered the glue on his own, the procedure was called an

21   embolization.

22          We need to know from the people up at the Board at

23   the time, for instance Kenneth Blum is one of those people.

24   And I know that specifically because -- and the other person,

25   who I blanked on his name, was the Director of the IRB.  If you

1    can let us have Kenneth Blum's deposition, I'm telling you why,

2    and that's the specifics, and the IRB -- the Director of the

3    IRB who sued the Board because of it, and Sheila Zimmett, we

4    can move this case rapidly.  And those people are not Leo

5    O'Donovan.  At first, we picked names because we didn't know

6    specifics.  We've got a little bit more now.  Those three depos

7    will give us the clues to almost everything.  And those are not

8    people that are out of this world, or at the Vatican.

9         And if we can get those done, those are the reasons,

10   because there was a directive at the time which resulted in a

11   lawsuit, which resulted in the Board saying, okay, forget it,

12   we'll fire Kenneth Blum, you go back to practicing medicine the

13   way you did.

14        Now, what role did Watson have during that time, and

15   what was the issue?  But, yes, the Court is correct.  Dr.

16   Watson also produced during his deposition prescriptions he

17   wrote to Canada for illegal devices.  A, the truth is, you

18   can't write a prescription for any drug outside the United

19   States if you're not licensed in Canada to do it.  Two, you

20   can't write prescriptions for false devices, for unapproved

21   devices.  He did that.  Now, did Georgetown say that's the way

22   to do it?  I don't know.

23        THE COURT:  Well, her argument is that no matter what

24   you discover and what you prove, Georgetown and Watson are

25   basically one and the same because of Respondeat Superior.

1      MR. NEWMAN:  I wonder in one circumstance, and that

2  is, if the issue is the device and the breach of the

3  standard -- if the issue is the device and the violation of the

4  statute, which in and of itself, which the Court has -- been

5  addressed, I believe Judge Kay did in his memorandum, can be an

6  issue of negligence, or negligence per se.

7      If the use of the device itself is negligence per se,

8  then I don't know what Watson has in the role of that because

9  Watson was told to do it, to violate the statute.  There's two

10  different cases.

11      They may go back to the issue of what happened to the

12  patient, but the one is, who told you to violate the statute?

13  And the violation of the statute itself if negligence per se,

14  would lead us to damages if there's a causal connection.  That

15  I think is a little bit different --

16      THE COURT:  That's what I'm trying to get at.  If

17  Watson violated, in your scenario, violated the statute on

18  direction or orders from somebody, that's one scenario.  If

19  Watson did this all on his own and nobody knew about it, that's

20  another scenario.

21      And the question is, if Georgetown is liable

22  regardless, whichever one you prove, if Georgetown is liable

23  regardless, then how is there a conflict, and how is there any

24  problem, is the point I think that Ms. Hills is making.

25      MR. NEWMAN:  I think there is a punitive damage claim

1  in this case, which was not dismissed.  And that circumstance

2  would certainly rest with the hospital and not with Watson if

3  he said I did all I could, I asked the lawyers, I asked the IRB

4  and they said go do it.  That's a separate claim.

5          THE COURT:  What if the proof at trial was that he

6  did it all on his own?

7          MR. NEWMAN:  Indeed, then Georgetown would not be --

8  if there was punitive damages against Watson, and whether they

9  had to pay for him under some policy of indemnity, Georgetown

10 then could walk from the punitive easily by saying that never

11 happened, we didn't tell him to do that.  The punitive damage

12 claim is different than the malpractice count, and so on,

13 especially with the punitives falling from the violation of the

14 statute.

15         First of all, I think that Sheila Zimmett's

16 deposition can be taken.  And if the defense gets private

17 counsel and counsel says they don't see the conflict, Sheila

18 Zimmett's testimony is taken, that probably will end the issue.

19         THE COURT:  You want Zimmett's testimony, you want

20 Blum's testimony, you want to finish Watson's testimony?

21         MR. NEWMAN:  Yes.  And there's one IRB person that,

22 I'm sorry I blanked on the name --

23         THE COURT:  What's IRB?

24         MR. NEWMAN:  The Institutional Review Board.  He was

25 the Director that made the suit against Blum and the Director.

 1   I have the name, I gave it to the defense.  But if we do those

 2   four, including the continuation of the last piece of Watson,

 3   which I can wait to the others to see if there's any issue

 4   that's raised, there's only about 40 minutes to an hour left of

 5   his depo available, that's basically -- we will move the case.

 6        THE COURT:  All right.  Well, I will talk with Judge

 7   Kay and see where we are.  Is there anything else that anybody

 8   wants to say before we --

 9        MR. NEWMAN:  I guess the real purpose of this

10   original status was not going to happen, that is, the issue of

11   where we are, as far as going ahead.  I just want to say for

12   the record the demand was still given to the defense before

13   this, it still rests out there, there's been no response.

14        They did set a deposition of Dr. Uscinski, the

15   defense set it.  Now, I don't know if they're now -- I would

16   assume that's going forward.

17        THE COURT:  How do you spell that?

18        MS. HILLS:  U-s-c-i-n-s-k-i.

19        THE COURT:  Thank you.

20        MR. NEWMAN:  I could have asked for it in a sentence,

21   too.  All right, Your Honor, I think that's basically what

22   there is.

23        THE COURT:  Ms. Hills.

24        MS. HILLS:  Your Honor, I need a ruling that I may

25   have Dr. Uscinski's deposition go forward on the 28th, that as

Linda L. Russo, RPR
Official Court Reporter

1    of now I do not have a conflict with either of my

2    representation, and that now that that conflict has been lifted

3    over me, I may advise my clients on settlement counteroffer, on

4    their responses to written discovery.  So, therefore, I need a

5    two week extension on defense's discovery responses, which are

6    due July 4th.  In my mind, I was told I had a conflict by

7    plaintiffs.

8              THE COURT:  Okay.  I'll talk with Judge Kay and one

9    of us will be in touch.

10             MR. NEWMAN:  Thank you, Your Honor.

11             MS. HILLS:  Thank you, Your Honor.

12         (Proceedings concluded.)

13

14                         CERTIFICATE

15         I, LINDA L. RUSSO, Official Court Reporter, certify

16   that the foregoing pages are a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19

20   _____
     Linda L. Russo, RPR

21   Virginia CCR No: 0313102

22

23

24

25

                    Linda L. Russo, RPR
                   Official Court Reporter