UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| Felice P. Iacangelo and Cicily Iacangelo, As Guardian of the Person and Property of KARYN A. KERRIS, <br><br> Plaintiffs, <br><br> v. <br><br> Georgetown University Hospital, GEORGETOWN UNIVERSITY, t/a Georgetown University, and VANCE E. WATSON, M.D., <br><br> Defendants. | Civ. Act. No. 1:05CV02086 (PLF/AK) <br><br> Judge Paul L. Friedman <br><br> Magistrate Judge Alan Kay |

### DEFENDANTS[1]' REPLY IN SUPPORT OF THE MOTION FOR PROTECTIVE ORDER TO PROHIBIT IRRELEVANT DISCOVERY INTO THE PRIOR *GLAZER*[2] LITIGATION

Plaintiffs' theory that a compensation plan for **tenured faculty** set out in the *Glazer* Complaint might provide a motive for Defendants to treat medically Karyn Kerris with unnecessary embolizations **fails** because Defendant Dr. Watson's Employment Contract proves that he was **never tenured, nor in a tenure-track position.**[3] The *Glazer* Complaint states: "As for their Complaint in this matter, **plaintiffs, all tenured members of the faculty of Georgetown University, hereby allege and state**. . . . On or about September 19, 1997,

---

[1] "Defendants" refers collectively to Defendants Georgetown University ("GU") and Vance E. Watson, M.D. ("Dr. Watson").

[2] The "*Glazer* litigation and its subject matter" refers to *Richard I. Glazer, et al. v. Georgetown University, et al.*, Civil Action No. 0000321-99 (D.C. Sup. Ct.) at 1 ¶ 32 (attached hereto as Ex. 1).

[3] *See* Ex. 2, Dr. Watson's Employment Contract (providing that Watson's employment "shall continue in effect for successive terms of one year" and shall be "on the AT [non-tenure] track.").

defendants . . . **announced a new compensation policy for *tenured* University Faculty members at the Medical Center only.**" (Emphasis added). These two documents definitively prove that the *Glazer* litigation and its subject matter are neither relevant, nor reasonably calculated to lead to admissible evidence.

Plaintiffs have failed to present any basis (or even logical speculation) to suggest there was improper patient care being administered by a non-tenured doctor because of a profit-related policy that **applied only to tenured faculty and encouraged them to obtain research grants**. No cherry-picking of selective quotes by Plaintiffs can show otherwise. Therefore, Defendants' Motion for Protective Order should be granted as "plaintiff is not entitled to demand from defendants information **that is neither relevant to a claim or defense nor likely to lead to information that is**." *Caldwell v. Ctr. for Corr. Health & Policy Studies, Inc.*, 228 F.R.D. 40, 44 (D.D.C. 2005); *see also* Fed. R. Civ. P.[4] 26 (providing that "[p]arties may obtain discovery regarding any matter, not privileged, **that is relevant to the claim or defense of any party.**") (Emphasis added throughout).

Plaintiffs' attempt to conduct discovery into the irrelevant and inapplicable subject matter of an old lawsuit will cause Defendants harm in resurrecting old grievances regarding a policy that led to litigation and resulted in a settlement. Many of the former plaintiffs in the *Glazer* litigation are still employed by Defendant Georgetown University and dredging up former disputes will hurt these ongoing relationships. Allowing it to be re-opened for no reason, years after its resolution, will irreparably harm Defendants with injurious publicity, destruction of ongoing relationships, and irritation of healed wounds.

---

[4] "Fed. R. Civ. P." refers to the Federal Rules of Civil Procedure.

I.  **This Court Has Already Found the *Glazer* Litigation and its Subject Matter to be Unrelated to the Current Lawsuit.**

In its July 18, 2007 Order, this Court found that inquiry into the *Glazer* litigation's subject matter was irrelevant. This Court stated: "Plaintiffs direct this Court's attention to the profit policy and the resulting litigation [the *Glazer* lawsuit] without providing any evidence that there is a link between such profit policy and the issues in the medical malpractice litigation." Ex. 4. Plaintiffs provide the Court with no reason to overturn its previous ruling since the *Glazer* litigation and its subject matter concerned **only tenured faculty**, and did not apply to Dr. Watson in any way.

