SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

Robert I. Glazer )
11352 Palatine Drive )
Potomac, MD 20854 )
)
)
Leonard Chiazze, Jr. )
11237 Waycross Way )
Kensington, MD 20895 )
)
)
Steven Byers )
1723 Webster Street, NW )
Washington, DC 20011 )
)
)
Jack G. Chirikjian )
8726 Hickory Bend Trail )
Potomac, MD 20854 )
)
)
Mark Danielson )
20130 Seabreeze Court )      Civil Action No. 0000321-99
Germantown, MD 20874 )
)
)
Karen N. Gale )
4453 Volta Place, NW )           RECEIVED
Washington, DC 20007 )         Civil Clerk's Office
)
)                             JAN 1 5 1999
Richard Gillis )
1500 44th Street, NW )        Superior Court of the
Washington, DC 20007 )        District of Columbia
)
)
Alfred B. Jenson )
14220 Briarwood Terrace )
Rockville, MD 20853 )
)
)
Gloria D. Massaro )
4034 Chancery Court, NW )
Washington, DC 20007 )
)

Donald Massaro )
4034 Chancery Court, NW )
Washington, DC 20007 )
)
Carlos Suarez-Quian )
5803 Roosevelt Street )
Bethesda, MD 20817 )
)
Charles B. Underhill )
4453 Volta Place, NW )
Washington, DC 20007 )
)
     Plaintiffs, )
)
)
v. )
. )
)
Georgetown University, )
a non-profit corporation, )
37th and O Streets, NW )
Washington, DC  20057; )
)
The Board of Directors of Georgetown )
University; )
)
Leo J. O'Donovan, S.J., individually and in his )
 capacity as President of Georgetown )
 University, )
204 Healy Hall )
Box 571789 )
Washington, DC 20057; )
)
Sam W. Wiesel, M.D., individually and in his )
 capacity as Georgetown University's )
 Executive Vice President for Health Services, )
6410 Shadow Road )
Chevy Chase, MD 20815; and )

2

Kenneth Bloem, individually and in his )
   capacity as Chief Executive Officer of the )
   Georgetown University Medical Center, )
4546 Cathedral Avenue, NW )
Washington, DC  20016 )
                          )
             Defendants. )
                           )

## COMPLAINT FOR
### BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, TORTIOUS INTERFERENCE WITH CONTRACT AND KNOWING PARTICIPATION IN FIDUCIARY BREACH

As and for their Complaint in this action, plaintiffs, all tenured members of the faculty of defendant Georgetown University, hereby allege and state as follows:

### PRELIMINARY ALLEGATIONS

1.    As tenured members of the faculty of defendant Georgetown University, plaintiffs work pursuant to contracts with the University, which contracts guarantee them, above all else, academic freedom and economic security.  Those contracts also require plaintiffs to adjudicate complaints concerning administrative actions by the University pursuant to the terms of a Faculty Grievance Code approved by defendant Board of Directors of Georgetown University.  Those same contracts bind the University to honor the results of the grievance process.

2.    In this case, Georgetown University President O'Donovan, Executive Vice President Wiesel and Medical Center Chief Executive Officer Bloem devised and

implemented a compensation plan, including productivity standards, that constitutes a direct and material breach of plaintiffs' tenure contracts with the University. When the plaintiffs successfully challenged that breach in a grievance prosecuted in strict conformance with the Faculty Grievance Code, defendants O'Donovan, Wiesel and Bloem persuaded defendant Board of Directors of Georgetown University to nullify and negate the grievance process and its results in order to maintain the wrongful compensation policy and to retaliate against plaintiffs for their success in the grievance. As a result of those actions, plaintiffs have suffered both monetary and non-monetary harm.

3.     By virtue of the acts set forth in this Complaint, defendant Georgetown University breached its contracts with the plaintiffs, and defendant Board of Trustees breached its fiduciary duties to the plaintiffs. Defendants O'Donovan, Wiesel and Bloem, who devised and engineered these wrongful acts, tortiously interfered with plaintiffs' contracts with the University and knowingly participated in defendant Board of Trustees' breaches of fiduciary duty.

