UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

------------------------x
                        :
FELICE I. IACANGELO,    :
et al.                  :
                        :
          Plaintiffs    :
                        : Case No.
    vs.                 : 1:05CV02086
                        : Judge Friedman
GEORGETOWN UNIVERSITY,  :
t/a Georgetown University :
Hospital, et al.        : Volume II
                        :
          Defendants    :
                        :
------------------------x

                    Washington, D.C.
                    November 7, 2007

Deposition of:

        LEONARD CHIAZZE, JR., Sc.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the Law

Offices of Williams & Connolly, 725 12th

Street, N.W., Washington, D.C., beginning at

10:13 a.m., before Zev V. Feder, CSR, a Notary

Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

Page 90

1
2  On behalf of the Plaintiffs:
3  Joseph, Greenwald & Laake
   By:  ANDREW E. GREENWALD, ESQ.
4      6404 Ivy Lane, Suite 400
       Greenbelt, Maryland 20770
5      (301) 220-2200
6  On behalf of the Defendants:
7  Williams & Connolly
   By:  MEGAN E. HILLS, ESQ.
8  By:  ZOE SCHARFF, Esq.
       725 12th Street, N.W.
9      Washington, D.C. 20005
       (202) 434-5393
10
         +++
11
12       C O N T E N T S
13  WITNESS:  LEONARD CHIAZZE, JR., Sc.D.
14  EXAMINATION BY:              PAGE
15  MR. GREENWALD                92
16  MS. HILLS                     -
17
18           EXHIBITS
19  DEPOSITION NO.     MARKED FOR IDENTIFICATION
20  5. Letter, 10/10/07; errata sheet      93
21  6. Complaint                 112
22

Page 91

1
2          P R O C E E D I N G S
3       MR. GREENWALD:  Before we start,
4  let me ask you, have you made a decision on
5  what your position is going to be about the
6  amended complaint?  Are you opposing it?  Are
7  you not opposing it?
8       MS. SCHARFF:  Can we do those
9  after, so the doctor can leave?
10      MS. HILLS:  If this is on the
11 record, I don't believe meet and confers are
12 supposed to be on the record.  I would like to
13 meet and confer and negotiate and discuss what
14 is in your amended complaint.  I am perfectly
15 willing to satisfy Rule 7M with a meet and
16 confer.  I am unwilling to have a conference
17 with the transcript.
18      MR. GREENWALD:  We can do the
19 meeting after -- we don't need to keep the
20 doctor waiting for that.
21      MS. HILLS:  Exactly.
22      MR. GREENWALD:  But I do want to

Page 92

1  have a transcript of our meeting.
2       MS. HILLS:  We can discuss that
3  after the deposition.
4       MR. GREENWALD:  Let's go with the
5  deposition, so we won't have to keep the
6  doctor here.
7  Whereupon,
8       LEONARD CHIAZZE, JR., Sc.D.
9  was called for examination by counsel and,
10 having been duly sworn by the Notary, was
11 examined and testified as follows:
12    EXAMINATION BY COUNSEL FOR PLAINTIFFS
13      BY MR. GREENWALD:
14    Q.   Doctor, this is a continuation of
15 the deposition that was started some time ago.
16 Do you recall when you were deposed on
17 September 18th?
18    A.   Yes.
19    Q.   After that deposition did you have
20 a chance to read the transcript from that day?
21    A.   Yes.
22    Q.   I would like to show you, first of

Page 93

1  all, a copy of an errata sheet from that
2  deposition.  We can mark this as an exhibit.
3       Do you have a copy?
4       MS. HILLS:  Yes, I do.
5       MR. GREENWALD:  I brought an extra
6  copy just in case you didn't have one.
7       MS. HILLS:  That would be great.
8       (Document referred to marked
9  Deposition Exhibit No. 5 for identification
10 and subsequently attached to the deposition.)
11      BY MR. GREENWALD:
12    Q.   Doctor, let me give you that.
13 That is the errata sheet we were provided from
14 the deposition that was taken on
15 September 18th.  Did you see that?
16    A.   Yes.
17    Q.   Is that your signature on the
18 bottom?
19    A.   Yes, it is.
20    Q.   Doctor, when you read the
21 deposition, when did you first come to realize
22 that, on pages 76, 77, that you left out the

Page 94

1 word tenure before all these words? When did
2 you come to that realization?
3          MS. HILLS: Objection. Calls for
4 speculation. Also, seeks to intrude upon
5 attorney-client privilege.
6          To the extent you can answer
7 without intruding upon attorney-client
8 privilege -- as we all know, errata sheets are
9 typed up by attorneys and whoever the court
10 reporters address, so attorneys are involved.
11 I object.
12          But to the extent you can answer
13 without discussing any conversations with your
14 attorney, please answer.
15          BY MR. GREENWALD:
16     Q.   I am not asking you about
17 discussions with the attorney, doctor.
18     A.   Would you tell me what you are
19 asking, please?
20     Q.   I am going to do it again because
21 it probably got lost in all of that
22 discussion.

Page 95

1     A.   Thank you.
2     Q.   By the way, if at any time you
3 need me to clarify something, please tell me,
4 because I am really happy to do that.
5     A.   Okay.
6     Q.   Because I want to make sure you
7 understand what I am asking you. So if at any
8 time you don't, please tell me. Okay?
9     A.   (Indicating.)
10     Q.   Okay?
11     A.   Yes. Sorry.
12     Q.   He has to take it down.
13     A.   I understand.
14     Q.   Can I assume, if you answer the
15 question, that you understood what I asked
16 you? Otherwise, you would say to me, "Clarify
17 it," or "I don't understand," or something
18 like that? Is that okay?
19     A.   That's okay. We will determine
20 that when we get to it.
21     Q.   If you answer and don't tell me
22 you didn't understand, I am going to assume

Page 96

1 you did. Okay?
2     A.   Okay. Yes.
3     Q.   My question that I asked you
4 before all of that was, when you read this
5 deposition in September, when did you first
6 come to the realization that you left out the
7 word tenure on page 76 line 22. Do you have a
8 copy of it with you?
9          MS. HILLS: For the record, I am
10 showing the doctor pages 76 and 77 of his
11 deposition. I believe counsel is referred to
12 page 76, line 22, the entry on the errata
13 sheet where tenure has been added.
14          BY MR. GREENWALD:
15     Q.   Doctor, when did you first come to
16 the realization that, when you answered this
17 question, you left out the word tenure?
18          MS. HILLS: Objection to the
19 extent it ignores the 30-day provision.
20          THE WITNESS: After I read the
21 transcript.
22          BY MR. GREENWALD:

Page 97

1     Q.   After you read the transcript, did
2 you then advise counsel that you left this
3 word out?
4          MS. HILLS: Objection.
5          Don't answer that. What you
6 advised me or what I advised you is an
7 attorney-client communication.
8          BY MR. GREENWALD:
9     Q.   Just so I understand, doctor, I
10 want to be clear, when you read this
11 deposition and you read page 76, as I
12 understand your testimony here under oath, as
13 you read that you said to yourself, "I left
14 out the word tenure here on this answer." Is
15 that correct?
16     A.   I am not sure.
17     Q.   Why are you not sure? What is it
18 that creates a question in your mind?
19          MS. HILLS: Objection. Calls for
20 speculation.
21          BY MR. GREENWALD:
22     Q.   What is it that creates a question

3 (Pages 94 to 97)

1  in your mind?
2      A.  The words, "As you read that."
3      Q.  Well, you did read it, right?
4      A.  Yes, I did.
5      Q.  And when you read it the first
6  time, did you say to yourself, "I left out the
7  word tenure"?
8      A.  That I don't recall, because I
9  read it more than once.
10     Q.  So on which reading did you
11  decide, gee, I left out the word tenure here?
12      MS. HILLS:  Objection.  Calls for
13  speculation.  Asked and answered.
14      BY MR. GREENWALD:
15      Q.  Doctor?
16      A.  I don't recall.
17      Q.  Just so we are clear, you read the
18  deposition more than once and on some reading
19  of this deposition you realized, as you read
20  it, that you left out the word tenure.  Is
21  that correct?
22      A.  I think that's correct.

1      Q.  And on page 77, line one, when you
2  answered the question that starts on page 76,
3  line 16 -- the question was, "As far as
4  compensation, do I understand, as that time in
5  May of 1998, that the faculty compensation
6  guidelines required faculty members to raise
7  certain amounts of income in order to justify
8  their compensation?"
9      Your answer was, "Not necessarily.
10  If your compensation level was below the cap,
11  then the cap would be guaranteed.  If your
12  compensation level was above the cap..." --
13  and then you went on to explain.
14      On which reading did you say to
15  yourself, gee, I left out the word tenure
16  before the word compensation on page 77?
17      A.  I don't --
18      MS. HILLS:  Objection.  Asked and
19  answered.  Calls for speculation.
20      BY MR. GREENWALD:
21      Q.  On which reading did you say, gee,
22  I left this word out?

