**From:** Wendy Wyeth [WWyeth@nmhlaw.net]
**Sent:** Tuesday, January 08, 2008 5:45 PM
**To:** Hills, Megan
**Subject:** RE: depositions

I am faxing you the requested information I have received from all of the experts now so you will get it before tomorrow. I put divider sheets indicating which expert provided which information. We are working on getting you identifications for all of the films.

---

Wendy Wyeth
Newman, McIntosh & Hennessey, LLP
7315 Wisconsin Avenue, Suite 700E
Bethesda, MD 20814
(301) 654-3400: Phone
(301) 907-2975: Fax

---

**From:** Hills, Megan [mailto:MHills@wc.com]
**Sent:** Tuesday, January 08, 2008 5:21 PM
**To:** Wendy Wyeth; Scharff, Zoe; Kiernan, David
**Cc:** Anthony Newman; Andrew E. Greenwald
**Subject:** RE: depositions

All data or information underlying the bases for all designated experts' conclusions should have been produced on 12/22/07. All of this material should be provided at this time and in advance of the deposition. *See* Fed.R.Civ.P. 26.

Regardless, all information or data considered by Dr. Kaufman in his report and the bases for his conclusions must be provided prior to his deposition on Friday. It is already 3 weeks late. The missing material is enumerated and listed in my letters of January 3 and 7, as well in the subpoena duces tecum. Sending **all of this material** by overnight mail tonight for arrival in our offices tomorrow morning may soften our argument for striking both his report and designation per the Rule.

We will respond to the remaining issues in your letter sent at 4:50 p.m. today elsewhere. We expect to receive **all information or data considered by Dr. Kaufman in reaching his conclusions and the bases for his conclusions by overnight mail for arrival tomorrow morning, Wednesday, January 9, 2008.**


Megan E. Hills, Esq.
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005
202-434-5393
fax: 202-434-5029

---

**From:** Wendy Wyeth [mailto:WWyeth@nmhlaw.net]
**Sent:** Tuesday, January 08, 2008 4:50 PM
**To:** Hills, Megan; Scharff, Zoe; Kiernan, David
**Cc:** Anthony Newman; Andrew E. Greenwald
**Subject:** depositions

Counsel:

Please see attached.

Wendy Wyeth
Newman, McIntosh & Hennessey, LLP
7315 Wisconsin Avenue, Suite 700E
Bethesda, MD 20814
(301) 654-3400: Phone
(301) 907-2975: Fax

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.516 / Virus Database: 269.17.13/1214 - Release Date: 1/8/2008 1:38 PM

---------------------------------------------------------------------------

NOTICE:

This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply or by telephone (call us collect at (202) 434-5000) and immediately delete this message and all its attachments.

===========================================================================

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.5.516 / Virus Database: 269.17.13/1214 - Release Date: 1/8/2008 1:38 PM

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.516 / Virus Database: 269.17.13/1214 - Release Date: 1/8/2008 1:38 PM

ANTHONY G. NEWMAN (DC & MD)
ERNEST W. MCINTOSH (DC, MD & MI)
JOSEPH A. HENNESSEY (DC & MD)
7315 WISCONSIN AVENUE, SUITE 700E
BETHESDA, MARYLAND 20814
PHONE:        (301) 654-3400
FAX:           (301) 907-2975

1232 17TH STREET NW
WASHINGTON, DC 20036
Phone:   (202) 659-8600
FAX:      (202) 659-8680

# NEWMAN, MCINTOSH & HENNESSEY, LLP

### FAX COVER SHEET

TO: Megan Hills          FROM: Wendy Wyeth

FAX: 202 434-5029       DATE: 1|8|08

PHONE:                   PAGES: ~~50~~ 30

RE: Expert Reports

Kaufmann

**Confidential Communication**

The information contained in this facsimile is proprietary and confidential and is intended only for the addressee(s) named above. If you have received this communication in error, please notify us immediately at (301) 654-3400 and return the communication by mail to the above address.

# Dr. Kaufman

1. Insurance Carrier form referred to is Bates stamp no. GT-10000368
2. Deposition of Vance E. Watson is the deposition of 5/31/07
3. The records Dr. Kaufman reviewed were the ones listed by bates stamp number
4. Import Alert and Code Violation Code translation are attached
5. Google search information is attached
6. Additional information considered by Dr. Kaufman was the Depositions of Sheila Zimmet, Esq. as well as her notes provided by defense counsel

## Papers of particular interest, published within the annual period of review, have been highlighted as: TOP

• **of special interest** TOP

•• **of outstanding interest** TOP

## Additional references related to this topic can also be found in the Current World Literature section in this issue (pp. 111-112). TOP

1• Choi JH, Mohr JP. Brain arteriovenous malformations in adults. Lancet Neurol 2005; 4:299-308.
[CrossRef] [Context Link]

2•• Al-Shahi R, Stapf C. The prognosis and treatment of arteriovenous malformations of the brain. Pract Neurol 2005; 5:194-205. Detailed overview on AVM natural history and treatment modalities.
[Context Link]

3 Brown RD Jr, Wiebers DO, Torner JC, O'Fallon WM. Incidence and prevalence of intracranial vascular malformations in Olmsted County, Minnesota, 1965 to 1992. Neurology 1996; 46:949-952.
[Fulltext Link] [Context Link]

4 Ondra SL, Troupp H, George ED, Schwab K. The natural history of symptomatic arteriovenous malformations of the brain: a 24-year follow-up assessment. J Neurosurg 1990; 73:387-391.
[Medline Link] [Context Link]

5 Moniz E. Arterial encephalography: its importance in the location of cerebral tumours [In French]. Rev Neurol 1927; 2:72-90.
[Context Link]

6•• Al-Shahi R, Bhattacharya JJ, Currie DG, et al. and Scottish Intracranial Vascular Malformation Study Collaborators. Prospective, Population-Based Detection of Intracranial Vascular Malformations in Adults: The Scottish Intracranial Vascular Malformation Study (SIVMS). Stroke 2003; 34(5):1163-1169. One of the two up-to-date references on prospective AVM incidence data.
[Context Link]

7•• Stapf C, Mast H, Sciacca RR, et al. The New York Islands AVM Study: design, study progress, and initial results. Stroke 2003; 34(5):E29-E33.
[Fulltext Link] [CrossRef] [Context Link]

8 Stapf C, Labovitz DL, Sciacca RR, Mast H, Mohr JP, Sacco RL. Incidence of adult brain arteriovenous malformation hemorrhage in a prospective population-based stroke survey. Cerebrovasc Dis 2002; 13:43-46.
[Fulltext Link] [CrossRef] [Context Link]

9 Crawford P, West CR, Chadwick DW, Shaw MDM. Arteriovenous malformations of the brain: natural history in unoperated patients. J Neurol Neurosurg Psychiatry 1986; 49:1-10.
[Context Link]

10•• Mast H, Young WL, Koennecke H-C, et al. Risk of spontaneous haemorrhage after diagnosis of cerebral arteriovenous malformation. Lancet 1997; 350(9084):1065-1068.
[Medline Link] [CrossRef] [Context Link]

11 Halim AX, Johnston SC, Singh V, et al. Longitudinal risk of intracranial hemorrhage in patients with arteriovenous malformation of the brain within a defined population. Stroke 2004; 35(7):1697-1702.
[Fulltext Link] [CrossRef] [Context Link]

12 Stapf C, Khaw AV, Mast H, et al. Predictors of intracranial hemorrhage during natural course follow-up in patients with untreated brain arteriovenous malformation. Stroke 2004; 35:328.
[Context Link]

13 Jane J, Kassell NF, Torner JC, Winn HR. The natural history of aneurysms and arteriovenous malformations. J Neurosurg 1985; 62:321.
[Medline Link] [Context Link]

14 Hartmann A, Mast H, Mohr JP, et al. Morbidity of intracranial hemorrhage in patients with cerebral arteriovenous malformation. Stroke 1998; 29(5):931-934.
[Fulltext Link] [Context Link]

15 Choi JH, Mohr JP, Sciacca RR, et al. Clinical outcome after first and subsequent hemorrhage in patients with untreated brain arteriovenous malformation. Stroke 2005; 36:464.
[Fulltext Link] [Context Link]

16 Hofmeister C, Stapf C, Hartmann A, et al. Demographic, morphological, and clinical characteristics of 1289 patients with brain arteriovenous malformations. Stroke 2000; 31:1307-1310.
[Fulltext Link] [Context Link]

17 Castel JP, Kantor G. Postoperative morbidity and mortality after microsurgical exclusion of cerebral arteriovenous malformations. Current data and analysis of recent literature [in French]. Neurochirurgie 2001; 47:369-383.
[Context Link]

18 Taylor CL, Dutton K, Rappard G, et al. Complications of preoperative embolization of cerebral arteriovenous malformations. J Neurosurg 2004; 100(5):810-812.
[Context Link]

19 Hartmann A, Pile-Spellman J, Stapf C, et al. Risk of endovascular treatment of brain arteriovenous malformations. Stroke 2002; 33(7):1816-1820.
[Fulltext Link] [CrossRef] [Context Link]

20• Goto K. Ectatic and occlusive disease of the venous drainage system of cerebral arteriovenous malformations (AVMs) - with emphasis on spectacular shrinking neurological deficits after embolization. Interv Neuroradiol 2005; 11:95-118. Of the 177 AVM patients treated between 1990-2004, 12 (6.8%) had transient, 6 (3.4%) mild, 1 (0.6%) a severe deficit and 2 (1.1%) died after embolization.
[Context Link]

21• Bhattacharya JJ, Jenkins S, Zampakis P, et al. Endovascular treatment of AVMs in Glasgow. Interv Neuroradiol 2005; 11:73-80. After embolization of 127 AVM patients (1999-2005), 5 (3.9%) procedure-related intracranial hemorrhages, and 7 (5.5%) neurological deficits unrelated to hemorrhage. Overall mortality: 1 (0.8%).
[Context Link]

22• Campos J, Biscoito L, Sequeira P, Batista A. Intra-arterial embolization in the treatment of brain arteriovenous malformations. Interv Neuroradiol 2005; 11:81-94. Clinical complications among 106 treated patients include 7 (6.6%) hemorrhages and 4 (3.7%) cerebral infarcts.
[Context Link]

23• Viñuela F, Duckweiler G, Jahan R, Murayama Y. Therapeutic management of cerebral arteriovenous malformations. Present role of interventional neuroradiology. Interv Neuroradiol 2005; 11:13-29. After embolization of 512 AVM patients: 3.9% mild, 3.3% moderate, 2.9% severe deficits, and 1.5% mortality.
[Context Link]

24• Raymond J, Iancu D, Weill A, et al. Embolization as one modality in a combined strategy for the management nof cerebral arteriovenous malformations. Interv Neuroradiol 2005; 11:57-62. Retrospective review of 227 embolizations (1994-2004) leading to treatment related hemorrhage in 17% and brain infarction in 5%. Overall clinical outcome stratified into Rankin 0: 43%; Rankin 1: 38%; Rankin 2: 10%, Rankin 3-5: 2%; and mortality: 7%. Possible outcome bias due to 44% unavailable patient files.
[Context Link]

25• Ozanne A, Alvarez H, Rodesch G, Lasjaunias P. Management of brain AVMs at Bicêtre: a comparison of two patients cohorts treated in 1985-1995 and 1996-2005. Interv Neuroradiol 2005; 11:31-36. After embolization of 283 AVM patients (1996-2005): 5.3% post procedural hemorrhages, 3.5% transient deficits without hemorrhage, 2.1% persistent deficits without hemorrhage. Overall: 1% mortality.
[Context Link]

26• Klurfan P, Gunnarsson T, Haw C, ter Brugge KG. Endovascular treatment of brain arteriovenous malformations: the Toronto experience. Interv Neuroradiol 2005; 11:51-56. Overall, 25 (9.9%) complications occurred during 252 embolizations, including 15 (5.9%) considered 'clinically relevant'. Unclear, if the latter add up to 9.7% per 155 cases treated between 1994 and 2004.
[Context Link]

27• Beltramello A, Zampieri P, Ricciardi GK, et al. Combined treatment of brain AVMs: analysis of five years (2000-2004) in the Verona experience. Interv Neuroradiol 2005; 11:63-72. Overall permanent morbidity after embolization of 44 patients (2000-2004).
[Context Link]

28• Pierot L, Januel C, Herbreteau D, et al. Endovascular treatment of brain arteriovenous malformations using Onyx: preliminary results of a prospective multicenter study. Interv Neuroradiol 2005; 11:159-164. After Onyx embolization in 50 prospective patients, hemorrhage was encountered in 4 (8%) and arterial





Update your links: *plague.law.umkc.edu* and *biotech.law.umkc.edu* have moved to *biotech.law.lsu.edu*

# MONITORING PHYSICIAN SERVICES

Once a physician has been admitted to the medical staff, the hospital has an ongoing duty to monitor the care that the physician renders and to ensure that it meets the appropriate standards. This duty to ensure the quality of care also implies a duty to limit or revoke medical staff privileges if the physician delivers substandard medical care. These duties are imposed by law in most states, and their breach can result in adverse monetary judgments if the breach leads to a patient injury. The same duties are imposed by the federal government on hospitals that participate in the Medicare program, through the "conditions of participation" that must be met by hospitals receiving Medicare funds. Finally, in its Standard IV, the JCAH mandates the monitoring of medical staff performance: "The medical staff shall provide mechanisms for the regular review, evaluation, and monitoring of medical staff practice and functions. Such mechanisms shall be designed to maintain high professional standards of care."

Before discussing the required mechanisms for physician monitoring, it is useful to review the duty to act on adverse finds. The duty to act, as well as the duty to monitor, applies to all entities that engage physicians, whether they be corporations, clinics, group practices, or hospitals. If any of these entities becomes aware that a physician under its control is delivering substandard care, it has a duty to correct the situation. However, this does not allow summary dismissal of the physician. The physician is entitled to a varying degree of due process in a dismissal action, depending on the legal status of the entity seeking to dismiss the physician. Since the due process requirement affects the types of records that must be generated during monitoring activities, it will be examined before the discussion of monitoring.

- Due Process



*The Medical and Public Health Law Site*
*Copyright as to non-public domain materials*
*Edward P. Richards, III, J.D., M.P.H.*
*Webmaster*



Update your links: *plague.law.umkc.edu and biotech.law.umkc.edu have moved to biotech.law.lsu.edu*

# INFORMED CONSENT

The traditional view of informed consent is that it is a relatively recent judicial creation:

Informed consent litigation began in 1957 with the California appelate decision in Salgo vs. Leland Stanford, Jr., University Board of Trustees. There the court appeared to recognize for the first time that a physician might be held liable for failure to disclose important information beyond the ancient requirement for revealing the nature of the procedure.

(The ancient requirement that Professor Katz alludes to is the "bare bones" consent discussed in reference to lawsuits based upon the battery theory.)

Unlike battery, the tort of failure of informed consent is not an intentional tort. The health care-provider has obtained a "bare bones" consent, but the patient alleges that the provider was negligent in not giving the patient a sufficiently detailed explanation of the proposed therapy. This has been taken by many legal scholars and health care providers to mean that a patient could sue a health care provider for not providing enough information. However, a careful analysis of the cases that have been litigated under an informed consent theory reveals a different situation.

- Legal Standard
- The Jury Process
- Quality Control Aspects



*The Medical and Public Health Law Site*
*Copyright as to non-public domain materials*
*Edward P. Richards, III, J.D., M.P.H.*
*Webmaster*



| Home | Biotech | Public Health | Online Courses | Legal Topics | Resources |

## Medical and Public Health Law Site

What's New | LSU School of Law | Search Site

*Update your links: plague.law.umkc.edu and biotech.law.umkc.edu have moved to biotech.law.lsu.edu*

## Legal Standard

The legal standard for informed consent is much more complex than the standard for total failure of consent. A lawsuit for "failure for informed consent" concedes that the patient consented to the therapy (thus ruling out battery) but alleges that the patient did not understand enough about the therapy for the consent to be effective.

