MELVIN VAN WOERT, M.D.

752 Ridgewood Road

Millburn, N.J. 07041

October 12, 2007

Anthony G. Newman

7315 Wisconsin Avenue

Besthesda, Maryland 20814

    RE: Felice I. Iacangelo, et al v. Georgetown University Hospital et al

Dear Mr. Newman:

    I have reviewed the medical records of Karyn Kerris, the Declaration of Vance E. Watson, M.D., the deposition of Vance E. Watson, M.D., the consent forms for surgery, the Georgetown University Hospital medical records of Karyn Kerris, the Georgetown's Institutional Review Board Policies and Procedures Manuel, the package insert for Histoacryl, the FDA Trade Alert #89-08, the FDA documents: Prohibited Acts and Penalties, Investigational Device Exemptions Manuel, IRB information sheets, 21 USC 360(g)(2), the letter to Yocan Medical Systems, the reprints: Am. J. Neuroradiol. 23, 748, 2002 and Current Opinions in Neurology 19, 63, 2006.

    Histoacryl and Lipiodol were Class III devices that did not have approval for any medical use in the United States. The FDA defines Class III devices as those which could have major health effects and serious risks to the health, safety and welfare of the patient. The use of Histocryl and Lipiodol as an endovascular embolic agent makes this a Class III device with major risks and limited evidence of efficacy. The FDA considers all unapproved Class III devices as investigational and experimental and requires a PMA(premarket approval) or IDE(investigational device exemption) and IRB(Institutional review board) approval. Just because Dr. Watson stated that he was using Histoacryl and Lipiodol only for "treatment" and not research, this did not exempt him from FDA regulations. This procedure was being used in a potentially life threatening medical condition, had significant health risks and unproven safety and efficacy issues; therefore this Class III device which was not FDA approved, could only be considered experimental and required an IDE, IRB approval and an approved detailed informed consent. Therefore, it was a violation of the national standard of care for Dr. Watson to treat patients with Histoacryl and Lipiodol without an IDE, IRB approval and an approved detailed informed consent. The national standard of care also requires a physician to be aware of FDA regulations applicable to drugs and medical devices

    It is my opinion, with a reasonable degree of medical certainty, that Dr. Watson's department and Georgetown University Hospital should have prevented him from his illegal use of Histoacryl and Lipiodoll until he obtained an IDE and IRB approval. To a reasonable degree of medical certainty, if this appropriate and responsible action had taken place, Karyn Kerris would not have been treated with illegal, unapproved and unsupervised experimental devices and procedures, and the disabling consequences of these procedures would not have occurred. In my opinion, based on my training and

(1)

experience, including my responsibilities as a clinical investigator and a consultant to the FDA, that to a reasonable degree of medical certainty, the use of Histoaryl and Lipiodol for Karyn Kerris was a violation of the standard of care, Federal Law and Georgetown's IRB policies and procedures. The use by Dr. Watson of Histoacryl cannot be considered an off-label use, since it was not approved in the United States for any medical indication and the device was changed(mixed with Lipiodol).

It is my opinion, to a reasonable degree of medical certainty, that the use by Dr. Watson and Georgetown University Hospital of the unapproved devices (Histoacryl and Lipiodol) does not fall under the exemption of 21 USC 360(g)(2). That section only exempts practitioners use of devices that they are "licensed by law to ...administer". No practitioner is "licensed by law to...administer" unapproved devices.

If Dr. Watson had applied for an IDE and IRB approval, the entire procedure would have been reviewed and probably modified and improved to reduce risk. The safety and efficacy of Histoacryl and Lipiodol in the treatment of AVM(cerebral arteriovenous malformation) had not been established. Oversight and independent evaluation was necessary and essential to maximize safety and efficacy.

Histoacryl was obtained from the company B.Braun in Germany. It was manufactured and marketed for use as a skin adhesive only. Histoacryl was not approved by an FDA equivalent in Germany for use as an endovascular embolic agent. There is no evidence that such a use was considered in its manufacturing, and its label indicated that it was for use only on the skin. In fact, the package insert generated by its manufacturer stated: "Histoacryl must not be used for closing wounds to internal organs or on the surface of the brain...administration to the intima and media of blood vessels should also be avoided on account of the risk of thrombosis and damage to the vascular wall". In my opinion, to a reasonable degree of medical certainty, this warning should have prohibited the use of Histoacrl as an endovascular emboli agent, unless there was further testing, investigation and protocols required for an IDE and IRB approval. The FDA had not inspected B.Braun's manufacturing facility to determine good manufacturing practices. Relevant animal studies and quality control should have been considered and carried out prior to clinical trials of Histoacryl as an endovascular embolic agent. No doubt an approvable IDE would have required chemical analysis of B.Braun's Histoacryl and other appropriate studies to determine the safety of the device and determine any needed modifications of the product.

It is my opinion, to a reasonable degree of medical certainty, that there were a number of technical considerations, such as most appropriate mixing of Histoacryl and Lipiodol, stability of mixture, optimal polymerization time, avoidance of occlusion of normal arterial branches, endovascular catheter adhesion, unwanted vascular damage, appropriate inclusion and exclusion criteria for selection of patients etc., that needed to be reviewed by the FDA and IRB. FDA and IRB reviews of a protocol (including these technical considerations) and progress reports could have resulted in modifications that improved the safety and efficacy of Histoacryl and Lipiodol use as an endovascular embolic agent. This breach of the national standard of care increased the risk of this treatment and to a reasonable degree of medical certainty, contributed to the disabling complications which followed the endovascular injection of Histoacryl and Lipiodol into Karyn Kerris' AVM. FDA and IRB approved exclusion criteria would probably have eliminated Karen Kerris as a candidate for this therapy, because of her complicated and large AVM(Spetzler-Martin grade 5).

