**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

*Civil Division*

| | | |
|---|---|---|
| Felice I. Iacangelo and Cicily Iacangelo, | : | |
| As Guardian of the Person and Property of | : | |
| KARYN A. KERRIS, | : | |
| | : | **Civil No. 1:05CV02086** |
| Plaintiffs, | : | |
| | : | **Judge Paul L. Friedman** |
| vs. | : | |
| | : | **Magistrate Judge Alan Kay** |
| GEORGETOWN UNIV. HOSPITAL, *et al.* | : | |
| | : | |
| Defendants. | : | |

_____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
JUDGMENT ON THE PLEADINGS/MOTION TO DISMISS PLAINTIFFS'
NEGLIGENCE *PER SE* CLAIMS BASED ON VIOLATIONS OF
<u>FEDERAL LAW AND PUNITIVE DAMAGES</u>**

COME NOW, the Plaintiffs, by and through their undersigned counsel, and submit the following Memorandum of Points and Authorities in Support of Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings/Motion to Dismiss Plaintiffs' Negligence *Per Se* Claims Based on Violations of Federal Law and Punitive Damages, and state the following:

**I.    INTRODUCTION**

Defendants want the Court to give them a free pass for illegally importing an unapproved, Class III medical device into the United States for illegal use in Plaintiff Kerris, which ultimately left her catatonic. In furtherance of obtaining that pardon, Defendants throw every possible argument at the wall in the hope that one will stick. For the reasons set forth below, this Court should flatly reject the Defendants' Motion and deny it in its entirety.

## II.     FACTUAL BACKGROUND

Plaintiff Kerris participated in a voluntary study, which included an MRI study of her brain, at the National Institutes of Health, where she worked. The resulting MRI showed evidence of an "AVM." Defendant Dr. Watson then evaluated Plaintiff Kerris to determine whether she could benefit from a non-surgical treatment known as an embolization. Apparently, while Dr. Watson recognized that any embolization attempt would carry with it significant risks, including death, Plaintiffs allege that this information was never conveyed to Plaintiff Kerris. In any event, Plaintiffs further allege that the risks far outweighed any minute benefits. Defendant Dr. Watson planned multiple embolizations for Plaintiff Kerris and performed three, which ultimately resulted in her current catatonic state.

The devices Defendant Dr. Watson chose for Plaintiff Kerris' embolizations were Histoacryl® and Lipiodol®, neither of which had FDA approval for *any* medical treatment in the United States, much less approval for embolizations. Both substances were categorized as "Class III" unapproved devices, due to their safety and efficacy concerns. *See* 21 U.S.C. § 360e(a). Dr. Watson obtained these substances from a Canadian pharmaceutical company[1] despite the substances' illicit nature. In fact, at the time they were being injected into Plaintiff Kerris, the substances Defendant Dr. Watson used were not only adulterated and misbranded,[2] they were also the subject of an FDA Import Alert (IA#89-08), dated August 11, 1992. That Trade Alert mandated that any shipments of Histoacryl® and Lipiodol® be seized by U.S. Customs prior to entering the

---

[1] In reality, the so-called company, Yocan Pharmaceuticals, was being run out of a residence.
[2] *See* 21 U.S.C. § (f)(1)(B)(I); 21 U.S.C. § 352(q).

United States.  Undeterred by the substances' illegality and unavailability, Defendant Dr. Watson procured them from Canada.

Furthermore, not only were Histoacryl® and Lipiodol® unapproved, adulterated, misbranded, and illegal to import, their use as an embolic agent was completely antithetical to the manufacturer's own contraindications, which provide that the substances should not be used in blood vessels or in the brain, *which is precisely how they were used by Defendant Dr. Watson.*  In this respect, Defendant Dr. Watson was negligent not only in procuring illegal substances, but even assuming the substances were legally procured, using them in a negligent manner since they were contraindicated for Plaintiff Kerris.

## III.    LEGAL ANALYSIS

### A.    <u>Standard of Review</u>

The standard of review for a motion for judgment on the pleadings is essentially the same as that for a motion to dismiss. *Jung v. Ass'n of Am. Med. Colls.,* 339 F. Supp.2d 26, 35-36 (D. D.C.2004).  All factual allegations must be presumed true and liberally construed in Plaintiffs' favor. *Shear v. Nat'l Rifle Ass'n of Am.,* 606 F.2d 1251, 1253 (D.C.Cir.1979).

> Because a Rule 12(c) motion would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, the Court must treat Defendants' motion with the greatest of care and deny it if there are allegations in the complaint which, if proved, would provide a basis for recovery. (citations and internal quotes omitted).

*Maniaci v. Georgetown University*, 510 F.Supp. 2d 50, 58 (D. D.C. 2007).

