# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | |
|---|---|
| Felice P. Iacangelo and Cicily Iacangelo, ) <br> As Guardian of the Person and Property of ) <br> KARYN A. KERRIS, ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> v. ) <br> ) <br> Georgetown University Hospital, ) <br> GEORGETOWN UNIVERSITY, t/a ) <br> Georgetown University, and ) <br> VANCE E. WATSON, M.D., ) <br> ) <br> **Defendants.** ) | Civ. Act. No. 1:05CV02086 (PLF) <br><br> Judge Paul L. Friedman |

## DEFENDANTS'[1] REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' NEGLIGENCE *PER SE* CLAIMS BASED ON VIOLATIONS OF FEDERAL LAW AND PUNITIVE DAMAGES

Ignoring on-point District of Columbia precedent dismissing their negligence *per se* claims and failing to address three out of five arguments for the dismissal of these counts, plaintiffs' Opposition concedes that District of Columbia law does not permit negligence *per se* claims based on the provisions of the federal Food, Drug and Cosmetic Act plaintiffs seek to bring. Plaintiffs' Opposition contains case law supporting defendants' argument for the dismissal of their negligence *per se* claims. Plaintiffs did not contest that liability does not lie for nondisclosure of a device's regulatory status. Plaintiffs did not address how direct liability can

---

[1] "Defendants" refers collectively to defendants Georgetown University (individually, "GU") and Vance E. Watson, M.D. (individually, "Dr. Watson"). "Plaintiffs" refers collectively to plaintiffs Felice and Cicily Iacangelo. Pursuant to the Court's February 27, 2008 Order, granting Plaintiffs' Motion to Amend the Amended Complaint, this motion is now a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Fed. R. Civ. P."). Hereinafter, all

be ascribed to a hospital that has not volunteered to be a research study site. Having brought no authority for maintaining their claims, defendants respectfully request that plaintiffs' negligence *per se* and all allegations making up those claims, and all averments from which no liability can stem as a matter of law.

## INTRODUCTION

Karyn A. Kerris ("Mrs. Kerris") suffered from a rare, progressive arteriovenous malformation ("AVM") deep inside her brain that even plaintiffs' own expert, Dr. Gerard DeBrun, testified would inevitably progress to cause her serious neurological impairment. In Dr. DeBrun's view, no treatment of any kind – radiation, surgery, or embolization – should have been attempted, then or now, despite knowledge that Ms. Kerris's condition would inevitably progress.

Dr. Watson offered Mrs. Kerris what was, perhaps, the only option that offered any chance of shrinking Mrs. Kerris's AVM – embolization. He had a handful of modalities to use; he could attempt to occlude the vessel with inert plastic beads, coils, clips or use a substance, such as the one now at issue (n-butyl-cyanoacrylate or NBCA)[2] that would harden on contact with the vessels in the AVM in an effort to seal it off. The use of NBCA for treatment of cerebral arteriovenous malformations was, and still is, well recognized in the medical literature and profession. *See, e.g.*, DeMeritt, J.S., *et al,* "Outcome Analysis of Preoperative Emoblization with N-Butyl Cyanoacrylate in Cerebral Arteriovenous Malformations," *Am J. Neuroradiology* 16:1801-07 (October 1995) (one of many articles describing use of NCBA, here in a group of 30 patients).

---

references will be to Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), filed February 14, 2007 ("Motion to Dismiss").

[2] Trade name, Histoacryl®. Sec. Am. Compl. ¶ 9.

Dr. Watson and the hospital staff will testify that they explained all of the options to Mrs. Kerris at length; and that, with her informed consent, NBCA was used; and that it was, as a practical matter, the only approach that could have been used. Dr. Watson and defendants' experts will testify that its use here was appropriate and while it was not successful in stopping the progression of Mrs. Kerris's AVM, it did not cause the AVM to continue to progress, let alone lead to Mrs. Kerris's current condition. Her parents, the plaintiffs, now contend that Mrs. Kerris's consent was allegedly not adequate and that some portion or condition is allegedly due to the attempts to treat her AVM, rather than to its inevitable natural progression. This is the crux of the case now before the court.

To this medical malpractice action, plaintiffs seek to add claims based on alleged violations of federal statutes – the Federal Food, Drug and Cosmetic Act[3] – which plaintiffs contend should be used to establish a standard of care for an interventional neuroradiologist to create negligence *per se* claims. In other words, even though the medical literature and the experts on both sides of this case will testify that use of NCBA was well recognized, plaintiffs want to use FDA statutes and regulations to establish that its use was allegedly negligent *per se* or as a matter of law.

Plaintiffs argue that the FDA statutes demonstrate that defendants' efforts to treat Ms. Kerris's life threatening AVM were somehow "illegal," "illicit," "unapproved," that the NBCA they used was, as a matter of law, "adulterated" "misbranded" and "illegal to import," and that its use was contrary to the manufacturer's own "contraindications." Opp.[4] at 1-3, 10-11, 14-15,

_____

[3] Hereinafter, "FDCA," 21 U.S.C. §§ 331, et seq. References to the FDCA contain the Medical Device Amendments, 21 U.S.C. §§ 301, et seq. The Food, Drug Administration is referred to as the "FDA."

