## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
*Civil Division*

| | |
|---|---|
| **FELICE P. IACANGELO,** *et al.* : | |
| : | |
| : | **Civil No. 1:05CV02086** |
| Plaintiffs, : | |
| : | **Judge Paul L. Friedman** |
| vs. : | |
| : | **Magistrate Judge Alan Kay** |
| **GEORGETOWN UNIVERSITY,** *et al.* : | |
| : | |
| Defendants. : | |
| _____ | |

### PLAINTIFFS' MOTION TO AMEND COMPLAINT

COME NOW Plaintiffs, by and through their attorneys, and respectfully move this Court
to allow Plaintiffs to amend their complaint pursuant to Federal Rules of Civil Procedure Rule
15(a) and District Court for the District of Columbia Local Rule 7(i). As grounds for this motion,
Plaintiffs state the following:

### I.    INTRODUCTION AND BRIEF PROCEDURAL HISTORY

Plaintiffs filed their original complaint on October 24, 2005.  Upon learning that one of
the original Defendants, MedStar Health, Inc., was named in error, Plaintiffs voluntarily
dismissed MedStar Health, Inc. on January 4, 2006.  On February 14, 2006, Plaintiffs filed their
Amended Complaint.  Defendants filed a Motion to Dismiss and Summary Judgment on March
6, 2006.  On March 26, 2007, the Court issued an order concerning Defendants' Motion to
Dismiss and Summary Judgment. As discovery progressed in this case, Plaintiffs now have facts
that allow the re-pleading two of their counts, breach of express warranty and fraud, with the
requisite particularity.

## II.    ARGUMENT

Federal Rule of Civ. P. 15(a) states that, once an answer has been filed, a party may amend a complaint with leave of court and "leave shall be freely given when justice so requires." Rule 15(a) of the Federal Rules of Civil Procedure states in relevant part that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party ... and leave shall be freely given when justice so requires." FED.R.CIV.P. 15(a).  This Court has stated that a " district court should grant a motion to amend unless there is a clear and solid justification for denying it." **Monroe v. Williams,  705 F.Supp. 621, 622 -623 (D.D.C. 1988).**

The Supreme Court defined the term "when justice so requires" to mean that absent any "apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.' " **Foman v. Davis, 371 U.S. 178, 182-183 (1962).**

In Judge Friedman's March 26, 2007 Memorandum Opinion concerning the dismissal of certain counts of Plaintiffs' Amended Complaint, he stated that Magistrate Judge Kay, in his October 11, 2006 Report and Recommendation, identified the reason for dismissing Plaintiffs' Fraud Count without prejudice (Count VI in Plaintiffs' Amended Complaint) was simply because of a failure to plead with particularity as required by Federal Rule of Civ. P. 9(b).  Judge Friedman held that  was "a matter that in many cases easily can be corrected."  (3/26/2007 Memorandum and Order, p. 2 fn. 2).

Judge Friedman adopted Magistrate Judge Kay's recommendation to dismiss Plaintiffs Breach of Express Warranty count (Count V in Plaintiffs' Amended Complaint) but in so doing, Judge Friedman pointed out that "[w]hile plaintiffs may not bring an express breach of warranty

claim as to the fitness of the medical device used in Ms. Kerris' procedure, the Court notes that a claim for breach of express warranty as to the *result* of a procedure or treatment is available where a physician 'clearly and unmistakably [gave] a positive assurance [that he would] produce or...avoid a particular result or results in treating a patient.'" (3/26/2007 Memorandum and Order, pp. 3-4, fn. 3 (citing **Scarzella v. Saxon, 436 A.2d 358, 361-62 (D.C. 1981)**(emphasis in original)). Judge Friedman further added that "Plaintiffs are free, of course, to move to amend their complaint under the liberal pleading standards of Rule 15 of the Federal Rules of Civil Procedure to add or substitute this theory for the one now articulated in Count V." (3/26/2007 Memorandum and Order, p. 4, fn. 3).

Plaintiffs, since filing their Amended Complaint, have been able to conduct fact discovery, including the depositions of Defendant Vance E. Watson, Felice P. Iacangelo and Cicily A. Iacangelo. With that discovery, Plaintiffs are now able to amend the Amended Complaint to plead fraud with the requisite particularity and to plead a breach of express warranty under the theory articulated by Judge Friedman. As these two amended counts are merely re-introduction of earlier material and rely on discovery to date, there is no prejudice and no undue surprise to the Defendants by allowing Plaintiffs to amend their complaint.

In addition to the aforesaid, the Amended Complaint corrects the misnomer of Felice I Iacangelo to Felice P. Iacangelo and removes reference to the counts which were dismissed with prejudice.

### III.    CONCLUSION

As there has been no undue delay, bad faith or dilatory motive on the part of Plaintiffs, no repeated failure to cure deficiencies by amendments previously allowed, no undue prejudice to the opposing party, the Court should, as the rules state, grant Plaintiffs Motion to Amend

Complaint.  Pursuant to Federal Rule of Civ. P. 15 and Local Civil Rule 7(i), a copy o f

Plaintiffs' Amended Complaint is attached to this Motion.

Respectfully submitted,

By:      /s/ Anthony Newman

Anthony Newman

Newman, McIntosh & Hennessey, LLP

7315 Wisconsin Ave., Suite 700E

Bethesda, MD 20814

(301) 654-3400


    /s/ Andrew E. Greenwald

Andrew E. Greenwald

Joseph, Greenwald & Laake, P.A.

6404 Ivy Lane, Suite 400

Greenbelt, MD 20770

(301) 220-2200


*Counsel for Plaintiffs*

**DUTY TO CONFER STATEMENT**

In accordance with the Court's Order, Local Rule of Civil Procedure 7(m) this certificate

will confirm that the parties conferred at the deposition of Leonard Chiazze on November 7,

2007 where defense counsel, when asked if there would be any objection to Plaintiffs filing their

amended complaint,  stated, "I believe under the amended pleading rules that there is no point in

objecting."[1]


    /s/ Anthony G. Newman

Anthony Newman

---

[1](Chiazze Deposition, November 7, 2007 pp. 178, l. 22 - 179, ll 1-2.  A copy of the deposition is attached hereto as Exhibit 2).

-4-

## CERTIFICATE OF SERVICE

Pursuant to the United States District Court Local Rule for the District of Columbia

5.4(d), I hereby certify that a copy of the foregoing Motion to Amend Complaint was served via

electronic filing on the Court's CM/ECF website on December 21, 2007 to:

Megan Hills, Esq.
Nicolas Muzin, Esq.
Zoe C. Scharff, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005

                                                        /s/ Anthony G. Newman
                                             Anthony Newman

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

*Civil Division*

FELICE I. IACANGELO, *et al.*           :
                                        :
                                        :     **Civil No. 1:05CV02086**
                  Plaintiffs,           :
                                        :     **Judge Paul L. Friedman**
vs.                                     :
                                        :     **Magistrate Judge Alan Kay**
**GEORGETOWN UNIVERSITY**, *et al.*     :
                                        :
                  Defendants.           :
_____

**ORDER**

      UPON CONSIDERATION of the Plaintiffs Motion to Amend Complaint, and

any Opposition and Reply thereto, it is this _____ day of _____, 2008, by the United

States District Court for the District of Columbia,

      **ORDERED**, that the Plantiffs' Motion to Amend Complaint is hereby **GRANTED**.


_____
The Honorable Alan Kay
Magistrate Judge
United States District Court for the District of Columbia

**Copies to**:

Anthony Newman
NEWMAN, MCINTOSH & HENNESSEY, LLP
7315 Wisconsin Ave., Suite 700E
Bethesda, MD 20814

Andrew E. Greenwald
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770

Megan Hills, Esq.
Nicolas Muzin, Esq.
Zoe C. Scharff, Esq.
David Kiernan, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth St., N.W.
Washington, D.C. 20005

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FELICE P. IACANGELO and** | : | |
| **CICILY A. IACANGELO, as** | : | |
| **GUARDIAN OF THE PERSON** | : | |
| **AND PROPERTY of** | : | |
| **KARYN A. KERRIS** | : | |
| **2109 Edgeware Street** | : | |
| **Silver Spring, MD 20905** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Plaintiffs,** | : | **Case No.   05-2086** |
| | : | |
| **v.** | : | **Judge Paul L. Friedman** |
| | : | |
| **GEORGETOWN UNIVERSITY, t/a** | : | **Magistrate Judge Alan Kay** |
| **Georgetown University Hospital** | : | |
| **serve:** | : | |
| | : | |
| **4000 Reservoir Road, NW** | : | |
| **Washington, DC   20007** | : | |
| | : | |
| **and** | : | |
| | : | |
| **VANCE E. WATSON, M.D.** | : | |
| **4000 Reservoir Road, NW** | : | |
| **Washington, DC   20007** | : | |
| | : | |
| **Defendants.** | : | |

## AMENDED COMPLAINT

COMES NOW the Plaintiffs, Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of

the Person and Property of Karyn A. Kerris, by and through her attorneys, Anthony G. Newman,

Esq., and Andrew Greenwald, Esq., and respectfully represents as follows:

## COUNT I
*(Medical Negligence - Personal Injury)*

1.      Jurisdiction of this Court is founded on diversity of citizenship.

2.      Felice I. Iacangelo and Cicily A. Iacangelo were duly appointed as Guardians of

the Person and Property of Karyn A. Kerris by the Circuit Court of Montgomery County (28221-FL) being so appointed on August 11, 2005 .

3.      Upon  information and belief, at all relevant times herein, the Defendants, Georgetown University, owned, leased, operated, managed, maintained, supervised, and/or did business as, Georgetown University Hospital, which is a hospital located in and doing business in the District of Columbia.

4.      At all relevant times herein, Georgetown University Hospital was a duly licensed and accredited health care facility, which held itself out to the public as an institution providing legally and ethically approved treatments to its patients, and was competent to provide legally and ethically approved health care services within the District of Columbia.

5.      At all relevant times herein, Defendant Vance E. Watson, M.D., was a licensed physician in the District of Columbia who held himself out to the public as a specialist in the field of interventional neuro-radiology.

6.      Defendant Vance E. Watson, M.D., is a resident of the District of Columbia.

7.      At all relevant times herein, Defendant Georgetown University  rendered care to Karyn A. Kerris through its employees, agents and/or servants acting within the scope of their employment, including Defendant Vance E. Watson, M.D.

8.      On or about the dates of November 4, 1998, January 13, 1999, and March 3, 1999, Defendant Vance E. Watson, M.D., performed multiple embolizations on Karyn A. Kerris' arteriovenous malformations at the Georgetown University Hospital using a combination of two devices, Histoacryl and Lipiodol.

9.      Histoacryl is chemically a n-butyl-cyanoacrylate, a polymer glue that is chemically

identical to "Super Glue"™; Lipiodol is a mixture of poppy seed oil mixed with a radio-opaque material.

10.    Defendant Georgetown University, through their servants, agents and employees, including Defendant Vance E. Watson, M.D., were negligent in their management, care and treatment of  Karyn A. Kerris on November 4, 1998 and continuing thereafter, including but not limited to the following particulars:

a.    negligent performance of examinations and evaluations;

b.    negligent decision to perform multiple embolizations on Karyn A. Kerris' vascular anomaly;

c.    negligent decision to perform embolizations utilizing a Class III, medical device that had not been approved and was thus illegal;

d.    negligent performance of embolizations without obtaining an investigational device exemption (IDE), without any other exemption or waiver from the Federal Government or its agencies and without providing notice to said entities of their intent to use such a device;

e.    negligent performance of embolizations on a AVM where the risk of failure outweighed any potential benefit;

f.    negligent technique in compounding a new device using two unapproved illegal Class III devices employed in the performance of the multiple embolizations;

g.    negligent failure to follow the express warnings and/or contraindications found on the manufacturer's package insert regarding the use of Histoacryl;

h.    negligent failure by Defendant Vance Watson, M.D., to submit his use of an "investigational" Class III device to Defendants Georgetown University's research body governing human experimentation and/or Institutional Review Board (IRB) prior to its usage;

i.    negligent supervision and/or monitoring by Defendant Georgetown University of the ordering, invoicing and use of illegal Class III devices by their employees, agents and/or servants, including Vance E. Watson, M.D., on patients within Georgetown University Hospital;

j.    negligent failure by Vance E. Watson, M.D. to follow Georgetown University's human experimentation and/or IRB rules and regulations;

k.    negligent failure to disclose patients in general, and Karyn A. Kerris in particular, that Defendants intended on using a device that had been the subject of a trade alert and had been seized by the FDA prior to its use on Karyn A. Kerris;

l.    negligent failure to record the embolizations of Karyn A. Kerris by video tape or otherwise, since it was an experiment using human subjects with an unapproved and illegal Class III device;

m.    negligent failure to document the precise combination and/or strength of Histoacryl and its diluent Lipiodol;

n.    Defendants were otherwise negligent; and,

o.    Plaintiffs may also rely on *res ipsa loquitur*.

