2178 Morley Way
Sacramento, CA 95864
October 15, 2007

Mr. Anthony G. Newman
Newman, McIntosh & Hennessey, LLP
The Air Rights Building
7315 Wisconsin Ave.
East Tower, Suite 700
Bethesda, MD 20814

**Re: Karyn Kerris**

Dear Mr. Newman,

Per your request, I have reviewed the medical records of Ms. Karyn Kerris, including the Affidavit and Deposition of Dr. Vance Watson of Georgetown University Medical Center and multiple imaging examinations. Of note were the MRI of the head of 11/25/97 which initially demonstrated her bithalmic arteriovenous malformation (AVM), and the three angiographic and embolization treatments of that AVM, on 11/4/98, 1/13/99, and 3/3/99, performed by Dr. Watson. It is my medical opinion, to a reasonable degree of medical certainty, that the care given to Ms. Kerris by Dr. Watson was below the national standard of care for the following reasons: the location and size of the lesion, the number of embolization procedures that would have been required to change its size and thus the high risk of potential complications, the fact that all of this would be performed in a patient who had never bled and who had vague symptoms of unknown etiology, and therefore should have never been performed, the fact that the patient and her family were not told of the large number of therapeutic sessions and their attendant risk which outweighed any potential benefit, and the lack of true "informed consent" regarding the use of a non-approved substance for the treatments, which required FDA and institutional IRB approval. I will elaborate on each point.

First, the lesion(s) consist of a myriad of tiny vessels throughout the thalami bilaterally, and the contiguous regions of the upper brainstem and basal ganglia. These deep regions of the brain are supplied by small vessels that are difficult to catheterize even when enlarged because of their supply to an AVM. These vessels supply critical areas of the brain responsible for not only motor, visual, and sensory functions, but also alertness and response to the external world. Any decreased perfusion to the normal tissue in these areas would have profound effects on the patient's neurological and neurocognitive status, which is exactly what happened to Ms. Kerris as an immediate response to the embolizations procedures, especially the third one; i.e., the embolization procedures were the proximate cause of her cognitive disability.

Second, the size of the lesion(s), rated as a grade 5 AVM by the Spetzler-Martin scale, made this the type of malformation one with a very low chance of cure, no matter what type of therapy would be administered, but also one with a very high risk of

complications, especially if embolization therapy were to be employed. It was obviously not a surgical lesion, as the patient had been told by a number of surgeons. The chance of focused irradiation via the Gamma Knife was very small, given its very large size. Dr. Watson felt he could decrease the size to make the AVM amenable to irradiation, but this would have required an unreasonable number of embolizations and subject the patient to an extremely high risk. Given a complication rate of at least 5-7% per embolization, the overall risk of a significant complication would thus be a virtual certainty. Such a risk might be tolerable if the patient had had significant hemorrhage in the past, or a major neurological deficit. However, she had never bled, and the symptoms she was exhibiting were difficult to ascribe to the AVM itself. Her symptoms might well have been attributable to the hydrocephalus produced by the compression of the cerebral aqueduct by the very large Vein of Galen, the major drainage of the AVM. Shunting the patient as a first step, a low risk procedure, was not even offered by Dr. Watson as her attending physician (her treating physicians were apparently under the assumption that because the cerebral sulci were enlarged—actually a result of venous hypertension and impaired CSF resorption—the obstructive hydrocephalus was "not significant"). There is no indication in the medical record that these issues were ever adequately discussed with the family.

Finally, the embolizations would have had to be performed with a "tissue adhesive"—a "glue". No such adhesive was FDA-approved at the time of the procedures, but many interventionalists used such an adhesive under an IDE and appropriate IRB approval within their own institution. While Dr. Watson says he "informed" the patient that such an adhesive was only available from overseas, there is no indication that Dr. Watson had such an IDE or local IRB approval which would have been required for the legal use of the substance ("device") to conform to the national standard of care for its use. Both Dr. Watson and Georgetown University Medical Center violated not only the national standard of care, but also the FDCA statues by using the device without an IDE and without institutional IRB approval. In addition, there is no indication that the family truly understood the complication rate of such a substance, especially if used for the many, many required embolization procedures by a practitioner, Dr. Watson, who had only limited experience with the substance.

In summary, Ms. Kerris was not treated properly by Dr. Watson. Her AVM would not have been considered for treatment in most institutions, unless under the most dire of circumstances, and by someone who had had a great deal of experience in such treatment. Most importantly, the family should have been fully informed of the elaborate "game plan" required for such a treatment, requiring many risky embolizations, and the very high risk of significant neurological and neurocognitive complications attendant to such treatment. None of these conditions existed in this case. As a result, Ms. Kerris suffered severe, life-altering complications that could not be improved by subsequent ventricular shunting, psychoactive drugs, and rehabilitation. She would not have suffered such immediate neurological damage without having undergone the misguided embolization procedures.

It is my opinion to a reasonable degree of medical certainty, in fact, to a high degree of certainty, that the aforesaid negligence and violations of the national standards of care by

Dr. Watson, and the national statutes regulating the use of a non-approved device ("tissue adhesive") by both Dr. Watson and Georgetown University Medical Center, resulted in significant neurological and neurocognitive impairment of Ms. Kerris. I am aware of the national standards of care by my experience, my attendance at national and international conferences and symposia, and via the literature.

Sincerely yours,

Richard E. Latchaw, MD