UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
FELICE I. IACANGELO, *et al.*,      )
                                    )
        Plaintiffs, )
                                    )
    v.                            )    Civil Action No. 05-2086 (PLF)
                                    )
GEORGETOWN UNIVERSITY, *et al.*,    )
                                    )
        Defendants.  )
_____ )

OPINION

This matter came before the Court on plaintiffs' motion to disqualify Williams & Connolly, LLP ("W&C") as counsel for the defendants on the ground that Williams & Connolly's representation of both defendant Georgetown University Hospital and defendant Dr. Vance E. Watson in this case is tainted by a conflict of interest. Both the case and the issue itself are complicated and involve many filings, depositions and assertions of fact supported by competing affidavits and declarations, all of which the Court has carefully considered.[1] Because

---

[1] The documents reviewed by the Court in reaching its decision include the following: plaintiffs' Second Amended Complaint [Docket No. 101] ("Compl."); plaintiffs' Motion to Disqualify Defendants' Counsel ("Mot."); defendants' Opposition to Plaintiffs' Motion to Disqualify Defendants' Counsel ("Opp."); Opp., Ex. C (Transcript of December 14, 2007 Deposition of Dr. Vance Wilson) ("Dec. 14, 2007 Watson Dep."); Opp., Ex. D (Transcript of May 31, 2007 Deposition of Dr. Watson) ("May 31, 2007 Watson Dep."); Opp., Ex. E (Transcript of July 26, 2007 Deposition of Sheila Zimmet) ("July 23, 2007 Zimmet Dep."); Transcript of June 26, 2007 Status Conference ("June 27, 2007 Tr."); defendants' Response to Alleged Conflict of Interest Issues [Docket No. 173] ("Defs.' Resp."); Affidavit of Defendant Vance E. Watson, M.D. [Docket No. 177] ("Watson Affid."); Iacangelo v. Georgetown Univ., Civil Action No. 05-2086, Memorandum Opinion and Order (D.D.C. June 27, 2007) ("June 27, 2007 Mem. Op. & Order"); id., Memorandum Opinion and Order (D.D.C. July 16, 2009) ("July 16, 2009 Mem. Op. & Order").

the Court concluded that most of plaintiffs' claims and contentions lack merit, it issued an Order on March 26, 2010, denying the motion to disqualify. This Opinion explains the reasons underlying that Order, and also discusses the one area where W&C may have a waivable conflict of interest that has not yet been waived by Dr. Watson and the process by which that waiver may be accomplished.

## I. BACKGROUND

### A. The Medical Treatment at Issue

This is a medical malpractice case concerning the care provided to Karyn A. Kerris, the daughter of plaintiffs Felice Iacangelo and Cicily Iacangelo, by defendant Dr. Vance Watson and Georgetown University Hospital ("Georgetown"). Ms. Kerris suffers from a bithalmic arteriovenous malformation ("AVM"), an abnormal tangle of veins and arteries in her brain through which blood does not flow properly. See Compl. ¶ 8. In 1998 and 1999, Dr. Watson attempted to treat this condition by utilizing a process known as "embolization," which involves using a glue-like substance to seal abnormal blood vessels off from healthy ones. See id. ¶¶ 8-9. As part of the embolization process, Dr. Watson combined two substances that would be applied to the AVM: Histoacryl, a glue, and Lipiodol, a poppyseed-oil mixture containing material that is visible in X-rays. Id. ¶ 9. Dr. Watson's treatment was not successful, and Ms. Kerris subsequently experienced damage to her brain that has incapacitated her. Id. ¶¶ 11-12.

Plaintiffs claim that at the time of the embolizations, Dr. Watson's combination of Histoacryl and Lipiodol was a "Class III[] medical device that had not been approved [by the FDA] and was thus illegal." Compl. ¶ 10(c). They further allege that Dr. Watson should have

2

obtained an investigational device exemption ("IDE") from the FDA and submitted to supervision by an institutional review board ("IRB") before combining and using the two substances in Ms. Kerris' brain. Id. ¶¶ 10(d), (j). In addition, at the time of the embolizations, Histoacryl was allegedly "the subject of a trade alert and had been seized by the FDA prior to its use on" Ms. Kerris. Id. ¶ 10(k).