The issue of relevancy having been raised (and determined), it becomes **Plaintiffs' burden** to persuade the Court that discovery into *Glazer*'s subject matter should be permitted and the Court's prior ruling overturned. "Once a relevancy objection has been raised, the party seeking discovery must demonstrate that the request is within the scope of discovery." *Tequila Centinela, S.A. de C.V. v. Bacardi & Co.,* 242 F.R.D. 1 (D.D.C. 2007). Plaintiffs have not met that burden. To the contrary, both parties (Defendants with the *Glazer* Complaint and Dr. Watson's Employment Contract and Plaintiffs with questioning in depositions) have demonstrated that the *Glazer* litigation and its subject matter are both irrelevant to this litigation and not reasonably calculated to lead to admissible evidence.

II.  **The *Glazer* Litigation and its Subject Matter Are Demonstrably Irrelevant to this Lawsuit.**

Plaintiffs have already sought to establish the relevance of the *Glazer* litigation by questioning Dr. Watson and others about it. Dr. Watson responded that he did not know about a compensation policy that arguably could have affected his medical treatment decisions; that he

3

didn't know about any evaluation of his department for financial productivity; and that no one in his department was terminated because of a financial motive.

> Q.            **During the time of 1998-1999 was your department ever evaluated for its profit range** and decided whether or not the members within your department could keep their job based on how much revenue they were bringing in?
>
> HILLS:        Objection; calls for speculation and vague.
>
> WITNESS:      **I would have no idea. I don't think we had anybody, at least to my recollection, nobody in our department has been terminated for financial reasons.** ...

*See* Ex. 3, Watson 5/31/07 Tr.[5] at 266-67 (emphasis added).

Plaintiffs also already asked Dr. Watson if he remembered the *Glazer* litigation and/or its subject matter and been told that he did not.

> Q.            **What do you know about the lawsuit that occurred from the investigators and faculty of Georgetown against the Board of Directors and the then president of the hospital? This was in 1999. Now, what do you know about that?**
>
> HILLS:        Objection; irrelevant.
>
> WITNESS:      Explain that again to me. This is kind of a -- or say that again. I'm going to get some water. You are saying there is a lawsuit between whom and whom?
>
> Q.            **Did you not know about a lawsuit against Kenneth Bloom by members of the IRB and the research faculty in 1999 that as a result of requiring them to raise 70 percent of their revenue from research or other elements that they would either do so or have to be terminated? You didn't hear about that?**
>
> HILLS:        Objection; asked and answered, calls for speculation.
>
> WITNESS:      You know, I am not -- well, how can I answer that? I mean I --
>
> Q.            If you didn't hear about it, just tell me you didn't hear about it. I'm just asking if you know.

---

[5] "Watson 5/31/07 Tr." refers to the Deposition of Vance E. Watson, M.D., 5/31/07.

> WITNESS: Well, again, you are talking a long time ago now. You know, I heard rumors of a couple different kinds of lawsuits. **This particular one I don't recall**.

*Id.* (emphasis added). When the individual who Plaintiffs allege would have been motivated by the *Glazer* litigation and the compensation plan for tenured faculty set out therein knows nothing about them, Plaintiffs have not and cannot show that the *Glazer* litigation and its subject matter are relevant to this action.