4.     To remedy the wrongful acts set forth herein, the plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages and the costs, including attorneys fees, of prosecuting the instant lawsuit.

## JURISDICTION

5.     Jurisdiction over this action is founded on D.C. Code Ann. § 11-921(a). The

4

defendants are all located in and doing business in the District of Columbia, and the events alleged in this Complaint took place in the District of Columbia.

## PARTIES

6.   Plaintiff Robert I. Glazer, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Pharmacology of the Georgetown University Medical Center ("GUMC"). Professor Glazer resides at 11352 Palatine Drive, Potomac, Maryland 20854.

7.   Plaintiff Leonard Chiazze, Jr., Sc.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Family Medicine of the GUMC. Professor Chiazze resides at 11237 Waycross Way, Kensington, Maryland 20895.

8.   Plaintiff Steven Byers, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and an Associate Professor in the Department of Cell Biology of the GUMC. Professor Byers resides at 1723 Webster Street, NW, Washington, DC 20007.

9.   Plaintiff Jack G. Chirikjian, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Biochemistry and Molecular Biology of the GUMC. Professor Chirikjian resides at 8726 Hickory Bend Trail, Potomac, Maryland 20854.

10.  Plaintiff Mark Danielson, Ph.D., is and at all relevant times has been a tenured

5

member of the Georgetown University Faculty and an Associate Professor in the Department of Biochemistry and Molecular Biology of the GUMC. Professor Danielson resides at 20130 Seabreeze Court, Germantown, Maryland 20874.

11.  Plaintiff Karen N. Gale, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Pharmacology of the GUMC. Professor Gale resides at 4453 Volta Place, NW, Washington, DC 20007.

12.  Plaintiff Richard Gillis, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Pharmacology of the GUMC. Professor Gillis resides at 1500 44th Street, NW, Washington, DC 20007.

13.  Plaintiff Alfred B. Jenson, M.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Pathology of the GUMC. Professor Jenson resides at 14220 Briarwood Terrace, Rockville, Maryland 20853.

14.  Plaintiff Gloria D. Massaro, M.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Pediatrics of the GUMC. Professor Massaro resides at 4034 Chancery Court, NW, Washington, DC 20007.

15.  Plaintiff Donald Massaro, M.D., is and at all relevant times has been a tenured

member of the Georgetown University Faculty and Professor in the Department of Medicine of the GUMC. Professor Massaro resides at 4034 Chancery Court, NW, Washington, DC 20007.

16. Plaintiff Carlos Suarez-Quian, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and an Associate Professor in the Department of Cell Biology of the GUMC. Professor Suarez-Quian resides at 5803 Roosevelt Street, Bethesda, Maryland 20817.

17. Plaintiff Charles B. Underhill, Ph.D., is and at all relevant times has been a tenured member of the Georgetown University Faculty and a Professor in the Department of Cell Biology of the GUMC. Professor Underhill resides at 4453 Volta Place, NW, Washington, DC 20007.

18. Defendant Georgetown University is a non-profit corporation, chartered by the United States Government and incorporated by Act of Congress. The University employees over 1,500 full-time faculty members, including plaintiffs, and enrolls 12,500 students at three campuses: Main Campus, the Medical Center and the Law Center. The University's central offices are located at 37th and O Streets, NW, Washington, D.C.

19. Defendant Board of Trustees of Georgetown University is a body corporate with the authority to manage the property and business of Georgetown University.

20. Leo O'Donovan, S.J., is the President of Georgetown University and, as such, the

7

University's chief academic and administrative officer. Defendant O'Donovan's

University address is 204 Healy Hall, Box 571789, Washington, D.C. 20057.

This suit is brought against defendant O'Donovan in both his individual and

official capacities.

21.    Defendant Sam W. Wiesel, M.D., is Georgetown University's Executive Vice

President for Health Sciences. Defendant Wiesel resides at 6410 Shadow Road,

Chevy Chase, MD 20815. This suit is brought against defendant Wiesel in both

his individual and official capacities.