1      A.  I don't know.  I don't recall.
2      Q.  Did you ever say to yourself,
3  doctor, as you read this deposition, "I left
4  this word out"?
5      MS. HILLS:  Objection.
6      BY MR. GREENWALD:
7      Q.  Was it your thought processes as
8  you read this that said to you, I left out the
9  word tenure?
10     MS. HILLS:  Objection.  Asked and
11  answered.  Calls for speculation.
12     THE WITNESS:  I am not sure.
13     BY MR. GREENWALD:
14     Q.  Why are you not sure?  What is it
15  about this that makes you unsure?
16     THE WITNESS:  Go back and read his
17  question for me, please?  Could you do that?
18     MR. GREENWALD:  He can do that any
19  time you want.
20     THE WITNESS:  Right now.
21     (The record was read by the
22  reporter as follows:

1      +++
2      Q.  "Was it your thought processes as
3  you read this that said to you, I left out the
4  word tenure?
5      MS. HILLS:  "Objection.  Asked and
6  answered.  Calls for speculation.
7      THE WITNESS:  "I am not sure.
8      BY MR. GREENWALD:
9      Q.  "Why are you not sure?  What is it
10  about this that makes you unsure?")
11     +++
12     THE WITNESS:  Because I can't
13  place an exact time on it.
14     BY MR. GREENWALD:
15     Q.  But that wasn't my question.  Let
16  me see if I can ask it again.
17     Is it your testimony, or that I
18  understand that, at some reading when you read
19  this deposition -- because you told me you
20  read it more than once -- when you got to page
21  77, line one, you said to yourself, gee,
22  before the word compensation, I left out the

1  word tenure?
2      MS. HILLS:  Objection.
3      BY MR. GREENWALD:
4      Q.   Did that thought process occur to
5  you as you read the deposition, on your own?
6  That's my question.
7      MS. HILLS:  Objection.  Calls for
8  speculation.  Asked and answered.
9      BY MR. GREENWALD:
10     Q.   You can answer, doctor.
11     A.   Your question, I believe, has more
12  than one part to it.
13         Again, can you go back and read
14  the question, please?  I am not trying to be
15  difficult.  I am trying to be exact.
16         MR. GREENWALD:  That's what I
17  want.  I don't have a problem with you being
18  exact.
19         THE WITNESS:  Good.
20         Could you go back and read --
21         MR. GREENWALD:  And I appreciate
22  the fact that you want to be exact.  I would

1  hope that every answer is as exact as you can
2  make it.
3         (The record was read by the
4  reporter as follows:
5              +++
6      Q.   "Did that thought process occur to
7  you as you read the deposition, on your own?
8  That's my question.")
9              +++
10         MS. HILLS:  The same objections.
11         THE WITNESS:  I believe that did.
12         BY MR. GREENWALD:
13     Q.   Why do you believe that?
14         MS. HILLS:  Objection.  Calls for
15  speculation.
16         THE WITNESS:  I am not exactly
17  sure.
18         BY MR. GREENWALD:
19     Q.   What is it that makes you unsure?
20         MS. HILLS:  Objection.  Calls for
21  speculation.  Asked and answered.
22         THE WITNESS:  Again, I am unsure.

1      BY MR. GREENWALD:
2      Q.   Why?
3         MS. HILLS:  Objection.  Asked and
4  answered.
5         THE WITNESS:  I am not sure why.
6         BY MR. GREENWALD:
7      Q.   Doctor, on page 77, line six, when
8  you read this, the sentence that started,
9  "But, in the medical center, to my knowledge,
10  and this is a general statement, the faculty
11  wanted to support themselves through
12  research."
13         Is it my understanding that, as
14  you read this, you said to yourself, and came
15  to this conclusion on your own, gee, I left
16  out the word 'tenure' before 'faculty' when I
17  gave this answer?
18         MS. HILLS:  Objection.  Asked and
19  answered.
20         BY MR. GREENWALD:
21     Q.   Is that correct?
22     A.   As I said, I don't recall if it

1  was as I read it.
2      Q.   Doctor, my question -- why were
3  you not sure as you read it?
4         MS. HILLS:  Objection.  Asked and
5  answered.  Calls for speculation.
6         BY MR. GREENWALD:
7      Q.   Let me ask it this way.  What was
8  it that made you realize that the word was
9  left out in all these places?
10     A.   I believe it was the emphasis on
11  the entire tenure compensation.
12     Q.   Well, see, doctor, I am a little
13  confused about all of these addings of the
14  word tenure.
15     A.   Sure.
16     Q.   Because on page 74 of your
17  deposition, at line 12, you were asked -- I am
18  sorry.  (Pause.)
19         You were asked, "Am I correct,
20  then, doctor, that whether the faculty
21  compensation guidelines affected other faculty
22  members than tenured professors, you would not

Page 106

1   know?"
2          Your answer was, "I don't recall.
3   I don't recall."
4          MS. HILLS:  Let me object to the
5   extent --
6          MR. GREENWALD:  Let me finish my
7   question.  Then you can -- if this is going to
8   be another speaking objection, we can ask the
9   doctor to wait outside and you can speak for
10  as long as you want.
11         MS. HILLS:  I would just like to
12  point out, the errata sheet says, "Consistency
13  of transcript."  The doctor was asked point
14  blank what he knew about in the deposition
15  and --
16         MR. GREENWALD:  This is a speaking
17  objection which is inappropriate.  We have
18  been through this with Magistrate Kay.  The
19  Defendant's deposition was held in the
20  Courthouse because of your behavior in that
21  deposition.  I really don't think we need to
22  spend all of this time with you doing

Page 107

1   inappropriate objections, for whatever reason
2   you feel the need to do that, which I am not
3   sure I personally understand other than we all
4   know it is incorrect.  It goes on all the
5   time.  It is unfortunate that we have to put
6   up with it.
7          MS. HILLS:  Objection to the
8   sidebar.
9          BY MR. GREENWALD:
10     Q.   Doctor, the question I asked you
11  was, on page 74 -- you probably have forgotten
12  this by now -- "Am I correct, then, doctor,
13  that whether the faculty compensation
14  guidelines affected other faculty members than
15  tenured professors, you would not know?"
16         And you said, "I don't recall.  I
17  don't recall."
18         Was that your answer at the time?
19  Take a look at that, make sure I read it
20  right.
21         MS. HILLS:  Objection.  Page 85,
22  full transcript, should be entered at this

Page 108

1   time.
2          MR. GREENWALD:  I asked him about
3   page 74.  Not for you to tell him what to say.
4          Is there a basic reason why you
5   feel you need to tell every person that we
6   depose, who you are, quote, representing, what
7   they need to say, that they are not competent
8   to understand what they should be answering,
9   that they need someone to tell them everything
10  they need to do?  This man is a Ph.D.  He is
11  certainly capable of understanding what he
12  said without you telling him where to fly all
13  over the deposition.
14         MS. HILLS:  Counsel, we --
15         MR. GREENWALD:  I asked a specific
16  question.
17         MS. HILLS:  -- don't need this.
18  All I entered, for the rule of completeness,
19  was --
20         BY MR. GREENWALD:
21     Q.   Doctor, "Did I read that
22  correctly" is the only question that is

Page 109

1   pending.
2      A.   At that time, I don't recall.
3          But there is also a correction to
4   your statement.  I do not have a Ph.D.  I have
5   an Sc.D.
6      Q.   I'm sorry.  You are a very
7   well-educated man.  Can we agree on that?
8      A.   I believe so.
9      Q.   Okay.  Good.  So my question to
10  you is, did I read that correctly on page 74?
11  "Am I correct, then, doctor, that..." --
12     A.   Yes.
13     Q.   So at the time of the deposition
14  you did not recall whether the faculty
15  compensation guidelines affected faculty
16  members other than tenured professors.
17  Correct?
18     A.   That's right.  But the next
19  question in the deposition asked me -- there
20  was a specifically -- tenured professors were
21  being violated by this.  And I answered that
22  is correct.

Feder Reporting Company
(202) 863-0000

Page 110

1    Q.   I understand that.
2    A.   That's what I am answering.  That
3  is correct.
4    Q.   But my question is, doctor, do you
5  know -- why did you decide, if you didn't know
6  whether other faculty members were covered by
7  the guidelines, that is, nontenured faculty
8  members, what made you decide that you needed
9  to correct and add tenure to all these places
10 in your deposition?
11        MS. HILLS:  Objection.  Asked and
12 answered.  Calls for speculation.  Misstates
13 the transcript in its entirety.
14        BY MR. GREENWALD:
15   Q.   Can you answer my question,
16 doctor?
17   A.   No, I don't have a specific answer
18 for that.  Other than there is a great
19 emphasis in this entire process regarding
20 tenure.
21   Q.   Yes?
22   A.   And that's it.

Page 111

1    Q.   So you decided on your own, as I
2  understand it, and I am leaving this topic
3  with this question, that -- strike that.  Let
4  me ask you this.
5        Did you come into possession of
6  any knowledge that you didn't have, at the
7  time the deposition was taken in September,
8  that caused you to make these changes on the
9  errata sheet that we just talked about?
10        MS. HILLS:  Objection.  Calls for
11 speculation.  Overbroad and vague.
12        BY MR. GREENWALD:
13   Q.   Did you come into any other
14 information, doctor?
15   A.   Please define what you mean by
16 come into any other information.
17   Q.   Did you read anything about the
18 lawsuit?  Did you read anything about the
19 compensation plan?  Did you see any other
20 documents or papers of any kind?  Did you have
21 any discussions with anyone not counsel?
22   A.   No.