In most states, the jury must answer four questions to determine liability:

1. Did the patient understand enough about the treatment to give an effective consent? If the answer to this question is no, then:

2. Was the patient given the same information that other patients in the same circumstances are given? If the answer to this question is no, then:

3. If the patient had been given the proper amount of information, would the patient have consented to the treatment? If the answer to this question is no, then:

4. Was the patient warned about the complication that occurred?

The health care provider can be held liable for failure of informed consent only if all four questions are answered no. Since the determination of what like patients are told is a matter of medical opinion, it must be determined by the testimony of an expert witness.

The final hurdle is the measure of damages. Even if the jury finds the health care provider liable for failure of informed consent, the patient may collect only the actual damages flowing from the accident. A procedure that does the patient no harm will not support a monetary award, despite a finding of a failure of informed consent.

A successful action for failure of informed consent requires the occurrence of a severe risk that results in a serious injury to the patient. The courts will not accept a suit based on a failure of informed consent in the absence of significant harm. It is important to contrast this with the action for battery, a tort of intent, where the physical consequences of the touching are ancillary to the damages awarded for the tort. The public policy behind the different standards for battery lawsuits and informed consent lawsuits is based on the lack of intent in informed consent lawsuits. The courts punish intentional torts to preserve order in society. If one person intentionally invades another's person, this is an injury to dignity. Mere compensation for the physical harm involved would allow one person to injure another with little fear of a significant penalty. This would lead to persons seeking private retribution, a legally undesirable situation.

In a negligence-based tort, such as failure of informed consent, the courts follow the public policy decision that persons should not be punished for negligence that causes no harm. They are responsible for any damages that are the direct result of their actions, but only for "actual" damages, not dignitary injuries. This is the basis for the four requirement that must be met before an award will be granted for failure of informed consent. For example, if the patient was properly warned about the complication that occurred, there will be no liability for the injury, regardless of whether everything else told the patient was misleading. The courts do not look at the transaction as a whole.

The most difficult problem to deal with is whether the omitted information would have deterred the patient from undergoing the therapy. In almost all cases of proper medical therapy, the jury will assume that a reasonable patient would have undergone the therapy. The difference between the theoretical tort of failure of informed consent and the actual case law on this tort stems from this assumption.



*The Medical and Public Health Law Site*
*Copyright as to non-public domain materials*
*Edward P. Richards, III, J.D., M.P.H.*
*Webmaster*

This site is scheduled to undergo maintenance on Saturday, August 11 from 5:00pm-10:00pm EST (10:00pm-3:00am GMT). During this period, the site and its contents may be unavailable. Thank you for your patience as this work is being performed.

LWWOnline | LOGOUT | eALERTS | PROFILE | CUSTOMER SUPPORT          ANTHONY NEWMAN

Wolters Kluwer | Lippincott Williams & Wilkins

*Current Opinion in*

**Neurology**

Home    Search    Current Issue    Archive

February 2006, 19:1 > Invasive treatment of unruptured ...                          < Previous

ARTICLE LINKS:
Abstract | PDF (287 K) | References (45) | View full-size inline images

Current Opinion in Neurology:Volume 19(1)February 2006p 63-68

# Invasive treatment of unruptured brain arteriovenous malformations is experimental therapy [Cerebrovascular disease]

Stapf, Christian[a,b]; Mohr, Jay P[a]; Choi, Jae H[a,c]; Hartmann, Andreas[d]; Mast, Henning[a,c]

[a]Stroke Center/The Neurological Institute, Columbia University, New York, NY, USA

[b]Service de Neurologie, Hôpital Lariboisière, Paris, France

[c]Schlaganfallzentrum Halle, Neurologische Klinik, BG Kliniken Bergmannstrost, Halle/Salle, Germany

[d]Neurologische Klinik, Charité - Campus Benjamin Franklin, Berlin, Germany

Correspondence to Christian Stapf, MD, Department of Neurology, Hôpital Lariboisière, 2 Rue Ambroise Paré, 75475 Paris CEDEX 10, France Tel: +33 1 4995 2597; fax: +33 1 4995 2596; e-mail: christian.stapf@lrb.aphp.fr

## Abstract TOP

Purpose of review: Brain arteriovenous malformations (AVMs) are currently being treated in a variety of ways, including medical management, endovascular procedures, neurosurgery and radiotherapy. The widespread diffusion of these various treatment approaches is partially driven by the existence of variations in the perception about the risks of rupture, and how devastating such events would be.

Recent findings: Data from the most recent studies suggest the majority of AVM patients are diagnosed without signs of hemorrhage, further, that the natural history risk for the unruptured cohort is far more benign than for those presenting with rupture. In cases where hemorrhage occurs, the clinical syndrome is significantly less disabling than in patients with non-AVM related hemorrhage. For unruptured AVMs, current morbidity data suggest a higher risk for invasive management than for the natural history of untreated patients.

Summary: No randomized clinical trial data exist on the benefit of invasive AVM treatment, and the most contentious issue at present is whether intervention should

**Article Outline**

- Abstract
- Introduction
- Prior assumptions on AVM natural history
- Shifting views on AVM natural history
    - Most brain AVMs diagnosed without hemorrhage
    - Low hemorrhage risk from unruptured brain AVMs
    - Low morbidity after spontaneous AVM hemorrhage
- Treatment risk
    - Endovascular embolization
    - Neurosurgical resection
    - Stereotactic radiotherapy
    - Combined therapy outcome
- Conclusion
- Acknowledgements
- References and recommended

be considered for AVMs that have not bled. In a scientific sense, invasive treatment for unruptured brain AVMs may be considered experimental therapy awaiting the results from 'A Randomized Trial of Unruptured Brain AVMs' (ARUBA), which is currently underway.

Abbreviation AVM: arteriovenous malformation.

reading
- Papers of particular interest, published within t...
- • of special interest
- •• of outstanding interest
- Additional references related to this topic can a...

**Figures/Tables**

- Figure 1
- Figure 2
- Figure 3

## Introduction top

Current invasive treatment strategies for brain arteriovenous malformations (AVMs) are varied and include endovascular procedures, neurosurgery, and radiotherapy alone and in combination, largely dependent on the decisions of the local clinical team [1•,2•,•]. All of these invasive treatments are administered on the assumption that they will decrease the risk of hemorrhage and lead to better long-term outcomes. With the emergence of new noninvasive imaging techniques, there has been a substantial increase in the incidental detection of unruptured brain AVMs [3], but published reports of invasive treatment outcome typically have blended the bled and unbled cohorts together as if their risk for lesion-related morbidity and their response to intervention is the same.

Although no controlled data exist on the effect of intervention even after brain AVM hemorrhage, the most contentious issue at present is whether intervention should be considered for those increasingly being discovered incidentally by brain imaging, with lesions that have not bled. Careful balancing of the presumed natural history risk against the risk of invasive therapy raises concerns about the actual benefit of invasive treatment strategies, particularly in patients with unruptured brain AVMs.

The following review provides an (overdue) critical discussion of earlier assumptions regarding AVM natural history and outlines new concepts arising from the most recent literature on AVM epidemiology, natural history risk, and treatment outcome.

## Prior assumptions on AVM natural history top

Current opinions on the natural history risk of spontaneous AVM rupture have many sources, the most often-quoted being the study of Ondra et al., spanning a period from 1942 to 1975 in Finland [4]. Although a pioneering effort at a population-based estimate of a low-frequency illness, the cohort reported was 160 unoperated cases among the 262 discovered over a 33-year period. The annual reported rates of hemorrhage, morbidity and death (annual hemorrhage rate 2-4%, major morbidity 1.7%, mortality 1% and combined morbidity and mortality 2.7% per year) among this group were high enough to spur many an invasive treatment team to treat AVMs discovered at any point in their course, whether having bled or not. The data as given indicate 71% (114/160) of the cohort presented as hemorrhage, so the study is not a natural history survey at all but really a study of the recurrence of hemorrhage in the majority of the cases.

The patient sample was detected from the time period between 1942 and 1975. The cases were all said to have been diagnosed angiographically; however, after its first description [5], angiography was first attempted anywhere scarcely 5 years before the first patient could have been enrolled. Given the hazards of direct carotid puncture angiogram, even under possibly ideal conditions in post-war Finland, it comes as no surprise that 114 of the final 160 had hemorrhage as the reason for the angiogram that led to their AVM diagnosis. That 46 had seizures or 'other' initial presentation and underwent angiogram is quite remarkable given that even nowadays angiogram seeking a diagnosis of AVM is driven by clinical evidence of hemorrhage, not by seizures or headaches.

On another side of the imaging front, 1975 was the final year for follow-up for this cohort. Like the availability of angiography decades earlier, the computerized tomography scan was only commercially available from 1973; thus, autopsy data aside, only the last 2 years of the study, at most, could have allowed a diagnosis of hemorrhage in life; however, one patient is said to have had 'as many as 12 ... hemorrhages'. The reader,



Figure 1 Survival curves of hemorrhage-free survival after initial AVM diagnosis, based on model estimates from 600 untreated AVM patients from the prospective Columbia AVM Database

## Low morbidity after spontaneous AVM hemorrhage TOP

Until recently, the focus on determining risk factors for brain AVM hemorrhage was largely based on the long-standing assumption that brain AVM hemorrhage is a devastating event, possibly analogous to that of subarachnoid or parenchymatous hemorrhage [13]. No clinician would argue brain AVM hemorrhages can be clinically unimportant, but compared with those from other causes, there is a lower morbidity than previously assumed. As far back as 20 years ago, Crawford et al. already reported on an overall mortality rate of only 1.5% per year (1.6% for those after initial hemorrhage) and an annual rate of severe morbidity as low as 1.4% [9]. In a previous smaller patient sample from the Columbia AVM Database (115 patients after AVM hemorrhage with prospective neurological assessment; mean follow-up time 1.35 years) only 7% were assigned Rankin Scale scores of 4 or 5 after first and subsequent bleeding event. The proportion of asymptomatic patients was 47%, an additional 37% remained independent in their daily activities (Rankin Scale: 1) [14]. More recent work shows a significant difference for milder clinical deficits from AVM-related parenchymal bleeding as compared with non-AVM hemorrhage (Fig. 2) [15].

Figure 2 Clinical 30-day outcome after first ever AVM related (Columbia AVM Database, n = 114) and non-AVM related (Northern Manhattan Study, n = 84) intracerebral hemorrhage (mean NIHSS scores ± SD)

## Treatment risk TOP

The indication for interventional AVM management remains ideally based on a multidisciplinary decision in a neurovascular team of neurologists, neuroradiologists, neurosurgeons, and radiotherapists [2••]. No uniform algorithm exists for interventional therapy, however, as treatment strategies vary by center, country, and continent depending on local experience, personal conviction, available technical equipment, and different policies of the various health insurance systems. The evidence for invasive AVM treatment is based on uncontrolled, highly selected cohorts, based at single centers, and subject to referral and treatment selection bias [16]. Technical progress in treatment also rapidly complicates clinical outcome comparison between different case series over time.

In the extensive meta-analysis from 25 sources of 2425 patients of Castel and Kantor [17], no reports of any of the treatment modalities were free from complications of therapy. Postoperative mortality was 3.3% with permanent postoperative morbidity of 8.6%, varying from 1.5% to 18.7%. Presurgical embolization alone also carried a substantial permanent morbidity varying from 4% to 8.9%. More details of complication rates per individual treatment type are given below, but interpretation of this literature is confounded by the trend of lumping together brain AVM cases presenting without having bled and those who have bled, making it impossible to assess the morbidity and mortality of treatment for the two groups separately.

## Endovascular embolization TOP

Clinical outcome after embolization has improved over the last two decades depending on catheter technique, embolization material, and brain AVM anatomy. Current morbidity data, however, show complication rates well above the often presumed overall 5% treatment risk. Persistent neurological deficits have been documented in 9% of patients, with a 2% case-fatality [18]. Data from the prospective Columbia

AVM Databank suggest an overall rate of clinical deficits of 14% as determined by independent neurological examination [19]. A recent multicenter overview on endovascular AVM therapy (presented at the 2005 World Federation of Interventional and Therapeutic Neuroradiology meeting) revealed stable frequencies of self-reported treatment-related complications in numerous well-established international centers: 11.9% in Fukuyama [20•], 9.4% in Glasgow [21•], 10.4% in Lisbon [22•], 11.6% in Los Angeles [23•], 22% in Montreal [24•], 10.9% in Paris [25•], 9.9% in Toronto [26•], and 9.1% in Verona [27•]. Hopes for more favorable outcome using newly developed liquid polymer agents have been tempered by 16% treatment-related morbidity in a French prospective multicenter registry [28•], 15.5% in Madrid [29•], 15.5% in Santiago de Chile [30•], and 22% in Shanghai [31•].

## Neurosurgical resection TOP

The most widely used scoring system developed for estimating the risk of AVM surgery is the Spetzler-Martin five-point scale [32]. By crude risk stratification, those with a Spetzler-Martin score of 3 or less are expected to have a lower risk of persistent functional deficits after surgery (< 3%), while those with scores 4 and 5 seem to have a higher risk (20%) [33]. In one prospective cohort with independent neurological evaluation, however, only AVM size appeared to be an independent predictor of deficits after surgery [34•]. Recent long-term outcome series showed treatment-induced permanent deficits in 11% of neurosurgeon-evaluated and 37% of neurologist-evaluated patients (6% of the latter were disabling) [34•,35]. Most important, the risk of clinical worsening may be more than twice as high after surgery for unruptured AVMs compared with AVM removal after prior hemorrhage [36].

## Stereotactic radiotherapy TOP

The major disadvantage of radiation therapy is a persistent hemorrhage risk of up to 10% until and even after the lesion disappears. Based on 2000 patients and 3000 patient-years at risk, a recent literature review assumes that radiotherapy may even increase the early annual risk of hemorrhage [37]. One prospective cohort of patients undergoing linear accelerator radiotherapy found more hemorrhages in cases who initially presented with AVM hemorrhage (6.3% per year) compared with those treated for initially unruptured brain AVMs (3.9% per year) [38]. A retrospective case series suggests that the hemorrhage risk decreases after radiation, but only in patients who have previously experienced AVM rupture [39•]. A recent multicenter analysis of 1255 patients receiving radiotherapy found 102 (8%) who developed a neurological deficit after the radiation [40]. Possible adverse effects include extended radiation necrosis, cyst formation, intracranial arterial stenosis, and cranial nerve injury and are more likely to occur with increasing radiation dose, in patients with deep AVM location, and those who experience AVM rupture.

## Combined therapy outcome TOP

The risk-benefit ratio of combined AVM therapy strategies, that is, any combination of the currently available treatment options, has received less study. In many prior publications the patients' baseline functional status is not provided, nor information on change of functional status between different treatment events (e.g. embolization followed by surgery). In a series of patients treated with combined endovascular and surgical intervention, Vinuela et al. detected a mild overall long-term morbidity of 6% with an additional moderate to severe morbidity and mortality rate of 13% [41]. Morgan et al. described a 33% total complication rate in their predominantly surgical series, which included 16% pre-operative embolizations [42]. These data, however, did not separate ruptured from unruptured cases in the cohorts. Our own experience with 119 prospective AVM patients and independent neurological assessment revealed treatment-related nondisabling neurologic deficits in 50 patients (42%), resulting from surgery in 32%, from embolization in 6%, and from both treatment types in 4%. Another six patients (5%) had persistent disabling deficits (3% from surgery and 2% from embolization) [43•••]. Figure 3 illustrates the cumulative effect of the two treatment modalities in a longitudinal analysis.