An approved IDE is necessary for the legal shipment of a Class III device for clinical investigation. Dr. Watson was obtaining Histoacryl indirectly from B.Braun and directly from Yocan Medical Systems in Canada. The FDA had an Import Alert requiring automatic detention of Histoacryl Tissue Adhesive because it was a medical device which had no approved PMA or IDE. Dr. Watson

knowingly participated in the illegal importation of a Class III medical device. Dr Watson's phone conversations with United States custom agents and communications with Yocan Medical Systems indicate that he was aware the FDA was seizing shipments of Histoacryl because its medical use in the USA was illegal without an IDE or PMA. This should have been further evidence to Dr. Watson that the national standard of care required an IDE, IRB approval and a detailed informed consent.

The informed consent obtained from Karyn Kerris was totally inadequate for a Class III experimental device whose safety and efficacy had not been established. The description of the procedure was limited to "cerebral angiogram and embolization". The national standard of care required that the consent form be specific for the use of Histoacryl and Lipiodol and indicate that it was experimental and not FDA approved. The consent should have mentioned that the device was obtained from Canada and was the subject of a FDA Trade Alert. The consent form should have included a statement that the procedure was voluntary and refusal does not affect alternate therapy (eg. surgery, radiation, polyvinyl alcohol etc.) all of which should have been described, in writing, to the patient. In addition, a statement about what could go wrong (eg. catheter placement error) and consequences (eg. neurological complications), and irreversibility of potential adverse events should have been included, in writing, in the informed consent. The patient should have been informed that consent can be withdrawn at any time and still receive medical care. All of the above components should have been in writing and approved by an IRB.

The Georgetown's Institutional Review Board Policies and Procedures Manuel ch12 describes the components of an approved informed consent form for this procedure:

a) Research Statement: 1) a statement that the use of the device involves research. 2) an explanation of the purpose of the research including its long term goal. 3) an explanation of the expected duration of subject's participation. 4) a description of what procedures will be followed. 5) Identification of any procedures that are experimental.
b) Reasonable foreseeable risk or discomforts associated with the use of the device.
c) Reasonably expected benefits to subjects or others.
d) Appropriate alternatives.
e) Extent of confidentially
f) Compensation or treatment for injury
g) Contact information
h) Voluntary participation statement

The informed consents obtained from Karyn Kerris were a violation of the national standard of care. Alone, verbal communications, without the above written information, was inadequate and did not meet the standard of care for these procedures.

In my opinion, to a reasonable degree of medical certainty, Dr. Watson's statement that the embolization likelihood of success was 95% was incorrect and misleading, particularly in view of Karyn Kerris' complicated and large AVM (Spetzler-Martin grade 5). In my opinion, to a reasonable degree of medical certainty, these violations of the national standard of care involving the informed consent resulted in Karyn Kerris agreeing to a procedure, without knowing all of the major risks involved and other safer alternate treatments.

In 1996, Cordis was conducting clinical trials with Trufill, a similar endovascular embolic agent. This device was improved based on detailed experimentation and quality controlled manufacturing. There was an IDE, and Trufill had FDA inspected manufacturing and labeling. In order to

(3)

protect his patients and provide improved and safer medical care, Dr. Watson could and should have contacted Cordis and attempted to get Trufill for his patients.

If Dr. Watson did not want to apply for an IDE, he could have referred his patients to other physicians (eg. at Duke or UCLA) who had an IDE an IRB approval for use of Histoacryl in AVMs.

In summary, Georgetown University Hospital had a duty to protect its patients; therefore it should not have allowed Dr. Watson to inject Histoacryl and Lipiodol into any patient, including Karyn Kerris. In my opinion, to a reasonable degree of medical certainty, Dr. Watson and Georgetown University Hospital illegally used the combination of two unapproved Class III devices in violation of Georgetown's own Institutional Review Board Policies as well as FDA regulations. In my opinion, to a reasonable degree of medical certainty, if proper procedures had been followed Karyn Kerris would not have received this treatment and her resultant disabling complications would not have occurred.

From 1978 to present, I have been a Professor in the Department of Neurology and Pharmacology at Mount Sinai School of Medicine. I am an internist practicing at Mount Sinai Medical Center. I have been a principal investigator on drug studies with industry and from my own facilities all of which have been reviewed by IRBs. In my long history of investigational clinical research I have received several INDs (Investigational new drug) approvals from the FDA. I have been a Consultant for Neuropharmacological Drug Products for the Food and Drug Administration and have been a member of the Pharmacy and Therapeutics Committee of Mount Sinai Hospital and the Public Affairs Committee of the American Society for Pharmacology and Experimental Therapeutics.

I have testified at the following depositions in the past 4 years:

10/10/03  Moxley v. Dist of Columbia et al.

9/15/05  Alica Golden et al v. Safeway, Inc.

7/14/04  Randall Black vs Alpharma Pharmaceutical and Purepac Pharmaceutical Co.

Sincerely,

Melvin Van Woert, M.D.

(4)