**A.** **Defendants Misconstrue the Theory of Liability – This is Not an Action to Enforce the FDCA. Further, D.C. Law Permits Negligence *Per Se* Actions Based on Statutory and Regulatory Violations. In Addition, Judge Jackson's Unpublished Superior Court Opinion, Upon Which Defendants Base Their Argument, Relies Upon The Lesser Analogous of Two, Fourth Circuit Opinions Regarding Alleged <u>Violations of the FDCA</u>.**

Defendants' first argument relies entirely on *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 353 (2001), where the Supreme Court rejected a "fraud on the FDA" claim. Defendants' here argue, quite disingenuously, that "Plaintiffs' FDCA-based negligence *per se* counts are virtually the same as the claims the Supreme Court deemed preempted in *Buckman* . . .." *See* Defs. Mot. at 7. To the contrary, Plaintiffs' claims are patently not actions to enforce the FDCA. In fact, quite recently, the Eastern District of Pennsylvania made clear that *Buckman* has limited value, stating,

> The Court agrees with Plaintiff that *Buckman* is distinguishable. In *Buckman*, the manufacturer of certain orthopedic bone devices hired a consulting company to help the manufacturer 'navigat[e] the federal regulatory process.' Plaintiffs brought suit not against the manufacturer, but instead alleging the defendant consultant company had defrauded the FDA in obtaining approval for the orthopedic bone screws. **Thus, when the Supreme Court held that the claims were impliedly preempted by the FDCA, it limited this holding to the rational that *policing fraud upon the FDA* is decidedly a federal function**. *Buckman*, 531 U.S. at 347, 121 S.Ct. 1012. Here, there is no 'fraud on the FDA' alleged and there is no comparative authority permitting the FDA to police non-compliance with the warning label regulations by virtue of not affirmatively providing stronger warnings. Further, as evidence of the fact that *Buckman* does not usurp all state tort claims, we note that numerous post-*Buckman* federal cases have rejected the preemption argument for claims based on inadequate warning labels on prescription drugs. *See, e.g., Leisure-Radke,* 2006 WL 901657 at *3, *McNellis*, Civ. No. 05-1286, at 14, *Witczak*, 377 F.Supp.2d at 729, *Zikis*, Civ. No. 04-8104, at 8, *Cartwright*, 369 F. Supp.2d at 887, *In re Paxil*, 2002 WL 31375497, at *1, *Caraker*, 172 F. Supp.2d at 1032-36. Simply stated, *Buckman* is irrelevant to the preemption issues presented in this case.

*Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 538 (E.D. Pa. 2006) (italics in original, bold emphasis added).

Defendants further contend that "the Court made clear that negligence *per se* claims that simply adopt federal statutory requirements as the basis for their claims were not allowed." *See* Defs. Mot. at 7, 8. Defendants go on to quote the Court's statement that *Medtronic* "does not and cannot stand for the proposition that any violation of the FDCA will support a state-law claim." *See id.* (*citing Buckman*, 531 U.S. at 352-53. This rejoinder simply misses the mark.

It is well-established that violations of both statutes and administrative regulations can constitute negligence *per se* and that such statutes and regulations, even when administrative in nature, set forth standards of care. In fact, the Restatement (Second) of Torts makes this crystal clear.

The Restatement of Torts (2d), § 285 states,

> **The standard of conduct of a reasonable man may be** (a) **established by a legislative enactment <u>or administrative regulation</u>** which so provides, or (b) adopted by the court from a legislative enactment or an administrative regulation which does not so provide, or (c) established by judicial decision, or (d) applied to the facts of the case by the trial judge or the jury, if there is no such enactment, regulation, or decision.

(Emphasis added). Further, § 286 states,

> **The court may adopt as the standard of conduct** of a reasonable man the requirements of a legislative enactment or **an administrative regulation** whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one who interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results.

(Emphasis added).

In *Sharp v. Artifex, Limited*, 110 F. Sup. 2d 388 (W.D. Pa. 1999), plaintiff brought a negligence *per se* claim against the manufacturer of a pedicle screw fixation device. The crux of the claim was the violation of FDCA and MDA standards. Like the District

of Columbia, Pennsylvania law provides that "the traditional standard of care, that of a reasonable person under the circumstances, may be prescribed by legislative enactment so that a 'violation of the statute or ordinance may serve as the basis for negligence *per se*.'" *Id.* at 392 (citation omitted). The court then went on to restate the elements cited above in § 286 of the Restatement of Torts.

Like the Defendants here, the *Sharp* defendants argued that there was no private right of action under the FDCA. *Id.* at 392. However, the court recognized that "[a] statute may still be used as the basis for a negligence *per se* claim when it is clear that, despite the absence of a private right of action, the policy of the statute will be furthered by such a claim because its purpose is to protect a particular group of individuals." *Id.* The court went on to deny Artifex, Ltd.'s summary judgment motion, ruling that "the policies of the FDCA and MDA will be furthered by allowing such a claim." *Id.* at 394.

Similarly, in *Valente v. Sofamor, S.N.C.*, 48 F. Supp.2d 862 (E.D. Wisc. 1999), the court ruled, in another pedicle screw case, that the plaintiff's negligence *per se* claim was viable, stating:

> ...the Supreme Court [in *Medtronic v. Lohr*] did not interpret the lack of an express or implied federal cause of action as precluding a state common law cause of action based on violation of the statute, as Judge Shabaz inferred in *Cali*.[3] To the contrary, the Court inferred that Congress intended, by not including an express or implied federal cause of action in the FDCA, to impose liability on FDCA violators state common law claims when such claims parallel federal requirements. (cite omitted). **By definition, a claim for negligence per se based on violation of an FDCA regulation parallels federal requirements**.

(Emphasis added).

The court continued,

> In *Lohr*, the Supreme Court noted that the MDA was enacted 'to provide for the safety and effectiveness of medical devices intended for human use' and that the

---
[3] *Cali v. Danek Medical, Inc.*, 24 F. Supp. 2d 941 (W.D. Wisc. 1998).

> primary issue motivating the MDA's enactment was 'the safety of those who use medical devices.' (cite omitted). **Such clear intent that the statute's primary motivation is to protect the safety of those who use medical devices is sufficient to infer the intent of Congress that the statute be used as a basis for civil liability under state common law.**

(Emphasis added).