[4] "Opp." refers to Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings/Motion to Dismiss, filed February 25, 2008.

17-20. Plaintiffs ask the Court to find that the FDA statutes containing regulatory words set a professional "standard of care" by which treating physicians, in this case, an interventional neuroradiologist, must practice.

No court has ever reached this conclusion and for good reason. The FDA does not regulate the practice of medicine. S. Rep. No. 361, 74th Cong., 1st Sess. at 3 (1935) (FDCA "not intended as a medical practices act and [would] not interfere with the practice of the healing art."). The statutes at issue were not intended to prohibit the use of such substances at the discretion of individual physicians for individual patients and they were not intended to, and do not set, a standard of care by which physicians practice. And, as plaintiffs themselves acknowledge, they have no private right to enforce any FDA regulation.

In their Opposition plaintiffs assert their claims are "not actions to enforce the FDCA," Opp. at 5, but rather actions that use the FDCA statutes to set "standards of care" for their underlying tort claims. Opp. at 5. Essentially, there is no distinction between seeking directly to enforce a statute and indirectly seeking to enforce it by calling it a standard of care. The strident rhetoric plaintiffs offer about defendants allegedly seeking a "free pass" from the "law" has the same overwhelmingly prejudicial and improper effect, irrespective of what one calls it.

As a matter of law, defendants should not be forced to litigate a case within a case and to rebut allegations that the FDA regulations somehow find application in this medical malpractice action, were allegedly violated, and set a professional "standard of care" by which Dr. Watson and Georgetown should be held. Plaintiffs should not be allowed to argue to the jury that FDA regulations allegedly demonstrate that the NCBA was "adulterated," even though it had no impurities, that it was "misbranded," even though no one contends it was improperly labeled (and, as a prescription device, any duty associated with a claim of misbranding or mislabeling

runs only to the physician, not the patient), that its possession was "illicit," even though its

possession and use was proper, that it should have allegedly been "seized" by Customs (even

though Customs demonstrably did not seize it), and that the substance (and derivatively the

procedure) was allegedly "unapproved."

If necessary, defendants can show that their actions were not prohibited by the FDA, that

the Import Alert is directed to commercial distributors not individual physicians, that the FDA

had knowledge of the use of NCBA in these circumstances and did not act then, or now, to try to

prevent such use, that the FDA statutes have no bearing on whether it is, or is not, appropriate for

an individual physician to elect to use NCBA (or any other modality) to treat AVMs.  In fact, the

FDA has never reached an determination as to whether Histoacryl® is safe and effective for this

purpose (However, the FDA did rule that NCBA, sold as Trufill® is safe and effective for

embolization use in September 2000 and approved Histoacryl® in February 2007 as a skin

adhesive[5]) and any effort to argue that the FDA regulations proscribed its use here, when they

did not, improperly suggests that such a determination had been made.  Such is not the case.

Indeed, there is no record that any interventional radiologist in the United States has ever been

sanctioned by the FDA for merely using NCBA to treat a patient because, as a practical matter,

the FDA defers to individual physicians when making choices like this with respect to individual

---

[5] Being approved, had Dr. Watson taken the same actions now as he took in 1998, plaintiffs could not presume to argue FDCA violations as 21 U.S.C.§ 396 (1997) states:  "Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.  This section shall not limit any existing authority of the Secretary to establish and enforce restrictions on the sale or distribution, or in the labeling, of a device that are part of a determination of substantial equivalence, established as a condition of approval, or promulgated through regulations. Further, this section shall not change any existing prohibition on the promotion of unapproved uses of legally marketed devices."

patients when there is no advertising, no sales to other practitioners, and no attempt to market an unapproved product.

The motion now before the Court presents a pure issue of law, which is whether plaintiffs can, under District of Columbia law, use statutes that they admit they have no private right to enforce, nonetheless to establish alleged "standards of care" in this medical malpractice case, by which they are entitled to assert claims of "negligence *per se*."

The D.C. Superior Court has already looked at this exact argument, presented in this exact context (use of NCBA/Histoacryl® to treat AVMs), by the exact same attorneys and concluded that the FDA statutes can not be used for this purpose. *Morton v. George Washington University Hosp.*, Civ. Act. No. 99ca004599 (D.C. Super. Ct., filed Nov. 30, 2001) (order granting defendants' 12(b)(6) Motion, dismissing plaintiffs' FDCA-based negligence *per se* claims) (Ex. 1).

Having crossed the street to federal court, plaintiffs' counsel now argues that the D.C. Superior Court's "unpublished, non-binding" 2001 decision, which looked squarely to District of Columbia and federal law, was allegedly flawed and that conduct that was legal on one side of the street in 2001 (and presumably prior to that in 1998) should now be determined to be negligent *per se* – or "illegal" to use plaintiffs' verbiage – on this side of the street. The law, however, does not support plaintiffs' arguments. The *Morton* Court looked at almost identical facts, involving the same procedure and the same substance and got it right. A negligence *per se* claim cannot be brought based on these statutes in the District of Columbia.