11.    As a direct and proximate result of the aforesaid negligence of the Defendants, Karyn A. Kerris, suffered serious permanent and disabling damage to her body, including but not limited to: glue particles escaping into eloquent portions of her brain causing: ischemia,

brain damage, seizures, hydrocephalus, psychological damages and other neurological and physical impairments leaving her brain damaged and dysfunctional for the remainder of her life. She has suffered, and will in the future suffer, she will endure expenses for medical services and supplies, physical and occupational therapy and testing, careful and frequent psychological and psychiatric evaluation and treatment, as well as for specialized devices required for the activities of daily living. She has suffered and forevermore will suffer a total loss of future earnings, earning capacity, and the ability to lead a normal life. She has endured in the past, and will endure in the future, pain, suffering, disability, humiliation, embarrassment, mental anguish and emotional distress. She presently requires and will require around-the-clock care and supervision for the remainder of her life.

12.    Karyn A. Kerris was adjudicated incompetent by the Circuit Court for Montgomery County, MD. As a result of her incompetence, the Circuit Court for Montgomery County, MD appointed Felice I. Iacangelo and Cicily A. Iacangelo, as Guardians of the Person and Property of Karyn A. Kerris. Thus, Karyn A. Kerris did not have and does not have the mental capacity to discover any of the negligent acts and/or omissions contained in this Complaint because after the negligent and illegal embolizations were performed, she became brain damaged, and will forevermore remain so, unable to comprehend or otherwise be cognizant of what had occurred, or what is presently occurring, nor can she express any understanding of said, assuming *arguendo* she had any such understanding, given her inability to communicate.

13.    Defendants' failure to provide proper informed consent as stated below in Count II and Defendants' fraud as set forth below in Count VI, also precluded Karyn A. Kerris from

-5-

discovering that the device(s) which was/were implanted into the vessels of her brain was/were unapproved and illegal and/or that the Defendants' physician was not authorized to perform embolizations with Histoacryl, thus she could not have discovered, even if she had been mentally competent to discover, the exact nature and extent of the negligent and/or illegal conduct of the Defendants.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

<u>COUNT II</u>
(*Lack of Informed Consent*)

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

14.    Defendants never disclosed before any of the embolizations had occurred, *inter alia*, their intent to use the unapproved Class III devices, Histoacryl and/or Lipiodol, during the embolizations, in a combination manufactured at the time of the procedure which had never been tested previously and could never be tested and could never again be duplicated, since the concoction and combination of Histoacryl and Lipiodol had neither been precisely measured nor recorded.

15.    Defendants never disclosed that the Histoacryl and Lipiodol which were to be injected into the vessels of Karyn A. Kerris' brain had to be smuggled into the United States since the two devices were not approved by the FDA and had been the subject of an FDA trade

alert.

16.     Defendants never described the high failure rates for embolizations utilizing Histoacryl and/or Lipiodol and/or its combination to treat vascular anomalies.

17.     Defendants never disclosed to Karyn A. Kerris the fact that the Histoacryl was to be employed in the vessels of her brain in a manner specifically forbidden by the manufacturer's labeling.

18.     Defendants never disclosed to Karyn A. Kerris the fact that any attempted embolization would have an extremely high risk of failure with catastrophic results.

19.     Defendants never disclosed to Karyn A. Kerris that the use of unapproved and untested devices, such as Histoacryl and Lipiodol and/or their combination was experimental, never disclosed that their use had not been approved by Georgetown University Hospital's  IRB, and never disclosed that approval was required before any experimental procedure could be conducted at the Hospital.

20.     Had Karyn A. Kerris been informed of the aforesaid facts in paragraphs 16 - 21, she would not have consented to the embolizations, because she would have knowledge that: a)the treatments had not received FDA approval; b) the risks and dangers inherent with the use of Histoacryl, and/or Lipiodol, and/or a combination thereof were extremely high; c) the concocted embolization device made up of unknown quantities and strengths of Histoacryl and/or Lipiodol was never previously tested, could not be duplicated, so its efficacy was unknown; d) defendants intended on utilizing unapproved medical devices without IRB oversight; e) defendants were unauthorized to use these devices; f) the illegal devices had unacceptable failure rates; g) their use was contrary to warnings by the manufacturer; and h) any attempted embolization with these

-7-

devices could have catastrophic results.

21.     Defendant had not authorized and/or created a proper IRB-approved informed consent form for human experimentation that set forth: a) the purpose of the treatment; b) the fact that the decision to use the experimental device was purely voluntary; c) the availability of alternative devices and/or treatments; d) that the use of the experimental device would not be charged to the patient; e) a full description of the risks and benefits of the proposed treatment; f) the number of persons in the study; and g) the failures during present and prior usage; without said information, Karyn A. Kerris could not provide proper consent and the Defendants were thus not authorized to provide said treatments.

WHEREFORE, Plaintiff Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants, Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT III
### (*Breach of Warranty*)

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:

22.     At all relevant times herein, Defendant Vance E. Watson, acting as an agent, servant, and/or employee of Defendant Georgetown, expressly warranted to the Karyn A. Kerris and her parents Felice P. Iacangelo and Cicily P. Iacangelo that the embolizations' chances of success were 95% and that success would mean a cure of Karyn A. Kerris' arteriovenous malformation (AVM).

23.     At all relevant times herein, Defendant Vance E Watson, M.D.'s clear and unmistakable positive assurances that his embolizationos would cure Karyn A. Kerris's AVM

constituted a warranty which induced Karyn A. Kerris and her family to consent to the treatments.

24.    Karyn A. Kerris would not have consented or agreed that the illegal medical devices could be injected into her body if there was no warranty made by Defendant Vance E. Watson, M.D.

25.    As a direct and proximate result of the Defendant Vance E. Watson, M.D.'s warranty, Karyn A. Kerris consented to the embolizations and suffered injuries and damages as set forth above.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

**COUNT IV**
*(Fraud)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:

26.    Defendant Vance E. Watson, M.D., who acting individually and/or as the agent, servant and/or employee of Defendant Georgetown University, made and/or fraudulently withheld representations of material facts which were false and/or the falsity of what was known or should have been known to Defendants at the time the representations were made.

27.    Defendants' defrauded Karyn A. Kerris by deliberately withholding or falsely representing information regarding the embolizations and the devices used therein, including:

a.    Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University, did not advise Karyn A. Kerris that the

-9-

devices were illegal because they had not obtained approval from the FDA to use the experimental devices, Histoacryl and Lipiodol or provide the FDA with notice of its use;

b.      Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University,  did not advise Karyn A. Kerris, that they did not  seek and/or obtain an IDE for use of these experimental devices, which would have been the only legal exemption to use the devices;

c.      Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University,  did not reveal to Karyn A. Kerris the illegal status of Histoacryl and/or Lipiodol;

d.      Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University,  did not reveal to Karyn A. Kerris that an untested illegal product would be injected into the vessels of her brain;

e.      Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University,  did not reveal to Karyn A. Kerris that a he would be creating a new device, by combining Histoacryl with Lipiodol at the bedside, which he would then inject into her brain.

f.      Defendant Vance E. Watson, acting as an agent, servant and/or employee of Defendant Georgetown University,  did not reveal to Karyn A. Kerris that the embolizations were not cure her AVM, instead, Defendant Vance E. Watson fraudulently revealed that the chances of cure were 95%.

28.    Defendant Vance E. Watson M.D. withheld or falsely represented the aforesaid on November 4, 1998, January 13, 1999 and March 3, 1999.

-10-

29.     These withholdings or false representations were made by Defendant Vance E. Watson, M.D. for the purpose of defrauding Karyn A. Kerris and inducing her to consent to the embolizations.

30.     Defendants knew or should have known that  Karyn A. Kerris would rely upon said representations and/or omissions and that said representations and/or omissions were material to a knowing and intelligent decision.

31.     Based on the special relationship which exists between Karyn A. Kerris and each Defendant, Defendants had a duty to disclose the information concealed from Karyn A. Kerris.

32.     Defendants' fraud in withholding or falsely representing, *inter alia:*  the truth about the legal status of the components and the combination of components of the device Defendants intended to manufacture and insert into Karyn A. Kerris; induced Ms. Kerris's consent and allowed the embolizations to occur.

33.     Defendant Vance E. Watson, M.D., an interventional neuroradiologist perpretrated the fraud, at Ms. Kerris's expense, in order to perfect his skills at treating a grade-5 AVM, an opportunity that had only presented itself approximately two times prior to Ms. Kerris, knowing that he could now generate new patients and new revenue for these procedures, if they were successful.

34.     Defendant Georgetown University agreed to, acquiesced and otherwise enabled Defendant Vance E. Watson, M.D. to perform the embolizations on Karyn A. Kerris using illegal devices in order to both raise revenue and in an attempt to position itself at the forefront of interventional neuroradiology.

35.     As a direct and proximate result of the Defendants' fraud, Karyn A. Kerris and suffered  injuries and damages as set forth above.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the

Person and Property of Karyn A. Kerris, demand judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT V
*(Breach of Fiduciary Obligations)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

36.  At all relevant times herein, Defendant Vance E. Watson, M.D., owed a fiduciary duty to Karyn A. Kerris to, *inter alia*, use only approved medical devices and/or be authorized to use unapproved devices.

37.    Vance E. Watson, M.D. and Georgetown University, breached their fiduciary duty of loyalty and care to Karyn A. Kerris and the duty to, at all times, act in good faith and in the best interests of the Plaintiff, abide by the Hippocratic oath of loyalty, care and to do no harm to her.

38.    Defendant, Vance E. Watson, M.D., owed fiduciary duty to each individually, jointly and severally to, *inter alia*, utilize only medical devices that were approved and/or which were legally authorized to utilize and/or which had a reasonable chance for success versus its risk. Defendant, Georgetown University breached their fiduciary duty of loyalty and care and to act in good faith and in the best interests of the Karyn A. Kerris by, *inter alia*:

a)    Failing to disclose the risks associated with each embolization.

b)    Failing to disclose that the medical device utilized would include the use of cyanoacrylate, and that was a device which the manufacturer specifically warned against using internally and specifically, in the area of the brain.

c)    Failing to disclose that the cyanoacrylate and its diluent were Class III medical

-12-

devices which required a physician to have sought and obtained an exemption prior to employing its use.

        d)     Failing to reveal Defendant Vance E. Watson, M.D.'s failure rates utilizing cyanoacrylates when he had previously attempted embolization with this medical device.

        e)     Failing to disclose that Histoacryl and Lipiodol were not approved medical devices.

        f)     Failing to disclose the Defendant Vance E. Watson, M.D., intended to manufacture a totally new, previously untested medical device and insert it into Karyn A. Kerris.

        g)     Failing to disclose that the medical device Defendant Vance E. Watson, M.D., manufactured could not be duplicated and efficacy tested accuracy.

        h)     Failing to fulfill its responsibility pursuant to 21CFR Sections 50 & 56 to establish an IRB and/or implement appropriate procedures to protect subjects in experimentation.

        i)     Failing to disclose the high risk and low benefit of the proposed embolizations.

        39.     Defendant Georgetown University acting by and through its actual and/or apparent agents, servants and/or employees breached their fiduciary duty to Karyn A. Kerris in that Defendants, *inter alia*, intentionally, recklessly and/or negligently failed to provide proper custodial care, treatment and supervision to her to, *inter alia*, insure that only medical devices which were approved, or for which an exemption had been provided and used by authorized personnel had been utilized and that any and all use of cyanoacrylate was done in a completely ethical, and procedurally and legally appropriate manner.

        40.     As a direct and proximate result of the aforesaid breaches of the fiduciary duty by the

-13-

Defendant Vance E. Watson, M.D., and/or Georgetown University Karyn A. Kerris suffered severe and permanent injuries and great pain of body and mind, as set forth above.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demand judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

### COUNT VI
*(Punitive Damages)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

41.    Defendant Georgetown University, acting by and through their agents, servants and/or employees, including their administrators, board of directors, financial directors, purchasing department and staff physicians, including Defendant Vance E. Watson, M.D. willfully, maliciously and fraudulently injected and/or allowed the injection into patients' cerebral blood vessels, of unapproved and un-exempted Class III devices to wit: Histoacryl and the combination of Histoacryl with Lipiodol, or some other diluent, on multiple occasions, including into Plaintiff, with full knowledge that the devices' safety and/or the effectiveness had never been and could not be tested.

42.    Defendants recklessly and wantonly permitted Vance E. Watson, M.D. to obtain the component parts necessary to manufacture "Histadol" and then to manufacture and inject the product described above.

43.    Defendants when they repeatedly ratified the conduct of Defendant Vance E. Watson, M.D. by continuing to order, purchase and stock and provide the component parts of "Histadol" with

-14-

the knowledge that they would be mixed in an unscientific fashion and injected into patients, including Karyn A. Kerris.

44.    Defendants intentionally performed all of the aforesaid without any provision for review of Vance E. Watson, M.D.'s manufacturing process, method of performance when utilizing the product and/or success/failure rate and/or an analysis of the reasons therefore.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of One Hundred Million Dollars ($100,000,000.00) plus costs and interest.

<u>COUNT VII</u>
*(Negligence Per Se - Violation of 21 U.S.C. §360c (a)(II), and 21 C.F.R. Ch. 1 § 812.20(a)(2))*

Plaintiffs replead and incorporate by reference herein each and every allegation set forth above and further state as follows:

45.    At all relevant times herein, Histoacryl and Lipiodol were, and continue to be, Class III artificial embolization devises as defined by 21 C.F.R. Ch. 1 § 882.5950, and as such, are unapproved for any use in the United states (Classes I and II are "approved" devices).

46.    A Class III device is one for which the Food and Drug Administration ("FDA") does not have "reasonable assurance" of "safety and effectiveness." See 21 U.S.C. §360e(a).