The defendants claim that they followed proper procedures in obtaining and using Histoacryl. There is deposition testimony that in 1994, several years before treating Ms. Kerris, Dr. Watson consulted Sheila Zimmet, a lawyer employed by Georgetown, about the use of Histoacryl. Defs.' Resp. at 6. The exact content of that discussion between Dr. Watson and Ms. Zimmet is unclear, but it is reasonably certain that (1) Ms. Zimmet informed Dr. Watson that he did not require the approval or the supervision of the IRB in order to perform the embolizations on Ms. Kerris, id.; and (2) Dr. Watson properly inferred from Ms. Zimmet's comments and demeanor that his use of Histoacryl was permissible, even though Histoacryl was not yet FDA-approved. See Defs.' Resp. at 7; Dec. 14, 2007 Watson Dep. at 350.

Dr. Watson consulted Ms. Zimmet again in 1998 to learn "how best to achieve prompt importation of Histoacryl." Defs.' Resp. at 7. Dr. Watson had already spoken with a U.S. Customs agent about the issue and had "been provided with language to be used" in a letter to be presented to the FDA, known as a "letter of need." Id. Ms. Zimmet recommended that Dr. Watson send the letter to the FDA by fax so that it would arrive at the agency before the Histoacryl shipment went through Customs. Id. Dr. Watson successfully obtained the Histoacryl and used it in treating Ms. Kerris, giving rise to the current lawsuit.

3

### B. *Plaintiffs' Claims*

Plaintiffs' most recent amended complaint included, among its other claims, three counts of negligence *per se* by Dr. Watson and Georgetown. Plaintiffs claimed that Dr. Watson had violated 21 U.S.C. § 360c(a)(II) and 21 C.F.R. § 812.20(a)(2) by obtaining and using unapproved "artificial embolization devices" without obtaining an IDE from the FDA. Compl. ¶¶ 45-59; 69-72. According to plaintiffs, Dr. Watson also breached 21 U.S.C. §§ 331(a)-(c), (g) and (k) by receiving and combining Histoacryl and Lipiodol, two allegedly "adulterated and misbranded devices." Id. ¶¶ 60-68. Plaintiffs argued that by allegedly violating these laws, Dr. Watson had necessarily breached his duty to Ms. Kerris, causing her injuries. The Court disagreed with that argument and dismissed plaintiffs' negligence *per se* claims in Orders issued on September 30, 2008 and February 4, 2009. Iacangelo v. Georgetown Univ., Civil Action No. 05-2086, Order and Judgment (D.D.C. Sept. 30, 2008) [Docket No. 125]; id., Memorandum Opinion and Order (D.D.C. Feb. 4, 2009) [Docket No. 145]. There remain five still-viable claims for relief in plaintiffs' amended complaint: negligence, lack of informed consent, breach of warranty, fraud, and breach of fiduciary obligations. Compl. Counts I-V. Currently pending before the Court is a motion by defendants for partial summary judgment on the plaintiffs' informed consent, breach of warranty, and fraud claims. See Defendants' Motion for Summary Judgment on Counts II-IV of the Second Amended Complaint [Docket No. 143].

## C. The Conflict-of-Interest Issue

The possibility that Williams & Connolly might have a conflict of interest in this case was first raised by Anthony Newman, plaintiffs' counsel, at a deposition of Dr. Watson. Megan Hills, a Williams & Connolly lawyer defending both Georgetown and Dr. Watson, notified Magistrate Judge Alan Kay of Mr. Newman's allegations. On June 27, 2007, this Court held a status conference to discuss the situation with counsel.

At the status conference, Mr. Newman attempted to explain the potential conflict he perceived. Dr. Watson had described during his deposition the content of his discussions with Georgetown attorney Sheila Zimmet concerning the use of Histoacryl. Mr. Newman characterized Dr. Watson's description as follows: "Dr. Watson testified that . . . [Ms.] Zimmet . . . said, it's not illegal to use this stuff that is not approved and is being smuggled across the border. . . . Two, she said, you don't need to go through the Institutional Review Board." June 27, 2007 Tr. at 6. At that time, Ms. Zimmet had not yet been deposed, and Mr. Newman expressed concern that her account of her discussions with Dr. Watson, whatever it might be, would create problems for the defense. If she confirmed Dr. Watson's account, then "[t]here may be a defense Watson has[,] saying, look, I didn't mean to break any rules, I was told to do so." Id. at 10. Mr. Newman did not clearly articulate the conflict he believed would arise if Ms. Zimmet disputed Dr. Watson's account.