Plaintiffs also had the opportunity to establish the relevance of the litigation with other witnesses, and have failed to do so. Plaintiffs went beyond Dr. Watson's knowledge and asked Dr. Watson's 1998-1999 supervisor and Chief of Neuroradiology (the section in which Interventional Neuroradiology was located),[6] Dieter Schellinger, M.D. ("Dr. Schellinger") who also knew nothing about the *Glazer* litigation and/or its subject matter tenured faculty compensation plan encouraging tenured faculty to obtain grants for research:

> Q. **What do you know, if anything, about Dr. Chiazze's lawsuit against Georgetown?**
>
> HILLS: Objection. I instruct you not to answer. There's a pending protective motion.
>
> NEWMAN: Well, you can do that but if he has no knowledge, that would help. If he says yes, then I'll let you do that. Then I don't have to worry about it.
>
> HILLS: **Do you have any knowledge?**
>
> WITNESS: **No.**
>
> NEWMAN: That's what I thought he was going to say.
>
> WITNESS: Interesting.

---

[6] Deposition of Dieter Schellinger, August 29, 2007 ("Schellinger Tr.") at 22:22-23:22 (attached as Ex. 5)

5

> Q.  **Safe to say you were not involved in that particular lawsuit.**
>
> A.  Correct.[7]

If the 1998-1999 Chief of the Neuroradiology Department does not know about a requirement to generate profits, the *Glazer* litigation and its subject matter cannot possibly be linked to a motive to perform unnecessary medical procedures when both Dr. Watson and his supervisor, Dr. Schellinger, know nothing about the *Glazer* litigation and the compensation plan described therein. Both Dr. Watson and Dr. Schellinger's testimony demonstrate that the *Glazer* litigation and its subject matter are irrelevant to this litigation.

In seeking to cobble together some reason to inquire into *Glazer*'s subject matter, Plaintiffs' discriminatorily select quotations from the *Glazer* Complaint where the word "tenured" does not appear in front of the word faculty. *See* Plts.' Opp. at 4. Plaintiffs mislead the Court by failing to acknowledge the most pertinent fact of all – the *Glazer* litigation was brought by **tenured faculty about a policy that impacted only <u>tenured faculty</u>**. *See* Ex. 1, *Glazer* Complaint, ¶ 32 ("On or about September 19, 1997, defendants [Father] O'Donovan and [Dr.] Wiesel **announced a new compensation policy for <u>tenured University faculty</u>** members at the Medical Center only."); ¶ 37 ("Thus, as defendants [Father] O'Donovan and [Dr.] Wiesel knew or had reason to know **the policy violated the <u>tenured faculty members</u> contractual guarantees** of academic freedom and economic security.") (emphasis added throughout)).

Plaintiffs cite to certain Guidelines that are referenced in the *Glazer* Complaint, without acknowledging that all references to the Guidelines are about their alleged impact on **tenure** compensation. Plts.' Opp. at 4. The *Glazer* Complaint describes the Guidelines as "spell[ing] out the productivity measures for the Medical Center faculty referenced in the

---

[7] *Id.* at 84:18-85:15 (emphasis added).

September 19, 1997 compensation policy," and the September 19, 1997 policy in turn is defined in the *Glazer* Complaint as one affecting **only certain tenured faculty.** *See* ¶ 34 ("**the September 19, 1997, policy called for the decrease in compensation for certain tenured Medical Center faculty members . . .**"); ¶ 35 ("The policy also permitted further compensation decreases for **tenured faculty members in the future.**"); ¶ 36 ("The policy also indicated that further adjustments to the compensation of **tenured faculty would follow, based on an as yet undefined measurement of faculty "productivity."**) (emphasis added throughout). Therefore, the *Glazer* Complaint makes it clear that the Guidelines referenced therein only applied to tenured faculty because they interpreted a policy (the September 19 policy) that only applied to tenured faculty.[8]

Plaintiffs' only proffer of relevancy for the *Glazer* litigation's subject matter is their theory that Defendant Dr. Watson might have been motivated to perform additional unnecessary procedures or would have decided to perform procedures "based on income potential rather than safe and sound science." Plts.' Opp. at 5. Plaintiffs further wish to make the argument that because of the compensation policy set out in the *Glazer* Complaint that Georgetown had "an individualized profit motive which fostered the illegal use of unapproved