22.    Defendant Kenneth Bloem is Chief Executive Officer of the Georgetown

University Medical Center. Defendant Bloem resides at 4546 Cathedral Avenue,

NW, Washington, D.C. 20016. This suit is brought against defendant Bloem in

both his individual and official capacities.

## GENERAL ALLEGATIONS
### THE UNIVERSITY AND ITS CONTRACT WITH ITS TENURED FACULTY

23.    Georgetown University is composed of three principal subdivisions: Main

Campus, which consists of the College of Arts and Sciences, the Graduate School

of Arts and Sciences and the Schools of Foreign Service, Business Administration

and Languages and Linguistics; the Medical Center and the Law Center.

24.    Although faculty members employed by the University are typically affiliated with

one of the University's subdivisions, and with individual departments within those

8

subdivisions, all University faculty members, including the plaintiffs, are members of the faculty of the University as a whole.

25. The highest form of recognition the University accords its faculty is tenure, which can only be achieved upon demonstration of excellence in teaching, scholarly accomplishment and service (both inside and outside the University).

26. Tenure is a contractual relationship between the individual tenured faculty member and the University as a whole; it is not a relationship between the faculty member and any given subdivision of the University.

27. Tenure is a mutually acknowledged expectation between the University and an individual faculty member of continuing employment for the faculty member, which can be terminated by the University only for just cause: i.e., professional or moral inadequacy, grave economic stringency on the part of the University as a whole or major changes in institutional aims.

28. Tenure is also a mutually acknowledged expectation between the faculty member and the University that the faculty member is to be guaranteed academic freedom and economic security.

29. Academic freedom means the freedom to teach, to pursue research and scholarly interests and to serve the University and society at large.

30. Economic security means, among other things, a protection against diminution of compensation.

31. Until the events alleged herein, the University had honored this particular aspect of the economic security guarantee throughout its history; in fact, during that entire history, regardless of the financial health of the University, the University has never reduced the compensation of any of its tenured faculty members.

## THE NEW MEDICAL CENTER COMPENSATION POLICY

32. On or about September 19, 1997, defendants O'Donovan and Wiesel announced a new compensation policy for tenured University faculty members at the Medical Center only.

33. That policy expressly reaffirmed the University and Medical Center's "commitment to tenure as the definitive reward for scholarly and professional achievement and the foundation of academic freedom."

34. However, the September 19, 1997, policy called for the decrease in compensation for certain tenured Medical Center faculty members beginning with the University's 1999 fiscal year, which would start on July 1, 1998.

35. The policy also permitted further compensation decreases for tenured faculty members in the future.

36. The policy also indicated that further adjustments to the compensation of tenured faculty would follow, based on an as yet undefined measurement of faculty "productivity."

37. Thus, as defendants O'Donovan and Wiesel knew or had reason to know, the

10

policy violated the tenured faculty members' contractual guarantees of academic freedom and economic security.

## THE GEORGETOWN UNIVERSITY FACULTY GRIEVANCE CODE

38. Pursuant to the University's Faculty Grievance Code, a system approved by the Board of Directors, a Georgetown University faculty member aggrieved by administrative action is required to seek relief by pursuing a grievance through a series of steps and tribunals staffed by members of the University faculty.

39. Pursuant to that same faculty Grievance Code, a Georgetown University faculty member also has an express right to have his or her grievance determined according to the procedures set forth in the Code.

40. Pursuant to the Code, a grievance is first considered by a three member faculty Grievance Panel.

41. Appeals from decisions of Grievance Panels are heard by a 14 member faculty Grievance Code Committee.

42. Appeals from the Grievance Code Committee are to be brought to the University President unless the President is a party to the grievance. In that case, the Grievance Code requires the President to designate as the final appeal officer an Executive Vice President from a University campus other than that from which the grievance arises.

43. Pursuant to the Faculty Grievance Code the Board itself approved, the Board of

11

Directors plays no role in the adjudication of a faculty grievance.