Page 112

1    Q.   About any of this?
2    A.   No.
3    Q.   So that all of this came to you on
4  your own without any other outside help?
5        MS. HILLS:  Objection.  Misstates
6  the testimony.
7        THE WITNESS:  I would think that
8  is correct.
9        (Discussion off the record.)
10        MR. GREENWALD:  Would you mark
11 this as Exhibit 6?  This is the lawsuit.
12        (Document referred to marked
13 Deposition Exhibit No. 6 for identification
14 and subsequently attached to the deposition.)
15        BY MR. GREENWALD:
16   Q.   Doctor, we have given you a copy
17 of Exhibit 6, which is the lawsuit that was
18 the subject of the last part of your
19 deposition in September.
20        Would you take a look at that
21 document for a minute and tell me whether you
22 recognize it?

Page 113

1    A.   (Pause).  Frankly, I don't recall.
2    Q.   You don't remember whether you
3  ever saw this before?
4    A.   I don't recall.
5    Q.   Is that your name on the front
6  page?
7    A.   Yes, it is.
8    Q.   Do you recall being a plaintiff in
9  a lawsuit such as this?
10   A.   Yes, I do.
11   Q.   Why were you a plaintiff in this
12 lawsuit?
13        MS. HILLS:  Objection.  Calls for
14 speculation.
15        THE WITNESS:  Because a policy was
16 being promulgated that breached the contract
17 with tenured faculty.
18        BY MR. GREENWALD:
19   Q.   What was the policy that you were
20 concerned about?
21        MS. HILLS:  Same objection.
22        THE WITNESS:  What was the policy

7 (Pages 110 to 113)

Page 114

1   I was concerned about?
2           BY MR. GREENWALD:
3       Q.   You said there was a policy that
4   breached a contract.  You just told me that.
5       A.   Yes.
6       Q.   What was the policy --
7       A.   It was the limit of the financial
8   guarantee to tenured faculty.
9       Q.   Explain to me how that worked and
10  what was it about that that was of concern to
11  you.
12      A.   The tenured faculty salary was
13  guaranteed by the university.  That didn't
14  mean that the University was paying all of the
15  tenured faculty salary but that the tenured
16  faculty salary was guaranteed, whatever that
17  salary was.
18      Q.   How was that salary established?
19          MS. HILLS:  Objection.  Calls for
20  speculation.
21          THE WITNESS:  Mine or anyone
22  else's?

Page 115

1           BY MR. GREENWALD:
2       Q.   As best you understood it.
3           MS. HILLS:  Objection.  Vague.  He
4   said, "Mine or everyone else's," and you
5   said --
6           BY MR. GREENWALD:
7       Q.   How was yours established?
8       A.   At what point in time?
9       Q.   Well, let me ask you this.  How
10  was this new policy that formed the basis of
11  this lawsuit, how did this change what you
12  understood your compensation was?
13          (Interruption.)
14          (Pause.)
15          THE WITNESS:  It didn't change
16  what my compensation was.  It changed what the
17  University guaranteed would be the
18  compensation for a tenured faculty member.
19          BY MR. GREENWALD:
20      Q.   How did it do that?
21      A.   By placing a limit on the
22  compensation for tenured faculty.

Page 116

1       Q.   Explain to me how that worked when
2   you say placed a limit.  What did that mean?
3       A.   That meant that the maximum amount
4   that the University would guarantee was the
5   limit in the compensation plan.
6       Q.   Prior to that how did that differ
7   from the prior compensation plan, as you
8   understood you were entitled to?
9       A.   The tenure contract provided a
10  guarantee of the full salary of all tenured
11  faculty members.
12      Q.   When you say that the change would
13  put a cap on it, what exactly do you mean by
14  that?  How would that cap work?
15          MS. HILLS:  Objection.  Overbroad.
16  Calls for speculation.
17          To him or in general?
18          BY MR. GREENWALD:
19      Q.   How did it work as you understood
20  the change?
21          MS. HILLS:  To him or in general?
22          BY MR. GREENWALD:

Page 117

1       Q.   The change applied to everybody
2   who was, as you said, tenured faculty.
3   Correct?
4           MS. HILLS:  Yes, counsel, and he
5   has already said --
6           BY MR. GREENWALD:
7       Q.   My question is to the doctor, did
8   the change apply to all tenured faculty?
9       A.   Yes.
10      Q.   What was your understanding of how
11  the change affected the salaries?  In other
12  words, you told me you put a cap on them.
13  What I am trying to understand --
14      A.   Excuse me.  I believe I said it
15  did not affect the salary.  What it did was to
16  put a cap on the guarantee of the University
17  to the tenured faculty member.
18      Q.   Explain to me how the guarantee
19  worked.
20      A.   The guarantee was that whatever
21  the tenured faculty member's salary was at the
22  time, that that amount of money would be

Feder Reporting Company
(202) 863-0000

Page 118

1  guaranteed by the university.
2      Q.   So how did the cap change that?
3      A.   The cap changed that by limiting
4  the amount that would be guaranteed to a
5  tenured faculty member.
6      Q.   Was that based on some type of a
7  formula?
8      A.   No.
9      Q.   How did it work?  How did the cap
10 limitation work?
11     A.   A number was established and
12 promulgated.
13     Q.   Do you know what that number was?
14     A.   I believe it was $100,000.
15     Q.   So just so I understand, if a
16 faculty member prior to this policy change
17 earned -- let's make up a number just so we
18 understand the mathematics -- $150,000 in
19 salary, the university would guarantee that
20 that faculty member would get that $150,000?
21     MS. HILLS:  Objection.
22     BY MR. GREENWALD:

Page 119

1      Q.   But with the policy change, the
2  university would only guarantee the number
3  that they picked, which was a hundred
4  thousand, as an example.  Is that correct?
5      MS. HILLS:  Objection.  Misstates
6  testimony.  Omits the word tenured faculty.
7      BY MR. GREENWALD:
8      Q.   Is that correct, doctor?
9  Mathematically is that correct?
10     A.   Mathematically it is correct.
11     Q.   I just wanted to make sure I
12 understood the process.
13     A.   Yes.
14     Q.   Was the salary based on any form
15 of productivity by the faculty member?  Was
16 that a component of the salary?
17     MS. HILLS:  Objection.
18     BY MR. GREENWALD:
19     Q.   Prior to the cap?
20     MS. HILLS:  Objection.  Misstates
21 the testimony.  Omitting the word tenure.
22     THE WITNESS:  I can't speak for

Page 120

1  everyone but I can speak for myself.  The
2  answer is no.
3      BY MR. GREENWALD:
4      Q.   You don't do procedures.  Correct?
5      A.   That is correct.
6      Q.   For those who did procedures,
7  medical procedures, do you know whether or not
8  the income from those procedures was a factor
9  in the compensation prior to the policy
10 change?
11     MS. HILLS:  Objection.  Misstates
12 testimony.  Omitting the word tenure.
13     BY MR. GREENWALD:
14     Q.   Do you know, doctor?
15     A.   I do not know the manner in which
16 compensation is set for any individual.  Any
17 tenured faculty member or otherwise.
18     That is private information.
19     Q.   Do you know whether or not -- and
20 you may have answered this but I am not sure
21 of your answer -- do you know whether
22 productivity was part of the compensation

Page 121

1  formula?
2      MS. HILLS:  Objection.  Misstates
3  prior testimony.  It omits the word tenure.
4      BY MR. GREENWALD:
5      Q.   Do you know, doctor?
6      A.   Can you define productivity?
7      Q.   Sure.  There are faculty members,
8  just hypothetically, who see patients in the
9  office and bring in a certain amount of
10 compensation, a certain amount of income, as a
11 result of their clinical work.  Right?
12     A.   I presume that is the case.
13     Q.   There are people who do procedures
14 that charge -- the university charges for
15 those procedures, don't they?
16     MS. HILLS:  Objection.  Calls for
17 speculation.
18     THE WITNESS:  I don't know that
19 for a fact.
20     BY MR. GREENWALD:
21     Q.   Who would be the person who would
22 have the most knowledge about how the

9 (Pages 118 to 121)

Page 122

1 compensation worked for those who were people
2 doing procedures and physicians?
3        MS. HILLS: Objection. Calls for
4 speculation.
5        THE WITNESS: That is true, it is
6 speculation.
7 I don't know for certain.
8        BY MR. GREENWALD:
9    Q.   Give me your best guess as to who
10 the person was who was the most knowledgeable.
11        MS. HILLS: Objection. Calls for
12 speculation and to guess.
13        BY MR. GREENWALD:
14    Q.   What would be your best answer?
15    A.   If I had to give a guess, my guess
16 would be the department chairman or
17 chairperson.
18    Q.   I am sorry?
19    A.   The department chairperson.
20    Q.   Who was that?
21    A.   (Indicating.)
22        MS. HILLS: Objection. Vague,

Page 123

1 overbroad.
2        BY MR. GREENWALD:
3    Q.   Doctor, who is Robert Glazer?
4    A.   Bob is a professor at Georgetown
5 University.
6    Q.   What is his specialty?
7    A.   I don't recall exactly. (Pause.)
8 It says here that he is a professor in the
9 department of pharmacology.
10    Q.   How about Steven Byers? Do you
11 know him?
12    A.   Yes. He is in the department of
13 cell biology, according to this.
14    Q.   How about Mark Danielson?
15        MS. HILLS: Let me just enter an
16 objection. I don't know -- maybe the doctor
17 does -- whether any of these people are still
18 at Georgetown, as this complaint was from
19 January, 1999. To the extent that the doctor
20 is saying he is, I don't know that that is
21 accurate.
22        THE WITNESS: I think that is

Page 124

1 correct. He is or was. I am not sure. I am
2 not there now and I am not sure.
3        BY MR. GREENWALD:
4    Q.   I didn't ask you if they were
5 still there.
6        Doctor, as part of your function
7 at Georgetown University, did you bring income
8 into the university as part of your work at
9 the University?
10        MS. HILLS: Objection. Vague.
11        THE WITNESS: Did I bring income?
12        BY MR. GREENWALD:
13    Q.   Yes.
14    A.   Yes.
15    Q.   In what areas did you bring
16 income?
17        MS. HILLS: Same objection.
18        THE WITNESS: In my research
19 areas.
20        BY MR. GREENWALD:
21    Q.   Are you talking about grants?
22    A.   Yes, grants to the university.