Figure 3 Prospectively assessed Rankin Scale scores of 119 patients from the Columbia AVM Database undergoing staged endovascular and surgical brain AVM treatment before, during, and after completed therapy



The most striking figures, however, are seen when treatment outcome is analyzed separately for ruptured and unruptured AVM cases. Among the 41 patients who initially presented with intracranial hemorrhage, only 11 patients (27%) experienced new treatment-related deficits. By comparison, of the 78 patients diagnosed with an unruptured AVM, 45 (58%) experienced new treatment-related deficits. Hence, the risk of new treatment related deficits in patients with nonhemorrhagic AVM presentation appears to be significantly higher (odds ratio 3.70; 95% CI: 1.63 to 8.33; $P = 0.001$) than for patients after initial rupture. When analyzing 5-year follow-up data for unruptured AVM only, initiation of any invasive treatment strategy was associated with an increased risk of AVM hemorrhage [$P < 0.0001$; hazard ratio (HR) = 3.61, 95% CI: 2.00-6.50]. Interventional treatment was also associated with an increased risk of clinical impairment as assessed by a Rankin score $\geq 2$ (HR = 8.17, 95% CI: 5.13-13.01, $P < 0.0001$) [44].

These observational data suggest that for unbled AVM patients raise concerns that interventional treatment may increase the risk of both symptomatic hemorrhage and the onset of an acute, disabling persisting clinical syndrome. In describing these data, we infer that similar outcome data apply for treatment at similarly experienced centers worldwide. The treatment rate of unruptured AVMs consumes a considerable amount of health resources [45]. With an annual incidence in the USA of nearly 3000 cases, and treatment costs in the range of $50 000 to $100 000 per patient, widespread utilization of early intervention would amount to an expenditure of between $150 million and $300 million per year. Thus, the choice between early intervention and medical management involves making a critical trade-off between avoiding the upfront risks and cost of an early intervention and possibly mitigating the long-term risks and costs associated with medical management.

## Conclusion TOP

Summarizing the literature to date, polar opposites can be found favoring treatment or medical management. The worst natural history risk of 4% per year (5-year risk: 20%) and best treatment risk of 5% (overall) for stroke or death, contrast with best natural history risk of stroke or death of 1% per year (5 year risk: 5%) and a cumulative 5-year invasive treatment risk of 19%. The difference is 15% in each direction. Assuming 5-year follow-up, a randomized clinical trial testing the outcome between invasive therapy alone versus medical treatment alone for those presenting unbled can therefore be accomplished with a cohort of 800 patients (power 80%, effect size 40%).

The international, multicenter trial 'A Randomized Trial of Unruptured Brain AVMs' (ARUBA) - is poised to randomize patients with unruptured brain AVMs to medical management versus best interventional therapy starting January 2006. Updates on study design, logistics, and contact information for participants are available on the study website http://www.arubastudy.org .

## Acknowledgements TOP

The Columbia AVM Database project and the New York Islands AVM Study are funded by NIH grant R01 NS 40792-01. The ARUBA (A Randomized Trial of Unruptured Brain AVMs) study is supported by NIH grant R01 NS 051483-01.

## References and recommended reading TOP

IMPORT ALERT IA8908                          http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&inhnavigate=ALL

IA #89-08,    -----8/11/92  REVISED  ATTACHMENT 10/29/99

TYPE OF ALERT: Automatic Detention

PRODUCT      : Class III medical devices for which there are no approved PMA's
               or Investigational Device Exemptions (IDE), and all other
               devices that have not been determined substantially equivalent
               or for which a 510(k) has not been filed.

PRODUCT CODE: Multiple

HARMONIZED
CODE        : N/A

PROBLEM      : Devices are being distributed without a 510(k) or approved PMA
               and are not the subject of an IDE.

COUNTRY      : See Attachment

MANUFACTURER
or SHIPPER   :  See Attachment

MANUFACTURER
SHIPPER I.D.#: N/A

IMPORTER'S
I.D.#        :  N/A

CHARGE       :  For Class III device:

               "The article is subject to refusal of admission pursuant to
               Section 801(a)(3) in that the device appears to be a Class III
               device and does not appear to have in effect an approved
               application for premarket approval pursuant to Section 515 of
               the Act, or an exemption pursuant to Section 520(g)(1)
               [Adulteration, Section 501(f)(1)(B)]."

               For other devices:

               The article is subject to refusal of admission pursuant to
               Section 801(a)(3) in that it appears to be a post 1976 device
               for which a Section 510(k) application has not been determined
               substantially equivalent or a 510(k) has not been filed
               [Misbranding, Section 502(o)]

RECOMMENDING
OFFICE       : CDRH, Office of Compliance and Surveillance
               Division of Compliance Operations
               Regulatory Guidance Branch HFZ-323

REASON FOR
ALERT        :  Devices listed in the Attachment lack either a filed 510(k) or
                approved PMA (Pre Market Approval) for commercial distribution.

INSTRUCTIONS: Automatically detain all devices, as designated, from the
              manufacturers listed in the Attachment.

FOI          : Purging between ^      ^ is required

KEYWORDS     : 510(k), PMA, IDE, Medical devices, devices, Class III devices,
               Pre Market Approval            Attachment to Import> <Alert>

         Revised 10/29/99

IMPORT ALERT IA8908

The following devices and firms are under automatic detention:

| Manufacturer | Device(s) / Date Added | Class |
|---|---|---|
| ALL COUNTRIES | | Hyperbaric Cha |
| All foreign manufacturers of Hyperbaric Chambers | Product Code 73CBF -10/29/99 | |
| AUSTRALIA | | |
| Australian Light Therapy 108 Forrest St. Cottesloe, W.A.  6011 Australia | Seasonal Affective Disorder Device (SAD Lights) (2/4/92) | III |
| Manufactured in China for: >>Oasis Latex, Co. Pomona, California<< | "Oradam" latex facial dam 1/20/95 | |
| BAHAMAS | | |
| IHT Limited P.O. Box N4361 Nassau, Bahamas FEI# 3002835158 | HIV Oral Test (aka HIV 1,2 & Subtype O Saliva Test) 82---/10/26/99 | III |
| Newco Associates P.O. Box CB12611 Nassau, Bahamas FEI# 3001680610 | HIV Oral Test (aka HIV 1,2 & Subtype O Saliva Test) 82---/10/26/99 | III |
| CANADA | | |
| Angel & Company P.O. Box 879 Knowlton, Quebec, Canada FEI#: 3002528073 | Angelcare Sound - 12/15/98 & Breathing Frequency Monitor Product Code: 73BZQ | |
| Aqua Sole Company Ltd. 27 Passmore Avenue, Unit #1 Scarborough, Ontario M1V 4T4 Canada MID #XOAQUSOL27SCA | Eye Mask (or Eye Masque) | |
| BioChem ImmunoSystems, Inc. 10900 Hamon St. Montreal, Quebe Canada FEI #1000229412 | BioChem SELECT-HIV Kit Product Code: 57YY99 7/27/98   c | |
| Biotronix 2000, Inc. 2185 Michelin Laval, Quebec Canada H7L 4S2 FEI# 3002129220 | NeedleSafe, all models including NX3000, NX2000, NX1000, NX5000 SDS; 80KDB & Sharpes Container sold with Model NX5000 SDS and alone; 80MMK - 8/19/98 | |
| Fidelity Electronics of Canada (Shipper) 5696 Ambler Drive Mississauga, Ontario, Canada L4W 2K9 MID# XOFIDELE5696MIS | 5/6/94 | |

Health Care Products, Inc.  Wipeout Long Life Activated          N/A
165 Matheson Blvd. E., Suite 8   Dialdehyde
Mississauga, Ontario,  (4/27/93)
Canada L4Z3K2
ID# XOHEACAR165MIS

Health Light, Inc.                Seasonal Affective             III
P.O. Box 3899 Station C           Disorder Device
Hamilton, Ontario L8H 7F2         (SAD Lights)
Canada                            (2/4/92)

J.K. Orthomedic, Ltee.             LARS (Ligament Advanced
a.k.a. Kirschner Canada            Reinforced System)
1755 St. Regis 210                 PRODUCT CODE: 87LML
Dollard-des-Ormeaux     10/13/95
Quebec, Canada H9B2M9

Medevice Inc.     Bio-Mate Spinal Catheter
5080 Timberlea Blvd.   2/25/93
Unit 11, Mississauga
Ontario, L4W 4M2
Canada
XOMEDINC5080MIS

Medionics International, Inc.      QC Transfer Sets
Plant:
114 Anderson Avenue               12/15/92
Markham, Ontario L6E 1A5
Canada
    MID# XOMEDINT114MAR

Office:
   1271 Denison Street
   Suite 4950
   Markham, Ontario L3R 4B5
   Canada
      MID# XOMEDINT4950MAR

Northern Light Thechnologies      Seasonal Affective Disorder    III
3070 Brabant-Marineau St.         Device (SAD Lights)
St. Laurent, Quebec I4S 1K7       (2/4/92)
Canada

Nordion International, Inc.        Validose Dosimetry System      II
447 March Road                    8/17/93
P.O. Box 13500
Kanata, Ontario
Canada K2K 1X8
MID# XONORINT1350KAN

Preferred Medical Products         Spinal anesthesia             III
3280 Schmon Parkway                trays containing
Thorold, Ontario L2V 4Y6           tetracaine hydrochloride
Canada                             for use in the pediatric
                                   population
ID# XOPREMED3280THO
                              Continuous Spinal Anethesia    III
                              Trays (non-pediatric)
                              (3/5/93)

                              Epi-Spinal Tray-Reorder #2002  III
                              Epi-Spinal Mini Kit-Reorder #2005  III
                              (7/30/93)

IMPORT ALERT IA8908

Seville Marketing                      Discreet HIV Test                     III
3017 Mountain Way                      82---/10/26/99
P.O. Box 16047
North Vancouver, BC, V7J 2R0
Canada
FEI# 3002764311

Sudor, Inc.                            Ground Zero,
P.O. Box 383                           Ground System and
Collingwood Ontario                    methods for organisms
Canada L9Y 3Z7                         (Ground Zero Grounding Device)
FEI # 3002828315                       Product Code 84- - - 10/20/99

* Tri Hawk International               Histoacryl Tissue                     III
1570 Rue Bane                          Adhesive
Montreal, Quebec, Canada, H4L 4M6      5/11/93
*(Shipper for B. Braun Melsungen AC.)

Ultrasoft Laboratories                 Contact Lenses (all types)            II
8855 Northbrook Court                  2/9/93
Burnaby, British Columbia V5J 5G1
Canada
ID# XCULTLAB8855BUR
ID# XCULTSOF4025BUR

Yocan Medical Systems Inc   Histoacryl Tissue Adhesive (MAY ALSO BE          III
4 Spirea Ct.                IDENTIFIED AS BIOLOGICAL GLUE)
Thornill, Ontario, Canada   84KGG
L3T 2W1                      79MFI
FEI #1000189357                (NOTE: PRODUCT HAS ALSO BEEN CODED AS
                            A DRUG UNDER 66V--99)
                            12/17/98

CHINA, PEOPLES REPUBLIC

Guanzhou HuaNan Medical                Positive/Negative Pressure
  Apparatus Co., Ltd. (MFR.)           Integrated Computer Control
212 Xingang W. Rd.                 Augmented Sequential External
Guangzhou, 510300, China           Counter-Pulsation Devices
FEI# 3001403711                    Prod. Code 89[][][]
                            2/24/98

Shipper for Guanzhou HuaNan:

Shandong Medicines & Health Products
  Import/Export Corp.
16 Baoding Road
Qindao, China
FEI# 3000246908

China National Agricultural Machinery   Universal Massage
Shenzhen, China                          Apparatus
MID #CNCHINATSHE                          11/30/94

Chongqing Bashan Instrument Factory      TDP Special Electromagnetic
83 Shi Xin Road                        Therapeutic Apparatus
Chongqing, PRC 630039                    80ILY
FEI# 3000983373                          8/19/97

Doo Jung H.K. Limited        Pap Smear Brushes (may be                       II

```
IA #89-08,    -----8/11/92  REVISED   ATTACHMENT 10/29/99


TYPE OF ALERT: Automatic Detention

PRODUCT    : Class III medical devices for which there are no approved PMA's
             or Investigational Device Exemptions (IDE), and all other
             devices that have not been determined substantially equivalent
             or for which a 510(k) has not been filed.

PRODUCT CODE:  Multiple

HARMONIZED
CODE       : N/A

PROBLEM    : Devices are being distributed without a 510(k) or approved PMA
             and are not the subject of an IDE.

COUNTRY    : See Attachment

MANUFACTURER
or SHIPPER  :  See Attachment

MANUFACTURER
SHIPPER I.D.#: N/A

IMPORTER'S
I.D.#      :  N/A

CHARGE     : For Class III device:

             "The article is subject to refusal of admission pursuant to
             Section 801(a)(3) in that the device appears to be a Class III
             device and does not appear to have in effect an approved
             application for premarket approval pursuant to Section 515 of
             the Act, or an exemption pursuant to Section 520(g)(1)
             [Adulteration, Section 501(f)(1)(B)]."

             For other devices:

             The article is subject to refusal of admission pursuant to
             Section 801(a)(3) in that it appears to be a post 1976 device
             for which a Section 510(k) application has not been determined
             substantially equivalent or a 510(k) has not been filed
             [Misbranding, Section 502(o)]

RECOMMENDING
OFFICE     : CDRH, Office of Compliance and Surveillance
             Division of Compliance Operations
             Regulatory Guidance Branch HFZ-323

REASON FOR
ALERT      :  Devices listed in the Attachment lack either a filed 510(k) or
              approved PMA (Pre Market Approval) for commercial distribution.

INSTRUCTIONS: Automatically detain all devices, as designated, from the
              manufacturers listed in the Attachment.

FOI        : Purging between ^     ^ is required

KEYWORDS : 510(k), PMA, IDE, Medical devices, devices, Class III devices,
                     Pre Market Approval           Attachment to Import> <Alert>
          Revised 10/29/99
```

The following devices and firms are under automatic detention:

| Manufacturer | Device(s) / Date Added | Class |

ALL COUNTRIES

All foreign manufacturers of                                              Hyperbaric Cha
Hyperbaric Chambers    Product Code 73CBF -10/29/99

AUSTRALIA

Australian Light Therapy    Seasonal Affective Disorder Device
108 Forrest St.            (SAD Lights) (2/4/92)                    III
Cottesloe, W.A.  6011
Australia

Manufactured in China for: "Oradam" latex facial
>>Oasis Latex, Co.                    dam
Pomona, California<<        1/20/95

BAHAMAS

IHT Limited              HIV Oral Test
P.O. Box N4361           (aka HIV 1,2 & Subtype O Saliva Test)    III
Nassau, Bahamas          82---/10/26/99
FEI# 3002835158

Newco Associates          HIV Oral Test
P.O. Box CB12611          (aka HIV 1,2 & Subtype O Saliva Test)    III
Nassau, Bahamas           82---/10/26/99
FEI# 3001680610

CANADA

Angel & Company              Angelcare Sound - 12/15/98
P.O. Box 879               & Breathing Frequency
Knowlton, Quebec, Canada          Monitor
FEI#: 3002528073          Product Code: 73BZQ

Aqua Sole Company Ltd. Eye Mask (or Eye Masque)
27 Passmore Avenue, Unit #1
Scarborough, Ontario M1V 4T4
Canada
MID #XOAQUSOL27SCA

BioChem ImmunoSystems, Inc. BioChem SELECT-HIV Kit
10900 Hamon St.    Product Code: 57YY99
Montreal, Quebe    7/27/98    c
Canada
FEI #1000229412

Biotronix 2000, Inc.              NeedleSafe, all models
2185 Michelin                including NX3000, NX2000,
Laval, Quebec                NX1000, NX5000 SDS; 80KDB
Canada H7L 4S2                    &
FEI# 3002129220              Sharpes Container sold with
                             Model NX5000 SDS and alone;
                             80MMK - 8/19/98