In *Allen v. Delchamps, Inc.*, 624 So.2d 1065 (Ala. 1993), the Supreme Court of Alabama denied summary judgment for the defendant in a negligence *per se* action based on FDCA violations. There, the court held:

> Delchamps asserts that summary judgment was proper because, it says, no private right of action exists under the F.D.C.A., 21 U.S.C. § 301 *et seq*. (1988). Delchamps is correct that there is no private cause of action for civil damages under the F.D.C.A. (cite omitted). **However, the plaintiffs in this case are not suing directly under the F.D.C.A. or its accompanying regulations. Rather, they are relying on the regulations to establish a duty or standard of care**. *See Grove Fresh Distributors, Inc. v. Flavor Fresh Foods, Inc.*, 720 F. Supp. 714, 716 (N.D. Il. 1989) ("Although courts have held that there is no private cause of action under the FDCA, Grove Fresh has not brought suit directly under the FDCA or its accompanying regulations. Grove Fresh relies on the FDA regulation merely to establish the standard or duty which defendants allegedly failed to meet. Nothing prohibits Grove Fresh from using the FDCA or its accompanying regulations in that fashion."). *See also Lowe v. General Motors Corp.*, 624 F.2d 1373, 1380 (5th Cir. 1980) (holding that in Alabama violation of the National Traffic and Motor Vehicle Safety Act is evidence of negligence per se).

*Id*. at 1067-68 (emphasis added). Obviously, the above is sound logic, for it was adopted by this Court in its Report and Recommendation of October 11, 2006 and adopted in Judge Friedman's Memorandum Opinion of March 26, 2007, when this Court held that "[t]he District of Columbia has permitted individual Plaintiffs to use statutes to prove a violation of the standard of care in cases where there is no private right of action."

Contrary to Defendants' assertions, D.C. law encompasses the Restatement approach. In fact, the general rule in D.C. is that "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent

the type of accident that occurred . . . unexplained violation of that standard renders the defendant negligence as a matter of law." *Ceco Corp. v. Coleman*, 441 A.2d 940 (D.C. 1982); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 557 (D.C. Cir. 1993) (same).

For example, in *Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268 (D.C. 1987), the D.C. Court of Appeals held that violation of the city's Alcoholic Beverage Control Act rendered a tavern keeper negligent *per se*. In its analysis, the Court cited the Restatement (Second) of Torts § 285 and § 286 with approval and stated that

> [t]he rule that 'violation of an ordinance intended to promote safety is negligence' is rooted in the principle that failure to comply with a statutory requirement designed to protect public safety 'is to fall short of the standard of diligence to which those who live in organized society are under a duty to confirm.'

*Id*. at 1273 (citations omitted). The Court continued,

> **Incorporating into the common law a standard of care set by a legislative enactment is distinct from determining that a cause of action arises, by implication, under a statute**. The latter task is a matter of statutory construction, requiring the court to determine whether the legislature intended something other than that which it provided expressly. Courts appropriately refrain from making such inferences except under certain defined circumstances. **By contrast, the decision to adopt from a penal statute a standard of care to be applied in determining common law negligence is 'purely a judicial one, for the court to make.'**

*Id*. at 1273-74 (emphasis added) (citations omitted).

The Court went on to list numerous instances where D.C. has "recognized that a variety of statutes have a public safety purpose justifying the application of the rule that their violation constitutes negligence." *Id*. at 1274. *See H.R.H. Construction Co. v. Conroy*, 411 F.2d 722, 724 (D.C. Cir. 1969) (construction injury); *Elliott v. Michael James, Inc*., 559 F.2d 759, 764 (D.C. Cir. 1977) (restaurant doors that were locked in violation of building code prevented escape of employee stabbed there).

The foregoing are some, but not all, of the examples cited by the D.C. Court of Appeals in *Zhou*. Moreover, as the Court in *Zhou* points out, D.C.'s standardized civil jury instructions make clear that violations of regulations can give rise to findings of negligence. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 5-8 (1981) ("If you find that a regulation ... intended to protect the public has been violated and thereby caused injuries which the regulation ... intended to avoid, you must find negligence....").

Casting the foregoing authorities aside, the Defendants here ask the Court to buy into the Superior Court's unpublished, non-binding disposition in *Morton v. The George Washington University*, which they attached to their Motion and represent to be the controlling law. There, Judge Jackson discussed the authorities cited above and ultimately rejected the negligence *per se* claim solely on the basis of his finding that "the statute and regulations relied upon by Plaintiffs are administrative in nature and do not set forth a standard of conduct, the breach of which would constitute negligence *per se*." *See* Slip. Op. at 9. He then goes on to cite *Talley v. Danek Medical, Inc.*, 179 F.3d 154 (4th Cir. 1999), where the Fourth Circuit differentiated between the purely administrative requirement that a given device be approved by the FDA versus a specific substantive requirement that it be safe and effective. *Talley* held that a breach of this type of purely administrative requirement is "analogous to the failure to have a driver's license."