Plaintiffs are free to argue that any given modality should allegedly not have been used based on the professional standards of care and established practice amongst interventional neuroradiologists during the relevant time. They are not free, however, to assert claims that FDA

statutes relating to medical devices and drugs generally set the standard of care for treating physicians, as a matter of law, in this case.

## ARGUMENT

### I.    Presented with Near Identical Facts, the District of Columbia Dismissed Plaintiffs' FDCA-Based Negligence *Per Se* Claim.

District of Columbia law dismissed Plaintiffs' negligence *per se* claims when presented the same arguments plaintiffs make here. 11/30/01 *Morton* Order (Ex. 1). Ignoring this Court's precedent using Superior Court memorandum opinions as authority, *Adler v. Vision Lab Telecomm., Inc.*, 393 F. Supp. 2d 35, 37-38 (D.D.C. 2005) (dismissing negligence *per se* claims based on alleged violations of federal law as D.C. law did not contain similar requirements), plaintiffs argue against dismissal of their state-based claims by overtly attacking the *Morton* Order, the Fourth Circuit, and implicitly disparaging the holdings of the some twenty cases cited throughout defendants' Motion to Dismiss. Opp. at 9-12.

Essentially, plaintiffs concede that D.C. Superior Court does not recognize the FDCA-based negligence *per se* claims brought here and then spend half of their Opposition to suggest that the D.C. Superior Court's prior decision was incorrect – as were the numerous circuit, federal district, and state court cases defendants cited throughout their initial motion. While plaintiffs may wish the District of Columbia recognized their FDCA-based negligence *per se* claims, plaintiffs' belated[6] assault on rulings regarding their case's merits cannot escape the fact that the District of Columbia law does not allow Plaintiffs' negligence *per se* claims.

---

[6] The *Morton* Order was not previously brought to this Court's attention as the case was represented as being sealed. *See* Plaintiffs' Opposition to Motion to Compel, filed September 20, 2007, at 3. Defendants only discovered the prior case by plaintiffs' counsel after going beyond plaintiffs' counsel's representation.

After implicitly acknowledging that the 11/30/01 *Morton* Order held that "the FDCA provisions and regulations proffered by Plaintiffs in support of their negligence *per se* claims are devoid of an appropriate standard of care" *Id.* at 9 (Ex. 1), plaintiffs' unsuccessfully attempt to maintain their FDCA-based negligence *per se* claims by:  1) Recycling previously rejected arguments for maintaining their negligence *per se* claims; 2) Inconsistently arguing that D.C. law should be ignored insofar as it dismisses their negligence *per se* claims, but arguing that D.C. allows their claims; 3) Failing to address the difference between the use of a federal statute for a D.C. law negligence *per se* claim versus a D.C. statute; and 4) Failing to explain how duties running to prescribing doctors translate to a duty to a patient.

**A.    D.C. Superior Court Rejected Plaintiffs' "Speeding Car" Argument and Dismissed Plaintiffs' Negligence *Per Se* Claims.**

Attempting to gloss over District of Columbia law's prior rejection of Plaintiffs' FDCA-based negligence *per se* claims, Plaintiffs attack the Honorable William M. Jackson's opinion, omit his citation to *Little* [*King*] *v. Danek Med., Inc.*, 37 S.W.3d 429 (Tenn. 2000), and argue that *Talley v. Danek Med. Inc.*, 179 F.3d 154, 161 (4th Cir. 1999) was also incorrect—all of which considered and rejected Plaintiffs' analogy of a "speeding car" and adoption of *Orthopedic Equipment Co. v. Eustler*, 276 F.2d 455 (4th Cir. 1960).  11/30/01 *Morton Order* at 9 (Ex. 1); Opp. at 10-11.  Neither strident rhetoric, nor contortions of logic changes the fundamental fact that District of Columbia precedent, federal precedent, and precedents from states across the nation dismiss plaintiffs' FDCA-based negligence *per se* claims.

Plaintiffs' FDCA-based negligence *per se* claims mirror the claims the Fourth Circuit dismissed in *Talley*.  Regardless of bolding or underlining, plaintiffs' allegations boil down to the allegation that defendants violated the FDCA by treating a patient with an unapproved device.  *See* Opp. at 11 ("receiving unapproved . . . devices"; "injecting an unapproved . . . device";

"(mixing) one unapproved . . . device . . . with another unapproved . . . device"; "introducing and unapproved . . . device . . . and using it in patients").

Similarly, the *Talley* plaintiffs argued that defendants violated the FDCA by employing orthopedic screws that were unapproved for use in back stabilization operations. *Talley*, 179 F.3d at 160. Like plaintiffs, the *Talley* plaintiff relied upon *Eustler* to advance her case and maintain her negligence *per se* claims. *Id.* at 161. And similarly as was previously done in *Morton* and should be done here, *Talley* dismissed the negligence *per se* claims. *Id.*

Willing to agree with the Fourth Circuit when the Fourth Circuit agrees with them, but rejecting the near forty year more recent Fourth Circuit opinion that dismisses their FDCA-based negligence *per se* claims, Plaintiffs try to adopt the Fourth Circuit's 1960 *Eutsler* case that allowed a negligence *per se* claim for mislabeling where the plaintiff sued the manufacturer for mislabeling a larger 9.27-10.12 mm[7] screw as a 9 mm screw for, *inter alia*, negligence *per se*. *Eustler*, 276 F.2d 455, 458. Because the wrongly labeled screw was supposed to fit in a 9 mm hole as it was marked, attempted insertion of it lost the *Eustler* plaintiff the use of his leg. *Eustler*, 276 F.2d at 461; *Little*, 37 S.W.3d at 459; *Talley*, 179 F.3d at 161; cited in 11/30/01 *Morton* Order at 9 (Ex. 1).