47.    The only acceptable process by which Class III devices can be marketed in the United States is by an approved application to the FDA, known as an application to obtain premarket approval (PMA). See 21 U.S.C. § 360c(a) (II).

48.    No application for PMA was filed with the FDA, and no PMA was obtained at

anytime prior to the date of Defendants' surgery on Karyn A. Kerris.

49.     The only exemption which allows a physician and/or a hospital to treat a patient with a Class III device is an investigational device exemption (IDE).  See 21 C.F.R. Ch. 1 § 360j(g)(1).

50.     To obtain an IDE, a physician or institution must become a "sponsor" and "submit an application to FDA." See 21 C.F.R. Ch. 1 § 812.20(a)(2).

51.     An application to obtain an IDE was never submitted by Defendants.

52.     The FDA's classification of Histoacryl and Lipiodol as Class III devices prohibited the production, distribution and medical use of those devices in the United States.

53.     In an effort to circumvent the government's regulations, Defendants ordered the devices from Yocan Medical Systems, Inc., in Ontario, Canada, through the use of documents that created the pretense that the devices were being used pursuant to a personal prescription and/or for an experiment (IDE).

54.     21 U.S.C. § 351(f)(1)(B)(I) defines a Class III device that does not have an approved, "application for premarket approval," as adulterated.

55.     21 U.S.C. § 352(q) defines a Class III device that is "used in violation of regulations," as misbranded.

56.     Defendants Georgetown University and their employees, agents and/or servants, including Defendant Vance Watson, M.D., violated the aforesaid sections by manufacturing, placing into the stream of commerce and employing the unapproved Class III devices.

57.     The aforesaid statutes were designed, *inter alia*, to promote the health and safety of the public by only allowing devices into the Unites States and into patients that have gone through the necessary regulatory process and had met the stringent requirements of the FDA.

-16-

58.    As a direct and proximate results of Defendants' violations of the aforesaid statutes, Karyn A. Kerris received the unapproved, misbranded, mislabeled devises and suffered permanent brain injury.

59.    The brain injury suffered by Karyn A. Kerris would not have occurred had the Defendants not violated the aforesaid statues.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo, as Gaurdians of the Person and Property of Karyn A. Kerris, demand judgment of and against Defendants, Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT VIII
*(Negligence Per Se - Violations of 21 U.S.C. §331 (a), (b), (c), (g) and (k))*

Plaintiffs replead and incorporate by reference herein each and every allegation set forth above and further state as follows:

60.    21 U.S.C. §331 entitled "Prohibited Acts" sets forth in subparagraph (a) that it is a violation of the statute to allow, "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."

61.    21 U.S.C. §331(b) states that it is a violation of the statute to allow, "[t]he adulteration or misbranding of any food, drug, device, or cosmetic in interstate commerce."

62.    21 U.S.C. §331(c) states that it is a violation of the statute to allow, "[t]he receipt in intestate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise."

63.    21 U.S.C. §331(g) states that it is a violation of the statute to allow, "[t]he

-17-

manufacture within any Territory of any food, drug, device, or cosmetic that is adulterated or misbranded."

64.    21 U.S.C. §331(k) states that it is a violation of the statute to allow, "[t]he alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

65.    Defendants' violated the aforesaid "Prohibited Acts"subsections, in that they:

(a)    introduced and or caused introduction of, Histoacryl and Lipiodol, both adulterated and misbranded devices, into interstate commerce,

(b)    adulterated both Histoacryl and Lipiodol by mixing and/or compounding the two devices together,

(c)    received a misbranded and adulterated device,

(d)    manufactured a "new" Class III adulterated and misbranded device when they mixed Histoacryl with Lipiodol,

(e)    ignored the warnings and/or destroyed the labeling on the Class III device Histoacryl.

66.    The aforesaid statutes were designed, *inter alia*, to promote the health and safety of the public by only allowing devices into the Unites States and into patients that have gone through the necessary regulatory process and had met the stringent requirements of the FDA.

67.    As a direct and proximate result of Defendants' violations of the aforesaid statutes, Karyn A. Kerris received the unapproved, misbranded, mislabeled devises and suffered permanent brain injury.

-18-

68.    The brain injury suffered by Karyn A. Kerris would not have occurred had the Defendants not violated the aforesaid statues.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo, as Gaurdians of the Person and Property of Karyn A. Kerris, demand judgment of and against Defendants, Georgetown University, and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

<u>**COUNT IX**</u>
*(Negligence Per Se - Violation of 21 C.F.R. § Ch. 1 812.20(a)(2))*

Plaintiffs replead and incorporate by reference herein each and every allegation set forth above and further state as follows:

69.    21 C.F.R. Ch. 1 § 812.20(a)(2), discussing investigational device exemptions, mandates that, "A sponsor shall not begin an investigation for which FDA's approval of an application is required until FDA has approved of an application is required until FDA has approved the application."

70.    21 C.F.R. Ch. 1 §812.1 states that the purpose of the development of investigational device exemptions ("IDEs") is, *inter alia*, "the protection of public health and safety."

71.    Defendants Georgetown University and , and their employees, namely their administrators, board of directors, purchasing department, and staff physicians, including Defendant Vance Watson, M.D., violated 21 C.F.R. Ch. 1 § 812.20(a)(2), by injecting Histoacryl and Lipiodol into Karyn A. Kerris without an IDE.

72.    As a direct and proximate result of Defendants' violation of 21 C.F.R. Ch. 1 § 812.20(a)(2), which was designed protect health and safety, Karyn A. Kerris suffered the injuries and damages set forth above.

-19-

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo, as Gaurdians of the Person and Property of Karyn A. Kerris, demand judgment of and against Defendants, Georgetown University, and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

Respectfully submitted,

_____

  /s/ Anthony G. Newman_____
Anthony Newman, Esquire
NEWMAN & McINTOSH
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814
(301) 654-3400

_____

  /s/ Andrew Greenwald_____
Andrew Greenwald, Esquire
GREENWALD AND LAAKE
6404 Ivy Lane, Suite 440
Greenbelt, Maryland 20770
(301) 220-220
**Attorneys for Plaintiffs**

### <u>REQUEST FOR JURY DEMAND</u>

_____Plaintiffs request trial by jury as to all counts herein.

  /s/ Anthony G. Newman_____
Anthony Newman, Esquire_____

_____

-20-

Page 89

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
------------------------x
                        :
FELICE I. IACANGELO,    :
et al.                  :
                        :
          Plaintiffs    :
                        : Case No.
    vs.                 : 1:05CV02086
                        : Judge Friedman
GEORGETOWN UNIVERSITY,  :
t/a Georgetown University :
Hospital, et al.        : Volume II
                        :
          Defendants    :
                        :
------------------------x
```

Washington, D.C.
November 7, 2007

Deposition of:

LEONARD CHIAZZE, JR., Sc.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the Law

Offices of Williams & Connolly, 725 12th

Street, N.W., Washington, D.C., beginning at

10:13 a.m., before Zev V. Feder, CSR, a Notary

Public in and for the District of Columbia,

when were present on behalf of the respective

parties:

Page 90

```
 1
 2    On behalf of the Plaintiffs:
 3    Joseph, Greenwald & Laake
      By:  ANDREW E. GREENWALD, ESQ.
 4       6404 Ivy Lane, Suite 400
         Greenbelt, Maryland  20770
 5       (301) 220-2200
 6    On behalf of the Defendants:
 7    Williams & Connolly
      By:  MEGAN E. HILLS, ESQ.
 8    By:  ZOE SCHARFF, Esq.
         725 12th Street, N.W.
 9       Washington, D.C. 20005
         (202) 434-5393
10
            +++
11
12      C O N T E N T S
13    WITNESS: LEONARD CHIAZZE, JR., Sc.D.
14    EXAMINATION BY:              PAGE
15    MR. GREENWALD                92
16    MS. HILLS              -
17
18         EXHIBITS
19    DEPOSITION NO.    MARKED FOR IDENTIFICATION
20    5. Letter, 10/10/07; errata sheet     93
21    6. Complaint              112
22
```

Page 91

```
 1
 2        P R O C E E D I N G S
 3        MR. GREENWALD:  Before we start,
 4    let me ask you, have you made a decision on
 5    what your position is going to be about the
 6    amended complaint?  Are you opposing it?  Are
 7    you not opposing it?
 8        MS. SCHARFF:  Can we do those
 9    after, so the doctor can leave?
10        MS. HILLS:  If this is on the
11    record, I don't believe meet and confers are
12    supposed to be on the record.  I would like to
13    meet and confer and negotiate and discuss what
14    is in your amended complaint.  I am perfectly
15    willing to satisfy Rule 7M with a meet and
16    confer.  I am unwilling to have a conference
17    with the transcript.
18        MR. GREENWALD:  We can do the
19    meeting after -- we don't need to keep the
20    doctor waiting for that.
21        MS. HILLS:  Exactly.
22        MR. GREENWALD:  But I do want to
```

Page 92

```
 1    have a transcript of our meeting.
 2        MS. HILLS:  We can discuss that
 3    after the deposition.
 4        MR. GREENWALD:  Let's go with the
 5    deposition, so we won't have to keep the
 6    doctor here.
 7    Whereupon,
 8        LEONARD CHIAZZE, JR., Sc.D.
 9    was called for examination by counsel and,
10    having been duly sworn by the Notary, was
11    examined and testified as follows:
12      EXAMINATION BY COUNSEL FOR PLAINTIFFS
13        BY MR. GREENWALD:
14      Q.   Doctor, this is a continuation of
15    the deposition that was started some time ago.
16    Do you recall when you were deposed on
17    September 18th?
18      A.   Yes.
19      Q.   After that deposition did you have
20    a chance to read the transcript from that day?
21      A.   Yes.
22      Q.   I would like to show you, first of
```

Page 93