The Court framed the potential conflict problem this way: "Presumably, if Sheila Zimmet says I never said that to Watson, then Watson has a credibility problem. . . . Watson's counsel has to stand by Watson's credibility, but Watson's counsel also has to stand by Sheila

Zimmet's credibility since she [Zimmet] is a Georgetown employee." June 27, 2007 Tr. at 9.

Addressing W&C counsel, the Court elaborated:

> [I]f Sheila Zimmet[] says that what Watson says is true, . . . I'm not sure how the conflict comes out if she says it's true. If she says it's not true, then can you really . . . put both Watson and Zimmet[] on the stand, or does one of them need a different lawyer at trial[?]
>
> You've got two clients, Georgetown and Watson. Their interests are identical, unless a primary spokesperson for Georgetown [Zimmet] says that your other client isn't telling the truth. And we certainly can't find ourselves in a situation mid-trial where that happens.

Id. at 12-13. The Court also pointed out that if Ms. Zimmet were to deny Dr. Watson's account of their conversations, Georgetown might attempt to argue that Dr. Watson had acted on his own without authorization, thus obviating *respondeat superior* liability: "If I were representing Georgetown I would say, wait a minute, if this guy is off on a frolic of his own, isn't there some way we could get out of this?" Id. at 14. In light of those concerns, the Court ordered that Ms. Zimmet be independently represented at her deposition, and that W&C arrange for independent counsel to advise Dr. Watson on any potential conflicts of interest. See June 27, 2007 Mem. Op & Order at 2.

Ms. Zimmet subsequently was deposed, and the independent counsel engaged for Dr. Watson, George Clark, attended her deposition. Ms. Zimmet confirmed that she had told Dr. Watson that he could treat Ms. Kerris with Histoacryl without the approval of an IRB. July 23, 2007 Zimmet Dep. at 52-53. She was aware that Histoacryl was not FDA approved, that it was being imported from Canada for Dr. Watson's use, and that no IDE had been obtained from the

6

FDA. Id. at 60-61. She nevertheless did not object to Dr. Watson's plan for the treatment of Ms. Kerris. Id.

After Ms. Zimmet's deposition passed without apparent incident, the conflict-of-interest problem resurfaced when counsel for the defendants filed a motion to strike some of the plaintiffs' designated experts. Those experts claimed that "[d]efendant Georgetown's in-house counsel [Zimmet] violated the national standard of care by condoning and allowing the use and continued use of illegal, unapproved Class III devices without both an IDE and IRB approval." Iacangelo v. Georgetown Univ., Civil Action No. 05-2086, Memorandum Opinion of Magistrate Judge Alan Kay at 7 (D.D.C. June 17, 2008) (quoting plaintiffs' Opposition to Defendants' Emergency Motion to Extend the Deadlines for Defendants' Fed. R. Civ. P. 26(a)(2) Expert Disclosures and to Strike Plaintiffs' Expert Reports for Plaintiffs' Failure to Comply with Fed. R. Civ. P. 26(a)(2)(B), at 5) (internal quotation marks omitted). Judge Kay granted the motion to strike, and the plaintiffs moved for reconsideration. In their opposition to the motion for reconsideration, defendants argued that the testimony of the proffered legal experts regarding communications between Ms. Zimmet and Dr. Watson was irrelevant to this medical malpractice case: "As the health care provider at issue, Dr. Watson's decision to use a non-FDA approved device to treat a patient was his alone." Defendants' Opposition to Plaintiffs' Motion for Reconsideration of Magistrate Judge Kay's June 17, 2008 Order [Docket No. 116] at 3.

The Court found this assertion troubling because "the argument that the decision to use a non-FDA approved device was Dr. Watson's 'alone' — regardless of what Ms. Zimmet advised him or what anyone else at Georgetown may have said or done — only seems to reinforce the Court's initial view that a conflict of interest exists (or may in the future exist)

7

between Georgetown University and Dr. Watson." July 16, 2009 Mem. Op. & Order at 3. The Court reminded the defendants that they were to submit a report by Dr. Watson's independent counsel, which they had failed to do for over two years despite the Court's earlier order. Id. at 5. The Court also posed a series of questions for both W&C and George Clark, Dr. Watson's independent counsel. Among the questions was the following: "If the Court rules that testimony from Ms. Zimmet and others about her legal advice to Dr. Watson *is* relevant and will be admitted . . . , then will the defendants argue that Dr. Watson should not be held liable at all while their other client (Georgetown University) should be?" Id. at 4 (emphasis in original).