---

[8] "Subsequent to the filing of the post-hearing submissions, on May 14, 1998, defendants [Dr.] Wiesel and [Mr.] Bloem, with the approval of defendant [Father] O'Donovan, **issued a set of Faculty Compensation Guidelines, which spelled out the productivity measures for Medical Center faculty referenced in the September 19, 1997 compensation policy. . . . [T]he Guidelines** represented a "profound cultural change" for <u>tenured faculty members</u> at the Medical Center and for the University as a whole. . . . **As a result of the implementation of the policy and Guidelines, the plaintiffs** ["plaintiffs" defined by the Complaint as "all <u>tenured members of the faculty</u>", *see* Complaint at 1 and 5-7, Ex. 1] **and <u>other tenured Medical Center faculty members</u> suffered tangible and material harm."** Ex. 1, *Glazer* Complaint at ¶¶ 51-52, 61 (emphasis added).

substances for embolizations by its staff in order to raise revenues and put them at the forefront of interventional neuroradiology." *Id.* at 4.

Plaintiffs' problem, however, is that their hoped-for argument has no factual support because, as stated in the *Glazer* Complaint, the compensation policy only applied to **tenured faculty** and both Dr. Watson and Dr. Schellinger testified that they have **no knowledge** of such a policy and resulting lawsuit – cannot lead to proof of Dr. Watson's intent or motive to perform embolizations. Ex. 3, Watson 5/31/07 Tr. at 265-67 (Regarding the *Glazer* litigation: "This particular one I don't recall."; Regarding the Financial Motive: "I would have no idea. I don't think we had anybody, at least to my recollection, nobody in our department has been terminated for financial reasons . . ."); Ex. 5, Schellinger Tr. at 84-85. Plaintiffs' logic also never explains how the use of unapproved FDA substances - not illegal and viewed as the standard of care treatment – would increase revenues as opposed to using other FDA approved substances for an embolization (the revenue for an embolization using other methods such as metal coils or PVA particles being the same or greater than the revenue for embolization with the devices used by Dr. Watson). There is simply no basis for Plaintiffs to draw an inference that Dr. Watson was impacted by a policy that **tenured** faculty members would have to earn a percentage of their own salaries by obtaining grants for research.[9]

---

[9] Plaintiffs' attempt to find support in *Cavanaugh v. Waugh*. 2007 WL 1601723 (Slip Copy) (D.D.C. 2007), Plts.' Opp. at 6-7, shows how misguided their argument is. *Cavanaugh* stands for the proposition that a declaration cannot substitute for testimony on a **relevant** topic. Here, however, *Cavanaugh* is inapplicable and irrelevant as **Plaintiffs have already obtain testimony regarding these irrelevant topics from Dr. Watson, Dr. Schellinger, and Sheila Cohen Zimmet, Esq.** (Deposition of Sheila Cohen Zimmet, July 23, 2007, at 123:17-124:5; attached as Ex. 6). *Cavanaugh* supports the proposition that discovery into irrelevant topics should not be allowed. In that case, discovery was allowed because the subject matter was relevant. Here, on the other hand, Plaintiffs have already obtained testimony regarding the irrelevant topics and Defendants will suffer irreparable harm by allowing Plaintiffs' discovery into irrelevant matters to continue.

Although Plaintiffs characterize the underlying compensation plan for **tenured faculty** as "unethical and potentially patient-endangering," Plts.' Opp. at 6, motivating twelve faculty members to challenge the policy in Court, the *Glazer* Complaint shows that the lawsuit was a breach of contract action and the plaintiffs – each of whom was a tenured faculty member – challenged the compensation policy because it could potentially reduce their tenure salaries and impact their "academic freedom and economic security" – with no mention of the policy affecting patients. *See generally* Ex. 1, ¶¶ 37, 99. Moreover, the policy at issue required tenure faculty to generate income from "external sources" – generally meaning **grants** – there is no indication it encouraged physicians to treat patients with unnecessary medical procedures to generate income. Ex. 1, ¶ 55; *see also* page 8, *infra*.