## THE PLAINTIFFS GRIEVE THE NEW COMPENSATION POLICY

44.   As required by the Grievance Code, which forms an element of each Georgetown

faculty member's contract with the University, on or about December 23, 1997,

the plaintiffs and others filed a formal grievance to set aside the compensation

policy. That grievance named defendants O'Donovan and Wiesel as respondents.

45.   A three member Grievance Panel was designated to hear the grievance, and the

Panel was chaired by Professor Samuel Dash of the Law Center.

46.   As required by the Grievance Code, the Panel first considered whether it had

jurisdiction to entertain the grievance.

47.   Although the Code expressly authorized defendants O'Donovan and Wiesel to

challenge jurisdiction, they made no effort to do so, and the Panel determined it

had jurisdiction to entertain the grievance.

48.   Defendants O'Donovan and Wiesel responded to the substance of the grievance on

or about April 3, 1998. In that response, defendants O'Donovan and Wiesel made

no claim that the grievance did not fall within the jurisdiction of the University

grievance mechanism.

49.   The grievants made their own submissions in support of their grievance, and the

duly constituted Grievance Panel convened a lengthy formal hearing on the

grievance on May 5, 1998. At that hearing, both sides were granted ample time to

12

present their views on the issues at hand.

50. After the hearing, both sides were asked to submit and did submit written submissions on particular questions raised by the Panel Chair at the hearing. Again, in their submission, defendants O'Donovan and Wiesel raised no claim that the Grievance Panel lacked jurisdiction to entertain the grievance.

51. Subsequent to the filing of the post-hearing submissions, on May 14, 1998, defendants Wiesel and Bloem, with the approval of defendant O'Donovan, issued a set of Faculty Compensation Guidelines, which spelled out the productivity measures for Medical Center faculty referenced in the September 19, 1997 compensation policy.

52. As defendants expressly indicated in the Guidelines, the Guidelines represented "a profound cultural change" for tenured faculty members at the Medical Center and for the University as a whole.

53. The Guidelines made clear that henceforth each Medical Center faculty member's compensation would be determined only by reference to the faculty member's income generating activities and not, as in the past, on the basis of the faculty member's achievement of excellence in teaching, scholarship and service.

54. The Guidelines further required the faculty to fund a specified portion of their salaries from external sources, a system later characterized as an "eat what you kill" approach.

13

55. Immediately recognizing that the Guidelines destroyed any semblance of academic freedom or economic security at the Medical Center, the plaintiffs submitted the Guidelines to the Grievance Panel for consideration along with the September 19, 1997, compensation policy.

56. The Grievance Panel rendered its decision in the matter on June 23, 1998, in a decision written by Panel Chair Samuel Dash. That decision held that the compensation policy and Guidelines violated the contracts of tenured faculty members in that they violated the faculty members' academic freedom and economic security.

57. Based on that finding, the Panel expressly directed that the policy and Guidelines "cannot be implemented."

## DEFENDANTS DEFY THE GRIEVANCE PANEL'S ORDER

58. On July 20, 1998, pursuant to the requirements of the Grievance Code, defendants O'Donovan and Wiesel appealed the Grievance Panel's decision to the full University Grievance Code Committee.

59. In that appeal, defendants made no claim that the Panel or the Committee lacked jurisdiction to entertain the grievance.

60. The day after their appeal was filed, and in direct defiance of the Grievance Panel's unambiguous ruling that the policy and Guidelines could not be implemented. on July 21, 1998, defendants O'Donovan, Wiesel and Bloem,

14

through University counsel, announced that the policy and Guidelines would nonetheless be implemented as planned with a retroactive effective date of July 1, 1998.

61.    As a result of the implementation of the policy and Guidelines, the plaintiffs and other tenured Medical Center faculty members suffered tangible and material harm.

62.    In their July 21, 1998 implementation announcement, however, defendants pledged that "If the grievants ultimately prevail and the compensation policy is modified or rescinded, the Medical Center obviously recognizes its obligation to make affected faculty members whole for any salary they would otherwise be owed."