Page 125

1    Q.   Did the grants in any way
2 determine how you were compensated?
3        MS. HILLS: Objection. Calls for
4 speculation.
5        BY MR. GREENWALD:
6    Q.   In other words, the number of
7 grants or the amount of grants, did that play
8 any part in how you were compensated?
9        MS. HILLS: Objection. Calls for
10 speculation.
11        THE WITNESS: I don't know the
12 answer to that question.
13        BY MR. GREENWALD:
14    Q.   Did your bringing in funds to the
15 university play any part in your compensation?
16        MS. HILLS: Objection. Asked and
17 answered. Calls for speculation.
18        THE WITNESS: Did my bringing in
19 funds? What was the next part of that?
20        BY MR. GREENWALD:
21    Q.   Play any part in determining what
22 your compensation would be?

Feder Reporting Company
(202) 863-0000

Page 126

1    MS. HILLS:  Same objections.
2    THE WITNESS:  No.
3    BY MR. GREENWALD:
4    Q.   What were the factors -- I am not
5    asking you how much you earned, doctor.  I am
6    not interested in that.  How was your
7    compensation determined?  Upon what basis?
8    MS. HILLS:  Objection.  Calls for
9    speculation.
10   THE WITNESS:  The total amount,
11   you are asking me?
12   BY MR. GREENWALD:
13   Q.   Yes.
14   A.   The amount was determined, first
15   of all, based on what I was making when I was
16   hired 40 years ago, with increases throughout
17   the 40 years, so we end up with how the
18   compensation was determined.
19   Q.   I guess what I am confused about,
20   doctor, and maybe you can help me, is why did
21   you find the cap a problem for you personally?
22   A.   Because it was a breach of the

Page 127

1    tenure contract.
2    Q.   Did it have a financial effect on
3    you personally?
4    MS. HILLS:  Objection.  Vague.
5    THE WITNESS:  That is vague.  Did
6    the cap have an effect on my salary?
7    BY MR. GREENWALD:
8    Q.   Yes.
9    A.   No.
10   Q.   Do you know whether the cap had an
11   effect on the salaries of physicians?
12   MS. HILLS:  Objection.  Calls for
13   speculation.  Misstates prior testimony.
14   THE WITNESS:  I don't know.
15   BY MR. GREENWALD:
16   Q.   Do you have a sense one way or the
17   other whether it did?
18   MS. HILLS:  Objection.  Misstates
19   prior testimony.  Omits the word tenure.
20   Asked and answered.  Calls for speculation.
21   MR. GREENWALD:  I am perfectly
22   happy to let you have that same objection to

Page 128

1    every question I ask.  In fact, you can have
2    an objection for every question I ask for
3    every reason ever known to the whole history
4    of the common law.  And I agree you can have a
5    continuing one, so we can get out of here
6    faster.
7    Can you read back the question?
8    THE WITNESS:  Please.
9    (The record was read by the
10   reporter as follows:
11   +++
12   THE REPORTER:  The last question
13   was: "Do you have a sense one way or the
14   other whether it did?"
15   The question prior was:
16   Q.   "Do you know whether the cap had
17   an effect on the salaries of physicians?")
18   +++
19   THE WITNESS:  I don't know the
20   answer to that.
21   BY MR. GREENWALD:
22   Q.   Turn with me, if you would,

Page 129

1    doctor, to page four of the lawsuit.
2    Actually, start at the bottom of
3    page three.  That would make more sense.
4    "In this case Georgetown
5    University President O'Donovan, Executive Vice
6    President Wiesel, and Medical Center Chief
7    Executive Officer Bloem, devised and
8    implemented a compensation plan, including
9    productivity standards."
10   Do you see that?
11   A.   Yes.
12   MS. HILLS:  For rule completeness,
13   the entire sentence, "...implemented a
14   compensation plan, including productivity
15   standards, that constitutes a direct and
16   material breach of plaintiffs' tenure
17   contracts with the university." Period,
18   closed quote.
19   MR. GREENWALD:  Do you always feel
20   the need to interrupt for reasons that make no
21   legal sense?  I got to tell you, I don't think
22   I have ever been in a deposition with another

11  (Pages 126 to 129)

Page 130

1   lawyer who spent so much time interjecting so
2   much garbage into a deposition and making so
3   many objections that it really makes one
4   wonder.
5           BY MR. GREENWALD:
6       Q.   The words "a compensation plan
7   including productivity standards," do you see
8   that?
9       A.   Yes, I do.
10      Q.   What does that mean, "including
11  productivity standards"?
12      A.   I don't know exactly.
13      Q.   Basically, you were plaintiff in a
14  lawsuit that made allegations that you didn't
15  understand what they meant?
16      A.   Excuse me.  I was a plaintiff in a
17  lawsuit for which the purpose of the lawsuit
18  was that the university was breaching the
19  contract of tenured faculty.  That's it.
20      Q.   But you were involved in a lawsuit
21  that alleges that a compensation plan was
22  implemented which included productivity

Page 131

1   standards.  That's what it says.  Did I read
2   that right?
3       A.   Yes.
4       Q.   What does that mean?
5       A.   I don't know.  It didn't apply to
6   me.
7       Q.   It also says at the bottom of that
8   paragraph, it talks about the grievance
9   process.  And it discusses a wrongful
10  compensation policy.  Do you see that?  Do you
11  see those words?
12      A.   Yes.
13      Q.   What does that mean, a wrongful --
14      A.   Where are you here?
15      Q.   At the bottom, right before --
16  where it says number three.
17      A.   Yes.
18      Q.   The wrongful compensation policy.
19  Do you see that?
20      A.   Yes.
21      Q.   What was the wrongful compensation
22  policy?

Page 132

1       A.   Let me read the entire statement,
2   please.
3       Q.   Sure.  Absolutely.
4       A.   (Pause).  If we go back a little
5   further in that sentence, you will see that
6   what happened was that the board of directors
7   nullified and negated the grievance process
8   and its results.
9       Q.   Uh-huh.
10      A.   Okay?  In order to maintain the
11  compensation policy that they had decided
12  upon, which was a limit --
13      Q.   On the guarantee?
14          MS. HILLS:  Please don't interrupt
15  the witness.
16          THE WITNESS:  The limit on tenured
17  faculty salaries guaranteed by the university
18  in the tenure contract agreement with the
19  individual tenured members.
20          BY MR. GREENWALD:
21      Q.   Why did the university do all of
22  this?

Page 133

1           MS. HILLS:  Objection.  Calls for
2   speculation.
3           THE WITNESS:  I have no idea why
4   they did all this.
5           BY MR. GREENWALD:
6       Q.   You don't know why the university
7   made a determination that they were not going
8   to guarantee salaries?
9           MS. HILLS:  Objection.  Asked and
10  answered.
11          THE WITNESS:  No, I do not.
12          BY MR. GREENWALD:
13      Q.   As I understand it, you were
14  plaintiff in a lawsuit against Georgetown
15  where you do not know what the productivity
16  standards were in the new compensation plan
17  and you do not know why the university made a
18  change.  Correct?
19          MS. HILLS:  Objection.  Asked and
20  answered.
21          BY MR. GREENWALD:
22      Q.   Is that correct?