Fidelity Electronics of Canada (Shipper)    5/6/94
5696 Ambler Drive
Mississauga, Ontario, Canada L4W 2K9
MID# XOFIDELE5696MIS

http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&hlnavigate=ALL

Health Care Products, Inc.  Wipeout Long Life Activated            N/A
165 Matheson Blvd. E., Suite 8   Dialdehyde
Mississauga, Ontario,  (4/27/93)
Canada L4Z3K2
ID# XOHEACAR165MIS

Health Light, Inc.              Seasonal Affective               III
P.O. Box 3899 Station C         Disorder Device
Hamilton, Ontario L8H 7P2       (SAD Lights)
Canada                          (2/4/92)

J.K. Orthomedic, Ltee.              LARS (Ligament Advanced
a.k.a. Kirschner Canada             Reinforced System)
1755 St. Regis 210                  PRODUCT CODE: 87LML
Dollard-des-Ormeaux   10/13/95
Quebec, Canada H9B2M9

Medevice Inc.      Bio-Mate Spinal Catheter
5080 Timberlea Blvd.   2/25/93
Unit 11, Mississauga
Ontario, L4W 4M2
Canada
XOMEDINC5080MIS

Medionics International, Inc.      QC Transfer Sets
Plant:
114 Anderson Avenue              12/15/92
Markham, Ontario L6E 1A5
Canada
    MID# XOMEDINT114MAR

Office:
    1271 Denison Street
    Suite 4950
    Markham, Ontario L3R 4B5
    Canada
    MID# XOMEDINT4950MAR

Northern Light Thechnologies    Seasonal Affective Disorder      III
3070 Brabant-Marineau St.       Device (SAD Lights)
St. Laurent, Quebec I4S 1K7     (2/4/92)
Canada

Nordion International, Inc.      Validose Dosimetry System        II
447 March Road                  8/17/93
P.O. Box 13500
Kanata, Ontario
Canada K2K 1X8
MID# XONORINT1350KAN

Preferred Medical Products       Spinal anesthesia               III
3280 Schmon Parkway              trays containing
Thorold, Ontario L2V 4Y6         tetracaine hydrochloride
Canada                           for use in the pediatric
                                 population

ID# XOPREMED3280THO
                                 Continuous Spinal Anethesia      III
                                 Trays (non-pediatric)
                                 (3/5/93)

                                 Epi-Spinal Tray-Reorder #2002      III
                                 Epi-Spinal Mini Kit-Reorder #2005  III
                                 (7/30/93)

IMPORT ALERT IA8908                    http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&hlnavigate=ALL

Seville Marketing                Discreet HIV Test                    III
3017 Mountain Way                82---/10/26/99
P.O. Box 16047
North Vancouver, BC, V7J 2R0
Canada
FEI# 3002764311

Sudor, Inc.                      Ground Zero,
P.O. Box 383              Ground System and
Collingwood Ontario           methods for organisms
Canada L9Y 3Z7                (Ground Zero Grounding Device)
FEI # 3002828315                 Product Code 84- - - 10/20/99


* Tri Hawk International         Histoacryl Tissue                    III
  1570 Rue Bane                     Adhesive
  Montreal, Quebec, Canada, H4L 4M6   5/11/93
*(Shipper for B. Braun Melsungen AC.)


Ultrasoft Laboratories           Contact Lenses (all types)          II
8855 Northbrook Court            2/9/93
Burnaby, British Columbia V5J 5G1
Canada
ID# XCULTLAB8855BUR
ID# XCULTSOF4025BUR


Yocan Medical Systems Inc   Histoacryl Tissue Adhesive (MAY ALSO BE   III
4 Spirea Ct.                   IDENTIFIED AS BIOLOGICAL GLUE)
Thornill, Ontario, Canada   84KGG
L3T 2W1                     79MFI
FEI #1000189357               (NOTE: PRODUCT HAS ALSO BEEN CODED AS
                            A DRUG UNDER 66V--99)
                            12/17/98


CHINA, PEOPLES REPUBLIC

Guanzhou HuaNan Medical              Positive/Negative Pressure
   Apparatus Co., Ltd. (MFR.)        Integrated Computer Control
212 Xingang W. Rd.             Augmented Sequential External
Guangzhou, 510300, China        Counter-Pulsation Devices
FEI# 3001403711                 Prod. Code 89[][][]
                            2/24/98


Shipper for Guanzhou HuaNan:

Shandong Medicines & Health Products
  Import/Export Corp.
16 Baoding Road
Qindao, China
FEI# 3000246908

China National Agricultural Machinery    Universal Massage
Shenzhen, China                 Apparatus
MID #CNCHINATSHE                 11/30/94

Chongqing Bashan Instrument Factory    TDP Special Electromagnetic
83 Shi Xin Road                 Therapeutic Apparatus
Chongqing, PRC 630039           80ILY
FEI# 3000983373                 8/19/97

Doo Jung H.K. Limited           Pap Smear Brushes (may be            II
Kwan Lan Town                   shipped as cosmetic brushes

Tai Wo Village                    or may be brush head only.
Shenzhen, China                   6/8/93
ID#: CNDOOJUNSHEN


CZECH REPUBLIC

Gel-Med International          ***DILAPAN Hygroscopic              III
 spol s.r.o.                     Cervical Dilators
V Cibulkach 51,                  DILAPAN-S Hygroscopic
150 00 PRAHA 5                    Cervical Dilators
Czech Republic                   6/26/96
FEI# 1000573518                  85MCR

***(DILAPAN Hygroscopic Cervical Dilators may be identified as
being manufactured and distributed under the label >>"Gynotech,
Inc., Middlesex, New Jersey<<") and DILAPAN-S Hygroscopic
Cervical Dilators may be identified as being distributed under
the label "FEMA INTERNATIONAL") and shipped by:***

***Shipper:
Kamedico Health Care Products, Inc.
1759 West 3rd Avenue
Vancouver, B.C., Canada V6J 1K7
FEI# 1000371924
MID# XCKAMHEA1759VAN

***Be aware that the U.S. manufacturer of the DILAPAN cervical
dilators is ^                                          ^ who
is presently under injunction since these devices were
manufactured in the absence of a valid supplemental PMA and
contrary to applicable good manufacturing practices (GMPs).***


DENMARK

Ambu International A/S         Ambu Cariopump ACD Resuscitator
SDR. Ringvej 49               4/29/94
2600 Glostrup
Denmark
MID #DKAMBINT215GLO


FINLAND

Labsystems OY                 Tetanus IgG EIA Kit                  II
Pulttitie 8
P.O. Box 8
00880 Helsinki, Finland
ID#: FILABOY8HEL
(6/4/93)

FRANCE

Burnet Laboratoire            Sterile Surgical Gloves              III
 Pharmaceutique
Av. Georges Denos, B.P. 61
72403 La Ferte Bernard, France

ELA Medical                   Chorus RM cardia pacemaker model 7034   III
98-100 Rue Maurice Arnoux     (9/9/92)
92120 Montrouge, France       Chorus II cardia pacemaker Model 6234        III
                 (9/9/92)

IMPORT ALERT IA8908

Laboratoires Eurosilicone          All Devices                              III
21, rue Francis Combe             12/28/94
95000 Cergy Pontoise
France
MID# FRLABEUR21PON

Laboratory Nycomed                 Polyvinyl Alcohol Foam                   III
Ingenor SA, 25 Quai                Particles PVA Foam) and
de la Gare-C.E.                    Balloon Catheters
No.19
F-75644 Paris Cedex 13
France

LARS                               LARS (Ligament Advanced
5 Rue de La Fontaine               Reinforced System)
Arc Surtille                       PRODUCT CODE: 87LML
France 21560            10/13/95

Medical Z, S.A.                    All Scar Management
BP 39, 55, Rue De L'Eglise         Gel Products (Medigel Z)
61110 Remalard                     79MDA
France                  11/27/96
FEI #1000656612
MID #FRMEDSA55REM

Opsia Laboratories                 All 100% Perflourodecalin             III
10, Avenue De L'Europe             DK Lines
Ramonville-Saint-Agne
France

Orthomed                           Ligastic artificial
256 Rue Vignes Dardelain           ligament(s)
21160 Marsannay LaCote             PRODUCT CODE: 87LML
Dijon, France                      10/13/95

SAPP                               Audiokinetron Device
#4 Rue Cozette                     Product code 76MGE
8000 Amiens                        (3/29/94)
France
MID #FRSAP4AMI

Tomatis Electronics                Electronic Ear, or any device
56 Rue Des Batignolles             labeled or marked for auditory
75017 Paris                        training, auditory integration,
France                             or behavioral improvement.
FEI #3000190157                    2/5/97
MID #FRTOMELE76PAR

          AND                      PRODUCT CODE 84GWJ

Tomatis International              2/5/97
6, Place de la Republique -
Dominicaine
75017 Paris
France
FEI #3000190169
MID #FRTOMINT6PAR


GERMANY

Aesculap Aktiengesellscraft Heifetz Skull Perforator Drill (only)    III
Postfach 40   (11/5/92)
D-7200 Tuttlingen, Germany

| | | |
|---|---|---|
| B. Braun Melsungen AC.<br>Carl Braun Strasse 1<br>Melsungen, West Germany<br>ID# DEBRAMEL1MEL | Histoacryl Tissue<br>Adhesive | III |
| *Beltex<br>C.P. 222    Adhesive<br>St. Sulpice, Quebec, J6K 3J0    (5/11/93)<br>ID# XQBEL222STS<br>*(Shipper for B. Braun Melsungen AC.) | Histoacryl Tissue | III |
| Kendall Germany<br>CDK Holding GmbH<br>Raffineriestr, 8 | CURITY Continuous<br>Spinal Anesthesia<br>Tray | III |
| | COSPAN Continuous<br>Spinal Anesthesia<br>Tray | III |
| | COSPAN Pediatric<br>Spinal Anesthesia<br>Tray | III |
| | CURITY Pediatric<br>Continuous Spinal<br>Anesthesia Tray | III |
| Leibinger GMBH<br>Schutzenstrabe 5-7<br>D7200 Tuttlingen<br>Germany, Federal Rep. of<br>ID# DELEIGMB57TUT | Total Joint or Condylar protheses for<br>the Temporomandibular joint (TMJ)<br>(4/16/93) | III |

U.S. Distributor:^

^

| | | |
|---|---|---|
| Leisegang Feinmechanik-Optik<br>GmbH & Ci.<br>Leibnizstrabe 32<br>D-10625, Berlin, Germany<br>MID# DELEIFEI32BER | All devices (except colposcopes, Models:<br>I, IB3, ID, ID3, IDS, IH3, IIB3, IIC3,<br>IIIBD(S), IIIBE, IIIH3, IIID3, IIIL3,<br>IIIDS, IIIBD3, IIIDLS, IIIDL3, IVM and<br>repair or replacement parts for these models<br>1/24/94 | II |

Note: all other models remain on automatic
detention

U.S. Distributor:^

^

| | | |
|---|---|---|
| Novafon Elektromedizinche<br>Gerate GmbH<br>(aka Novafon GmbH)<br>Stuttgart, W. Germany | Therapeutic Massagers: | |
| | Novafon SK1 Sound<br>Wave Appliance | III |
| ID# DENOVELE7000STU<br>or  DENOVGMB7000STU | Nostrafon SK2 Sound<br>Wave Appliance | III |
| | Medi-pol, (magnetic field<br>therapy attachment used as<br>an accessory device with<br>Nostrafon unit) | III |

IMPORT ALERT IA8908                        http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&h|navigate=ALL

Rheinmagnet, Inc.                  Magnetic Devices
Germany                            No classification name,
FEI #1000490604                    number, or regulation citation
MID #DERHEINCUNK                   2/29/96

Team Ver Packung                   Silicone Oil                              III
Muhlen Koppel 2                    for Opthalmic
Ascheberg-Trentrade,               Use (Sterile)
Germany, Federal Rep. of


HONG KONG

Asia Unlimited                     The Shealy RelaxMate (aka RelaxEase)
Hong Kong                          86HOY
FEI #3002165857                    8/27/98

Automatic Manufacturing Ltd. (Mfr)  Shealy Relaxmate
Kiwuntong, Hong Kong               Glasses
MID# HKAUTMANKIW                   5/6/94

Azad International (HK) Limited     WhisperXL mini sound            II
33 Canton Road                     amplifier (behind the ear
TRW 1, Room 2103                   hearing aid)
Kowloon, Hong Kong                 12/21/94

Doo Jung H.K. Limited              Pap Smear Brushes (may be       II
21-D Broadway                      shipped as cosmetic brushes
12/F Mei Foo Sun Chuen             or may be brush head only.
Laichikok, Kowloon                 6/8/93
Hong Kong
ID#: HKDOOJUN21LAI


INDIA

International Medical Devices      Freeman Universal               III
17 Industrial Estate, Palam Rd.   Intraocular Lenses
Bombay, India                     (IOL) Anterior Chamber
                                  (Optional posterior
                                  chamber
                                  Style Code: IMD-AC-FA
                                  7/6/92

Shah & Shah Intraocular           Intraocular Lenses              III
Lens (Pvt) Ltd.                   86HQL
2 Russell Street                  4/10/95
H.D. Road, Joka 743512
Calcutta 700 071, India
MID: INSHASHA743CAL
FEI: 1000327725


ISRAEL

Zer Science Ltd.                  HIV I+II                        57Y-99
Jerusalem, Israel                 One-Step Test                   Class III
FEI #3000168281                   7/9/98

NOTE:

Several FDA districts have encountered shipments of unapproved HIV diagnostic test k
invoiced and labeled for "research use only" or "investigational use only", and some
the kits were unlabeled.

IMPORT ALERT IA8908                    http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&hlnavigate=ALL

HIV diagnostic test kits are Class III devices within the meaning of Sec. 513(f)(1)
the Act and are regulated by CBER under the current Intercenter Agreement between CD
and CBER.

Investigations by FDA revealed that the unapproved HIV diagnostic test kits were int
for commercial distribution, not for "research" or "investigational" uses as invoice
The unapproved diagnostic test kits claim to detect HIV antibodies in blood or saliv
provide results in the home in 15 minutes or less.  The test kits could present a se
hazard to the public health, including possible HIV transmission to partners and del
access to medical care due to misdiagnosed false negative tests.

Districts encountering shipments of the unapproved HIV diagnostic test kits should
contact the CBER Import/Export Team at (301) 827-6201.