The Fourth Circuit's analysis in *Talley* is actually instructive here, notwithstanding the quotation of a small portion of it in the *Morton* opinion. In *Talley*, the Fourth Circuit distinguished between the types of claims where a substantive standard

would be found versus those that are truly predicated upon merely administrative

violations that bear no relationship to protecting the public.  The Court stated:

> At the time of Talley's surgery, pedicle screw fixation devices were classified by the FDA as Class III devices, meaning that they could not be sold without FDA approval, and, the parties agree, the Dyna-Lok Device was not then approved for use in the pedicles of the spine. **The parties also agree, however, that the Dyna-Lok Device was considered a Class II device for another medical purpose and therefore could lawfully be sold.** Talley contends that while purportedly selling the Dyna-Lok Device for its Class II purpose, Danek was in fact marketing the device for the unapproved Class III purpose of use in the pedicles of the spine, an allegation that Danek denies. **Talley further contends that this action-marketing an approved device for an unapproved use-constitutes a violation of the FDCA that supports a negligence per se claim**. Even assuming, however, that there is a genuine dispute of fact over whether Danek was marketing the device for use in the pedicles of the spine in violation of the FDCA, Talley's claim fails. **She has not demonstrated either that marketing the device without FDA approval violated a standard of care or that the absence of FDA approval had any causal relationship to her injury**.
>
> Talley relies on our decision in *Orthopedic Equipment Co. v. Eutsler,* 276 F.2d 455 (4th Cir.1960), to advance her claim that *any* violation of the FDCA constitutes negligence per se in Virginia. **In that case we held that the misbranding of a bone nail, by wrongfully imprinting a dimension on the nail indicating that it would fit into a 9mm hole, violated a standard of care that would support a negligence per se claim under Virginia law**. In that case, the plaintiff had undergone surgery in which the bone nail was to be inserted into the plaintiff's femur (thigh bone). When the surgeon sought to insert the nail into a 9mm hole, it would not fit properly because the misbranded nail was too large. The attempted insertion caused the plaintiff to lose the use of his leg. **We held that the statutory requirement to label a surgical nail with the correct size on it established a standard of care because the mislabeling created an unreasonable risk for patients**. *Id.* at 461. **The alleged violation in *Eutsler,* however, is distinguishable from the alleged violation in Talley's case**.
>
> **Breach of the requirement not to misbrand a surgical nail is similar to a breach of a speed limit; each violates a specific and substantive standard of care that is intended to protect others**. The holding in *Eutsler,* however, does not establish the principle that the simple failure to obtain *approval* of a device from the FDA, standing alone, can support a negligence per se claim. The administrative requirement that a given device be approved by the FDA before being marketed-as opposed to a specific substantive requirement that a device be safe and effective-is only a tool to facilitate administration of the underlying regulatory scheme. Because it lacks any independent substantive content, it does not impose a standard of care, the breach of which could form the

basis of a negligence per se claim. Its breach is analogous to the failure to have a drivers license.

*Talley*, 179 F.3d at 160 -161 (emphasis added).

It is plain that the facts here are far more analogous to the *Eutsler* facts, where the Fourth Circuit permitted a negligence *per se* claim based on an FDCA violation, than the *Talley* facts and rationale that Judge Jackson relied upon in *Morton*. Accordingly, this Court certainly need not, and should not, accept Judge Jackson's analysis as persuasive.

This Court need only make a cursory review of Plaintiffs' claims to conclude that they are far more akin to those brought in *Eutsler*. Here, Plaintiffs content that

a) Georgetown and Dr. Watson violated the national standard of care by **receiving** unapproved, untested, illegal Class III devices;

b) Georgetown and Dr. Watson violated the national standard of care by **injecting** an unapproved, untested, illegal Class III device, which had no valid approval or indication in the United States;

c) Georgetown and Dr. Watson violated the national standard of care by **adulterating** (mixing) one unapproved, untested, illegal Class III devices, with another unapproved, untested, illegal Class III device, which was also embodied in 21 USC §331(b) (adulteration of a device prohibited); and

d) Georgetown and Dr. Watson, violated the national standard of care by **introducing** an unapproved, untested, illegal Class III device into the United States and **using it in patients**, which is embodied in 21 USC §331(a) (introduction of unapproved or misbranded devices prohibited).

As stated above, in *Eutsler*, *supra,* the Fourth Circuit held that the statutory requirement to label a surgical nail with the correct size on it established a standard of care because the mislabeling created an unreasonable risk for patients. Here, the statutory bar on receiving, injecting, adulterating, and introducing unapproved, Class III devices, establishes a standard of care. This is not a case, moreover, where Plaintiffs claims rest solely on a lack of FDA approval. In other words, Plaintiffs do not rest on allegations that Defendant Dr. Watson merely lacked a driver's license; rather, he not only failed to obtain the license *but also* drove recklessly and negligently by injecting a

substance into Plaintiff Kerris that, even per the manufacturer's own specifications, could not be safely used in her. For this reason, this Court should find unpersuasive Judge Jackson's reliance on *Talley* in his *Morton* opinion.

Apparently, the defense has decided to file this renewed motion in lieu of filing a motion *in limine* as they suggested on the same subject. As such, this should be their last opportunity. *See* Report and Recommendation at p.22 (During the September 8, 2006 hearing, counsel for Defendants here suggested that the statutory violation claims may be more appropriate for resolution through motions *in limine*.)