Unlike *Eustler*, Plaintiffs here make no allegation that the device used for Mrs. Kerris's medical treatment was anything other than what it purported to be – Histoacryl® and Lipidol®. *See* Sec. Am. Compl. ¶¶ 8-9. In contrast, the *Eustler* Fourth Circuit opinion found that the *Eustler* plaintiff stated a claim for negligence *per se* because the device was labeled to be a 9mm screw when it was not and a reasonable person would or should know that incorrectly marking a

---

[7] "Measurements of cross-sections of the nail, as testified to by a machinist, varied from a minimum of 9.27mm to a maximum of 10.12mm. . . . [I]t is undisputed that the nail was actually more than 9mm wide." *Eustler*, 276 F.2d at 458-59.

device as smaller than it is would foreseeably cause harm when used in a patient. *Eustler*, 276 F.2d at 461; *Little*, 37 S.W.3d at 459; *Talley v. Danek Med. Inc.*, 179 F.3d at 161; cited in 11/30/01 *Morton* Order at 9 (Ex. 1). The Plaintiffs' analogy to a "speeding car" and *Eustler* is precisely the argument previously rejected by D.C. Superior Court, the Fourth Circuit (as well as the other circuits to which the issue was presented—Third, Sixth, and Eighth, as well as the various federal and state court opinions throughout defendants' Motion to Dismiss—none of which Plaintiffs addressed).

Rejected by Superior Court Associate Judge Jackson in *Morton* and *Talley* and *Little*, Plaintiffs' argument FDCA-based negligence *per se* claims here is similarly unpersuasive as:

> The holding in *Eutsler*, however, does not establish the principle that the simple failure to obtain approval of advice [sic—"a device"] from the FDA, standing alone, can support a negligence per se claim.

*Little*, 37 S.W.3d at 457; *Talley*, 179 F.3d at 161; cited in 11/30/01 *Morton* Order at 9 (Ex. 1).

As true as when stated in the Court's March 26, 2007 Order, the District of Columbia has permitted individual Plaintiffs to use statutes to prove a violation of the standard of care in cases where there is no private right of action," Opp. at 7, but the District of Columbia has not permitted individual plaintiffs to use the FDCA to prove a violation of the standard of care. *See* 11/30/01 *Morton* Order (Ex. 1). Plaintiffs' recycling of a rejected argument adds nothing to its merit. This Court should similarly reject it and dismiss Plaintiffs' three negligence *per se* claims as the District of Columbia, various federal circuits, federal district courts, and state courts previously did.

**B.     Use of a Federal Act, the FDCA, on which to Base a Negligence *Per Se* Claim is Rejected by District of Columbia Law.**

The District of Columbia *Morton* case is exactly on point and prohibits the use of the FDCA provisions brought here for negligence *per se* claims. The *Morton* Order is also a format

used by this Court as precedential authority, *see Adler*, 393 F. Supp. 2d at 37-38. While acknowledging the *Morton* holding, plaintiffs spend pages of their Opposition on general hornbook principles of negligence *per se* without addressing the specific aspects of this case: 1) District of Columbia law does not allow negligence *per se* claims based on the FDCA statutes brought here, *see* 11/30/01 *Morton* Order (Ex. 1); 2) None of plaintiffs' District of Columbia authority addresses the FDCA; and 3) None of plaintiffs' District of Columbia authority involve use of a federal—as opposed to a District of Columbia—statute on which to base a negligence *per se* claim.

Unable to distinguish the *Morton* case from this one, Plaintiffs attack the Honorable William H. Jackson and his reasoning, making the precise argument that was previously rejected in cases cited therein. *See* Sec. IA, *supra*. Without ever addressing *Adler v. Telecomm., Inc.* Plaintiffs also dismiss the *Morton* case as "nonbinding," Opp. at 9, with no mention of why this Court uses D.C. Superior Court unpublished opinions to determine whether District of Columbia law allows a negligence *per se* claim based upon the federal Telephone Protection Consumer Act, but should not use Superior Court opinions when determining whether District of Columbia law allows negligence *per se* claims based on the federal FDCA. Plaintiffs' failure to address this Court's precedent using D.C. Superior Court unpublished decisions reveals how unsupported their position is. *See* Motion to Dismiss at 14-16.