```
 1    all, a copy of an errata sheet from that
 2    deposition.  We can mark this as an exhibit.
 3        Do you have a copy?
 4        MS. HILLS: Yes, I do.
 5        MR. GREENWALD:  I brought an extra
 6    copy just in case you didn't have one.
 7        MS. HILLS:  That would be great.
 8        (Document referred to marked
 9    Deposition Exhibit No. 5 for identification
10    and subsequently attached to the deposition.)
11        BY MR. GREENWALD:
12      Q.   Doctor, let me give you that.
13    That is the errata sheet we were provided from
14    the deposition that was taken on
15    September 18th.  Did you see that?
16      A.   Yes.
17      Q.   Is that your signature on the
18    bottom?
19      A.   Yes, it is.
20      Q.   Doctor, when you read the
21    deposition, when did you first come to realize
22    that, on pages 76, 77, that you left out the
```

Page 94

1  word tenure before all these words?  When did
2  you come to that realization?
3          MS. HILLS:  Objection.  Calls for
4  speculation.  Also, seeks to intrude upon
5  attorney-client privilege.
6          To the extent you can answer
7  without intruding upon attorney-client
8  privilege -- as we all know, errata sheets are
9  typed up by attorneys and whoever the court
10  reporters address, so attorneys are involved.
11  I object.
12          But to the extent you can answer
13  without discussing any conversations with your
14  attorney, please answer.
15          BY MR. GREENWALD:
16      Q.   I am not asking you about
17  discussions with the attorney, doctor.
18      A.   Would you tell me what you are
19  asking, please?
20      Q.   I am going to do it again because
21  it probably got lost in all of that
22  discussion.

Page 95

1      A.   Thank you.
2      Q.   By the way, if at any time you
3  need me to clarify something, please tell me,
4  because I am really happy to do that.
5      A.   Okay.
6      Q.   Because I want to make sure you
7  understand what I am asking you.  So if at any
8  time you don't, please tell me.  Okay?
9      A.   (Indicating.)
10      Q.   Okay?
11      A.   Yes.  Sorry.
12      Q.   He has to take it down.
13      A.   I understand.
14      Q.   Can I assume, if you answer the
15  question, that you understood what I asked
16  you?  Otherwise, you would say to me, "Clarify
17  it," or "I don't understand," or something
18  like that?  Is that okay?
19      A.   That's okay.  We will determine
20  that when we get to it.
21      Q.   If you answer and don't tell me
22  you didn't understand, I am going to assume

Page 96

1  you did.  Okay?
2      A.   Okay.  Yes.
3      Q.   My question that I asked you
4  before all of that was, when you read this
5  deposition in September, when did you first
6  come to the realization that you left out the
7  word tenure on page 76 line 22.  Do you have a
8  copy of it with you?
9          MS. HILLS:  For the record, I am
10  showing the doctor pages 76 and 77 of his
11  deposition.  I believe counsel is referred to
12  page 76, line 22, the entry on the errata
13  sheet where tenure has been added.
14          BY MR. GREENWALD:
15      Q.   Doctor, when did you first come to
16  the realization that, when you answered this
17  question, you left out the word tenure?
18          MS. HILLS:  Objection to the
19  extent it ignores the 30-day provision.
20          THE WITNESS:  After I read the
21  transcript.
22          BY MR. GREENWALD:

Page 97

1      Q.   After you read the transcript, did
2  you then advise counsel that you left this
3  word out?
4          MS. HILLS:  Objection.
5          Don't answer that.  What you
6  advised me or what I advised you is an
7  attorney-client communication.
8          BY MR. GREENWALD:
9      Q.   Just so I understand, doctor, I
10  want to be clear, when you read this
11  deposition and you read page 76, as I
12  understand your testimony here under oath, as
13  you read that you said to yourself, "I left
14  out the word tenure here on this answer."  Is
15  that correct?
16      A.   I am not sure.
17      Q.   Why are you not sure?  What is it
18  that creates a question in your mind?
19          MS. HILLS:  Objection.  Calls for
20  speculation.
21          BY MR. GREENWALD:
22      Q.   What is it that creates a question

3 (Pages 94 to 97)

1  in your mind?
2      A.   The words, "As you read that."
3      Q.   Well, you did read it, right?
4      A.   Yes, I did.
5      Q.   And when you read it the first
6  time, did you say to yourself, "I left out the
7  word tenure"?
8      A.   That I don't recall, because I
9  read it more than once.
10     Q.   So on which reading did you
11 decide, gee, I left out the word tenure here?
12         MS. HILLS:  Objection.  Calls for
13 speculation.  Asked and answered.
14         BY MR. GREENWALD:
15     Q.   Doctor?
16     A.   I don't recall.
17     Q.   Just so we are clear, you read the
18 deposition more than once and on some reading
19 of this deposition you realized, as you read
20 it, that you left out the word tenure.  Is
21 that correct?
22     A.   I think that's correct.

1      Q.   And on page 77, line one, when you
2  answered the question that starts on page 76,
3  line 16 -- the question was, "As far as
4  compensation, do I understand, as that time in
5  May of 1998, that the faculty compensation
6  guidelines required faculty members to raise
7  certain amounts of income in order to justify
8  their compensation?"
9          Your answer was, "Not necessarily.
10 If your compensation level was below the cap,
11 then the cap would be guaranteed.  If your
12 compensation level was above the cap..." --
13 and then you went on to explain.
14         On which reading did you say to
15 yourself, gee, I left out the word tenure
16 before the word compensation on page 77?
17     A.   I don't --
18         MS. HILLS:  Objection.  Asked and
19 answered.  Calls for speculation.
20         BY MR. GREENWALD:
21     Q.   On which reading did you say, gee,
22 I left this word out?

1      A.   I don't know.  I don't recall.
2      Q.   Did you ever say to yourself,
3  doctor, as you read this deposition, "I left
4  this word out"?
5          MS. HILLS:  Objection.
6          BY MR. GREENWALD:
7      Q.   Was it your thought processes as
8  you read this that said to you, I left out the
9  word tenure?
10         MS. HILLS:  Objection.  Asked and
11 answered.  Calls for speculation.
12         THE WITNESS:  I am not sure.
13         BY MR. GREENWALD:
14     Q.   Why are you not sure?  What is it
15 about this that makes you unsure?
16         THE WITNESS:  Go back and read his
17 question for me, please?  Could you do that?
18         MR. GREENWALD:  He can do that any
19 time you want.
20         THE WITNESS:  Right now.
21         (The record was read by the
22 reporter as follows:

1          +++
2      Q.   "Was it your thought processes as
3  you read this that said to you, I left out the
4  word tenure?
5          MS. HILLS:  "Objection.  Asked and
6  answered.  Calls for speculation.
7          THE WITNESS:  "I am not sure.
8          BY MR. GREENWALD:
9      Q.   "Why are you not sure?  What is it
10 about this that makes you unsure?")
11         +++
12         THE WITNESS:  Because I can't
13 place an exact time on it.
14         BY MR. GREENWALD:
15     Q.   But that wasn't my question.  Let
16 me see if I can ask it again.
17         Is it your testimony, or that I
18 understand it, at some reading when you read
19 this deposition -- because you told me you
20 read it more than once -- when you got to page
21 77, line one, you said to yourself, gee,
22 before the word compensation, I left out the

4  (Pages 98 to 101)

Page 102

1  word tenure?
2      MS. HILLS: Objection.
3      BY MR. GREENWALD:
4      Q.   Did that thought process occur to
5  you as you read the deposition, on your own?
6  That's my question.
7      MS. HILLS: Objection. Calls for
8  speculation. Asked and answered.
9      BY MR. GREENWALD:
10     Q.   You can answer, doctor.
11     A.   Your question, I believe, has more
12 than one part to it.
13         Again, can you go back and read
14 the question, please? I am not trying to be
15 difficult. I am trying to be exact.
16         MR. GREENWALD: That's what I
17 want. I don't have a problem with you being
18 exact.
19         THE WITNESS: Good.
20         Could you go back and read --
21         MR. GREENWALD: And I appreciate
22 the fact that you want to be exact. I would

Page 103

1  hope that every answer is as exact as you can
2  make it.
3         (The record was read by the
4  reporter as follows:
5         +++
6      Q.   "Did that thought process occur to
7  you as you read the deposition, on your own?
8  That's my question.")
9         +++
10        MS. HILLS: The same objections.
11        THE WITNESS: I believe that did.
12        BY MR. GREENWALD:
13     Q.   Why do you believe that?
14        MS. HILLS: Objection. Calls for
15 speculation.
16        THE WITNESS: I am not exactly
17 sure.
18        BY MR. GREENWALD:
19     Q.   What is it that makes you unsure?
20        MS. HILLS: Objection. Calls for
21 speculation. Asked and answered.
22        THE WITNESS: Again, I am unsure.

Page 104

1      BY MR. GREENWALD:
2      Q.   Why?
3      MS. HILLS: Objection. Asked and
4  answered.
5      THE WITNESS: I am not sure why.
6      BY MR. GREENWALD:
7      Q.   Doctor, on page 77, line six, when
8  you read this, the sentence that started,
9  "But, in the medical center, to my knowledge,
10 and this is a general statement, the faculty
11 wanted to support themselves through
12 research."
13         Is it my understanding that, as
14 you read this, you said to yourself, and came
15 to this conclusion on your own, gee, I left
16 out the word 'tenure' before 'faculty' when I
17 gave this answer?
18         MS. HILLS: Objection. Asked and
19 answered.
20         BY MR. GREENWALD:
21     Q.   Is that correct?
22     A.   As I said, I don't recall if it

Page 105

1  was as I read it.
2      Q.   Doctor, my question -- why were
3  you not sure as you read it?
4      MS. HILLS: Objection. Asked and
5  answered. Calls for speculation.
6      BY MR. GREENWALD:
7      Q.   Let me ask it this way. What was
8  it that made you realize that the word was
9  left out in all these places?
10     A.   I believe it was the emphasis on
11 the entire tenure compensation.
12     Q.   Well, see, doctor, I am a little
13 confused about all of these addings of the
14 word tenure.
15     A.   Sure.
16     Q.   Because on page 74 of your
17 deposition, at line 12, you were asked -- I am
18 sorry. (Pause.)
19         You were asked, "Am I correct,
20 then, doctor, that whether the faculty
21 compensation guidelines affected other faculty
22 members than tenured professors, you would not

5 (Pages 102 to 105)

Page 106

1    know?"
2           Your answer was, "I don't recall.
3    I don't recall."
4           MS. HILLS:  Let me object to the
5    extent --
6           MR. GREENWALD:  Let me finish my
7    question.  Then you can -- if this is going to
8    be another speaking objection, we can ask the
9    doctor to wait outside and you can speak for
10   as long as you want.
11          MS. HILLS:  I would just like to
12   point out, the errata sheet says, "Consistency
13   of transcript."  The doctor was asked point
14   blank what he knew about in the deposition
15   and --
16          MR. GREENWALD:  This is a speaking
17   objection which is inappropriate.  We have
18   been through this with Magistrate Kay.  The
19   Defendant's deposition was held in the
20   Courthouse because of your behavior in that
21   deposition.  I really don't think we need to
22   spend all of this time with you doing

Page 107

1    inappropriate objections, for whatever reason
2    you feel the need to do that, which I am not
3    sure I personally understand other than we all
4    know it is incorrect.  It goes on all the
5    time.  It is unfortunate that we have to put
6    up with it.
7           MS. HILLS:  Objection to the
8    sidebar.
9           BY MR. GREENWALD:
10     Q.   Doctor, the question I asked you
11   was, on page 74 -- you probably have forgotten
12   this by now -- "Am I correct, then, doctor,
13   that whether the faculty compensation
14   guidelines affected other faculty members than
15   tenured professors, you would not know?"
16          And you said, "I don't recall.  I
17   don't recall."
18          Was that your answer at the time?
19   Take a look at that, make sure I read it
20   right.
21          MS. HILLS:  Objection.  Page 85,
22   full transcript, should be entered at this

Page 108

1    time.
2           MR. GREENWALD:  I asked him about
3    page 74.  Not for you to tell him what to say.
4           Is there a basic reason why you
5    feel you need to tell every person that we
6    depose, who you are, quote, representing, what
7    they need to say, that they are not competent
8    to understand what they should be answering,
9    that they need someone to tell them everything
10   they need to do?  This man is a Ph.D.  He is
11   certainly capable of understanding what he
12   said without you telling him where to fly all
13   over the deposition.
14          MS. HILLS:  Counsel, we --
15          MR. GREENWALD:  I asked a specific
16   question.
17          MS. HILLS:  -- don't need this.
18   All I entered, for the rule of completeness,
19   was --
20          BY MR. GREENWALD:
21     Q.   Doctor, "Did I read that
22   correctly" is the only question that is

Page 109

1    pending.
2      A.   At that time, I don't recall.
3           But there is also a correction to
4    your statement.  I do not have a Ph.D.  I have
5    an Sc.D.
6      Q.   I'm sorry.  You are a very
7    well-educated man.  Can we agree on that?
8      A.   I believe so.
9      Q.   Okay.  Good.  So my question to
10   you is, did I read that correctly on page 74?
11   "Am I correct, then, doctor, that..." --
12     A.   Yes.
13     Q.   So at the time of the deposition
14   you did not recall whether the faculty
15   compensation guidelines affected faculty
16   members other than tenured professors.
17   Correct?
18     A.   That's right.  But the next
19   question in the deposition asked me -- there
20   was a specifically -- tenured professors were
21   being violated by this.  And I answered that
22   is correct.

6 (Pages 106 to 109)

Page 110

1      Q.  I understand that.
2      A.  That's what I am answering.  That
3  is correct.
4      Q.  But my question is, doctor, do you
5  know -- why did you decide, if you didn't know
6  whether other faculty members were covered by
7  the guidelines, that is, nontenured faculty
8  members, what made you decide that you needed
9  to correct and add tenure to all these places
10  in your deposition?
11          MS. HILLS:  Objection.  Asked and
12  answered.  Calls for speculation.  Misstates
13  the transcript in its entirety.
14          BY MR. GREENWALD:
15      Q.  Can you answer my question,
16  doctor?
17      A.  No, I don't have a specific answer
18  for that.  Other than there is a great
19  emphasis in this entire process regarding
20  tenure.
21      Q.  Yes?
22      A.  And that's it.

Page 111

1      Q.  So you decided on your own, as I
2  understand it, and I am leaving this topic
3  with this question, that -- strike that.  Let
4  me ask you this.
5          Did you come into possession of
6  any knowledge that you didn't have, at the
7  time the deposition was taken in September,
8  that caused you to make these changes on the
9  errata sheet that we just talked about?
10          MS. HILLS:  Objection.  Calls for
11  speculation.  Overbroad and vague.
12          BY MR. GREENWALD:
13      Q.  Did you come into any other
14  information, doctor?
15      A.  Please define what you mean by
16  come into any other information.
17      Q.  Did you read anything about the
18  lawsuit?  Did you read anything about the
19  compensation plan?  Did you see any other
20  documents or papers of any kind?  Did you have
21  any discussions with anyone not counsel?
22      A.  No.

Page 112

1      Q.  About any of this?
2      A.  No.
3      Q.  So that all of this came to you on
4  your own without any other outside help?
5          MS. HILLS:  Objection.  Misstates
6  the testimony.
7          THE WITNESS:  I would think that
8  is correct.
9          (Discussion off the record.)
10          MR. GREENWALD:  Would you mark
11  this as Exhibit 6?  This is the lawsuit.
12          (Document referred to marked
13  Deposition Exhibit No. 6 for identification
14  and subsequently attached to the deposition.)
15          BY MR. GREENWALD:
16      Q.  Doctor, we have given you a copy
17  of Exhibit 6, which is the lawsuit that was
18  the subject of the last part of your
19  deposition in September.
20          Would you take a look at that
21  document for a minute and tell me whether you
22  recognize it?

Page 113

1      A.  (Pause).  Frankly, I don't recall.
2      Q.  You don't remember whether you
3  ever saw this before?
4      A.  I don't recall.
5      Q.  Is that your name on the front
6  page?
7      A.  Yes, it is.
8      Q.  Do you recall being a plaintiff in
9  a lawsuit such as this?
10      A.  Yes, I do.
11      Q.  Why were you a plaintiff in this
12  lawsuit?
13          MS. HILLS:  Objection.  Calls for
14  speculation.
15          THE WITNESS:  Because a policy was
16  being promulgated that breached the contract
17  with tenured faculty.
18          BY MR. GREENWALD:
19      Q.  What was the policy that you were
20  concerned about?
21          MS. HILLS:  Same objection.
22          THE WITNESS:  What was the policy

7 (Pages 110 to 113)

Page 114

1  I was concerned about?
2        BY MR. GREENWALD:
3     Q.   You said there was a policy that
4  breached a contract.  You just told me that.
5     A.   Yes.
6     Q.   What was the policy --
7     A.   It was the limit of the financial
8  guarantee to tenured faculty.
9     Q.   Explain to me how that worked and
10  what was it about that that was of concern to
11  you.
12     A.   The tenured faculty salary was
13  guaranteed by the university.  That didn't
14  mean that the University was paying all of the
15  tenured faculty salary but that the tenured
16  faculty salary was guaranteed, whatever that
17  salary was.
18     Q.   How was that salary established?
19        MS. HILLS:  Objection.  Calls for
20  speculation.
21        THE WITNESS:  Mine or anyone
22  else's?

Page 115

1        BY MR. GREENWALD:
2     Q.   As best you understood it.
3        MS. HILLS: Objection. Vague. He
4  said, "Mine or everyone else's," and you
5  said --
6        BY MR. GREENWALD:
7     Q.   How was yours established?
8     A.   At what point in time?
9     Q.   Well, let me ask you this.  How
10  was this new policy that formed the basis of
11  this lawsuit, how did this change what you
12  understood your compensation was?
13        (Interruption.)
14        (Pause.)
15        THE WITNESS:  It didn't change
16  what my compensation was.  It changed what the
17  University guaranteed would be the
18  compensation for a tenured faculty member.
19        BY MR. GREENWALD:
20     Q.   How did it do that?
21     A.   By placing a limit on the
22  compensation for tenured faculty.

Page 116

1     Q.   Explain to me how that worked when
2  you say placed a limit.  What did that mean?
3     A.   That meant that the maximum amount
4  that the University would guarantee was the
5  limit in the compensation plan.
6     Q.   Prior to that how did that differ
7  from the prior compensation plan, as you
8  understood you were entitled to?
9     A.   The tenure contract provided a
10  guarantee of the full salary of all tenured
11  faculty members.
12     Q.   When you say that the change would
13  put a cap on it, what exactly do you mean by
14  that?  How would that cap work?
15        MS. HILLS:  Objection.  Overbroad.
16  Calls for speculation.
17        To him or in general?
18        BY MR. GREENWALD:
19     Q.   How did it work as you understood
20  the change?
21        MS. HILLS:  To him or in general?
22        BY MR. GREENWALD:

Page 117

1     Q.   The change applied to everybody
2  who was, as you said, tenured faculty.
3  Correct?
4        MS. HILLS:  Yes, counsel, and he
5  has already said --
6        BY MR. GREENWALD:
7     Q.   My question is to the doctor, did
8  the change apply to all tenured faculty?
9     A.   Yes.
10     Q.   What was your understanding of how
11  the change affected the salaries?  In other
12  words, you told me you put a cap on them.
13  What I am trying to understand --
14     A.   Excuse me.  I believe I said it
15  did not affect the salary.  What it did was to
16  put a cap on the guarantee of the University
17  to the tenured faculty member.
18     Q.   Explain to me how the guarantee
19  worked.
20     A.   The guarantee was that whatever
21  the tenured faculty member's salary was at the
22  time, that that amount of money would be

1  guaranteed by the university.
2      Q.  So how did the cap change that?
3      A.  The cap changed that by limiting
4  the amount that would be guaranteed to a
5  tenured faculty member.
6      Q.  Was that based on some type of a
7  formula?
8      A.  No.
9      Q.  How did it work?  How did the cap
10  limitation work?
11      A.  A number was established and
12  promulgated.
13      Q.  Do you know what that number was?
14      A.  I believe it was $100,000.
15      Q.  So just so I understand, if a
16  faculty member prior to this policy change
17  earned -- let's make up a number just so we
18  understand the mathematics -- $150,000 in
19  salary, the university would guarantee that
20  that faculty member would get that $150,000?
21      MS. HILLS:  Objection.
22      BY MR. GREENWALD:

1      Q.  But with the policy change, the
2  university would only guarantee the number
3  that they picked, which was a hundred
4  thousand, as an example.  Is that correct?
5      MS. HILLS:  Objection.  Misstates
6  testimony.  Omits the word tenured faculty.
7      BY MR. GREENWALD:
8      Q.  Is that correct, doctor?
9  Mathematically is that correct?
10      A.  Mathematically it is correct.
11      Q.  I just wanted to make sure I
12  understood the process.
13      A.  Yes.
14      Q.  Was the salary based on any form
15  of productivity by the faculty member?  Was
16  that a component of the salary?
17      MS. HILLS:  Objection.
18      BY MR. GREENWALD:
19      Q.  Prior to the cap?
20      MS. HILLS:  Objection.  Misstates
21  the testimony.  Omitting the word tenure.
22      THE WITNESS:  I can't speak for

1  everyone but I can speak for myself.  The
2  answer is no.
3      BY MR. GREENWALD:
4      Q.  You don't do procedures.  Correct?
5      A.  That is correct.
6      Q.  For those who did procedures,
7  medical procedures, do you know whether or not
8  the income from those procedures was a factor
9  in the compensation prior to the policy
10  change?
11      MS. HILLS:  Objection.  Misstates
12  testimony.  Omitting the word tenure.
13      BY MR. GREENWALD:
14      Q.  Do you know, doctor?
15      A.  I do not know the manner in which
16  compensation is set for any individual.  Any
17  tenured faculty member or otherwise.
18      That is private information.
19      Q.  Do you know whether or not -- and
20  you may have answered this but I am not sure
21  of your answer -- do you know whether
22  productivity was part of the compensation

1  formula?
2      MS. HILLS:  Objection.  Misstates
3  prior testimony.  It omits the word tenure.
4      BY MR. GREENWALD:
5      Q.  Do you know, doctor?
6      A.  Can you define productivity?
7      Q.  Sure.  There are faculty members,
8  just hypothetically, who see patients in the
9  office and bring in a certain amount of
10  compensation, a certain amount of income, as a
11  result of their clinical work.  Right?
12      A.  I presume that is the case.
13      Q.  There are people who do procedures
14  that charge -- the university charges for
15  those procedures, don't they?
16      MS. HILLS:  Objection.  Calls for
17  speculation.
18      THE WITNESS:  I don't know that
19  for a fact.
20      BY MR. GREENWALD:
21      Q.  Who would be the person who would
22  have the most knowledge about how the

9 (Pages 118 to 121)

Page 122

1  compensation worked for those who were people
2  doing procedures and physicians?
3       MS. HILLS: Objection. Calls for
4  speculation.
5       THE WITNESS: That is true, it is
6  speculation.
7  I don't know for certain.
8       BY MR. GREENWALD:
9       Q.   Give me your best guess as to who
10  the person was who was the most knowledgeable.
11       MS. HILLS: Objection. Calls for
12  speculation and to guess.
13       BY MR. GREENWALD:
14       Q.   What would be your best answer?
15       A.   If I had to give a guess, my guess
16  would be the department chairman or
17  chairperson.
18       Q.   I am sorry?
19       A.   The department chairperson.
20       Q.   Who was that?
21       A.   (Indicating.)
22       MS. HILLS: Objection. Vague,

Page 123

1  overbroad.
2       BY MR. GREENWALD:
3       Q.   Doctor, who is Robert Glazer?
4       A.   Bob is a professor at Georgetown
5  University.
6       Q.   What is his specialty?
7       A.   I don't recall exactly. (Pause.)
8  It says here that he is a professor in the
9  department of pharmacology.
10       Q.   How about Steven Byers? Do you
11  know him?
12       A.   Yes. He is in the department of
13  cell biology, according to this.
14       Q.   How about Mark Danielson?
15       MS. HILLS: Let me just enter an
16  objection. I don't know -- maybe the doctor
17  does -- whether any of these people are still
18  at Georgetown, as this complaint was from
19  January, 1999. To the extent that the doctor
20  is saying he is, I don't know that that is
21  accurate.
22       THE WITNESS: I think that is

Page 124

1  correct. He is or was. I am not sure. I am
2  not there now and I am not sure.
3       BY MR. GREENWALD:
4       Q.   I didn't ask you if they were
5  still there.
6       Doctor, as part of your function
7  at Georgetown University, did you bring income
8  into the university as part of your work at
9  the University?
10       MS. HILLS: Objection. Vague.
11       THE WITNESS: Did I bring income?
12       BY MR. GREENWALD:
13       Q.   Yes.
14       A.   Yes.
15       Q.   In what areas did you bring
16  income?
17       MS. HILLS: Same objection.
18       THE WITNESS: In my research
19  areas.
20       BY MR. GREENWALD:
21       Q.   Are you talking about grants?
22       A.   Yes, grants to the university.

Page 125

1       Q.   Did the grants in any way
2  determine how you were compensated?
3       MS. HILLS: Objection. Calls for
4  speculation.
5       BY MR. GREENWALD:
6       Q.   In other words, the number of
7  grants or the amount of grants, did that play
8  any part in how you were compensated?
9       MS. HILLS: Objection. Calls for
10  speculation.
11       THE WITNESS: I don't know the
12  answer to that question.
13       BY MR. GREENWALD:
14       Q.   Did your bringing in funds to the
15  university play any part in your compensation?
16       MS. HILLS: Objection. Asked and
17  answered. Calls for speculation.
18       THE WITNESS: Did my bringing in
19  funds? What was the next part of that?
20       BY MR. GREENWALD:
21       Q.   Play any part in determining what
22  your compensation would be?

10 (Pages 122 to 125)

Page 126