On July 31, 2009, George Clark submitted a report in which he stated that he found no conflicts of interest in W&C's representation of both Georgetown and Dr. Watson. See Report of Independent Counsel for Defendant Vance E. Watson, M.D. ¶ 2 [Docket No. 174]. On that same day, W&C filed responses to the questions posed by the Court. See Defs.' Resp. In addition, Dr. Watson filed an affidavit in which he averred, "I am satisfied with the representation I have received from Williams & Connolly and believe that it is not tainted by conflict of interest." Watson Affid. ¶ 8. He also stated, "I believe that I know any material risks and reasonably available alternatives to continued representation by Williams & Connolly. I agree to waive any conflict of interest." Id. ¶ 10.

## II. DISCUSSION

### A. *The Applicable Rule of Professional Responsibility*

According to the plaintiffs, Williams & Connolly's continued joint representation of both Georgetown and Dr. Watson violates Rule 1.7(a) of the District of Columbia Rules of

8

Professional Conduct. That Rule provides: "A lawyer shall not advance two or more adverse positions in the same matter." D.C. RULES OF PROF'L CONDUCT R. 1.7(a). It sets out "the limited circumstances in which representation of conflicting interests is absolutely prohibited even with the informed consent of all involved clients." D.C. RULES OF PROF'L CONDUCT R. 1.7, cmt. 1. While the prohibition of Rule 1.7(a) is "absolute," its "reach . . . is relatively narrow." D.C. Bar Legal Ethics Comm., Op. 217 (1991). The prohibition of Rule 1.7(a) "relates only to actual conflicts of position, not to mere formalities . . . [A] lawyer is not absolutely forbidden to provide joint or simultaneous representation if the clients' positions are only nominally but not actually adverse." D.C. RULES OF PROF'L CONDUCT R. 1.7(a), cmt. 6. According to the D.C. Bar's Legal Ethics Committee, Rule 1.7(a) applies only to situations where a lawyer *actually* asserts two incompatible arguments on behalf of two different clients on the same issue in the same proceeding:

> Rule 1.7(a) precludes a firm that takes a position on behalf of Client A from representing Client B in the same proceeding only if Client B actually takes or will take an adverse position on the issue. If the benefits of joint representation are sufficiently great or the likelihood of prevailing on a position that would increase its individual recovery is sufficiently small, each of the clients might after "consultation" choose to forgo such arguments. . . . Accordingly, if Client B chooses to forgo taking an adverse position on the particular issue, Rule 1.7(a) would be inapplicable by its terms. Rule 1.7(b) governs in any case in which simultaneous representation of clients with *potentially* adverse interests would not actually require the firm to take inconsistent positions in the same proceeding.

D.C. Bar Legal Ethics Comm., Op. 217 (emphasis added).

By this logic, Rule 1.7(a) would apply if, for example, W&C were representing both Georgetown and Dr. Watson, and proposed to argue during the course of the same trial both

9

that (1) administering the Histoacryl to Ms. Kerris was appropriate and legal, and (2) administering the Histoacryl to Ms. Kerris may have been illegal and inappropriate, and further that (3) only Georgetown, not Dr. Watson, bears any liability because Ms. Zimmet (Georgetown's lawyer) told the doctor he could use the substance. In contrast, Rule 1.7(a) would not apply where W&C *could* make both of those arguments but instead was making only Argument (1). In that case, Rule 1.7(b), not Rule 1.7(a), governs because W&C's two clients have potentially adverse interests but are not actually advancing adverse positions in the same proceeding. Rule 1.7(b) provides that "[E]xcept as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if . . . [s]uch representation will be or is likely to be adversely affected by representation of another client." D.C. RULES OF PROF'L CONDUCT R. 1.7(b).[2]

        This distinction matters for two reasons. First, Rule 1.7(b), unlike Rule 1.7(a), is not an absolute bar to representation where a conflict exists; the conflict may be "cured" if "[e]ach potentially affected client provides informed consent to such [joint or dual] representation after full disclosure of the existence and nature of the possible conflict and the