"[R]elevancy does not encompass discovery of information with 'no conceivable bearing on the case.'" *Burlington Ins. Co. v. Okie Dokie, Inc.*, 368 F.Supp.2d 83, 86 (D.D.C. 2005) (quoting *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984)). "The district court does not abuse its discretion when it denies a discovery request that would amount to nothing more than a fishing expedition." *Bastin v. Fannie Mae*, 104 F.3d 1392, 1396 (D.C. Cir. 1997).

### III. Plaintiffs May Not Abuse the Discovery Process by Withholding Relevant Material to Barter for Irrelevant Material.

Though Plaintiffs now accuse Defendants of taking inconsistent positions with respect to what matters are properly discoverable in this litigation, Defendants have consistently maintained that the Federal Rules of Civil Procedure apply and that only information that is reasonably calculated to lead to admissible evidence is discoverable. *See* Fed. R. Civ. P. 26. If Defendants seek to obtain relevant discovery, and at the same time seek to prevent Plaintiffs

from obtaining **irrelevant** discovery that will harm them, Defendants' position reflects a consistent application of the discovery rules.[10]

### IV.  Plaintiffs Mischaracterize the August 15, 2007 Teleconference with Magistrate Judge Kay.

Plaintiffs imply that Defendants ignored a ruling by Magistrate Judge Kay on this issue during the August 15, 2007 teleconference. However, during that teleconference, the Court declined to make a ruling and Defendants then advised Plaintiffs and the Court that the pending Motion for a Protective Order would be forthcoming and that pursuant to the Federal Rules, witnesses would be instructed not to answer pending the resolution of the Motion, which the Court acknowledged was Defendants' right.

---

[10] The fact that Defendants seek to prohibit inquiry into irrelevant areas does not give Plaintiffs leave to refuse Defendants access to appropriate discovery sought in Defendants' Motion to Compel Production of Transcripts (seeking production of transcripts regarding the subject matter of this litigation – embolization and embolic substances – referenced by Plaintiffs in depositions).

## **CONCLUSION**

**WHEREFORE,** for the reasons set forth herein and in Defendants' Memorandum in Support of the Motion for a Protective Order, Defendants respectfully request this Court to enter a protective order, prohibiting the Plaintiffs from discovery regarding the *Glazer* litigation and its subject matter, pursuant to Fed. R. Civ. P. 26 because the *Glazer* litigation and its subject matter are irrelevant and not reasonably calculated to lead to admissible evidence, and the only conceivable interest Plaintiffs have in this information is to cause irreparable harm to Defendants by harassing and embarrassing Defendants by digging up old grievances of tenured faculty members.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated: September 24, 2007         By: _____
                                  Megan E. Hills (D.C. Bar # 437340)
                                  Zoe C. Scharff (D.C. Bar # 490482)

                                  725 Twelfth Street, N.W.
                                  Washington, D.C. 20005
                                  (202) 434-5000
                                  (202) 434-5029 (fax)
                                  mhills@wc.com
                                  zscharff@wc.com

## CERTIFICATE OF SERVICE

Pursuant to United States District Court Local Rule for the District of Columbia 5.4(d), I hereby certify that a copy of the foregoing was served via electronic filing on the Court's CM/ECF website on the 24th day of September, 2007 on the forgoing:

>Anthony Newman, Esquire
>Ernest McIntosh, Esquire
>Wendy Wyeth, Esquire
>Newman, McIntosh & Hennessy
>7315 Wisconsin Avenue
>Suite 700E
>Bethesda, Maryland 20814
>
>and
>
>Andrew Greenwald, Esquire
>Joseph, Greenwald & Laake, P.A.
>6404 Ivy Lane
>Suite 440
>Greenbelt, Maryland 20770
>
>Plaintiffs' Counsel

_____
Zoe C. Scharff