## DEFENDANTS LOSE THEIR APPEAL AND ACT TO NULLIFY THE GRIEVANCE PROCESS

63.    After receiving the plaintiffs' response to the defendants' appeal, on October 2, 1998, the Grievance Code Committee affirmed the decision of the Grievance Panel, holding that the policy and guidelines constituted "a fundamental and dramatic change" that "violates the Grievants' rights as tenured faculty members."

64.    With the rejection of their appeal by the Grievance Code Committee, defendants O'Donovan, and Wiesel had one more level of appeal to an administrative official of the University to be designated within specified time limits by defendant

15

O'Donovan.

65. Defendants O'Donovan and Wiesel noticed their final appeal on October 26, 1998.

66. In that appeal, and for the first time in a process that had thus far lasted over ten months, the defendants challenged the jurisdiction of the grievance mechanism to entertain the grievance in the first place.

67. Notwithstanding the filing of the appeal, defendant O'Donovan failed and refused to designate a final appeal official as required by the Grievance Code.

68. Accordingly, on November 4, 1998, the Chair of the Grievance Code Committee declared the proceeding at an end and further declared as final the Grievance Code Committee's October 2, 1998 decision.

69. As expressly provided by the Grievance Code, that final decision was to be "immediately implemented by the appropriate University authorities."

70. Having lost at each stage of the grievance process, defendants O'Donovan, Wiesel and Bloem knowingly, willfully and with malice sought to undo the result reached in strict conformance with the Faculty Grievance Code. They also acted to nullify their express promise to make the plaintiffs whole should the compensation policy and Guidelines be rescinded.

71. Unbeknownst to the plaintiffs or to the members of the Grievance Code Committee, on or about October 30, 1998, defendant O'Donovan, in concert with defendants Wiesel and Bloem, surreptitiously persuaded defendant Board of

Directors to preempt the grievance process and to suspend all proceedings relating to plaintiffs' grievance.

72. Defendant Board of Directors issued a resolution to that effect on October 30, 1998, notwithstanding the fact that the Faculty Grievance Code, which the Board itself had approved, contained no provision for Board participation in the grievance process.

73. That Board resolution was kept secret from the Grievance Code Committee until November 4, 1998.

74. Also on October 30, 1998, moreover, defendant O'Donovan, in concert with defendants Wiesel and Bloem, persuaded the Board of Directors to maintain in effect the policy and Guidelines, effectively nullifying the decisions of the Grievance Panel and Grievance Code Committee to the contrary.

75. Thus, due to the instigation of defendants O'Donovan. Wiesel and Bloem, and with the direct assistance of defendant Board of Directors, the violations of plaintiffs' tenure contracts encompassed in the compensation policy and Guidelines remain in effect to this day.

76. As a result of defendants' actions, then, plaintiffs continue to suffer tangible and material harm and will continue to suffer such harm until defendants' wrongful acts are set aside and plaintiffs made whole for their injuries.

77. Although the plaintiffs have made repeated requests to defendants that they honor

17

the results of the grievance process and honor the terms of plaintiffs' tenure contracts with the University as enunciated in the two decisions issued in that process, defendants have repeatedly refused to do so.

## COUNT I
### BREACH OF CONTRACT
### (COMPENSATION POLICY AND GUIDELINES)

78. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-77 of this Complaint as if fully stated herein.

79. The relationship between plaintiffs, as tenured faculty members, and defendant Georgetown University is contractual in nature.

80. The compensation policy and Guidelines enunciated on or about September 19, 1997, and May 14, 1998, respectively, and implemented effective July 1, 1998 constitute a material breach of that contract.

81. Due to the breach of their tenure contracts with Georgetown University, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT II
### BREACH OF CONTRACT
### (NULLIFICATION OF GRIEVANCE PROCESS)

82. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-81 of this Complaint as if fully stated herein.