12 (Pages 130 to 133)

Page 134

1      A.   Correct, but I do know that the
2  compensation plan breached the tenure
3  contract.
4      Q.   I understand that.
5      A.   Good.
6          (Discussion off the record.)
7          BY MR. GREENWALD:
8      Q.   Do you know whether or not
9  nontenured physicians at Georgetown had any
10  type of productivity incentives?
11         MS. HILLS:  Objection.
12         THE WITNESS:  I don't know.
13         MS. HILLS:  Objection.  Asked and
14  answered in the prior deposition.
15         BY MR. GREENWALD:
16     Q.   Now, if you look with me, doctor,
17  on page nine -- let me ask you this.  Was this
18  also a lawsuit about economic security for the
19  plaintiffs?
20         MS. HILLS:  Objection.  Vague.
21  Calls for speculation.
22         THE WITNESS:  I don't understand

Page 135

1  that question.
2          BY MR. GREENWALD:
3      Q.   Do you know what economic security
4  means?
5      A.   No.
6      Q.   Well, you were a party to this
7  lawsuit, Exhibit Number 5 or 6?  6, I think.
8      A.   Yes.
9      Q.   Read for me number 30 at the
10  bottom of the page.
11     A.   There we go.  Okay.  Well, then
12  that's the answer.
13     Q.   Could you read it?
14     A.   "Economic security means, among
15  other things, a protection against diminution
16  of compensation."
17     Q.   Do you think that that was one of
18  the reasons why this new policy on
19  compensation was put forth?
20         MS. HILLS:  Objection.  Calls for
21  speculation.  Vague.
22         BY MR. GREENWALD:

Page 136

1      Q.   Do you know?
2      A.   No, I don't.
3      Q.   Do you need Ms. Hills to keep
4  telling you that it calls for speculation and
5  it is vague?  Is that helping you with your
6  answers?
7          MS. HILLS:  Don't answer that.
8  That is protected by attorney --
9          BY MR. GREENWALD:
10     Q.   You have a big smile on your face,
11  doctor.  Too bad we don't have a video.  It is
12  a really nice smile.
13         MS. HILLS:  Objection to the
14  sidebar.
15         Don't answer.
16         BY MR. GREENWALD:
17     Q.   Are you telling us something by
18  that smile?
19     A.   I will defer.  I will not answer
20  that question.
21         MR. GREENWALD:  I would appreciate
22  it if you would stop.  The rules provide that

Page 137

1  all you say is objection, unless it is
2  privileged.  You, however, do not believe you
3  are subject to the rules.
4          MS. HILLS:  That is contrary to
5  the rules.  The rules state I must state the
6  basis for the objection or it is waived.
7  Therefore, I am stating the objection.  I am
8  sorry if counsel doesn't like the rules.  I am
9  sorry if counsel doesn't like to obey the
10  rules.  Please go on with your deposition.
11         MR. GREENWALD:  The question of
12  obeying the rules is something that you are
13  intimately familiar with, as we know from what
14  has happened in this case so far.
15         BY MR. GREENWALD:
16     Q.   Doctor, let's look at page ten.
17         I think you told me earlier, when
18  I was asking you, that you do not know and did
19  not know whether or not the new policy would
20  result in a decrease in the income of any of
21  the faculty members.  Correct?
22     A.   That's correct.  I don't know

13 (Pages 134 to 137)

Page 138

1    that.
2        Q.    Would you read for me number 34 in
3    the lawsuit, out loud?
4        A.    "However, the September 19, 1997
5    policy called for the decrease in compensation
6    for certain tenured medical center faculty
7    members, beginning with the university's
8    fiscal year, which would start on July 1,
9    1998."
10       Q.    Would you read 35, please?
11       A.    "The policy also permitted further
12   compensation decreases for tenured faculty
13   members in the future."
14       Q.    And 36, following?
15       A.    "The policy also indicated that
16   further adjustments to the compensation of
17   tenured faculty would follow based on an as
18   yet undefined measurement of faculty," quote,
19   "productivity," end quote.
20       Q.    What does that mean when it says,
21   based on undefined measure of faculty
22   productivity?  What does that mean?

Page 139

1        MS. HILLS:  Objection.  The
2    document speaks for itself.
3        BY MR. GREENWALD:
4        Q.    What does that mean, doctor, to
5    you?
6        A.    It means that they hadn't defined
7    how they were going to make that
8    determination.
9        Q.    When it says it called for a
10   decrease in compensation, what does that mean,
11   that it called for a decrease in compensation?
12   I am talking about 34, now.
13       MS. HILLS:  Misstates the
14   paragraph.  Objection.
15       BY MR. GREENWALD:
16       Q.    What does that mean to you,
17   paragraph 34?
18       A.    It means that there may have been
19   certain tenured medical faculty, medical
20   center faculty, whose compensation would have
21   decreased.
22       Q.    And, doctor, reading that together

Page 140

1    with 36, do you have any inclination as to
2    whether or not productivity would play any
3    part in the compensation?
4        MS. HILLS:  Objection.  Calls for
5    speculation.
6        THE WITNESS:  I am not sure what
7    the terms would be but may I please take you
8    back to 32?
9        BY MR. GREENWALD:
10       Q.    Certainly.
11       A.    The compensation policy was for
12   tenured university faculty members at the
13   medical center only.
14       Q.    Do you know whether Dr. Watson was
15   at the medical center?
16       MS. HILLS:  The witness is
17   gesturing that he is not finished.  Please
18   don't interrupt him.
19       THE WITNESS:  Tenure is a
20   guarantee by Georgetown University and not by
21   a cost center.
22       BY MR. GREENWALD:

Page 141

1        Q.    Do you know why Georgetown
2    University was pushing a policy which would
3    lead to a decrease, according to this lawsuit,
4    in compensation of medical center tenured
5    faculty?
6        MS. HILLS:  Objection.  Calls for
7    speculation.
8        THE WITNESS:  I don't know why.
9        BY MR. GREENWALD:
10       Q.    Do you have any thoughts about
11   why?
12       MS. HILLS:  Objection.  Calls for
13   speculation.  Asked and answered.
14       THE WITNESS:  No, I am not going
15   to speculate.
16       BY MR. GREENWALD:
17       Q.    So did you ever have any
18   discussions with any of the other plaintiffs
19   about why this was happening?
20       MS. HILLS:  Objection.
21       To the extent that involves
22   attorney-client privilege of another attorney,

14 (Pages 138 to 141)

Page 142

```
 1   don't answer it.  But if you can answer the
 2   question outside the tenure of this being
 3   plaintiffs in this lawsuit, go ahead.
 4          THE WITNESS:  Well, I can't answer
 5   it because those are the only discussions that
 6   we had.
 7   BY MR. GREENWALD:
 8      Q.   You never had a discussion with
 9   any of these people without a lawyer present?
10          MS. HILLS:  Objection.  That's not
11   attorney-client privilege when two
12   plaintiffs --
13   BY MR. GREENWALD:
14      Q.   Did you ever have a discussion
15   with any of these other plaintiffs where there
16   were no lawyers present?  That's just a yes or
17   no question.
18      A.   Yes.
19      Q.   During any of those discussions
20   when there was no lawyer present -- okay? --
21   was there any discussion about why this policy
22   was being instituted?
```

Page 143

```
 1          MS. HILLS:  Don't answer that to
 2   the extent your discussion with other
 3   plaintiffs involved this lawsuit such that it
 4   is still covered by the attorney-client
 5   privilege.
 6          MR. GREENWALD:  Objection.  Number
 7   one, he wouldn't know what that means.  Number
 8   two, there is no attorney-client privilege
 9   which is discussions with other people without
10   attorneys present.
11          MS. HILLS:  I beg to differ.
12          MR. GREENWALD:  Fine.
13   BY MR. GREENWALD:
14      Q.   My question is, doctor, did you
15   have any discussions with them about why this
16   cap on compensation guarantees was being
17   promulgated?
18          MS. HILLS:  To the extent you can
19   answer that without implicating --
20          MR. GREENWALD:  That's a yes or no
21   question.
22          MS. HILLS:  Please don't interrupt
```

Page 144

```
 1   my objection.
 2          To the extent you can answer that
 3   when this lawsuit was not pending, so no
 4   lawyer was involved, you may answer.
 5          THE WITNESS:  Yes.
 6   BY MR. GREENWALD:
 7      Q.   Those conversations prior to the
 8   time that you all went to see a lawyer about
 9   this, were there any discussions about why
10   this policy was being promulgated?
11          MS. HILLS:  Objection.  Calls for
12   speculation.
13          THE WITNESS:  I presume there must
14   have been some discussion of why the policy.
15   But that wasn't the point.  The point was the
16   policy was being promulgated and it was a
17   breach of the contract.
18   BY MR. GREENWALD:
19      Q.   I understand that.  But were you
20   not interested in why this was happening?
21      A.   We were interested, yes.
22      Q.   And did you come to any discussion
```

Page 145

```
 1   or any thoughts about the potential reasons
 2   for why this was happening?
 3          MS. HILLS:  Outside of the
 4   lawsuit.
 5          THE WITNESS:  Not really.
 6   BY MR. GREENWALD:
 7      Q.   So you had no idea, whatsoever,
 8   why this was occurring?  Is that right?
 9          MS. HILLS:  Objection.  Asked and
10   answered.  Calls for speculation.
11   BY MR. GREENWALD:
12      Q.   You had no idea why this was
13   happening.  Right?
14      A.   I could speculate on why it was
15   happening but I did not know why it was
16   happening.
17      Q.   Speculate for me.
18          MS. HILLS:  Objection.
19          THE WITNESS:  I am not going to
20   speculate.
21   BY MR. GREENWALD:
22      Q.   Was there any discussion, doctor,
```

15 (Pages 142 to 145)

Page 146

1  about the university having any financial
2  difficulties, or the medical center having any
3  financial difficulties at this time?
4      MS. HILLS: Objection. Overbroad.
5  Vague.
6      THE WITNESS: Was there any
7  discussion. Please define that.
8      BY MR. GREENWALD:
9      Q.  Did you discuss with anybody in
10  this lawsuit, any of the people prior to
11  seeing a lawyer, whether or not the
12  university, medical center, was having any
13  financial difficulties?
14      MS. HILLS: Same objection.
15      THE WITNESS: I presume we must
16  have had, we might have had some discussion.
17      BY MR. GREENWALD:
18      Q.  About that?
19      A.  Yes.
20      Q.  Can you tell me what, if anything,
21  you recall about those discussions?
22      A.  No. I don't recall the

Page 147

1  discussions. I said I --
2      Q.  Was it your belief, doctor, at the
3  time, that one of the reasons why this policy
4  was being instituted was as a cost saving
5  measure for the medical center?
6      MS. HILLS: Objection. Calls for
7  speculation. Asked and answered.
8      THE WITNESS: I don't know the
9  answer to that question.
10      BY MR. GREENWALD:
11      Q.  My question is was that one of
12  your thoughts as to why this was going on?
13      MS. HILLS: Same objection. Asked
14  and answered. Calls for speculation.
15      THE WITNESS: I don't know why
16  this was going on.
17      BY MR. GREENWALD:
18      Q.  I said, was that one of your
19  thoughts about why this was going on? I
20  didn't ask you for a definitive answer. I
21  asked you whether you thought that might be
22  one of the reasons.