ITALY

M.E.D.I.Co Italia            Pacemaker (Phymos ADV/VDD-M)              III
Medical Electronic Devices   (12/08/92)
International Co.
Via Pitagora, 15-35030 Rubano (PD)
Italy
MID# ITMEDELEISRUB

S.M.E.I.srl                          Sculpture Ultrasonic Aspiration Device
(Surgical Medical Aesthetic          (Sculpture Ultrasound Wave Liposculpture)
Supplies)
Via F. Negri 15                          Product Code: 85MGI
15033 Cassale Monferrato             1/22/99
Alessandria, Italy
FEI #3001811866


JAPAN

Fuji Latex Co., Ltd.         Wrinkle Chapeau Condoms                  II
19-1, 3-Chome                (7/20/93)
Kanda Nishiki-Cho, Chiyoda-Ku
Tokyo, Japan
ID# JPFULAT191CHI

Fuji Medical Instruments     "New Health Club"                       III
 Mfg. Co., Ltd.              Low Frequency
5-521 Nipponbashi            Therapeutic Apparatus
Naniwa-Ku, Osaka, Japan          Type C, Model HC-32
MID# JPFUJMED5521OSA         (8/13/93)

Hakko Shoji Co., Ltd.            Sterile Disposable Spinal
7-9 Kamimeguro 1-Chrome          and Tuohy Epidural
Meguro-ku                        Needles
Tokyo, 153, Japan            4/16/96
FEI #1000189548
MID #JPHAKSHO79TOK

Hirayama Manufacturing Corp.       Sterilizer, autoclave
2-16-16 Yushima, Bunkyo-Ku            75LXG
Tokyo 113                          9/17/98
Japan
FEI# 1000197696

Kyoto Daiichi                Ammonia Checker II                      III
Kagaku Co., Ltd              Blood Ammonia Checker System
57 Nishi Aketa-cho           Model AA-4120 (9/9/92)

Higashi Kujo
Minami Ku
Kyoto 601, Japan

Maramunji Sangyo Co., LTD        Infant Heel Warmers
17-11-3 Ishimaru                 Infant Crib Warmers
Mino-Shi                         12/27/94
Osaka 562, Japan

Nippon Germanium Laboratory Co., Ltd.    Germanium Pellets
2-11-9 Kasuga, Shizuoka City             Bandages              III
Shizuoka, Japan                          5/20/96
MID# JPNIPGER2119SHT
FEI# 1000548833

Sanwa Health Co. Ltd         Germa Knee Sports Wrap        III
39 Kamisekerya-sho           Germa Adhesive Bandages       III
Murasakamo, Kita-Ka
Kyoto, Japan


KOREA

Hesung Medical Supply        Scalp Vein Sets               II
517-4 Sangdaewon-Dong        Infusion Sets                 II
Seongnam City, Seoul, Korea


Unis Medical Electronics     Heparin Lock (PRN)       II
Co., Ltd.                    Protected Needle              II
Rm. 508, Dae Kwang Bldg 7-15 Adapter (PNA)
Nonhyun-Dong, Xangnam-Ku     IV In-Line Connector          II
Seoul, Korea                 Multiple Sample Luer     II
                             Adapter
ID# KRUNIMED715SEO           (3/5/93)


MALAYSIA

Alang Bidara Industries      Latex Patient                     I
Sdn Bhd, Lot 2574,           Examination Gloves
Kampong Olak Lempit          80LYY, 80FMC
Kuala Langat      9/4/96
42700 Banting, Selangor
Darul Ehsan, West Malaysia
FEI# 1000565458
MID# MYALABID2574KUA

L.S. Rubber SDN. BHD         Flavored Latex Condoms       Class II
(previously known as MBF     (All Flavors)
Personal Care SDN. BHD)      Product Code: 85LTZ
PLO 22, Senai Industrial Estate   1/22/98
Phase 1, 81400 Senai
Johor, Malaysia
FEI#: 3001085209


SINGAPORE

Genelabs Diagnostics PTE LTD   Helico Blot 2.0; 83LYR
85 Science Park Drive, #04-01, HEV IgM ELISA; 83--- &
The Cavendish,                 OraScreen HIV Rapid
Singapore Science Park         Test Kits; 57YY99
Singapore                      8/13/97
FEI #1000436598

IMPORT ALERT IA8908                              http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&hlnavigate=ALL

SWEDEN

Lic Care, AB                  BD5000 Optima Birthing Bed (10/27/92)    II
Svetsarvagen 20                   BD6000 Optima Birthing Bed (10/27/92)    II
Solna, Sweden

 Postal Address:
LIC Care, AB
5-17183 Solna, Sweden
 or
LIC Rehab Care AB
Box 8164
S-163 08 SPANGA, Sweden

Scandicare Products AB         All devices
Depagaten 2, Box 34            Product codes: 85HFW, 79HXD
S-33400 Anderstorp, Sweden  11/21/95
FEI# 6891
MID# SESCAPRO24AND


SWITZERLAND

Bilimed AG                     Belimed Washing Machine Model SM 700
Ch-5608                        (3/5/92)                          III
Stetton                     Belimed Scope Washing Machine Model
Switzerland                     SME 2000 (3/5/92)                    III
                            Belimed Washington Machine Model
                            SM 1000 (3/5/92)                    III


Compex, S.A.                   Compex 2 Iontophoresis (Product Code=89EGJ)
Chemin Du Devent               3/1/99
CH-1024 Ecublens
Switzerland
FEI# 3002601983

Corange International Ltd.      Elecsys HBsAg
Hamilton Cham Branch           Immunoassay Kits
Hinterbergstrasse 9,           11/26/97
Postbach 5146                  PRODUCT CODE
Cham, Switzerland 6330         83L[][]OM
FEI#1000326892


                           Endoclean 2000, and Decontaminating        II
HAMO AG                     Machines Models LS-850, LS-76, DW/T-216
Reinigungs-Hyglenetechnik
Bielstrasse 76    (1/30/92)
2542 Pieterlen/Biel
Switzerland


TAIWAN, ROC

ACUTE IDEA CO., LTD.           Pacifier Thermometer
TAIWAN, R.O.C.                 3/9/94

Distributed by:

^

Trade Name:  Paci-Temp

^

^

Trade Name:  Lumiscope Baby Therm

WINTEK MICROCIRCUIT CORP.          Pacifier Thermometer
Taipei, Taiwan, R.O.C.             3/9/94

Distributed by:

^                                           ^

Trade Name:  Dubby

^

^

Trade Name:  Lumiscope Baby Therm


TAIWAN SHINING YOUNG TRADING       Pacifier Thermometer
  Co., Ltd.
Taipei, Taiwan R.O.C.              3/9/94
Trade Name:  Knoble

Distributed by:

^

^

Trade Name:  Lumiscope Baby Therm

Chipper-Tech Co.                   Brainwave Synchronizer
No. 19 Lane 53 Shwanglien St.      9/9/94
Taipei, Taiwan

Importer/Consignee:

^

^

or

^

^

Kung's Medical Instruments    LYM -03-Terminator Mini Electrical      III
  Company, Ltd.               Syringe Needle Destroyer (2/1/93)
P.O. Box 55-1620
Taipei, Taiwan, ROC

T.A. Yu Chanc Industrial Co., Ltd.    Sun Eeze (fitsrite)
299 Nan Yang Road                     protective eye wear
Seng Yaun, Taiwan ROC                 (10/14/94)

UNITED KINGDOM

Medical Wire & Equipment Co.
  (Bath) Ltd.
Corsham, Wiltshire, England
UK SN13 9RT
MID# UKMEDWIRCOR

        Transwabs (MW169C,
MW172PT, MW172CT,
    MW174P, MW175C)
    Theater Pack, Virocult,
    Chlamydia Transwab, Strip
tests (Beta, Pro-, Pyo,
Gram, and Indo-Test),
Micro Ring (XV, AC, AN,
and Yeast ID)
1/13/95

ANTHONY G. NEWMAN (DC & MD)
ERNEST W. MCINTOSH (DC, MD & MI)
JOSEPH A. HENNESSEY (DC & MD)
7315 WISCONSIN AVENUE, SUITE 700E
BETHESDA, MARYLAND 20814
PHONE:        (301) 654-3400
FAX:           (301) 907-2975

1232 17TH STREET NW
WASHINGTON, DC 20036
Phone:   (202) 659-8600
FAX:      (202) 659-8680

# NEWMAN, MCINTOSH & HENNESSEY, LLP
## FAX COVER SHEET

TO: Megan Hills          FROM: Wendy Wyeth

FAX: 202 434 5029        DATE: 1|8|08

PHONE:                    PAGES: 21

RE: Kaufman cont'd

**Confidential Communication**

The information contained in this facsimile is proprietary and confidential and is intended only for the addressee(s) named above. If you have received this communication in error, please notify us immediately at (301) 654-3400 and return the communication by mail to the above address.

http://www.fda.gov/ora/oasis/ora_onsis_viol.htm

# Violation Code translation

Revised: 17-Mar-1999  09:19 AM

Reason: ***
Section: 402(a)(5), 801(a)(3); ADULTERATION
Charge: The food appears to be, in whole or in part, the
product of a diseased animal or of an animal which has died
otherwise than be slaughter.

Reason: ADDED BULK
Section: 402(b)(4), 801(a)(3); ADULTERATION
Charge: The food appears to have a substance added to, mixed
or packed with it so as to increase its bulk or weight, or
reduce its quality or strength, or make it appear better or
of greater value than it is.

Reason: AFLATOXIN
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to contain aflatoxin, a
poisonous and deleterious substance which may render it
injurious to health.

Reason: AGR RX
Section: 801(d)(1),(2); IMPORTATION RESTRICTED
Charge: The article appears to be a prescription drug
manufactured in the U.S. and offered for import by other
than the manufacturer and reimportation does not appear to
have been authorized by the Secretary for use in a medical

Reason: AGRINSULIN
Section: 801(d)(1),(2);IMPORTATION RESTRICTED
Charge: The article appears to be composed wholly or partly
of insulin manufactured in the US and offered for import by
other than the manufacturer and reimportation does not
appear to have been authorized by the Secretary for a

Reason: ALCOHOL
Section: 402(d)(2), 801(a)(3); ADULTERATION
Charge: The article appears to be a confectionary that bears
or contains alcohol in excess of 1/2 of 1% by volume derived
solely from the use of flavoring extracts.

Reason: ANTIBIOTIC
Section: 502(1), 801(a)(3); MISBRANDING
Charge: The drug appears to purport, or represented as,
being composed wholly or partly of an antibiotic and it does
not appear to be from a batch with respect to which a
certificate or release has been issued pursuant to section

Reason: BACTERIA
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to contain a poisonous and
deleterious substance which may render it injurious to
health.  Contains

Reason: BANNED

VIOLATION CHARGE CODES

Section: 501(g), 801(a)(3); ADULTERATION
Charge: The article appears to be a banned device.

Reason: BSE FILTH
Section: 402(a)(3), 801(a)(3); Adulteration
Charge: The article is subject to refusal of admission pursuant to Section 801(a)(3) in that it appears to be unfit for food.

Reason: BUTTER
Section: 402(e), 801(a)(3); ADULTERATION
Charge: The article appears to be oleo/margarine or butter with raw materials consisting in whole or in part of a filthy, putrid, or decomposed substance or the article is otherwise be unfit for food.

Reason: COL ADDED
Section: 501(a)(4)(A), 801(a)(3); ADULTERATION
Charge: The article appears to bear or contain, for the purpose of coloring only, a color additive which is unsafe within the meaning of Section 721(a).

Reason: COLOR LBLG
Section: 602(e), 801(a)(3); MISBRANDING
Charge: The color additive appears to not have its packaging and labeling in conformity with such requirements as issued under section 721.

Reason: COLOR LBLG
Section: 403(k), 801(a)(3); MISBRANDING
Charge: The article appears to contain an artificial coloring and it fails to bear labeling stating that fact.

Reason: CONCEALED
Section: 402(b)(3), 801(a)(3); ADULTERATION
Charge: It appears to be food which has damage or inferiority concealed in any manner.

Reason: CONTAINER
Section: 402(a)(6), 801(a)(3); ADULTERATION
Charge: The container appears to be composed, in whole or in part, of a poisonous or deleterious substance which may render the contents injurious to health.

Reason: CONTAINER
Section: 501(a)(3), 801(a)(3); ADULTERATION
Charge: The container appears to be composed, in whole or in part, of a poisonous or deleterious substance which may render the contents injurious to health.

Reason: CONTAINER
Section: 601(d), 801(a)(3); ADULTERATION
Charge: The container appears to be composed, in whole or in part, of a poisonous or deleterious substance which may render the contents injurious to health.

Reason: CONTAM CAN
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to be held in a container containing a poisonous or deleterious substance which may render it injurious to health.

Reason: COSM COLOR

VIOLATION CHARGE CODES

Section: 601(e), 801(a)(3); ADULTERATION
Charge: The cosmetic appears to not be a hair dye, and is, bears, or contains a color additive which is unsafe within the meaning of section 721(a).

Reason: COSMETIC
Section: 601(c), 801(a)(3); Adulteration
Charge: The article appears to be an ingredient in a cosmetic product and may have been prepared packed or held under insanitary conditions whereby it may have become contaminated with filth or rendered injurious to health.

Reason: COSMETLBLG
Section: 5(c)(3)(A); 801(a)(3) Misbranding
Charge: It appears the label does not bear the common or usual name of the cosmetic.

Reason: COSMETLBLG
Section: 5(c)(3)(B); 801(a)(3) Misbranding
Charge: It appears that the cosmetic consists of two or more ingredients and the label does not list the common or usual name of each ingredient.

Reason: COUMARIN
Section: 402(a)(1), 801(a)(3), Adulteration
Charge: The article appears to bear or contain Coumarin, a poisonous or deleterious substance, which may render it injurious to health.

Reason: CSTIC LBLG
Section: 602(a) and/or (b), and/or (c), 801(a)(3); MISBRANDING
Charge: The labeling appears to fail to comply with cosmetic labeling requirments of Section 602(a), and/or (b), and/or (c), and as identified by 21 C.F.R. Part 701.

Reason: DANGEROUS
Section: 502(j), 801(a)(3); MISBRANDING
Charge: The article appears to be dangerous to health when used in the dosage or manner, or with the frequency or duration, prescribed, recommended, or suggested in the labeling thereof.

Reason: DE IMP GMP
Section: 801(a)(1); NON CONFORMING MANUFACTURING PRACTICES
Charge: The methods used in, or the facilities or controls used for the manufacture, packing, storage or installation do not conform to the requirements under section 520(f).

Reason: DEVICE GMP
Section: 501(h), 801(a)(3); ADULTERATION
Charge: The methods, facilities, or controls used for the article's manufacture, packing, storage, or installation do not conform with applicable requirements under section 520(f)(1) or a condition prescribed by an order under

Reason: DIET INGRE
Section: 402(a)(3), 801(a)(3); Adulteration
Charge: The article is subject to refusal of admission pursuant to Section 801(a)(3) in that it appears to be for use as an ingredient in a dietary supplement and appears to be or may be otherwise unfit for food.

Reason: DIETARY
Section: 403(j), 801(a)(3); MISBRANDING
Charge: The article purports to be or is represented for

special dietary uses and its label does not appear to bear the nutritional information required by regulation.

Reason: DIRECTIONS
Section: 502(f)(1), 801(a)(3); MISBRANDING
Charge: The article appears to lack adequate directions for use.

Reason: DIRSEXMPT
Section: 502(f)(1), 801(a)(3); MISBRANDING
Charge: The article appears to lack adequate directions for use, and the article does not appear to be exempt from such requirements.

Reason: DISEASED
Section: 402(a)(5), 801(a)(3); ADULTERATION
Charge: The food appears to be, in whole or in part, the product of a diseased animal or of an animal which has died otherwise than by slaughter.

Reason: DR QUALITY
Section: 501(b), 801(a)(3); ADULTERATION
Charge: The article appears to be represented as a drug the name of which is recognized in an official compendium and its strength appears to differ from or its quality or purity appear to fall below the standards set forth in such

Reason: DR QUALITY
Section: 501(c), 801(a)(3); ADULTERATION
Charge: The drug appears to be represented as not being recognized in an official compendium and appears its strength differs from or its quality or purity falls below, that which it purports or is represented to possess.

Reason: DRUG COLOR
Section: 502(m), 801(a)(3); MISBRANDING
Charge: The article appears to be a color additive the intended use of which is for the purpose of coloring only, and its packaging and labeling do not conform to regulations issued under section 721.

Reason: DRUG GMPS
Section: 501(a)(2)(B), 801(a)(3); ADULTERATION
Charge: It appears that the methods used in or the facilities or controls used for manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing

Reason: DRUG NAME
Section: 502(e)(1); 801(a)(3); Misbranding
Charge: The article appears to be a drug and fails to bear the proprietory or established name and/or name and quantity of each active ingredient.

Reason: DV NAME
Section: 502(e)(2); 801(a)(3); Misbranding
Charge: The article appears to be a device and its labeling fails to bear the proprietary or established name.