> **B.    Defendants' Informed Consent Argument Ignores the Facts of this Case, Erroneously Lumps it Together with Typical Medical Malpractice Actions, and Highlights Defense Counsels' Own Incurable Conflict of Interest in Representing Both Dr. Watson and <u>Georgetown</u>.**

Defendants seek dismissal of Plaintiffs' informed consent claims with respect to Defendant Georgetown, contending that only a physician owes a duty to inform the patient. *See* Defs. Mot. at 26. Though this is the general rule in the typical medical malpractice action, this case is not the typical medical malpractice action.[4] The distinction between the typical case and a case such as Plaintiff Kerris' was effectively explained in *Lenahan v. University of Chicago*, 348 Ill.App.3d 155, 160, 808 N.E.2d

---

[4] Even if it was, in *Ritz v. Jackson*, 176 F.R.D. 412 (D. D.C. 1997), for example, this Court (Friedman, J.) granted summary judgment for defendants on such a claim but *not because an informed consent claim could not be brought against a hospital*. There, plaintiff made an informed consent claim against defendant Greater Southeast Community Hospital. The Court found that there was insufficient evidence in the record to generate a dispute of fact regarding such claim. In doing so, however, the Court stated,

> [Plaintiff] did not concede in her deposition testimony the basis for her **separate claim that the Hospital had a duty to inform her** of the experimental nature of the pedicle screws, **a matter that undoubtedly will be addressed by competing expert testimony at trial**.

*Id.* at 415 (emphasis added). Implicit in that statement is the viability of such a claim.

1078, 1083-1084, 283 Ill.Dec. 790, 795 - 796 (Ill.App. 1 Dist. 2004), and the cases cited

in its analysis.  The relevant portions of the holding are:

> **Here, plaintiff has adequately pleaded that the University <u>and Hospital</u> owed the decedent the <u>duty to provide him with a consent form</u> complying with FDA and DHHS regulations, that the University <u>and Hospital</u> breached their duty, and that the breach of duty proximately caused his injuries**.

> This case is similar to *Kus v. Sherman Hospital,* 268 Ill.App.3d 771, 206 Ill.Dec. 161, 644 N.E.2d 1214 (1995). In *Kus,* a patient who was implanted with experimental intraocular lenses brought suit against Sherman Hospital and a physician for failure to obtain informed consent. *Kus,* 268 Ill.App.3d at 773, 206 Ill.Dec. 161, 644 N.E.2d 1214. The patient alleged that the consent form that he signed had been modified from the FDA-approved form and did not inform the patient that the lens was experimental and being evaluated for safety and effectiveness. *Kus,* 268 Ill.App.3d at 774-75, 206 Ill.Dec. 161, 644 N.E.2d 1214.

> <u>**The appellate court noted the general rule that physicians, *not hospitals*, have the duty to obtain informed consent from their patients**</u>. *Kus,* 268 Ill.App.3d at 780, 206 Ill.Dec. 161, 644 N.E.2d 1214, citing *Pickle v. Curns,* 106 Ill.App.3d 734, 738, 62 Ill.Dec. 79, 435 N.E.2d 877 (1982), and *Winters v. Podzamsky,* 252 Ill.App.3d 821, 825, 190 Ill.Dec. 203, 621 N.E.2d 72 (1993). The rationale for this rule is that the physician has the knowledge and training necessary to advise each patient of the risks, whereas the hospital does not know the patient's medical history or the details of the particular surgery to be performed. *Kus,* 268 Ill.App.3d at 780, 206 Ill.Dec. 161, 644 N.E.2d 1214. <u>**However, the court further noted that intraocular lens implants *were subject to specific FDA regulations regarding informed consent*, and that pursuant thereto Sherman Hospital had established an Institutional Review Board (IRB) to assure that a legally effective informed consent was obtained**</u>. *Kus,* 268 Ill.App.3d at 773-76, 206 Ill.Dec. 161, 644 N.E.2d 1214. The court held that **"[w]hile we agree that generally a hospital is not in the best position to inform a patient of risks, here it is clear that Sherman Hospital undertook the responsibility to inform the plaintiff of the experimental nature of his surgery**." *Kus,* 268 Ill.App.3d at 780, 206 Ill.Dec. 161, 644 N.E.2d 1214. <u>**The court further held that under these "particular facts," *a hospital as well as a physician may be held liable for claims arising from the lack of informed consent***</u>. *Kus,* 268 Ill.App.3d at 780-81, 206 Ill.Dec. 161, 644 N.E.2d 1214.

> Similarly, the FDA regulated Protocol 8558, and the Hospital and University adopted policies and established an IRB to ensure that the consent forms complied with the applicable FDA and DHHS regulations. **Under these facts, the Hospital and University may be held liable for claims arising from lack of informed consent**.

*Id.* (Emphasis added).  Similarly, in this case, Defendant Georgetown had a duty to inform Plaintiff Kerris of the risks associated with using unapproved, adulterated devices in the form of IRB review, which it failed to complete.

Our facts regarding the consent form are also quite unique.  On the document dated 11/4/98, it is printed that, "_____has described the nature of this procedure…" the blank contained the name, "Vance Watson," and while illegible, it was witnessed by some hospital employee. On a subsequent consent form dated 1/13/99, the blank contained the names "Watson and Nicrolic (sp)", witnessed by an O'Brian, R.N. (sp?) another hospital employee.  Finally, on 3/3/99, the blank contained the name, "Paul Goldberg," witnessed by yet another illegible hospital employee.  With all these individuals involved with the consent process the hospital still wishes to divest itself of responsibility for the words of not only Defendant Dr. Watson, but other unknown hospital employees as well.