Plaintiffs' citation of *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993) supports defendants' position that plaintiffs' negligence *per se* claims are prohibited. Opp. at 8. In *Joy*, the D.C. Circuit affirmed the trial judge's refusal to give the negligence *per se* instruction. *Id.* at 558. The D.C. Circuit's explanation mirrors defendants' argument against plaintiffs' FDCA-based negligence *per se* claims: "[A] common sense approach to the

negligence per se doctrine suggests that specific obligations must be set forth on the face of a regulation for that doctrine [negligence *per se*] to come into play." If this Court looks at the federal statutes and regulations plaintiffs seek to use, it will not find any obligation set forth for practicing physicians. It will not find a prohibition against treating physicians using unapproved devices. It will not find a requirement that a treating physician apply for an IDE if the practicing physician is treating patients and not conducting research. Further, the Court will find that research, as well as clinical investigations, are defined by the regulations themselves, neither of which definition applies to the facts in the Second Amended Complaint. *See* 45 C.F.R. § 46.102 and 21 C.F.R. § 56.102. *Joy*, therefore, is further support for the dismissal of plaintiffs' negligence *per se* claims.

Without exception, none of plaintiffs' D.C. cases speak to the FDCA. Each of plaintiffs' cited D.C. cases involves some other type of D.C. statute. *See* Opp. at 8-9. *Ceco Corp. v. Coleman*, 441 A.2d 940, 945-46 (D.C. 1982) (alleged violation of D.C. safety statute); *Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268 (D.C. 1987) (alleged violation of D.C. Alcoholic Beverage Control Act); *H.R.H. Construction Co. v. Conroy*, 411 F.2d 722, 723-24 n.3 (D.C. Cir. 1969) (alleged violation of D.C. Building Code and D.C. Minimum Wage and Industrial Safety Board regulations); *Elliott v. Michael James, Inc.*, 559 F.2d 759, 762 (D.C. Cir. 1977) (alleged violation of District of Columbia Building Code).

Beyond not involving the federal FDCA, none of these D.C. cases involve the use of a **federal** statute, as opposed to a D.C. statute. The D.C. Circuit makes clear that "[d]uties set forth in *federal law* do not, therefore, automatically create duties under *local tort law*." *Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1158 (D.C. Cir. 1985) (citations omitted; italics in original); *see also Tripp v. U.S.*, 257 F. Supp. 2d 37, 45 (D.D.C. 2003) (dismissing

negligent disclosure of confidential information on grounds that duties under federal laws could not form the basis for a negligence claim where no analogous duties exist under D.C. state law). As *Adler, supra,* held in dismissing the negligence *per se* claims, it is simply not enough to parrot a general duty of care and ascribe duties set forth by federal law as subsumed in it. Plaintiffs have not and cannot point to a District of Columbia obligation, *inter alia,* apply to the FDA for an IDE.

   Plaintiffs also failed to address the difference between using a federal statute as the basis for a state law negligence *per se* claim and the use of a District of Columbia statute. *See* Motion to Dismiss at 16-19. As stated in the Motion to Dismiss, *id.* at 16-19, the single most important inquiry as to whether to recognize a negligence *per se* claim based on the violation of a federal statute is whether Congress intended to create the private remedy sought by the plaintiffs. *325-343 E. 56th Street Corp. v. Mobil Oil Corp.,* 906 F. Supp. 669, 673 (D.D.C. 1995). A state's ability to use a federal statute violation for state tort liability depends on the intent of Congress. *In re Bendectin Litig.,* 857 F.2d 290, 313 (6th Cir. 1988), *cert. denied, Hoffman v. Merrell Dow Pharms., Inc.,* 488 U.S. 1006 (1989) (*citation omitted*). Plaintiffs' Opposition, citing only District of Columbia cases involving D.C. statutes, fails to address this crucial issue and lends further support that deference to congressional intent precludes their FDCA-based, state law negligence *per se* claim.[8]

---

[8] The Court may treat plaintiffs as conceding these arguments as no response to them were contained in the Opposition. *See* footnote 10, *infra.*

**C.     The Learned Intermediary Doctrine Provides Further Confirmation that Negligence *Per Se* Claims Based on Federal Mislabeling and Misbranding Provisions for Prescription Devices Are Irrelevant to the Standard of Care For a Practicing Doctor.**

District of Columbia law recognizes the learned intermediary doctrine, which holds that all labeling and branding duties for prescription drugs and devices run to the prescribing physician, not the patient. *MacPherson v. Searle & Co.*, 775 F. Supp. 417, 422 (D.D.C. 1991) (*citing Stottlemire v. Cawood*, 213 F. Supp. 897, 898 (D.D.C. 1963)). In trying to use a federal statute regarding the labeling of prescription devices as setting forth the standard of care for practicing doctors, plaintiffs seek to overturn the learned intermediary doctrine by forcing duties upon practicing doctors to patients that the doctrine explicitly states they do not have. Defendant Dr. Watson owed no duty to Mrs. Kerris for the labeling or branding of the prescription devices used in her medical treatment as those duties, if any, are owed to him as the learned intermediary.

Just as the *MacPherson* court (acknowledging the D.C. Court of Appeals' adoption of the learned intermediary doctrine in the prescription drug context, 775 F. Supp. at 423[9]) dismissed plaintiff's allegations regarding mislabeling against defendant Searle, this Court should dismiss plaintiffs' allegations and claims here that attempt to force duties and standards of care on prescribing, practicing doctors that the learned intermediary doctrine prohibits. *See Ellis v. C.R. Bard, Inc.*, 311 F.2d 1272, 1280-81 (11th Cir. 2002) (listing cases). Plaintiffs' Second Amended Complaint is permeated with allegations of breaches of duties that the learned intermediary doctrine states defendant Dr. Watson does not have. Sec. Am. Compl. Count VIII (asserting defendants owed Mrs. Kerris duties under Misbranding and Mislabeling federal statutes).