```
 1          MS. HILLS:  Same objections.
 2          THE WITNESS:  No.
 3          BY MR. GREENWALD:
 4      Q.    What were the factors -- I am not
 5  asking you how much you earned, doctor.  I am
 6  not interested in that.  How was your
 7  compensation determined?  Upon what basis?
 8          MS. HILLS:  Objection.  Calls for
 9  speculation.
10          THE WITNESS:  The total amount,
11  you are asking me?
12          BY MR. GREENWALD:
13      Q.   Yes.
14      A.    The amount was determined, first
15  of all, based on what I was making when I was
16  hired 40 years ago, with increases throughout
17  the 40 years, so we end up with how the
18  compensation was determined.
19      Q.   I guess what I am confused about,
20  doctor, and maybe you can help me, is why did
21  you find the cap a problem for you personally?
22      A.   Because it was a breach of the
```

Page 127

```
 1  tenure contract.
 2      Q.   Did it have a financial effect on
 3  you personally?
 4          MS. HILLS:  Objection.  Vague.
 5          THE WITNESS:  That is vague.  Did
 6  the cap have an effect on my salary?
 7          BY MR. GREENWALD:
 8      Q.   Yes.
 9      A.   No.
10      Q.   Do you know whether the cap had an
11  effect on the salaries of physicians?
12          MS. HILLS:  Objection.  Calls for
13  speculation.  Misstates prior testimony.
14          THE WITNESS:  I don't know.
15          BY MR. GREENWALD:
16      Q.   Do you have a sense one way or the
17  other whether it did?
18          MS. HILLS:  Objection.  Misstates
19  prior testimony.  Omits the word tenure.
20  Asked and answered.  Calls for speculation.
21          MR. GREENWALD:  I am perfectly
22  happy to let you have that same objection to
```

Page 128

```
 1  every question I ask.  In fact, you can have
 2  an objection for every question I ask for
 3  every reason ever known to the whole history
 4  of the common law.  And I agree you can have a
 5  continuing one, so we can get out of here
 6  faster.
 7          Can you read back the question?
 8          THE WITNESS:  Please.
 9          (The record was read by the
10  reporter as follows:
11          +++
12          THE REPORTER:  The last question
13  was:  "Do you have a sense one way or the
14  other whether it did?"
15          The question prior was:
16      Q.   "Do you know whether the cap had
17  an effect on the salaries of physicians?")
18          +++
19          THE WITNESS:  I don't know the
20  answer to that.
21          BY MR. GREENWALD:
22      Q.   Turn with me, if you would,
```

Page 129