---

[2] Contrary to the arguments made in a motion recently filed by the plaintiffs, the decision in Vestal v. Hoffa, Civil Action Nos. 1832-71, 1313-71, 1237-71, 1718-71, & 2010-71, 1972 WL 865 (D.D.C. July 11, 1972), is not "the leading D.C. authority directly on point regarding disqualification from concurrent representation of defendants." Plaintiffs' Motion to Stay the Entry of Appearance of Jennifer L. Attrep, Esq. [Docket No. 190], at 3 n.1. The legal authority governing the disqualification question at issue in that case was not the District of Columbia's Rules of Professional Conduct or the professional code that preceded them, but Yablonski v. United Mine Workers of America, 448 F.2d 1175 (1971), a case discussing the propriety of a law firm's concurrent representation of a union and one of the union's officers. Yablonski itself did not purport to interpret the Rules of Professional Conduct, but instead applied the law of labor relations. See, e.g., Yablonski v. United Mine Workers of America, 448 F.2d at 1179-80. Because this case does not involve labor law, Yablonski and Vestal are of little relevance.

possible adverse consequences of such representation." D.C. RULES OF PROF'L CONDUCT R. 1.7(c). Second, because plaintiffs focus solely on Rule 1.7(a) in their motion to disqualify, they spend a great deal of time attempting to classify minor or perhaps nonexistent inconsistencies in the depositions of Dr. Watson and Ms. Zimmet as "adverse positions" advocated by W&C.

### B. The "Adverse Positions" Identified by Plaintiffs

The supposedly adverse positions cited by the plaintiffs in their motion to disqualify W&C may be organized into three sets. One set of "adverse positions" is composed of inconsistencies — or what plaintiffs unconvincingly present as inconsistencies — in defendants' case. A second set involves instances in the course of this litigation where, according to the plaintiffs, W&C has taken actions that will lead to one or more of its lawyers being called to the witness stand. The third set consists of only one assertion, the claim that Dr. Watson may have a defense that W&C may not present because it would work to Georgetown's disadvantage. Only this last claim requires serious attention.

#### 1. Inconsistencies in the Defendants' Case

Plaintiffs claim that W&C has advanced "adverse positions" because (1) Dr. Watson has said that Ms. Zimmet told him his use of Histoacryl was "legal," while Ms. Zimmet doesn't remember having conversations with Dr. Watson using the specific term "legality," see Mot. at 7-8; (2) Dr. Watson says he made the "'legal' distinction" in deciding IRB supervision of his Histoacryl use was unnecessary, while Ms. Zimmet says "she clarified the 'legal' distinction," see Mot. at 10; (3) Ms. Zimmet said that letters of need always must be used to obtain

11

unapproved devices for clinical use, and Dr. Watson did not use a letter of need to obtain the Histoacryl, Mot. at 11; and (4) Dr. Watson has said that there are serious medical risks associated with the use of embolization, while defendants have argued that there is no basis for identifying the embolizations of Ms. Kerris' AVM as the cause of the degeneration of her health.

Attempting to pursue their argument that Ms. Zimmet's deposition testimony conflicts with or refutes Dr. Watson's, the plaintiffs take statements contained in deposition transcripts out of context and then parse them to create the appearance of inconsistency. At one of his depositions, Dr. Watson said that, prior to his treatment of Ms. Kerris, he had "been told" by Ms. Zimmet that his use of Histoacryl was "not illegal." May 31, 2007 Watson Dep. at 128. The plaintiffs contend that Ms. Zimmet refuted this statement by saying that she had not discussed Histoacryl with Dr. Watson "in terms of legality." July 23, 2007 Zimmet Dep. at 77-78.

The Court finds that the statements of Dr. Watson and Ms. Zimmet regarding this issue are not inconsistent when viewed in context. Dr. Watson explained that his discussion of Histoacryl with Ms. Zimmet occurred when he asked her if he needed to obtain IRB approval and supervision, and she said no. See May 31, 2007 Watson Dep. at 129-30. Ms. Zimmet's account of their discussion is similar. See July 23, 2007 Zimmet Dep. at 52. Dr. Watson never claimed that Ms. Zimmet used the specific term "legal" or "legality"; in fact, he has vehemently denied that she did so. See Dec. 14, 2007 Watson Dep. at 354-55. Instead, he has said that he inferred from his general discussion of Histoacryl with her that he was permitted to use it; he assumed that she would have stopped him if he was not so permitted. Id. at 358-59. Similarly, Ms. Zimmet stated that she "indicated [to Dr. Watson] that . . . it seem[ed] to her that the FDA was