83. Pursuant to plaintiffs' contracts with the University, plaintiffs are guaranteed access to and required to make use of a grievance process to adjudicate

deprivations of their rights as tenured faculty members of the University.

84.   The unilateral suspension and nullification of the grievance process set forth above deprives the plaintiffs of their contractual rights and constitutes a material breach of plaintiffs' contracts with the University.

85.   Due to the violation of their contractual rights to a specified grievance process, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
## (COMPENSATION POLICY AND GUIDELINES)

86.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-85 of this Complaint as if fully stated herein.

87.   At all times relevant to this Complaint, defendants O'Donovan, Wiesel and Bloem knew that plaintiffs had a contract with the University and further knew or should have known that the compensation policy and Guidelines developed and implemented by the same defendants constituted a material breach of that contract.

88.   Nevertheless, defendants O'Donovan, Wiesel and Bloem knowingly, willfully, wrongfully and with malice and bad faith first developed and later implemented the policy and Guidelines, thereby wrongly interfering with plaintiffs' contracts with the University and effecting a material breach of those contracts.

89.   Defendants' actions in developing and implementing the policy and Guidelines

19

advanced no legitimate interest of the University and were taken outside the scope of their employment by the University; instead, their actions advanced only the personal agendas of the defendants, which directly conflicted with the expressly stated interests and principles of the University.

90.    As a direct and proximate result of defendants' wrongful actions, plaintiffs have suffered and will continue to suffer monetary, and non-monetary harm.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
## (NULLIFICATION OF GRIEVANCE PROCESS)

91.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-90 of this Complaint as if fully stated herein.

92.    At all times relevant to this Complaint, defendants O'Donovan, Wiesel and Bloem knew that plaintiffs had a contractual right and obligation to adjudicate violations of their rights pursuant to the grievance process made mandatory by the Faculty Grievance Code.

93.    Nevertheless, defendant O'Donovan, in concert with defendants Wiesel and Bloem, knowingly, willfully, wrongfully and with malice and bad faith engineered the suspension and nullification of the grievance process in order to nullify the decisions in plaintiffs' favor reached in that process. In so doing, defendants wrongfully interfered with plaintiffs' contracts with the University and effected a material breach of those contracts.

20

94.   Defendants' wrongful actions in engineering the suspension of the grievance process advanced no legitimate interest of the University and were taken outside the scope of their employment by the University; instead, those actions merely advanced defendants' personal agendas, including their desire to retaliate against and injure plaintiffs for successfully exercising their contractual right to adjudicate their claims through the grievance process.

95.   As a direct and proximate result of defendants' wrongful actions, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

**COUNT V**
**BREACH OF FIDUCIARY DUTY**
**(COMPENSATION POLICY AND GUIDELINES)**

96.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-95 of this Complaint as if fully stated herein.

97.   Defendant Board of Trustees occupies a position of trust with respect to the affairs of the University and, by virtue of that position, owes a fiduciary duty to the University and its constituent elements, including tenured faculty members like plaintiffs.

98.   Specifically, defendant Board of Trustees has a fiduciary duty to uphold the core principles of the contract between the University and its tenured faculty — namely, academic freedom and economic security.

99.   Defendant Board of Directors breached that fiduciary duty by adopting the

21

compensation policy and permitting that policy and the Guidelines to be implemented notwithstanding the fact that, taken together or separately, both devices directly violated the principles of academic freedom and economic security.

100. As a direct and proximate result of the Board's breach of fiduciary duty, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT VI
## KNOWING PARTICIPATION IN FIDUCIARY BREACH
## (COMPENSATION POLICY AND GUIDELINES)

101. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-100 of this Complaint as if fully stated herein.

102. At all times relevant to this Complaint, defendants O'Donovan, Wiesel and Bloem knew that defendant Board of Directors had a fiduciary duty to the University and its constituent elements, including tenured faculty members like the plaintiffs.

103. At all times relevant, defendants O'Donovan, Wiesel and Bloem knew or had reason to know that the compensation policy and Guidelines violated the principles of academic freedom and economic security that the Board of Directors had a fiduciary duty to preserve for tenured faculty members of the University.