Page 148

1      MS. HILLS: Same objections.
2      THE WITNESS: That might have been
3  one of the reasons put forward but that
4  doesn't necessarily mean that was a reason.
5      BY MR. GREENWALD:
6      Q.  As I understand it, and just so I
7  am clear on this, because I don't want to
8  belabor the point, you were a plaintiff in a
9  lawsuit against Georgetown where you worked,
10  based on a breach of a contract which affected
11  compensation to tenured faculty members with
12  respect to a cap guarantee by the university
13  of those salaries. And yet you had no idea
14  why this policy was being implemented. Is
15  that a fair statement?
16      MS. HILLS: Objection. Misstates
17  the prior testimony.
18      BY MR. GREENWALD:
19      Q.  Is that a fair statement?
20      A.  No.
21      Q.  Why is it unfair?
22      A.  Because you said that I had no

Page 149

1  idea.
2      Q.  Tell me what ideas you have, then.
3      MS. HILLS: Objection. Calls for
4  speculation. Asked and answered.
5      THE WITNESS: Perhaps, I would
6  say, I can recall a faculty meeting where the
7  question was asked of one of the defendants in
8  this lawsuit, what kind of a deficit were they
9  talking about? Was it a cash flow deficit or
10  was it an accounting deficit. A perfectly
11  reasonable question.
12      BY MR. GREENWALD:
13      Q.  Yes, I agree.
14      A.  There was no answer forthcoming.
15  My recollection is that the person running the
16  meeting didn't know. Turned to the financial
17  person who was there and that person didn't
18  care to give an answer. So in that context
19  one couldn't be definitive about the issue of
20  financial difficulties or the extent of
21  financial difficulties. All of which was
22  immaterial because the lawsuit had to do with

16 (Pages 146 to 149)

Page 150

1  a breach of a contract.
2      Q.   I understand.  Do you remember
3  when the meeting took place?
4      A.   No, somewhere, my guess is
5  somewhere before this date --
6      Q.   Before the suit was filed?
7      A.   Yes.
8      Q.   Was that a meeting to try to get
9  answers as to what was going on?
10         MS. HILLS:  Object.
11         THE WITNESS:  I don't know the
12  purpose of the meeting.  I just know it was a
13  faculty meeting.
14         BY MR. GREENWALD:
15      Q.   At which time the proposed
16  reversal of the guarantees was discussed?
17         MS. HILLS:  Objection.  Vague.
18         THE WITNESS:  I don't recall that.
19         BY MR. GREENWALD:
20      Q.   The policy was discussed, the new
21  policy?
22      A.   I don't recall if that was

Page 151

1  discussed at the particular meeting to which I
2  refer.
3      Q.   Was it discussed at any meeting
4  that you were at?
5         MS. HILLS:  Objection.  Overbroad.
6  Calls for speculation.
7         THE WITNESS:  Was the compensation
8  policy?
9         BY MR. GREENWALD:
10      Q.   The new one that was being
11  advocated.
12      A.   Yes.
13      Q.   Was that discussed at any faculty
14  meeting?
15      A.   Yes.
16      Q.   Tell me what you recall the
17  substance of that discussion or those
18  discussions to be.
19      A.   This was some time ago but my
20  recollection is there was an announcement that
21  the tenure contract would be broken.  It
22  wasn't said in those words but it was said

Page 152

1  that there would be a cap on the tenure
2  guarantee.  That came up at a couple of
3  meetings.  I don't remember the dates.
4      Q.   At those meetings when that came
5  up did people question why this was happening?
6      A.   I don't recall the exact content
7  of those meetings.
8      Q.   Do you recall any meetings where
9  people wanted to know why this was happening?
10      A.   That was probably the case.  But I
11  don't recall specifically.
12      Q.   I understand.  What is your
13  general recollection of what response you were
14  given, or the faculty was given, as to why
15  this was happening?
16      A.   I don't recall any satisfactory
17  response given.
18      Q.   What were the unsatisfactory
19  responses that were given?
20      A.   I don't recall those, either.  Not
21  the details of them.  I just don't recall.
22      Q.   At the meeting when you asked

Page 153

1  whether the deficit was financial or
2  accounting --
3      A.   I didn't say that I asked.
4      Q.   That someone asked whether the
5  deficit was financial or accounting, at that
6  meeting, who was present from the University
7  that the questions were being asked of?
8      A.   I am not sure.
9      Q.   The best of your recollection is
10  all I am asking.
11      A.   Probably, it would have been
12  Mr. Bloem and Dr. Wiesel.
13      Q.   Did you ever have any private
14  conversations with either of those two
15  gentlemen about the tenure contract?  Did you
16  ever have any meetings with them?
17      A.   Just me?
18      Q.   The first question is just you.
19      A.   The answer is no.
20      Q.   Did you with others?  Were you
21  part of a group that met with them?
22         MS. HILLS:  Objection.  Vague.

17 (Pages 150 to 153)

Page 154

1   Misstates prior testimony.
2           THE WITNESS:  During the grievance
3   process there was a meeting with Dr. Wiesel.
4           BY MR. GREENWALD:
5       Q.   Tell me what you recall, as best
6   you can recall, occurred at that meeting.
7       A.   I don't recall the details of that
8   meeting at all.
9       Q.   You don't recall anything that
10  happened at that meeting?
11      A.   I don't recall exactly but I
12  believe Dr. Wiesel indicated that the
13  grievance process was not going to stop them.
14      Q.   Did he indicate why?
15      A.   No.
16      Q.   I guess it was your view that they
17  were pretty determined to push this new
18  policy.
19          MS. HILLS:  Objection.  Assumes
20  facts not in evidence.  Calls for speculation.
21          BY MR. GREENWALD:
22      Q.   I assume that's what led up to the

Page 155

1   lawsuit being filed.
2       A.   It said, if you look at this, we
3   went through the grievance process of the
4   university.  Three steps to that process.
5       Q.   And you prevailed?
6       A.   And we prevailed.
7       Q.   And then father O'Donovan was
8   supposed to appoint a last resort appeal
9   person?
10      A.   No.  We won the grievance process.
11  There was no last appeal.  What they did at
12  that point was to just simply declare that the
13  grievance process, if I have the correct
14  terminology here, was null and void.  It
15  didn't exist.  So the grievance that we filed
16  and the process we went through didn't exist.
17      Q.   And they did this to keep the
18  policy that you were fighting about their cap
19  on compensation no longer being guaranteed?
20          MS. HILLS:  Objection.  Calls for
21  speculation.
22          THE WITNESS:  I would have to

Page 156

1   speculate that that was the case but I don't
2   know that for sure.
3           BY MR. GREENWALD:
4       Q.   But that would be your best
5   opinion, wouldn't it?
6       A.   It would be a guess of mine.
7       Q.   Take a look with me, if you would,
8   on page 13.
9           Would you read for me, please,
10  paragraph 51?
11      A.   "Subsequent to the filing of the
12  post-hearing submissions on May 14, 1998
13  Defendants Wiesel and Bloem, with the approval
14  of Defendant O'Donovan, issued a set of
15  faculty compensation guidelines which spelled
16  out the productivity measures for medical
17  center faculty referenced in the September 19,
18  1997 compensation policy."
19      Q.   Did you ever see that document?
20      A.   No.
21      Q.   Do you know who would have a copy
22  of that document?