Reason: DV QUALITY
Section: 501(c); 801(a)(3) Adulteration
Charge: The article appears to be a device whose quality falls below that which it purports or is represented to possess.

Reason: EXCESS SUL
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to contain excessive sulfites, a poisonous and deleterious substance which may render it injurious to health.

Reason: FAILS STD
Section: 501(e), 801(a)(3); ADULTERATION
Charge: The article appears to be a device which is subject to a performance standard established under Section 514 and does not appear to be in all respects in conformity with such standard.

Reason: FALSE
Section: 502(a), 801(a)(3); MISBRANDING
Charge: The labeling for this article appears to be false or misleading.

Reason: FALSE
Section: 403(a)(1), 801(a)(3); MISBRANDING
Charge: The labeling of the article appears to be false and misleading.

Reason: FEED & NAD
Section: 501(a)(6), 801(a)(3); ADULTERATION
Charge: The article appears to be an animal feed bearing or containing a new animal drug, and such animal feed is unsafe within the meaning of section 512.

Reason: FILTH
Section: 601(b), 801(a)(3); ADULTERATION
Charge: The cosmetic appears to consist in whole or in part of any filthy, putrid, or decomposed substance.

Reason: FILTHY
Section: 402(a)(3), 801(a)(3); ADULTERATION
Charge: The article appears to consist in whole or in part of a filthy, putrid, or decomposed substance or be otherwise unfit for food.

Reason: FILTHY
Section: 501(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to consist in whole or in part of any filthy, putrid, or decomposed substance.

Reason: FLAVR LBLG
Section: 403(k), 801(a)(3); MISBRANDING
Charge: The article appears to contain an artificial flavoring and it fails to bear labeling stating that fact.

Reason: FLUOROCARB
Section: 402(a)(2)(A), 801(a)(3); ADULTERATION
Charge: The article appears to contain chloroflurocarbons in violation of 21 CFR 2.125.

Reason: FLUOROCARB
Section: 501(a)(5), 801(a)(3); ADULTERATION
Charge: The article appears to be a new animal drug containing chloroflurocarbons in violation of 21 CFR 2.125.

Reason: FLUOROCARB
Section: 601(a), 801(a)(3); ADULTERATION
Charge: The article appears to contain chloroflurocarbons in violation of 21 CFR Part 2.125.

VIOLATION CHARGE CODES

Reason: FORBIDDEN
Section: 801(a)(2); FORBIDDEN OR RESTRICTED IN SALE
Charge: The article appears to be forbidden or restricted in
sale in the country in which it was produced or from which
it was exported.

Reason: FOREIGN OB
Section: 402(a)(3), 801(a)(3); ADULTERATION
Charge: The article appears to consist in whole or in part
of a filthy, putrid, or decomposed substance, or is
otherwise unfit for food in that it appears to contain
foreign objects.

Reason: GINSENG
Section: 402(a)(2)(C), 801(a)(3); ADULTERATION
Charge: The article appears to bear or contain "Ginseng", a
food additive which is unsafe within the meaning of Section
409.

Reason: HEALTH C
Section: 801(a)(3); 403(r)(1)(A)/(B) misbranding
Charge: The article appears to be misbranded in that the
label or labeling bears an unauthorized nutrient
content/health claim.

Reason: HELD INSAN
Section: 601(c), 801(a)(3); ADULTERATION
Charge: The cosmetic appears to have been prepared, packed,
or held under insanitary conditions whereby it may have
become contaminated with filth, or whereby it may have been
rendered injurious to health.

Reason: HOLES
Section: 501(c); 801(a)(3) Adulteration
Charge: The quality of the article falls below that which it
purports or is represented to possess, in that the devices
contain defects/holes.

Reason: IMBED OBJT
Section: 402(d)(1), 801(a)(3); ADULTERATION
Charge: The article appears to be a confectionary that has
partially or completely imbedded therein any nonnutritive
object.

Reason: IMITATION
Section: 403(c), 801(a)(3); MISBRANDING
Charge: The article appears to be an imitation of another
food, and the label does not bear in type of uniform size
and prominence, the word "imitation" and immediately
thereafter, the name of the food imitated.

Reason: IMPTRHACCP
Section: 801(a)(3) , 402(a)(4)  Adulteration
Charge: The food appears to have been prepared, packed or
held under insanitary conditions, or may have become
injurious to health, due to the failure of the importer to
provide verification of compliance pursuant to 21 CFR

Reason: INCONSPICU
Section: 403(f), 801(a)(3); MISBRANDING
Charge: Information required by the Act to be on the label
or labeling does not appear to be conspicuous enough as to
render it likely to be read and understood by the ordinary
individual under customary conditions of purchase and use.

VIOLATION CHARGE CODES

Reason: INCONSPICU
Section: 502(c), 801(a)(3); MISBRANDING
Charge: Information required by the Act to be on the label
or labeling does not appear to be conspicuous enough as to
render it likely to be read and understood by the ordinary
individual under customary conditions of purchase and use.

Reason: INGRED FIL
Section: 402(a)(4), 801(a)(3); Adulteration
Charge: The article appears to be an ingredient in a dietary
supplement and may have been prepared packed or held under
insanitary conditions whereby it may have become
contaminated with filth or rendered injurious to health.

Reason: INSAN BSE
Section: 402(a)(4), 801(a)(3); Adulteration
Charge: The article is subject to refusal of admission
pursuant to Section 801(a)(3) in that it appears to have
been prepared, packed or held under insanitary conditions
whereby it may have been rendered injurious to health.

Reason: INSANITARY
Section: 501(a)(2)(A), 801(a)(3); ADULTERATION
Charge: The article appears to have been prepared, packed or
held under insanitary conditions whereby it may have been
contaminated with filth, or whereby it may have been
rendered injurious to health.

Reason: INSANITARY
Section: 402(a)(4), 801(a)(3); ADULTERATION
Charge: The article appears to have been prepared, packed,
or held under insanitary conditions whereby it may have
become contaminated with filth, or whereby it may have been
rendered injurious to health.

Reason: INSULIN
Section: 502(k), 801(a)(3); MISBRANDING
Charge: The drug appears to purport, or represented as,
being composed wholly or partly of insulin and it does not
appear to be from a batch with respect to which a
certificate or release has been issued pursuant to section

Reason: JUICE %
Section: 403(i)(2), 801(a)(3); MISBRANDING
Charge: It appears the food is a beverage containing
vegetable or fruit juice and does not bear a statement on
the label in appropriate prominence on the information panel
of the total percentage of such fruit or vegetable juice

Reason: LABELING
Section: Section 4(a); 801(a)(3) Misbranding
Charge: The article appears in violation of FPLA because of
its placement, form and/or contents statement.

Reason: LACK NOTIF
Section: 301(s)
Charge: Adulterated, 801(a)(3), lack of documentation
establishing that the infant formula meets all notification
conditions required by 412(c) or 412(d), Prohibited Act,
Section 301(s).

Reason: LACKS FIRM
Section: 403(e)(1), 801(a)(3); MISBRANDING
Charge: The food is in package form and appears to not bear
a label containing the name and place of business of the

VIOLATION CHARGE CODES

manufacturer, packer, or distributor.

Reason: LACKS FIRM
Section: 502(b)(1), 801(a)(3); MISBRANDING
Charge: The article is in package form and appears to not
bear a label containing the name and place of business of
the manufacturer, packer, or distributor.

Reason: LACKS N/C
Section: 403(e)(2), 801(a)(3); MISBRANDING
Charge: The food is in package form and appears to not have
a label containing an accurate statement of the quantity of
the contents in terms of weight, measure or numerical count
and no variations or exemptions have been prescribed by

Reason: LACKS N/C
Section: 502(b)(2), 801(a)(3); MISBRANDING
Charge: The article is in package form and appears to not
have a label containing an accurate statement of the
quantity of the contents in terms of weight, measure or
numerical count and no variations or exemptions have been

Reason: LBL STEEL
Section: 502(a); 801(a)(3); Misbranding
Charge: The labeling for this article appears to be false or
misleading: labeling suggests it is composed of stainless
steel, but it doesn't meet standard requirements for the
appropriate type of stainless steel.

Reason: LBLG ADVER
Section: 502(a), 201(n) and 801(a)(3) Misbranding
Charge: The art apprs misbranded because its lblg is misledg
namely it fails to reveal facts (non-sterility) that are
material w/ respect to consequences frm the use of the art
accordg to  lblg or advertisg or undercondtns of customary

Reason: LEAK/SWELL
Section: 402(a)(3), 801(a)(3); ADULTERATION
Charge: The article appears to be held in swollen containers
or contains micro leaks.

Reason: LENS CERT
Section: 502(a), 801(a)(3); MISBRANDING
Charge: The lenses are declared by accompanying certificate
to meet the requirements for impact-resistant lenses in 21
CFR 801.410 but does not appear to be impact-resistant.

Reason: LIST INGRE
Section: 403(i)(2), 801(a)(3); MISBRANDING
Charge: It appears the food is fabricated from two or more
ingredients and the label does not list the common or usual
name of each ingredient.

Reason: LISTERIA
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to contain Listeria, a poisonous
and deleterious substance which may render it injurious to
health.

Reason: MFR INSAN
Section: 801(a)(1); INSANITARY MANUFACTURING, PROCESSING OR PACKING
Charge: The article appears to have been manufactured,
processed, or packed, under insanitary conditions.

Reason: NEEDS ACID

Section: 402(a)(4), 801(a)(3); ADULTERATION
Charge: The food appears to have been prepared, packed, or
held under insanitary conditions, or it may have been
rendered injurious to health due to inadequate
acidification.

Reason: NEEDS FCE
Section: 402(a)(4), 801(a)(3); ADULTERATION
Charge: It appears the manufacturer is not registered as a
low acid canned food or acidified food manufacturer pursuant
to 21 CFR 108.25(c)(1) or 108.35(c)(1).

Reason: NEW VET DR
Section: 501(a)(5), 801(a)(3); ADULTERATION
Charge: The article appears to be a new animal drug which is
unsafe within the meaning of Section 512(a) in that there is
not in effect an approval of an applications filed with
respect to its intended use or uses.

Reason: NO 510(K)
Section: 801(a)(3); 502(o) Misbranding
Charge: It appears that a notice or other information
respecting the device was not provided to FDA, as required
by Section 510(k) and the device was not found to be
substantially equivalent to a predicate device.

Reason: NO ENGLISH
Section: 403(f), 801(a)(3); MISBRANDING
Charge: Required label or labeling appears to not be in
English per 21 CFR 101.15(c).

Reason: NO ENGLISH
Section: 502(c); 801(a)(3) ;MISBRANDING
Charge: Required label or labeling appears to not be in
English in violation of 21 C.F.R. 201.15(c)(1).

Reason: NO LICENSE
Section: 502(f)(1), 801(a)(3); MISBRANDING & PHS BIOL. ACT 351
Charge: The article appears to be a biological product not
manufactured at an establishment holding an unsuspended and
unrevoked license issued under the Public Health Service
Act, Biological Products section 351.

Reason: NO PERMIT
Section: 1, 2; PROHIBITION WITHOUT PERMIT
Charge: The article is milk or cream not subject to a valid
permit.

Reason: NO PMA
Section: 501(f)(1)(B), 801(a)(3); ADULTERATION
Charge: The article appears to be a class III device without
an approved application for premarket approval pursuant to
section 515(a).

Reason: NO PROCESS
Section: 402(a)(4), 801(a)(3); ADULTERATION
Charge: It appears that the manufacturer has not filed
information on its scheduled process as required by 21 CFR
108.25(c)(2) or 108.35(c)(2).

Reason: NO REGISTR
Section: 536(a); Failure to file initial report
Charge: The article appears to be an electronic product that
does not comply with an applicable standard as prescribed by
Section 534 because no reporting has been provided as

required by Section 537(b).

Reason: NO TAG
Section: 536(a),(b); NOT CERTIFIED
Charge: It appears that the article does not have affixed to
it a certification in the form of a label or tag in
conformity with section 534(h).

Reason: NON STD
Section: 536(a),(b); NON STANDARD
Charge: It appears that the article fails to comply with
applicable standards prescribed under section 534.

Reason: NONNUT SUB
Section: 402(d)(3), 801(a)(3); ADULTERATION
Charge: The article appears to be confectionery and it bears
or contains a nonnutritive substance.

Reason: NONSTEEL
Section: 502(a) and/or 502(f)(1); Misbranding
Charge: Labeling appears false or misleading or fails to
bear adequate directions for use,because the article appears
to be misrepresented as a disposable single use instrument
when it is intended for use as a stainless steel multi-use

Reason: NOT IMPACT
Section: 501(c), 801(a)(3); ADULTERATION
Charge: The article appears to not have impact-resistant
lenses in accordance with 21 CFR 801.410.

Reason: NOT LISTED
Section: 502(o), 801(a)(3); MISBRANDING
Charge: It appears the drug or device is not included in a
list required by Section 510(j), or a notice or other
information respecting it was not provided as required by
section 510(j) or 510(k).

Reason: NUTRIT LBL
Section: 403(q); 801(a)(3); Misbranding
Charge: The article appears to be misbranded in that the
label or labeling fails to bear the required nutrition
information.

Reason: OFF ODOR
Section: 402(a)(3), 801(a)(3); ADULTERATION
Charge: The article appears to consist in whole or in part
of a filthy, putrid, or decomposed substance or be otherwise
unfit for food. Contains an off odor.

Reason: OMITTED
Section: 402(b)(1), 801(a)(3); ADULTERATION
Charge: It appears that a valuable constituent of the
article has been in whole or in part omitted or abstraced
from the article.

Reason: OPTION ING
Section: 403(g)(2), 801(a)(3); MISBRANDING
Charge: It appears to be a food for which a definition and
standard of identity have been prescribed by regulations
under section 401 and appears to not be labelled with the
common names of the optional ingredients specified therein.

Reason: PERSONALRX
Section: 502(a) & (f)(1), 801(a)(3); MISBRANDING

VIOLATION CHARGE CODES

721(a).

Reason: UNSAFE COL
Section: 501(a)(4)(B), 801(a)(3); ADULTERATION
Charge: The article appears to be a color additive for the
purposes of coloring only in or on drugs or devices, and is
unsafe within the meaning of Section 721(a).

Reason: UNSAFE SUB
Section: 402(a)(2)(A), 801(a)(3); ADULTERATION
Charge: The article appears to bear or contain a substance
which is unsafe within the meaning of Section 406.

Reason: UNSFDIETSP
Section: 402(f)(1)(B), 801(a)(3)  Adulteration
Charge: The article appears to be a dietary supplement or
ingredient for which there is inadequate information to
provide reasonable assurance that such ingredient does not
present a significant or unreasonable risk of illness or

Reason: USUAL NAME
Section: 403(i)(1), 801(a)(3); MISBRANDING
Charge: It appears that the label does not bear the common
or usual name of the food.

Reason: VET LEGEND
Section: 502(a) & (f)(1), 801(a)(3); MISBRANDING
Charge: The article appears to be a veterinary drug without
the "Caution" statement as required by Section 503(f)(4).

Reason: VITAMN LBL
Section: 403(a)(2), 801(a)(3); MISBRANDING
Charge: The food appears to be subject to section 411 and
its advertising is false or misleading in a material respect
or its labeling is in violation of section 411(b)(2).

Reason: WARNINGS
Section: 502(f)(2), 801(a)(3); MISBRANDING
Charge: It appears to lack adequate warning against use in a
pathological condition or by children where it may be
dangerous to health or against an unsafe dose, method,
administering duration, application, in manner/form, to

Reason: WRONG IDEN
Section: 403(b), 801(a)(3); MISBRANDING
Charge: The article appears to be offered for sale under the
name of another food.