As such, this is not a case where the hospital simply provided a room for a procedure and had no involvement with the choice of procedure and no independent acts that cause injury to a patient.  *See* Defs. Mot. at 27.  Rather, this is a case where the defendant hospital facilitated the obtaining of illegal, unapproved, untested, Class III devices for use on its patients.  Though this Court is limited to evaluating the sufficiency of the pleadings, the undisputed evidence in this case, both through deposition testimony and the notes of Defendant Georgetown's counsel, Sheila Zimmet, Esq., indicate that they knew, as of  9/21/98, less than two months before Plaintiff Kerris was embolized, that: a) Histoacryl was "never approved in US;" b) Histoacryl had been "impounded" by the FDA; c) the 'FDA [was] not letting some shipments [of Histoacryl] through," d) there

were "bad batches [of Histoacryl ]due to delays in shipment," e) Histoacryl "polymerizes

quickly," f) the one time U.S. manufacturer of Histoacryl, "quit making [it] after at least a

few trials," g) the new manufacturer of Histoacryl was "not interested in trials in the US,"

and h) Histoacryl required both a bogus "prescription" and "letter of need" to get it

through U.S. customs.

Even with all of the above: lack of IRB review, failure to generate an IRB

approved consent form, employees (other than Defendant Dr. Watson) being involved in

discussions regarding the informed consent, counsel knowledge involvement in obtaining

illegal devices, Defendant Georgetown still wants to hide behind the curtain of an

everyday hospital and its usual immunity to suits regarding informed consent.  Given its

involvement, it can not avail itself of such a privilege.

In any event and without any room for equivocation, Williams & Connolly, LLP

has created a major conflict between its representation of Defendant Dr. Watson and

Defendant Georgetown by the present argument.  Defendants' Memorandum states:

> Our case law on lack of informed consent recognizes the **"duty of a physician to
> inform the patient**…"*Miller-McGee*, 920 A.2d 439 (emphasis added).  It is not
> the hospital's duty, but the doctor's…
>
> *       *       *
>
> Defendants do not challenge the indirect liability that Plaintiffs may or may not be
> able to prove regarding lack of informed consent and breach of fiduciary duty;
> however, Plaintiffs seek to levy direct liability on Defendant Georgetown by
> holding it singularly responsible for failing to obtain informed consent.

*See* Defs. Mot. at 26.  Though this issue of conflict of representation of both Defendant

Dr. Watson and Defendant Georgetown based on the actions and inactions of Sheila

Zimmet, Esq., *vis a vis* Dr.Watson, is presently being grappled with by special counsel

for Dr. Watson, the Defendants' Motion has made the conflict irrefutable.  Clearly, there

15

is an absolute conflict, for as the Defendants' Motion states, "[i]**t is not the hospital's duty, but the doctor's**." *See* Defs. Mot. at 26 (emphasis added).

How can counsel purport to represent the interests of both Defendant Dr. Watson and Defendant Georgetown by such an argument? The argument is one-sided and if adopted by the Court, which it should not be, would leave Defendant Dr. Watson out on his own, for he would be the only defendant potentially liable for claims of lack of informed consent and/or breach of fiduciary duty.

**C.     Defendants Failed to Set Forth Any Basis to Strike the Paragraphs At Issue in Their Motion.**

Finally, Plaintiffs will address the almost "invisible" motion to strike numerous paragraphs in the Proposed Amended Complaint, namely paragraphs 4, 10(c-d), (f), (h-l), 13-21, 24, 27-32, 36-39.   Paragraph 10's subparagraphs c-d, f, h-l, and paragraph 39, represent the Defendants' third attempt to have the Court strike those sections.[5]   The only obtuse "basis" for striking all of these paragraphs offered by the defense is that they contain language that, in defense's opinion, relates to either the claim of negligence *per se*,  or "allegations regarding regulatory status" or "failure to inform Mrs. Kerris of the … regulatory status" of a device.  *See* Defs. Mot. at 28.  While Plaintiffs take issue with Defendants' logic that these sections must be eliminated, Plaintiffs will state globally that even if the Court were to be persuaded to dismiss the claims of negligence *per se* and a portion of the informed consent claim, which it should not be, there is no basis to strike sections of the language of these unrelated counts.  The paragraphs that have been previously adjudicated will be addressed first.

---

[5] The attempt to strike paragraphs 13-21 are not discussed herein for they involve issues addressed above in the lack of informed consent section.

On two separate occasions the Defendants have been unsuccessful in striking paragraphs 11's subparagraph c-d, f, h-l, and paragraph 61 of the Amended Complaint (now re-numbered into paragraph 10 with subparagraphs c-d, f, h-l, and paragraph 39, of the Proposed Amended Complaint). After a hearing and full briefing, this Court recommended that the motion to strike these sections be denied (Report and Recommendations 10/11/2006 p. 26-27), and after considering objections, Judge Freidman adopted the recommendations (Memorandum Opinion 3/26/2007 p. 8-9).

In any event the relevant portions of Paragraph 10 read as follows:

c.  negligent decision to perform embolizations utilizing a Class III, medical device that had not  been approved and was thus illegal;

d. negligent performance of embolizations without obtaining an investigational device exemption (IDE), without any other exemption or waiver from the Federal Government or its agencies and without providing notice to said entities of their intent to use such a device;

    *      *      *

f. negligent technique in compounding a new device using two unapproved illegal Class III devices employed in the performance of the multiple embolizations;

    *      *      *

h. negligent failure by Defendant Vance Watson, M.D., to submit his use of an "investigational" Class III device to Defendants Georgetown University's research body governing human experimentation and/or Institutional Review Board (IRB) prior to its usage;

i. negligent supervision and/or monitoring by Defendant Georgetown University of the ordering, invoicing and use of illegal Class III devices by their employees, agents and/or servants, including Vance E. Watson, M.D., on patients within Georgetown University Hospital;

j. negligent failure by Vance E. Watson, M.D. to follow Georgetown University's human experimentation and/or IRB rules and regulations;

k. negligent failure to disclose patients in general, and Karyn A. Kerris in particular, that Defendants intended on using a device that had been the subject of a trade alert and had been seized by the FDA prior to its use on Karyn A. Kerris;

l. negligent failure to record the embolizations of Karyn A. Kerris by video tape or otherwise, since it was an experiment

using human subjects with an unapproved and illegal Class III
device;