---

[9] (*citing Mampe v. Ayerst Laboratories*, 548 A.2d 798, 806 n.6 (D.C. 1988) (*citation omitted*)).

*MacPherson* and *Mampe v. Wyerst Laboratories*, 548 A.2d 798 (D.C. 1988), are very clear. Plaintiffs have no claim against defendant Dr. Watson as the prescribing doctor (as pled, Sec. Am. Compl. ¶ 5) for mislabeling or misbranding of a prescription drug or even if one surmises as an alleged manufacturer (as the duty runs to Defendant Dr. Watson), other than for lack of informed consent, but not for alleged requirement in federal FDCA's provisions.

**II.   *DiColacicco*:  Dismissed Plaintiff's Negligence *Per Se* Claims As Barred by Preemption; Plaintiffs' Remaining Citations Also Direct the Dismissal of These Claims.**

*Colacicco v. Apotex, Inc.*, 432 F. Supp. 514, 554 (E.D. Pa. 2006), Plaintiffs' authority against preemption, Opp. at 4, dismissed plaintiff's negligence *per se* claims, holding them barred by preemption.  Though the *Colacicco* court felt that *Buckman v. Plaintiffs' Legal Committee* was limited to policing fraud on the FDA, the *Colacicco* court held that deference to the FDA required the dismissal of plaintiffs' FDCA-based negligence *per se* claims.  Defendants argued that deference to the FDA was an independent ground for dismissal of plaintiffs' FDCA-based negligence *per se* claims.  *See* Defendants' Motion to Dismiss at 19-22.  As plaintiffs did not oppose this argument, the Court may consider plaintiffs as conceding that deference to the FDA requires the dismissal of their FDCA-based claims negligence *per se* claims, particularly when plaintiffs cite authority to this Court that supports defendants' argument.[10]

---

[10] *See Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp.2d 174, 179 (D.D.C. 2002) (citations omitted) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded . . . ."); *U.S. v. Real Property Identified as: Parcel 03179-005R*, 287 F.Supp.2d 45 (D.D.C. 2003) (same; granting defendants summary judgment). *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp.2d 154, 159 (D.D.C. 2002) (citation omitted) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."). It is not this "[C]ourt's role. . . to act as an advocate for the [the parties] and construct legal arguments on [their] behalf in order to counter those in the motion to dismiss." *Stephenson v. Cox*, 223 F. Supp. 2d 119, 127 (D.D.C. 2002) (citations omitted).

Underscoring the weakness of a position that fails to distinguish the on-point District of Columbia case, address the more than twenty cases cited in defendants' Motion to Dismiss, and oppose three of five arguments presented by the initial motion. Plaintiffs' attempt to find support in the two remaining federal cases cited by plaintiffs, *Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862 (E.D. 1999) and *Sharp v. Artifex, Ltd.*, 110 F. Supp. 2d 388 (W.D. 1995) and state case opinion, *Allen v. Delchamps, Inc.*, 624 A.2d 1065 (Ala. 1993), reveals the weakness of their argument.

Used by plaintiffs to try to show that their negligence *per se* claims are valid, Opp. at 6-7, *Valente v. Sofamor*, 48 F. Supp. 2d 862, explicitly states that the "court underscores the fact that its decision regarding negligence per se based on violation of the FDCA **is limited to the specific FDCA violation alleged by plaintiffs** . . . 21 U.S.C. §351(f)." *Id.* at 876 (emphasis added). Plaintiffs here have not based their negligence *per se* claim on 21 U.S.C. § 351(f); therefore, *Valente* provides no support.[11]

Similarly, reliance on *Sharp v. Artifex, Ltd.* is unpersuasive. The subsequent Third Circuit decision dismissing negligence *per se* claims based on the FDCA, *In re Orthopedic Bone Screw Products*, 193 F.3d 781, 796 (3d Cir. 1999), calls the earlier *Sharp* opinion into question. Additionally, *Sharp* explicitly states that Pennsylvania law does not require any showing that the legislature intended that the statute become a basis for civil liability. 110 F. Supp. 2d at 393. In contrast, this Court holds that the single most important inquiry as to whether to recognize a negligence *per se* claim based on the violation of a federal statute is whether Congress intended to create the private remedy sought by the plaintiffs. *325-343 E. 56th Street*, 906 F.Supp. at 673.

---

[11] Subsequent opinions have declined to follow *Valente*. *Vanderwerf v. SmithKlineBeecham Corp.*, 414 F. Supp.2d 1023 (D. Kan. 2006); *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp.