```
 1  doctor, to page four of the lawsuit.
 2          Actually, start at the bottom of
 3  page three.  That would make more sense.
 4          "In this case Georgetown
 5  University President O'Donovan, Executive Vice
 6  President Wiesel, and Medical Center Chief
 7  Executive Officer Bloem, devised and
 8  implemented a compensation plan, including
 9  productivity standards."
10          Do you see that?
11      A.   Yes.
12          MS. HILLS:  For rule completeness,
13  the entire sentence, "...implemented a
14  compensation plan, including productivity
15  standards, that constitutes a direct and
16  material breach of plaintiffs' tenure
17  contracts with the university."  Period,
18  closed quote.
19          MR. GREENWALD:  Do you always feel
20  the need to interrupt for reasons that make no
21  legal sense?  I got to tell you, I don't think
22  I have ever been in a deposition with another
```

Feder Reporting Company
(202) 863-0000

Page 130

1 lawyer who spent so much time interjecting so
2 much garbage into a deposition and making so
3 many objections that it really makes one
4 wonder.
5      BY MR. GREENWALD:
6      Q.    The words "a compensation plan
7 including productivity standards," do you see
8 that?
9      A.    Yes, I do.
10      Q.    What does that mean, "including
11 productivity standards"?
12      A.    I don't know exactly.
13      Q.    Basically, you were plaintiff in a
14 lawsuit that made allegations that you didn't
15 understand what they meant?
16      A.    Excuse me.  I was a plaintiff in a
17 lawsuit for which the purpose of the lawsuit
18 was that the university was breaching the
19 contract of tenured faculty.  That's it.
20      Q.    But you were involved in a lawsuit
21 that alleges that a compensation plan was
22 implemented which included productivity

Page 131

1 standards.  That's what it says.  Did I read
2 that right?
3      A.    Yes.
4      Q.    What does that mean?
5      A.    I don't know.  It didn't apply to
6 me.
7      Q.    It also says at the bottom of that
8 paragraph, it talks about the grievance
9 process.  And it discusses a wrongful
10 compensation policy.  Do you see that?  Do you
11 see those words?
12      A.    Yes.
13      Q.    What does that mean, a wrongful --
14      A.    Where are you here?
15      Q.    At the bottom, right before --
16 where it says number three.
17      A.    Yes.
18      Q.    The wrongful compensation policy.
19 Do you see that?
20      A.    Yes.
21      Q.    What was the wrongful compensation
22 policy?

Page 132

1      A.    Let me read the entire statement,
2 please.
3      Q.    Sure.  Absolutely.
4      A.    (Pause).  If we go back a little
5 further in that sentence, you will see that
6 what happened was that the board of directors
7 nullified and negated the grievance process
8 and its results.
9      Q.    Uh-huh.
10      A.    Okay?  In order to maintain the
11 compensation policy that they had decided
12 upon, which was a limit --
13      Q.    On the guarantee?
14      MS. HILLS:  Please don't interrupt
15 the witness.
16      THE WITNESS:  The limit on tenured
17 faculty salaries guaranteed by the university
18 in the tenure contract agreement with the
19 individual tenured members.
20      BY MR. GREENWALD:
21      Q.    Why did the university do all of
22 this?

Page 133

1      MS. HILLS:  Objection.  Calls for
2 speculation.
3      THE WITNESS:  I have no idea why
4 they did all this.
5      BY MR. GREENWALD:
6      Q.    You don't know why the university
7 made a determination that they were not going
8 to guarantee salaries?
9      MS. HILLS:  Objection.  Asked and
10 answered.
11      THE WITNESS:  No, I do not.
12      BY MR. GREENWALD:
13      Q.    As I understand it, you were
14 plaintiff in a lawsuit against Georgetown
15 where you do not know what the productivity
16 standards were in the new compensation plan
17 and you do not know why the university made a
18 change.  Correct?
19      MS. HILLS:  Objection.  Asked and
20 answered.
21      BY MR. GREENWALD:
22      Q.    Is that correct?

12  (Pages 130 to 133)

Page 134

1    A.    Correct, but I do know that the
2  compensation plan breached the tenure
3  contract.
4    Q.    I understand that.
5    A.    Good.
6        (Discussion off the record.)
7        BY MR. GREENWALD:
8    Q.    Do you know whether or not
9  nontenured physicians at Georgetown had any
10  type of productivity incentives?
11        MS. HILLS:  Objection.
12        THE WITNESS:  I don't know.
13        MS. HILLS:  Objection.  Asked and
14  answered in the prior deposition.
15        BY MR. GREENWALD:
16    Q.    Now, if you look with me, doctor,
17  on page nine -- let me ask you this.  Was this
18  also a lawsuit about economic security for the
19  plaintiffs?
20        MS. HILLS:  Objection.  Vague.
21  Calls for speculation.
22        THE WITNESS:  I don't understand

Page 135

1  that question.
2        BY MR. GREENWALD:
3    Q.    Do you know what economic security
4  means?
5    A.    No.
6    Q.    Well, you were a party to this
7  lawsuit, Exhibit Number 5 or 6?  6, I think.
8    A.    Yes.
9    Q.    Read for me number 30 at the
10  bottom of the page.
11    A.    There we go.  Okay.  Well, then
12  that's the answer.
13    Q.    Could you read it?
14    A.    "Economic security means, among
15  other things, a protection against diminution
16  of compensation."
17    Q.    Do you think that that was one of
18  the reasons why this new policy on
19  compensation was put forth?
20        MS. HILLS:  Objection.  Calls for
21  speculation.  Vague.
22        BY MR. GREENWALD:

Page 136

1    Q.    Do you know?
2    A.    No, I don't.
3    Q.    Do you need Ms. Hills to keep
4  telling you that it calls for speculation and
5  it is vague?  Is that helping you with your
6  answers?
7        MS. HILLS:  Don't answer that.
8  That is protected by attorney --
9        BY MR. GREENWALD:
10    Q.    You have a big smile on your face,
11  doctor.  Too bad we don't have a video.  It is
12  a really nice smile.
13        MS. HILLS:  Objection to the
14  sidebar.
15        Don't answer.
16        BY MR. GREENWALD:
17    Q.    Are you telling us something by
18  that smile?
19    A.    I will defer.  I will not answer
20  that question.
21        MR. GREENWALD:  I would appreciate
22  it if you would stop.  The rules provide that

Page 137

1  all you say is objection, unless it is
2  privileged.  You, however, do not believe you
3  are subject to the rules.
4        MS. HILLS:  That is contrary to
5  the rules.  The rules state I must state the
6  basis for the objection or it is waived.
7  Therefore, I am stating the objection.  I am
8  sorry if counsel doesn't like the rules.  I am
9  sorry if counsel doesn't like to obey the
10  rules.  Please go on with your deposition.
11        MR. GREENWALD:  The question of
12  obeying the rules is something that you are
13  intimately familiar with, as we know from what
14  has happened in this case so far.
15        BY MR. GREENWALD:
16    Q.    Doctor, let's look at page ten.
17        I think you told me earlier, when
18  I was asking you, that you do not know and did
19  not know whether or not the new policy would
20  result in a decrease in the income of any of
21  the faculty members.  Correct?
22    A.    That's correct.  I don't know

13 (Pages 134 to 137)

Page 138

1   that.
2       Q.    Would you read for me number 34 in
3   the lawsuit, out loud?
4       A.    "However, the September 19, 1997
5   policy called for the decrease in compensation
6   for certain tenured medical center faculty
7   members, beginning with the university's
8   fiscal year, which would start on July 1,
9   1998."
10      Q.    Would you read 35, please?
11      A.    "The policy also permitted further
12  compensation decreases for tenured faculty
13  members in the future."
14      Q.    And 36, following?
15      A.    "The policy also indicated that
16  further adjustments to the compensation of
17  tenured faculty would follow based on an as
18  yet undefined measurement of faculty," quote,
19  "productivity," end quote.
20      Q.    What does that mean when it says,
21  based on undefined measure of faculty
22  productivity?  What does that mean?

Page 139

1       MS. HILLS:  Objection.  The
2   document speaks for itself.
3       BY MR. GREENWALD:
4       Q.    What does that mean, doctor, to
5   you?
6       A.    It means that they hadn't defined
7   how they were going to make that
8   determination.
9       Q.    When it says it called for a
10  decrease in compensation, what does that mean,
11  that it called for a decrease in compensation?
12  I am talking about 34, now.
13      MS. HILLS:  Misstates the
14  paragraph.  Objection.
15      BY MR. GREENWALD:
16      Q.    What does that mean to you,
17  paragraph 34?
18      A.    It means that there may have been
19  certain tenured medical faculty, medical
20  center faculty, whose compensation would have
21  decreased.
22      Q.    And, doctor, reading that together

Page 140

1   with 36, do you have any inclination as to
2   whether or not productivity would play any
3   part in the compensation?
4       MS. HILLS:  Objection.  Calls for
5   speculation.
6       THE WITNESS:  I am not sure what
7   the terms would be but may I please take you
8   back to 32?
9       BY MR. GREENWALD:
10      Q.    Certainly.
11      A.    The compensation policy was for
12  tenured university faculty members at the
13  medical center only.
14      Q.    Do you know whether Dr. Watson was
15  at the medical center?
16      MS. HILLS:  The witness is
17  gesturing that he is not finished.  Please
18  don't interrupt him.
19      THE WITNESS:  Tenure is a
20  guarantee by Georgetown University and not by
21  a cost center.
22      BY MR. GREENWALD:

Page 141

1       Q.    Do you know why Georgetown
2   University was pushing a policy which would
3   lead to a decrease, according to this lawsuit,
4   in compensation of medical center tenured
5   faculty?
6       MS. HILLS:  Objection.  Calls for
7   speculation.
8       THE WITNESS:  I don't know why.
9       BY MR. GREENWALD:
10      Q.    Do you have any thoughts about
11  why?
12      MS. HILLS:  Objection.  Calls for
13  speculation.  Asked and answered.
14      THE WITNESS:  No, I am not going
15  to speculate.
16      BY MR. GREENWALD:
17      Q.    So did you ever have any
18  discussions with any of the other plaintiffs
19  about why this was happening?
20      MS. HILLS:  Objection.
21      To the extent that involves
22  attorney-client privilege of another attorney,

14 (Pages 138 to 141)

Page 142

1  don't answer it.  But if you can answer the
2  question outside the tenure of this being
3  plaintiffs in this lawsuit, go ahead.
4          THE WITNESS:  Well, I can't answer
5  it because those are the only discussions that
6  we had.
7          BY MR. GREENWALD:
8      Q.   You never had a discussion with
9  any of these people without a lawyer present?
10         MS. HILLS:  Objection.  That's not
11 attorney-client privilege when two
12 plaintiffs --
13         BY MR. GREENWALD:
14     Q.   Did you ever have a discussion
15 with any of these other plaintiffs where there
16 were no lawyers present?  That's just a yes or
17 no question.
18     A.   Yes.
19     Q.   During any of those discussions
20 when there was no lawyer present -- okay? --
21 was there any discussion about why this policy
22 was being instituted?

Page 143

1          MS. HILLS:  Don't answer that to
2  the extent your discussion with other
3  plaintiffs involved this lawsuit such that it
4  is still covered by the attorney-client
5  privilege.
6          MR. GREENWALD:  Objection.  Number
7  one, he wouldn't know what that means.  Number
8  two, there is no attorney-client privilege
9  which is discussions with other people without
10 attorneys present.
11         MS. HILLS:  I beg to differ.
12         MR. GREENWALD:  Fine.
13         BY MR. GREENWALD:
14     Q.   My question is, doctor, did you
15 have any discussions with them about why this
16 cap on compensation guarantees was being
17 promulgated?
18         MS. HILLS:  To the extent you can
19 answer that without implicating --
20         MR. GREENWALD:  That's a yes or no
21 question.
22         MS. HILLS:  Please don't interrupt

Page 144

1  my objection.
2          To the extent you can answer that
3  when this lawsuit was not pending, so no
4  lawyer was involved, you may answer.
5          THE WITNESS:  Yes.
6          BY MR. GREENWALD:
7      Q.   Those conversations prior to the
8  time that you all went to see a lawyer about
9  this, were there any discussions about why
10 this policy was being promulgated?
11         MS. HILLS:  Objection.  Calls for
12 speculation.
13         THE WITNESS:  I presume there must
14 have been some discussion of why the policy.
15 But that wasn't the point.  The point was the
16 policy was being promulgated and it was a
17 breach of the contract.
18         BY MR. GREENWALD:
19     Q.   I understand that.  But were you
20 not interested in why this was happening?
21     A.   We were interested, yes.
22     Q.   And did you come to any discussion

Page 145

1  or any thoughts about the potential reasons
2  for why this was happening?
3          MS. HILLS:  Outside of the
4  lawsuit.
5          THE WITNESS:  Not really.
6          BY MR. GREENWALD:
7      Q.   So you had no idea, whatsoever,
8  why this was occurring?  Is that right?
9          MS. HILLS:  Objection.  Asked and
10 answered.  Calls for speculation.
11         BY MR. GREENWALD:
12     Q.   You had no idea why this was
13 happening.  Right?
14     A.   I could speculate on why it was
15 happening but I did not know why it was
16 happening.
17     Q.   Speculate for me.
18         MS. HILLS:  Objection.
19         THE WITNESS:  I am not going to
20 speculate.
21         BY MR. GREENWALD:
22     Q.   Was there any discussion, doctor,

15 (Pages 142 to 145)

1   about the university having any financial
2   difficulties, or the medical center having any
3   financial difficulties at this time?
4           MS. HILLS: Objection. Overbroad.
5   Vague.
6           THE WITNESS: Was there any
7   discussion. Please define that.
8           BY MR. GREENWALD:
9       Q.   Did you discuss with anybody in
10  this lawsuit, any of the people prior to
11  seeing a lawyer, whether or not the
12  university, medical center, was having any
13  financial difficulties?
14          MS. HILLS: Same objection.
15          THE WITNESS: I presume we must
16  have had, we might have had some discussion.
17          BY MR. GREENWALD:
18      Q.   About that?
19      A.   Yes.
20      Q.   Can you tell me what, if anything,
21  you recall about those discussions?