12

acquiescing to clinical use [of Histoacryl] in medical practice." July 23, 2007 Zimmet Dep. at 78.[3]

Plaintiffs next assert that the defendants have presented inconsistent claims about the proper means of obtaining Histoacryl. The defendants have said that "Georgetown and Dr. Watson and . . . Ms. Zimmet[] have always asserted that the Letter of Need procedure was the appropriate procedure to follow when, as here, the intended use is individual patient care and not for research." Mot. at 11 (citing Defs.' Resp. at 3) (internal quotation marks omitted). Dr. Watson has said that in obtaining Histoacryl in the past, he found that "[s]ometimes you needed [a letter of need]," and "[s]ometimes you didn't." Mot. at 11 (citation and internal quotation marks omitted). According to the plaintiffs, these statements by Dr. Watson, combined with the defendants' inability to locate the letter of need allegedly used in Ms. Kerris' case, demonstrate conclusively that no letter of need was used to obtain the Histoacryl for Ms. Kerris, and therefore contradict the defendants' representations.

This contention is really just a preview of one of plaintiffs' arguments on the merits, and it does not present an example of any "adverse positions" espoused by W&C, or even any necessarily inconsistent statements by the defendants. Dr. Watson's statement that "[s]ometimes you needed [letters of need]," and "[s]ometimes you didn't" referred to his experiences obtaining Histoacryl for various patients after he arrived at Georgetown in 1994.

---

[3] The plaintiffs also claim that there is a dispute regarding "who made the decision to forego IRB review and upon whose word did they rely," Mot. at 10, but the Court cannot discern any inconsistency in the depositions on this point. Both Dr. Watson and Ms. Zimmet have said that, after he told her that he would be using Histoacryl to treat a patient, she told him that IRB involvement was unnecessary. See July 23, 2007 Zimmet Dep. at 52; May 31, 2007 Watson Dep. at 129-30.

13

See May 31, 2007 Watson Dep. at 138. Dr. Watson said that in many instances, Histoacryl was available at the hospital, having been procured by someone else, and that he only had to prepare letters of need to obtain additional Histoacryl in some cases. Id. at 134-36. He has also said that, to a degree of "very, very reasonable certainty," he believes he did use a letter of need to obtain the Histoacryl in Ms. Kerris' case. Dec. 14, 2007 Watson Dep. at 370. There is no conflict between Dr. Watson and Georgetown on this point. Plaintiffs argue that Dr. Watson failed to procure a letter of need in Ms. Kerris' case, see Mot. at 12; both Georgetown and Dr. Watson disagree. See Opp. at 16-17.

Finally, plaintiffs say that a conflict of interest exists because Dr. Watson has admitted that "embolization procedures using the Lipiodol and Histoacryl mixture" carry "significant, great risks — including a high rate of failure, death, stroke, neurologic worsening," while the defendants have argued in their briefs that "[t]here is no basis for asserting that the embolization allegedly caused Ms. Kerris to suffer permanent injury." Mot. at 17. This claim by the plaintiffs, again, is more of an argument on the merits than it is an assertion about conflict of interest. The defendants do not claim that embolization is not risky. See Opp. at 23. Rather, they claim that any possible risks "did not materialize." Opp. at 8.

2. Testimony by Williams & Connolly Lawyers

In two of their arguments, plaintiffs claim that W&C has a conflict of interest because W&C lawyers may need to be called to the witness stand at trial to explain inconsistencies in their case. The plaintiffs point out that in an affidavit prepared for Dr. Watson to sign, W&C inaccurately summarized the warnings Dr. Watson had given to Ms. Kerris,

writing that he had told her that a prior patient had died "after experiencing complications associated" with embolization. Mot. at 12. In fact, the complications "weren't really associated with the procedure," as Dr. Watson later explained in a deposition. Id. Instead, they resulted from a subsequent surgical procedure. May 31, 2007 Watson Dep. at 98-99. Regardless of the reason for the difference between what Dr. Watson's affidavit says and what he himself said at a deposition, plaintiffs assert that "the veracity of the Declaration versus the veracity of Dr. Watson is at issue. . . . Plaintiffs will have to 'flesh out' the facts at trial by calling both Dr. Watson and the lawyer(s) from Williams & Connolly who drafted the document to the stand." Mot. at 13.