104. Nevertheless, defendants O'Donovan, Wiesel and Bloem knowingly, willfully, wrongfully and with malice and bad faith instigated the Board of Directors to adopt the compensation policy and to permit the policy and the Guidelines to be

implemented.

105.  In so doing, defendants knowingly participated in the Board of Director's breach of fiduciary duty to the plaintiffs and are to be held jointly and severally liable for all of the harm proximately caused by that breach of duty.

106.  As a direct and proximate result of the Board's breach of duty, which defendants O'Donovan, Wiesel and Bloem instigated and in which they knowingly participated, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

## COUNT VII
## BREACH OF FIDUCIARY DUTY
## (NULLIFICATION OF GRIEVANCE PROCESS)

107.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-106 of this Complaint as if fully stated herein.

108.  Having approved the Faculty Grievance Code and having made the process set forth in the Code the mandatory method for adjudicating faculty complaints within the University, defendant Board of Trustees took on a fiduciary duty to ensure that the provisions of the Code were enforced and that members of the University's faculty received a full and final determination of their grievances pursuant to the terms of the Code.

109.  By directing that plaintiffs' grievance be suspended and thereby nullified and that the subject of that grievance, the compensation policy and Guidelines, continue in

23

effect notwithstanding decisions to the contrary by the Grievance Panel and the

Grievance Code Committee, defendant Board of Trustees breached its fiduciary

duty to the plaintiffs.

110.  As a direct and proximate result of the Board's breach of duty, the plaintiffs have

suffered and will continue to suffer monetary and non-monetary harm.

## COUNT VIII
## KNOWING PARTICIPATION IN FIDUCIARY BREACH
## (NULLIFICATION OF GRIEVANCE PROCESS)

111.  Plaintiffs reallege and incorporate by reference the allegations set forth in

paragraphs 1-110 of this Complaint as if fully stated herein.

112.  At all times material to this Complaint, defendants O'Donovan, Wiesel and Bloem

knew that defendant Board of Directors had a fiduciary duty to uphold the

provisions of the Faculty Grievance Code, which the Board itself had approved.

113.  Nevertheless, defendants O'Donovan, Wiesel and Bloem knowingly, willfully,

wrongfully, with malice and bad faith and with an intent to harm the plaintiffs

persuaded the Board to suspend and nullify the grievance process for plaintiffs and

therefore caused the Board to breach its fiduciary duty to plaintiffs and to the rest

of the University community.

114.  In so doing, defendants O'Donovan, Wiesel and Bloem knowingly participated in

the Board's breach of fiduciary duty and are to be held jointly and severally liable

for all of the harm proximately caused by that breach of duty.

24

115. As a direct and proximate result of that breach of duty, which defendants O'Donovan, Wiesel and Bloem instigated and in which they fully and knowingly participated, plaintiffs have suffered and will continue to suffer monetary and non-monetary harm.

WHEREFORE, plaintiffs pray that this Court award them the following relief:

1. enter a declaratory judgment declaring the wrongfulness of the acts complained of in this Complaint;

2. enter the appropriate injunctions necessary to vacate, set aside and nullify the wrongful acts complained of in this Complaint; to prohibit defendants from instituting in the future, in whole or in part, the illicit Compensation Policy and Guidelines and to prohibit defendants from interfering in the future with the duly authorized and constituted grievance process at Georgetown;

3. award plaintiffs compensatory and punitive damages in amounts to be determined but in excess of $50,000;

4. award plaintiffs the costs incurred, including attorneys fees and expenses, in prosecuting this action; and

5. award plaintiffs such other relief as this Court may deem just and proper.

Plaintiffs further demand a trial by jury on all claims.

25

Respectfully submitted,

Steven K. Hoffman, Esq.
Marie Chopra, Esq.
JAMES & HOFFMAN, P.C.
1146 19th Street, NW, Ste. 600
Washington, DC 20036

Dated: January 15, 1999

26