Page 157

1           MS. HILLS:  Objection.  Calls for
2   speculation.
3           THE WITNESS:  I have no idea.
4           BY MR. GREENWALD:
5       Q.   When it says the productivity
6   measures for the medical center faculty, what
7   does that mean?
8       A.   I don't know.
9       Q.   Do you know whether the medical
10  center, prior to this new procedure, had a
11  productivity factor built into their
12  compensation?
13          MS. HILLS:  Objection.  Calls for
14  speculation.
15          BY MR. GREENWALD:
16      Q.   Do you know?
17      A.   No, I don't.
18      Q.   One way or the other?
19      A.   No, I don't.
20      Q.   Who would be the person who would
21  be in the best position to know that?  Would
22  that be the same gentleman you mentioned

18 (Pages 154 to 157)

Page 158

1  before?
2         MS. HILLS:  Objection.  Vague.
3  Misstates prior testimony.  Calls for
4  speculation.
5         THE WITNESS:  I believe what I
6  said before was department chairperson.  There
7  is not a single department chairperson.  There
8  are many department chairpersons.
9         BY MR. GREENWALD:
10  Q.   By the way, doctor, do you recall
11  that the medical center was sold to Medstar at
12  some point?
13  A.   Yes.
14  Q.   Do you remember what that was?
15  A.   Not exactly.
16  Q.   Do you remember whether it was
17  around the time that this was occurring?
18  A.   I believe it was sometime around
19  here or after this.  But I am not sure of the
20  exact time.
21  Q.   In paragraph 53, it says, "The
22  guidelines make clear that, henceforth, each

Page 159

1  medical center faculty member's compensation
2  would be determined only by reference to the
3  faculty member's income-generating
4  activities."  Do you see that?
5  A.   Yes.
6  Q.   Did I read that correctly?
7  A.   I believe so.
8  Q.   Please read the rest of paragraph
9  53 and tell me if anywhere in paragraph 53,
10  where it talks about the medical center
11  faculty members' compensation, the word tenure
12  appears.
13         MS. HILLS:  Objection.  The
14  document speaks for itself.  Violates rule of
15  completeness.
16         BY MR. GREENWALD:
17  Q.   Do you find the word tenure
18  anywhere in paragraph 53 talking about the
19  medical center faculty's compensation?
20  A.   No.
21  Q.   Would you read paragraph 54 for
22  me, please, out loud?

Page 160

1  A.   "The guidelines further required
2  the faculty to fund a specified portion of
3  their salaries from external sources.  A
4  system later characterized as an, quote, eat
5  what you kill, end quote, approach."
6  Q.   Do you know what that means, eat
7  what you kill approach?
8  A.   No idea.
9  Q.   Were there faculty members who
10  were not tenured at this time?
11         MS. HILLS:  Objection.  Overbroad.
12  Vague.
13         BY MR. GREENWALD:
14  Q.   Were there faculty members who
15  were not tenured?
16         MS. HILLS:  Same objections.
17         THE WITNESS:  I presume there
18  were.
19         BY MR. GREENWALD:
20  Q.   Tell me, doctor, in paragraph 54,
21  where it talks about the faculty required to
22  fund a specific portion of their salaries from

Page 161

1  external sources, does the word tenure appear
2  anywhere in paragraph 54?
3         MS. HILLS:  Objection.  Violates
4  rule of completeness.
5         BY MR. GREENWALD:
6  Q.   Does it appear anywhere in
7  paragraph 54?
8         Ms. Hills, it would really be nice
9  if once, during this entire case, and maybe
10  even during every case you have, you would act
11  appropriately and stop signaling the witness
12  as to what you would like the witness to say,
13  as opposed to the testimony the witness has
14  sworn to give in telling the truth.
15         MS. HILLS:  Same objections.  The
16  document speaks for itself.
17         MR. GREENWALD:  Yes, we both have
18  the same objections.
19         BY MR. GREENWALD:
20  Q.   Doctor, can you answer the
21  question?
22  A.   If I remember the question.

19 (Pages 158 to 161)

Page 162

1      Q.   I will give it to you again.  In
2   paragraph 54, where it says the guidelines
3   requiring the faculty to fund a specified
4   portion of their salaries from external
5   sources anywhere, refers to tenured faculty --
6      A.   No.
7      Q.   -- in that paragraph.
8           Doctor, do you have any idea why
9   the medical center was sold to Medstar?
10          MS. HILLS:  Objection.  Calls for
11  speculation.
12          BY MR. GREENWALD:
13     Q.   Do you have any idea?
14     A.   I do not know why.
15     Q.   I didn't ask you if you knew.  I
16  asked you whether you had any thoughts about
17  why it was sold.
18          MS. HILLS:  Calls for speculation.
19          THE WITNESS:  I will answer again,
20  I don't know why.
21          BY MR. GREENWALD:
22     Q.   Did you hear any discussion about

Page 163

1   the medical center being sold for financial
2   reasons?
3      A.   Did I hear any discussion?
4      Q.   From any source.
5          MS. HILLS:  Objection.  Overbroad.
6          THE WITNESS:  There was
7   discussion, I presume, there was talk -- I
8   don't know specifically when or where -- that
9   there were financial reasons for selling the
10  hospital and the clinical entities.
11          BY MR. GREENWALD:
12     Q.   Doctor, were you aware that the
13  law center was extremely profitable and the
14  medical center was exactly the opposite, and
15  there was an issue at the university about the
16  law school using some of its funds to cover
17  the deficits of the medical school?  Were you
18  aware of that?  Which led to a dispute between
19  Father O'Donovan and Judy Areen, dean of the
20  law school?  Were you aware of any of that?
21     A.   The first part of your question
22  was was I aware of anything.  And the answer

Page 164

1   is there was talk but I did not see the books
2   of the medical center.  I have no idea what
3   the extent, if any, the financial problems of
4   the medical center were.
5          As to problems between the law
6   center and the medical center, I'm not privy
7   to those.
8      Q.   Why at the meeting that you told
9   me about a little while ago did someone ask
10  whether the deficit was financial or
11  accounting?
12          MS. HILLS:  Objection.  Calls for
13  speculation.
14          THE WITNESS:  Because I presume
15  there was discussion of the deficit in the
16  medical center.
17          BY MR. GREENWALD:
18     Q.   Did you ever have any discussions
19  with Sheila Zimmet about the compensation
20  issues that were involved in the policy?
21          MS. HILLS:  To the --
22          MR. GREENWALD:  That's just a yes

Page 165

1   or no question.  I didn't ask you what the
2   discussions were.
3          MS. HILLS:  Still intrudes upon
4   attorney-client privilege.  To the extent
5   there were discussions where you were asking
6   as a client in terms of being a university
7   employee, Sheila Zimmet being the university
8   counsel, do not answer.  It is covered by the
9   attorney-client privilege.
10          THE WITNESS:  I have no
11  recollection of talking with Sheila Zimmet
12  about this issue at all.
13          BY MR. GREENWALD:
14     Q.   Doctor, at the time that this
15  lawsuit was about ready to be filed did you
16  ever read it?
17          MS. HILLS:  Object.
18          THE WITNESS:  I don't recall.  I
19  just don't recall.
20          BY MR. GREENWALD:
21     Q.   Based upon what we have gone over
22  so far in the lawsuit, is anything that we

20 (Pages 162 to 165)

Page 166

1  read in the lawsuit, to the best of your
2  knowledge, untrue?
3         MS. HILLS: Objection. Overbroad.
4  Vague.
5         THE WITNESS: I don't believe so
6  but I don't know. I haven't read each one of
7  these points.
8         BY MR. GREENWALD:
9     Q.  I understand. We have read
10  certain paragraphs in the lawsuit, as we have
11  gone through this deposition. My question to
12  you is, as we went through those, did you find
13  anything that we read, or that you read, to be
14  untrue, that is contained in this lawsuit?
15     A.  I don't believe so.
16     Q.  Doctor, at the time your
17  deposition was initially taken, there was a
18  deposition notice. I am just going to show it
19  to you and ask you, did you ever see that
20  document before?
21         MS. HILLS: Objection. Asked and
22  answered.

Page 167

1         THE WITNESS: (Pause). I believe
2  so.
3         BY MR. GREENWALD:
4     Q.  Just so we are sure, you do not
5  have in your possession or access to any of
6  the things you were asked to bring? Is that
7  correct?
8         MS. HILLS: Objection. Asked and
9  answered. Pages 15 through 19 of the prior
10  deposition transcript.
11         THE WITNESS: I provided my
12  curriculum vitae and, IRB proceedings to each
13  meeting, the files are handed over to the IRB
14  and they are shredded.
15         BY MR. GREENWALD:
16     Q.  I am sorry, I didn't hear you.
17     A.  After each IRB meeting the files
18  are provided to the IRB office and they are
19  shredded. They are not kept by people.
20         MS. HILLS: You mean to the
21  members?
22         THE WITNESS: To the members, yes.

Page 168

1         BY MR. GREENWALD:
2     Q.  So the university doesn't -- when
3  you say shredded, you mean each individual
4  member's copy, as opposed to the university
5  shredding everything that happened.
6     A.  Oh, yes, each individual member's
7  copy.
8     Q.  So the university keeps a copy but
9  the individual members don't keep copies?
10     A.  I believe that's correct.
11     Q.  Where are those copies kept in the
12  university?
13         MS. HILLS: Objection. Asked and
14  answered. Prior deposition, pages 18, 19.
15         THE WITNESS: I don't know.
16         BY MR. GREENWALD:
17     Q.  Did you make any attempt to obtain
18  any of those or look for those in preparation
19  for your deposition, before?
20     A.  No.
21         MS. HILLS: For the record, as
22  stated in the prior deposition, the IRB

Page 169

1  records have been searched prior to the
2  deposition of Sheila Zimmet which was in
3  August of this year, prior to Dr. Chiazze's
4  deposition. The same request was contained in
5  both notices.
6         THE WITNESS: Excuse me.
7         MR. GREENWALD: Do you want to
8  take a break for a minute?
9         THE WITNESS: No, let's finish
10  this.
11         MS. HILLS: Do you know how much
12  longer you are going to go? It is about 11 --
13         MR. GREENWALD: Five or ten
14  minutes. I am just about done.
15         BY MR. GREENWALD:
16     Q.  Dr. Chiazze, would it be fair to
17  say that, with respect to the lawsuit, Exhibit
18  Number 6, and the effects that the policy had
19  on physicians, you would not be the most
20  knowledgeable person about that?
21         MS. HILLS: Objection. Misstates
22  prior testimony.