Reason: YELLOW #5
Section: 402(c), 403(m), 801(a)(3); ADULTERATION, MISBRANDING
Charge: The food appears to bear or contain the color
additive FD & C Yellow No. 5, which is not declared on the
label per 21 CFR 74.705 under section 721.

Charge: The article appears to be a drug which requires a prescription from your doctor.

Reason: PESTICIDE
Section: 402(a)(2)(B), 801(a)(3); ADULTERATION
Charge: The article appears to be a raw agricultural commodity that bears or contains a pesticide chemical which is unsafe within the meaning of Section 408(a).

Reason: POISON PKG
Section: 502(p), 801(a)(3); MISBRANDING
Charge: The article appears to be a drug and its packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 or 4 of the Poison Prevention Packaging Act of 1970.

Reason: POISONOUS
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to contain a poisonous or deleterious substance which may render it injurious to health.

Reason: POISONOUS
Section: 601(a), 801(a)(3); ADULTERATION
Charge: The cosmetic appears to bear or contain a poisonous or deleterious substance which may render it injurious to users under the conditions prescribed in the labeling.

Reason: PRESRV LBL
Section: 403(k), 801(a)(3); MISBRANDING
Charge: The article appears to contain a chemical preservative and it fails to bear labeling stating that fact including its function.

Reason: RECORDS
Section: 502(t), 801(a)(3); MISBRANDING
Charge: The article appears to be a device and the requirements under 518 or to furnish any material or information required by or under section 519 respecting a device were not met.

Reason: REDUCED
Section: 501(d)(1), 801(a)(3); ADULTERATION
Charge: It appears to be a drug that a substance has been mixed or packed with so as to reduce its strength.

Reason: REGISTERED
Section: 502(o), 801(a)(3); MISBRANDING
Charge: It appears the device is subject to listing under 510(j) and the initial distributor has not registered as required by 21 CFR 807.20 (a)(4).

Reason: REJECT TEA
Section: 1 (21USC41); PROHIBITED TEA
Charge: The article is inferior in purity, quality, and fitness for consumption to the standards provided in section 43.

Reason: RX DEVICE
Section: 502(a),(f)(1), 801(a)(3); MISBRANDING
Charge: The article appears to be a prescription device without a prescription device legend as required by 21 CFR 801.109.

Reason: RX LEGEND

Section: 502(a) & (f)(1), 801(a)(3); MISBRANDING
Charge: The article appears to be a prescription drug
without a prescription drug legend as required by Section
503(b)(4).

Reason: SACCHARIN
Section: 403(o); 801(a)(3) Misbranded
Charge: The article contains Saccharin, a non-nutritive
sweetner, and its label or labeling fails to bear the
required warning statement.

Reason: SALMONELLA
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to contain Salmonella, a
poisonous and deleterious substance which may render it
injurious to health.

Reason: SHIGELLA
Section: 402(a)(1), 801(a)(3); ADULTERATION
Charge: The article appears to contain Shigella, a poisonous
and deleterious substance which may render it injurious to
health.

Reason: SOAKED/WET
Section: 402(a)(4), 801(a)(3); ADULTERATION
Charge: The article appears to have been prepared, packed,
or held under insanitary conditions whereby it may have
become contaminated with filth, or whereby it may have been
rendered injurious to health in that it appears to been held

Reason: STAINSTEEL
Section: 501(c); 801(a)(3) Adulteration
Charge: The article appears to be a device whose quality
falls below that which it purports or is represented to
possess, in that instrument is represented as stainless
steel but does not meet requirements for such steel for

Reason: STD FILL
Section: 403(h)(2), 801(a)(3); MISBRANDING
Charge: The article appears to be represented as a food for
which a standard of fill of container has been prescribed by
regulations as provided by section 401 and it appears it
falls below the standard of fill and its label does not so

Reason: STD IDENT
Section: 403(g)(1), 801(a)(3); MISBRANDING
Charge: The food appears to be represented as a food for
which a definition and standard of identity have been
prescribed by regulations as provided by section 401 and the
food does not appear to conform to such definition and

Reason: STD LABEL
Section: 502(s), 801(a)(3); MISBRANDING
Charge: The article appears to not bear labeling prescribed
by the performance standard established under section 514.

Reason: STD NAME
Section: 403(g)(2), 801(a)(3); MISBRANDING
Charge: It appears to be a food for which a definition and
standard of identity have been prescribed by regulations
under section 401 and appears to not be labelled with the
name specified in the definition and standard.

Reason: STD QUALIT

Section: 403(h)(1), 801(a)(3); MISBRANDING
Charge: The article appears to be represented as a food for
which a standard of quality has been prescribed by
regulation as provided by Sec. 401 and it appears its
quality falls below such standard and its label does not so

Reason: STERILITY
Section: 501(a)(2)(A), 801(a)(3); ADULTERATION
Charge: The article appears to have been prepared, packed or
held under insanitary conditions whereby it may have been
contaminated with filth, or whereby it may have been
rendered injurious to health.

Reason: SUBSTITUTE
Section: 402(b)(2), 801(a)(3); ADULTERATION
Charge: It appears that a substance has been substituted
wholly or in part for one or more of the article's
ingredients.

Reason: SUBSTITUTE
Section: 501(d)(2), 801(a)(3); ADULTERATION
Charge: It appears to be a drug that a substance has been
substituted wholly or in part.

Reason: SULFITELBL
Section: 403(a)(1), 801(a)(3) ;MISBRANDING
Charge: The lablg apprs false & misleading because it apprs
to contn sulfites but the lbl fails to declare the presence
of sulfites, a fact material to sulfite-sensitive
individuals who must avoid the ingr due to potnl hlth

Reason: TAMPERING
Section: 501(a)(2)(B), 801(a)(3); ADULTERATION
Charge: It appears that the packing does not conform with
current good manufacturing practices under 21 CFR 211.132
for tamper-resistant packaging.

Reason: TISSUE
Section: 361
Charge: This tissue is in violation of 21 CFR Part 1270.
The tissue must not be distributed and must be held intact
pending recall and/or distruction, or release.

Reason: UNAPPROVED
Section: 505(a), 801(a)(3); UNAPPROVED NEW DRUG
Charge: The article appears to be a new drug without an
approved new drug application.

Reason: UNDER PRC
Section: 402(a)(4), 801(a)(3); ADULTERATION
Charge: The article appears to have inadequate processing in
having been prepared, packed, or held under insanitary
conditions whereby it may have been rendered injurious to
health.

Reason: UNSAFE ADD
Section: 402(a)(2)(C), 801(a)(3); ADULTERATION
Charge: The article appears to bear or contain a food
additive which is unsafe within the meaning of Section 409.
Contains

Reason: UNSAFE COL
Section: 402(c), 801(a)(3); ADULTERATION
Charge: The article appears to be, or to bear or contain a
color additive which is unsafe within the meaning of Section

OASIS DETENTIONS Canada                    http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&hlnavigate=ALl

# Detentions for OASIS for Canada

```
Manufacture Name
City/State                            District    Entry #        DOC  Line Suffix
Product Code        Product Description
Detention Type          Date                  Sample Num      Reason
```

Laboratoires Pelchat
At-Etienne De Lauzon         CIN-DO      I99-9614038-2    1    1
66V--99    BUTYLENE GLYCOL
Detention            01-MAR-1999                        DIRECTIONS
                                                        UNAPPROVED

Shore Pharmacy
Montreal                     NSV-DO      I99-7093215-0    1    1
64LDA99    40070932153, Budesonide-Unapproved drug.
Detention            01-MAR-1999                        PERSONALRX

Marv Sydor Mds. Inc.
Rexdale                      NSV-DO      I99-3162653-7    1    1
87H--XB    440631626533, Vaginal Probe-No Device Listing.
Detention            01-MAR-1999                        NOT LISTED

Marnet Holdings
North Vancouver              NSV-DO      I99-9325504-3    1    1
66VDY99    40093255046, Meda Zhentongy-Product contains no English labe
Detention            01-MAR-1999                        NO ENGLISH

Nutri Chem Pharmacy
Ottawa                       NSV-DO      I99-4624850-9    1    1
54ACT99    40046248506, Nutri-Chem-ingredients listed under Import Aler
Detain w/o Exam    01-MAR-1999                          PERSONALRX

S D L Optics
Central Saanich              NSV-DO      110-7100394-0    1    1
95L--22    BUTTERFLY LASER DIODE
Detention            01-MAR-1999                        FAILS STD

Craig Foxcroft
London   Ontario             NSV-DO      I99-3757696-7    1    1
65QDA22    40037576965, Robaxisol-US Approved drug.
Detention            01-MAR-1999                        AGR RX

B. Braun Mcgan     c/o Livingston Healthcare
Calgary                      NSV-DO      110-6799169-4    1    1
80L--DQ    40068805516, Angetear Tear-Away sheath Indroducer Set-No dev
Detention            01-MAR-1999                        NOT LISTED

Joe Werner
Vancouver                    NSV-DO      110-7104967-9    1    1
66VIY99    PRESCIPTION OF ADALAT XL 60 MG
Detention            02-MAR-1999                        AGR RX

THE AROMA SHOP
TORONTO,                     CIN-DO      582-0495160-0    1    1    A
53PD-99    VARIOUS COSMETIC LOTIONS
Detention            02-MAR-1999      I207935          CSTIC LBLG

THE AROMA SHOP
TORONTO,                     CIN-DO      582-0495160-0    1    1    B
53PD-99    VARIOUS COSMETIC CLEANSERS

```
Detention          02-MAR-1999         I207936      CSTIC LBLG

THE AROMA SHOP
TORONTO,                             CIN-DO   582-0495160-0   1   1   C
53PD-99   PLASTIC 5ML. JARS,CREAM MAKING BOOK, MISC. CREAM MAKING SUPP
Detention          02-MAR-1999         I207938      CSTIC LBLG

Glaxo Wellcome
Toronto                              FLA-DO   M05-0316595-9   1   1
64HDL99   PHARMACEUTICALS - WHSE ENTRY FOR EXPORT ONLY
Detention          02-MAR-1999                     NOT LISTED

<Yocan> Medical Systems Inc.
Thornill                             NSV-DO   110-6795595-4   1   1
79M--FI   40059625064; HISTOACRYL (IA#89-08)
Detention          02-MAR-1999                     NO PMA

<Yocan> Medical Systems Inc
Thornill                             NSV-DO   110-6795605-1   1   1
79M--FI   40059625075; HISTOACRYL  IA# 89-08
Detention          02-MAR-1999                     NO PMA

DR. QUINLAN
MEDICINE HAT                         NSV-DO   I99-6750765-0   1   1
61N--29   40067507650; US APPROVED PROZAC (FLUOXETINE HCL)
Detention          02-MAR-1999                     AGR RX

JERRY URIEND
WINNIPEG                             NSV-DO   I99-5479176-2   1   1
56E--60   40054791763; US APPROVED DRUG MINOCYCLINE
Detention          02-MAR-1999                     AGR RX

RUBY SIMMONS
WINNIPEG                             NSV-DO   I99-7759777-4   1   1
61P--26   40077597774; US APPROVED DRUG METFORMIN
Detention          02-MAR-1999                     AGR RX

BRIAN WATT
ONTARIO                              NSV-DO   I99-7307352-3   1   1
64LCQ02   VANCERIL AND 6 OTHER MEDICATIONS.40073073523
Detention          02-MAR-1999                     AGR RX

Mentor Medical Systems
Oshawa                               NSV-DO   I99-3909185-8   1   1
86L--CC   404839091850, Pneumotonometer-No device listing.
Detention          02-MAR-1999                     NOT LISTED
                                                   NO 510(K)

Gordner Shoppers
Windsor                              NSV-DO   110-7107128-5   1   1
66VCP99   MOTILIUM      40072523323
Detention          03-MAR-1999                     PERSONALRX

Benisti Import & Export
Montreal                             NSV-DO   110-7108497-3   1   1
66VCP99   SYNTHROID
Detention          03-MAR-1999                     PERSONALRX

Benisti Import & Export
Montreal                             NSV-DO   110-7108497-3   2   1
66VCP99   ESTRADERM
Detention          03-MAR-1999                     AGR RX

Benisti Import & Export
Montreal                             NSV-DO   110-7108497-3   3   1
```

# Detentions for OASIS by Product

Country                                    Entry #   DOC   Line Suffix
Manufacture Name
City/State                        District
Product Code          Product Description
Detention Type            Date              Sample Num      Reason


Canada                                 112-4936379-5   1      1
Upjohn
Don Mills                          NYK-DO
66AAY99    INJECTABLE MEDICATION
Detention          18-FEB-1999          I206253         PERSONALRX

Mexico                                 I99-6086938-8   1      1
Ires Garcia Baeza
Lomas De San Lorenzo               NSV-DO
66CDM99    40060869384, Azitrocin-Unapproved drug, and other drugs.
Detention          16-FEB-1999                          PERSONALRX

Italy                                  411-8309207-5   3      1        A
Cs33 Fine Chemicals
Milan                              DAL-DO
66DDY99    Silver Sulfadiazine
Detention          19-FEB-1999                          NOT LISTED

Italy                                  411-8309207-5   3      1        B
Cs33 Fine Chemicals
Milan                              DAL-DO
66DDY99    Metronidazole
Detention          19-FEB-1999                          NOT LISTED

Dominican Republic                     I99-5262152-4   1      1
MAGALY SANCHEZ
SANTO DOMINGO                      NSV-DO
66MCA36    HALDOL. 40052621520
Detention          23-FEB-1999                          AGR RX

Canada                                 I99-4547467-6   1      1
SAIFUR RAMMAN
ETOBICOKE                          NSV-DO
66MCA86    40045474671; US APPROVED DRUG LORAZEPAM AND OTHER DRUGS
Detention          25-FEB-1999

```
Rusnov Pharmacienne
Montreal                             NSV-DO
66VCP99    TAPAZOLE     40072604302
Detention            19-FEB-1999                        AGR RX

Canada                           110-6778755-5  3     1
Rusnov Pharmacienne
Montreal                             NSV-DO
66VCP99    ERYTHROMYCIN STORATE 40072604302
Detention            19-FEB-1999                        AGR RX

Canada                           110-6778755-5  4     1
Rusnov Pharmacienne
Montreal                             NSV-DO
66VCP99    NORVASC   40072604302
Detention            19-FEB-1999                        AGR RX

Canada                           110-6778755-5  5     1
Rusnov Pharmacienne
Montreal                             NSV-DO
66VCP99    LOZIDE     40072604302
Detention            19-FEB-1999                        AGR RX

Switzerland                      110-6789617-4  1     1
Victoria Apotheke
Zuerich                              NSV-DO
66VCP99    PREMARIN   40058129330
Detention            23-FEB-1999                        AGR RX

Canada                           110-6767445-6  1     1
Power
Halifax                              NSV-DO
66VCP99    APO-LARAZEPAM   40055005156
Detention            24-FEB-1999                        PERSONALRX

Germany, Federal Republic of     110-6789811-3  1     1
<Yocan Medical Systems Inc
Thornill                             NSV-DO
66VCP99    HISTOACRYL GLUE 40059625042
Detain w/o Exam      24-FEB-1999                        NO FMA

South Africa                     I99-1912692-2  1     1
TOM BURKE
RSS                                  NSV-DO
66VCR99    809419126928; U.S. Unapproved drug Diphosphopyridine Nucleot
Detention            04-FEB-1999                        UNAPPROVED

France                           110-0886506-4  1     1
Council De L'Europe
Strasbourg                           SJN-DO
66VCS99    FAMOTIDENE
Detention            05-FEB-1999                        NOT LISTED

Colombia                         110-6739488-1  1     1
Iniridia Asencio
Bogota                               NSV-DO
66VCY99    DIANE     40086794853
Detention            04-FEB-1999                        PERSONALRX

Barbados                         110-6739474-1  1     1
Dave Carrington
St Michael                           NSV-DO
66VCY99    MEDICATION    40037043933
Detention            04-FEB-1999                        PERSONALRX
```

```
Tutogen Medical Gmbh
Erlangen                        FLA-DO
79M--FH   HUMAN TISSUE
Detention         23-AUG-1999                           TISSUE

Germany, Federal Republic of    DF2-8301436-6  1   1
Tutogen Medical Gmbh
Erlangen                        FLA-DO
79M--FH   HUMAN TISSUE  (BANKED)
Detention         31-AUG-1999                           TISSUE

Germany, Federal Republic of    110-7493137-8  1   1
<Yocan> <Medical> <Systems> <Inc>
Thornill                        NSV-DO
79M--FI   GLUE  40078751013
Detain w/o Exam   02-AUG-1999                           NO PMA

Canada                          112-5372732-3  1   1
B.Braun Melsungen Ag
Melsugen                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detention         03-AUG-1999         I226182           NO PMA

Germany, Federal Republic of    110-7493253-3  1   1
<Yocan> <Medical> <Systems> <Inc>
Thornill                        NSV-DO
79M--FI   HISTOACRYL  40078751002
Detain w/o Exam   06-AUG-1999                           NO PMA

Germany, Federal Republic of    112-5900062-6  1   1
B.Braun Melsungen Ag
Melsugen                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam   10-AUG-1999                           NO PMA

Canada                          112-5900684-7  1   1
B BRAUN AG
MELSUNGEN                       NYK-DO
79M--FI   HISTOACRYL, BIOLOGICAL GLUE.
Detain w/o Exam   10-AUG-1999                           NO PMA

Germany, Federal Republic of    112-5901028-6  1   1
<Yocan> <Medical> <Systems> <Inc>
Thornill                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam   10-AUG-1999                           NO PMA

Germany, Federal Republic of    112-5373418-8  1   1
B.Braun Melsungen Ag
Melsungen                       NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam   10-AUG-1999                           NO PMA

Germany, Federal Republic of    112-5148776-3  1   1
<Yocan> <Medical> <Systems> <Inc>
Thornill                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam   10-AUG-1999                           NO PMA

Germany, Federal Republic of    112-5900062-6  1   1
B.Braun Melsungen Ag
Melsugen                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam   16-AUG-1999                           NO PMA
```