Without a doubt, paragraph 10's subparagraphs c-d, f, and h-l, set forth viable allegations in this case. They do not relate to a claim of negligence *per se.* While the language contains references to illegal Class III device, failure to obtain an IDE, failure to submit the investigational Class III to an IRB, and seizures of the devices, that is no reason to strike the allegations. These concepts would remain in the simple negligence case regardless of any ruling, and as such must be averred in the Amended Complaint.

Paragraph 39 reads:

39. Defendant Georgetown University acting by and through its actual and/or apparent agents, servants and/or employees breached their fiduciary duty to Karyn A. Kerris in that Defendants, inter alia, intentionally, recklessly and/or negligently failed to provide proper custodial care, treatment and supervision to her to, inter alia, insure that only medical devices which were approved, or for which an exemption had been provided and used by authorized personnel had been utilized and that any and all use of cyanoacrylate was done in a completely ethical, and procedurally and legally appropriate manner.

The above simply states that Defendant Georgetown had a duty to see that the medical care given to Plaintiff Kerris "was done in a completely ethical and procedurally and legally appropriate manner," and by using unapproved devices it acted "intentionally, recklessly and/or negligently." Again it may mention concepts that aggravate the defense but these issues will be presented to the jury.

As for Paragraph 4, the first paragraph not previously evaluated by the Court, reads:

4. At all relevant times herein, Georgetown University Hospital was a duly licensed and accredited health care facility, which held itself out to the public as an institution providing legally and ethically approved treatments to its patients, and was competent to provide legally and ethically approved health care services within the District of Columbia.

Does the defense really deny that "Georgetown University Hospital was a duly licensed and accredited healthcare facility…[that] provided legally and ethically approved treatments?"  If so, Plaintiffs would agree to amend the paragraph to read that Defendant Georgetown provided neither legal nor ethically approved treatments to its patients.  However, until such an agreement is reached, or until a cogent argument can be made to strike this averment, this paragraph must also stand. [6]

Paragraph 24 reads:

24. Karyn A. Kerris would not have consented or agreed that the illegal medical devices could be injected into her body if there was no warranty made by Defendant Vance E. Watson, M.D.

This is a critical element of Plaintiffs' claim of Lack of Informed Consent; it cannot be and must not be removed.  Moreover, it relates to no other issue in the case.

Paragraphs 27 -32, read:

27. Defendants' defrauded Karyn A. Kerris by deliberately withholding or falsely representing information regarding the embolizations and the devices used therein, including:
  a. Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University, did not advise Karyn A. Kerris that the devices were illegal because they had not obtained approval from the FDA to use the experimental devices, Histocryl and Lipiodol or provide the FDA with notice of its use;
  b. Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University, did not advise Karyn A. Kerris, that they did not seek and/or obtain an IDE for use of these experimental devices, which would have been the only legal exemption to use the devices;
  c. Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University, did not reveal to Karyn A. Kerris the illegal status of Histocryl and/or Lipiodol;
  d. Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University, did not reveal to Karyn A. Kerris that an untested illegal product would be injected into the vessels of her brain;

---

[6] It is important to note that counsel for Defendants created another conflict between Georgetown and Dr. Watson by attempting to strike paragraph 4, regarding Georgetown's duty to patients, but not attempting to strike paragraph 5 regarding Dr. Watson's duty to patients.

e. Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University, did not reveal to Karyn A. Kerris that a he would be creating a new device, by combining Histoacryl with Lipiodol at the bedside, which he would then inject into her brain.

f. Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University, did not reveal to Karyn A. Kerris that the embolizations were not cure her AVM, instead, Defendant Vance E. Watson fraudulently revealed that the chances of cure were 95%.

28. Defendant Vance E. Watson M.D. withheld or falsely represented the aforesaid on November 4, 1998, January 13, 1999 and March 3, 1999.

29. These withholdings or false representations were made by Defendant Vance E. Watson, M.D. for the purpose of defrauding Karyn A. Kerris and inducing her to consent to the embolizations.

30. Defendants knew or should have known that Karyn A. Kerris would rely upon said representations and/or omissions and that said representations and/or omissions were material to a knowing and intelligent decision.

31. Based on the special relationship which exists between Karyn A. Kerris and each Defendant, Defendants had a duty to disclose the information concealed from Karyn A. Kerris.

32. Defendants' fraud in withholding or falsely representing, inter alia: the truth about the legal status of the components and the combination of components of the device Defendants intended to manufacture and insert into Karyn A. Kerris; induced Ms. Kerris' consent and allowed the embolizations to occur.

These paragraphs make up the bulk, but not the entirety of Count IV, the Fraud

Count. Here the defense uses an interesting ploy. Defendants' attempts to have the fraud

count all but dismissed without raising a single argument meriting such a rash action (in

the same manner Defendants attempt to eviscerate Count V, Breach of Fiduciary

Obligations, below). Recognizing that a direct assault on the count would be futile, given

the facts, Defendants attempt to bootstrap the language of this count to the language of

the negligence *per se* and informed consent counts. The Defendants then ask the Court to

strike the language in the fraud count simply because it has similar language as the other

counts. Defendants' efforts to have all the phrases it does not appreciate removed from

this case are futile. This case involves, *inter alia*, illegal devices, failure to ask for FDA

permission, fraudulent concealment of legality and safety of the devices to Plaintiff

Kerris, adulterating devices, as well as fabrication as to the success rate of the procedure.