The 1993 Alabama state court opinion, *Allen v. Delchamps, Inc.*, 624 So.2d 1065 (Ala. 1993), is irrelevant. *Allen* does not even address prescription drugs or prescription devices. In suing a grocery store operator for injuries resulting from ingestion of celery hearts treated with sodium bisulfite, *Allen* allowed the plaintiff to proceed to a jury with FDA regulations (promulgated under the FDCA) "indicating that sodium bisulfite is not safe 'when used on fruits or vegetables intended to be served raw to consumers or sold raw to consumers or to be presented to consumers as fresh' . . . ." *Id.* at 1067 (*quoting* 21 C.F.R. § 182.3739). These FDA provisions were directed to the sellers of raw fruits and vegetables. The *Allen* court relied on FDA statements that the adoption of the sulfite regulations was to "address[] the potential hazards to sulfite-sensitive individuals' was its primary concern and that "'consumers are not likely to associate raw produce with the presence of preservatives such as sulfating agents.'" *Id.* (*quoting* 51 Fed. Reg. 25021-22 (1986)). Additionally, Alabama state law contained statutory obligations contained similar requirements to the FDA regulations. *Id.* at 1068. Unlike the *Allen* case, the FDCA provisions plaintiffs seek to use do not mirror D.C. statutory requirements, are not limited to plaintiffs' specific claim, and are not explicitly directed at practicing doctors.

**III.    Plaintiffs Concede No IRB[12] Involvement on Which to Base Direct Liability for Defendant Georgetown University for Lack of Informed Consent.**

Basing claims of negligence *per se* against defendants on **no IRB involvement**, Opp. at 15 ("no IRB review"), Plaintiffs cannot hold defendant Georgetown University directly[13] liable

---

2d 1299 (N.D. Okla. 2000); *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp.2d 1276 (N.D. Okla. 2000).

[12] "IRB" refers to Institutional Review Board.

[13] Defendants have never argued that defendant Georgetown University could not **indirectly** be liable for lack of informed consent based upon the doctrine of *respondeat superior*, Motion to Dismiss at 26 ("defendants do not challenge the indirect liability plaintiffs may or may not be able to prove regarding lack of informed consent and breach of fiduciary duty"; quoted in Opp. at 15); therefore, plaintiffs' attempt to muddy the legal issues presented to the Court by

for lack of informed consent with precedent that explicitly bases its holding **on the involvement** of a hospital's IRB. Plaintiffs do not claim that Mrs. Kerris's medical treatment was provided in conjunction with a research study or clinical investigation. *See* Sec. Am. Compl. In contrast, all plaintiffs' cited authority involve patients who were treated in clinical trial protocols. Opp. at 12-13 (*Lenahan v. University of Chicago*, 808 N.E.2d 1078, 1081 (Ill.App. 1 Dist. 2004) (Patient participating in phase I clinical trial, referred to as Protocol 8558, for chemotherapy/stem cell treatment); *Kus v. Sherman Hospital,* 644 N.E.2d 1214, 1221 (Ill. App. 2 Dist. 1995) (patient participating in intraocular lens implants study)).

Plaintiffs' authority explains that "the general rule [is] that physicians, not hospitals, have the duty to obtain informed consent from their patients." *Lenahan*, 808 N.E.2d at 1083. Both the *Lenahan* and *Kus* Ohio state courts' finding of direct liability of the hospitals for lack of informed consent was explicitly based on the hospitals' voluntary assumption of becoming a study site with its attendant responsibilities. *Kus*, 644 N.E.2d at 1221 ("By becoming a participating institution in this particular study . . . . Sherman Hospital undertook the responsibility to inform the patient . . ."); *Lenahan*, 808 N.E.2d at 1084 (same). Moreover, both the *Lenahan* and *Kus* courts explicitly limited the rulings to the particular facts presented by those cases—situations where the hospital had voluntarily assumed the responsibilities attendant with being a FDA designated research site—a fact plaintiffs concede is not present here.

---

disingenuously claiming a conflict between defendants with defendant Dr. Watson being "out on his own, for he would be the only defendant potentially liable for claims of lack of informed consent and/or breach of fiduciary duty," Opp. at 16, ignores the *respondeat superior* liability that attaches to defendant Georgetown University. All plaintiffs' allegations in this matter (e.g., the medical treatment, the consent, etc.) were provided by defendant Dr. Watson within the scope of his employment. If defendant Dr. Watson is found liable for lack of informed consent, defendant Georgetown University is also liable. Plaintiffs' smoke and mirrors attack is simply absurd, particularly when plaintiffs quote defendants' acknowledgement of potential liability for all defendants. Opp. at 15-16.

*Lenahan*, 808 N.E.2d at 1084 ("Under these facts . . ."); *Kus*, 644 N.E. 2d at 1220 ("In the case at bar, we determine . . .").

Plaintiffs concede that defendant Georgetown University was not an investigational site, nor was its IRB involved. *See* Opp. at 15 ("lack of IRB review, failure to generate an IRB approved consent form"). Citing no cases to the contrary, plaintiffs cannot now argue for direct liability on the premise that defendant Georgetown University should have, but did not, become a research site with those duties. Opp. at 15. Under both parties' reasoning, the general rule is that a hospital does not have direct liability for lack of informed consent, therefore, all allegations of direct liability of defendant Georgetown University should be dismissed.