22      A.   No. I don't recall the

1   discussions. I said I --
2       Q.   Was it your belief, doctor, at the
3   time, that one of the reasons why this policy
4   was being instituted was as a cost saving
5   measure for the medical center?
6           MS. HILLS: Objection. Calls for
7   speculation. Asked and answered.
8           THE WITNESS: I don't know the
9   answer to that question.
10          BY MR. GREENWALD:
11      Q.   My question is was that one of
12  your thoughts as to why this was going on?
13          MS. HILLS: Same objection. Asked
14  and answered. Calls for speculation.
15          THE WITNESS: I don't know why
16  this was going on.
17          BY MR. GREENWALD:
18      Q.   I said, was that one of your
19  thoughts about why this was going on? I
20  didn't ask you for a definitive answer. I
21  asked you whether you thought that might be
22  one of the reasons.

1           MS. HILLS: Same objections.
2           THE WITNESS: That might have been
3   one of the reasons put forward but that
4   doesn't necessarily mean that was a reason.
5           BY MR. GREENWALD:
6       Q.   As I understand it, and just so I
7   am clear on this, because I don't want to
8   belabor the point, you were a plaintiff in a
9   lawsuit against Georgetown where you worked,
10  based on a breach of a contract which affected
11  compensation to tenured faculty members with
12  respect to a cap guarantee by the university
13  of those salaries. And yet you had no idea
14  why this policy was being implemented. Is
15  that a fair statement?
16          MS. HILLS: Objection. Misstates
17  the prior testimony.
18          BY MR. GREENWALD:
19      Q.   Is that a fair statement?
20      A.   No.
21      Q.   Why is it unfair?
22      A.   Because you said that I had no

1   idea.
2       Q.   Tell me what ideas you have, then.
3           MS. HILLS: Objection. Calls for
4   speculation. Asked and answered.
5           THE WITNESS: Perhaps, I would
6   say, I can recall a faculty meeting where the
7   question was asked of one of the defendants in
8   this lawsuit, what kind of a deficit were they
9   talking about? Was it a cash flow deficit or
10  was it an accounting deficit. A perfectly
11  reasonable question.
12          BY MR. GREENWALD:
13      Q.   Yes, I agree.
14      A.   There was no answer forthcoming.
15  My recollection is that the person running the
16  meeting didn't know. Turned to the financial
17  person who was there and that person didn't
18  care to give an answer. So in that context
19  one couldn't be definitive about the issue of
20  financial difficulties or the extent of
21  financial difficulties. All of which was
22  immaterial because the lawsuit had to do with

16 (Pages 146 to 149)

Page 150

1   a breach of a contract.
2       Q.   I understand.  Do you remember
3   when the meeting took place?
4       A.   No, somewhere, my guess is
5   somewhere before this date --
6       Q.   Before the suit was filed?
7       A.   Yes.
8       Q.   Was that a meeting to try to get
9   answers as to what was going on?
10          MS. HILLS:  Object.
11          THE WITNESS:  I don't know the
12  purpose of the meeting.  I just know it was a
13  faculty meeting.
14          BY MR. GREENWALD:
15      Q.   At which time the proposed
16  reversal of the guarantees was discussed?
17          MS. HILLS:  Objection.  Vague.
18          THE WITNESS:  I don't recall that.
19          BY MR. GREENWALD:
20      Q.   The policy was discussed, the new
21  policy?
22      A.   I don't recall if that was

Page 151

1   discussed at the particular meeting to which I
2   refer.
3       Q.   Was it discussed at any meeting
4   that you were at?
5           MS. HILLS:  Objection.  Overbroad.
6   Calls for speculation.
7           THE WITNESS:  Was the compensation
8   policy?
9           BY MR. GREENWALD:
10      Q.   The new one that was being
11  advocated.
12      A.   Yes.
13      Q.   Was that discussed at any faculty
14  meeting?
15      A.   Yes.
16      Q.   Tell me what you recall the
17  substance of that discussion or those
18  discussions to be.
19      A.   This was some time ago but my
20  recollection is there was an announcement that
21  the tenure contract would be broken.  It
22  wasn't said in those words but it was said

Page 152

1   that there would be a cap on the tenure
2   guarantee.  That came up at a couple of
3   meetings.  I don't remember the dates.
4       Q.   At those meetings when that came
5   up did people question why this was happening?
6       A.   I don't recall the exact content
7   of those meetings.
8       Q.   Do you recall any meetings where
9   people wanted to know why this was happening?
10      A.   That was probably the case.  But I
11  don't recall specifically.
12      Q.   I understand.  What is your
13  general recollection of what response you were
14  given, or the faculty was given, as to why
15  this was happening?
16      A.   I don't recall any satisfactory
17  response given.
18      Q.   What were the unsatisfactory
19  responses that were given?
20      A.   I don't recall those, either.  Not
21  the details of them.  I just don't recall.
22      Q.   At the meeting when you asked

Page 153

1   whether the deficit was financial or
2   accounting --
3       A.   I didn't say that I asked.
4       Q.   That someone asked whether the
5   deficit was financial or accounting, at that
6   meeting, who was present from the University
7   that the questions were being asked of?
8       A.   I am not sure.
9       Q.   The best of your recollection is
10  all I am asking.
11      A.   Probably, it would have been
12  Mr. Bloem and Dr. Wiesel.
13      Q.   Did you ever have any private
14  conversations with either of those two
15  gentlemen about the tenure contract?  Did you
16  ever have any meetings with them?
17      A.   Just me?
18      Q.   The first question is just you.
19      A.   The answer is no.
20      Q.   Did you with others?  Were you
21  part of a group that met with them?
22          MS. HILLS:  Objection.  Vague.

17 (Pages 150 to 153)

Page 154

1    Misstates prior testimony.
2          THE WITNESS:  During the grievance
3    process there was a meeting with Dr. Wiesel.
4          BY MR. GREENWALD:
5          Q.    Tell me what you recall, as best
6    you can recall, occurred at that meeting.
7          A.    I don't recall the details of that
8    meeting at all.
9          Q.    You don't recall anything that
10   happened at that meeting?
11         A.    I don't recall exactly but I
12   believe Dr. Wiesel indicated that the
13   grievance process was not going to stop them.
14         Q.    Did he indicate why?
15         A.    No.
16         Q.    I guess it was your view that they
17   were pretty determined to push this new
18   policy.
19         MS. HILLS:  Objection.  Assumes
20   facts not in evidence.  Calls for speculation.
21         BY MR. GREENWALD:
22         Q.    I assume that's what led up to the

Page 155

1    lawsuit being filed.
2          A.    It said, if you look at this, we
3    went through the grievance process of the
4    university.  Three steps to that process.
5          Q.    And you prevailed?
6          A.    And we prevailed.
7          Q.    And then father O'Donovan was
8    supposed to appoint a last resort appeal
9    person?
10         A.    No.  We won the grievance process.
11   There was no last appeal.  What they did at
12   that point was to just simply declare that the
13   grievance process, if I have the correct
14   terminology here, was null and void.  It
15   didn't exist.  So the grievance that we filed
16   and the process we went through didn't exist.
17         Q.    And they did this to keep the
18   policy that you were fighting about their cap
19   on compensation no longer being guaranteed?
20         MS. HILLS:  Objection.  Calls for
21   speculation.
22         THE WITNESS:  I would have to

Page 156

1    speculate that that was the case but I don't
2    know that for sure.
3          BY MR. GREENWALD:
4          Q.    But that would be your best
5    opinion, wouldn't it?
6          A.    It would be a guess of mine.
7          Q.    Take a look with me, if you would,
8    on page 13.
9          Would you read for me, please,
10   paragraph 51?
11         A.    "Subsequent to the filing of the
12   post-hearing submissions on May 14, 1998
13   Defendants Wiesel and Bloem, with the approval
14   of Defendant O'Donovan, issued a set of
15   faculty compensation guidelines which spelled
16   out the productivity measures for medical
17   center faculty referenced in the September 19,
18   1997 compensation policy."
19         Q.    Did you ever see that document?
20         A.    No.
21         Q.    Do you know who would have a copy
22   of that document?

Page 157

1          MS. HILLS:  Objection.  Calls for
2    speculation.
3          THE WITNESS:  I have no idea.
4          BY MR. GREENWALD:
5          Q.    When it says the productivity
6    measures for the medical center faculty, what
7    does that mean?
8          A.    I don't know.
9          Q.    Do you know whether the medical
10   center, prior to this new procedure, had a
11   productivity factor built into their
12   compensation?
13         MS. HILLS:  Objection.  Calls for
14   speculation.
15         BY MR. GREENWALD:
16         Q.    Do you know?
17         A.    No, I don't.
18         Q.    One way or the other?
19         A.    No, I don't.
20         Q.    Who would be the person who would
21   be in the best position to know that?  Would
22   that be the same gentleman you mentioned

18 (Pages 154 to 157)

Page 158

1  before?
2          MS. HILLS: Objection. Vague.
3  Misstates prior testimony. Calls for
4  speculation.
5          THE WITNESS: I believe what I
6  said before was department chairperson. There
7  is not a single department chairperson. There
8  are many department chairpersons.
9          BY MR. GREENWALD:
10     Q.   By the way, doctor, do you recall
11  that the medical center was sold to Medstar at
12  some point?
13     A.   Yes.
14     Q.   Do you remember what that was?
15     A.   Not exactly.
16     Q.   Do you remember whether it was
17  around the time that this was occurring?
18     A.   I believe it was sometime around
19  here or after this. But I am not sure of the
20  exact time.
21     Q.   In paragraph 53, it says, "The
22  guidelines make clear that, henceforth, each

Page 159

1  medical center faculty member's compensation
2  would be determined only by reference to the
3  faculty member's income-generating
4  activities." Do you see that?
5     A.   Yes.
6     Q.   Did I read that correctly?
7     A.   I believe so.
8     Q.   Please read the rest of paragraph
9  53 and tell me if anywhere in paragraph 53,
10  where it talks about the medical center
11  faculty members' compensation, the word tenure
12  appears.
13          MS. HILLS: Objection. The
14  document speaks for itself. Violates rule of
15  completeness.
16          BY MR. GREENWALD:
17     Q.   Do you find the word tenure
18  anywhere in paragraph 53 talking about the
19  medical center faculty's compensation?
20     A.   No.
21     Q.   Would you read paragraph 54 for
22  me, please, out loud?

Page 160

1     A.   "The guidelines further required
2  the faculty to fund a specified portion of
3  their salaries from external sources. A
4  system later characterized as an, quote, eat
5  what you kill, end quote, approach."
6     Q.   Do you know what that means, eat
7  what you kill approach?
8     A.   No idea.
9     Q.   Were there faculty members who
10  were not tenured at this time?
11          MS. HILLS: Objection. Overbroad.
12  Vague.
13          BY MR. GREENWALD:
14     Q.   Were there faculty members who
15  were not tenured?
16          MS. HILLS: Same objections.
17          THE WITNESS: I presume there
18  were.
19          BY MR. GREENWALD:
20     Q.   Tell me, doctor, in paragraph 54,
21  where it talks about the faculty required to
22  fund a specific portion of their salaries from

Page 161

1  external sources, does the word tenure appear
2  anywhere in paragraph 54?
3          MS. HILLS: Objection. Violates
4  rule of completeness.
5          BY MR. GREENWALD:
6     Q.   Does it appear anywhere in
7  paragraph 54?
8          Ms. Hills, it would really be nice
9  if once, during this entire case, and maybe
10  even during every case you have, you would act
11  appropriately and stop signaling the witness
12  as to what you would like the witness to say,
13  as opposed to the testimony the witness has
14  sworn to give in telling the truth.
15          MS. HILLS: Same objections. The
16  document speaks for itself.
17          MR. GREENWALD: Yes, we both have
18  the same objections.
19          BY MR. GREENWALD:
20     Q.   Doctor, can you answer the
21  question?
22     A.   If I remember the question.

19 (Pages 158 to 161)

Page 162

1    Q.   I will give it to you again.  In
2  paragraph 54, where it says the guidelines
3  requiring the faculty to fund a specified
4  portion of their salaries from external
5  sources anywhere, refers to tenured faculty --
6    A.   No.
7    Q.   -- in that paragraph.
8       Doctor, do you have any idea why
9  the medical center was sold to Medstar?
10      MS. HILLS:  Objection.  Calls for
11 speculation.
12      BY MR. GREENWALD:
13   Q.   Do you have any idea?
14   A.   I do not know why.
15   Q.   I didn't ask you if you knew.  I
16 asked you whether you had any thoughts about
17 why it was sold.
18      MS. HILLS:  Calls for speculation.
19      THE WITNESS:  I will answer again,
20 I don't know why.
21      BY MR. GREENWALD:
22   Q.   Did you hear any discussion about

Page 163

1  the medical center being sold for financial
2  reasons?
3    A.   Did I hear any discussion?
4    Q.   From any source.
5       MS. HILLS:  Objection.  Overbroad.
6       THE WITNESS:  There was
7  discussion, I presume, there was talk -- I
8  don't know specifically when or where -- that
9  there were financial reasons for selling the
10 hospital and the clinical entities.
11      BY MR. GREENWALD:
12   Q.   Doctor, were you aware that the
13 law center was extremely profitable and the
14 medical center was exactly the opposite, and
15 there was an issue at the university about the
16 law school using some of its funds to cover
17 the deficits of the medical school?  Were you
18 aware of that?  Which led to a dispute between
19 Father O'Donovan and Judy Areen, dean of the
20 law school?  Were you aware of any of that?
21   A.   The first part of your question
22 was was I aware of anything.  And the answer

Page 164

1  is there was talk but I did not see the books