Contrary to the plaintiffs' claims, there is no reason to suppose that any lawyers from W&C would be necessary witnesses at trial to address this issue. To the extent that there are discrepancies between Dr. Watson's affidavit and his deposition testimony, plaintiffs are free to explore them and their reasons for them in cross-examining Dr. Watson. The jury will decide if his explanations affect its view of his credibility. There is no "adverse position" here, since W&C agrees with Dr. Watson's clarification of his affidavit. See Opp. at 20.

Plaintiffs also complain that W&C did not show Dr. Watson the documents that the law firm intended to file as exhibits to his affidavit before asking him to sign the affidavit. Mot. at 14. It appears, however, that Dr. Watson did review the exhibits, but did not understand the way that they were numbered. See May 31, 2007 Watson Dep. at 150; Opp. at 21. Here, too, the plaintiffs claim that they will need to call a W&C lawyer as a witness at trial to "establish whether the exhibits were attached to the Declaration when Dr. Watson executed it and whether they were in error and/or did not relate to the issue for which they were cited." Id. at 14. Again, it is difficult to imagine why the Court would permit the plaintiffs to call defendants' counsel to

15

the witness stand to testify on this issue. It is utterly irrelevant to the merits of the case, is easily explained, and, at most, goes to Dr. Watson's attention to detail (and hence his credibility); there is no conflict or adversity.

### 3. Failure to Present a Complete Defense of Dr. Watson

Plaintiffs argue that by moving to strike the plaintiffs' legal experts, W&C demonstrated that they will neglect a defense available to Dr. Watson — the argument that Dr. Watson reasonably relied on Ms. Zimmet to tell him if obtaining and using the Histoacryl was legal or involved possible violations of law. See Mot. at 17. This is a legitimate concern. If the legality of Dr. Watson's acquisition and use of Histoacryl became relevant at trial, it is conceivable that he could limit or eliminate his own liability by explaining that he behaved as any reasonable practitioner would have: he consulted with and received the approval of in-house counsel before treating Ms. Kerris with a substance unapproved by the FDA. Of course, if Dr. Watson testified in this fashion, he could undermine Georgetown's position that Ms. Zimmet's advice was absolutely correct. See Defs.' Resp. at 9. Georgetown thus has an interest in not presenting this defense that Dr. Watson does not, presenting a potential conflict of interest problem for W&C.

The Court alluded to this concern in its July 16, 2009 Memorandum Opinion: "If the Court rules that testimony from Ms. Zimmet and others about her legal advice to Dr. Watson *is* relevant and will be admitted . . . , then will the defendants argue that Dr. Watson should not be held liable at all while their other client (Georgetown University) should be?" July 16, 2009 Mem. Op. & Order at 4 (emphasis in original). W&C evaded this question in the response it

16

filed with the Court on July 31, 2009. While arguing that the Court should not admit any evidence regarding alleged statutory or regulatory violations, W&C did not provide assurances that in representing Dr. Watson it will present all defenses open to him:

> There was no violation of FDA rules or regulations and the care provided was state of the art, standard of care therapy. . . . The Court instructs the jury on the law and the Court has already dismissed the Counts [for negligence *per se*] based on alleged violations of FDA regulations. Thus, any testimony about this issue — from any witness — should be excluded as it is no longer part of this case.

Defs.' Resp. at 9.

It is true, as W&C asserts, that plaintiffs' negligence *per se* claims already have been dismissed, so that plaintiffs cannot prove that Dr. Watson was negligent simply by demonstrating that he violated FDA regulations or the FDCA. At the same time, W&C ignores the fact that statutory or regulatory provisions may well be relevant for the purpose of defining the standard of care in a negligence case, and that violations of those provisions, even when they do not establish negligence *per se*, may still be some evidence of negligence. See RESTATEMENT (SECOND) OF TORTS § 288B ("The unexcused violation of an enactment or regulation [not adopted as defining the standard of care] may be relevant evidence bearing on the issue of negligent conduct."). From W&C's responses to the Court's questions, it seems clear to the Court — if not to Dr. Watson or his independent counsel — that if evidence of alleged statutory or regulatory violations is admitted at trial, W&C nevertheless will decline to present any sort of "reasonable reliance" defense on Dr. Watson's behalf: "Should this issue need to be litigated . . . Defendants will present a united front." Defs.' Resp. at 9. W&C says:

17

> If there is any discussion of FDA regulations, counsel will tell the jury that Dr. Watson was correct in his decision to use Histoacryl and Lipiodol on a case-by-case basis to treat patients without an IDE or IRB supervision, and that a Letter of Need was appropriate to import the devices. Ms. Zimmet never instructed Dr. Watson otherwise.