21 (Pages 166 to 169)

Page 170

1    BY MR. GREENWALD:
2    Q.   Is that correct?
3    A.   I don't know what the compensation
4    policy was for the physicians.  I am not a
5    physician, as I have stated before.  I don't
6    see patients.  I don't know what their
7    policy --
8    Q.   I understand.  So if I wanted to
9    ask somebody about the effect of the
10   compensation policy and what productivity
11   meant, and all of those things that you and I
12   went over, the best person to ask would be a
13   tenured or nontenured faculty member who was a
14   physician.  Correct?
15        MS. HILLS:  Objection.
16        BY MR. GREENWALD:
17   Q.   At the time.
18        MS. HILLS:  Objection.  Calls for
19   speculation.
20        BY MR. GREENWALD:
21   Q.   Would that be the best person to
22   ask?

Page 171

1    A.   I don't know who the best person
2    would be to ask.
3    Q.   A physician who was affected by
4    this policy would know more about how
5    physicians were affected than you.  Correct?
6        MS. HILLS:  Objection.  Calls for
7    speculation.
8        THE WITNESS:  Perhaps would know
9    more about his or her compensation, but
10   whether they would know about the compensation
11   of others, I have no idea.
12        BY MR. GREENWALD:
13   Q.   Since your income is not based on
14   productivity, you told me -- correct?
15   A.   (Pause.)
16   Q.   Or am I missing something?
17        MS. HILLS:  Objection.  Misstates
18   testimony.
19        BY MR. GREENWALD:
20   Q.   Was your income at the time based
21   to any degree on productivity?
22        MS. HILLS:  We can read back that

Page 172

1    exact question and answer.  It was asked and
2    answered.
3        MR. GREENWALD:  I asked about
4    income generation.  I don't think I used the
5    word productivity.
6        THE WITNESS:  Are you asking
7    whether any portion of my salary came from my
8    grants?  Is that what you are asking?
9        BY MR. GREENWALD:
10   Q.   Yes, that's what I am asking.
11   A.   The answer is yes.
12   Q.   Would the cap guarantee have
13   affected you?
14   A.   Certainly, if I had lost all my
15   grants, the cap would have affected me.
16   Q.   This is what I was trying to get
17   to earlier.
18        So that the money that you brought
19   in to the university, the amount that you
20   brought in, played a part in how your salary
21   was determined.  Right?
22        MS. HILLS:  Objection.

Page 173

1    Misstates --
2        BY MR. GREENWALD:
3    Q.   Because if your grants got
4    reduced --
5    A.   No.
6    Q.   You just told me it would affect
7    your compensation.
8    A.   My salary level was set by the
9    department that I was in.
10   Q.   I understand what --
11        MS. HILLS:  Please don't interrupt
12   the witness.
13        MR. GREENWALD:  I will withdrew
14   the question.
15        BY MR. GREENWALD:
16   Q.   Did you get bonuses or extra
17   incentives added onto your salary based upon
18   the amount of grant money you brought in?
19        MS. HILLS:  Objection.  Vague.
20        THE WITNESS:  No.
21        BY MR. GREENWALD:
22   Q.   You said if the grant money was

22  (Pages 170 to 173)

Page 174

1 reduced it would affect your salary. Did you
2 mean because you wouldn't have anything to do,
3 or did you mean in some other way it would
4 affect your salary?
5     A.   Some other way.
6     Q.   What other way was that?
7     A.   Because the amount of money that I
8 was receiving would go down.
9     Q.   Did all the grant money go to the
10 university?
11         MS. HILLS: Objection. Calls for
12 speculation.
13         THE WITNESS: I don't understand
14 that question.
15         BY MR. GREENWALD:
16     Q.   When grant money came in for work
17 you were doing, did that money go to you
18 personally or did it go to the university?
19     A.   It went to the university.
20     Q.   Explain to me -- this is the final
21 thing I want to understand. Explain to me
22 how, if the grant money was reduced, your

Page 175

1 income would go down.
2     A.   My income was over the 100,000
3 figure. So if all the grant money
4 disappeared --
5     Q.   I understand. And since there was
6 no guarantee except at a hundred --
7     A.   Correct.
8     Q.   You would only get the hundred?
9     A.   That's right.
10     Q.   So it was --
11     A.   In theory.
12     Q.   I understand that. But it still
13 was in your best interests to get as much
14 grant money as you could?
15         MS. HILLS: Objection. Vague.
16         THE WITNESS: It was in my best
17 interest to be able to support my research
18 program. Not necessarily personally. Part of
19 my salary did come from my grants, but
20 certainly one of the reasons for being on the
21 faculty is to conduct research.
22         BY MR. GREENWALD:

Page 176

1     Q.   I understand. And I understand
2 that research is important. I am not, by any
3 means, suggesting it is not.
4         If, hypothetically, you had an
5 income of $100,000 plus, as a result of the
6 grants, the University would guarantee that
7 income for you, under the old policy?
8         MS. HILLS: Objection. Vague.
9         THE WITNESS: If I understand your
10 question correctly, yes.
11         BY MR. GREENWALD:
12     Q.   So if your grants fell off for
13 some reason, would the university still
14 guarantee that amount under the old policy of
15 what your prior salary, what your salary was
16 based on the grants that didn't come in? That
17 level?
18     A.   Yes.
19     Q.   So that what was happening now
20 with the new policy was that if the grants
21 fell off, they would not still guarantee the
22 level you were at. They would only guarantee

Page 177

1 you at $100,000?
2     A.   Theoretically, yes.
3     Q.   And so if the change went through
4 and you wanted to keep the level of income
5 that the university had previously guaranteed,
6 you would need to keep the same level of grant
7 money coming in?
8     A.   I think that's true.
9         MR. GREENWALD: Dr. Chaizze, you
10 have been extremely helpful. Thank you so
11 much for your time.
12         THE WITNESS: You are welcome.
13         MR. GREENWALD: That's all I have
14 for now.
15         MS. HILLS: We will read and sign.
16         Let's take a short break to let
17 the doctor go. Then if you want to do the
18 meet and confer.
19         MR. GREENWALD: Yes, let's do that
20 quickly.
21         (Whereupon, at 11:36 a.m., the
22 deposition was concluded.)

23 (Pages 174 to 177)

Page 178

1       (A recess was taken.)
2       MR. GREENWALD:  On the discussion
3   about the amended complaint, there were three
4   things that were changed in the complaint.
5   One, the product liability was taken out.
6   Two, the fraud count was pled with
7   specificity.  And, three, the express warranty
8   was put in the form of a guarantee about the
9   95 percent success rate.
10      So I guess the question is whether
11  you have an objection to the amended
12  complaint, or to any part of it, or what is
13  your position?
14      MS. HILLS:  I would disagree that
15  the fraud count as pled satisfies Rule 9(B)
16  with specificity.  I would also note that it
17  contains allegations regarding a motivation of
18  perfecting the technique that misstates
19  discovery of facts under oath that Plaintiffs
20  developed, namely, there had been hundreds of
21  embolizations prior to Ms. Kerris, not three.
22  That all being said, I believe under the

Page 179

1   amended pleading rules that there is no point
2   in objecting.  I just note that I don't
3   believe the amendment is in good faith or
4   passes the muster of the discovery developed.
5   But be that as it may, I am not going to file
6   an opposition to your amendment because under
7   Rule 15 it would be for naught.
8       MR. GREENWALD:  I will discuss
9   your concerns before we file it with Tony.
10  Okay?
11      MS. HILLS:  I wanted to, also -- I
12  don't believe this is necessary but, because
13  dispositive motions don't require a confer,
14  but if the amended complaint that was provided
15  to us when filed, we would file either or both
16  partial summary judgment as to the counts
17  because, as I said, of the misstated, in our
18  opinion, discovery that was developed, as well
19  as some pleading defects under 12(B)(6).  Just
20  to let you know that.
21      (Whereupon, at 11:50 a.m., the
22  proceedings were concluded.)

Page 180

2       CERTIFICATE FOR READING AND SIGNING
4       I hereby certify that I have read
5   and examined the within transcript and the
6   same is a true and accurate record of the
7   testimony given by me.
8       Any corrections I have listed on
9   the separate errata sheet enclosed, indicating
10  the page and line number of each correction.

15  _____
    Leonard Chiazze, Jr., Sc.D.
16

17  _____
    Date

Page 181

1       CERTIFICATE OF NOTARY PUBLIC
2       I, Zev V. Feder, the officer
3   before whom the foregoing deposition was
4   taken, do hereby certify that the witness,
5   whose testimony appears in the foregoing
6   deposition, was duly sworn by me; that the
7   testimony of said witness was taken by me in
8   shorthand and thereafter reduced to computer
9   type under my direction; that said deposition
10  is a true record of the testimony given by
11  said witness; that I am neither counsel for,
12  related to, nor employed by any of the parties
13  to which this deposition was taken; and
14  further, that I am not a relative or employee
15  of any attorney or counsel employed by the
16  parties hereto, nor financially or otherwise
17  interested in the outcome of the action.
18
19  _____
        Notary Public in and for
20      The District of Columbia
21  My Commission Expires:
    April 14, 2012
22