OASIS DETENTIONS INDUSTRY 79                http://www.verity.fda.gov/search97cgi/s97...art%3D1%26ResultCount%3D10&hlnavigate=ALL

Germany, Federal Republic of        112-5148776-3   1        1
<Yocan> <Medical> <Systems> <Inc>
Thornill                                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam      16-AUG-1999                          NO PMA

Germany, Federal Republic of        112-5901028-6   1        1
<Yocan> <Medical> <Systems> <Inc
Thornill                                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam      16-AUG-1999                          NO PMA

Germany, Federal Republic of        112-5904086-1   1        1
B.Braun Melsungen Ag
Melsugen                                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detain w/o Exam      17-AUG-1999                          NO PMA

Germany, Federal Republic of        112-5909448-8   1        1
B BRAUN AG
MELSUNGEN                                        NYK-DO
79M--FI   BIOLOGICAL GLUE/HYSTOACRYL
Detention            26-AUG-1999                          NO PMA

Australia                            N95-0991870-8   1        1
Rye Pharmaceuticals P/L
Ultimo  Nsw                                      LOS-DO
79M--GP   BURN DRESSING
Detain w/o Exam      10-AUG-1999                          REGISTERED

ANTHONY G. NEWMAN (DC & MD)
ERNEST W. MCINTOSH (DC, MD & MI)
JOSEPH A. HENNESSEY (DC & MD)
7315 WISCONSIN AVENUE, SUITE 700E
BETHESDA, MARYLAND 20814
PHONE:      (301) 654-3400
FAX:        (301) 907-2975

1232 17TH STREET NW
WASHINGTON, DC 20036
Phone:  (202) 659-8600
FAX:    (202) 659-8680

# NEWMAN, MCINTOSH & HENNESSEY, LLP

FAX COVER SHEET

TO: Megan Hills          FROM: Wendy Wyeth

FAX: 202 434 5029        DATE: 1/8/08

PHONE:                   PAGES: 12 14

RE: Expert Report materials

Gabis + Margulies + Harris

**Confidential Communication**
The information contained in this facsimile is proprietary and confidential and is
intended only for the addressee(s) named above. If you have received this communication in
error, please notify us immediately at (301) 654-3400 and return the communication by mail to
the above address.

# Ms. Gabis

1. FDA Device Advice article attached.
2. Copies of notes from conversations attached.



FDA Home Page | CDRH Home Page | Search | CDRH A-Z Index | Contact CDRH



**Clinical Trials & Investigational Device Exemption (IDE)**
Device Advice Home | CDRH Home | DSMICA Comments

Search for [          ] in  Device Advice  [GO]  (Powered by Google)   All IDE (PDF/)

## Introduction

### IDE Overview

An investigational device exemption (IDE) allows the investigational device to be used in a clinical study in order to collect safety and effectiveness data required to support a Premarket Approval (PMA) application or a Premarket Notification [510(k)] submission to FDA. Clinical studies are most often conducted to support a PMA. Only a small percentage of 510(k)'s require clinical data to support the application. Investigational use also includes clinical evaluation of certain modifications or new intended uses of legally marketed devices. All clinical evaluations of investigational devices, unless exempt, must have an approved IDE before the study is initiated.

Clinical evaluation of devices that have not been cleared for marketing requires:

- an IDE approved by an institutional review board (IRB). If the study involves a significant risk device, the IDE must also be approved by FDA;
- informed consent from all patients;
- labeling for investigational use only
- monitoring of the study and;
- required records and reports.

An approved IDE permits a device to be shipped lawfully for the purpose of conducting investigations of the device without complying with other requirements of the Food, Drug, and Cosmetic Act (Act) that would apply to devices in commercial distribution. Sponsors need not submit a PMA or Premarket Notification 510(k), register their establishment, or list the device while the device is under investigation. Sponsors of IDE's are also exempt from the Quality System (QS) Regulation except for the requirements for design control.

### Good Clinical Practices (GCP)

Good Clinical Practices (GCP) refers to the regulations and requirements that must be complied with while conducting a clinical study. These regulations that apply to the manufacturers, sponsors, clinical investigators, Institutional review boards, and the medical device. The primary regulations that govern the conduct of clinical studies are included in the Code of Federal Regulations, Title 21 (21 CFR):

- 21 CFR 812, *Investigational Device Exemptions*, covers the procedures for the conduct of clinical studies with medical devices including application, responsibilities of sponsors and investigators, labeling, records, and reports.
- 21 CFR 50, *Protection of Human Subjects*, provides the requirements and general elements of informed consent;
- 21 CFR 56, *Institutional Review Boards*, covers the procedures and responsibilities for institutional review boards (IRBs) that approve clinical investigations protocols;
- 21 CFR 54, *Financial Disclosure by Clinical Investigators*, covers the disclosure of financial compensation to clinical investigators which is part of FDA's assessment of the reliability of the clinical data.
- 21 CFR 820 Subpart C, *Design Controls of the Quality System Regulation*, provides the requirement for procedures to control the design of the device in order to ensure that the specified design requirements are met.

Each of these regulations is discussed in detail throughout this section.

### Definitions and Acronyms

Some of the pertinent definitions used in the IDE regulation are as follows.

#### Application Integrity Policy (AIP)

Application Integrity Policy (AIP) is FDA's policy for the integrity of data or information submitted in an application. If it is suspected that an applicant has submitted false or misleading information, the data are thoroughly investigated. Submitting false or misleading information may result in FDA refusal to review submissions until certain requirements are met.

#### Implant

Implant is a device that is placed into a surgically or naturally formed cavity of the human body and is intended to remain there for a period of 30 days or more. In order to protect public health, FDA may determine that devices placed in subjects for shorter periods are also implants.

#### Institutional Review Board (IRB)

Institutional Review Board (IRB) is a board, committee, or other group formally designated by an institution to review, to approve the initiation of, and to conduct periodic review of biomedical research involving human subjects. The primary purpose of such review is to assure the protection of the rights, safety, and welfare of human subjects. The IRB should be established, operated, and function in conformance with 21 CFR 56. The term has the same meaning as "institutional review committee" in section 520(g) of the FD&C Act.

#### Investigation

Investigation is a clinical investigation or research involving one or more subjects to determine the safety and/or effectiveness of a device.

#### Investigational device

Investigational device is a device, including a transitional device, that is the object of an investigation.

#### Investigational device exemptions (IDE)

IDE refers to the regulations under 21 CFR 812. An approved IDE means that the IRB (and FDA for significant risk devices) has approved the sponsor's study application and all the requirements under 21 CFR 812 are met.

#### Investigator

Investigator is an individual who actually conducts a clinical investigation, i.e., under whose immediate direction the investigational device is administered, dispensed to, or used involving a subject. In the event of an investigation being conducted by a team of individuals, "investigator" refers to the responsible leader of that team.

#### Monitor

When used as a noun, monitor is an individual designated by a sponsor or contract research organization to oversee the progress of an investigation. The monitor may be an employee of a sponsor, or a consultant to the sponsor, or an employee of or consultant to a contract research organization. When used as a verb "monitor" means to oversee an investigation.

#### Premarket Approval (PMA)

A premarket approval means any premarket approval application for a Class III medical device, including all information submitted with or incorporated by reference therein. (21 CFR 814.3)

#### Premarket Notification [PMN or 510(k)]

510(k) refers to the type of submission to FDA described under 21 CFR 807 Subpart E in which the applicant must establish that their device is substantially equivalent to a legally marketed device. This type of submission is used for most Class II devices and some Class I devices.

Jan 08 2008 1:51PM    HP LASERJET FAX                6108341190                p.4

### Significant risk device (SR device)

Significant risk device is an investigational device that: (1) is intended as an implant and presents a potential for serious risk to the health, safety, or welfare of a subject; (2) is for use in supporting or sustaining human life and represents a potential for serious risk to the health, safety, or welfare of a subject; (3) is for a use of substantial importance in diagnosing, curing, mitigating, or treating disease or otherwise preventing impairment of human health and presents a potential for serious risk to the health, safety, or welfare of a subject; or (4) otherwise presents a potential for serious risk to a subject.

### Sponsor

Sponsor is a person or other entity that initiates but does not actually conduct the investigation. An entity other than an individual (e.g., a corporation or an agency) which uses one or more of its own employees to conduct an investigation that it has initiated is considered to be a sponsor, not a sponsor-investigator, and the employees are considered to be investigators. The sponsor of an IDE must be located in the United States (see 21 CFR 812.18).

### Sponsor-Investigator

Sponsor-investigator is an individual who both initiates and actually conducts, alone or with others, a clinical investigation, i.e., under whose immediate direction the investigational device is administered, dispensed, or used. The term does not, for example, include a corporation or agency. The obligations of a sponsor-investigator include those of an investigator and those of a sponsor.

### Subject

Subject is a human who participates in an investigation, either as an individual on whom or on whose specimen an investigational device is used or who participates as a control. A subject may be in normal health or may have a medical condition or disease.

### Transitional device

Transitional device is a device subject to section 520(l) of the FD&C Act and which FDA previously regulated as a new drug or an antibiotic drug before May 28, 1976.

### Unanticipated adverse device effect

Unanticipated adverse device effect is any serious adverse effect on health or safety, any life-threatening problem or death caused by, or associated with a device, if that effect, problem, or death was not previously identified in nature, severity, or degree of incidence in the application; or any other unanticipated serious problem associated with a device that relates to the rights, safety, or welfare of subjects.

### References

21 CFR 812.1
21 CFR 812.3

Regulating In Vitro Diagnostic Device (IVD) Studies

http://www.fda.gov/cdrh/comp/ivdreg.html
http://www.fda.gov/cdrh/comp/ivdreg.pdf

Early Collaboration Meetings Under the FDA Modernization Act (FDAMA), guidance for Industry and CDRH Staff

http://www.fda.gov/cdrh/ode/guidance/310.pdf
http://www.fda.gov/cdrh/ode/guidance/310.html

Last updated date 7/8/2005

 Printer Friendly Version

9/6/07     Anthony Newman
           TT's lawyer
           international neuroradiologist
           Class III device not approved
           used device to poly up AVM's
           while customs officers were siezing
           Talked to general counsel —
           waived attorney. Client privilege
           Sherda Zimmett — Georgetown — was nurse
               became lawyer
               Try to comply w/ customs
               Didn't know name of device (she claims)
               Coulda have checked but didn't
           Compliance officer — Can't use Class III devices
               that is not approved
           Sat as IRB Committee's attorney
           Not do research
           Hospital - related counsel —

Zinnet
   When Watson —
       unapproved, problem getting it into the
       country
   Duty to bring it higher than herself
   If they let it in — must be OK

   Negligence of hospital

   Should have done research
       buy siezed or border


   IRB
   Can only use by research

   Compliance w/ FDA
   Not go thru IRB
   Can't use unapproved devices — IDE
   If you are
   Need safeguard
   Complete consent


   Can only use unapproved device
       21 USC 362 (§)
   Prohibited to receive it, promise to
   use it
   Only except if licensed to prescribe

Lots of people usy through IDE —
could get one
Must be dry research
Otherwise can't use

PMA (Pre-Market Approval)
IDE — many IDE's — been a part of
one time
To bypass — didn't know device

Be under of exception
Have to register
Laid
10–30% risk of injury
bleeding — 1–3% )

No IRB, no IDE
Consent form not sufficient

Stuff long on — 1994-1998    See 122
then it stops

Talked to Zimmet in 1994-1995

First conversation in 1994 ⟶ Raised w
Second one in 1998    Watson

1st conv. — where she don't know

Issue is not so much IRB —
 a) Can't use w/out IDE / IRB
 b) Other quality issues — even if not
    necessary

As of 1998
  Sized, expanded, shipments not long length

Trade Alert in 1992

need
   Report —
   Form —
      background —
      travel opinions
        use Sheila Zimmett —
           Institute
        violated national standard of care
        by:

        Failing to investigate whether under what
        Circumstances 'dence' could be used
        determination

For expert
   opinions
   more likely than not —
     ( would recommend that it not be used —
       not be used

CV — fax —
Letter

Standard fed rules —
use notional standard of care
more likely
to a reasonable degree of legal probability
Caused that actions by violated
notional standard

As a result of aforesaid, my opinion to
r.d. of legal certainty, had it been
done — dence would not have been or

failure to rec. proximate cause — rec.
of l.p. — not to me dence

As late as I want

IRB recs + issue of research as to me
finis

# Dr. Margulies

*SHELDON MARGULIES, M.D.*
*705 Kersey Road*
*Silver Spring, MD 20902*
*301-754-0888*
*Practice Limited to Neurology*

*FAX:*
*301-593-2183*

*e-mail:*
*lsmarg@erols.com*

## FEE SCHEDULE

| | |
|---|---|
| Case Evaluation, Preparation of Report, and Discussions | $500 per hour |
| Office Patient Examination | $500 per hour |
| Out of State Patient Examination | $3750.00 |
| Discovery Deposition | $500 per hour |
| Live Trial Appearance or Videotape | $1750 per half day<br>$3750 per whole day<br>plus expenses |
| Deposition Cancellation Fee<br>(for less than 48 hours notice) | $1000 |

# Dr. Harris

# COVER PAGE

FAX TO:  ANTHONY G. NEWMAN, Esq.

FAX #        (301) 907-2975

RE:          Fees

DATE:        January 8, 2008

FROM:        A. Basil Harris, MD

FAX #:       (360) 387-1286

PAGES:       1 (cover Page)

Comments: Fees: $300.00/hr. for reviews; $500.00/hr. for depositions, plus travel; $10,000.00/day for a trial plus expenses for travel and lodging.

*a. Basil Harris, M.D*