These issues will be, and must be addressed in the fraud count.

Finally, Paragraphs 36-38 read:

36. At all relevant times herein, Defendant Vance E. Watson, M.D., owed a fiduciary duty to Karyn A. Kerris to, inter alia, use only approved medical devices and/or be authorized to use unapproved devices.

37. Vance E. Watson, M.D. and Georgetown University, breached their fiduciary duty of loyalty and care to Karyn A. Kerris and the duty to, at all times, act in good faith and in the best interests of the Plaintiff, abide by the Hippocratic oath of loyalty, care and to do no harm to her.

38. Defendant, Vance E. Watson, M.D., owed fiduciary duty to each individually, jointly and severally to, inter alia, utilize only medical devices that were approved and/or which were legally authorized to utilize and/or which had a reasonable chance for success versus its risk. Defendant, Georgetown University breached their fiduciary duty of loyalty and care and to act in good faith and in the best interests of the Karyn A. Kerris by, inter alia:

a) Failing to disclose the risks associated with each embolization.

b) Failing to disclose that the medical device utilized would include the use of cyanoacrylate, and that was a device which the manufacturer specifically warned against using

internally and specifically, in the area of the brain.

c) Failing to disclose that the cyanoacrylate and its diluent were Class III medical devices which required a physician to have sought and obtained an exemption prior to employing

its use.

d) Failing to reveal Defendant Vance E. Watson, M.D.'s failure rates utilizing cyanoacrylates when he had previously attempted embolization with this medical device.

e) Failing to disclose that Histoacryl and Lipiodol were not approved medical devices.

f) Failing to disclose the Defendant Vance E. Watson, M.D., intended to manufacture a totally new, previously untested medical device and insert it into Karyn A. Kerris.

g) Failing to disclose that the medical device Defendant Vance E. Watson, M.D., manufactured could not be duplicated and efficacy tested accuracy.

h) Failing to fulfill its responsibility pursuant to 21CFR Sections 50 & 56 to establish an IRB and/or implement appropriate procedures to protect subjects in experimentation.

i) Failing to disclose the high risk and low benefit of the proposed embolizations.

As with the above, this covers the bulk of Count V, Breach of Fiduciary Obligation.

Again, Defendants attempt to bootstrap Count V with other counts.  This attempt must

fail for Count V, like Count IV stands regardless of any ruling on any other counts in Plaintiffs' Amended Complaint.

      **D.**        **Defendants' Argument Regarding Punitive Damages Should Be Moot.**

      Finally, Defendants complain about Plaintiffs' punitive damages count.  Though there is language from this Court that suggests such a count would not impair Plaintiffs' ability to recover such damages,[7] since this portion of the Motion merely requests a change in the form of Plaintiffs' Amended Complaint, and not its substance, Plaintiffs ask this Court for its preference.  Plaintiffs can simply insert a request for punitive damages in each count's *ad damnum* clause, or, if the Court prefers, Plaintiffs can seek leave of Court to add the language formally in a Motion to Amend the Amended Complaint.

**IV.**      **CONCLUSION**

      Defendants' Motion should be denied in its entirety because D.C. law recognizes negligence *per se* actions based on violations of federal regulations.  This is *not* an action to enforce the FDCA.  Moreover, given the facts of this case, Defendant Georgetown can be directly liable for failing to obtain Plaintiff Kerris' informed consent.

---

[7] *See Calvetti v. Antcliff*, 346 F. Supp.2d 92, 108, n.18 (D. D.C. 2004), stating:

    FN18. **The defendants argument that the plaintiffs' request for punitive damages should be dismissed because they pled the claim for punitive damages in a separate count of the complaint is without merit**. Def.'s D.A. Mem. at 10. Although the plaintiffs acknowledge that it may have been inappropriate for the complaint to plead punitive damages as a separate cause of action, they argue that they are nevertheless entitled to an award of punitive damages. Pls.' Opp'n to C.A.'s Mot. at 12. **This Court has found many cases where punitive damages have been pled as a separate claim and cannot conclude this tactic warrants the denial of an award of punitive damages**. *See, e.g., Hendel v. World Plan Exec. Council,* 705 A.2d 656, 669 n. 1 (D.C.1997); *Dalo v. Kivitz,* 596 A.2d 35, 37 (D.C.1991).  (emphasis added).

V.    CONDITIONAL REQUEST FOR A HEARING

Plaintiffs respectfully request a hearing on the matter if the Court is not inclined

to deny the Defendants' Motion on the papers alone.

Respectfully submitted,

By:    _____/s/_____
        Anthony Newman
        NEWMAN, MCINTOSH & HENNESSEY, LLP
        7315 Wisconsin Ave., Suite 700E
        Bethesda, MD 20814
        (301) 654-3400


        _____/s/_____
        Andrew E. Greenwald
        JOSEPH, GREENWALD & LAAKE, P.A.
        6404 Ivy Lane, Suite 400
        Greenbelt, MD 20770
        (301) 220-2200

        *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2008, a copy of the foregoing Opposition
was sent via electronic mail via the Court's electronic filing system to:

David Kiernan, Esq.
Megan Hills, Esq.
Zoe Scharff, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005


        _____/s/_____
        Anthony Newman