**IV.  All Allegations Concerning Disclosure of Regulatory Status, Direct Liability for Lack of Informed Consent for the Hospital, and Legal Conclusions Should Be Dismissed With the Claims Asserting Liability For the Same.**

Opposing the dismissal of allegations embodying causes of action that fail to state a claim under the law simply "back doors" admission of the very cause of action defendants move to dismiss. Plaintiffs explicitly incorporate by reference each averment sought to be dismissed into the claims sought to be dismissed. *See* Sec. Am. Compl. Count VI preamble ("Plaintiffs replead and incorporate by reference herein each and every allegation set forth above and further state as follows:"); Count VII-IX preambles (same). Plaintiffs' Second Amended Complaint premises liability on allegations that are invalid. All of these allegations form, per plaintiffs' explicit incorporation, the bases for their alleged grounds for recovery. Bases for the dismissal of allegations embodying plaintiffs' negligence *per se* counts, dismissal of allegations embodying plaintiffs' claim of liability for nondisclosure of regulatory status, dismissal of allegations embodying plaintiffs' claim for holding defendant Georgetown University directly liable for lack of informed consent are presented in defendants' Motion to Dismiss. That neither the Court, nor

defendants had the benefit of counsel for plaintiffs' prior District of Columbia case, *Morton v. George Washington University, et al.*, at an earlier time can only be ascribed to plaintiffs' actions.[14]

Case law states that a doctor cannot be held liable for failing to disclose a device's regulatory status (another argument that plaintiffs did not oppose and the Court may treat as conceded); therefore, if one has no legal duty to disclose some information, one cannot be held liable for fraudulent nondisclosure. Allegations purporting to state a claim for liability based on the nondisclosure of a device's regulatory status cannot be maintained. Sec. Am. Compl. ¶¶ 14-15, 19, 20(a), (d)-(f), 21, 27(a)-(d), 32, 38(c), (e); Motion to Dismiss at 23-26. Similarly, as D.C. law, preemption, FDA and congressional deference, and the doctrine of negligence *per se* requiring a standard of care in the statute itself prohibits the use of these FDCA provisions as the basis of negligence *per se* claims; therefore, allegations regarding breaches of duties and legality only imposed by an invalid FDCA-based negligence *per se* claim cannot stand. Sec. Am. Compl. ¶¶ 4, 36, 38-39 (only legally approved devices may be used), 10(c), (f), (h), (l), 12, 20(f), 24, 27(a), (c)-(d), 34 ("illegal"), 10(h), (j), 19, 20(d), 21, 38(h) (IRB and/or IDE duty), *see also* Motion to Dismiss.

Contrary to plaintiffs' assertions, defendants are not "bootstrapping" the allegations to be dismissed to the counts sought to be dismissed, Opp. at 20; rather, plaintiffs "bootstrapped" these allegations to these counts by "incorporate[ing] by reference herein each and every allegation set forth above." Sec. Am. Compl. Counts VI-IX preambles. In failing to state a claim under the law for FDCA-based, District of Columbia negligence *per se* causes of action, direct liability for

---

[14] *See* footnote 6, *supra*.

a hospital for lack of informed consent, and liability for alleged nondisclosure of a prescription device's regulatory status, plaintiffs' allegations making up those claims should be dismissed.

## CONCLUSION

**WHEREFORE,** for the reasons set forth in defendants' Motion to Dismiss and set forth herein, defendants respectfully request the Court dismiss with prejudice plaintiffs' negligence *per se* claims, Sec. Am. Compl. Counts VII-IX, as well as all allegations forming the bases for those claims; all allegations for alleged failure to inform Mrs. Kerris of the medical devices' regulatory status, as no liability can stem from these averments, Punitive Damages, Count VI, and all allegations seeking to hold defendant Georgetown University's directly liable for lack of informed consent, as such averments fail to state a claim as a matter of law.[15]

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

Dated:  March 5, 2008                    By:  _Megan E. Hills_
                                              David C. Kiernan (D.C. Bar # 413806
                                              Megan E. Hills (D.C. Bar # 437340)
                                              Zoe C. Scharff (D.C. Bar # 490482)

                                              725 Twelfth Street, N.W.
                                              Washington, D.C. 20005
                                              (202) 434-5000
                                              (202) 434-5029 (fax)
                                              dkiernan@wc.com
                                              mhills@wc.com
                                              zscharff@wc.com

---

[15] The specific allegations sought to be dismissed are contained in defendants' Motion to Dismiss and proposed Order.

## CERTIFICATE OF SERVICE

Pursuant to United States District Court Local Rule for the District of Columbia 5.4(d), I

hereby certify that a copy of the foregoing was served via electronic filing on the Court's CM/ECF website

on the 5th day of March, 2008 on the forgoing:

Anthony Newman, Esquire
Ernest McIntosh, Esquire
Wendy Wyeth, Esquire
Newman, McIntosh & Hennesy
7315 Wisconsin Avenue
Suite 700E
Bethesda, Maryland 20814

and

Andrew Greenwald, Esquire
Greenwald and Laake
6404 Ivy Lane
Suite 440
Greenbelt, Maryland 20770

Plaintiffs' Counsel


Megan R. Hills