2  of the medical center.  I have no idea what
3  the extent, if any, the financial problems of
4  the medical center were.
5       As to problems between the law
6  center and the medical center, I'm not privy
7  to those.
8    Q.   Why at the meeting that you told
9  me about a little while ago did someone ask
10 whether the deficit was financial or
11 accounting?
12      MS. HILLS:  Objection.  Calls for
13 speculation.
14      THE WITNESS:  Because I presume
15 there was discussion of the deficit in the
16 medical center.
17      BY MR. GREENWALD:
18   Q.   Did you ever have any discussions
19 with Sheila Zimmet about the compensation
20 issues that were involved in the policy?
21      MS. HILLS:  To the --
22      MR. GREENWALD:  That's just a yes

Page 165

1  or no question.  I didn't ask you what the
2  discussions were.
3       MS. HILLS:  Still intrudes upon
4  attorney-client privilege.  To the extent
5  there were discussions where you were asking
6  as a client in terms of being a university
7  employee, Sheila Zimmet being the university
8  counsel, do not answer.  It is covered by the
9  attorney-client privilege.
10      THE WITNESS:  I have no
11 recollection of talking with Sheila Zimmet
12 about this issue at all.
13      BY MR. GREENWALD:
14   Q.   Doctor, at the time that this
15 lawsuit was about ready to be filed did you
16 ever read it?
17      MS. HILLS:  Object.
18      THE WITNESS:  I don't recall.  I
19 just don't recall.
20      BY MR. GREENWALD:
21   Q.   Based upon what we have gone over
22 so far in the lawsuit, is anything that we

20  (Pages 162 to 165)

Page 166

1  read in the lawsuit, to the best of your
2  knowledge, untrue?
3          MS. HILLS: Objection. Overbroad.
4  Vague.
5          THE WITNESS: I don't believe so
6  but I don't know. I haven't read each one of
7  these points.
8  BY MR. GREENWALD:
9      Q.   I understand. We have read
10 certain paragraphs in the lawsuit, as we have
11 gone through this deposition. My question to
12 you is, as we went through those, did you find
13 anything that we read, or that you read, to be
14 untrue, that is contained in this lawsuit?
15     A.   I don't believe so.
16     Q.   Doctor, at the time your
17 deposition was initially taken, there was a
18 deposition notice. I am just going to show it
19 to you and ask you, did you ever see that
20 document before?
21         MS. HILLS: Objection. Asked and
22 answered.

Page 167

1          THE WITNESS: (Pause). I believe
2  so.
3          BY MR. GREENWALD:
4      Q.   Just so we are sure, you do not
5  have in your possession or access to any of
6  the things you were asked to bring? Is that
7  correct?
8          MS. HILLS: Objection. Asked and
9  answered. Pages 15 through 19 of the prior
10 deposition transcript.
11         THE WITNESS: I provided my
12 curriculum vitae and, IRB proceedings to each
13 meeting, the files are handed over to the IRB
14 and they are shredded.
15         BY MR. GREENWALD:
16     Q.   I am sorry, I didn't hear you.
17     A.   After each IRB meeting the files
18 are provided to the IRB office and they are
19 shredded. They are not kept by people.
20         MS. HILLS: You mean to the
21 members?
22         THE WITNESS: To the members, yes.

Page 168

1          BY MR. GREENWALD:
2      Q.   So the university doesn't -- when
3  you say shredded, you mean each individual
4  member's copy, as opposed to the university
5  shredding everything that happened.
6      A.   Oh, yes, each individual member's
7  copy.
8      Q.   So the university keeps a copy but
9  the individual members don't keep copies?
10     A.   I believe that's correct.
11     Q.   Where are those copies kept in the
12 university?
13         MS. HILLS: Objection. Asked and
14 answered. Prior deposition, pages 18, 19.
15         THE WITNESS: I don't know.
16         BY MR. GREENWALD:
17     Q.   Did you make any attempt to obtain
18 any of those or look for those in preparation
19 for your deposition, before?
20     A.   No.
21         MS. HILLS: For the record, as
22 stated in the prior deposition, the IRB

Page 169

1  records have been searched prior to the
2  deposition of Sheila Zimmet which was in
3  August of this year, prior to Dr. Chiazze's
4  deposition. The same request was contained in
5  both notices.
6          THE WITNESS: Excuse me.
7          MR. GREENWALD: Do you want to
8  take a break for a minute?
9          THE WITNESS: No, let's finish
10 this.
11         MS. HILLS: Do you know how much
12 longer you are going to go? It is about 11 --
13         MR. GREENWALD: Five or ten
14 minutes. I am just about done.
15         BY MR. GREENWALD:
16     Q.   Dr. Chiazze, would it be fair to
17 say that, with respect to the lawsuit, Exhibit
18 Number 6, and the effects that the policy had
19 on physicians, you would not be the most
20 knowledgeable person about that?
21         MS. HILLS: Objection. Misstates
22 prior testimony.

21 (Pages 166 to 169)

Page 170

1        BY MR. GREENWALD:
2    Q.   Is that correct?
3    A.   I don't know what the compensation
4  policy was for the physicians.  I am not a
5  physician, as I have stated before.  I don't
6  see patients.  I don't know what their
7  policy --
8    Q.   I understand.  So if I wanted to
9  ask somebody about the effect of the
10 compensation policy and what productivity
11 meant, and all of those things that you and I
12 went over, the best person to ask would be a
13 tenured or nontenured faculty member who was a
14 physician.  Correct?
15       MS. HILLS:  Objection.
16       BY MR. GREENWALD:
17   Q.   At the time.
18       MS. HILLS:  Objection.  Calls for
19 speculation.
20       BY MR. GREENWALD:
21   Q.   Would that be the best person to
22 ask?

Page 171

1    A.   I don't know who the best person
2  would be to ask.
3    Q.   A physician who was affected by
4  this policy would know more about how
5  physicians were affected than you.  Correct?
6        MS. HILLS:  Objection.  Calls for
7  speculation.
8        THE WITNESS:  Perhaps would know
9  more about his or her compensation, but
10 whether they would know about the compensation
11 of others, I have no idea.
12       BY MR. GREENWALD:
13   Q.   Since your income is not based on
14 productivity, you told me -- correct?
15   A.   (Pause.)
16   Q.   Or am I missing something?
17       MS. HILLS:  Objection.  Misstates
18 testimony.
19       BY MR. GREENWALD:
20   Q.   Was your income at the time based
21 to any degree on productivity?
22       MS. HILLS:  We can read back that

Page 172

1  exact question and answer.  It was asked and
2  answered.
3        MR. GREENWALD:  I asked about
4  income generation.  I don't think I used the
5  word productivity.
6        THE WITNESS:  Are you asking
7  whether any portion of my salary came from my
8  grants?  Is that what you are asking?
9        BY MR. GREENWALD:
10   Q.   Yes, that's what I am asking.
11   A.   The answer is yes.
12   Q.   Would the cap guarantee have
13 affected you?
14   A.   Certainly, if I had lost all my
15 grants, the cap would have affected me.
16   Q.   This is what I was trying to get
17 to earlier.
18       So that the money that you brought
19 in to the university, the amount that you
20 brought in, played a part in how your salary
21 was determined.  Right?
22       MS. HILLS:  Objection.

Page 173

1  Misstates --
2        BY MR. GREENWALD:
3    Q.   Because if your grants got
4  reduced --
5    A.   No.
6    Q.   You just told me it would affect
7  your compensation.
8    A.   My salary level was set by the
9  department that I was in.
10   Q.   I understand what --
11       MS. HILLS:  Please don't interrupt
12 the witness.
13       MR. GREENWALD:  I will withdrew
14 the question.
15       BY MR. GREENWALD:
16   Q.   Did you get bonuses or extra
17 incentives added onto your salary based upon
18 the amount of grant money you brought in?
19       MS. HILLS:  Objection.  Vague.
20       THE WITNESS:  No.
21       BY MR. GREENWALD:
22   Q.   You said if the grant money was

22  (Pages 170 to 173)

Page 174

1  reduced it would affect your salary. Did you
2  mean because you wouldn't have anything to do,
3  or did you mean in some other way it would
4  affect your salary?
5      A.   Some other way.
6      Q.   What other way was that?
7      A.   Because the amount of money that I
8  was receiving would go down.
9      Q.   Did all the grant money go to the
10 university?
11         MS. HILLS:  Objection. Calls for
12 speculation.
13         THE WITNESS:  I don't understand
14 that question.
15         BY MR. GREENWALD:
16     Q.   When grant money came in for work
17 you were doing, did that money go to you
18 personally or did it go to the university?
19     A.   It went to the university.
20     Q.   Explain to me -- this is the final
21 thing I want to understand. Explain to me
22 how, if the grant money was reduced, your

Page 175

1  income would go down.
2      A.   My income was over the 100,000
3  figure. So if all the grant money
4  disappeared --
5      Q.   I understand. And since there was
6  no guarantee except at a hundred --
7      A.   Correct.
8      Q.   You would only get the hundred?
9      A.   That's right.
10     Q.   So it was --
11     A.   In theory.
12     Q.   I understand that. But it still
13 was in your best interests to get as much
14 grant money as you could?
15         MS. HILLS:  Objection. Vague.
16         THE WITNESS:  It was in my best
17 interest to be able to support my research
18 program. Not necessarily personally. Part of
19 my salary did come from my grants, but
20 certainly one of the reasons for being on the
21 faculty is to conduct research.
22         BY MR. GREENWALD:

Page 176

1      Q.   I understand. And I understand
2  that research is important. I am not, by any
3  means, suggesting it is not.
4          If, hypothetically, you had an
5  income of $100,000 plus, as a result of the
6  grants, the University would guarantee that
7  income for you, under the old policy?
8          MS. HILLS:  Objection. Vague.
9          THE WITNESS:  If I understand your
10 question correctly, yes.
11         BY MR. GREENWALD:
12     Q.   So if your grants fell off for
13 some reason, would the university still
14 guarantee that amount under the old policy of
15 what your prior salary, what your salary was
16 based on the grants that didn't come in? That
17 level?
18     A.   Yes.
19     Q.   So that what was happening now
20 with the new policy was that if the grants
21 fell off, they would not still guarantee the
22 level you were at. They would only guarantee

Page 177

1  you at $100,000?
2      A.   Theoretically, yes.
3      Q.   And so if the change went through
4  and you wanted to keep the level of income
5  that the university had previously guaranteed,
6  you would need to keep the same level of grant
7  money coming in?
8      A.   I think that's true.
9          MR. GREENWALD:  Dr. Chaizze, you
10 have been extremely helpful. Thank you so
11 much for your time.
12         THE WITNESS:  You are welcome.
13         MR. GREENWALD:  That's all I have
14 for now.
15         MS. HILLS:  We will read and sign.
16         Let's take a short break to let
17 the doctor go. Then if you want to do the
18 meet and confer.
19         MR. GREENWALD:  Yes, let's do that
20 quickly.
21         (Whereupon, at 11:36 a.m., the
22 deposition was concluded.)

23 (Pages 174 to 177)

Page 178

1          (A recess was taken.)
2          MR. GREENWALD:  On the discussion
3    about the amended complaint, there were three
4    things that were changed in the complaint.
5    One, the product liability was taken out.
6    Two, the fraud count was pled with
7    specificity.  And, three, the express warranty
8    was put in the form of a guarantee about the
9    95 percent success rate.
10         So I guess the question is whether
11   you have an objection to the amended
12   complaint, or to any part of it, or what is
13   your position?
14         MS. HILLS:  I would disagree that
15   the fraud count as pled satisfies Rule 9(B)
16   with specificity.  I would also note that it
17   contains allegations regarding a motivation of
18   perfecting the technique that misstates
19   discovery of facts under oath that Plaintiffs
20   developed, namely, there had been hundreds of
21   embolizations prior to Ms. Kerris, not three.
22   That all being said, I believe under the

Page 179

1    amended pleading rules that there is no point
2    in objecting.  I just note that I don't
3    believe the amendment is in good faith or
4    passes the muster of the discovery developed.
5    But be that as it may, I am not going to file
6    an opposition to your amendment because under
7    Rule 15 it would be for naught.
8          MR. GREENWALD:  I will discuss
9    your concerns before we file it with Tony.
10   Okay?
11         MS. HILLS:  I wanted to, also -- I
12   don't believe this is necessary but, because
13   dispositive motions don't require a confer,
14   but if the amended complaint that was provided
15   to us when filed, we would file either or both
16   partial summary judgment as to the counts
17   because, as I said, of the misstated, in our
18   opinion, discovery that was developed, as well
19   as some pleading defects under 12(B)(6).  Just
20   to let you know that.
21         (Whereupon, at 11:50 a.m., the
22   proceedings were concluded.)

Page 180

2         CERTIFICATE FOR READING AND SIGNING

4          I hereby certify that I have read
5    and examined the within transcript and the
6    same is a true and accurate record of the
7    testimony given by me.
8          Any corrections I have listed on
9    the separate errata sheet enclosed, indicating
10   the page and line number of each correction.

_____
15   Leonard Chiazze, Jr., Sc.D.

_____
17   Date

Page 181

1         CERTIFICATE OF NOTARY PUBLIC
2          I, Zev V. Feder, the officer
3    before whom the foregoing deposition was
4    taken, do hereby certify that the witness,
5    whose testimony appears in the foregoing
6    deposition, was duly sworn by me; that the
7    testimony of said witness was taken by me in
8    shorthand and thereafter reduced to computer
9    type under my direction; that said deposition
10   is a true record of the testimony given by
11   said witness; that I am neither counsel for,
12   related to, nor employed by any of the parties
13   to which this deposition was taken; and
14   further, that I am not a relative or employee
15   of any attorney or counsel employed by the
16   parties hereto, nor financially or otherwise
17   interested in the outcome of the action.

_____
20   Notary Public in and for
     The District of Columbia
21   My Commission Expires:
     April 14, 2012

24  (Pages 178 to 181)