Id.

Since it is apparent from their filings that W&C has no intention of presenting evidence of the reasonable reliance defense on behalf of Dr. Watson or arguing it to the jury,[4] two questions remain: (1) Can the Court be satisfied that Dr. Watson has been made aware of this possible defense by W&C or by Mr. Clark and that he knowingly, voluntarily and intelligently consented to forgo it? And (2) how valuable is this potential defense — so valuable that the Court cannot permit Dr. Watson to waive it by keeping W&C as his counsel? As to the first question, the Court has seen nothing in the voluminous filings by W&C on the conflict-of-interest issue to convince it that someone has clearly explained to Dr. Watson that a reasonable reliance defense may exist, and that he must give it up if he wishes to retain W&C as his counsel. Dr. Watson's affidavit, in which he purports to waive any conflict of interest faced by W&C, makes no mention of this issue. Neither does the report of Mr. Clark, the independent counsel secured for Dr. Watson by W&C. In fact, Mr. Clark affirms that W&C's representation of Georgetown and Dr. Watson "is not an instance where one commonly represented defendant is trying to blame the other for any alleged liability." Report of Independent Counsel ¶ 29. It appears that Mr. Clark has not contemplated the possibility that it could conceivably be in Dr. Watson's interest to blame Georgetown.

---

[4] The Court will, of course, confirm this with counsel at a hearing in open court before the case proceeds to trial.

One of the legal ethics experts who has written a report in support of W&C's opposition to the motion to disqualify declares that Mr. Clark "has specifically disclaimed on Dr. Watson's behalf the claim that 'Georgetown gave him "bad advice" with respect to whether he had to go to the IRB or with respect to how to import Histoacryl from Canada.'" Opp., Ex. B (Declaration of Hamilton P. Fox III) at 16 (citation omitted). With all due respect to this acknowledged expert in the field of legal ethics, this statement is not accurate. Mr. Clark has promised that Dr. Watson *will not assert* that Georgetown gave him "bad advice." See Report of Independent Counsel ¶¶ 17, 31, 34. He has not said that he explained a possible reasonable reliance defense to Dr. Watson and that Dr. Watson agreed to forgo that defense in order to retain W&C as his counsel.

Dr. Watson has not, then, provided satisfactory assurance that he understands and does not wish to assert the reasonable reliance defense. He should be permitted an opportunity to do so. As explained above, conflicts of interest governed by Rule 1.7(b) of the District of Columbia Rules of Professional Conduct may be waived by the client under Rule 1.7(c) "[i]f the benefits of joint representation are sufficiently great or the likelihood of prevailing on a position that would increase [his] individual recovery is sufficiently small." D.C. Bar Legal Ethics Comm., Op. 217. While one may debate whether the reasonable reliance defense is likely to be of help to Dr. Watson, Dr. Watson needs to be fully advised before the Court can conclude that he has given *informed* consent and wishes to forgo the defense and retain W&C as his counsel.

19

## III. CONCLUSION

W&C's decision not to present the reasonable reliance defense — and the firm's failure to provide assurances that Dr. Watson knows he is forgoing such a defense by retaining W&C as his counsel — creates the only potential conflict-of-interest issue that merits serious attention. Accordingly, the Court will hold a hearing at which it will inquire of Mr. Clark and lead trial counsel for the defendants whether they have discussed the reasonable reliance defense with Dr. Watson. It will also address Dr. Watson directly and explain to him the reasonable reliance defense. The Court will advise Dr. Watson that while it does not know how strong the defense is or even whether the defense will be relevant at trial, Dr. Watson is certainly giving it up if he chooses to be represented by W&C. The Court will then inquire whether Dr. Watson is prepared to forgo that defense in order to stay with W&C. An Order providing for the scheduling of the necessary hearing will issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: May 7, 2010